No. 26-1101

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## BRIEF OF APPELLANTS
## (ORAL ARGUMENT REQUESTED)

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026                                              *Counsel for Appellants*

**TABLE OF CONTENTS**

Table of Authorities...........................................................................................iii

Statement of Related Cases ...............................................................................1

Statement of Jurisdiction ...................................................................................1

Statement of the Issues .....................................................................................1

Statement of the Case........................................................................................3

    I.     The First Amendment and public accommodations. .....................................3

    II.    Colorado adopts H.B. 25-1312 to punish dissenting views on sex and gender. ............................................................................................................4

        A.    The Colorado Anti-Discrimination Act....................................................5

        B.    H.B. 25-1312's new "gender expression" and "chosen name" definitions. ...................................................................................................7

        C.    The Unwelcome Provision and the Unwelcome Statements Provision. .....................................................................................................9

    III.   Plaintiffs filed this lawsuit to protect their rights and their members' rights. .........................................................................................................10

    IV.   The district court says Plaintiffs lack standing. ........................................17

Summary of Argument.....................................................................................20

Argument........................................................................................................22

    I.     Plaintiffs likely have standing to seek a preliminary injunction.....................23

        A.    Standing is a low bar in pre-enforcement First Amendment cases. ..24

        B.    Plaintiffs' speech is chilled by a credible threat of enforcement. .......26

        C.    The district court's contrary rationales get the law and the facts wrong. ......................................................................................................33

    II.    Because Plaintiffs have standing, this Court should grant a preliminary injunction. .................................................................................................43

        A.    Defendants forfeited any argument on the merits .............................44

        B.    In any event, CADA's speech prohibitions are unconstitutional.......45

        C.    The remaining factors favor a preliminary injunction. ........................48

        D.    A tailored preliminary injunction is appropriate here. .........................50

Conclusion .....................................................................................................52

Statement in Support of Oral Argument............................................................................54

Certificate of Compliance ...................................................................................................55

Certificate of Service...........................................................................................................55

Attachment A: District Court's Order Adopting Magistrate Judge
Recommendation ......................................................................................................5-App-149

Attachment B: Recommendation of United States Magistrate Judge..............5-App-021

Attachment C: Transcript of United States Magistrate Judge's Oral
Recommendation ......................................................................................................5-App-117

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
    385 F. Supp. 3d 1147 (D. Colo. 2019) ........................................................5

*303 Creative LLC v. Elenis*,
    6 F.4th 1160 (10th Cir. 2021) ...........................6, 10, 23-25, 28-29, 31-32, 39, 47-48

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ...........................................3-5, 7, 19, 21, 24, 30, 48

*303 Creative LLC v. Elenis*,
    725 F. Supp. 3d 1235 (D. Colo. 2024) ........................................................52

*Am. Encore v. Fontes*,
    152 F.4th 1097 (9th Cir. 2025) ........................................................38

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) ........................................................28

*Arizona v. Yellen*,
    34 F.4th 841 (9th Cir. 2022) ........................................................40

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ........................................................50

*Babbitt v. United Farm Workers Nat. Union*,
    442 U.S. 289 (1979) ........................................................25

*Brown v. Kemp*,
    86 F.4th 745 (7th Cir. 2023) ........................................................37

*Bryant v. Woodall*,
    1 F.4th 280 (4th Cir. 2021) ........................................................27-28, 41

*California Pro-Life Council v. Getman*,
    328 F.3d 1088 (9th Cir. 2003) ........................................................25

*CDIA v. King*,
    678 F.3d 898 (10th Cir. 2012) ........................................................52

*Cerame v. Slack*,
    123 F.4th 72 (2d Cir. 2024) ........................................................40, 41

*Chiles v. Salazar*,
    116 F.4th 1178, (10th Cir. 2024) ........................................................25, 29

*Chiles v. Salazar*,
    146 S. Ct. 1010 (2026) ........................................................4, 25, 30, 39

*Christian Healthcare Ctrs. v. Nessel,*
117 F.4th 826 (6th Cir. 2024) ..............................8, 25, 35, 39, 43, 46

*Citizens for Responsible Gov't. v. Davidson,*
236 F.3d 1174 (10th Cir. 2000) ...........................................................37

*Citizens United v. Gessler,*
773 F.3d 200 (10th Cir. 2014) ...................................................... 22, 48

*Coalition of Concerned Citizens To Make Art Smart v. FTA,*
843 F.3d 886 (10th Cir. 2016) .............................................................26

*Craig v. Masterpiece Cakeshop,*
370 P.3d 272 (Colo. Ct. App. 2015) ......................................................6

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019).......................................................... 43, 51

*Darren Patterson Christian Acad. v. Roy,*
699 F. Supp. 3d 1163 (D. Colo. 2023) ............................27, 30, 40, 45

*Defending Education v. Olentangy Loc. Sch. Dist. BoE,*
158 F.4th 732 (6th Cir. 2025) (en banc)...................1, 11, 25, 45-46

*Doe v. Mut. of Omaha Ins. Co.,*
179 F.3d 557 (7th Cir. 1999)...............................................................39

*Elrod v. Burns,*
427 U.S. 347 (1976)..............................................................................49

*FEC v. Cruz,*
596 U.S. 289 (2022)..............................................................................37

*Fischer v. Thomas,*
52 F.4th 303 (6th Cir. 2022) ........................................................ 30, 42

*Fish v. Kobach,*
840 F.3d 710 (10th Cir. 2016) .............................................................45

*Free the Nipple v. Fort Collins,*
916 F.3d 792 (10th Cir. 2019) ..................................... 20, 22, 49-51

*Gays Against Groomers v. Garcia,*
169 F.4th 981 (10th Cir. 2026) ...........................................................25

*Griffin v. Bryant,*
30 F. Supp. 3d 1139 (D.N.M. 2014)....................................................47

*Hager v. Brinker Texas, Inc.,*
102 F.4th 692 (5th Cir. 2024) ....................................................35-36, 39

*Hobby Lobby Stores v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ..................................................................23

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ....................................................................................23

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) .............................................................1, 4, 45, 47

*Idaho Org. of Res. Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) .......................................................28

*iMatter Utah v. Njord*,
774 F.3d 1258 (10th Cir. 2014) ..................................................................44

*In re McGough*,
737 F.3d 1268 (10th Cir. 2013) ..................................................................35

*Inst. for Free Speech v. Johnson*,
148 F.4th 318 (5th Cir. 2025) .....................................................................38

*Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*,
601 F.2d 809 (5th Cir. 1979) ......................................................................28

*IRI v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ...........................................................26, 43

*Janus v. AFSCME*,
585 U.S. 878 (2018) ...................................................................................25

*Koon v. Reynolds*,
649 F. Supp. 3d 14 (D.N.J. 2023) ...............................................................29

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ...................................................................26

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ..................................................................................50

*Latta v. Otter*,
2014 WL 12597162 (D. Idaho May 14) ......................................................50

*Leverington v. Colorado Springs*,
643 F.3d 719 (10th Cir. 2011) ....................................................................44

*Masterpiece Cakeshop v. CCRC*,
584 U.S. 617 (2018) ..............................................................3-4, 6, 21, 29

*Masterpiece Cakeshop v. Elenis*,
445 F. Supp. 3d 1226 (D. Colo. 2019) ..................................................28, 31

*Masterpiece Cakeshop v. Scardina*,
  556 P.3d 1238 (Colo. 2024) ................................................................30

*Matal v. Tam*,
  582 U.S. 218 (2017) ............................................................................47

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021).........................................................1, 54

*Minn. Voters All. v. Mansky*,
  585 U.S. 1  (2018) ...............................................................................48

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ...................................................................... 22, 26

*Nat. Ass'n for Gun Rights v. Polis*,
  173 F.4th 1317 (10th Cir. 2026) .........................................................22

*NOM v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ...............................................................38

*Peace Ranch v. Bonta*,
  93 F.4th 482 (9th Cir. 2024) ....................................................... 29, 38

*Peck v. McCann*,
  43 F.4th 1116 (10th Cir. 2022) .................................24, 27, 29, 42

*Planned Parenthood of Kansas v. Andersen*,
  882 F.3d 1205 (10th Cir. 2018) ..........................................................44

*Pryor v. Sch. Dist. No. 1*,
  99 F.4th 1243 (10th Cir. 2024) ...........................................................49

*Reno v. ACLU*,
  521 U.S. 844 (1997)............................................................................24

*Riley v. Nat'l Fed'n of the Blind*,
  487 U.S. 781 (1988).............................................................................3

*Rio Grande Found. v. Oliver*,
  57 F.4th 1147 (10th Cir. 2023) ...........................................................24

*Rocky Mountain Gun Owners v. Polis*,
  121 F.4th 96 (10th Cir. 2024) ...........................................29, 40, 41

*San Francisco v. Trump*,
  783 F. Supp. 3d 1148 (N.D. Cal. 2025)...............................................37

*SBA List v. Driehaus*,
  573 U.S. 149 (2014)................................. 23-25, 27-28, 31-32, 43

*Scott v. Allen*,
   153 F.4th 1088 (10th Cir. 2025) ................................................................21, 24, 25

*Speech First v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ................................................................................46

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ....................................................................................28

*St. Mary Catholic Parish v. Roy*,
   154 F.4th 752 (10th Cir. 2025) ................................................................................30

*St. Mary Catholic Parish v. Roy*,
   2026 WL 1052111 (U.S. Apr. 20, 2026) ................................................................30

*Tingley v. Ferguson*,
   47 F.4th 1055 (9th Cir. 2022) ..................................................................................25

*Turtle Island Foods, S.P.C. v. Strain*,
   65 F.4th 211 (5th Cir. 2023) ....................................................................................37

*United Food & Com. Workers Union v. Brown Grp*,
   517 U.S. 544 (1996) ..................................................................................................23

*United States v. Lesh*,
   107 F.4th 1239 (10th Cir. 2024) ..............................................................................45

*United States v. Stevens*,
   559 U.S. 460 (2010) ..................................................................................................38

*United States v. Texas*,
   144 S. Ct. 797 (2024) ................................................................................................50

*United States v. Williams*,
   553 U.S. 285 (2008) ..................................................................................................46

*Ute Indian Tribe. v. Lawrence*,
   22 F.4th 892, 908 (10th Cir. 2022) ..........................................................................43

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ..................................................................................................52

*Verlo v. Martinez*,
   820 F.3d 1113 (10th Cir. 2016) ....................................................................20, 44, 45

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ..........................................................................................27-29, 41

*Ward v. Utah*,
   321 F.3d 1263 (10th Cir. 2003) ................................................................................24

*West Alabama Women's Ctr. v. Williamson*,
  900 F.3d 1310 (11th Cir. 2018) ...................................................................37

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ...................................................................... 22-23

**Statutes & Regulations**

Colo. Rev. Stat. §24-34-301 ............................................. 2, 6-10, 16, 21, 34-36, 45-46, 51

Colo. Rev. Stat. §24-34-306 ..................................................................... 7, 28, 31

Colo. Rev. Stat. §24-34-600.3 .......................................................................... 6

Colo. Rev. Stat. §24-34-601 ........................................... 2, 5-10, 16, 19, 34-36, 47

Colo. Rev. Stat. §24-34-605 .......................................................................... 7

Colo. Rev. Stat. §24-34-701 ............................................... 2, 10, 16, 34, 47

H.B. 25-1312, 2025 Colo. Sess. Laws ch. 205 ............................................................5

3 C.C.R. 708-1:81.6 ......................................................................51

**Other Authorities**

*Objectionable*, Merriam-Webster Dictionary (archived May 11, 2025) ..............................10

*Unwelcome*, Merriam-Webster Dictionary (archived May 11, 2025) ...............................10

## STATEMENT OF RELATED CASES

This appeal has been partially procedurally consolidated with the appeals in *Committee of Five v. Sullivan*, 26-1103, and *Doxa Enterprises v. Sullivan*, 26-1104.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs allege violations of the First and Fourteenth Amendments. This Court has jurisdiction under 28 U.S.C. §1292(a)(1) because Plaintiffs appeal from an order denying injunctive relief. The district court entered that order on March 31, 2026, and Plaintiffs appealed the next day. *See* 5-App-149, 173; FRAP 4(a)(1)(A).

## STATEMENT OF THE ISSUES

"Our society continues to debate whether biological pronouns are appropriate or offensive—just as it continues to debate many other issues" surrounding sex and gender. *Defending Education v. Olentangy Loc. Sch. Dist. BoE*, 158 F.4th 732, 738 (6th Cir. 2025) (en banc). One side believes that sex is fixed and that people should use language that reflects biology; the other believes gender is subjective and that people should use so-called gender-affirming language like "preferred pronouns." *Meriwether v. Hartop*, 992 F.3d 492, 508-09 (6th Cir. 2021). The First Amendment prohibits the State from "skew[ing] this debate by forcing one side to change the way it conveys its message or by compelling it to express a different view." *Olentangy*, 158 F.4th at 738; *see Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995). Yet Colorado has amended its anti-discrimination laws to do exactly that: require those who operate in a place of public accommodation to use a person's "chosen name" and other forms

1

of "addres[s]" that affirm the person's gender identity and prohibit them from making any statements that make those individuals feel "unwelcome." Colo. Rev. Stat. §§24-34-301(9), 601(2)(a), 701.

Plaintiffs, who frequently host events in places of public accommodation and operate public-facing medical practices in Colorado, want to use biologically accurate language when they address people, regardless of the other person's gender identity. But they must stay silent now because the Colorado Anti-Discrimination Act makes that speech illegal. The district court, however, found that Plaintiffs do not have standing to seek a preliminary injunction against Colorado's speech bans.

The issues presented in this appeal are:

**1.** CADA as amended by H.B. 25-1312 arguably prohibits Plaintiffs' speech, Defendants have not disavowed enforcement, and Defendants have used CADA to punish similar speech in the past. Do Plaintiffs have standing?

**2.** In the district court, Defendants declined to respond to Plaintiffs' arguments regarding CADA's constitutionality, so they have forfeited the merits. Thus, if the Court agrees that Plaintiffs likely have standing, should it grant a preliminary injunction?

**3.** Alternatively, this Court can resolve the merits itself because CADA's constitutionality presents a pure legal question and Colorado has declined to satisfy its burden to establish the law's constitutionality. Does CADA likely violate the First and Fourteenth Amendments because it compels speech, discriminates based on content and viewpoint, is overbroad, and is vague?

2

**4.** In First Amendment cases, the likelihood of success on the merits is usually the determinative factor. Do the remaining preliminary-injunction factors favor an injunction because Plaintiffs likely have standing and Defendants have forfeited the merits?

## STATEMENT OF THE CASE

### I.   The First Amendment and public accommodations.

"The framers designed the … First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023). They did so because "the freedom of speech" is both "'an end'" and a "'means.'" *Id.* "'An end because the freedom to think and speak is among our inalienable human rights,'" and a "means because the freedom of thought and speech is 'indispensable to the discovery and spread of political truth.'" *Id.* The First Amendment thus protects "an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." *Id.* at 586 (cleaned up). It also protects the right "*not* to" speak. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 797 (1988). At bottom, the government "may not compel a person to speak its own preferred messages." *303 Creative*, 600 U.S. at 586.

These principles apply with equal force in places of public accommodation. *Id.* at 592 ("[N]o public accommodations law is immune from the demands of the Constitution."); *Masterpiece Cakeshop v. CCRC*, 584 U.S. 617, 655-56 (2018) (Thomas, J.,

concurring) ("When a public-accommodations law has the effect of declaring speech itself to be the public accommodation, the First Amendment applies with full force."). Indeed, the Supreme Court has consistently affirmed that, "whatever state law may demand," business owners, event hosts, professionals, and others who operate in a place of public accommodation have "a First Amendment right to present their message undiluted by views they d[o] not share." *303 Creative*, 600 U.S. at 585-86 (citing *Hurley*, 515 U.S. at 572-73).

Unfortunately, Colorado has taken a different path. The State has repeatedly tried to use its anti-discrimination laws to coerce protected speech. Worse, it has done so specifically to silence opposing voices on issues of sex and gender, arguing that it could force a baker and a website designer to make custom products endorsing same-sex marriage, *Masterpiece*, 584 U.S. at 625-30; *303 Creative*, 600 U.S. at 580-83, and punish therapists who engage in conversations with patients concerning gender identity, *Chiles v. Salazar*, 146 S. Ct. 1010, 1017-18 (2026). These activities, the Supreme Court has explained, are "'pure speech,'" and Colorado cannot use its anti-discrimination laws to coerce "'expressive activity.'" *303 Creative*, 600 U.S. at 587-92; *see Masterpiece*, 584 U.S. at 631-33; *Chiles*, 146 S. Ct. at 1022-24.

## II.   Colorado adopts H.B. 25-1312 to punish dissenting views on sex and gender.

Unfortunately, Colorado still has not taken the Supreme Court's lessons to heart. A year ago, the State enacted another law—House Bill 25-1312—designed to promote

gender ideology (the notion that a person's gender can change) and suppress dissenting speech that does not affirm a person's self-professed gender identity. *See* H.B. 25-1312, 2025 Colo. Sess. Laws ch. 205. Most pertinently, Section 8 of H.B. 25-1312 amends Colorado's Anti-Discrimination Act (CADA), which regulates those who operate in places of public accommodation, to compel Coloradans to refer to transgender individuals using state-approved language.

### A.    The Colorado Anti-Discrimination Act

CADA is Colorado's "anti-discrimination framework governing public accommodations, housing, employment, club licensing, juror service, and various other incidents of daily life." *303 Creative*, 385 F. Supp. 3d 1147, 1162 (D. Colo. 2019). In its existing provisions governing activity in places of public accommodation, the law prohibits discrimination on the basis of "sexual orientation, gender identity, gender expression," and other protected characteristics:

> It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. Colo. Rev. Stat. §24-34-601(2)(a).

CADA "defines a 'public accommodation' broadly." *303 Creative*, 600 U.S. at 580-81. It includes "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the

public." Colo. Rev. Stat. §24-34-600.3. In fact, the only kind of venue the law does *not* claim to regulate is facilities "principally used for religious purposes." *Id.* §24-34-600.3(1)(b).

CADA, moreover, does not directly prohibit discrimination *by* a place of public accommodation. Rather, the law prohibits discrimination by "a person" who operates "in" a place of public accommodation. *Id.* §24-34-601(titled "Discrimination *in* places of public accommodation" (emphasis added)). Specifically, it is "unlawful" for "*a person*" to do something that "deni[es]" someone "the full and equal enjoyment … *of* a place of public accommodation." *Id.* §24-34-601(2)(a) (emphasis added). And the term "person" in CADA includes "individuals, limited liability companies, partnerships, associations, corporations," or their "legal representatives." *Id.* §24-34-301(15)(a). Thus, anyone who, while operating in a place of public accommodation, "directly or indirectly" engages in conduct or speech that denies someone else "equal enjoyment of" anything offered by a place of accommodation is potentially liable. *Id.* §24-34-601(2)(a). In *Masterpiece*, for example, Colorado pursued charges of discrimination against the bakery owner "personally," in addition to the bakery itself, because "he was the person whose conduct was at issue." 370 P.3d 272, 278 (Colo. Ct. App. 2015); *see also* 2-App-246-48.

"CADA provides several different means of enforcement." *303 Creative*, 6 F.4th 1160, 1169 (10th Cir. 2021). Relevant here, "CADA establishes an administrative system for the resolution of discrimination claims." *Masterpiece*, 584 U.S. at 628. Those who feel they have been subjected to discrimination can file a charge with the Colorado Civil

Rights Division. Colo. Rev. Stat. §24-34-306(1)(a)(I). The Colorado Civil Rights Commission, individual Commissioners, or the Colorado Attorney General can also file charges on their own, without an aggrieved party, if they think an "alleged discriminatory or unfair practice imposes a significant societal or community impact." *Id.* §24-34-306(1)(b). When a charge is filed, the Division "investigat[es]" and, upon a determination of probable cause, can issue orders compelling individuals to "participate in compulsory mediation." *Id.* §24-34-306(2)(a), (2)(b)(II). If mediation does not succeed, the Commission can "requir[e]" them "to answer the charges at a formal hearing." *Id.* §24-34-306(4). And if the Commission finds a violation, it can order the respondent to "cease and desist" their speech. *Id.* §24-34-306(9). It can also order them to file compliance reports, *id.* §24-34-605, "participat[e] in mandatory educational programs," *303 Creative*, 600 U.S. at 581, and "take" other "affirmative action[s]," *id.* §24-34-605.

## B. H.B. 25-1312's new "gender expression" and "chosen name" definitions.

"Gender expression" is one of CADA's many protected categories. Before H.B. 25-1312, its definition was limited to appearance and conduct: "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior." Colo. Rev. Stat. §24-34-301(9) (eff. May 25, 2023). Thus, a business could not deny someone access or services because that person's dress or appearance did not conform to their biological sex. *See id.* §24-34-601(2)(a); *cf. 303 Creative*, 600 U.S. at 594-95, 597-98.

7

H.B. 25-1312 amends that definition to include the use of a "chosen name" and "how the individual chooses to be addressed." *See* Colo. Rev. Stat. §24-34-301(9) (eff. May 16, 2025). And it further defines "chosen name" to mean any "name that an individual requests to be known as in connection to" their "gender identity, gender expression," or other protected category. *Id.* §24-34-301(3.5) (eff. May 16, 2025).

In other words, in addition to liability for denying access or services, those who operate in a place of public accommodation are now liable if they refuse to "addres[s]" or refer to someone using their "chosen name," preferred pronouns, or other gender-affirming terms. If the speaker instead addresses or refers to a transgender-identifying individual using biologically accurate pronouns, birth names, or other non-gender-affirming terms—i.e., if the speaker "deadnames" or "misgenders" them, as proponents of H.B. 25-1312 call it—they have denied the individual the "full and equal enjoyment" of a public accommodation based on the individual's "chosen name" and preferred form of "addres[s]." *Id.* §§24-34-301(9); 24-34-601(2)(a); *see, e.g., Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 845 (6th Cir. 2024) (refusal to "use a transgender [person's] preferred pronouns … at least arguably den[ies]" them the "'full and equal enjoyment'" of "a place of public accommodation"). H.B. 25-1312 thus expands the definition of "gender expression" to cover not just conduct but also *speech* based on sex and gender.

H.B. 25-1312 creates only a narrow carveout for these new speech requirements. Individuals need not speak using the name that "an individual requests to be known as" if and only if the requested name "contain[s] offensive language" or the person is

8

"requesting the name for frivolous purposes." Colo. Rev. Stat. §24-34-301(3.5) The law offers no exception to its blanket requirement that Coloradans speak using an individual's preferred pronouns or other forms of "address." *Id.*

### C. The Unwelcome Provision and the Unwelcome Statements Provision.

Colorado's prohibitions on disfavored speech do not stop there. In addition to its new speech-based revisions to "gender expression," CADA also includes two provisions—an Unwelcome Provision and an Unwelcome Statements Provision—that regulate speech in public accommodations based on whether the listener finds the speech unwelcoming.

Under the Unwelcome Provision, it is unlawful for any person who operates in a place of public accommodation to "directly or indirectly … publish" or otherwise distribute "any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable" based on "gender expression" or any other protected category. *Id.* §24-34-601(2)(a). And under the Unwelcome Statements Provision, it is unlawful for any "person that is the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation" to "directly or indirectly … publish" or otherwise distribute "any communication" that "[s]tates that the patronage, custom, presence, [or] frequenting … by any person or class of persons" is "unwelcome or objectionable or not acceptable, desired,

9

or solicited" based on "gender expression" or any other protected category. *Id.* §24-34-701(1)(c).

Neither the Unwelcome Provision nor the Unwelcome Statements Provision define any of their key terms, but they "surely impl[y] a subjective element on behalf of the person" who claims to feel unwelcome. *303 Creative*, 6. F.4th at 1213-14 (Tymkovich, C.J., dissenting); *see, e.g.*, *Unwelcome*, Merriam-Webster Dictionary (archived May 11, 2025), perma.cc/X2KK-D5QJ ("not wanted"); *Objectionable*, Merriam-Webster Dictionary (archived May 11, 2025), perma.cc/94D7-2QVY ("offensive").

As amended by H.B. 25-1312, then, CADA also prohibits anyone who operates in a public accommodation from distributing any communication that offends a transgender person or makes them feel "unwelcome" because the communication refers to transgender people without using their "chosen name" or other terms by which they "choos[e] to be addressed" or expresses opposition to the use of such terms. Colo. Rev. Stat. §§24-34-301(9), 24-34-601(2)(a), 24-34-701(1)(c). Such communications constitute a "discriminatory" and "unlawful" practice based on "gender expression." *Id.* §24-34-601(2)(a).

## III.  Plaintiffs filed this lawsuit to protect their rights and their members' rights.

Seven Plaintiffs filed this lawsuit. Colorado Parent Advocacy Network (CPAN) and Protect Kids Colorado (PKC) are Colorado organizations supported by parents, educators, and other Colorado citizens who advocate strong parental rights and oppose

the spread of gender ideology. 1-App-118-19 ¶¶4-5; 1-App-140-42 ¶¶4-5, 9. Defending Education (DE) is a nationwide association whose members are likewise opposed to gender ideology. 1-App-114-15 ¶¶3-5. DE litigates to protect the First Amendment rights of its members and has secured injunctions against speech-coercing pronoun policies before. *See Olentangy*, 158 F.4th at 738. DE's members in Colorado include CPAN's executive director Lori Gimelshteyn and PKC's executive director Erin Lee. 1-App-115 ¶6.

Dr. Travis Morrell is a dermatologist who co-owns and practices at a medical practice in Grand Junction, CO. 1-App-165-66 ¶¶3-4. Dr. Valeri Leswing is a pediatrician who is the sole owner and physician at her medical practice, Mountain Pediatrics, in Evergreen, CO. 1-App-182-83 ¶¶3-4. Mountain Pediatrics is also a plaintiff. 1-App-020 ¶18. And Do No Harm (DNH) is a nationwide association whose members oppose gender-ideology and so-called gender-affirming medical treatments. 1-App-161-62 ¶¶3-4. DNH's members in Colorado include Dr. Morrell, Dr. Leswing, and Mountain Pediatrics. 1-App-162 ¶6.

Plaintiffs all hold traditional views on sex and gender. CPAN's and PKC's leaders (Ms. Gimelshteyn and Ms. Lee) believe that sex is determined at birth and immutable and that, if they affirmed someone's non-biological "gender identity" or "gender expression," they would be affirming a lie. 1-App-119 ¶¶6-8; 1-App-141 ¶¶6-8. Dr. Morrell and Dr. Leswing likewise hold the "scientific" and "objective" views that "sex is determined at birth and is immutable" and believe that "affirming an individual's non-

biological gender identity or gender expression" would "encourage them to believe a falsehood." 1-App-166-67 ¶¶5, 9; 1-App-183-85 ¶¶6, 10. Accordingly, they do not want to use chosen names, preferred pronouns, or other non-biologically-accurate terms when referring to others. 1-App-120-23 ¶¶10-16; 1-App-127 ¶29; 1-App-142-43 ¶¶12-14; 1-App-149 ¶29; 1-App-168-70 ¶¶10-16; 1-App-185-86 ¶¶11-15.

In line with their beliefs, each Plaintiff has referred to transgender individuals using biological pronouns and birth names that do not match those individuals' self-professed gender identities. In other words, Plaintiffs regularly misgender and dead-name. *E.g.*, 1-App-142-45 ¶¶12-17; 1-App-121-23 ¶¶12-17; 1-App-166 ¶6; 1-App-183 ¶7; 3-App-059-60, 094:3-98:25, 132:8-145:13, 147:2-148:8, 227:1-8; 7-App-012:11-16, 017:7-18:23, 020:12-22, 022:21-23:7, 026:14-28:7. And, critically, they want to *continue* using such language in the future. 1-App-119-20 ¶¶7-9; 1-App-122-24 ¶¶14-15, 18; 1-App-127 ¶29; 1-App-141-45 ¶¶2-9, 14-15, 18; 1-App-149 ¶29; 1-App-166-69 ¶¶5, 7-13; 1-App-174 ¶28; 1-App-183-86 ¶¶6, 8-14; 1-App-189 ¶26.

CPAN and PKC, for example, regularly host events in places of public accommodation, including hotels, conference centers, restaurants, and government buildings. 1-App-120-21 ¶10; 1-App-142 ¶10; 3-App-023-41. CPAN's and PKC's leaders and other attendees "frequently discuss … transgender individuals" at their events, 1-App-121 ¶12; 1-App-142-43 ¶12, and transgender individuals have attended their events in the past, 1-App-122 ¶13; 1-App-143 ¶13; *e.g.*, 3-App-110:22-112:21, 112:6-113:10, 146:2-3. But regardless of gender identity, CPAN and PKC have "used biologically

12

accurate pronouns and birth names" when talking to or about people. 1-App-121 ¶12; 1-App-142-43 ¶12; 3-App-143:13-145:13. Both Ms. Gimelshteyn and Ms. Lee, moreover, regularly speak at public events on behalf of their organizations and misgender and deadname in those speeches. 3-App-094:3-96:20, 97:16-100:4 132:8-142:14, 147:2-148:8. CPAN and PKC also regularly make statements and publish materials (for example, social media posts, educational resources for parents, or flyers for their events) that refer to transgender people using biologically accurate terms. *E.g.*, 1-App-133, 160.

Ms. Gimelshteyn and Ms. Lee anticipate that transgender individuals will continue to attend CPAN and PKC events. 1-App-122 ¶13; 1-App-143 ¶13. Going forward, they want to continue using biologically accurate pronouns and birth names when they host events in places of public accommodation, "even if those pronouns or names conflict with an individual's self-professed gender identity." 1-App-119-20 ¶¶7-9; 1-App-122 ¶14; 1-App-127 ¶29; 1-App-141-42 ¶¶7-9; 1-App-143 ¶14; 1-App-149 ¶29; 3-App-122:16-19. They also want to keep publishing materials that use such language. 1-App-122-24 ¶¶15, 18; 1-App-143-45 ¶¶15, 18. In other words, they want to keep misgendering and deadnaming.

Similarly, Dr. Morrell and Dr. Leswing have declined to use "chosen names" or "preferred pronouns" when talking to or about transgender patients in their medical practices. 1-App-166 ¶6; 1-App-183 ¶7; *see also* 3-App-059-60; 7-App-004-6. Instead, they have "used biologically accurate pronouns and birth names." 1-App-166 ¶6; 1-App-183 ¶7; *see also* 3-App-227:1-8 (explaining that Dr. Morrell "treated transgender

13

patients … within the last year" preceding H.B. 25-1312 and "at all times … used their birth names and the pronouns that match their sex at birth"); 7-App-004-30 (discussing patient interactions in which Dr. Leswing declined to use transgender-affirming language). And they use "biologically accurate terms" in patient records as well. 1-App-166 ¶6; 1-App-183 ¶7. Dr. Morrell, who in addition to his practice "regularly speak[s] and write[s] on the issues of sex and gender," has also "referred to transgender individuals by their biological pronouns … and their birth names" in his speaking and writing. 1-App-169 ¶¶14-15.

Both Dr. Morrell and Dr. Leswing welcome patients of all backgrounds. 1-App-166 ¶6; 1-App-183 ¶7. They have both treated transgender, gender-dysphoric, and gender-questioning individuals before, continue to treat them now, and expect that they will treat them in the future. 1-App-166 ¶6; 1-App-183 ¶7; 3-App-059-60. Both would like to continue using biologically accurate language with those patients and in their public speaking and writing. 1-App-166-69 ¶¶5-13; 1-App-174 ¶28; 1-App-183-86 ¶¶6-14; 1-App-189 ¶26. Indeed, for Dr. Morrell and Dr. Leswing, their practice of using biologically accurate language is critical to their work as physicians because "[d]etermining the proper course of treatment or advising patients on their treatment's risk …might depend on a patient's biological sex." 1-App-166 ¶7; 1-App-184 ¶8. By contrast, they feel that using language that "affirm[s]" a patient's non-biological gender identity may "discourag[e] them from seeking proper care to address their gender dysphoria." 1-App-167 ¶9; *see* 1-App-184-85 ¶10 (similar).

Plaintiffs have been targeted, harassed, accused of transphobia, and threatened with legal action, and have lost patients because of their speech. In addition to regular online harassment, those who disagree with CPAN's and PKC's views have, for example, tried to pressure venues to cancel their events. *See, e.g.*, 3-App-048-49, 051, 054. Their events are regularly protested. 3-App-038-49, 051-52. After Ms. Gimelshteyn testified in the Colorado Senate in opposition to H.B. 25-1312, she "had to be escorted from the Capitol Building to her vehicle by Capitol police after several transgender individuals" blocked her path. 3-App-050. Ms. Lee has been threatened with legal action for social media posts that misgendered a biological girl who identifies as male. 3-App-051-52, 149:20-155:22. Both CPAN and PKC have had to hire police officers or private security for their events. 3-App-049, 051. Dr. Morrell's practice has been targeted by negative Google reviews claiming he is "[n]ot a safe physician for lgbt patients," 1-App-172 ¶23, and activists have successfully campaigned to have Continuing Medical Education credits revoked from his speaking events, 3-App-203:1-8, 214:20-215:21. At least "5-10 families have left [Dr. Leswing's] practice after explicitly complaining," in often-emotionally-charged encounters, that she does not affirm her patients' non-biological gender identities. 3-App-060; *see* 7-App-004-30. Other examples abound. *See, e.g.*, 3-App-090:24-91:24, 103:22-105:5, 107:7-12, 127:4-131:6, 159:19-165:8, 206:2-209:6, 210:22-214:19, 255-70.

Despite these pressures, Plaintiffs continued to use biologically accurate pronouns and names because doing so accords with their "deeply held belie[f]" that sex is

15

fixed at conception and immutable, 1-App-120 ¶8; 1-App-141 ¶8, and, for the doctors, their belief that affirming non-biological gender identities would "harm rather than help the[ir] patient[s]," 1-App-170 ¶17; 1-App-186 ¶16.

But Colorado has now silenced them. Because H.B. 25-1312 has amended CADA to make their speech unlawful, Plaintiffs must stop referring to individuals in places of public accommodation (e.g., at CPAN and PKC events or in the doctors' medical practices) using biological terms instead of preferred pronouns, chosen names, and other terms by which individuals "choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9). They must also refrain from "publish[ing]" materials that use such language or otherwise make individuals feel unwelcome based on their gender expression. *Id.* §§24-34-601(2)(a), 701(1)(c).

Plaintiffs now self-censor because they fear that, if they don't, they will be hit with discrimination charges, investigated by the Division, and subjected to penalties. *See* 1-App-126 ¶25; 1-App-147-48 ¶25; 1-App-173 ¶24; 1-App-188-89 ¶23. "[P]rior to 1312," Ms. Lee "felt pretty confident that [she] had the right to speak [her] opinions on gender ideology," but since H.B. 25-1312 was adopted, she must "do mental gymnastics to try to avoid saying the wrong thing and getting [her]self in trouble." 3-App-166:16-21. Under the new regime, for example, it is "very hard" for her to "spea[k] publicly about the parents that [she] help[s]" whose children experience gender dysphoria. 3-App-167:12-19. Ms. Gimelshteyn "immediately silenced" herself "when [she] became aware that [H.B. 25-1312] was in place." 3-App-116:7-8. She "realized that" she

16

"needed to prohibit [her] speech and really make sure that [she] was in alignment," and she fears that CPAN will be "unable to host" events "because of [the] law." 3-App-092:20-22, 117:12-15. "[P]rior to the signing of 1312, it was typical" for Dr. Morrell to use "biological pronouns" in his practice. 3-App-194:15-18. But "[f]ollowing 1312," he is "definitely going to avoid this for fear of the Civil Rights Commission." 3-App-229:1-2. And Dr. Leswing is similarly "concerned that the State will come after [her] if [she] refer[s] appropriately to [a] patient" by "their biological sex." 3-App-248:14-18. She "feel[s] now forced to refer to [patients] androgynously" so they don't "have the ability to seek punitive legal action" just "because [she] spoke honestly with them." 3-App-250:3-9.

CPAN and PKC also fear that venues will refuse to host their events out of fear that their practice of deadnaming and misgendering will incur liability for the venue itself. *See* 1-App-127 ¶28; 1-App-148 ¶28. And Dr. Morrell and Dr. Leswing fear that their medical practices will be investigated and punished for their speech or that (in Dr. Morrell's case) his partners will attempt to terminate his ownership interest or otherwise compel him to disassociate from his medical practice if the practice is investigated on account of his speech. 1-App-173 ¶25; 1-App-188-89 ¶23.

## IV.    The district court says Plaintiffs lack standing.

H.B. 25-1312 was signed into law on May 16, 2026. 1-App-80. Plaintiffs filed this lawsuit the next business day to protect their right to speak according to their conscience. 1-App-001, 018 ¶11. The complaint asserted that CADA's new misgendering

17

and deadnaming ban and its existing ban on unwelcoming speech violate the First and Fourteenth Amendments because they compel speech, discriminate based on content and viewpoint, and are overbroad and vague. 1-App-058-70 ¶¶137-78. Plaintiffs also filed a motion for a preliminary injunction on May 20, 2026, and an amended motion with largely identical substance on June 13. 1-App-001, 003, 081-113.

Rather than respond to the preliminary-injunction motion, Defendants filed a motion seeking extensive discovery. 1-App-193-208. Plaintiffs explained that discovery was "unwarranted" at this stage and would delay resolution of their important First Amendment claims, but the parties agreed to a discovery and briefing schedule in the interest of compromise. 1-App-220, 222, 230. Soon after Plaintiffs filed this case, two other plaintiffs filed parallel cases challenging the same CADA provisions. *See Committee of Five v. Sullivan*, 1:25-cv-01668 (D. Colo. May 27, 2025); *Doxa Enterprises v. Sullivan*, 1:25-cv-02177 (D. Colo. July 16, 2025). The district court placed all three cases on the same timeline and allowed Defendants to file a consolidated preliminary-injunction opposition addressing all the cases. *See* 1-App-008-09.

Tellingly, in their opposition to the preliminary-injunction motion, Defendants never defended CADA's constitutionality or made any arguments contesting the merits of Plaintiffs' claims. Instead, Defendants focused almost entirely on attacking Plaintiffs' standing. *See* 1-App-236-85.

The magistrate judge recommended that the preliminary-injunction motion be denied, and the district court agreed, denying the motion on the grounds that Plaintiffs

likely lacked standing because there was no credible threat that Defendants would enforce CADA's speech prohibitions against Plaintiffs. 5-App-164-70. In reaching that conclusion, the court considered three factors: (1) whether Defendants had disavowed enforcement, (2) whether Plaintiffs had shown a history of past enforcement, and (3) the fact that anyone can file a complaint alleging discrimination. 5-App-166-70.

First, on disavowal, the district court relied heavily on Defendants' statutory-construction argument that CADA punishes misgendering and deadnaming only if it is accompanied by something *more*, like harassment. 5-App-166-68. The court acknowledged that Defendants had not actually "disavowed any possible prosecution," but reasoned that their narrow interpretation of the law reduced the likelihood of prosecution. *Id.* The court also construed CADA to proscribe only the denial of "goods or services," 5-App-166-67, though the statute's text covers the denial of "facilities, privileges, advantages, or accommodations" as well, Colo. Rev. Stat. §24-34-601(2)(a). Next, the court declined to find a history of enforcement because, on its view, past cases in which the Division, before H.B. 25-1312 was passed, found probable cause for a CADA violation involving misgendering or deadnaming also involved a denial of services or goods. 5-App-168-70. Finally, the court agreed that the fact that "'anyone in the State may file a complaint'" against Plaintiffs "'and initiate a potentially burdensome administrative hearing process'" favored finding a credible threat of enforcement. 5-App-170 (quoting *303 Creative*, 600 U.S. at 583). But it declined to do so because it believed the other two factors went the other way. *Id.*

19

The district court briefly addressed the remaining preliminary-injunction factors. It did not dispute that these factors would necessarily favor Plaintiffs if Plaintiffs were likely to succeed on the merits. *See Free the Nipple v. Fort Collins*, 916 F.3d 792, 806-07 (10th Cir. 2019). But because the court found that Plaintiffs likely lacked standing and therefore failed to show a likelihood of success on the merits, the court concluded that Plaintiffs did not satisfy these factors. 5-App-170-71.[*]

## SUMMARY OF ARGUMENT

This Court has repeatedly emphasized that it is easy for Plaintiffs to establish standing in pre-enforcement First Amendment cases because of "the seminal importance of the interests at stake." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). Indeed, on the credible-threat-of-prosecution question in particular, "*the evidentiary bar that must be met is extremely low*." *Scott v. Allen*, 153 F.4th 1088, 1096 (10th Cir.

---

[*] Defendants also filed motions to dismiss simultaneously with their oppositions to the preliminary-injunction motion. *See* 1-App-009. A month after the district court denied Plaintiffs' preliminary-injunction motion for lack of standing, the magistrate judge recommended denying in part the motions to dismiss because it found that Plaintiffs *do* "demonstrate a credible threat of enforcement and, in turn, a chilling effect supporting standing." 5-App-197. Unlike the magistrate judge's recommendation to deny the preliminary injunction and the district court's order adopting that recommendation, 5-App-124-28, 166-70, the recommendation on the motions to dismiss found that (1) Plaintiffs' speech "is arguably proscribed by CADA," (2) the supposed lack of prior enforcement history did not weigh against Plaintiffs because H.B. 25-1312 is a "'new'" law, and (3) Defendants' arguments regarding CADA's scope are not a true "disavowal," "leave intact the State's full enforcement authority," and "reserve rather than relinquish enforcement discretion," 5-App-192-96. The recommendation is currently before the district court.

2025). The district court's preliminary-injunction denial here disregards that well-established principle.

Plaintiffs face a credible threat of enforcement, and therefore have standing to seek a preliminary injunction, because all the factors that go into that analysis favor Plaintiffs. First, courts presume that new or recently amended laws, like CADA and H.B. 25-1312, will be enforced. Second, Defendants have refused to disavow enforcement, which is enough on its own to establish a credible threat. Though Defendants have made a *statutory-interpretation* argument that CADA punishes misgendering and deadnaming only if it rises to the level of harassment, that is not the same as a disavowal, and courts regularly reject attempts by government defendants to avoid pre-enforcement challenges by adopting narrow statutory interpretations. In any event, Defendants are wrong; their interpretation has no basis in CADA's text, which straightforwardly prohibits refusals to use someone's "chosen name" or other preferred forms of "addres[s]." Colo. Rev. Stat. §24-34-301(9). Third, because H.B. 25-1312 was a brand-new law when Plaintiffs sued, the Court should presume a likelihood of enforcement. Besides, Colorado *does* have a history of using CADA to punish similar speech. The State has repeatedly argued that it can use CADA to coerce speech on issues of sex and gender, *e.g.*, *Masterpiece Cakeshop v. CCRC*, 584 U.S. 617 (2018); *303 Creative v. Elenis*, 600 U.S. 570 (2023), and it has found probable cause for CADA violations in cases involving misgendering and deadnaming. Fourth, as even the district court agreed, the fact that

21

anyone can file a complaint accusing them of discrimination heightens the risk that Plaintiffs' speech will be subject to discipline under CADA.

If this Court agrees that Plaintiffs have standing, it should grant a preliminary injunction. Defendants have forfeited the merits because they failed to respond to Plaintiffs' constitutional arguments below, and Plaintiffs are clearly right on the merits anyway. And because Plaintiffs likely have standing and are likely to succeed on the merits of their constitutional claims, the remaining preliminary-injunction factors are readily satisfied.

## ARGUMENT

This Court reviews the district court's decision denying a preliminary injunction for "abuse of discretion." *Nat. Ass'n for Gun Rights v. Polis*, 173 F.4th 1317, 1331 (10th Cir. 2026). A preliminary-injunction denial "crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Free the Nipple*, 916 F.3d at 796-97. Thus, this Court "examine[s] the [district] court's factual findings for clear error and its legal conclusions de novo." *Id.* When the "denial of a preliminary injunction rest[s]" on "an error of law," like the district court's standing analysis here, this Court "must reverse the denial." *Citizens United v. Gessler*, 773 F.3d 200, 219 (10th Cir. 2014).

Plaintiffs are entitled to a preliminary injunction because they "'likely'" have standing, *Murthy v. Missouri*, 603 U.S. 43, 58 (2024), and are "likely" to succeed on the merits of their claims, *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In

constitutional cases, that is usually "'the determinative factor.'" *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). But Plaintiffs satisfy the other preliminary-injunction factors as well: they are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities" favors an injunction, and "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## I.    Plaintiffs likely have standing to seek a preliminary injunction.

Plaintiffs have standing if they show injury, traceability, and redressability. *SBA List v. Driehaus*, 573 U.S. 149, 157-58 (2014). For the Plaintiff associations, DE and DNH, they have standing to sue if "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] see[k] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

No one disputes that, because all Defendants "have authority to enforce CADA," any injury is traceable to them and redressable by an injunction against them. *303 Creative*, 6 F.4th at 1175. Likewise, no one disputes that the First Amendment interests this lawsuit seeks to protect are germane to DE's and DNH's missions, *see* 1-App-114-16 ¶¶3-4, 6-8; 1-App-161-63 ¶¶3-4, 6-8, or that "'individual participation'" is not "necessary when an association seeks prospective or injunctive relief for its members." *United Food & Com. Workers Union v. Brown Grp*, 517 U.S. 544, 546 (1996). Thus, only injury-in-fact is at issue. *See* 1-App-257-58, 264-65; 5-App-155, 164.

In First Amendment cases, plaintiffs can establish injury-in-fact, and thus pre-enforcement standing, by showing a "'chilling effect'" on their speech caused by a "'credible threat of future prosecution.'" *Scott*, 153 F.4th at 1094; *see also SBA List*, 573 U.S. at 159. Because of the "'nature'" and "'importance'" of First Amendment rights, courts "'readily'" find pre-enforcement standing. *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1160 (10th Cir. 2023). Proving the point, this Court already found standing in a case raising the same kind of pre-enforcement challenge (First and Fourteenth Amendment claims) against the same law (CADA) to protect the same kind of speech (speech on sex and gender). *See 303 Creative*, 6 F.4th 1160, 1171-76. And the Supreme Court went even further, giving the plaintiff a win on the merits. 600 U.S. at 603. This Court should do the same here.

### A.    Standing is a low bar in pre-enforcement First Amendment cases.

First Amendment pre-enforcement cases implicate "unique interests," especially when a challenged law chills protected speech. *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (vague and content-based regulations of speech "rais[e] special First Amendment concerns because of [their] obvious chilling effect"). Because the "'mere threat of prosecution under [an] allegedly unlawful statute'" can chill protected speech, society has a special "'interest in having the statute challenged.'" *Ward v. Utah*, 321 F.3d 1263, 1266-67 (10th Cir. 2003).

Recognizing those unique interests, "the Supreme Court has dispensed with rigid standing requirements" in the First Amendment pre-enforcement context. *California*

*Pro-Life Council v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003). Instead, courts "apply the standing requirements somewhat more leniently" in First Amendment cases to "facilitat[e] pre-enforcement suits." *Scott*, 153 F.4th at 1095; *see also Chiles v. Salazar*, 116 F.4th 1178, 1195 (10th Cir. 2024). Plaintiffs can bring pre-enforcement suits alleging chilled speech as long as they face "'a credible threat of prosecution.'" *Scott*, 153 F.4th at 1096. Critically, "this is not a high bar." *Id.* Indeed, the Supreme Court "'has often found standing to challenge" speech regulations "even when those statutes have *never* been enforced.'" *Id.* (emphasis added). As long as a plaintiff's speech is "arguably" covered by the challenged law, *SBA List*, 573 U.S. at 162, and it is not "wholly speculative" that the government might enforce the law, *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979), the plaintiff has standing.

Standing is especially easy when, as here, the speech at issue involves pronouns, names, and other (non-)gender-affirming language. Federal courts, including this Court and the Supreme Court, have repeatedly found standing in cases involving such language because "sexual orientation and gender identity" are "matters of profound value and concern to the public." *Janus v. AFSCME*, 585 U.S. 878, 913-14 (2018) (cleaned up). "Such speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Id.* (cleaned up); *e.g.*, *Chiles*, 146 S. Ct. at 1019 & n.* (2026); *303 Creative*, 6 F.4th at 1171-76; *Gays Against Groomers v. Garcia*, 169 F.4th 981, 990-91 (10th Cir. 2026); *Tingley v. Ferguson*, 47 F.4th 1055, 1066-69 (9th Cir. 2022); *Olentangy*, 158 F.4th at 741-42; *Nessel*, 117 F.4th at 843-47.

The test for pre-enforcement standing, moreover, is particularly lenient at the preliminary-injunction stage. Standing is evaluated according to "'the manner and degree of evidence required at [each] successive stag[e] of the litigation.'" *Murthy*, 603 U.S. at 58. And at the preliminary-injunction stage, the plaintiff "need not show a certainty of winning.'" *Coalition of Concerned Citizens To Make Art Smart v. FTA*, 843 F.3d 886, 901 (10th Cir. 2016). Instead, the plaintiff need only show that he is "'likely' to establish each element of standing." *Id.*; *see, e.g.*, *L.A. Press Club v. Noem*, 171 F.4th 1179, 1187 (9th Cir. 2026) (same).

Put simply, at this stage of the case, Plaintiffs need only show that, under a *lenient* standard, they are *likely* to establish that their speech is *arguably* covered by CADA and that Colorado *might* enforce the law against them. They more than satisfy that test.

## B.    Plaintiffs' speech is chilled by a credible threat of enforcement.

Plaintiffs can demonstrate a chilling effect tied to a credible threat of prosecution by showing (1) that in the past they have "engaged in the type of speech affected by the challenged government action," (2) "a present desire, though no specific plans, to engage in such speech" again, and (3) "a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced" against them. *IRI v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

No one disputes that the first two criteria are met here for all Plaintiffs. Ms. Gimelshteyn and Ms. Lee have used non-biological pronouns, birth names, and other non-transgender-affirming language to refer to specific individuals at their CPAN and PKC

26

events and in public statements. *E.g.*, 1-App-121-23 ¶¶12-17; 1-App-142-45 ¶¶12-17; 2-App-238. CPAN's and PKC's other officers, supporters, and event attendees have used the same language. *See* 1-App-121-22 ¶¶12, 14; 1-App-142-43 ¶¶12, 14. Likewise, Dr. Morrell and Dr. Leswing have referred to patients in their medical practice and elsewhere using biological pronouns and birth names that do not match those individuals' preferred terminology. *E.g.*, 1-App-166 ¶6; 1-App-183 ¶7; 2-App-238. And all of them desire to *keep* using this language going forward. *See supra* 13-14.

Plaintiffs have also shown a credible threat of enforcement. This requirement, again, is "not supposed to be a difficult bar for plaintiffs to clear." *Peck*, 43 F.4th at 1133. To that end, all the factors that affect the likelihood of enforcement favor Plaintiffs here. *See SBA List*, 573 U.S. at 164-66. Most importantly, H.B. 25-1312 is a new law, and Defendants have not disavowed enforcement. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Additionally, Defendants have a history of enforcing the law against similar conduct, and the fact that anyone can file a complaint alleging discrimination compounds the risk that Plaintiffs will be targeted. *See SBA List*, 573 U.S. at 164-66.

**1.** To start, there is a strong "'presumption of enforcement'" for "new" laws, *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1176 (D. Colo. 2023), as well as recently amended laws, *Bryant v. Woodall*, 1 F.4th 280, 286-87 (4th Cir. 2021). "This is because a court presumes that a legislature enacts a statute with the intent that

it be enforced." *Id.*; *see also Am. Booksellers*, 484 U.S. at 393 ("[W]e see no reason to assume" that a "newly enacted law will not be enforced.").

H.B. 25-1312 is a brand-new law, enacted just *one* business day before Plaintiffs filed this lawsuit, and its adoption was the subject of intense "public interest." *Masterpiece Cakeshop v. Elenis*, 445 F. Supp. 3d 1226, 1256 (D. Colo. 2019). The Court is "entitled to assume that [state] agencies will not disregard such a recent," public, and forceful "expression of the legislature's will." *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979); *see also Antonyuk v. James*, 120 F.4th 941, 1016 (2d Cir. 2024) (similar); *Speech First v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases).

**2.** Next, although they "have had ample opportunity to" do so, Defendants "notably" have not "disavow[ed] their intent to enforce" CADA against Plaintiffs. *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1035 (D. Idaho 2025); *see also SBA List*, 573 U.S. at 165. They have "made no … promise" that they will not enforce the law's speech prohibitions against Plaintiffs when they misgender, deadname, or use language that makes transgender-identifying people feel unwelcome in a place of public accommodation. *303 Creative*, 6 F.4th at 1174. To the contrary, when someone files a charge of discrimination, the Division must "make a prompt investigation of the charge." Colo. Rev. Stat. §24-34-306(2)(a); *see also* 4-App-229:12-25. And in their briefing below, Defendants insisted that they have a "clear" and "compelling" interest in enforcing CADA both in general and specifically against misgendering and deadnaming. 1-App-282-83. Their "strenuous assertion that" they have "a compelling interest in

28

enforcing" the law undercuts any argument that they have disavowed enforcement here. *303 Creative*, 6 F.4th at 1174.

Refusal to disavow enforcement is enough on its own to establish a credible threat of enforcement. *See Peace Ranch v. Bonta*, 93 F.4th 482, 490 (9th Cir. 2024) (pre-enforcement standing "often rises or falls with the enforcing authority's willingness to disavow enforcement"). This Court has repeatedly found a credible threat based solely on a refusal to disavow enforcement, *e.g.*, *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110-11 (10th Cir. 2024); *Chiles*, 116 F.4th at 1198-99, even when a challenged statute had existed for sixteen years without ever being enforced against anyone, *see Peck*, 43 F.4th at 1124, 1127, 1132-33.

Defendants' refusal to disavow enforcement is especially fatal here because H.B. 25-1312 is, again, a new piece of legislation, *see Am. Booksellers*, 484 U.S. at 393; *Koon v. Reynolds*, 649 F. Supp. 3d 14, 29 (D.N.J. 2023) ("Absent a concession by Defendants that they do not intend to enforce the newly enacted legislation, Plaintiffs have averred credible threats of prosecution."), and there is "nothing" else to guarantee that Plaintiffs will not be punished for violating the law's speech rules, *Chiles*, 116 F.4th at 1198.

**3.** Colorado also has a history of punishing dissenting speech on issues of sex and gender identity. Take *Masterpiece*, for example. There, the Commission issued a cease-and-desist order and imposed a suite of other remedial measures against a Christian baker who declined to bake a cake endorsing same-sex marriage. 584 U.S. at 625-

29

30. Likewise, in *303 Creative*, the Division insisted it could use its public-accommodation laws to force a wedding website designer to create websites for same-sex marriages even though the designer firmly believed that "marriage should be reserved to unions between one man and one woman." 600 U.S. at 580-83. Other Colorado agencies have used other state laws to coerce speech on gender identity. *See, e.g.*, *Chiles*, 146 S. Ct. at 1017-29 (Colorado law required therapists to affirm patients' gender identity); *Roy*, 699 F. Supp. 3d at 1170-72 (Colorado law compelled religious school to agree to non-discrimination provisions that affected the school's policy on "pronoun usage"); *St. Mary Catholic Parish v. Roy*, 154 F.4th 752, 757, 759-61 (10th Cir. 2025) (same), *cert. granted*, 2026 WL 1052111 (U.S. Apr. 20, 2026).

Defendants have also repeatedly used CADA to punish alleged discrimination based on gender identity and gender expression. For example, the Division has pursued cases against establishments that declined to allow biological men who identify as women in women's restrooms. *E.g.*, 6-App-022-26, 170-79; *cf. Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (a credible threat of enforcement exists when the defendant has previously launched investigations into "similar conduct"). And they have used CADA to punish non-gender-affirming *speech* in particular. In a second *Masterpiece* case, for example, the Division "found probable cause that discrimination occurred" when the bakery refused to prepare a custom cake "to celebrate [a would-be customer's] gender transition and identity as a transgender woman." 556 P.3d 1238, 1242 (Colo. 2024). That probable cause determination "demonstrated a willingness to enforce the statute,"

*Masterpiece*, 445 F. Supp. 3d at 1253, 1256, and it (rightfully) causes Plaintiffs to fear they will be similarly punished, *see* 3-App-171:18-173:25, 236:3-22, 237:7-19 (explaining their fear that they will be targeted because Masterpiece Cakeshop was targeted).

And in case any doubt remains, Defendants have also used CADA to go after misgendering and deadnaming. The Division has repeatedly found probable cause for CADA violations based on the use of gendered language that did not affirm someone's transgender identity. *See, e.g.*, 6-App-142-45 (finding probable cause where a blood bank identified a biological man as "male," instead of the donor's preferred "female," in the donor profile); 6-App-075-82, 104-13 (both likewise finding probable cause in employment discrimination cases based on misgendering or deadnaming).

**4.** Finally, the threat of enforcement is "bolstered by the fact that authority to file a complaint" is "not limited" to the Division, the Commission, or the Attorney General. *SBA List*, 573 U.S. at 164. Instead, "any person" can file a charge alleging discrimination. Colo. Rev. Stat. §24-34-306(1)(a)(I). That means anyone who wishes to use Plaintiffs' services or attend one of their events but feels unwelcome due to their use of biologically accurate language can "file a complaint and initiate a potentially burdensome administrative" process against them. *303 Creative*, 6 F.4th at 1174; *see also* 4-App-230:7-231:25 (those accused of discrimination must provide the Division with "financial information," "personnel files, "emails or text messages," and answer written questions under threat of subpoena). Thus, Plaintiffs "must fear not only charges

31

brought by Colorado, but charges brought by any person who might" disagree with their speech. *303 Creative*, 6 F.4th at 1174.

And the nature of Plaintiffs' activities makes this risk even more severe: As advocacy organizations and physicians with public-facing medical practices, they "are easy targets." *SBA List*, 573 U.S. at 164. Indeed, because their views on sex and gender are publicly known and "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from" individuals who try to attend Plaintiffs' events or patronize their medical practices *because of* their views on sex and gender. *Id.*; *see* 1-App-125-26 ¶24; 1-App-147 ¶24; 3-App-220:11-13, 226:17-25 ("anyone who googles [Dr. Morrell] could find out [his] personal beliefs on this subject"); 3-App-249:1-18 (Dr. Leswing has "been in this community for a long time" and "the community knows" her views, so it is "not at all inconceivable that [she] would be directly and actively targeted by somebody" who wanted to "mak[e] a stand for what they consider are trans rights").

Nor is that risk hypothetical. Quite the opposite. Transgender individuals regularly attend CPAN's and PKC's events, and both Dr. Morrell and Dr. Leswing regularly treat transgender patients. *See* 3-App-110:22-112:21, 113:10-114:16, 146:2-3, 227:1-8, 242:17-23. Transgender individuals, moreover, regularly file complaints with the Division alleging discrimination specifically—and sometimes solely—because they were misgendered or deadnamed. *E.g.*, 6-App-130 (attorney called client by "dead name" and attorney's staff used the "wrong pronouns"); 6-App-027, 046-51, 062, 073-74, 083-84,

32

114-17, 128-29, 131, 133 (all similar). The Division, as noted above, has found probable cause in some of those cases. And other individuals have filed complaints against medical providers who, like Dr. Leswing and Dr. Morrell, refuse to provide so-called gender-affirming care or refer to patients using biologically accurate terms that do not correspond to their gender identity. *E.g.*, 6-App-028-29 (medical insurance provider declined to cover facial feminization surgery); 6-App-43-45 (surgeon misgendered complainant and refused to perform bilateral mastectomy).

All parties seemingly agree that Plaintiffs are right to worry about accusations of discrimination. Indeed, Defendants' own expert testified that transgender individuals take misgendering and deadnaming very seriously. 4-App-133:24-134:7. They perceive it as "hurt[ful]," "stigmatiz[ing]," and "upset[ting]." 4-App-130:16-132:5, 134:3-7. They often feel "offended" because such language is, in their eyes, a rejection of their "identity." 4-App-134:3-4, 135:4-19. It is no great leap to think that some of those individuals may file complaints.

### C.   The district court's contrary rationales get the law and the facts wrong.

The district court did not dispute that Plaintiffs have misgendered, deadnamed, and used other non-gender-affirming speech in the past, or that they would *keep* using such language if not for CADA. Instead, the district court found that Plaintiffs did not "prov[e] a credible threat of enforcement," and thus do not have standing, for two reasons. 5-App-170. Both are wrong.

33

**1.** Though the district court conceded that Defendants "have not completely disavowed any possible prosecution of [the] Plaintiffs," which should end the standing debate in Plaintiffs' favor, it found that Plaintiffs do not face a credible threat of enforcement because Defendants say that "misgendering and deadnaming alone is not conduct that violates CADA *per se.*" 5-App-166-68. Instead, Defendants argue that the law punishes such language only if the speaker's surrounding conduct "rise[s] to the level of harassment," which supposedly requires that the speaker "'intentionally treat [the person] differently based on their'" transgender status and that such treatment constitute both a subjective and objective denial of "goods or services." 5-App-167, 169

The text of CADA, however, says none of this. On the contrary, it makes it unlawful for anyone who operates "in" a place of public accommodation to "directly or indirectly" "deny" someone "the full and equal enjoyment" of the "goods, services, facilities, privileges, advantages, or accommodations" of the public accommodation based on "gender expression," which includes the use of a "chosen name" or other forms of "addres[s]." Colo. Rev. Stat. §§24-34-301(9), 601(2)(a). It also prohibits publishing or circulating statements or materials that "directly or indirectly" indicate that such enjoyment will be denied or that an individual's presence is "unwelcome," "objectionable," "unacceptable," "undesirable," or not "solicited." *Id.* §§24-34-601(2)(a), 24-34-701.

In other words, CADA's plain text makes it illegal to misgender or deadname someone—full stop. Speakers may not make someone feel "unwelcome" or deny them

34

"equal enjoyment" by refusing to use their "chosen name" or other terms by which they "choos[e] to be addressed." *Id.* §§24-34-301(9), 24-34-601(2)(a). That is what it *means* to "deadname" or "misgender" someone, *see* 1-App-240 n.2, and that is what Plaintiffs want to do. The law requires nothing more for a violation to occur. It certainly does not limit itself, as the district court would, to transactions involving "goods or services." *Contra* 5-App-169. Rather, it encompasses "goods, services, facilities, privileges, advantages, *or* accommodations," and it requires regulated parties to provide not just *access* to those things, but "equal enjoyment" of them. *Id.* (emphasis added). The district court's analysis "reads" all of those terms "out of the statute." *In re McGough*, 737 F.3d 1268, 1275 (10th Cir. 2013).

Caselaw confirms what the text makes obvious. The Sixth Circuit, for example, concluded that a similar Michigan law would be violated by simple misgendering or deadnaming. *Nessel*, 117 F.4th at 845. In that case, a Christian medical services provider had no problem treating "transgender patients" but would not "accede" to their "requests" to use preferred pronouns. *Id.* at 839. The Sixth Circuit held that, although the provider was not denying medical services to transgender individuals, its refusal to "use a transgender patient's preferred pronouns … at least arguably den[ied]" them the same "privilege, enjoyed by cisgender individuals, of using pronouns" in "accordance with their gender identity." *Id.* at 845. Other courts have likewise confirmed that the mandate to provide "equal enjoyment" implicates "more than just the outright denial of services." *Hager v. Brinker Texas, Inc.*, 102 F.4th 692, 701 (5th Cir. 2024). Access on terms

35

that make a patron "so uncomfortable that they lea[ve]" is not "genuine or equal …

service." *Id.*

This case proves the point. Consider Dr. Leswing, for example. She wants to use biologically accurate language and, in the past, has "refused" to use non-biological pronouns and names when talking with transgender patients because she believes "biological gender is always relevant" to treatment. 1-App-185 ¶¶11-12; 3-App-246:23-24; 7-App-004-06; *e.g.*, 1-App-184 ¶8 ("Susie needs treatment with antibiotics because, as a girl, she faces a higher risk of UTI."). Multiple "families have left her practice" as a result, "explicitly complaining that [she] does not provide so-called gender-affirming care." 3-App-060. In other words, Dr. Leswing's refusal to use her patients' "chosen name[s]" and other terms by which they "choos[e] to be addressed" arguably denied them "equal enjoyment of" her medical "services." Colo. Rev. Stat. §§24-34-301(9), 601(2)(a). Or consider Ms. Lee, who testified that she "openly" uses transgender individual's birth names when she speaks on behalf of PKC, even if transgender individuals are in "attend[ance]" at the event. 3-App-134:18-135:14; *see also, e.g.*, 3-App-140:22-141:2; 3-App-143:14-145:4. As Defendants' own expert witness testified, a transgender individual who hears that language could very well feel that Ms. Lee has "stigmatized" them and rejected their "identity," 4-App-134:3-7, and thus feel that they have been "indirectly … deni[ed] … full … enjoyment" of the "facilit[y]," Colo. Rev. Stat. §24-34-601(2)(a).

Even if Defendants' reading of the law weren't so off-base, it still would not save them. Defendants cannot defeat pre-enforcement standing with a mid-litigation statutory construction argument. Such arguments "are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *West Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018). Indeed, Defendants in pre-enforcement cases regularly make such arguments, and courts regularly reject them. *E.g.*, *FEC v. Cruz*, 596 U.S. 289, 299-300 (2022) (finding standing where "the Government argu[ed] that" the plaintiff's conduct "would not violate the statute" and the plaintiff "argu[ed] that they would"); *Citizens for Responsible Gov't. v. Davidson*, 236 F.3d 1174, 1192-93 (10th Cir. 2000) (finding a credible threat even though Colorado "insisted that" the plaintiffs would "not be prosecuted" "under the State's construction" of the law, because courts do not "defer" to the government's statutory "construction").

Instead, when standing in pre-enforcement cases turns on competing interpretations of a challenged statute, plaintiffs have standing as long as their reading of the statute is plausible, even if it is "not … the *best* interpretation." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023). Thus, even if Plaintiffs' reading of CADA were not enough to ultimately "win on the merits of their constitutional claims," *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023)," or if Defendants' "narrower reading" were more persuasive, *San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1181 (N.D. Cal. 2025), that would not matter. At this stage, the test is different (and easier): "for the purposes

of standing," this Court should "accept Plaintiffs' interpretation of [CADA] so long as it is an arguable interpretation." *Am. Encore v. Fontes*, 152 F.4th 1097, 1116 (9th Cir. 2025). Especially because Plaintiffs raise concerns under the First Amendment, which "does not leave [speakers] at the mercy of" the State's "noblesse oblige." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

That is the rule across the circuits. The Ninth Circuit, for example, has rejected arguments by government defendants that plaintiffs lack standing because the "statute does not apply to" them. *Peace Ranch*, 93 F.4th at 489. Allowing the State to "defeat standing by conceding that the law does *not* apply," the Ninth Circuit explained, would "unavoidably tangle standing with the merits." *Id.* The Second Circuit, too, has rejected defendants' "deni[al] that the plaintiff actually was subject to the challenged law." *NOM v. Walsh*, 714 F.3d 682, 690 (2d Cir. 2013). The proper course, the Second Circuit explained, is to "give credence to" the plaintiff's "assertion" that the law "'chills [them] from proceeding with [their] speech.'" *Id.*

Regardless, even if the Court takes Defendants' extra-statutory requirements as a given, their argument is still *not* a promise that they won't punish Plaintiffs. If anything, it's the opposite. Their contention that enforcement turns on the "'facts regarding the circumstances surrounding the hypothetical complained conduct,'" 5-App-167, is an assertion that they will enforce the statute when they see fit, *see Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (argument that "enforcement would depend on the facts of the case" constitutes "refusal to disavow prosecution" (cleaned up));

*Nessel*, 117 F.4th at 848 (when "applicability" is "a 'fact dependent' question," defendants "cannot disavow enforcement").

Finally, even if the district court were correct that CADA violations occur only when "goods or services" are "den[ied]," 5-App-166, that would still implicate Plaintiffs' speech. For medical professionals like Dr. Morrell and Dr. Leswing, their speech and their services (medical treatment) are intertwined. *Chiles*, 146 S. Ct. at 1023; *see, e.g.*, 3-App-221:24-222:12 ("at a certain point you're going to use pronouns and people's name in a visit"); 3-App-218:16-219:11; 3-App-229:4-24 (similar); 1-App-166-69 ¶¶7-12; 1-App-184-86 ¶¶8-13. And when CPAN's or PKC's speech at an event makes transgender individuals "so uncomfortable that they lea[ve]," they have arguably denied those individuals enjoyment of the space itself. *Hager*, 102 F.4th at 701; *cf. Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (anti-discrimination law means the "operator of" a venue cannot prevent protected individuals "from using the facility in the same way that [others] do").

Thus, even on the district court's version of the law, Plaintiffs' speech would be prohibited when it denies transgender-identifying patients access to their event spaces and medical services. Either way, then, "at least some" of Plaintiffs' speech "arguably would deny to an individual because of [gender expression] the full and equal enjoyment of goods and services." *303 Creative*, 6 F.4th at 1172-73 (cleaned up). That is enough to show a credible threat of enforcement.

**2.** The district court also declined to find a credible threat of enforcement because, it said, there is no evidence of "past enforcement against the same" speech that Plaintiffs want to use here. 5-App-170. But this conclusion fails twice over.

First, when "the challenged statute is new, as it is here, the history of past enforcement carries little, if any weight." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022). CADA in its current form (as amended by H.B. 25-1312) had been on the books for only one business day before Plaintiffs "filed this pre-enforcement challenge." *Cerame v. Slack*, 123 F.4th 72, 85 (2d Cir. 2024). So "there was no history of non-enforcement from which we could infer a lack of future intent to enforce it." *Id.* In fact, given the presumption of enforcement for new and recently amended laws, *see supra* 27-28, the fact that H.B. 25-1312 was enacted just before Plaintiffs' lawsuit means the past-enforcement factor cuts in *favor* of Plaintiffs, not against them. *See Roy*, 699 F. Supp. 3d at 1176 ("[T]his factor seems to support standing" when the challenged provision is "new" and "being implemented for the first time" "this year."). Especially because, as the district court agreed, Defendants have not "disavowed" the "possible prosecution" of "Plaintiffs." 5-App-168.

This Court's own caselaw (and the Supreme Court's) confirms the commonsense conclusion that, when a law or amendment is new and the defendant has not forsworn enforcement, there is obviously a credible threat of prosecution. In *Rocky Mountain Gun Owners*, for example, this Court allowed the plaintiffs to challenge a prohibition on firearm sales. 121 F.4th at 104. Although Plaintiffs did not point to any history of

enforcement, they had filed their lawsuit the same day the governor had signed the bill into law and the governor had not "disavowed enforcing [the law] against [the plaintiff]." *Id.* at 104-05, 110-11. And in *American Booksellers*, the Supreme Court found pre-enforcement standing to challenge a ban on the display of pornographic materials. 484 U.S. at 386, 392-93. The State argued that the challenge was "premature" because it was "made before the statute became effective" and no "prosecution" had occurred. *Id.* at 392-93. But the Court found standing because it was a "newly enacted law" and the State had "not suggested" that it would "not be enforced." *Id.*

Other circuits have reached the same conclusion. In *Bryant v. Woodall*, for example, the Fourth Circuit allowed "abortion providers" to challenge North Carolina's "criminalization of previability abortions" in part because the State had amended the abortion law (as Colorado has amended CADA here) just one year before the lawsuit. 1 F.4th at 283, 286-87. "It is difficult to explain," said the court, "why the legislature would have altered the text of the [law] if it did not expect for those words to ever be given effect." *Id.* at 287. And there, the amendment did not even affect the "core" of the abortion prohibition, which the State had "not enforced" at all in the prior "fifty years." *Id.* at 286-87; *see also Cerame*, 123 F.4th at 85-86 (likewise finding a credible threat of enforcement of a "new rule" even though the defendants had never "sanctioned anyone for similar conduct under the prior version" of the rule).

Indeed, even when a law is *not* new, this Court has no difficulty finding a credible threat of enforcement when the defendant declines to disavow enforcement. *See, e.g.*,

41

*Peck*, 43 F.4th at 1124, 1127, 1132-33 (finding a credible threat based on refusal to dis-avow, even though there were no "recorded instances of past prosecutions" in sixteen years). The credible-threat question simply "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Id.* at 1133.

Second, even though Plaintiffs don't need to show prior enforcement history, they have. Defendants have used CADA to punish conduct "similar" to Plaintiffs' speech in the past. *Fischer*, 52 F.4th at 308 (6th Cir. 2022). In one case, the Division found probable cause when a blood bank listed a biologically male blood donor as "male" in the donor profile and "refused" to change the designation to "female." 6-App-143-44; *see id.* (the donor "was not allowed to self-identify her gender"). In another case, a biologically female employee "explained to their manager and their coworkers that their preferred pronouns [were] 'they/them/theirs.'" 6-App-077. But the em-ployee's manager "consistently misgendered them by using female pronouns, 'she/her,'" and "the word 'it.'" *Id.* The Division found probable cause there, too, be-cause the manager "consistently misgendered" the employee. 6-App-078. And in a third case, a biological female employee who identified as male discovered that coworkers "were referring to him as 'her'" and "deadnamed" the employee "in text messages'" 6-App-109-10. Again, the Division found probable cause for discrimination based on "gender identity." 6-App-110-11.

The district court did not discuss the employment cases, and it discounted the blood bank case because, it said, it involved the "denial … of goods and services" in

addition to prohibited speech. 5-App-168-69. But even accepting that characterization, the Division's enforcement history still demonstrates a willingness to use CADA to punish the "type" of speech (non-gender-affirming) at issue here. *Walker*, 450 F.3d at 1089; *see Nessel*, 117 F.4th at 849 ("[A] plaintiff need not always show that the statute has been enforced previously against the precise conduct it wishes to undertake."). "On these facts, the prospect of future enforcement is far from imaginary or speculative." *SBA List*, 573 U.S. at 165 (cleaned up).

## II.    Because Plaintiffs have standing, this Court should grant a preliminary injunction.

Sometimes, when it reverses a district court's preliminary injunction denial based on a threshold error like standing, this Court simply vacates and remands. But this Court can also decide for itself whether an injunction is appropriate and, if so, enter an injunction. *See Ute Indian Tribe. v. Lawrence*, 22 F.4th 892, 908, 910-11 (10th Cir. 2022). That is the better path here, for two main reasons: One, Defendants have forfeited any arguments on CADA's constitutionality, so the merits necessarily favor Plaintiffs. Two, because the merits can only be resolved in Plaintiffs' favor, the remaining preliminary-injunction factors favor Plaintiffs as well.

Sending the case back to the district court, on the other hand, would only compound "the constitutional injury [Plaintiffs] suffe[r]," as they are forced to "restrain" their speech every day they go without an injunction. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019).

43

### A.    Defendants forfeited any argument on the merits

In their preliminary-injunction motion, Plaintiffs explained CADA's constitutional flaws in detail. *See* 1-App-096-110. Yet Defendants, across more than a hundred pages of preliminary-injunction briefing, made *no* argument at all on the substance of *any* of Plaintiffs' First and Fourteenth Amendment claims. Even after Plaintiffs pointed out Defendants' failure to argue the merits, *see* 2-App-236-37, they offered not even a conclusory response. Instead, they rested on their standing arguments. "Thus," Defendants have forfeited the merits, "at least for purposes of … the preliminary injunction order." *Verlo*, 820 F.3d at 1133.

Because Defendants have forfeited the merits, that factor necessarily weighs in favor of an injunction. Nor can Defendants raise any late-in-the-day merits arguments here. They cannot win on a flimsy standing argument in the district court and then, if that argument is rejected here, try to "'prevail on appeal on a different theory'" that Plaintiffs never had the chance to rebut below. *Id* at 1132.; *see Leverington v. Colorado Springs*, 643 F.3d 719, 728 n.6 (10th Cir. 2011).

In sum, because Plaintiffs have standing and Defendants have forfeited the merits, this Court should simply grant the requested injunction. Especially because "the merits" are "most important preliminary-injunction factor," *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018), and, in First Amendment cases, the government "'bears the burden of establishing [a law's] constitutionality,'" *iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014). This Court regularly grants preliminary

injunctions against unconstitutional laws when the "to-be-enjoined party raise[s] no arguments on a particular issue." *Roy*, 699 F. Supp. 3d at 1183; *e.g.*, *Verlo*, 820 F.3d at 1132-33; *Fish v. Kobach*, 840 F.3d 710, 729-30 (10th Cir. 2016). It should do the same here.

### B.    In any event, CADA's speech prohibitions are unconstitutional.

Forfeiture is the simplest path forward. But if this Court chooses to address the merits, it "can easily conclude" that Plaintiffs are "likely to succeed" on their claim that CADA violates the First and Fourteenth Amendments. *Verlo*, 820 F.3d at 1135. Indeed, the Sixth Circuit recently granted Plaintiff Defending Education a preliminary injunction against another pronoun policy precisely because "the First Amendment bars the government from enforcing" controversial views on sex and gender "through its control of language." *Olentangy*, 158 F.4th at 760.

The same is true here. Colorado cannot regulate the speech of those who operate in public accommodations for "no better reason than promoting [its] approved message" on sex and gender. *Hurley*, 515 U.S. at 579); *see* 1-App-096-110. They certainly cannot do so with vague laws that "lac[k] the necessary precision and guidance" to ensure "those enforcing the law do not act in an arbitrary or discriminatory way." *United States v. Lesh*, 107 F.4th 1239, 1247 (10th Cir. 2024); *see* 1-App-103-04, 110. CADA violates both principles.

**1.** Start with H.B. 25-1312's new "gender expression" and "chosen name" definitions, Colo. Rev. Stat. §24-34-301(9), which "at least arguably" punish refusals to "use

a transgender [person's] preferred pronouns," *Nessel*, 117 F.4th at 845. These new definitions violate the Constitution in at least five ways, both on their face and as applied to Plaintiffs.

First, the definitions compel speech because they force those who, like Plaintiffs, believe "only two sexes (male and female) exist" and that "sex is determined at birth" to nevertheless use pronouns and names that "convey[s]" the "message" that "people can have a 'sense of their gender' that differs from their biological sex." *Olentangy*, 158 F.4th at 753-54; *see* 1-App-096-98. Second, they discriminate based on content because they regulate only one kind of speech (names, pronouns, and other forms of address) and only in connection with certain protected characteristics like "gender expression." Colo. Rev. Stat. §24-34-301(3.5), (9); *see* 1-App-098-99; *Speech First v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022). Third, they discriminate based on viewpoint because they punish a "speaker's use of biological pronouns as improper while allowing [others] to use preferred pronouns (no matter how novel)." *Olentangy*, 158 F.4th at 754-55; *see* 1-App-099-100. Fourth, they are overbroad because they punish "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008); *see* 1-App-100-02. And fifth, they are unconstitutionally vague because they do not explain what forms of "addres[s]" they will require Coloradans to honor. Colo. Rev. Stat. §24-34-301(9). The definitions also protect "chosen name[s]" only if they are not chosen for "frivolous purposes" and do not contain "offensive language," but they offer no detail on what language is considered offensive or what purposes are frivolous. *Id.* §24-34-301(3.5).; *see*

46

1-App-103-04. Indeed, even Colorado admits that CADA's application is "dependent on surrounding circumstances." 1-App-244.

**2.** The Unwelcome Provision and Unwelcome Statements Provision, which make it unlawful to "directly or indirectly" publish or communicate statements that make someone feel "unwelcome," "objectionable," "unacceptable," or "undesirable" at a place of public accommodation because of a protected characteristic, Colo. Rev. Stat. §§24-34-601(2)(a), 701(1)(c), suffer from the same constitutional flaws.

They compel speech because they force Coloradans to either alter their publications so that their speech does not make someone feel unwelcome or refrain from making supposedly offensive statements altogether. *See Hurley*, 515 U.S. at 581 (States cannot "compel [a] speaker to alter the[ir] message" to make it "more acceptable to others."); 1-App-104-05. They discriminate based on content because they punish speech based on a reader's subjective reaction. If a statement makes someone *feel* "unwelcome," it is unlawful. *See 303 Creative*, 6. F.4th at 1213-14 (Tymkovich, C.J., dissenting) (the terms "surely impl[y] a subjective element"); 1-App-105. They discriminate based on viewpoint because they prohibit unwelcoming speech only if it targets members of protected categories, effectively prohibiting statements *critical* of a named group while permitting supportive statements. *See* 1-App-105-06. "'It is difficult to imagine'" a less viewpoint-neutral policy. *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1184 (D.N.M. 2014). They are overbroad because they always target pure speech and *most* of the speech they punish is protected speech. *See* 1-App-106-07; *Matal v. Tam*, 582 U.S. 218, 243 (2017)

47

("Giving offense is a viewpoint."). And they are vague because they leave their key terms

undefined, offering no details as to what kind of statements Defendants consider un-

welcoming, objectionable, unacceptable, or undesirable. *See* 1-App-110. Nor do they

explain what information Defendants will consider in making that determination. *See*

*303 Creative*, 6. F.4th at 1214-15 (Tymkovich, C.J., dissenting).

Viewpoint restrictions are always "prohibited," so the challenged laws—both the

definitions and the provisions on unwelcoming language—are necessarily unconstitu-

tional. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018); *see* 1-App-110. Even if they

were only subject to strict scrutiny, Colorado would lose because, though the State may

have an interest in ensuring *access* to public accommodations, it has no compelling in-

terest in suppressing *speech* in public accommodations. *303 Creative*, 600 U.S. at 583-84,

588-89. Even if it did, the definitions are not narrowly tailored. "In fact the only interest

distinctively served by" the laws "is that of displaying the [State's] special hostility to-

wards" traditional views on sex and gender. *R.A.V. v. St. Paul*, 505 U.S. 377, 396 (1992).

### C.   The remaining factors favor a preliminary injunction.

When plaintiffs present a "valid" First Amendment claim, this Court has "little

difficulty" finding that "the remaining preliminary-injunction factors" are met. *Citizens*

*United*, 773 F.3d at 218. Thus, because Plaintiffs likely have standing and Defendants

have forfeited the merits (which Plaintiffs would likely win anyway), Plaintiffs prevail

on the equities as well.

48

**1. Irreparable Harm.** It is "well-settled law" that violating or threatening a constitutional right is always an irreparable harm. *Free the Nipple*, 916 F.3d at 806; *see Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, there is no easily ascertainable "monetary remedy" for Plaintiffs' First and Fourteenth Amendment injuries. *Free the Nipple*, 916 F.3d at 806.

Contrary to Defendants' arguments, those injuries are far from "hypothetical." PI.Opp.42. Since H.B. 25-1312 was passed, Ms. Gimelshteyn and Ms. Lee have been forced to "do mental gymnastics" to "avoid using [the] names" and pronouns of transgender individuals. 3-App-166:16-168:5; *see also* 3-App-116:1-117:15; *supra* 16-17. And CPAN has cancelled at least one public event for fear of running afoul of the law. 3-App-075-76 ¶¶6-8. Likewise, Dr. Morrell and Dr. Leswing now feel compelled to address patients using gender-neutral language where they would prefer to use biological pronouns. *Supra* 16-17; 3-App-194:15-18; 3-App-247:19-250:9; 3-App-254:7-14. Because CADA has "chilled [Plaintiffs'] protected speech," they have "establish[ed] irreparable injury." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024).

The district court, for its part, found that Plaintiffs "have not demonstrated irreparable harm" only because it already concluded that Plaintiffs "have not demonstrated a credible threat of enforcement." Order.23. In other words, the court got the irreparable-injury question wrong because it got the standing question wrong.

**2. The Balance of Harms and the Public Interest.** As with irreparable harm, the balance of the equities necessarily tips in Plaintiffs' favor because they win on the

merits. "[E]ven a temporary loss" of constitutional rights outweighs any harm that a preliminary injunction might cause to a defendant. *Free the Nipple*, 916 F.3d at 806. Any interest Colorado has in enforcing its "likely unconstitutional" law "do[es] not outweigh [Plaintiffs' interests] in having [their] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). The district court agreed, acknowledging that "the public has an interest in protecting an individual's constitutional rights." Order at 23; *see Free the Nipple*, 916 F.3d at 807 (same).

### D.    A tailored preliminary injunction is appropriate here.

The district court also explored a handful of "threshold considerations" bearing on the preliminary-injunction analysis. 5-App-159-64. None of these considerations were dispositive in the court's analysis, *see* 5-App-164 (noting that the real "dispute lies in the result of the [standing] analysis"). To the extent these factors do affect the calculus, though, they favor Plaintiffs.

**1.** First, the district court considered whether the requested injunction would "alter the status quo." 5-App-161. But the status quo is a "tricky metric," *United States v. Texas*, 144 S. Ct. 797, 798 n.2 (2024), which is why courts do not apply a "blanket rule of 'preserving the status quo,'" *Labrador v. Poe*, 144 S. Ct. 921, 931 (2024) (Kavanaugh, J., concurring). Instead, the "essential factor" for a preliminary injunction is "likelihood of success on the merits," where Plaintiffs clearly prevail. *Id.* "[T]he public interest," moreover, does not "favor preserving a status quo that deprives individuals of their constitutional rights." *Latta v. Otter*, 2014 WL 12597162, at *1 (D. Idaho May 14).

But if the status quo does matter, it favors Plaintiffs. Properly understood, the "status quo" is "'the last peaceable uncontested status existing between the parties before the dispute developed.'" *Free the Nipple*, 916 F.3d at 798 n.3. And this dispute developed when Colorado passed H.B. 25-1312. *See supra* 7-9, 16-17. The relevant status quo is therefore "the status existing *before* [Colorado] enacted" that law. *Free the Nipple*, 916 F.3d at 798 n.3.

The district court reached the opposite conclusion because, although H.B. 25-1312 is new, an existing Commission regulation purports to prohibit misgendering and deadnaming when it rises to the level of "harassment." 5-App-161; *see* 3 C.C.R. 708-1:81.6. But as explained above, H.B. 25-1312 doesn't ban harassment; it bans *all* refusals to use a "chosen name" or other preferred terms of "addres[s]." Colo. Rev. Stat. §24-34-301(9); *supra* 34-36. In other words, H.B. 25-1312 and the regulation are two different things. *See* 4-App-262:21-263:2 (agreeing that the regulation's extra requirements are "not in the Colorado Anti-Discrimination Act").

Regardless, even assuming Plaintiffs could have sought relief sooner, "'tardiness is not particularly probative in the context of ongoing, worsening injuries'" like chilled speech. *Cuviello*, 944 F.3d at 833. An injunction, no matter how late in the day, will prevent Plaintiffs' First Amendment injury from compounding further. *Id.*

**2.** Next, the district court reasoned that, because "CADA's private right of action allows individuals to file" civil suits on their own, a preliminary injunction "against Defendants would not cure" Plaintiffs' injury. 5-App-163 (cleaned up). Notably,

52

Defendants never raised this argument themselves. Nor was it raised in *303 Creative*, which granted a similar injunction against the same Defendants and the same law. *See* 725 F. Supp. 3d 1235, 1246-47 (D. Colo. 2024).

For good reason. An injunction does not have to fix *all* of a plaintiff's injuries. The ability "to effectuate a partial remedy" still warrants injunctive relief. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). The Tenth Circuit, applying this principle, has held that injunctions against state officials are appropriate even "in cases where the state defendant shares enforcement power with private litigants." *CDIA v. King*, 678 F.3d 898, 904-05 (10th Cir. 2012).

## CONCLUSION

This Court should reverse and enter a preliminary injunction.

53

Dated: June 8, 2026

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Appellants*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants believe that oral argument would be of assistance to this court and respectfully request oral argument. The use of pronouns, names, and other gender-specific language is a "hot issue" that "has produced a passionate political and social debate." *Meriwether*, 992 F.3d at 508-09. With H.B. 25-1312, Colorado has put its thumb on the scale in that debate. But the district court's decision that Plaintiffs lack standing to seek a preliminary injunction prevents them from even getting a chance to argue that the law is unconstitutional. And without an injunction, Plaintiffs continue to self-censor. The district court's decision should not be affirmed without full deliberation.

## CERTIFICATE OF COMPLIANCE

This brief complies with FRAP 32(a)(7)(B) because it contains 12,908 words, excluding the parts that can be excluded. This brief also complies with FRAP 32(a)(5)-(6) and 10th Circuit Rule 32(A) because it is prepared in a proportionally spaced face using 14-point Garamond font.

Dated: June 8, 2026

/s/ J. Michael Connolly
Counsel for Appellants

## CERTIFICATE OF SERVICE

On June 8, 2026, I e-filed this brief with the Court, which will email everyone requiring notice.

Dated: June 8, 2026

/s/ J. Michael Connolly
Counsel for Appellants

55

**ATTACHMENT A:**
**DISTRICT COURT'S ORDER ADOPTING**
**MAGISTRATE JUDGE RECOMMENDATION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

**Civil Action No. 25-cv-01572-RMR-MDB**

DEFENDING EDUCATION, *et al.*,

      Plaintiffs,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division (the "Division"), in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and ERIC ARTIS, as members of the Colorado Civil Rights Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official capacity,

      Defendants.

**Civil Action No. 25-cv-01668-RMR-MDB**

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

**Civil Action No. 25-cv-02177-RMR-MDB**

DOXA ENTERPRISES, LTD d/b/a Born Again Used Books,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

**5-App-149**

## ORDER ADOPTING MAGISTRATE JUDGE RECOMMENDATION

This matter is before the Court on the Recommendation of United States Magistrate Judge Maritza Dominguez Braswell. On February 19, 2026, Magistrate Judge Braswell held a hearing addressing three motions for preliminary injunction in three related cases: *Defending Education, et al, v. Sullivan, et al.*, No. 25-cv-01572-RMR-MDB ("Defending Education"); *Committee of Five, Inc. v. Sullivan, et al.*, No. 25-cv-01668-RMR-MDB ("Committee of Five"); and *Doxa Enterprises, Ltd., v. Sullivan, et al.*, No. 25-cv-02177-RMR-MDB ("Doxa"). At the end of the hearing, Magistrate Judge Braswell pronounced the Recommendation: *Defending Education*, ECF No. 102; *Committee of Five*, ECF No. 87; and *Doxa*, ECF No. 49.

The motions addressed in the Recommendation are motions for preliminary injunction filed by Plaintiff(s) in each case: *Defending Education*, ECF No. 27; *Committee of Five*, ECF No. 15; and *Doxa*, ECF No. 4. Magistrate Judge Braswell recommends denying each motion for preliminary injunction. Plaintiff(s) timely filed an objection to the Recommendation in each case: *Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; and *Doxa*, ECF No. 57. Defendants filed a response in each case: *Defending Education*, ECF No. 112; *Committee of Five*, ECF No. 97; and *Doxa*, ECF No. 59.

The Court has reviewed the Recommendation, as well as the objections, the responses, the record, and the pleadings in each case. For the reasons stated below, the Court overrules the objections and adopts the Recommendation.

## I.    BACKGROUND

The central issue in this case is whether the Court should enjoin enforcement of Colorado's amended anti-discrimination law. All Plaintiffs allege the amended statute unconstitutionally regulates their speech, violating the First and Fourteenth Amendment.[1] The Colorado Anti-Discrimination Act ("CADA") prohibits discrimination in places of public accommodation. *See* Colo. Rev. Stat. § 24-34-601. In May 2025, Colorado passed HB25-1312 (the "Act"), which amends portions of the CADA. Plaintiffs challenges the constitutionality of CADA's discrimination in places of public accommodation statute with the Act's amended definitions.

### A.  Colorado Statutes at Issue

The "Discrimination in places of public accommodation" statute under CADA as amended states:

> It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, **gender identity**, **gender expression**, marital status, national origin, or ancestry the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation **or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is**

---

[1] Because these cases involve "a common question of law or fact," the Court addresses the *Defending Education*, *Committee of Five*, and *Doxa* preliminary injunction motions in this consolidated Order "to avoid unnecessary cost or delay" under Fed. R. Civ. P. 42(a).

> **unwelcome, objectionable, unacceptable, or undesirable**
> because of disability, race, creed, color, sex, sexual
> orientation, **gender identity**, **gender expression**, marital
> status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601(a)(2) (emphases added). The Act amends CADA's definition

of "gender expression" to:

> an individual's way of reflecting and expressing the
> individual's gender to the outside world, typically
> demonstrated through appearance, dress, behavior, **chosen
> name**, and how the individual chooses to be addressed.

*Id.* § 24-34-301(9) (emphasis added). It also amends "chosen name" to mean:

> a name that an individual requests to be known as in
> connection to the individual's disability, race, creed, color,
> religion, sex, sexual orientation, gender identity, gender
> expression, marital status, familial status, national origin, or
> ancestry, so long as the name does not contain offensive
> language and the individual is not requesting the name for
> frivolous purposes.

*Id.* § 24-34-301(3.5). And finally, "gender identity" is defined under CADA as:

> an individual's innate sense of the individual's own gender,
> which may or may not correspond with the individual's sex
> assigned at birth.

*Id.* § 24-34-301(10).

## B. Background on *Defending Education*, *Committee of Five*, and *Doxa* Plaintiffs

*Defending Education* plaintiffs are various non-profit organizations (Defending

Education, Colorado Parent Advocacy Network, Protect Kids Colorado, and Do No

Harm), two individuals (Dr. Travis Morrell and Dr. Valeri Leswing), and Dr. Leswing's

medical practice, Mountain Pediatrics. *Defending Education*, ECF No. 27 at 12-13. The

organizations "hold traditional views on matters of sex and gender identity" and "believe

that sex is determined at birth and immutable." *Id.* at 13. They host events in places of public accommodation and want "to refer to individuals at these events using biological pronouns, birth names, and other biologically accurate terms, even if those pronouns, names, or terms conflict with an individual's self-professed gender identity or expression." *Id.* at 13. Dr. Morrell and Dr. Leswing possess "scientific, objective, and reproducible views on matters of sex and gender identity." *Id.* at 14. Dr. Morrell also "wants to refer to individuals using birth names and biologically accurate pronouns and other terms" when writing or speaking publicly about issues of sex and gender. *Id.* Dr. Leswing "wishes to issue a public statement notifying potential patients that she will not refer to them using chosen names, preferred pronouns, or other non-biological terms." *Id.* at 15.

The *Defending Education* organizations allege the Act forces them to stop addressing individuals by their biological pronouns in places of public accommodation and prohibits them from publishing materials that refer to individuals using biologically accurate pronouns, birth names, and other terms inconsistent with their purported gender identity or gender expression. *Id.* Dr. Morrell and Dr. Leswing "fear that their medical practices will be investigated and punished for their speech," and Dr. Morrell fears termination of his ownership interest or other disassociation from his medical practice if he is investigated. *Id.*

*Committee of Five* plaintiff is an athletic-apparel retailer called XX-XY Athletics ("XX-XY") with a distinct message and mission: "to empower women and protect women's sports and women's spaces." *Committee of Five*, ECF No. 1 ¶ 1. XX-XY's message and mission are "grounded in the belief that men and women are physiologically different; sex

5

**5-App-153**

is binary, biological, and immutable; women deserve the chance to be champions in their own sports." *Id.* XX-XY uses its platform to draw attention to "men and boys who compete in women's sports" and "refers to them with masculine pronouns and terms, often using their given name, rather than their chosen names." *Id.* ¶ 2. In one instance, XX-XY published a video on X "protesting a male athlete competing in girls' high-school track in Pennsylvania." *Id.* ¶ 3. The post included the text: "Sean 'Luce' Allen is having a track season to remember. Meanwhile girls are receiving a message they'll never forget. When boys run girls' track, they win. *And girls lose*." *Id.* The post refers to the athlete as a "boy" and uses the athlete's given name. *Id.* XX-XY alleges that if it could not refer to male athletes as "male," "men," or "boys," its advertisements would not make sense. *Id.* ¶ 4. It asserts that "the Act coerces the company to speak against its principles and alter the meaning of its core message." *Id.* ¶

Finally, *Doxa* plaintiff is a Christian bookstore, Born Again Used Books, in Colorado Springs with the "mission [] to provide literature that supports customers in their relationship with God and others." *Doxa*, ECF No. 4-1 at 10. To achieve this, Born Again Used Books "curates its selection according to its Christian faith, refusing to sell books with a message contradicting the store's mission of providing uplifting Christian support." *Id.* "To stay faithful to these beliefs," Born Again Used Books "will not use pronouns, honorifics, or other language inconsistent with a person's sex." *Id.* at 9. Additionally, it would like to "formalize this policy, publish it to its employees and customers, and publicly explain the religious basis for the policy, including by writing about it on the Bookstore's blog." *Id.* However, Born Again Used Books "happily sells books to everyone." *Id.* It "fears

that if it formalized its policy on gender identity and pronouns and spoke about that policy on its blog, Colorado would swoop in to punish it under CADA." *Id.* at 12.

*Defending Education* plaintiffs, XX-XY, and Born Again Used Books (collectively, "Collective Plaintiffs") seek as-applied pre-enforcement preliminary injunctions under the First and Fourteenth Amendment enjoining Defendants from enforcing CADA on them. *Defending Education*, ECF No. 25; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4.

### C. First Amendment Pre-Enforcement Claims

To establish standing for its First Amendment pre-enforcement claim, Collective Plaintiffs must demonstrate they "intend[] to engage in arguably protected conduct that is covered by the challenged governmental action" and "face[] a credible threat of enforcement." *Gays Against Groomers v. Garcia*, No. 24-1473, 2026 WL 668378, at *5 (10th Cir. Mar. 10, 2026). The plain language of CADA's public accommodation statute describes prohibited "discriminatory conduct" as "to refuse, withhold from, or deny to an individual or a group, because of . . . gender identity, gender expression . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a public place of accommodation." Colo. Rev. Stat. § 24-34-601. Therefore, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex without denying goods or services—does not appear on its face to violate CADA or present a credible threat of enforcement. For these reasons, and those stated below, the Court accepts the Recommendation and denies each Collective Plaintiffs' Motion for Preliminary Injunction.

## II.    LEGAL STANDARD

The Court is required to make a de novo determination of those portions of a magistrate judge's recommendation to which a specific, timely objection has been made, and it may accept, reject, or modify any or all of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

"[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996).

## III.    THE RECOMMENDATION

Magistrate Judge Braswell opens and closes her Recommendation emphasizing that "[a] preliminary injunction is an extraordinary remedy, the exception rather the rule." *Doxa*, ECF No. 54 at 79:7-10 (quoting *Gunnison Cnty. Stockgrowers' Ass'n, Inc. v. U.S. Fish & Wildlife Serv.*, 707 F. Supp. 3d 1056, 1062 (D. Colo. 2023)); *id.* at 91:22-25. She also highlights several threshold considerations. First, there is no "freestanding constitutional right to pre-enforcement review in federal court." *Id.* at 79:22-80:2 (quoting *Uber Techs., Inc. v. Moss*, No. 1:25-CV-00096-DDD-KAS, 2025 WL 1420940, at *3 (D. Colo. Jan. 31, 2025)). Second, the injunctive relief requested is exceptionally broad. *Id.*

80:3-8. Third, the motions for preliminary injunction seek the same relief as its complaint, which is disfavored. *Id.* at 80:12-16 (citing *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019)). Fourth, granting a preliminary injunction would disturb rather than preserve the status quo. *Id.* at 81:5-11. And fifth, even if the Court were to enjoin Defendants from enforcing the challenged provisions, Collective Plaintiffs would still be required to comply with CADA or risk suit by an aggrieved individual. *Id.* at 81:18-25. Magistrate Judge Braswell explains the evidence "suggests that [Collective] Plaintiffs feel the pressure more significantly from the public at large than anything else. . . . Thus, from the Court's perspective, [Collective] Plaintiffs' own statements demonstrate that a preliminary injunction would be of limited practical value and would not cure the dilemma that they describe." *Id.* at 82:18-83:5.

Next, Magistrate Judge Braswell turns to the factors Collective Plaintiffs must prove to succeed on a request for pre-enforcement preliminary injunction. She first considers the likelihood of success on the merits and the fundamental question of standing. *Id.* at 83:9-22. Magistrate Judge Braswell explains that even if Collective Plaintiffs made a clear showing that their speech is actually prescribed and chilled, "the absence of a credible threat of enforcement can be dispositive in a pre-enforcement standing analysis." *Id.* at 84:13-20 (citing *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 512 (6th Cir. 2025)). When analyzing credible threat of enforcement, Magistrate Judge Braswell evaluates three factors: (1) whether the Collective Plaintiffs showed past enforcement against the same conduct; (2) whether authority to initiate the charges was not limited to a prosecutor or an agency and instead

any person can file a complaint; and (3) whether the state disavowed future enforcement. *Id.* at 84:21-85:2. She also highlights that "[e]ach element must be supported in the same way as any other matter on which the [Collective] Plaintiff bears the burden of proof, *i.e.*, with the same manner and degree of evidence required at the successive stages of the litigation." *Id.* at 85:7-14 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). At the preliminary injunction stage, the plaintiff must make a "clear showing that she is likely to establish each element of standing." *Id.* at 85:15-22 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). Therefore, Magistrate Judge Braswell applies the clear showing standard. *Id.* at 85:23-86:6.

Magistrate Judge Braswell distinguishes *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1169 (D. Colo. 2023) and highlights that, in that case, Judge Domenico recognized the presumption of enforcement for new laws but did not adopt the presumption himself. *Id.* at 85:2-10. She also explains that Collective Plaintiffs overstates *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 387 (1988), because the statute in that case was directed at plaintiffs and imposed criminal prosecution as a penalty. *Id.* at 86:17-87:1. Then, she clarifies that Defendant Sullivan's interpretation of the subject CADA provisions, while not law, helps demonstrate that the mere act of speaking would not automatically trigger enforcement and that this operates like a disavowal under factor three (whether the state disavowed future enforcement). *Id.* at 87:15-88:23. Regarding factor one (whether the Collective Plaintiffs showed past enforcement against the same conduct), Magistrate Judge Braswell calls attention to the fact that the Colorado Civil Rights Division (the "Division") has not received any complaints about Collective Plaintiffs'

10
**5-App-158**

misgendering and that the Division has not warned them that their desired approach is unlawful. *Id.* at 88:24-89:6. She ultimately determines that these two of the three factors are enough to weigh against a finding of credible threat of enforcement and that Collective Plaintiffs have "not demonstrated a credible threat under the heavy burden that applies to these preliminary injunction motions." *Id.* at 90:2-25. With respect to factor two (whether authority to initiate the charges is limited to a prosecutor or an agency), Magistrate Judge Braswell states that any person can file a charge alleging discrimination under CADA. *Id.* at 90:9-14. Collective Plaintiffs contend that the authority to initiate charges remains with the Division, because it can choose which complaints to take action on. *Id.* at 90:15-20. Even if this factor weighed in favor of Collective Plaintiffs, Magistrate Judge Braswell finds the balance of the three factors weigh against them. *Id.* at 90:21-25. Thus, she determines that Collective Plaintiffs have not established a credible threat of enforcement to have standing.

Finally, Magistrate Judge Braswell notes that "the balance of harms and public interest do not favor the sweeping injunctions [Collective] Plaintiffs seek." *Id.* at 91:7-17. Thus, she recommends the preliminary injunction requests be denied.

## IV.   ANALYSIS

### A. Threshold Considerations

Collective Plaintiffs object to the Recommendation's threshold considerations, arguing that "none has merit." ECF No. 57 at 1. Plaintiff makes six arguments: (1) a preliminary injunction could be undone after trial; (2) a preliminary injunction would not disrupt the status quo; (3) preliminary injunctions are proper in pre-enforcement litigation;

(4) Collective Plaintiffs seek an appropriate scope of relief; (5) CADA's enforcement scheme counsels for preliminary relief, not against it; and (6) standing requirements are applied leniently in First Amendment cases. The Court addresses each argument below.

First, Collective Plaintiffs object to the Recommendation's fourth threshold consideration that they seek a disfavored injunction. Disfavored injunctions prompt "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-the-harms factors." *Free the Nipple*, 916F.3d at 797. Collective Plaintiffs argue that they are not seeking a disfavored injunction because, although their complaints and motions for preliminary injunction seek the same relief, the preliminary injunction can be undone. *Committee of Five*, ECF No. 95 at 7-8; *Doxa*, ECF No. 57 at 7-8 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001)). Collective Plaintiffs contend the instant case is similar to *Pierce*, where the Tenth Circuit determined "the preliminary injunction granted by the district court did not, as the defendants contend, afford the tribe substantially all the relief it might recover." 253 F.3d at 1278. The Court agrees. In *Pierce*, the plaintiff's complaint alleged that "the state was compelled to grant recognition to tribal motor vehicle registrations and titles pursuant to the Indian Commerce Clause, the Kansas Act for Admission, and other federal law." *Id.* at 1239. The preliminary injunction motion sought to "enjoin the Defendants from enforcing the Kansas motor vehicle registration and titling laws against the Plaintiff and any persons who operate or own a vehicle registered and titled the Tribal Code § 17-10-1 *et seq.*" *Id.* Here, Collective Plaintiffs' complaint seeks a "preliminary and permanent injunction" to enjoin Defendants and those acting in concert with them from enforcing CADA as applied to Collective

Plaintiffs and "third-party speakers similarly situated to" them. *Committee of Five*, ECF No. 1 at 50; *Doxa*, ECF No. 1 at 40. Collective Plaintiffs' preliminary injunction requests only seek to enjoin Defendants from enforcing CADA as applied to Collective Plaintiffs. *Committee of Five*, ECF No. 15 at 1-2; *Doxa*, ECF No. 4 at 1-2. Thus, the Court is persuaded by Collective Plaintiffs' argument that granting their preliminary injunction requests would not afford them all the relief they might recover.

However, another type of disfavored injunction is one that would alter the status quo. *Free the Nipple*, 916 F.3d at 797. Collective Plaintiffs argue a preliminary injunction would not disrupt status quo. The Court disagrees. As Defendants note, the CADA provisions at issue were in place decades before the passage of the Act and, the "Commission Rules have explicitly outlined when misgendering and deadnaming rise to a CADA violation since 2009." *Committee of Five*, ECF No. 97 at 4; *Doxa*, ECF No. 59 at 4. Commission Rule 81.6(A)(4), which went into effect November 30, 2009, prohibits "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as unlawful harassment. 3 CCR 708-1-81.6(4). Thus, Collective Plaintiffs' argument that CADA as applied prior to the Act only prevented discrimination in furnishing tangible goods does not hold weight. Their requested injunctions would disrupt CADA's decades-long history. Accordingly, the Court agrees with the Recommendation's finding that Collective Plaintiffs seek a disfavored injunction.

Next, Collective Plaintiffs object to Magistrate Judge Braswell's determination that pre-enforcement actions are "particularly fraught" because there is no "freestanding constitutional right to pre-enforcement review in federal court." *Committee of Five*, ECF

No. 95 at 9; *Doxa*, ECF No. 57 at 9. They argue that the Tenth Circuit regularly grants pre-enforcement preliminary injuncions and that "*Uber Technologies* merely stands for the proposition that a pre-enforcement plaintiff seeking a preliminary injunction must show a credible threat to avoid an 'advisory ruling.'" *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9 (citing *Uber Technologies*, 2025 WL 1420940, at *3). The Court finds Collective Plaintiffs' reasoning coincides with the Recommendation. The Court interprets Magistrate Judge Braswell's statement that there is no "freestanding constitutional right to pre-enforcement review in federal court" to mean that a preliminary injunction is an extraordinary remedy and that Collective Plaintiffs must meet their burden in demonstrating the right to a pre-enforcement preliminary injunction. Collective Plaintiffs do not (and cannot) dispute this.

Fourth, Collective Plaintiffs contend the relief they seek is appropriate in scope and not "exceptionally broad" as stated in the Recommendation. *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9. The Court acknowledges that the Recommendation addresses all three preliminary injunction motions filed by different groups of plaintiffs. Thus, certain statements made in the Recommendation may apply more directly to some plaintiff's motions and not others. The Court agrees that injunctive relief must be "narrowly tailored to remedy the harm shown." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002). However, the scope of each Collective Plaintiffs' relief requested was not the basis for the recommended denial of injunctive relief, and the Court will not give this consideration extra weight.

Fifth, Collective Plaintiffs object to the Recommendation's interpretation of CADA's enforcement scheme as it relates to their motions for preliminary injunction. Collective Plaintiffs argue "an injunction need not relieve every conceivable injury to provide an appropriate remedy." *Committee of Five*, ECF No. 95 at 10; *Doxa*, ECF No. 57 at 10 (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)). The Recommendation does not bring up CADA's private right of action to indicate that an injunction needs to relieve "every conceivable injury." Instead, CADA's private right of action allows individuals to file the type of complaints Collective Plaintiffs seek to enjoin Defendants from pursuing. This part of CADA's enforcement scheme highlights the fact that the grant of Collective Plaintiffs' preliminary injunction motions against Defendants "would not cure the dilemma that [Collective Plaintiffs] describe." ECF No. 54 at 82:18-83:5. Thus, the Recommendation appropriately considers this threshold issue before reaching the merits of the case.

Finally, Collective Plaintiffs contend the Recommendation incorrectly applied the heightened "clear showing" standard in its analysis. *Committee of Five*, ECF No. 95 at 11; *Doxa,* ECF No. 57 at 11. Relying on *Peck*, Collective Plaintiffs argue that standing requirements should be applied "leniently" in First Amendment cases.  (citing *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022)). Collective Plaintiffs fail to address the rest of the Tenth Circuit's statement—"the First Amendment context creates unique interests that lead us to apply the standing requirements *somewhat more leniently*, facilitating pre-enforcement suits." *Peck*, 43 F. 4th at 1129 (emphasis added). The Tenth Circuit goes on to explain that a plaintiff bringing a First Amendment claim can prove

standing by: (1) "alleging an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a *credible threat of prosecution* thereunder" or (2) "alleging a *credible threat of future prosecution* plus an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights." *Id.* (emphases added). This does not contradict the Recommendation's application of the "clear showing" standard. *See Murthy*, 603 U.S. at 58 ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."). Further, Collective Plaintiffs concede in their objections that "[p]recedent requires only a *clear showing* that the Bookstore is *likely* to establish a credible threat of enforcement." *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (first emphasis added). Thus, Collective Plaintiffs admit the Recommendation was correct in applying the "clear showing" standard. However, Collective Plaintiffs insinuate that, because this "is not supposed to be a difficult bar for plaintiffs to clear," they must have surpassed it. *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024)). The dispute lies in the result of the analysis, which the Court turns to next.

### B.  Credible Threat of Enforcement

Collective Plaintiffs assert they have standing, because they each face a credible threat of enforcement. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11. Preliminarily, Plaintiff alleges the Recommendation disregards Tenth Circuit precedent where plaintiffs were found to have standing even with past enforcement of a statute. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *303 Creative LLC*

*v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021), *rev'd*, 600 U.S. 570 (2023); *Chiles*, 116 F.4th at 1198). Although Plaintiff does not discuss how this precedent applies to the instant case, the Court finds them distinguishable.

Shortly before entering this Order on March 31, 2026, the Supreme Court issued its opinion on *Chiles*, reversing the Tenth Circuit's judgment. *Chiles v. Salazar*, No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026). The Supreme Court agreed with both the district court and the Tenth Circuit determination that "Ms. Chiles had Article III standing to pursue her as-applied pre-enforcement challenge." *Id.* at *5. "Ms. Chiles had alleged a 'credible threat' that the State would enforce its law against her if she continued speaking as she had in the past and wished to do in the future." *Id.* Additionally, "both courts observed, Colorado authorities had refused to disavow bringing enforcement actions against her." *Id.* The circumstances in this case are different.[2] As described above, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex—in and of itself does not violate CADA's public accommodations statute. The plain language of the statute requires denial of "the full and equal enjoyment of the goods [or] services" of each public accommodation. Colo. Rev. Stat. § 24-34-601. Collective Plaintiffs have not alleged such denial of goods or services. In fact, Born Again Used Book states it will "happily sell its products to anyone." Therefore, Collective Plaintiffs' intended conduct does not appear on its face to violate CADA or present a credible threat of enforcement. And, for the

---

[2] The Court also notes that the *303 Creative* is distinguishable, because it was decided at the summary judgment stage on the merits. *303 Creative LLC*, 6 F.4th at 1190, The instant case has not yet reached the merits.

reasons stated below, Collective Plaintiffs have failed to demonstrate the elements of credible threat of enforcement to justify pre-enforcement injunctive relief.

### 1.  Disavowal of Future Enforcement

Collective Plaintiffs reject the Recommendation's finding that Director Sullivan's testimony "operates like a disavowal." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12. Collective Plaintiffs suggest that, because it declines to use pronouns in *every* situation, it "risks violating Colorado's supposedly fact-intensive and obscure inquiry." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12.  Relying on *Scott v. Allen*, they contend that "Colorado's claim that enforcement under CADA depends on the facts just confirms the enforcement threat."  *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. But in *Scott v. Allen*, "at least one professional association believe[d] that Scott violated the statute, and the District Attorney himself refuse[d] to disavow that Scott's intended actions do not fall under the statute." 153 F.4th 1088, 1097 (10th Cir. 2025). Additionally, the District Attorney did not disavow the possibility of a future prosecution. *Id.*

Here, the specific facts at issue are important. Again, Collective Plaintiffs have represented they will not deny their goods or services to anyone. Therefore, there is no violation of the statute on its face. Further, while Collective Plaintiffs eschew the Division's explanation of the process it uses to determine whether a prosecution under this statute would be pursued, such explanation sheds light on the likelihood of prosecution and the credible threat of prosecution—an issue on which Collective Plaintiffs bear the burden. According to the Director, a CADA violation would have to satisfy three steps: (1) "the

public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status"; (2) "the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity;" and (3) "the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity." *Committee of Five*, ECF No. 84-1 at 7; *Doxa*, ECF No. 46-1 at 7. Defendants have provided sworn declarations, deposition testimony, and discovery responses explaining that Collective Plaintiffs' intended misgendering and deadnaming alone is not conduct that violates CADA *per se*—the conduct must rise to the level of harassment to be a violation. *Doxa*, ECF No. 59 at 7-8; *see Doxa*, ECF No. 46-1 at 8 (Defendants' interrogatory response describing conduct that would violate CADA: "Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment."). The Division has not received any complaints against a place of public accommodation regarding its policy or publication on misgendering or deadnaming. *Committee of Five*, ECF No. 84-1 at 555; *Doxa*, ECF No. 46-1 at 555. Even if a member of the public were to file a complaint, it would ultimately be up to the Division to determine whether an enforcement action would proceed. Again, the Director has provided evidence that such an action would not be taken under the

circumstances presented by Collective Plaintiffs. While it is true the Defendants have not completely disavowed any possible prosecution of Collective Plaintiffs under any circumstances, this is not required. Rather Collective Plaintiffs must demonstrate a credible threat of prosecution. has At this stage, they have not offered a reasonable basis to infer they face a credible threat of prosecution—which, again, is their burden. Thus, the Court agrees with the Recommendation on this factor.

### 2. Past Enforcement Against the Same Conduct

Plaintiff contends that "[e]nforcing CADA against similar speech is enough" to satisfy the second credible threat of enforcement. *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. Collective Plaintiffs offer two examples where the Division found probable cause "based solely on misgendering." *Committee of Five*, ECF No. 95 at 13-14; *Doxa*, ECF No. 57 at 13-14. According to Collective Plaintiffs, these examples and the fact that they challenge "a newly enacted law" is enough to prove this factor.

Defendants clarify that the examples introduced by Collective Plaintiffs were circumstances in which there was "a denial of full and equal enjoyment of goods and services." *Committee of Five*, ECF No. 97 at 10; *Doxa*, ECF No. 59 at 10. The first example involved a complainant utilizing the respondent's services to donate blood. *Doxa*, ECF No. 47 at 142. The complainant identified as "male" when creating a donor profile but completed her transition from male to female over a decade later. *Id.* After her transition, the complainant sought the respondent's blood donation services and filled out a new profile, self identifying as "female." *Id.* at 143. The respondent merged the accounts but "refused to change the [c]omplainant's gender to female in the system." *Id.* In the

20
5-App-168

second example, the charging party and her friend were patrons of the respondent, a cocktail lounge. *Id.* at 23. The charging party, who identifies as female/transgender, and her friend went to the women's bathroom. *Id.* at 22-23. When they exited the bathroom, an off-duty police officer employed by the respondent was waiting to speak with them. *Id.* at 23-24. The officer "told her if they were going to use the women's bathroom again then they were not permitted to re-enter the establishment. *Id.* at 24.

As described above, a violation of CADA requires a denial of the full and equal enjoyment of the goods or services offered by the public accommodation because of the individual's gender identity. In the blood bank case, the complainant "was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile." *Id.* at 143. In the other example, the complainant was told if she and her friend were "going to use the women's bathroom again then they were not permitted to re-enter the establishment." *Id.* at 24. In both cases, the complainants were denied the services of the public accommodations because of their gender identity.

Collective Plaintiffs have expressed that they intend to offer their goods or services to everyone. Additionally, *Darren Patterson Christian Academy* and *St. Mary* do not involve the conduct of misnaming and deadnaming. *Darren Patterson Christian Academy*, 699 F.Supp.3d at 1173 (addressing the non-discrimination rules of the "Universal Preschool Program" as applied to hiring ministers); *see also St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956 (D. Colo. 2024) (also addressing the "Universal

Preschool Program). Thus, Collective Plaintiffs have not satisfied their burden of demonstrating past enforcement against the same conduct.

### 3.  Authority to Initiate Charges

Collective Plaintiffs also object to the Recommendation's conclusion that an individual's ability to file a charge against them weighs against a clear threat of enforcement. *Committee of Five*, ECF No. 95 at 15; *Doxa*, ECF No. 57 at 15. Collective Plaintiffs rely on *303 Creative*, arguing that CADA's complaint process itself creates a credible threat of enforcement. *Id.* Indeed, the Supreme Court stated that "anyone in the State may file a complaint . . . and initiate a potentially burdensome administrative hearing process." *303 Creative*, 600 U.S. at 583. However, *303 Creative* did not describe the weight of each factor in the clear threat of enforcement analysis. In this case, Magistrate Judge Braswell clearly explained that the weight of the other two factors are sufficient to find that Collective Plaintiffs have not demonstrated they face a credible threat of enforcement. *Doxa*, ECF No. 54 at 90:21-25. Collective Plaintiffs do not dispute this.

Thus, the Court finds that Collective Plaintiffs have not met their burden in proving clear threat of enforcement to establish standing.

### C.  Remaining Preliminary Injunction Factors

Finally, Collective Plaintiffs object to the Recommendation's finding that the remaining preliminary injunction factors weigh against preliminary relief. *Committee of Five*, ECF No. 95 at 15-16; *Doxa*, ECF No. 57 at 15-16. Collective Plaintiffs asserts that (1) their injuries are irreparable because they face a credible threat of enforcement by Colorado and (2) "it is always in the public interest to prevent the violation of a party's

constitutional rights." *Committee of Five*, ECF No. 95 at 16; *Doxa*, ECF No. 57 at 16. (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). As described above, Collective Plaintiffs have not demonstrated a credible threat of enforcement. They also fail to provide evidence of a single complaint or history of enforcement tied to the conduct at issue. Therefore, Collective Plaintiffs have not demonstrated irreparable harm. And, while the Court agrees the public has an interest in protecting an individual's constitutional rights, this alone cannot overcome Collective Plaintiffs' failure to satisfy their burden of demonstrating that the extraordinary relief of pre-enforcement injunction is appropriate.

Accordingly, the Court agrees with the Recommendation and finds that Collective Plaintiffs have not carried their burden to demonstrate pre-enforcement injunctive relief is appropriate. Therefore, their requests for preliminary injunction are denied. The Court notes that, at this stage, it has not reached the merits of these cases. The motions to dismiss (*Committee of Five*, ECF Nos. 69, 70; *Defending Education*, ECF Nos. 81, 82; *Doxa*, ECF Nos. 33, 34) are fully briefed and the Court orders the parties to set a status conference with Magistrate Judge Braswell as soon as possible to address the motions to dismiss and the relief requested thereunder.

### V.    CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Collective Plaintiffs' Objections to the Recommendation (*Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; *Doxa*, ECF No. 57) are OVERRULED;

5-App-172

2. The Recommendation (*Defending Education*, ECF No. 102; *Committee of Five*, ECF No. 87; *Doxa*, ECF No. 49) is ACCEPTED AND ADOPTED;

3. Collective Plaintiffs' Motions for Preliminary Injunction (*Defending Education*, ECF No. 27; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4) are DENIED; and

4. The parties are ORDERED to set a status conference with Magistrate Judge Braswell to address the pending motions to dismiss (*Defending Education*, ECF Nos. 81, 82; *Committee of Five*, ECF Nos. 69, 70; *Doxa*, ECF Nos. 33, 34) and the relief requested thereunder.


DATED:  March 31, 2026


BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

**ATTACHMENT B:**
**RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No:    25-cv-01572-RMR-MDB    Date:    February 19, 2026
Courtroom Deputy:    E. Lopez Vaughan    FTR:    Courtroom 101

_Parties:_    _Counsel:_

Defending Education et al    Paul Draper

    Plaintiffs,

v.

Aubrey Sullivan et al    Janna Fischer

    Defendants.

Truth and Liberty Coalition, Inc. et al

    Amicus    Andrew Nussbaum

---

Civil Action No:    25-cv-01668-RMR-MDB

Committee of Five, Inc.    Mercer Martin

    Plaintiff
v.

Aubrey Sullivan, et al    Janna Fischer

    Defendants

Truth and Liberty Coalition, Inc. et al

    Amicus    Andrew Nussbaum

---

Civil Action No:    25-cv-02177-RMR-MDB

Doxa Enterprise    Mercer Martin

    Plaintiffs,

**5-App-021**

v.

Aubrey Sullivan et al                                    Janna Fischer

    Defendants.

---

## COURTROOM MINUTES

---

**MOTION HEARING**

**1:02 p.m.        Court in session.**

Court calls case.  Appearances of counsel.

These matters are being heard contemporaneously on Plaintiffs'*Motions for Preliminary Injunctions:*
ECF No. 27 in 25-cv-01572
ECF No. 15 in 25-cv-01668
ECF No. 4 in 25-cv-02177

**2:22 p.m.        Court in recess.**
**2:29 p.m.        Court back in session.**

For reasons put forth on the record, the Court issues its findings in the form of
**RECOMMENDATION(S)** that the Motions for Preliminary Injunctions in each case be
**DENIED.**[1]

---

[1]**ADVISEMENT TO THE PARTIES**
Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

**5-App-022**

Additionally, the Court considers the *Motions to Restrict* at ECF No.'s 72 and 88 in Case 25-cv-01572 and for reasons put forth on the record, it is

**ORDERED**:   The *Motions to Restrict* are both **GRANTED**.


**2:52 p.m.        Court in recess.**

Hearing concluded.
Total in-court time    01:45

*To order transcripts of hearings, please contact Patterson Transcription Company at (303) 755-4536 or AB Litigation Services at (303) 629-8534.

**5-App-023**

**ATTACHMENT C:
TRANSCRIPT OF UNITED STATES
MAGISTRATE JUDGE'S ORAL RECOMMENDATION**

of a recommendation which the parties can object to in the appropriate timeframe.

The record is obviously audio, but the parties can order a transcript, and you can order that transcript on an expedited basis if you'd like, so it doesn't cut into your objection period for too long.

A preliminary injunction is an extraordinary remedy, the exception rather than the rule. *Gunnison County Stockgrowers' Association, Inc. v. U.S. Fish and Wildlife*, 707 F.Supp. 3d 1056, 1062 (D. Colo. 2023). "To obtain a preliminary injunction, the movant must show a substantial likelihood of success on the merits; irreparable harm to the movant if the injunction is denied; three, that the threatened injury outweighs the harm the preliminary injunction may cause the opposing party; and four, that the injunction, if issued, will not adversely affect the public interest. It is the movant's burden to establish that each of these four factors tips in their favor."

Before considering each of the preliminary injunction factors, I want to highlight several threshold considerations.

First, this is a pre-enforcement action. Preliminary injunctions in pre-enforcement actions are, quote, "particularly fraught," unquote, because there is no, quote, "freestanding constitutional right to pre-enforcement

**5-App-117**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 80 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 96

80

review in federal court," end quote, *Uber Technologies, Inc. v. Moss*, 2025 WL 1420940, at 3 (D. Colo. January 31, 2025).

Second, Plaintiffs' injunctive relief request is exceptionally broad.  They seek to enjoin Defendants from enforcing the entire unwelcome and unwelcome statements provisions, as well as other provisions that impact multiple aspects of CADA and any other, quote, "materially similar statutory or regulatory provisions."

That's from the Plaintiffs' brief.  And for simplicity, I'll cite to document number 27, at 32.  That's in their conclusion.

Third, Plaintiffs' preliminary injunction motions seek the same injunctive relief requested in the complaints, which is disfavored.  The case cite for that is *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

Plaintiffs disagree with this, saying that a preliminary injunction falls into the all-relief category only if its effect, once complied with, cannot be undone.  But this is an overstatement.

Plaintiffs quote from a footnote in which the Tenth Circuit said the district court likely erred in applying the heightened standard, but the Tenth Circuit expressly declined to resolve the issue because Plaintiffs could satisfy the heightened standard anyway.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 81 of 97
Appellate Case: 26-1101    Document: 18    Date Filed: 06/08/2026    Page: 97

81

The Court therefore rejects that argument and finds that a heightened standard is appropriate here where relief on these preliminary injunction motions is essentially a win on the claims.

Fourth, granting a preliminary injunction would disturb rather than preserve the status quo.  Plaintiffs argue the status quo is the state of the law prior to the recent CADA amendments, but that framing ignores that the amendments were made to a longstanding statute, and that the existing enforcement regime under that statute is itself the status quo.

Because Plaintiffs seek to broadly enjoin enforcement under a statutory scheme that has been operative for years, their requested relief would upset the status quo, and that too requires a heightened showing.  See *Colorado Motor Carriers Association v. Town of Vail*, 153 F.4th 1052 at 1065-66 (10th Cir. 2025).

Fifth and finally, even if the Court were to enjoin Defendants from enforcing the challenge provisions, to some extent, Plaintiffs would still be required to comply with CADA or risk suit by an aggrieved individual.  This is because an aggrieved individual alleging public accommodation discrimination may either file a charge with the Civil Rights Commission or proceed directly to court under C.R.S. § 24-34-602.

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 82 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 98

82

And while the Court may have the ability to enjoin these Defendants, it cannot enjoin prospective aggrieved individuals from filing suit, nor can it strike the challenged statutory language from CADA.  See *Uber Technologies, Inc.*, 2025 WL 1420940.

Stated differently, with or without a preliminary injunction, Plaintiffs still have to choose between giving up what they contend are their First Amendment rights or complying with CADA to avoid exposure.

Indeed, citing to the statute, Plaintiffs admit that, quote, "Violators can also be sued by aggrieved individuals and upon a finding of liability, be forced to pay hefty fines," at doc number 27 at 12.  And today in court, obviously, we also discussed that this is a separate path that prospective aggrieved individual could take regardless of the Division or the state being enforced or enjoined from enforcing the statute.

Additionally, as I noted earlier, the evidence suggests that the Plaintiffs feel the pressure more significantly from the public at large than anything else. Most of the evidence refers to public comments being made, public reviews being given, feeling forced to refer to patients in a particular way so that the family doesn't have the ability to seek punitive legal action.

That is the type of evidence the Plaintiffs have

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 83 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 99

83

submitted in support of their injunction motion.  Thus, from the Court's perspective, Plaintiffs' own statements demonstrate that a preliminary injunction would be of limited practical value and would not cure the dilemma that they describe.

With these threshold considerations in mind, the Court moves on to consider each of the preliminary injunction factors.

First, the substantial likelihood of success on the merits.  Here Plaintiffs are correct that this is the most significant factor, but the likelihood of success on the merits depends in part on the resolution of certain threshold jurisdiction arguments.  See *Murthy v. Missouri*, 603 U.S. 43 at 58 (2024).  See also *Oklahoma v. Biden*, 577 F.Supp. 3d 1245, at 1251 (W.D. Okla. 2021), and *Fisher v. Lynch*, 2007 WL 2225943, at 5 (D. Kan. July 31, 2007).

In this case, Defendants challenge standing.  To establish Article III standing, a Plaintiff must show an injury in fact, a sufficient causal connection between the injury and the conduct, and the likelihood that the injury will be redressed by a favorable decision, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, at 157 to 58 (2014).

In the pre-enforcement context, a Plaintiff satisfies the injury in fact requirement where they allege an intention to engage in a course of conduct arguably affected

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 84 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 100

84

with a constitutional interest but prescribed by a statute, and there exists a credible threat of prosecution thereunder.

In the First Amendment context, the Plaintiff can also show a credible threat of future prosecution plus an ongoing chilling effect on their desire to exercise their First Amendment rights.  But either way, the mere presence on the statute books of an unconstitutional statute in the absence of enforcement or credible threat of enforcement does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally-protected conduct prohibited by the statute.  And that's from *Winsness v. Yocom*, 433 F.3d 727 at 732 (10th Cir. 2006).

Thus, even assuming that Plaintiffs have made a clear showing that their speech is actually prescribed or arguably prescribed, as the Plaintiffs have noted today, by the amendments, and assuming that their speech is indeed chilled, the absence of a credible threat of enforcement can't be dispositive in a pre-enforcement standing analysis. See *Moms for Liberty - Wilson County, TN v. Wilson County Board of Education*, 155 F.4th 499 at 512 (6th Cir. 2025).

Courts consider at least three factors when analyzing whether there is a credible threat of enforcement:

One, whether the Plaintiff showed past enforcement against the same conduct; two, whether authority to initiate the charges was not limited to a prosecutor or an agency and

**5-App-122**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 85 of 97
Appellate Case: 26-1101    Document: 18    Date Filed: 06/08/2026    Page: 101

85

instead any person can file a complaint; and three, whether the state disavowed future enforcement.

And while it is true that this is not supposed to be a difficult bar for Plaintiffs to clear in the First Amendment pre-enforcement context, there is an important nuance here.

The standing analysis must be conducted under the correct standard. Indeed, the United States Supreme Court has specifically said this of the Article III standing analysis. Quote, "Each element must be supported in the same way as any other matter on which the Plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony*, 573 U.S. at 158.

More importantly -- I'm sorry, more recently, the Supreme Court has also expressly stated that at, quote, "the preliminary injunction stage, the plaintiff must make a, quote, clear showing that she is likely to establish each element of standing." And that's *Murthy*, 603 U.S. at 58. See also *Winter v. Natural Resources Defense Council*, 555 U.S. 7, at 22 (2008) and also *Am. Encore v. Fontes*, 152 F.4th 1097, at 1106 (9th Cir. 2025).

Thus, the Court applies a clear showing standard. That is, have the Plaintiffs made a clear showing that there is a credible threat of enforcement? Plaintiffs argue that

**5-App-123**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 86 of 97
Appellate Case: 26-1101    Document: 18    Date Filed: 06/08/2026    Page: 102

86

there is a presumption of enforcement when it comes to new laws.  Saying that courts assume a likelihood of enforcement for new laws, they rely on *Darren Patterson Christian Academy v. Roy*, 699 F.Supp. 3d 1163 (D. Colo. 2023) where, according to Plaintiffs in their brief, the Court noted a strong presumption of enforcement for, quote, "new laws."

Not exactly.  In that case, the United States District Court Judge Dan Domenico recognized that some courts have adopted such a presumption and he cited Fifth Circuit authority, but he did not adopt the presumption himself.

Instead, Judge Domenico found that the newness of the law, quote, "seems to diminish the relevance of the lack of enforcement history factor, making it, quote, neutral rather than weighing against standing."  In short, his statements on the matter were just a little more nuanced than Plaintiffs suggest.

Similarly, Plaintiffs overstated *Virginia v. Amer. Booksellers Association*, 484 U.S. 383.  There the Court said it saw, quote, "no reason to assume non-enforcement, but the statement came after the court had already determined that plaintiffs had standing based on concrete facts."  The statute was aimed directly at plaintiffs, imposed criminal prosecution as a penalty, required significant and costly compliance measures, and caused well-founded fears of enforcement.  Thus, the statement was not, as Plaintiffs

**5-App-124**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 87 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 103

87

suggest, some presumption of enforcement.

Plaintiffs also place great weight on the automatic operation of CADA provisions. And they certainly don't describe it this way, but as the Court reads their briefs, that is how the Court is interpreting their arguments.

Plaintiffs argue that, quote, "Those who operate in a place of public accommodation are now liable if they refuse to address or refer to someone using their chosen name, preferred pronouns, or other gender-affirming terms and that by doing so they have denied the individual in full and equal enjoyment of a public accommodation." This is from Plaintiffs' brief document number 27, at 10.

Under Plaintiffs' theory, the mere act of speaking in the manner they wish to speak would inevitably trigger enforcement and liability. But Defendant Sullivan, Director of the Colorado Civil Rights Division, has offered the following interpretation of the subject CADA provisions.

Quote, "Whether a place of public accommodation would violate CADA by failing and/or refusing to use an individual's chosen name based on gender identity and/or how the individual chooses to be addressed based on gender identity would be a highly fact-specific inquiry and contains both subjective and objective elements. As a result, a place of public accommodation's announcement of a desire to use and/or ultimate failure or refusal to use an individual's

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 88 of 97
Appellate Case: 26-1101    Document: 18    Date Filed: 06/08/2026    Page: 104

88

chosen name and/or how the individual chooses to be addressed by itself is not per se unlawful discrimination under CADA."

"Rather, it requires a close analysis of all facts and context of the usage and the circumstances related to the usage, including how such usage relates to providing any goods, service, facility, privilege, advantage, or accommodation to the general public."  That's from document number 85-1 at 211 to 12.

These statements, of course, are not law and ultimately, they may be nothing more than tangentially relevant, if at all, to the question of constitutionality. However, as it concerns a credible threat of enforcement, Defendant Sullivan's statements demonstrate that the mere act of speaking would not automatically trigger enforcement.

They also demonstrate that Defendants do not intend to enforce CADA against Plaintiffs at this juncture based merely on a, quote, "failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed," end quote from the same statement.

In essence, although the Plaintiffs disagree, this operates like a disavowal.  Defendants do not intend to prosecute, as Plaintiffs say, the mere act of misgendering and deadnaming.

Moreover, there's no evidence that the Division has received complaints about Plaintiffs misgendering or that the

Division has warned Plaintiffs that their desired approach is unlawful. And while the record shows some evidence that members of the public have lashed out against certain Plaintiffs, there does not appear to be any evidence that members of the public have complained to a state official in a manner that might lead to enforcement.

Thus, while Plaintiffs offer evidence that the Division believes intentional misgendering and deadnaming can be considered hostile, this evidence speaks to the Division's general views on hostility, but not necessarily to a specific threat of enforcement.

Plaintiffs also argue that Defendants have used CADA in the past to punish alleged discrimination determination based on gender identity and gender expression. They offer some evidence of probable cause determinations and suggest that the basis for those determinations is misgendering and deadnaming on its own.

But the evidence tends to support what Defendant Sullivan says about the process of determining whether a CADA violation has occurred, that it is highly fact specific. Indeed, in responses to interrogatories, the Division said it has, quote, "not found probable cause in any public accommodations case solely based upon a respondent's place of public accommodations, failure to use an individual's chosen name, and/or how the individual chooses to be addressed."

**5-App-127**

And that's from document number 98-1 at 6.

Accordingly, two of the three factors weigh against finding a credible threat of enforcement, and as to the third, which is whether authority to initiate charges is limited to a prosecutor or agency or whether any person can file a complaint, Plaintiffs argue that the authority to file a complaint is not limited to the Division, the Commission, or the Attorney General.

Instead, any person can file a charge alleging discrimination, and anyone who wishes to make use of Plaintiffs' services or attend one of their events but feels unwelcome due to Plaintiffs' use of biologically-accurate language may file a complaint and initiate a potentially burdened administrative hearing against Plaintiffs.

To the extent Plaintiffs are referring to complaints the Division can choose to take action on, the authority appears to remain with Defendants.  To the extent Defendants are referring to a private right of action that would, as already stated, counsel against a preliminary injunction in this case.

In any event, even assuming that the Court weighs this factor in Plaintiffs' favor, the other two factors weigh against Plaintiffs.  Thus, Plaintiffs have not demonstrated a credible threat of enforcement under the heavy burden that applies to these preliminary injunction motions.

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 91 of 97
Appellate Case: 26-1101   Document: 18   Date Filed: 06/08/2026   Page: 107

91

For similar reasons, Plaintiffs have not made a clear showing that irreparable injury is likely in the absence of an injunction.  The absence of pending complaints or a history of enforcement tied to the specific conduct Plaintiffs describe undermines any claim of imminent or non-speculative harm.

Moreover, the fact that CADA and specifically the provisions Plaintiffs seek to nullify have been in place for decades also undercuts the claim of irreparable harm.

Additionally, the balance of harms and public interest do not favor the sweeping injunctions Plaintiffs seek.  The state articulates significant interest in administering and enforcing its anti-discrimination regime and case law in this district counsels restraint where the requested relief would alter the status quo and be of limited practical value in light of a private right of action.  See *Uber Technologies* 2025 WL 1420940, at 3.

For these reasons, the Court recommends that the Plaintiffs' request for a preliminary injunction be denied. However, before closing, the Court pauses to emphasize two points.

First, as noted already, a preliminary injunction is an extraordinary remedy, one that is particularly disfavored, whereas here it would alter the status quo or afford Plaintiffs the full relief they might obtain at trial.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 92 of 97
Appellate Case: 26-1101    Document: 18    Date Filed: 06/08/2026    Page: 108

92

Second, the record is voluminous and the Court reviewed it on a somewhat expedited basis, though still thoroughly, but in order to give Plaintiffs a prompt hearing without disrupting the Court's docket.  Accordingly, this ruling should not be read as a decision on the pending motions to dismiss, which are governed by a different legal standard and are not yet fully briefed.

A finding that Plaintiffs have not made a clear showing that is required to carry their burden on the preliminary injunction motions is not a prediction of the outcome under that different standard and with the benefit of full briefing on those different motions.

Additionally, the Court expresses no view on the ultimate question of whether the statute, as amended, does or does not violate the First and Fourteenth Amendments.

And unless the parties want me to address anything else, administrative or otherwise, we can adjourn.  Oh, the motion's to restrict.  I do want to address that.  Yeah.

MS. FISCHER:  And just one question, Your Honor. We will be filing a motion, our motion to dismiss reply.  I assume, per our prior status conference, having a consolidated reply is your preference.

THE COURT:  I thought that's what you all had requested and maybe I'm misremembering the email to my chambers when you were coordinating, I think, the

**5-App-130**