No. 26-1101

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## APPELLANTS' APPENDIX VOLUME I

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026

*Counsel for Appellants*

**TABLE OF CONTENTS**

**VOLUME I**

| Document | ECF No. | App. Page |
|---|---|---|
| District Court Docket | N/A | 1-App-1 |
| First Amended Complaint | 25 | 1-App-15 |
| Plaintiffs' Amended Motion for Preliminary Injunction | 27 | 1-App-81 |
| Exhibit to Amended Preliminary Injunction Motion: Sarah Perry Declaration | 27-1 | 1-App-114 |
| Exhibit to Amended Preliminary Injunction Motion: Lori Gimelshteyn Declaration | 27-2 | 1-App-118 |
| Exhibit to Amended Preliminary Injunction Motion: Erin Lee Declaration | 27-3 | 1-App-140 |
| Exhibit to Amended Preliminary Injunction Motion: Kristina Rasmussen Declaration | 27-4 | 1-App-161 |
| Exhibit to Amended Preliminary Injunction Motion: Travis Morrell Declaration | 27-5 | 1-App-165 |
| Exhibit to Amended Preliminary Injunction Motion: Valeri Leswing Declaration | 27-6 | 1-App-182 |
| Defendants' Motion for Discovery | 31 | 1-App-193 |
| Exhibit A to Defendants' Motion for Discovery: Defendants' Discovery Requests | 31-1 | 1-App-209 |
| Exhibit B to Defendants' Motion for Discovery: Defendants' Proposed Deposition Topics | 31-2 | 1-App-218 |
| Plaintiff's Opposition to Defendant's Motion for an Extension of Time | 32 | 1-App-220 |
| Joint Motion to Adopt a Scheduling Order | 43 | 1-App-230 |
| Defendants' Consolidated Opposition to Motions for Preliminary Injunction | 85 | 1-App-236 |

## VOLUME II

Excerpts of Appendix to Defendants'
Consolidated Opposition to Motions
for Preliminary Injunction ................................................................85-1    2-App-1

Plaintiffs' Brief in Support of Motion for Preliminary
Injunction and in Opposition to Defendants' Motions
to Dismiss.................................................................................98    2-App-226

## VOLUME III

Excerpts of Appendix to Plaintiffs' Brief in Support
of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................98-1    3-App-1

## VOLUME IV

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................98-1    4-App-1

## VOLUME V

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................98-1    5-App-1

Courtroom Minutes for Preliminary Injunction
Motion Hearing Held on Feb. 19, 2026 and
Recommendation of United States Magistrate Judge........................ 101    5-App-21

Plaintiffs' Objections to Recommendation of United
States Magistrate Judge................................................................ 110    5-App-24

Exhibit A: Preliminary Injunction Hearing Transcript ..................110-1    5-App-39

Defendants' Response to Objections to Recommendation
of United States Magistrate Judge .............................................. 112    5-App-136

Order Adopting Recommendation of United
States Magistrate Judge and Denying Motion
for Preliminary Injunction .......................................................... 115    5-App-149

Notice of Appeal........................................................................ 118    5-App-173

Recommendation of United States Magistrate Judge
on Defendants' Motions to Dismiss ............................................. 125    5-App-175

## VOLUME VI (SEALED)

Sealed Appendix to Plaintiffs' Replies in Support
of their Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss...................................99    6-App-1

## VOLUME VII (SEALED)

Second Restricted Appendix to Plaintiffs' Motion
for Preliminary Injunction and in Opposition
to Defendants' Motion to Dismiss....................................................... 100    7-App-1

ALLMTN,APPEAL,JD3,MAGR,MJ CIV PP

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01572–RMR–MDB

Defending Education et al v. Sullivan et al
Assigned to: Judge Regina M. Rodriguez
Referred to: Magistrate Judge Maritza Dominguez Braswell
Case in other court:  USCA 10th Circuit, 26–01101
Cause: 42:1983 Civil Rights Act

Date Filed: 05/19/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2025 | 1 | COMPLAINT against All Defendants (Filing fee $ 405,Receipt Number ACODC–10343976)Attorney J. Michael Connolly added to party Defending Education(pty:pla), Attorney J. Michael Connolly added to party Colorado Parent Advocacy Network(pty:pla), Attorney J. Michael Connolly added to party Protect Kids Colorado(pty:pla), Attorney J. Michael Connolly added to party Do No Harm(pty:pla), Attorney J. Michael Connolly added to party Travis Morrell(pty:pla), filed by Protect Kids Colorado, Colorado Parent Advocacy Network, Defending Education, Do No Harm, Travis Morrell. (Attachments: # 1 Summons Sullivan Summons, # 2 Summons Cordova Summons, # 3 Summons Asfaw Summons, # 4 Summons Fieweger Summons, # 5 Summons Ward Summons, # 6 Summons Kelly Summons, # 7 Summons Artis Summons, # 8 Summons Weiser Summons, # 9 Civil Cover Sheet)(Connolly, J.) (Entered: 05/19/2025) |
| 05/19/2025 | 2 | CORPORATE DISCLOSURE STATEMENT. (Connolly, J.) (Entered: 05/19/2025) |
| 05/19/2025 | 3 | Case assigned to Magistrate Judge Kathryn A. Starnella. Text Only Entry. (sadhi, ) (Entered: 05/20/2025) |
| 05/19/2025 | 5 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. (sadhi, ) (Entered: 05/20/2025) |
| 05/20/2025 | 4 | Administrative Notice: Summons cannot be issued. All defendants must be listed on the caption or be attached with "see attached" in the caption. (sadhi, ) (Entered: 05/20/2025) |
| 05/20/2025 | 6 | MINUTE ORDER. Pursuant to D.C.COLO.LCivR 40.1(c)(4), the deadline to file the Consent/Non–Consent to United States Magistrate Judge Jurisdiction form [#5] is August 5, 2025. by Magistrate Judge Kathryn A. Starnella on 5/20/2025. Text Only Entry (kaslc2, ) (Entered: 05/20/2025) |
| 05/20/2025 | 7 | MOTION for Preliminary Injunction by Plaintiffs Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Attachments: # 1 Perry Declaration, # 2 Rasmussen Declaration, # 3 Gimelshteyn Declaration, # 4 Lee Declaration, # 5 Morrell Declaration)(Connolly, J.) (Entered: 05/20/2025) |
| 05/20/2025 | 8 | SUMMONS REQUEST as to Defendants Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, Eric Artis, and Philip Jacob Weiser by Plaintiffs Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Attachments: # 1 Artis Summons, # 2 Asfaw Summons, # 3 Cordova Summons, # 4 Fieweger Summons, # 5 Kelly Summons, # 6 Ward Summons, # 7 Weiser Summons)(Connolly, J.) (Entered: 05/20/2025) |
| 05/20/2025 | 9 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge Kathryn A. Starnella on 20 May 2025. Proposed Scheduling Order due 8/12/2025. Scheduling Conference set for 8/19/2025 10:30 AM in Courtroom C204 before Magistrate Judge Kathryn A. Starnella. (Attachments: # 1 Continuation of Main Document, # 2 Continuation of Main Document) (cmadr, ) (Entered: 05/21/2025) |

**1-App-001**

| | | |
|---|---|---|
| 05/21/2025 | 10 | MINUTE ORDER. This case shall be assigned to a District Judge under D.C.COLO.LCivR 40.1(c)(8) and D.C.COLO.LCivR 40.1(a), by Magistrate Judge Kathryn A. Starnella on 5/21/2025. This case is randomly reassigned to Judge Regina M. Rodriguez for all further proceedings. All future pleadings should be designated as **25–cv–1572–RMR** (angar, ) (Entered: 05/21/2025) |
| 05/22/2025 | 11 | ORDER. In light of Plaintiffs' 7 Motion for Preliminary Injunctive Relief, Defendants SHALL FILE a response to the Motion seeking a preliminary injunction no later than 21 calendar days after Plaintiffs file with this Court proof of service on the Defendants pursuant to Rule 4. After Defendants file a response, the Court will determine whether a reply brief from Plaintiffs and/or a hearing on the preliminary injunction is necessary. SO ORDERED by Judge Regina M. Rodriguez on 5/22/2025. Text Only Entry (rmrja) (Entered: 05/22/2025) |
| 05/27/2025 | 12 | SUMMONSES issued by Clerk re: 8 Summons Request. (ggill, ) (Entered: 05/27/2025) |
| 05/27/2025 | 13 | ORDER REFERRING CASE to Magistrate Judge Kathryn A. Starnella. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non–dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. SO ORDERED by Judge Regina M. Rodriguez on 5/27/2025. Text Only Entry (rmrja) (Entered: 05/27/2025) |
| 05/27/2025 | 14 | WAIVER OF SERVICE Returned Executed by Protect Kids Colorado, Colorado Parent Advocacy Network, Defending Education, Do No Harm, Travis Morrell. All Defendants. (Attachments: # 1 Artis Service Waiver, # 2 Asfaw Service Waiver, # 3 Cordova Service Waiver, # 4 Fieweger Service Waiver, # 5 Kelly Service Waiver, # 6 Ward Service Waiver, # 7 Weiser Service Waiver)(Connolly, J.) (Entered: 05/27/2025) |
| 05/27/2025 | 15 | Amended MINUTE ORDER, by Magistrate Judge Kathryn A. Starnella on 5/27/2025. (corrected to ECF 10 – no changes but signature was corrected) (angar, ) (Entered: 05/27/2025) |
| 06/06/2025 | 16 | NOTICE of Entry of Appearance by Kathleen L. Spalding on behalf of Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko FiewegerAttorney Kathleen L. Spalding added to party Daniel S. Ward(pty:dft), Attorney Kathleen L. Spalding added to party Jade Rose Kelly(pty:dft), Attorney Kathleen L. Spalding added to party Eric Artis(pty:dft), Attorney Kathleen L. Spalding added to party Aubrey C. Sullivan(pty:dft), Attorney Kathleen L. Spalding added to party Sergio Raudel Cordova(pty:dft), Attorney Kathleen L. Spalding added to party Geta Asfaw(pty:dft), Attorney Kathleen L. Spalding added to party Mayuko Fieweger(pty:dft) (Spalding, Kathleen) (Entered: 06/06/2025) |
| 06/06/2025 | 17 | NOTICE of Entry of Appearance by Helen L. Norton on behalf of Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko FiewegerAttorney Helen L. Norton added to party Daniel S. Ward(pty:dft), Attorney Helen L. Norton added to party Jade Rose Kelly(pty:dft), Attorney Helen L. Norton added to party Eric Artis(pty:dft), Attorney Helen L. Norton added to party Aubrey C. Sullivan(pty:dft), Attorney Helen L. Norton added to party Sergio Raudel Cordova(pty:dft), Attorney Helen L. Norton added to party Geta Asfaw(pty:dft), Attorney Helen L. Norton added to party Mayuko Fieweger(pty:dft) (Norton, Helen) (Entered: 06/06/2025) |
| 06/06/2025 | 18 | NOTICE of Entry of Appearance by Janna K. Fischer on behalf of Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko FiewegerAttorney Janna K. Fischer added to party Daniel S. Ward(pty:dft), Attorney Janna K. Fischer added to party Jade Rose Kelly(pty:dft), Attorney Janna K. |

| | | |
|---|---|---|
| | | Fischer added to party Eric Artis(pty:dft), Attorney Janna K. Fischer added to party Aubrey C. Sullivan(pty:dft), Attorney Janna K. Fischer added to party Sergio Raudel Cordova(pty:dft), Attorney Janna K. Fischer added to party Geta Asfaw(pty:dft), Attorney Janna K. Fischer added to party Mayuko Fieweger(pty:dft) (Fischer, Janna) (Entered: 06/06/2025) |
| 06/06/2025 | 19 | NOTICE of Entry of Appearance by Dominick Drake Schumacher on behalf of Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko FiewegerAttorney Dominick Drake Schumacher added to party Daniel S. Ward(pty:dft), Attorney Dominick Drake Schumacher added to party Jade Rose Kelly(pty:dft), Attorney Dominick Drake Schumacher added to party Eric Artis(pty:dft), Attorney Dominick Drake Schumacher added to party Aubrey C. Sullivan(pty:dft), Attorney Dominick Drake Schumacher added to party Sergio Raudel Cordova(pty:dft), Attorney Dominick Drake Schumacher added to party Geta Asfaw(pty:dft), Attorney Dominick Drake Schumacher added to party Mayuko Fieweger(pty:dft) (Schumacher, Dominick) (Entered: 06/06/2025) |
| 06/06/2025 | 20 | NOTICE of Entry of Appearance by Lane Towery on behalf of Philip Jacob WeiserAttorney Lane Towery added to party Philip Jacob Weiser(pty:dft) (Towery, Lane) (Entered: 06/06/2025) |
| 06/09/2025 | 21 | NOTICE of Entry of Appearance by Talia Boxerman Kraemer on behalf of Philip Jacob WeiserAttorney Talia Boxerman Kraemer added to party Philip Jacob Weiser(pty:dft) (Kraemer, Talia) (Entered: 06/09/2025) |
| 06/09/2025 | 22 | NOTICE of Entry of Appearance by Paul Richard Draper on behalf of All Plaintiffs Attorney Paul Richard Draper added to party Defending Education(pty:pla), Attorney Paul Richard Draper added to party Colorado Parent Advocacy Network(pty:pla), Attorney Paul Richard Draper added to party Protect Kids Colorado(pty:pla), Attorney Paul Richard Draper added to party Do No Harm(pty:pla), Attorney Paul Richard Draper added to party Travis Morrell(pty:pla) (Draper, Paul) (Entered: 06/09/2025) |
| 06/09/2025 | 23 | NOTICE of Entry of Appearance by Cameron T. Norris on behalf of All Plaintiffs Attorney Cameron T. Norris added to party Defending Education(pty:pla), Attorney Cameron T. Norris added to party Colorado Parent Advocacy Network(pty:pla), Attorney Cameron T. Norris added to party Protect Kids Colorado(pty:pla), Attorney Cameron T. Norris added to party Do No Harm(pty:pla), Attorney Cameron T. Norris added to party Travis Morrell(pty:pla) (Norris, Cameron) (Entered: 06/09/2025) |
| 06/13/2025 | 24 | NOTICE of Filing Amended Pleading by Plaintiffs Valeri Leswing, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell (Attachments: # 1 Exhibit First Amended Complaint Redline)(Connolly, J.) (Entered: 06/13/2025) |
| 06/13/2025 | 25 | AMENDED COMPLAINT against All Defendants Attorney J. Michael Connolly added to party Mountain Pediatrics(pty:pla), Attorney J. Michael Connolly added to party Valeri Leswing(pty:pla), filed by Protect Kids Colorado, Colorado Parent Advocacy Network, Valeri Leswing, Defending Education, Do No Harm, Travis Morrell, Mountain Pediatrics.(Connolly, J.) (Entered: 06/13/2025) |
| 06/13/2025 | 26 | CORPORATE DISCLOSURE STATEMENT. (Connolly, J.) (Entered: 06/13/2025) |
| 06/13/2025 | 27 | Amended MOTION for Preliminary Injunction by Plaintiffs Valeri Leswing, Mountain Pediatrics, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Attachments: # 1 Perry Declaration, # 2 Gimelshteyn Declaration, # 3 Lee Declaration, # 4 Rasmussen Declaration, # 5 Morrell Declaration, # 6 Leswing Declaration)(Connolly, J.) (Entered: 06/13/2025) |
| 06/16/2025 | 28 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 6/16/25. PLEASE NOTE LOCATION CHANGE ONLY. IT IS HEREBY ORDERED that the Scheduling Conference set for August 19, 2025, at 10:30 a.m. is RESET from the Byron G. Rogers United States Courthouse to Courtroom A 501, Fifth Floor, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado 80294. (sgrim) (Entered: 06/16/2025) |
| 06/20/2025 | 29 | NOTICE OF CASE ASSOCIATION by Kathleen L. Spalding on behalf of All Defendants (Spalding, Kathleen) (Entered: 06/20/2025) |

**1-App-003**

| 06/27/2025 | 30 | MOTION for Extension of Time to File Response/Reply as to 27 Amended MOTION for Preliminary Injunction *and Answer Amended Complaint 25* by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Philip Jacob Weiser, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Fischer, Janna) (Entered: 06/27/2025) |
|---|---|---|
| 06/27/2025 | 31 | MOTION for Discovery by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Attachments: # 1 Exhibit Defendants' Exhibit A, # 2 Exhibit Defendants' Exhibit B)(Fischer, Janna) (Entered: 06/27/2025) |
| 06/29/2025 | 32 | RESPONSE to 30 MOTION for Extension of Time to File Response/Reply as to 27 Amended MOTION for Preliminary Injunction *and Answer Amended Complaint 25* filed by Plaintiffs Valeri Leswing, Mountain Pediatrics, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Connolly, J.) (Entered: 06/29/2025) |
| 06/30/2025 | 33 | ORDER REFERRING MOTION: 31 MOTION for Discovery filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Regina M. Rodriguez on 6/30/2025. Text Only Entry (rmrja) (Entered: 06/30/2025) |
| 06/30/2025 | 34 | REPLY to Response to 30 MOTION for Extension of Time to File Response/Reply as to 27 Amended MOTION for Preliminary Injunction *and Answer Amended Complaint 25* filed by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Philip Jacob Weiser, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Fischer, Janna) (Entered: 06/30/2025) |
| 07/01/2025 | 35 | Unopposed MOTION for Extension of Time to File Response/Reply as to 27 Amended MOTION for Preliminary Injunction by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Philip Jacob Weiser, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Fischer, Janna) (Entered: 07/01/2025) |
| 07/01/2025 | 36 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 1 July 2025. IT IS HEREBY ORDERED that a Motion Hearing is scheduled for August 6, 2025, at 1:30 p.m. in Courtroom A–501, Fifth Floor, Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado 80294. Please note Judge Starnellas new courthouse location.IT IS FURTHER ORDERED that any response to the Motion 31 shall be filed by July 18, 2025, and any reply by August 1, 2025. (cmadr, ) (Entered: 07/01/2025) |
| 07/01/2025 | 37 | MOTION to Withdraw as Attorney by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Spalding, Kathleen) (Entered: 07/01/2025) |
| 07/01/2025 | 38 | ORDERED that Defendants' Motion for Extension of Deadlines to Respond to Amended Complaint and Amended Motion for Preliminary Injunction Pending Discovery, ECF No. 30 , is GRANTED. Defendants shall have up through and including three weeks after the completion of any limited discovery period as ordered by Magistrate Judge Starnella to respond to both Plaintiffs' Amended Complaint and Amended Motion for Preliminary Injunction. It is FURTHER ORDERED that Defendants' Motion for Extension for Defendants' Opposition to Plaintiffs' Amended Motion for Preliminary Injunction to No Earlier than July 14, 2025, ECF No. 35 , is DENIED as moot. SEE ATTACHED ORDER. By Judge Regina M. Rodriguez on 7/1/2025.(rmrja) (Entered: 07/01/2025) |
| 07/01/2025 | 39 | ORDER REFERRING MOTION: 37 MOTION to Withdraw as Attorney filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Regina M. Rodriguez on 7/1/2025. Text Only Entry (rmrja) (Entered: 07/01/2025) |

| 07/01/2025 | 40 | ORDER granting 37 Motion to Withdraw as Attorney. Attorney Kathleen Spalding is relieved of any further representation of Defendants Sullivan, Cordova, Asfew, Fieweger, Ward, Kelly, and Artis. The Clerk of Court is instructed to terminate Attorney Spalding as counsel of record, and to remove this name from the electronic certificate of mailing. These Defendants shall continue to be represented by Attorneys Dominick Schumacher, Helen Norton, and Janna Fischer. by Magistrate Judge Kathryn A. Starnella on 7/1/2025. Text Only Entry(kaslc2, ) (Entered: 07/01/2025) |
|---|---|---|
| 07/02/2025 | 41 | NOTICE of Entry of Appearance by Nora Quinto Passamaneck on behalf of Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko FiewegerAttorney Nora Quinto Passamaneck added to party Daniel S. Ward(pty:dft), Attorney Nora Quinto Passamaneck added to party Jade Rose Kelly(pty:dft), Attorney Nora Quinto Passamaneck added to party Eric Artis(pty:dft), Attorney Nora Quinto Passamaneck added to party Aubrey C. Sullivan(pty:dft), Attorney Nora Quinto Passamaneck added to party Sergio Raudel Cordova(pty:dft), Attorney Nora Quinto Passamaneck added to party Geta Asfaw(pty:dft), Attorney Nora Quinto Passamaneck added to party Mayuko Fieweger(pty:dft) (Passamaneck, Nora) (Entered: 07/02/2025) |
| 07/10/2025 | 42 | PRE–SCHEDULING CONFERENCE ORDER by Magistrate Judge Kathryn A. Starnella on 10 July 2025. (cmadr, ) (Entered: 07/11/2025) |
| 07/11/2025 | 43 | Proposed Scheduling Order by Plaintiffs Valeri Leswing, Mountain Pediatrics, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Connolly, J.) Modified on 7/14/2025 to correct event (angar, ). (Entered: 07/11/2025) |
| 07/14/2025 | 44 | ORDER REFERRING MOTION:<br><br>43 Joint Motion to Adopt a Scheduling Order filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado.<br><br>Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Regina M. Rodriguez on 7/14/2025. Text Only Entry (rmrja) (Entered: 07/14/2025) |
| 07/15/2025 | 45 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 15 July 2025. IT IS HEREBY ORDERED that the Joint Motion 43 is GRANTED IT IS FURTHER ORDERED that the Motion for Discovery 31 is DENIED as moot. IT IS FURTHER ORDERED that the Motion Hearing set for August 6, 2025, at 1:30 p.m. is VACATED. IT IS FURTHER ORDERED that the Scheduling Conference set for August 19, 2025, at 10:30 a.m. is VACATED, as is the August 12, 2025 deadline by which to file a proposed scheduling order. IT IS FURTHER ORDERED that, within ten days of a denial of any Rule 12(b)(1) motion filed by Defendants, the parties shall jointly file a motion seeking to have the Scheduling Conference reset. If no Rule 12(b)(1) motion is filed, the parties shall file a motion no later than September 29, 2025, seeking to have the Scheduling Conference reset.(cmadr, ) (Entered: 07/15/2025) |
| 07/25/2025 | 46 | Joint MOTION for Protective Order by Plaintiffs Valeri Leswing, Mountain Pediatrics, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Attachments: # 1 Proposed Protective Order)(Connolly, J.) (Entered: 07/25/2025) |
| 07/25/2025 | 47 | ORDER REFERRING MOTION:<br><br>46 Joint MOTION for Protective Order filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado.<br><br>Motion referred to Magistrate Judge Kathryn A. Starnella by Judge Regina M. Rodriguez on 7/25/2025. Text Only Entry (rmrja) (Entered: 07/25/2025) |
| 07/25/2025 | 48 | MINUTE ORDER by Magistrate Judge Kathryn A. Starnella on 25 July 2025. IT IS HEREBY ORDERED that the Motion 46 is GRANTED. The Protective Order [#46–1] supplied by the parties is accepted and entered as an Order of the Court as of the date of this Minute Order.(cmadr, ) (Entered: 07/28/2025) |

**1-App-005**

| 07/25/2025 | 49 | PROTECTIVE ORDER by Magistrate Judge Kathryn A. Starnella on 25 July 2025. (cmadr, ) (Entered: 07/28/2025) |
|---|---|---|
| 07/31/2025 | 50 | Unopposed MOTION to File Amicus Brief by Amicus Parties Truth and Liberty Coalition, Inc., Dr. James Dobson Family Institute. (Attachments: # 1 Exhibit Brief of Amici Curiae Truth and Liberty Coalition and James Dobson Family Institute in Support of Plaintiffs Motion for a Preliminary In–junction)(Nussbaum, Andrew) (Entered: 07/31/2025) |
| 08/01/2025 | 51 | ORDER granting 50 Motion to File Amicus Brief by Amicus Parties Truth and Liberty Coalition, Inc., Dr. James Dobson Family Institute. The Clerk of the Court is requested to docket Ex. 1 to ECF 50 as a separate document. SO ORDERED by Judge Regina M. Rodriguez on 8/1/2025. Text Only Entry(rmrja) (Entered: 08/01/2025) |
| 08/01/2025 | 52 | BRIEF of Amici Curiae Truth and Liberty Coalition and James Dobson Family Institute in Support of Plaintiffs' Motion for a Preliminary In–junction. (Docketed pursuant to ECF (51) Order. ) (ccuen, ) (Entered: 08/01/2025) |
| 08/11/2025 | 53 | NOTICE OF CASE ASSOCIATION by Nora Quinto Passamaneck on behalf of All Defendants (Passamaneck, Nora) (Entered: 08/11/2025) |
| 08/12/2025 | 54 | NOTICE: This matter comes before the court *sua sponte*. The Court has reviewed the 41 Notice of Entry of Appearance by Nora Quinto Passamaneck. This shall provide Notice to the parties that Ms. Passamaneck and I were previously partners at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP. It has been over 4 years since I left the firm in July of 2021. Upon review of the rules, the Court has determined that recusal is not required; however, if either party wishes to request that I recuse myself, they shall file an Objection within three (3) business days of this Notice for my consideration. SO ORDERED by Judge Regina M. Rodriguez on 8/12/2025. Text Only Entry (rmrja) (Entered: 08/12/2025) |
| 09/15/2025 | 55 | Unopposed MOTION for Leave to File Excess Pages *in their Motion to Dismiss* by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Passamaneck, Nora) (Entered: 09/15/2025) |
| 09/15/2025 | 56 | Unopposed MOTION for Leave to File Excess Pages *in their Opposition to Plaintiff's Motion for PI* by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Passamaneck, Nora) (Entered: 09/15/2025) |
| 09/15/2025 | 57 | Unopposed MOTION for Leave to File Excess Pages *in Opposition to Plaintiffs' Motion for PI* by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 09/15/2025) |
| 09/16/2025 | 58 | ORDER. In light of the 53 Notice of Case Association, and to conserve judicial resources, this case is reassigned to Magistrate Judge Maritza Dominguez Braswell. All future pleadings should be designated 25–cv–1572–RMR–MDB. SO ORDERED by Judge Regina M. Rodriguez on 9/16/2025. Text Only Entry (rmrja) (Entered: 09/16/2025) |
| 09/16/2025 | 59 | REASSIGNING MAGISTRATE JUDGE. Pursuant to ECF (58) Order. This case is re–drawn to Magistrate Judge Maritza Dominguez Braswell. All future pleadings should be designated as 25–cv–01572–RMR–MDB.(Text Only Entry) (ccuen, ) (Entered: 09/16/2025) |
| 09/16/2025 | 60 | MINUTE ORDER: A Status Conference is **set for October 1, 2025, at 10:30 AM** before Magistrate Judge Maritza Dominguez Braswell. The Conference will be conducted by video using the attached instructions. By Magistrate Judge Maritza Dominguez Braswell on 9/16/2025. Text Only Entry (mdblc1) (Entered: 09/16/2025) |
| 09/17/2025 | 61 | ORDER REFERRING MOTION: 55 Unopposed MOTION for Leave to File Excess Pages *in their Motion to Dismiss* filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. |

| | | |
|---|---|---|
| | | Motion referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 9/17/2025. Text Only Entry (rmrja) (Entered: 09/17/2025) |
| 09/17/2025 | 62 | MINUTE ORDER granting 55 Division and Commission's Unopposed Motion for Extension of Page Limit for their Motion to Dismiss. The Division and Commission Defendants are granted leave to file a Motion to Dismiss up to twenty–four (24) pages in length. By Magistrate Judge Maritza Dominguez Braswell on 9/17/2025. Text Only Entry (mdblc5) (Entered: 09/17/2025) |
| 09/19/2025 | 63 | ORDER REFERRING MOTIONS:<br><br>57 Unopposed MOTION for Leave to File Excess Pages *in Opposition to Plaintiffs' Motion for PI* filed by Philip Jacob Weiser,<br>56 Unopposed MOTION for Leave to File Excess Pages *in their Opposition to Plaintiff's Motion for PI* filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw.<br><br>Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 9/19/2025. Text Only Entry (rmrja) (Entered: 09/19/2025) |
| 09/19/2025 | 64 | MOTION to Dismiss by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Attachments: # 1 Appendix Defendants' Appendix to MTD)(Passamaneck, Nora) (Entered: 09/19/2025) |
| 09/19/2025 | 65 | RESTRICTED DOCUMENT – Level 1: *Restricted Appendix to ECF 64* by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger.. (Passamaneck, Nora) (Entered: 09/19/2025) |
| 09/19/2025 | 66 | RESPONSE to 27 Amended MOTION for Preliminary Injunction filed by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger. (Attachments: # 1 Appendix Defendants' Appendix to PI Opposition)(Passamaneck, Nora) (Entered: 09/19/2025) |
| 09/19/2025 | 67 | RESTRICTED DOCUMENT – Level 1: *Restricted Appendix to ECF 66* by Defendants Daniel S. Ward, Jade Rose Kelly, Eric Artis, Aubrey C. Sullivan, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger.. (Passamaneck, Nora) (Entered: 09/19/2025) |
| 09/19/2025 | 68 | MOTION to Dismiss by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 09/19/2025) |
| 09/19/2025 | 69 | BRIEF in Opposition to 27 Amended MOTION for Preliminary Injunction filed by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 09/19/2025) |
| 09/19/2025 | 70 | ORDER REFERRING MOTIONS:<br><br>64 MOTION to Dismiss filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw,<br>68 MOTION to Dismiss filed by Philip Jacob Weiser.<br><br>Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 9/19/2024. Text Only Entry (rmrja) (Entered: 09/19/2025) |
| 10/01/2025 | 71 | COURTROOM MINUTES for Status Conference held on 10/1/2025 before Magistrate Judge Maritza Dominguez Braswell contemporaneously with 25–cv–01668 and 25–cv–02177. JointStatus Report due by 10/15/2025. Video Status Conference set for 10/20/2025 01:00 PM before Magistrate Judge Maritza Dominguez Braswell (participant instructions attached). FTR: Colorado Springs Courtroom 101. (Attachments: # 1 VTC instructions) (evaug) (Entered: 10/02/2025) |
| 10/03/2025 | 72 | Unopposed MOTION for Leave to Restrict by Plaintiffs Valeri Leswing, Mountain Pediatrics, Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, Travis Morrell. (Connolly, J.) (Entered: 10/03/2025) |
| 10/03/2025 | 73 | ORDER REFERRING MOTION: |

| | | |
|---|---|---|
| | | 72 Unopposed MOTION for Leave to Restrict filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado. |
| | | Motion referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 10/3/2025. Text Only Entry (kmyha) (Entered: 10/03/2025) |
| 10/15/2025 | 74 | Joint STATUS REPORT by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward, Philip Jacob Weiser. (Passamaneck, Nora) (Entered: 10/15/2025) |
| 10/20/2025 | 75 | MINUTE ORDER: Upon review of the Joint Status Report ("JSR"), the Status Conference set for October 20, 2025, is **vacated**. |
| | | Additionally, the Court accepts the schedule proposed by the parties in the JSR. Specifically: |
| | | CCRD and Commission Defendants may conduct a 30(b)(6) deposition of XX–XY Athletics by November 7, 2025. |
| | | Defendants shall file oppositions to Plaintiffs' pending preliminary injunction motions and Fed. R. Civ. P. 12(b)(1) motions to dismiss by November 21, 2025. |
| | | Plaintiffs may serve written discovery, if any, on CCRD and Commission Defendants by November 26, 2025. Defendant's deadline to respond to any written discovery is December 23, 2025. |
| | | Plaintiffs may conduct a consolidated 30(b)(6) deposition of the CCRD or CCRC and a consolidated deposition of each of Defendants' non– CCRD declarants between January 6 and January 21, 2026. |
| | | Plaintiffs' deadline to reply in support of their preliminary injunction motions and respond in opposition to Defendants' 12(b)(1) motions to dismiss is February 11, 2026. |
| | | Defendants' deadline to reply in support of their 12(b)(1) motions to dismiss is February 25, 2026. |
| | | All discovery specifications and limitations agreed to by the parties in the JSR are adopted by the Court. |
| | | By Magistrate Judge Maritza Dominguez Braswell on 10/20/2025. Text Only Entry (mdblc1) (Entered: 10/20/2025) |
| 11/14/2025 | 76 | MINUTE ORDER granting the 56 Division and Commission's Unopposed Motion for Extension of Page Limit for their Opposition to Plaintiffs' Motion for Preliminary Injunction and 57 The Attorney General's Unopposed for Extension of Page Limit for his Opposition to Plaintiffs' Motion for Preliminary Injunction. The Division and Commission's response to the 7 Preliminary Injunction Motion shall not exceed 30 pages. The Attorney General's response shall not exceed 18 pages. By Magistrate Judge Maritza Dominguez Braswell on 11/14/2025. Text Only Entry(mdblc1) (Entered: 11/14/2025) |
| 11/17/2025 | 77 | Unopposed MOTION for Leave to File Excess Pages *for Motion to Dismiss* by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Passamaneck, Nora) (Entered: 11/17/2025) |
| 11/17/2025 | 78 | Unopposed MOTION for Leave to File Excess Pages *for Opposition to Preliminary Injunction* by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward, Philip Jacob Weiser. (Passamaneck, Nora) (Entered: 11/17/2025) |
| 11/18/2025 | 79 | ORDER REFERRING MOTIONS: |
| | | 77 Unopposed MOTION for Leave to File Excess Pages *for Motion to Dismiss* filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. |

**1-App-008**

| | | Sullivan, Daniel S. Ward, Geta Asfaw,<br>78 Unopposed MOTION for Leave to File Excess Pages *for Opposition to Preliminary Injunction* filed by Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Philip Jacob Weiser, Daniel S. Ward, Geta Asfaw, Eric Artis, Jade Rose Kelly.<br><br>Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 11/18/2025. Text Only Entry (rmrja) (Entered: 11/18/2025) |
|---|---|---|
| 11/18/2025 | 80 | MINUTE ORDER granting 77 78 Defendants' Unopposed Motions for Extension of Page Limits. Defendants Aubrey Sullivan's and Commissioners of the Colorado Civil Rights Commission's consolidated Motion to Dismiss shall not exceed **thirty (30) pages.** Defendants' consolidated opposition to Plaintiffs' motions for preliminary injunction shall not exceed **forty–five (45) pages.** By Magistrate Judge Maritza Dominguez Braswell on 11/18/2025. Text Only Entry(mdblc6.) (Entered: 11/18/2025) |
| 11/21/2025 | 81 | MOTION to Dismiss by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 11/21/2025) |
| 11/21/2025 | 82 | MOTION to Dismiss by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Attachments: # 1 Appendix Defendants' Appendix to Motion to Dismiss)(Passamaneck, Nora) (Entered: 11/21/2025) |
| 11/21/2025 | 83 | ORDER REFERRING MOTIONS:<br><br>81 MOTION to Dismiss filed by Philip Jacob Weiser,<br>82 MOTION to Dismiss filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw.<br><br>Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 11/21/2025. Text Only Entry (rmrja) (Entered: 11/21/2025) |
| 11/21/2025 | 84 | RESTRICTED DOCUMENT – Level 1: *Restricted Appendix to ECF82* by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward.. (Passamaneck, Nora) (Entered: 11/21/2025) |
| 11/21/2025 | 85 | BRIEF in Opposition to 27 Amended MOTION for Preliminary Injunction filed by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Attachments: # 1 Appendix Defendants' Appendix to PI Opposition)(Passamaneck, Nora) (Entered: 11/21/2025) |
| 11/21/2025 | 86 | RESTRICTED DOCUMENT – Level 1: *Restricted Appendix to ECF85* by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward.. (Passamaneck, Nora) (Entered: 11/21/2025) |
| 11/24/2025 | 87 | MINUTE ORDER: In light of 81 82 Defendants' consolidated motions to dismiss, 64 68 Defendants' earlier motions to dismiss are moot. By Magistrate Judge Maritza Dominguez Braswell on 11/24/2025. Text Only Entry(mdblc6.) (Entered: 11/24/2025) |
| 12/02/2025 | 88 | Unopposed MOTION for Leave to Restrict by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 12/02/2025) |
| 12/02/2025 | 89 | ORDER REFERRING MOTION:<br><br>88 Unopposed MOTION for Leave to Restrict filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado.<br><br>Motion referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 12/2/2025. Text Only Entry (rmrja) (Entered: 12/02/2025) |
| 01/15/2026 | 90 | ORDER REFERRING MOTIONS:<br><br>81 MOTION to Dismiss filed by Philip Jacob Weiser,<br>7 MOTION for Preliminary Injunction filed by Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Protect Kids Colorado, |

| | | |
|---|---|---|
| | | 27 Amended MOTION for Preliminary Injunction filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado, 82 MOTION to Dismiss filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 1/15/2026. Text Only Entry (rmrja) (Entered: 01/15/2026) |
| 01/29/2026 | 91 | MINUTE ORDER: A Motion Hearing to address the Preliminary Injunction Motion is **set for February 19, 2026, at 1:00 PM** before Magistrate Judge Maritza Dominguez Braswell. The Hearing will be conducted **in−person** in Courtroom 101 of the US District Court for the District of Colorado at Colorado Springs located at 212 N. Wahsatch Ave, Colorado Springs, CO 80903. By Magistrate Judge Maritza Dominguez Braswell on 1/29/2026. Text Only Entry (mdblc1) (Entered: 01/29/2026) |
| 02/02/2026 | 92 | MINUTE ORDER: In light of 27 Plaintiffs' Amended Motion for a Preliminary Injunction, 7 Plaintiffs' Motion for a Preliminary Injunction is found to be moot. By Magistrate Judge Maritza Dominguez Braswell on 2/2/2026. Text Only Entry(mdblc1) (Entered: 02/02/2026) |
| 02/05/2026 | 93 | Unopposed MOTION for Leave to File Excess Pages by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 02/05/2026) |
| 02/05/2026 | 94 | ORDER REFERRING MOTION: <br><br> 93 Unopposed MOTION for Leave to File Excess Pages filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado. <br><br> Motion referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 2/5/2026. Text Only Entry (rmrja) (Entered: 02/05/2026) |
| 02/05/2026 | 95 | Unopposed MOTION for Extension of Time to File Response/Reply as to 81 MOTION to Dismiss , 82 MOTION to Dismiss by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward, Philip Jacob Weiser. (Passamaneck, Nora) (Entered: 02/05/2026) |
| 02/05/2026 | 96 | ORDER REFERRING MOTION: <br><br> 95 Unopposed MOTION for Extension of Time to File Response/Reply as to 81 MOTION to Dismiss , 82 MOTION to Dismiss filed by Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Philip Jacob Weiser, Daniel S. Ward, Geta Asfaw, Eric Artis, Jade Rose Kelly. <br><br> Motion referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 2/5/2026. Text Only Entry (rmrja) (Entered: 02/05/2026) |
| 02/06/2026 | 97 | MINUTE ORDER granting 93 Plaintiffs' Unopposed Motion for Extension of Page Limits and the 95 Unopposed Motion for an Extension of Time for Defendants to File their Replies in Support of their Motion to Dismiss. <br><br> Plaintiffs may file a single brief in support of their preliminary injunction motion and in opposition to Defendants' motions to dismiss, not to exceed 40 pages. Additionally, Defendants' deadline to replies in support of their motions to dismiss is extended to March 4, 2026. <br><br> By Magistrate Judge Maritza Dominguez Braswell on 2/6/2026. Text Only Entry(mdblc1) (Entered: 02/06/2026) |
| 02/11/2026 | 98 | REPLY to Response to 27 Amended MOTION for Preliminary Injunction *and RESPONSE to 81 MOTION to dismiss and 82 MOTION to dismiss* filed by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Attachments: # 1 Appendix)(Connolly, J.) (Entered: 02/11/2026) |

| | | |
|---|---|---|
| 02/11/2026 | 99 | RESTRICTED DOCUMENT – Level 1: *Restricted Appendix to 98* by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado.. (Connolly, J.) (Entered: 02/11/2026) |
| 02/11/2026 | 100 | RESTRICTED DOCUMENT – Level 1: *Second Restricted Appendix to 98* by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado.. (Connolly, J.) (Entered: 02/11/2026) |
| 02/19/2026 | 101 | COURTROOM MINUTES for Motion Hearing held on 2/19/2026 before Magistrate Judge Maritza Dominguez Braswell: The Court Grants the Motions for Leave to Restrict at 72 Motion and 88 . The Court issues a RECOMMENDATION that the Motion for Preliminary Injunction at ECF No. 27 be DENIED. FTR: Colorado Springs Courtroom 101. (evaug) (Main Document 101 replaced on 2/20/2026) (evaug, ). (Entered: 02/19/2026) |
| 02/19/2026 | 102 | RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE: re 27 Amended MOTION for Preliminary Injunction filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado should be DENIED for reasons put forth on the record. Objections to R&R due by 3/5/2026 by Magistrate Judge Maritza Dominguez Braswell on 2/19/2026. (SEE COURTROOM MINUTES AT 101 .) Text Only Entry (evaug) Modified on 2/19/2026 (evaug ). (Entered: 02/19/2026) |
| 02/25/2026 | 103 | MOTION for Leave to Restrict by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Fischer, Janna) (Entered: 02/25/2026) |
| 02/25/2026 | 104 | Unopposed MOTION for Leave to File Excess Pages by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Fischer, Janna) (Entered: 02/25/2026) |
| 02/25/2026 | 105 | ORDER REFERRING MOTIONS: <br><br> 104 Unopposed MOTION for Leave to File Excess Pages filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw, <br> 103 MOTION for Leave to Restrict filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. <br><br> Motions referred to Magistrate Judge Maritza Dominguez Braswell by Judge Regina M. Rodriguez on 2/25/2026. Text Only Entry (rmrja) (Entered: 02/25/2026) |
| 02/25/2026 | 106 | MINUTE ORDER granting the 104 Division and Commission Defendants' Unopposed Motion for Extension of Page Limit for their Consolidated Reply in Support of their Motion to Dismiss. The Division and Commission Defendants Reply in Support of their Motion to Dismiss shall not exceed 20 pages By Magistrate Judge Maritza Dominguez Braswell on 2/25/2026. Text Only Entry(mdblc1) (Entered: 02/25/2026) |
| 03/02/2026 | 107 | TRANSCRIPT of MOTION HEARING held on 02/19/2026 before Magistrate Judge Braswell. Pages: 1–97. Prepared by: AB LITIGATION SERVICES (cboone@ablitservices.com or bpritchard@ablitservices.com). **NOTICE – REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (AB Court Reporting & Video, Inc., ) (Entered: 03/02/2026) |
| 03/04/2026 | 108 | REPLY to Response to 82 MOTION to Dismiss filed by Defendants Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Passamaneck, Nora) (Entered: 03/04/2026) |

| 03/04/2026 | 109 | REPLY to Response to 81 MOTION to Dismiss filed by Defendant Philip Jacob Weiser. (Kraemer, Talia) (Entered: 03/04/2026) |
|---|---|---|
| 03/05/2026 | 110 | OBJECTION to 102 Report and Recommendations filed by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Attachments: # 1 Exhibit A – Preliminary Injunction Hearing Transcript)(Connolly, J.) (Entered: 03/05/2026) |
| 03/18/2026 | 111 | RESPONSE to 103 MOTION for Leave to Restrict filed by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 03/18/2026) |
| 03/19/2026 | 112 | RESPONSE to Objection to 102 RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE re 27 Amended MOTION for Preliminary Injunction filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Pr filed by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward, Philip Jacob Weiser. (Passamaneck, Nora) (Entered: 03/19/2026) |
| 03/19/2026 | 113 | Unopposed MOTION for Leave to Restrict by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 03/19/2026) |
| 03/25/2026 | 114 | ORDER granting 113 Motion for Leave to Restrict. Being satisfied that 113 Plaintiffs' Motion to Restrict fulfills the requirements of D.C.COLO.LCivR 7.2(c), the Court GRANTS the Motion. The Clerk of the Court shall maintain a Level 1 Restriction to ECF No. 100 . SO ORDERED by Judge Regina M. Rodriguez on 3/25/2026. Text Only Entry(rmrja) (Entered: 03/25/2026) |
| 03/31/2026 | 115 | ORDER. Collective Plaintiffs' Objections to the Recommendation (Defending Education 110 ; Committee of Five 95 ; Doxa 57 ) are OVERRULED; The Recommendation (Defending Education 102 ; Committee of Five 87 ; Doxa 49 ) is ACCEPTED AND ADOPTED; Collective Plaintiffs' Motions for Preliminary Injunction (Defending Education 27 ; Committee of Five 15 ; Doxa 4 ) are DENIED; and The parties are ORDERED to set a status conference with Magistrate Judge Braswell to address the pending motions to dismiss (Defending Education, ECF Nos. 81, 82; Committee of Five, ECF Nos. 69, 70; Doxa, ECF Nos. 33, 34) and the relief requested thereunder. By Judge Regina M. Rodriguez on 3/31/2026. (kmyha) (Entered: 03/31/2026) |
| 04/01/2026 | 116 | MINUTE ORDER: A Status Conference is **set for April 7, 2026, at 2:30 PM** before Magistrate Judge Maritza Dominguez Braswell. The Conference will be conducted by video using the attached instructions. By Magistrate Judge Maritza Dominguez Braswell on 4/1/2026. Text Only Entry (mdblc1) (Entered: 04/01/2026) |
| 04/01/2026 | 117 | REPLY to Response to 103 MOTION for Leave to Restrict filed by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Passamaneck, Nora) (Entered: 04/01/2026) |
| 04/01/2026 | 118 | NOTICE OF APPEAL as to 115 Order on Motion for Preliminary Injunction,,, Order on Report and Recommendations,, 102 RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE re 27 Amended MOTION for Preliminary Injunction filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Pr by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado (Filing fee $ 605, Receipt Number ACODC–10920100) (Connolly, J.) (Entered: 04/01/2026) |
| 04/02/2026 | 119 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 118 Notice of Appeal,, filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record)(ccuen, ) (Entered: 04/02/2026) |
| 04/02/2026 | 120 | USCA Case Number 26–1101 for 118 Notice of Appeal,, filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, |

**1-App-012**

| | | Defending Education, Valeri Leswing, Protect Kids Colorado. (ccuen, ) (Entered: 04/03/2026) |
|---|---|---|
| 04/07/2026 | 121 | COURTROOM MINUTES for Status Conference held on 4/7/2026 before Magistrate Judge Maritza Dominguez Braswell: Joint Status Report due by 5/7/2026. FTR: Colorado Springs Courtroom 101. (evaug ) (Entered: 04/09/2026) |
| 04/09/2026 | 122 | MINUTE ORDER granting the 103 Division and Commission Defendants' Opposed Motion to Restrict Access. Considering the briefing and arguments made during the 121 Status Conference, and applying D.C.COLO.LCivR 7.2, the Court determines that the requested restriction is appropriate. Accordingly, the Clerk of Court is directed to maintain Level 1 restriction over ECF 99, the Appendix to Plaintiffs' Replies in Support of their Motions for Preliminary Injunction and Responses in Opposition to Defendants' Motions to Dismiss. By Magistrate Judge Maritza Dominguez Braswell on 4/9/2026. Text Only Entry(mdblc1) (Entered: 04/09/2026) |
| 04/15/2026 | 123 | TRANSCRIPT ORDER FORM re 118 Notice of Appeal,, by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado (Connolly, J.) (Entered: 04/15/2026) |
| 04/28/2026 | 124 | LETTER TO USCA and all counsel certifying the record is complete as to 118 Notice of Appeal,, filed by Mountain Pediatrics, Do No Harm, Travis Morrell, Colorado Parent Advocacy Network, Defending Education, Valeri Leswing, Protect Kids Colorado. A transcript order form was filed stating that the necessary transcript is already on file. ( Appeal No. 26–1101) Text Only Entry (ccuen, ) (Entered: 04/28/2026) |
| 05/01/2026 | 125 | RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE re 81 MOTION to Dismiss filed by Philip Jacob Weiser, 82 MOTION to Dismiss filed by Jade Rose Kelly, Eric Artis, Sergio Raudel Cordova, Mayuko Fieweger, Aubrey C. Sullivan, Daniel S. Ward, Geta Asfaw. the Court respectfully RECOMMENDS that The Attorney General's Consolidated Motion to Dismiss and the Division and Commission Defendants' Consolidated Motion to Dismiss be GRANTED in part and DENIED in part. The Court further RECOMMENDS that Defending Education, Colorado Parent Advocacy Network and Protect Kids Colorado's claims be dismissed without prejudice for lack of standing. By Magistrate Judge Maritza Dominguez Braswell on 05/01/2026. (jrobe, ) (Entered: 05/01/2026) |
| 05/07/2026 | 126 | Unopposed MOTION for Extension of Time to *File Objection to R&R on Motions to Dismiss* by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 05/07/2026) |
| 05/07/2026 | 127 | Joint STATUS REPORT by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 05/07/2026) |
| 05/07/2026 | 128 | ORDER granting 126 Motion for Extension of Time to File Objection to R&R on Motions to Dismiss. Defendant is GRANTED an extension of time, to and including 5/22/26, to file an objection to 125 Recommendation of United States Magistrate Judge. SO ORDERED by Judge Regina M. Rodriguez on 5/7/2026. Text Only Entry (kmyha) (Entered: 05/07/2026) |
| 05/07/2026 | 129 | Unopposed MOTION to Clarify re 128 Order on Motion for Extension of Time to File, by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 05/07/2026) |
| 05/07/2026 | 130 | CORRECTED ORDER granting 126 Motion for Extension of Time to File Objection to R&R on Motions to Dismiss. All parties are GRANTED an extension of time, to and including 5/22/26, to file an objection to 125 Recommendation of United States Magistrate Judge. SO ORDERED by Judge Regina M. Rodriguez on 5/7/2026. Text Only Entry(kmyha) (Entered: 05/07/2026) |
| 05/12/2026 | 131 | MINUTE ORDER: Within fourteen (14) days of the resolution of the forthcoming objections to the 125 Recommendation, the parties are directed to file a Joint Status Report proposing a discovery plan. By Magistrate Judge Maritza Dominguez Braswell on 5/12/2026. Text Only Entry (mdblc6.) (Entered: 05/12/2026) |

| 05/22/2026 | 132 | OBJECTION to 125 Report and Recommendations filed by Defendants Eric Artis, Geta Asfaw, Sergio Raudel Cordova, Mayuko Fieweger, Jade Rose Kelly, Aubrey C. Sullivan, Daniel S. Ward. (Passamaneck, Nora) (Entered: 05/22/2026) |
|---|---|---|
| 05/22/2026 | 133 | OBJECTION to 125 Report and Recommendations filed by Defendant Philip Jacob Weiser. (Towery, Lane) (Entered: 05/22/2026) |
| 05/22/2026 | 134 | OBJECTION to 125 Report and Recommendations filed by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 05/22/2026) |
| 06/02/2026 | 135 | Unopposed MOTION for Leave to File Excess Pages *in Response to Defendants' Objections to the Report and Recommendation* by Plaintiffs Colorado Parent Advocacy Network, Defending Education, Do No Harm, Valeri Leswing, Travis Morrell, Mountain Pediatrics, Protect Kids Colorado. (Connolly, J.) (Entered: 06/02/2026) |
| 06/03/2026 | 136 | ORDER granting 135 Motion for Extension of Page Limits. Plaintiffs in each case are granted leave to file excess pages, not to exceed 15 pages, to their combined response to 132 Division and Commission Defendants' Objections to the Report & Recommendation on Their Motion to Dismiss, and 133 the Attorney General's Objection to the Report & Recommendation on His Motion to Dismiss. SO ORDERED by Judge Regina M. Rodriguez on 6/3/2026. Text Only Entry(rmrja) (Entered: 06/03/2026) |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION; COLO-
RADO PARENT ADVOCACY
NETWORK; PROTECT KIDS COLO-
RADO; DO NO HARM; TRAVIS
MORRELL; VALERI LESWING; and
MOUNTAIN PEDIATRICS,

      *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official ca-
pacity as Director of the Colorado Civil
Rights Division; SERGIO RAUDEL COR-
DOVA, GETA ASFAW, MAYUKO
FIEWEGER, DANIEL S. WARD, JADE
ROSE KELLY, and ERIC ARTIS, in their
official capacities as members of the Colo-
rado Civil Rights Commission; and PHILIP
JACOB WEISER, in his official capacity as
the Attorney General of Colorado,

      *Defendants.*

Case No. 1:25-cv-01572-RMR

## FIRST AMENDED COMPLAINT

Plaintiffs Defending Education, Colorado Parent Advocacy Network, Protect Kids

Colorado, Do No Harm, Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics

bring this complaint against Defendants, various Colorado state officials, under 42 U.S.C.

§1983 for violations of the First and Fourteenth Amendments to the United States Consti-

tution.

## INTRODUCTION

1.      "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943). The state cannot place its thumb on the scale to favor one side of a contentious public debate. It certainly cannot stifle viewpoints it doesn't like simply because it finds those views offensive or disagreeable.

2.      Colorado is flouting that fundamental constitutional principle. Over fierce opposition from many Coloradans, the State recently adopted a law—House Bill 25-1312—that punishes Coloradans for their speech and compels them to use language endorsing the State's views on highly contested and highly political matters of sex and gender.

3.      H.B. 25-1312 enacts a number of controversial policies designed to promote gender ideology—the notion that sex is not fixed at birth, that people can be "born in the wrong body," and that individuals experiencing gender dysphoria should use potentially irreversible procedures (including hormone treatments and surgery) to change their body to conform to an internal sense of "gender identity."

4.      Relevant here, Section 8 of H.B. 25-1312 amends the State's Anti-Discrimination Act to compel Coloradans to refer to transgender-identifying individuals using their "chosen name" and preferred pronouns.

- 2 -
**1-App-016**

5. Specifically, H.B. 25-1312 amends the definition of "gender expression," a protected category under the Colorado Anti-Discrimination Act, to include the use of a "chosen name" and other words by which an individual "chooses to be addressed."

6. Thus, it is now a "discriminatory practice" under Colorado law to refer to transgender-identifying individuals by their birth name (i.e., not their "chosen name") or to use biological pronouns (i.e., not their preferred pronouns) in a place of public accommodation.

7. It is also a "discriminatory practice" under Colorado law to "publish," "display," "circulate," or "mail" any communication that "states" or "indicates" that a person's presence at a place of public accommodation is "unwelcome, objectionable, unacceptable, or undesirable" because of "gender expression." Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c). Accordingly, H.B. 25-1312's revision to the definition of "gender expression" means that Coloradans who operate in a place of public accommodation are prohibited from publishing or sending materials that refer to a transgender-identifying individual by their birth name (i.e., not their "chosen name") or use their biological pronouns (i.e., not their preferred pronouns).

8. Coloradans need not use the name that "an individual requests to be known as" only in limited circumstances: when the requested name "contain[s] offensive language" or when the individual is "requesting the name for frivolous purposes." The law contains no exception for using an individual's preferred pronouns.

9.      Defending Education ("DE"), Colorado Parent Advocacy Network ("CPAN"), Protect Kids Colorado ("PKC"), Do No Harm ("DNH"), Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics bring this lawsuit to stop Colorado from abridging the fundamental speech rights of its citizens. Plaintiffs believe that sex is immutable and fixed at birth, and they oppose the spread of controversial gender ideologies among Colorado's youth. They want to speak consistently with that view. They do not want to be forced to affirm—through the use of pronouns, names, or other language—that a biological man is actually a woman or vice versa. Yet that is precisely what H.B. 25-1312 requires.

10.      The challenged provisions of the Colorado Anti-Discrimination Act violate the First Amendment, both facially and as applied, and are impermissibly vague in violation of the Fourteenth Amendment.

11.      Plaintiffs bring this action to protect their rights, their members' rights, and the rights of every person in Colorado who does not want to be punished for expressing their sincerely held views about sex and gender. The challenged provisions should be declared unconstitutional, and Defendants should be enjoined from enforcing them.

## PARTIES

12.      Plaintiff DE is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include parents, students, and other concerned citizens. DE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of education and the spread of harmful gender ideology. DE has members in

- 4 -

Colorado, including Lori Gimelshteyn and Erin Lee, who share DE's opposition to politicized education and gender ideology.

13. Plaintiff CPAN is a statewide, grassroots, 501(c)(4) non-profit organization organized under Colorado law. The organization is based in the State of Colorado. The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children. CPAN hosts meetings, summits, and other events that are open to the public and which occur in places of public accommodation. CPAN's Executive Director is Lori Gimelshteyn.

14. Plaintiff PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado. The organization aims to restore the principle that parents have a fundamental right to make decisions about their children's wellbeing and education. PKC hosts meetings and other events that are open to the public and which occur in places of public accommodation. PKC's Executive Director is Erin Lee.

15. Plaintiff DNH is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include healthcare professionals, students, patients, and policymakers. DNH's mission is to ensure that medicine is driven by scientific evidence rather than ideology. To that end, the organization opposes the spread of gender ideology and the use of so-called gender-affirming medical treatments. DNH has members in Colorado who share its opposition to gender ideology and dangerous gender-affirming care. Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics are members of DNH.

16.    Dr. Travis Morrell is a licensed physician and a double board-certified dermatologist and dermatopathologist. He also obtained a Master of Public Health degree. Dr. Morrell's medical practice focuses on the diagnosis and treatment of serious skin conditions, including melanoma, carcinoma, autoimmune disease, and cutaneous effects of systemic disorders. Dr. Morrell's practice is located in Grand Junction, Colorado.

17.    Dr. Valeri Leswing is a licensed physician and practicing pediatrician. Her medical practice focuses on providing complete pediatric care for children and young adults from newborns to college students, including comprehensive well care, physicals, and visits for illness or injury.

18.    Mountain Pediatrics is Dr. Leswing's medical practice. Dr. Leswing is the practice's sole owner and physician. The practice is located in Evergreen, Colorado.

19.    Defendant Aubrey C. Sullivan is the Director of the Colorado Civil Rights Division. The civil rights division is "a division of [the] state government" responsible for enforcing Colorado's antidiscrimination laws, including H.B. 25-1312. Colo. Rev. Stat. §§24-34-302, 24-34-305. As Director, Sullivan is the "head" of the Civil Rights Division and leads its enforcement functions. *Id.* §§24-34-302, 24-34-306. Sullivan is sued in her official capacity.

20.    Defendants Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, and Eric Artis are members of the Colorado Civil Rights Commission, with authority to enforce Colorado's antidiscrimination laws, including H.B. 25-1312. *Id.* §§24-34-305, 24-34-306, 24-34-605. The Commissioners are sued in their official capacity.

21.    Defendant Philip Jacob Weiser is the Attorney General of Colorado, with authority to enforce Colorado's antidiscrimination laws, including H.B. 25-1312. *Id.* §24-34-306. Weiser is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §1983.

23.    The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

24.    Venue is proper under 28 U.S.C. §1391 because all Defendants reside in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

**I.    H.B. 25-1312 compels Coloradans to affirm controversial beliefs about sex and gender with which they disagree.**

25.    States have a strong interest in ensuring that all of their citizens enjoy equal treatment under the law and equal access to places of public accommodation. At the same time, the Constitution "protects the right for minorities and majorities alike to hold certain views" and express those views in the public sphere. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. BOE*, 82 F.4th 664, 671 (9th Cir. 2023). "Often, anti-discrimination laws and the protections of the Constitution work in tandem to protect minority views in the face of dominant public opinions." *Id.* But when the two clash, "antidiscrimination laws, as

critically important as they are, must yield to the Constitution." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).

26.    In other words, even if a State may prohibit "the *act* of discriminating against individuals," it "is not free to interfere with *speech* for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 572, 579 (1995) (emphasis added).

27.    Colorado was reminded of this lesson just two years ago. In *303 Creative v. Elenis*, the Supreme Court warned Colorado that, even if it can require businesses to "work with all people," it could not use its antidiscrimination laws to compel a website designer to create content endorsing a message with which she disagreed. 600 U.S. 570, 597-602 (2023). A few years before that, though it acknowledged that Colorado could apply antidiscrimination laws to business owners who "refused to sell *any* goods" to gay customers, the Court chastised the State for trying to coerce a religious baker to "use his artistic skills to make an expressive statement" about the propriety of same-sex marriage. *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 631-33 (2018) (emphasis added).

28.    Unfortunately, Colorado has not taken that lesson to heart. On May 16, Colorado Governor Jared Polis signed into law H.B. 25-1312. Section 8 of that bill, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), amends Colorado's antidiscrimination laws to prohibit certain speech about sex and gender. *See* Exhibit A.

29.     The Colorado Anti-Discrimination Act already prohibits "discriminatory" or "unfair" practices in employment, housing, public accommodations, and advertising on the basis of various characteristics, including "gender expression." Colo. Rev. Stat. §§24-34-402, 502, 601, & 701. In other words, it was already illegal to deny someone actual "services" or "goods" in a public accommodation because their "dress" or "appearance" does not conform to their biological sex. *Id.* §§24-34-301(9), 601(2)(a); *cf. 303 Creative*, 600 U.S. at 594-95 (parties agree that businesses in Colorado must offer their products on the same terms to all customers).

30.     But H.B. 25-1312 expands the definition of "gender expression" to include conduct and, more importantly, *speech* based on an individual's "chosen name" or "how [they] choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9). Now, those who operate a public accommodation are liable under the Colorado Anti-Discrimination Act if they refer to someone without using their chosen name, preferred pronouns, or other gender-affirming terms. *Id.*

31.     H.B. 25-1312 creates only a narrow carveout for this speech compulsion. Speakers need not use the name that "an individual requests to be known as" only when the requested name "contain[s] offensive language" or when the person is "requesting the name for frivolous purposes." *Id.* §24-34-301(3.5). The law contains no exception for using an individual's preferred pronouns. *See id.*

32.     Under H.B. 25-1312, then, someone who operates in a public accommodation commits a discriminatory act when they refer to a transgender-identifying individual using

the individual's birth name or biological pronouns instead of their chosen name or preferred pronouns—speech commonly known as "deadnaming" and "misgendering"—because that speech supposedly denies the transgender individual the "full and equal enjoyment" of the place of public accommodation based on their "gender expression." *Id.* §§24-34-301(9), 24-34-601(2)(a).

33.    The Colorado Civil Rights Commission has also adopted a regulation that prohibits "[u]nlawful harassment," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6.

34.    The Colorado Anti-Discrimination Act also includes an Unwelcome Provision and an Unwelcome Statements Provision. Under the Unwelcome Provision, it is unlawful for any person to "directly or indirectly … publish" or otherwise distribute "any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable" based on, among other things, "gender expression." Colo. Rev. Stat. §24-34-601(2)(a). Similarly, the Unwelcome Statements Provision provides that any "person that is the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation … shall not, directly or indirectly, publish" or otherwise distribute "any communication" that "[s]tates that the patronage, custom, presence, [or] frequenting" "at the place by any person or class of persons belonging

to or purporting to be of any particular" "gender expression" is "unwelcome or objectionable or not acceptable, desired, or solicited." *Id.* §24-34-701(1)(c).

35. These Provisions do not define any of their terms and instead turn on the customer's subjective experience. The term "unwelcome," for example, commonly means "not wanted." *Merriam-Webster Dictionary* (archived May 18, 2025), perma.cc/9HAD-4MUB; *see also* perma.cc/8CKG-E9K9 ("objectionable" means "offensive"); perma.cc/RHY6-2DL4 ("unacceptable" means "not pleasing or welcome"); perma.cc/9XU4-E22J ("undesirable" means "unwanted").

36. As amended by H.B. 25-1312, then, the Colorado Anti-Discrimination Act prohibits anyone who operates in a public accommodation from publishing any statement or sending any communication that offends a transgender-identifying person or makes them feel unwelcome because the communication or statement refers to such persons without using their "chosen name" or other terms by which they "choos[e] to be addressed" or expresses opposition to the use of chosen names, preferred pronouns, or other so-called gender-affirming language. Colo. Rev. Stat. §24-34-301(9). Colorado law treats such communications and statements as a "discriminatory" and "unlawful" practice based on "gender expression." *Id.* §24-34-601(2)(a); *see id.* §24-34-701(1)(c).

37. Those who violate the Colorado Anti-Discrimination Act are subject to investigations, lawsuits, and fines.

38. Those who violate the Colorado Anti-Discrimination Act can be reported to the Colorado Civil Rights Division. *Id.* §24-304-306(1)(a)(I). The Director "investigat[es]"

reports and, upon a determination of probable cause, can issue orders compelling individuals to "participate in compulsory mediation." *Id.* §24-34-306(2)(a), (2)(b)(II). If mediation does not succeed, the Commission can "requir[e]" them "to answer the charges at a formal hearing." *Id.* §24-34-306(4). And if the Commission finds a violation, it can order the speakers to "cease and desist" their speech. *Id.* §24-34-306(9). The Commission can also order parties "to take affirmative action," *id.* §24-34-605, including "participation in mandatory educational programs," *303 Creative*, 600 U.S. at 581.

39.    Commission members, the Director, and the Attorney General can each institute investigations of suspected violations of the law on their own, without first receiving a report. Colo. Rev. Stat. §24-304-306(1)(b).

40.    The Colorado Anti-Discrimination Act also threatens private lawsuits and financial penalties. Those who violate the law can be sued by an "aggrieved" party and, upon a finding of liability, be forced to pay substantial fines and subjected to injunctive relief. *See id.* §24-34-602(1).

## II.    H.B. 25-1312 was designed to punish disfavored speech.

41.    The purpose of H.B. 25-1312 is clear. The law punishes those who refuse to speak using chosen names and pronouns, and it does so in order to suppress traditional and scientific beliefs about sex and gender. In other words, the law openly discriminates based on viewpoint.

42.    H.B. 25-1312's viewpoint discrimination is apparent from the text itself. On its face, the law punishes the use of any name *except* an individual's "chosen name." Colo. Rev.

Stat. §24-34-301(9). And it punishes the use of any manner of address—e.g., pronouns—

*other* than "how the individual chooses to be addressed." *Id.* But "refus[ing] to address" an

individual with their chosen name or pronouns "advance[s] a viewpoint on gender identity."

*Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). This viewpoint affirms that "sex is

fixed in each person from the moment of conception, and that it cannot be changed, regard-

less of an individual's feelings or desires." *Id.* Even if H.B. 25-1312 prohibited only offensive

refusals to use someone's chosen name or pronouns, "[g]iving offense is a viewpoint." *Matal*

*v. Tam*, 582 U.S. 218, 243 (2017); *see Iancu v. Brunetti*, 588 U.S. 388, 394 (2019) (same).

43.    H.B. 25-1312's sponsors confirmed that the law's speech prohibitions are de-

signed to push those with traditional views about sex and gender out of the public

conversation. State Representative Lorena García, the law's prime sponsor, described those

who refer to others using biologically accurate pronouns and birth names as "bull[ies]."

Marissa Ventrelli, *Colorado Democrats Seek to Penalize 'Misgendering' and Deadnaming'*, Denver

Gazette (Apr. 3, 2025), perma.cc/9U5U-TJ4X. Another sponsor, asked why parental rights

groups who oppose gender ideology were not consulted during the law's drafting, called such

organizations "hate groups," compared them to the "KKK," and explained that she had no

interest in hearing their "opinion." Tyler O'Neill, *'Crossed the Rubicon': Colorado House Passes*

*Bill Treating as Child Abuse Dissent From Transgender Orthodoxy*, Daily Signal (Apr. 7, 2025),

perma.cc/Z8VY-8A8G.

44.    The law's proponents likewise welcomed H.B. 25-1312 precisely because it

places a thumb on the scale in the public debate surrounding gender ideology and "gender-

- 13 -
**1-App-027**

affirming care." In their eyes, traditional views about sex and gender don't deserve legal protection because "calling someone by the wrong name or pronoun on purpose" isn't "free speech"; it's "spite" and "discrimination." Melissa Goset, *Colorado Passes Groundbreaking Trans Rights Legislation*, GoMag (Apr. 4, 2025), perma.cc/XZQ9-9J35.

45.    As Representative García says, H.B. 25-1312 sends a "message … that we are not going to tolerate" dissenting speech on sex and gender. Jacob Factor, *'Kelly Loving Act': Colorado Lawmakers Push for More Transgender Protections*, FOX31 (Apr. 10, 2025), bit.ly/4k4dVS1.

### III.  H.B. 25-1312 injures Plaintiffs and their members.

### A.    Defending Education, CPAN, and PKC.

46.    ***Defending Education***. DE is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include parents, students, and others concerned about the state of education in America. The organization's mission is to prevent the politicization of both K-12 and higher education, including government attempts to usurp parents' rights and to silence students who express dissenting views. DE furthers its mission through network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful school policies to DE's members and other parents; advocacy; and, if necessary, litigation.

47.    DE strongly opposes the spread of harmful gender ideology and so-called gender-affirming care, and the organization strives to protect the right of its members to speak freely about these topics. In line with that mission, DE regularly litigates on behalf of its

members to protect their First Amendment right to refer to individuals using biologically accurate pronouns and/or birth names. DE also publishes informational resources about the scope of, and threats to, constitutional speech rights, and it advises parents and students on how to navigate school speech restrictions.

48.   DE has members in Colorado who share the organization's opposition to the politicization of America's schools and the spread of harmful gender ideology.

49.   DE's members include Lori Gimelshteyn, CPAN's Executive Director, and Erin Lee, PKC's Executive Director. DE's members in Colorado are injured by H.B. 25-1312.

50.   ***CPAN and Lori Gimelshteyn***. Lori Gimelshteyn is the Executive Director of Colorado Parent Advocacy Network ("CPAN"). In her role as Executive Director, she runs the organization on a day-to-day basis and is its lead spokesperson.

51.   CPAN is a statewide, grassroots, 501(c)(4) non-profit organization organized under Colorado law. The organization is based in the State of Colorado. The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children. CPAN is committed to restoring an educational environment in Colorado that is academically rigorous, non-ideological, safe, and transparent.

52.   In furtherance of this mission, CPAN advocates for educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives. CPAN furthers this mission through network- and coalition-

building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and informational resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy; and, if necessary, litigation.

53. Much of CPAN's programming and advocacy focuses on K-12 education. The organization encourages schools to prioritize educational quality over politics, opposes the teaching of gender ideology, and defends the free speech rights of students, parents, and educators. CPAN regularly offers informational resources and hosts public events about the state of education in Colorado. *E.g.*, *School Safety Summit*, bit.ly/4ddPLCj; *Whose Children Are They?*, bit.ly/3GPKXHm; *Protecting Taxpayers & Prioritizing Academic Achievement In Our Schools*, bit.ly/4mbybTF; *Colorado's National School Choice Week*, bit.ly/3EQR7Xc.

54. CPAN supports traditional views and opinions on matters of sex and gender identity. In particular, CPAN and Ms. Gimelshteyn believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. CPAN and its leadership want to exercise their fundamental constitutional right to speak in a manner that reflects those views.

55. In line with their belief that sex is determined at birth and immutable, when CPAN or its leaders (including Ms. Gimelshteyn) speak about individuals, they want to refer to those individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

56.     When CPAN and Ms. Gimelshteyn use birth names and biologically accurate pronouns, they are not doing so to be malicious or hurtful. They do so because this expression reflects their deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If they were to refer to a biological male as a "she" instead of a "he," they would be lying to themselves and to others. They would be communicating an idea and belief that they firmly disagree with.

57.     The use of birth names and biologically accurate pronouns is also critical to CPAN's mission. CPAN and Ms. Gimelshteyn vehemently oppose government attempts to promote harmful practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and cannot change their sex based on personal preference. Being compelled to use an individual's preferred pronouns or names would prevent CPAN and Ms. Gimelshteyn from expressing their core beliefs— and, in effect, surrender the debate before it begins.

58.     CPAN hosts meetings, summits, and other events in places of public accommodation. These events are open to the public, including parents and other interested individuals. CPAN is therefore subject to Colorado laws governing places of public accommodation. *See* Colo. Rev. Stat §24-34-601 (prohibiting "discrimination in places of public accommodation"); *Creek Red Nation v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1298 (D. Colo. 2016) ("[P]ublic accommodation" includes "organizations that conduct activities in facilities … that are open to the public."). For example, in April 2024, CPAN leased space

in the Inverness Hilton, a hotel in Englewood Colorado, to host a "Summit on Safeguarding Children from Gender-Affirming Care." CPAN hosted a second summit on the same topic at the same hotel in April 2025. Both summits were open to the public and widely advertised.

59.    CPAN plans to host additional public events in the future and has agreements in place to lease space in places of public accommodation for those events.

60.    At its public events, CPAN, its officers (including Ms. Gimelshteyn), and other attendees frequently discuss specific individuals, including transgender individuals. When they do so, they have used biologically accurate pronouns and birth names rather than "preferred pronouns" and "chosen names." For example, they have discussed Representative Brian Titone and how the person identifies as a woman and goes by the name "Brianna," and Kevin Smotherman (who ran for the State Senate) and how the person identifies as a woman and goes by the name "Vivian." In line with their beliefs about sex and gender, when CPAN, its officers, and attendees discuss specific individuals, they want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. As another example, to highlight the prevalence of gender ideology in American media, they will call out biologically male celebrities and say things like, "Dylan Mulvaney is a man pretending to be a woman. 'She' is actually a 'he' and does not know the experience of American girls."

61.    Transgender-identifying individuals have attended CPAN's public events in the past, and CPAN anticipates that transgender-identifying individuals will attend their events

in the future. For example, at CPAN's last event, a transgender-identifying individual showed up at the event and told Ms. Gimelshteyn he had come because he was concerned that they were not going to represent the perspective of the transgender community at their event. Ms. Gimelshteyn told him that their event was designed to highlight the harms of gender ideology, not to promote the other side's views. At the same event, two different parents each brought one of their children. One child identifies as transgender and the other identifies as nonbinary. CPAN also had protestors outside of the event, many of whom identify as transgender.

62. At their events, when CPAN, its officers, or other attendees have referred to transgender individuals, they have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, they want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

63. CPAN and Ms. Gimelshteyn also want to publish materials—for example, flyers advertising CPAN events, videos and presentations from the events, social media posts, educational resources for parents, and other materials distributed at their events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, in March 2025, to raise awareness about the danger that "gender-affirming care" poses to children, CPAN published a post on X about a Colorado teacher who harbored a 17-year-

old transgender-identifying child without the parent's consent. Though the child, who goes by "Onyx," identified as a boy, CPAN's post referred to the child as "a teen girl."

64.    CPAN regularly publishes materials that comment on state and local policy proposals, highlight developing news stories in the education and gender space, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of "gender-affirming care." These published materials include petitions supporting or opposing legislation, social media posts, informative videos, documentaries, investigative reports, opinion pieces in widely circulated newspapers and online publications, gender issue guidelines, and other resources. In April 2025, for example, CPAN published an infographic informing Coloradans about the threat to parental rights and free speech posed by Colorado House Bill 25-1312.

65.    CPAN's published materials often refer to specific individuals, including transgender individuals. For example, in March 2024, CPAN published a post on X responding to a video featuring Dylan Mulvaney, a transgender activist. Though Mulvaney identifies as a woman, the tweet referred to Mulvaney using the person's biological sex, stating "That is a man ridiculing girls."

66.    In line with their belief that sex is immutable and determined at birth, CPAN and Ms. Gimelshteyn want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's preferred pronouns or conflict with an individual's self-professed

**1-App-034**

gender identity or gender expression. CPAN and Ms. Gimelshteyn also want to refer to individuals in published materials using birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

67. However, Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for CPAN and their leadership to effectively exercise their constitutionally protected right to speak in a manner that reflects their sincere belief that sex is immutable and fixed at birth.

68. Because of the public nature of CPAN's and Ms. Gimelshteyn's expression, they are well-known among the transgender activist community in Colorado. They have become a frequent target of harassment and intimidation by individuals and groups who oppose their mission. They have received aggressive and threatening emails and messages from individuals because of their speech. Ms. Gimelshteyn has received death threats because of her work. After she testified against H.B. 25-1312, an individual spat in her hair. She has been called a "Nazi" and a "white supremacist." She once received a thank-you card from the Satanic Temple, thanking her for "motivating a generous donation" that had been made in her name. Protestors regularly attend CPAN's events. Ms. Gimelshteyn has also been sued in her personal capacity over her work combatting gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn and Erin Lee*, No. 2024SA63 (Colo. S. Ct. filed Feb. 28, 2024). Given her past experience, she has no doubt that there are individuals who will want to report CPAN or her or sue them because of their speech.

69.   Because H.B. 25-1312 threatens to punish deadnaming and misgendering, CPAN and its leadership, including Ms. Gimelshteyn, must stop referring to individuals using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at their public events and in their published materials. They fear that, if they continue to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, they will be investigated by the Colorado Civil Rights Division, sued by individuals, and face financial or equitable penalties. Ms. Gimelshteyn also fears that she will be sued personally, e.g., for refusing to "addres[s]" an individual using their "chosen name" or other preferred terms. *Id.* §24-34-301(3.5), (9); *see* §24-34-602(1)(a) ("*Any person*" who commits a discriminatory act may be sued (emphasis added)).

70.   H.B. 25-1312's punishments for disfavored speech also means that CPAN and Ms. Gimelshteyn must refrain from "publish[ing]" materials in connection with their public events that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

71.   Because H.B. 25-1312 renders CPAN and Ms. Gimelshteyn unable to speak candidly about biological sex or publish materials that contain such speech, their ability to inform parents about gender ideology in Colorado schools is greatly diminished. Likewise, their ability to organize support for or opposition to political candidates, ballot measures, legislation, school board policies, or other measures is compromised. Because of H.B. 25-

1312, CPAN and Ms. Gimelshteyn are no longer allowed to use their preferred language at their public events or in their publications. Nor can they discuss specific news stories involving transgender-identifying individuals.

72.    As Executive Director of CPAN, Ms. Gimelshteyn is in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is her experience that these parents and citizens will be less likely to support CPAN if they believe the organization may face legal penalties, including fines, for so-called discriminatory speech. Also in her experience, venues will be less willing to host their public events if CPAN is branded a "discriminatory" organization.

73.    CPAN and Ms. Gimelshteyn do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. They want to continue to speak, publish materials, and host events consistent with their belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet they are unable to effectively exercise their speech rights because of H.B. 25-1312's prohibitions and penalties.

74.    ***PKC and Erin Lee.*** Erin Lee is the Executive Director of Protect Kids Colorado ("PKC"). In her role as Executive Director, she runs the organization on a day-to-day basis and is its lead spokesperson.

75.    PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado. The organization aims to restore the principle that parents have a fundamental right to make decisions about their children's

wellbeing and education. It hopes to raise awareness about the prevalence of false gender ideologies and the dangers of so-called gender-affirming treatments. PKC furthers this mission through coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies; educational campaigns; and, if necessary, litigation.

76.    Much of PKC's programming focuses on K-12 education and school transparency. The organization raises awareness about the prevalence of controversial gender ideology in Colorado's public schools, warns parents of the need to closely monitor their children's education, and hosts public events on those same topics. *E.g.*, Emily Washburn, *'Art Club' Documentary — One Family's Escape from Gender Ideology, and the Bigger Trend Sweeping the Nation*, The Daily Citizen (Feb. 6, 2024), perma.cc/RZ94-YRPY.

77.    PKC supports traditional views and opinions on matters of sex and gender identity. In particular, PKC and Ms. Lee believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. PKC and its leadership want to exercise their fundamental constitutional right to speak in a manner that reflects those views.

78.    In line with their belief that sex is determined at birth and immutable, when PKC or its leaders (including Ms. Lee) speak about individuals, they want to refer to those individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

79.    When PKC and Ms. Lee use birth names and biologically accurate pronouns, they are not doing so to be malicious or hurtful. They do so because this expression reflects

their deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If they were to refer to a biological male as a "she" instead of a "he," they would be lying to themselves and to others. They would be communicating an idea and belief that they firmly disagree with.

80.    The use of birth names and biologically accurate pronouns is also critical to PKC's mission. PKC and Ms. Lee vehemently oppose government attempts to promote harmful practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and cannot change their sex based on personal preference. If they were forced to identify an individual by his or her "preferred" pronoun and names, then they have already lost the debate.

81.    PKC hosts meetings and other events in places of public accommodation. These meetings are open to parents and other interested members of the public. PKC is therefore subject to Colorado laws governing places of public accommodation. *See* Colo. Rev. Stat §24-34-601; *Creek Red Nation*, 175 F. Supp. 3d at 1298. For example, in July and August 2024, PKC leased space in Denver-area restaurants to host signature-gathering events in support of its ballot initiatives. PKC publicized these events on social media.

82.    PKC plans to host additional public events in the future and is actively seeking to lease space in places of public accommodation for those events.

83.    At its public events, PKC, its officers (including Ms. Lee), and other attendees frequently discuss specific individuals, including transgender individuals. When they do so,

they have used biologically accurate pronouns and birth names, rather than "preferred pronouns" and "chosen names." In line with their beliefs about sex and gender, when PKC and its officers discuss specific individuals, they want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. For example, a powerful way for them to oppose allowing biological males to compete in women's sports is to speak the truth that the person was born a male. They often say things like, "That swim meet was deeply unfair. It was won by a biological male who was born William Thomas but now calls himself Lia Thomas. He should not have been allowed to compete in an event for female athletes."

84.    Transgender-identifying individuals have attended PKC's public events in the past, and PKC and Ms. Lee anticipate that transgender-identifying individuals will attend their events in the future. For example, a few weeks ago, PKC sponsored an event at a recreation center that was open to the public. An individual who Ms. Lee knows to identify as transgender came to the event.

85.    At their events, when PKC, its officers, or other attendees have referred to transgender individuals, they have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, they want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

86.     PKC and Ms. Lee also want to publish materials—for example, flyers advertising PKC events, videos of their events, educational resources for parents, social media posts, and other materials distributed at their events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, PKC and Ms. Lee have in the past opposed the positions of Colorado State Representative "Brianna Titone." Titone identifies as a woman and goes by the name "Brianna." But in Ms. Lee's capacity as Executive Director of PKC, she refers to Representative Titone using biological sex and the birth name, Brian Titone. PKC and Ms. Lee want to be able to publish materials that say things like, "Tell Brian Titone to stop his attacks on Colorado families."

87.     PKC and Ms. Lee regularly publish materials that comment on state and local policy proposals, highlight developing news stories involving gender ideology and children, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of "gender-affirming care." These published materials include petitions, social media posts, informative videos, gender issue guidelines, opinion pieces in widely circulated newspapers and online publications, and other resources. For example, in April 2025, PKC published a guide on reasons to oppose Colorado House Bill 25-1312, emphasizing the threat to free speech posed by the bill's chosen name provisions.

88.     PKC's and Ms. Lee's published materials often refer to specific individuals, including transgender individuals. For example, in March 2025, PKC posted a video on

Instagram of a transgender-identifying student athlete in Oregon. Although the athlete identifies as a girl and uses the chosen name "Ada," PKC's video referred to the person with the birth name, "Aayden," and identified the person as a "male" and not a "girl."

89.    In line with their belief that sex is immutable and determined at birth, PKC and Ms. Lee want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's preferred pronouns or conflict with an individual's self-professed gender identity or gender expression. PKC and Ms. Lee also want to refer to individuals in published materials using individuals' birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

90.    However, Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for PKC, their leadership, their supporters, and their volunteers to effectively exercise their constitutionally protected right to speak in a manner that reflects their sincere belief that sex is immutable and fixed at birth.

91.    Because of the public nature of PKC's and Ms. Lee's expression, they are well-known among the transgender activist community in Colorado. They have received aggressive and threatening emails and messages from individuals because of their speech. Ms. Lee has received death threats because of her activities (as recently as about six weeks ago), and she has reported these threats to the FBI and to the sheriff's office. She has been called a "bigot," a "Nazi," a "transphobe," an "anti-trans zealot," a "terrorist," a "murderer," a "child abuser," and a "Christian nationalist." She has also been sued in her personal capacity over

her work combatting gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn and Erin Lee*, No. 2024SA63 (Colo. S. Ct. filed Feb. 28, 2024). Given her past experience, she has no doubt that there are individuals who will want to report her and PKC or sue her and PKC because of their speech.

92.    Because H.B. 25-1312 threatens to punish deadnaming and misgendering, PKC and its leadership, including Ms. Lee, must stop referring to individuals using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at their public events and in their published materials. They fear that, if they engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, they will be investigated by the Colorado Civil Rights Division, sued by individuals, and face financial or equitable penalties. Ms. Lee also fears that she will be sued personally for refusing to "address" an individual using their "chosen name" or other preferred terms.

93.    H.B. 25-1312's punishments for disfavored speech also means that PKC and Ms. Lee must refrain from "publish[ing]" materials in connection with their public events that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

94.    Because H.B. 25-1312 renders PKC unable to speak candidly about biological sex or publish materials that contain such speech, their ability to inform parents about

dangerous gender ideology in Colorado schools is greatly diminished. Likewise, their ability to organize support for or opposition to political candidates, ballot measures, legislation, school board policies, or other measures is compromised. Because of H.B. 25-1312, PKC and Ms. Lee are no longer allowed to use their preferred language at their public events or in their publications. Nor can they oppose specific political figures with their preferred language, such as Representative Titone, as explained above.

95.     As Executive Director of PKC, Ms. Lee is in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is her experience that these parents and citizens will be less likely to share information with PKC, volunteer with PKC, or otherwise support its mission if they believe the organization or its supporters may face legal penalties, including fines, for so-called discriminatory speech. Also in Ms. Lee's experience, venues will be less willing to host their public events if PKC is branded a "discriminatory" organization.

96.     PKC and Ms. Lee do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. They want to continue to speak, publish materials, and host events consistent with their belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet they are unable to effectively exercise their speech rights because of H.B. 25-1312's prohibitions and penalties.

## B.    Do No Harm and the Colorado Physicians.

97.    ***Do No Harm.*** DNH is a nationwide, grassroots, 501(c)(3) non-profit member-ship organization whose members include healthcare professionals, students, patients, and policymakers. DNH's mission is to ensure that medicine is driven by scientific evidence rather than politics. To that end, DNH seeks to highlight and counteract divisive trends in medicine, such as "Diversity, Equity, and Inclusion" practices and youth-focused gender ideology. DNH opposes the use of chosen names, preferred pronouns, and so-called gender-affirming medical treatments. DNH furthers its mission through network- and coalition-building; educational resources to raise awareness about divisive trends in the medical field; engagement on local, state, and national policies; advocacy; and, if necessary, litigation.

98.    DNH works to protect the rights of its members to speak freely on controversial topics in the medical profession, including gender ideology and gender-affirming care. In line with that mission, DNH litigates to protect its members' First Amendment rights and educates its members about threats to free expression in the medical field.

99.    DNH has members in Colorado who share its opposition to gender ideology and dangerous gender-affirming care, including Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics. DNH's members in Colorado, including Dr. Morrell, Dr. Leswing, and Mountain Pediatrics, are injured by H.B. 25-1312.

100.    ***Dr. Travis Morrell.*** Dr. Morrell holds scientific, objective, and reproducible views on matters of sex and gender identity. In particular, he believes that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their

- 31 -
**1-App-045**

identity. He wants to exercise his fundamental constitutional right to speak in a manner that reflects those views.

101. Dr. Morrell has treated transgender-identifying, gender-dysphoric, and gender-questioning patients in his medical practice in the past, and he anticipates treating such patients in the future. When he has addressed these patients or discussed these patients with his colleagues, he has used biologically accurate pronouns and birth names. He does not address or refer to patients using "chosen names" connected to their "gender expression" or preferred pronouns that conflict with the patient's biological sex. In a patient's records, he refers to all patients using biologically accurate terms.

102. Addressing and referring to patients using accurate terms is important to his work as a physician. Determining the proper course of treatment or advising patients on their treatment's risks, for example, might depend on a patient's biological sex, so it is important that he be able to clearly communicate (both to patients and to other medical professionals) whether a patient is male or female.

103. In addition, as a medical doctor, Dr. Morrell is trained to treat patients holistically. Dr. Morrell has difficult discussions with patients about psychiatric disorders, habits and behaviors that may impact them both dermatologically and overall, such as alcohol abuse, smoking, anxiety, body dysmorphia, self-harm, and, relevant here, gender dysphoria. In these cases, it is vital that he be able to address the root cause. The medical treatment of gender dysphoria with cross-sex hormones and surgery may impact many aspects of the patient's health, even in areas that might appear unrelated. Surgical procedures, particularly

in areas involved with sex-reassignment, may cause extensive scarring. Cross-sex hormones affect the entire body, including the skin, where testosterone can cause severe cystic acne in some cases. It is of tremendous importance that he be permitted to provide accurate information regarding the risks associated with these interventions. Affirmation of the patient's subjective experience under these circumstances is potentially deleterious to their health, which should, at all times, be the primary concern.

104. Dr. Morrell also believes that affirming an individual's non-biological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria. "Social transition," involving "chosen names" and "pronouns," has been found to contribute to increased medicalization and its harmful effects. Therefore, as a medical professional with an obligation not to harm his patients, he believes it would be wrong to address a male patient using feminine pronouns or his "chosen name" or address a woman using masculine pronouns or her "chosen name." If he were to do so, he would be affirming a lie and harming his patients.

105. In line with his beliefs, when transgender patients are in his office, Dr. Morrell does not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to them. When he discusses patients with other medical professionals or employees in his office (such as other doctors, schedulers, or medical assistants), he wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender

- 33 -

**1-App-047**

expression. For example, he might say, "Can you please perform a urine pregnancy test for Sarah"; "Let's send his penile biopsy specimen to the lab"; or "What were the results of her pregnancy test?" His patients will inevitably hear these statements—both because he will make them in front of the patient and because his workspace is immediately outside his patient rooms so that sound carries throughout the space.

106.   Moreover, because he believes that gender ideology is so harmful, Dr. Morrell wants to be able to address individuals (both orally and in written communications) directly by their birth name and not a "chosen name." Calling a biological male by a female's name (or vice versa) would further indulge the person's delusions that he or she can change or has changed his or her gender.

107.   When Dr. Morrell refers to patients in medical records, he wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, he might say, "Her rash is most consistent with subacute cutaneous lupus erythematosus," or "Jennifer has been taking oral contraceptives for over one month." These medical notes would be available to the patient on their online portal. Patients can also receive a printed copy of these notes by asking the front desk.

108.   Dr. Morrell also wants to publish materials that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

109. Dr. Morrell regularly speaks and writes on the issues of sex and gender as they relate to the medical profession. In those speaking engagements and publications, he opposes gender ideology (including the use of chosen names and preferred pronouns) and raises awareness about the dangers of gender-affirming care. *E.g.*, Travis Morrell, *Medical Schools Have Embraced Radicalism*, Washington Examiner (Sept. 26, 2024), perma.cc/79SM-SKVS; *Rocky Mountain Summit on Safeguarding Children from Gender-Affirming Care*, CPAN (archived May 12, 2025), perma.cc/WQM6-PQXN. Dr. Morrell is also the founder and chair of Colorado Principled Physicians, a group dedicated to protecting free speech in the medical profession and opposing gender-affirming care.

110. Dr. Morrell's speaking engagements are held in places of public accommodation, including hotel event spaces and restaurants. Transgender individuals have attended his events, and he anticipates that they will attend them in the future. At his speaking events, he has referred to transgender individuals by their biological pronouns (instead of their "preferred pronouns") and their birth names (instead of their "chosen names"). He wants to continue to speak in this manner in the future. Speaking the truth is critical to his work.

111. Dr. Morrell is also active on social media, where—consistent with his belief that sex is immutable—he regularly publishes content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns or chosen names. For example, he has opposed the policies of Colorado State Representative "Brianne Titone." Titone identifies as a woman and goes by the name "Brianne," but Dr. Morrell's social media posts refer to Titone using biological sex and birth

name, Brian. Dr. Morrell wants to continue to publish materials that say things like, "Oppose Brian Titone because his policies hurt Colorado's children," or "Even though Brian's post says he can 'get some clear liquid to seep out of the nips,' that is not breastmilk and he cannot breastfeed."

112.   Dr. Morrell does not use birth names or biologically accurate pronouns to be mean or hurtful. He does so because that speech reflects his belief that sex is fixed in each person from the moment of conception and cannot be changed, and because he believes that affirming a patient's non-biological gender identity or gender expression would harm rather than help the patient.

113.   Because of the public nature of his expression, Dr. Morrell is known among the transgender activist community in Colorado. He regularly receives direct messages, reply posts, and emails challenging or disagreeing with the views that he has expressed. He has received aggressive and threatening messages from individuals because of his speech. At his last public speaking event in April, about 40-60 people protested his event. After the protest was announced, the conference center required him to hire two armed deputies for the event. He has been called a "Nazi" and had his speech interrupted. Activists recently organized a successful campaign to pressure the Accreditation Council for Continuing Medical Education (ACCME) to cancel the Continuing Medical Education (CME) credit that was to be made available for one of his speeches. Last year, a number of people whom he has never treated "review bombed" him on Google Reviews by posting fake reviews and giving him one star. One individual posted that he was "Not a safe physician for lgbt patients." Given

his extensive history of harassment, he has no doubt that there are individuals who will want to report him or sue him because of his speech.

114. Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for him to effectively exercise his constitutionally protected right to speak in a manner that reflects his beliefs.

115. Because H.B. 25-1312 threatens to punish deadnaming and misgendering, Dr. Morrell must stop addressing or referring to individuals in his medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression." He fears that, if he continues to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, he will be investigated by the Colorado Civil Rights Division, sued by individuals, and face financial or equitable penalties.

116. Dr. Morrell also fears that his medical practice will be investigated by the Civil Rights Division, sued by individuals, and face financial or equitable penalties if he continues to engage in speech that refers to individuals using biologically accurate pronouns, birth names, or other non-gender-affirming terms. Because Dr. Morrell is a co-owner of the practice, any financial or equitable penalties imposed on the practice injure Dr. Morrell. And Dr. Morrell does not want his practice or his colleagues to face financial or reputational harm if the State brands the practice a "discriminatory" business on account of his speech. He fears that, if his practice or colleagues face the threat of investigation or punishment because of

- 37 -

**1-App-051**

his speech, they will refuse to refer patients to him, terminate his ownership, and otherwise compel him to disassociate from the practice.

117. H.B. 25-1312's punishments for disfavored speech also means that he must refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

118. Because H.B. 25-1312 renders him unable to speak candidly about biological sex in his practice or publish materials and communications that contain such speech, Dr. Morrell's ability to treat patients is compromised. Likewise, his ability to give speeches and publish content promoting his view that sex is immutable, and that medical professionals should address patients using accurate terms, is greatly diminished. As is his ability to oppose legislation and politicians who promote harmful gender ideology. Because of H.B. 25-1312, Dr. Morrell is no longer allowed to use his preferred language in his practice or his publications.

119. Dr. Morrell does not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. Dr. Morrell wants to continue to speak, publish materials, send communications, and treat patients consistent with his belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet he is unable to effectively exercise his speech rights because of Colorado law.

120.    ***Dr. Valeri Leswing and Mountain Pediatrics***. Dr. Leswing is the sole owner of and physician in her medical practice, Mountain Pediatrics. She holds scientific, objective, and reproducible views on matters of sex and gender identity. In particular, she believes that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. She wants to exercise her fundamental constitutional right to speak in a manner that reflects those views to best serve the medical needs of all her patients.

121.    Dr. Leswing has treated transgender-identifying, gender-dysphoric, and gender-questioning patients in her medical practice in the past, and she anticipates treating such patients in the future. When she has addressed these patients or discussed these patients with her colleagues, she has used biologically accurate pronouns and birth names. She does not address or refer to patients using "chosen names" connected to their "gender expression" or preferred pronouns that conflict with the patient's biological sex. In a patient's records, she refers to all patients using biologically accurate terms.

122.    Addressing and referring to patients using accurate terms is important to Dr. Leswing's work as a physician. Diagnosing conditions, determining the proper course of treatment, or advising patients on a treatment's risks, for example, might depend on a patient's biological sex, so it is important that she be able to clearly communicate (to patients to their parents, and to other medical professionals) whether a patient is male or female.

123.    In addition, as a pediatrician, Dr. Leswing provides treatment for many non-adult-specific medical conditions that her patients might encounter, including psychiatric disorders. Treating those conditions requires difficult discussions with patients about

harmful habits and behaviors like alcohol abuse, smoking, anxiety, body dysmorphia, self-harm, and, relevant here, gender dysphoria. In these cases, it is vital that she be able to address the root cause of her patients' conditions and concerns.

124.   Dr. Leswing also believes that affirming an individual's non-biological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves, suggests they are somehow inadequate as they currently are, and discourages them from seeking proper care to address their underlying gender dysphoria. "Social transition," involving "chosen names" and "pronouns," has been found to contribute to increased medicalization and its harmful effects. Therefore, as a medical professional with an obligation not to harm her patients, she believes it would be wrong to address a male patient using feminine pronouns or his "chosen name" or address a woman using masculine pronouns or her "chosen name." If she were to do so, she would be affirming a lie and harming her patients.

125.   In line with her beliefs, when transgender patients are in her office, Dr. Leswing does not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to them. When she discusses patients with other medical professionals or employees in her office, she wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, she might say "Scott needs his meningitis vaccine" or ask her medical assistant to "Please check Luna's urine for white blood cells." Her patients will inevitably hear these statements—both because she will make

them in front of the patient and because the physical layout of her office is such that sound carries throughout the space.

126.    Moreover, because she believes that gender ideology is so harmful, Dr. Leswing wants to be able to address individuals (both orally and in written communications) directly by their birth name and not a "chosen name." Calling a biological male by a female's name (or vice versa) would further reinforce his or her delusions that he or she can change or has changed his or her gender and suggest that his or her actual gender is somehow wrong and something to be hidden or lied about.

127.    When Dr. Leswing refers to patients in medical records, she wants to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, she might say, "Caleb is doing well today and is excited about his plans for the summer" or "She is feeling much better, and her headaches have completely resolved." These medical notes would be available to the patient in their medical records, both digitally and in printed paper copies upon request.

128.    Dr. Leswing also wants to publish materials expressing her belief that sex is fixed at birth and immutable and that it is wrong and medically harmful to address or refer to someone using non-biological pronouns, chosen names, or other terms.

129.    For example, Dr. Leswing's practice, Mountain Pediatrics, maintains a Facebook page to advertise its services and communicate with the public. Dr. Leswing wants to post a statement on the practice's Facebook page explaining to potential patients that,

because she has an obligation as a physician not to harm her patients, she will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names.

130. Dr. Leswing does not use birth names or biologically accurate pronouns to be mean or hurtful. She does so because that speech reflects her belief that sex is fixed in each person from the moment of conception and cannot be changed, and because she believes that affirming a patient's non-biological gender identity or gender expression would harm rather than help the patient.

131. Because her beliefs and expression about sex and gender are unpopular in some circles, Dr. Leswing worries that she, her practice, and her employees will be targeted and harassed by those who hold contrary views. She feels that she must warn her employees, and has warned her employees, that her desire not to address transgender-identifying individuals using so-called chosen names, preferred pronouns, or other non-biological terms may cause some patients to react in a hostile manner or make the practice a target for supporters of gender ideology. Given the controversial nature of gender ideology and so-called deadnaming and misgendering, Dr. Leswing has no doubt that there are individuals who will want to report her and her practice or sue them because of her speech.

132. Colorado's public accommodation laws as amended by H.B. 25-1312 make it impossible for Dr. Leswing to effectively exercise her constitutionally protected right to speak in a manner that reflects her beliefs.

133. Because H.B. 25-1312 threatens to punish deadnaming and misgendering, Dr. Leswing must stop addressing or referring to individuals in her medical practice using

biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression." She fears that, if she continues to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, she and her practice will be investigated by the Colorado Civil Rights Division, sued by individuals, and face financial or equitable penalties.

134.   H.B. 25-1312's punishments for disfavored speech also means that she must refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression or materials explaining that she will refer to patients in her practice using such language. Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

135.   Because H.B. 25-1312 renders her unable to speak candidly about biological sex in her practice or publish materials and communications that contain such speech, Dr. Leswing's ability to treat patients is compromised. Likewise, her ability to publish content explaining her view that sex is immutable, and that medical professionals should address patients using accurate terms, is greatly diminished. Because of H.B. 25-1312, Dr. Leswing is no longer allowed to use her preferred language in her practice or in public statements.

136.   Dr. Leswing does not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. Dr. Leswing wants to continue to speak, publish materials, send communications, and treat patients consistent with her belief that sex is determined at birth and immutable, regardless of an individual's internal

perceptions about their identity. Yet she is unable to effectively exercise her speech rights because of Colorado law.

## COUNT I
### Violation of the First Amendment
### (Colo. Rev. Stat. §24-34-301(3.5) & (9) – The "Chosen Name" and "Gender Expression" Provisions)

137.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

138.   H.B. 25-1312's "chosen name" and "gender expression" definitions violate the First Amendment to the United States Constitution, both facially and as applied.

139.   The definition of "gender expression" prohibits any act of discrimination based on "chosen name" and "how the individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). "Chosen name" is further defined to include any "name that an individual requests to be known as in connection to" any one of a long list of protected characteristics, including "gender identity" and "gender expression." *Id.* §24-34-301(3.5). The only exceptions are for names that "contain offensive language" or are chosen "for frivolous purposes." *Id.*

140.   ***Compelled Speech***. The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. AFSCME*, 585 U.S. 878, 892 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "The First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how

to say it." *Riley v. Nat'l Fed'n of the Blind of N. Carolina*, 487 U.S. 781, 790-91 (1988). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 585 U.S. at 892.

141.   Here, the "gender expression" and "chosen name" provisions unconstitutionally compel speech because they require speakers to use "chosen name[s]" and preferred pronouns instead of using birth names and biological pronouns. Colo. Rev. Stat. §§24-34-301(3.5), (9), 24-34-601(2)(a).

142.   The Supreme Court's decision in *303 Creative* requires the conclusion that H.B. 25-1312 unconstitutionally compels speech. There, Colorado argued that its public accommodation antidiscrimination laws required a wedding website designer to create websites for same-sex marriages even though the designer firmly believed that "marriage should be reserved to unions between one man and one woman." 600 U.S. at 580-83. But that, said the Court, "would not respect the First Amendment." *Id.* at 592. Though the designer's business was a public accommodation, and public accommodation laws play "a vital role" in ensuring "'equal *access* to public establishments,'" the designer's custom website creations were "pure speech," and Colorado could not apply its public accommodation laws to coerce "'expressive activity'" out of the designer. *Id.* at 587-92 (emphasis added).

143.   All the more so here. If anything is "pure speech," it is the actual words Coloradans use to address one another, especially when those words express a view about something as fundamental as sex and gender. *See Meriwether*, 992 F.3d at 508 ("Pronouns can

and do convey a powerful message implicating a sensitive topic of public concern.") Colorado seeks to regulate that speech by compelling groups like CPAN and PKC and individuals like Ms. Gimelshteyn, Ms. Lee, and Dr. Morrell to speak using state-approved language.

144.   That H.B. 25-1312 does not literally require Coloradans to speak is of no consequence. Even if Plaintiffs and their members could avoid the law's penalties by holding their tongues, compelled silence *is* compelled speech. *Riley*, 487 U.S. at 796-97. In any event, using pronouns and names is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). It would be "impossible" for Plaintiffs or their members to not "use any pronouns" or any names when discussing an individual. *Meriwether*, 992 F.3d at 517. So H.B. 25-1312 forces them to "carr[y]" the "government['s] message" about sex and gender. *Doe 1*, 367 F. Supp. 3d at 1326.

145.   ***Viewpoint- and Content-Based Regulations of Speech***. "'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *Simon & Schuster v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). Speech restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "Content-based regulations" are likewise "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). "[A]ny restriction based on the content of the speech must satisfy strict scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

146.   H.B. 25-1312 punishes speech based on its content and viewpoint. Specifically, the "chosen name" and "gender expression" provisions punish individuals for speaking about transgender-identifying individuals using *birth* names and *biological* pronouns, but not if they use an individual's "chosen name" or other terms by which they "choos[e] to be addressed." Colo. Rev. Stat. §24-34-301(9).

147.   That is a classic viewpoint-based speech regulation. *See, e.g.*, *Meriwether*, 992 F.3d at 506-07 (invalidating a state university's policy requiring professors to use preferred pronouns because "the state cannot wield its authority to categorically silence dissenting viewpoints"). And because the law regulates based on viewpoint, it is necessarily unconstitutional. *See 303 Creative*, 600 U.S. at 589 (applying public accommodation laws to "excise certain ideas or viewpoints from the public dialogue" is "more than enough … to represent an impermissible abridgement of the First Amendment's right to speak freely" (cleaned up)); *Rosenberger v. University of Virginia*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

148.   Indeed, H.B. 25-1312 was passed for the very purpose of suppressing traditional views on sex and gender and punishing those who refuse to address transgender-identifying individuals using so-called chosen names and preferred pronouns.

149.   Even if H.B. 25-1312 were merely *content*-based, *see Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) (a regulation is content-based when it is "'based upon either the content or the subject matter of the speech'"), it would still be subject to strict scrutiny, *Reed*

*v. Gilbert*, 576 U.S. 155, 163-64 (2015). And Colorado plainly fails that test. *See Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022) (the burden is on the government to show a compelling interest and narrow tailoring). While the State may have an interest in ensuring equal *access* to places of public accommodation, it has no compelling interest in suppressing *speech* on issues of significant public concern like sex and gender. *See 303 Creative*, 600 U.S. at 590-92 (observing that public accommodations laws "sweep too broadly when deployed to compel speech"). Even if it did, H.B 25-1312 is not sufficiently tailored to further that interest. It is therefore unconstitutional.

150.   ***Overbreadth***. The First Amendment prohibits overbroad laws: regulations of speech that "punish a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up). This "expansive remedy" guards against the possibility that "an overbroad law may deter or 'chill' constitutionally protected speech." *Id.* at 119 The freedoms protected by First Amendment, in other words, "'need breathing space to survive,'" so the government may regulate speech "'only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A policy is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

151.   The "gender expression" and "chosen name" provisions are facially overbroad. By their terms, they apply to protected speech. The law's unconstitutional applications make up a significant number of its applications and their ban on deadnaming and misgendering are the "heartland applicatio[n]." *Moody v. NetChoice*, 603 U.S. 707, 744 (2024).

152.   *As Applied.* The "chosen name" and "gender expression" definitions are also unconstitutional as applied to Plaintiffs and their members. Plaintiffs and their members operate in places of public accommodations. They want to refer to transgender-identifying individuals using biological pronouns, birth names, and other forms of address inconsistent with an individual's self-professed gender identity or gender expression. But the "chosen name" and "gender expression" provisions make their speech unlawful and unconstitutionally compel them to alter their speech.

153.   To the extent Rule 81.6 of the Colorado Civil Rights Commission Rules and Regulations is interpreted to punish Plaintiffs' speech, that rule violates the First Amendment for the same reasons as H.B. 25-1312. *See* 3 C.C.R. 708-1:81.6.

154.   Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

### COUNT II
### Violation of the First Amendment
### (Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c) – The "Unwelcome" and "Unwelcome Statements" Provisions)

155.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

156.   The Colorado Anti-Discrimination Act's Unwelcome Provision and Unwelcome Statements Provision violate the First Amendment to the United States Constitution, both facially and as applied.

- 49 -
**1-App-063**

157.    The Unwelcome Provision makes it "a discriminatory practice and unlawful for a person, directly or indirectly, to … publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of" a protected characteristic. Colo. Rev. Stat. §24-34-601(2)(a).

158.    The Unwelcome Statements Provision states that "any person that is the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation … shall not, directly or indirectly, publish, issue, circulate, send, distribute, give away, or display in any way, manner, or shape or by any means or method … any communication, paper, poster, folder, manuscript, book, pamphlet, writing, print, letter, notice, or advertisement of any kind, nature, or description that … [s]tates that … any person or class of persons" is "unwelcome or objectionable or not acceptable, desired, or solicited" based on, among other things, "gender expression." *Id.* §24-34-701(1)(c).

159.    The Unwelcome Provision and Unwelcome Statement Provision always target speech. They prohibit, among other things, "publish[ing]," "display[ing]," or "post[ing]" certain "communication[s]" and "[s]tate[ments]." *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

160.    These Provisions clearly prohibit speech based on content and viewpoint. They prohibit speech that makes someone feel "unwelcome," "objectionable," "unacceptable," or "undesirable." But "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243. They also compel speech by, for example, requiring published speech to be "[w]elcom[ing]" and

"[un]objectionable." Even assuming these provisions only regulated speech based on content, Defendants have no compelling interest for prohibiting this type of speech.

161. The Provisions are also overbroad. Countless forms of protected speech are prohibited by the Unwelcome Provision and Unwelcome Statements Provision. Consider a retail business owner who posts a sign in his store saying, "Transgenderism Is A Mental Illness!" That is surely protected speech—it advances a view on whether an individual's non-biological gender identity should be affirmed or corrected—but it just as surely could make a transgender individual feel "unwelcome" in the store based on their gender identity. Or consider a Christian-owned bookstore with a banner in its religious books section stating, "The Bible is the only true word of God." Again, that is protected speech, but it might make a Muslim imam feel that his presence is "undesirable" because of his religious creed. Or consider a Palestinian-born doctor who posts on social media that "Israel is an apartheid state!" That post expresses a view about a salient political issue, but a Jewish patient who reads the post might feel "unwelcome" in the doctor's practice.

162. The Provisions are not mere "incidental" regulations of speech. *Telescope Media*, 936 F.3d at 757. In other words, they do not simply prohibit statements indicating that an individual will actually be denied service or access because of a protected characteristic. *Id.* In fact, *other* provisions already do that. *See* Colo. Rev. Stat. §24-34-601(2)(a) (separately prohibiting statements "indicat[ing] that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual"); *id.* §24-34-701(1)(b) (prohibiting

- 51 -
**1-App-065**

statements that "any of the accommodations, rights, privileges, advantages, or conveniences of the place shall or will be refused, withheld from, or denied to any person or class of persons"). The Unwelcome Provision and Unwelcome Statements Provision go beyond such incidental regulation and directly target speech that has nothing to do with actual access. *See 303 Creative*, 600 U.S. at 587-92 (public accommodation laws may ensure equal access, but they may not target pure speech).

163. The Unwelcome Provision and Unwelcome Statements Provision are also unconstitutional as applied to Plaintiffs and their members. The Provisions prevent them from publishing materials or sending communications that refer to transgender-identifying individuals using biological pronouns, birth names, or other forms of address inconsistent with an individual's self-professed gender identity or gender expression, or that express opposition to the use of so-called gender-affirming language. Like the "chosen name" and "gender expression" definitions, the Unwelcome Provision and Unwelcome Statements Provision compel speech and discriminate based on content and viewpoint.

164. Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

## COUNT III
### Violation of the Fourteenth Amendment
**(Colo. Rev. Stat. §24-34-301(3.5) & (9) – The "Chosen Name" and "Gender Expression" Provisions)**

165. Plaintiffs repeat and reallege each of the prior allegations in this complaint.

166.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness doctrine "addresses two concerns." *United States v. Lesh*, 107 F.4th 1239, 1247 (10th Cir. 2024). First, it ensures that regulated parties "'know what is required of them so they may act accordingly.'" *Id.* Second, it ensures that "'those enforcing the law do not act in an arbitrary or discriminatory way.'" *Id.*; *see Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311 (8th Cir. 1997) ("a central purpose of the vagueness doctrine" is to prevent "'arbitrary and discriminatory enforcement'").

167.   As to the first concern, a law is impermissibly vague if it "'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Lesh*, 107 F.4th at 1247. And for the second concern, a law is impermissibly vague if "it lacks the necessary precision and guidance so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* (cleaned up). "[L]aws must provide explicit standards for those who apply them." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023) (quoting *Grayned*, 408 U.S. at 108).

168.   The need for clarity is especially critical when First Amendment freedoms are at stake—as they are here. If a challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Virginia*, 359 U.S. 344, 353 (1959).

169.   H.B. 25-1312's definitions of "chosen name" and "gender expression" are impermissibly vague both on their face and as applied.

170.   H.B. 25-1312 redefines "gender expression" to include the use of a "chosen name, and how the individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). But the State has not explained what forms of "addres[s]" it will require Coloradans to honor. Likewise, the bill defines a "chosen name" to mean any "name that an individual requests to be known as … *so long as* the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." *Id.* §24-34-301(3.5) (emphasis added). But it offers no detail on what "language" the State considers "offensive" or what "purposes" it considers "frivolous."

171.   Coloradans who operate in public accommodations are left to guess as to how Defendants will choose to enforce these terms. This vagueness guarantees arbitrary enforcement and will "inevitably lead [Coloradans] to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up).

172.   To the extent Rule 81.6 of the Colorado Civil Rights Commission Rules and Regulations is interpreted to punish Plaintiffs' speech, that rule is impermissibly vague for the same reasons as H.B. 25-1312. *See* 3 C.C.R. 708-1:81.6.

173.   Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

**COUNT IV**
**Violation of the Fourteenth Amendment**
**(Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c) – The "Unwelcome" and "Un-welcome Statements" Provisions)**

174.   Plaintiffs repeat and reallege each of the prior allegations in this complaint.

175.   Like the "chosen name" and "gender expression" definitions, the Anti-Discrimination Act's Unwelcome Provision and Unwelcome Statements Provision are unconstitutionally vague both on their face and as applied.

176.   The Unwelcome Provision makes it unlawful to "directly or indirectly … publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable." Colo. Rev. Stat. §24-34-601(2)(a). The Unwelcome Statements Provision likewise makes it unlawful to "directly or indirectly" publish such materials that "stat[e] that … any person or class of persons … is unwelcome or objectionable or not acceptable, desired, or solicited." *Id.* §24-34-701(1)(c).

177.   But the Provisions leave many of their terms undefined. For example, they fail to offer any detail on what kind of statements Colorado will consider to be "unwelcome," "objectionable," "unacceptable," or "undesirable." They also fail to explain what kinds of "indirect" publication or communication Colorado will punish. Because these key terms lack any meaningful boundary, the Unwelcome Provision and Unwelcome Statements Provision again invite arbitrary enforcement.

178. Defendants are acting "under color of state law" within the meaning of 42 U.S.C. §1983 when they enforce Colorado's public accommodations law to compel speech and prevent Plaintiffs and their members from expressing their preferred speech.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in their favor and against Defendants and provide the following relief:

A. A declaratory judgment that Section 8 of Colorado House Bill 25-1312, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), and any other materially similar statutory or regulatory provisions violate the First and Fourteenth Amendments on their face and as applied;

B. A preliminary and permanent injunction barring Defendants from enforcing Section 8 of Colorado House Bill 25-1312, codified at Colo. Rev. Stat. §24-34-301(3.5) & (9), and any other materially similar statutory or regulatory provisions in full and as applied;

C. A declaratory judgment that the Colorado Anti-Discrimination Act's Unwelcome Provision and Unwelcome Statements Provision, codified at Colo. Rev. Stat. §§24-34-601(2)(a) and 24-34-701(1)(c), and any other materially similar statutory or regulatory provisions violate the First and Fourteenth Amendments on their face and as applied;

D. A preliminary and permanent injunction barring Defendants from enforcing the Colorado Anti-Discrimination Act's Unwelcome Provision and Unwelcome

- 56 -

Statements Provision, codified at Colo. Rev. Stat. §§24-34-601(2)(a) and 24-34-701(1)(c), and any other materially similar statutory or regulatory provisions in full and as applied;

E. Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

F. All other relief that the Court deems just and proper.

Dated: June 13, 2025                           Respectfully submitted,

                                               */s/ J. Michael Connolly*

                                               J. Michael Connolly
                                               Cameron T. Norris
                                               Paul R. Draper
                                               CONSOVOY MCCARTHY PLLC
                                               1600 Wilson Blvd., Ste. 700
                                               Arlington, VA 22209
                                               (703) 243-9423
                                               mike@consovoymccarthy.com
                                               cam@consovoymccarthy.com
                                               paul@consovoymccarthy.com

                                               *Counsel for Plaintiffs*

- 58 -

# Exhibit A



HOUSE BILL 25-1312

BY REPRESENTATIVE(S) Garcia and Stewart R., Bacon, Boesenecker, Brown, Camacho, Duran, Espenoza, Froelich, Gilchrist, Hamrick, Joseph, Lieder, Lindsay, Mabrey, McCormick, Rydin, Sirota, Smith, Story, Titone, Valdez, Velasco, Willford, Zokaie, McCluskie, Clifford, Lindstedt, Paschal, Woodrow;
also SENATOR(S) Winter F. and Kolker, Amabile, Ball, Bridges, Cutter, Danielson, Gonzales J., Hinrichsen, Kipp, Marchman, Michaelson Jenet, Wallace, Weissman, Coleman.

CONCERNING LEGAL PROTECTIONS FOR TRANSGENDER INDIVIDUALS.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1. Short title.** The short title of this act is the "Kelly Loving Act".

**SECTION 2.** In Colorado Revised Statutes, 14-2-106, **add** (3) as follows:

**14-2-106. License to marry.** (3) (a) IF, AT ANY POINT FOLLOWING THE ISSUANCE OF A VALID LICENSE TO MARRY ISSUED PURSUANT TO THIS SECTION, A PARTY TO THE MARRIAGE PRESENTS THE ISSUING COUNTY CLERK

---

*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

**1-App-073**

AND RECORDER WITH APPROPRIATE DOCUMENTATION OF THAT PARTY'S NAME CHANGE AND REQUESTS THE ISSUANCE OF A NEW LICENSE TO MARRY, THE COUNTY CLERK SHALL ISSUE A NEW LICENSE TO MARRY THAT REFLECTS THE PARTY'S NAME CHANGE.

(b) A NEW LICENSE TO MARRY ISSUED PURSUANT TO SUBSECTION (3)(a) OF THIS SECTION SUPERSEDES THE ORIGINAL LICENSE TO MARRY AS THE OFFICIAL PUBLIC RECORD AND MUST NOT BE MARKED AS AMENDED OR INDICATE IN ANY MANNER THAT THE NAME ON THE LICENSE TO MARRY HAS BEEN CHANGED.

**SECTION 3.** In Colorado Revised Statutes, **amend** 14-2-107 as follows:

**14-2-107. When licenses to marry issued - validity.** Licenses to marry ~~shall~~ MUST be issued by the county clerk and recorder only during the hours that the office of the county clerk and recorder is open as prescribed by law and at no other time, and such licenses ~~shall~~ MUST show the exact date and hour of their issue. NEW LICENSES TO MARRY ISSUED PURSUANT TO SECTION 14-2-106 (3)(a) MUST SHOW THE DATE AND HOUR OF ISSUANCE OF THE NEW LICENSE, BUT THE EFFECTIVE DATE OF THE MARRIAGE IS THE DATE LISTED ON THE ORIGINAL LICENSE TO MARRY. NEW LICENSES TO MARRY ISSUED PURSUANT TO SECTION 14-2-106 (3)(a) ARE VALID. A license shall not be valid for use outside the state of Colorado. Within the state, such licenses shall not be valid for more than thirty-five days after the date of issue. If any license to marry is not used within thirty-five days, it is void and shall be returned to the county clerk and recorder for cancellation.

**SECTION 4.** In Colorado Revised Statutes, 14-15-110, **add** (3) as follows:

**14-15-110. Issuance of a civil union license - certification - fee.** (3) (a) IF, AT ANY POINT FOLLOWING THE ISSUANCE OF A VALID CIVIL UNION LICENSE ISSUED PURSUANT TO THIS SECTION, A PARTY TO THE CIVIL UNION PRESENTS THE ISSUING COUNTY CLERK AND RECORDER WITH APPROPRIATE DOCUMENTATION OF THAT PARTY'S NAME CHANGE AND REQUESTS THE ISSUANCE OF A NEW CIVIL UNION LICENSE, THE COUNTY CLERK SHALL ISSUE A NEW CIVIL UNION LICENSE THAT REFLECTS THE PARTY'S NAME CHANGE.

(b) A NEW CIVIL UNION LICENSE ISSUED PURSUANT TO SUBSECTION

PAGE 2-HOUSE BILL 25-1312

(3)(a) OF THIS SECTION SUPERSEDES THE ORIGINAL CIVIL UNION LICENSE AS THE OFFICIAL PUBLIC RECORD AND MUST NOT BE MARKED AS AMENDED OR INDICATE IN ANY MANNER THAT THE NAME ON THE CIVIL UNION LICENSE HAS BEEN CHANGED.

**SECTION 5.** In Colorado Revised Statutes, **amend** 14-15-111 as follows:

**14-15-111. When civil union licenses issued - validity.** The county clerk and recorder shall issue a civil union license only during the hours that the office of the county clerk and recorder is open as prescribed by law and at no other time and shall show the exact date and hour of the license's issue. NEW CIVIL UNION LICENSES ISSUED PURSUANT TO SECTION 14-2-110 (3)(a) MUST SHOW THE DATE AND HOUR OF ISSUANCE OF THE NEW LICENSE, BUT THE EFFECTIVE DATE OF THE CIVIL UNION IS THE DATE LISTED ON THE ORIGINAL CIVIL UNION LICENSE. NEW CIVIL UNION LICENSES ISSUED PURSUANT TO SECTION 14-2-110 (3)(a) ARE VALID. A civil union license is not valid for use outside the state of Colorado. Within the state, a civil union license is not valid for more than thirty-five days after the date of issue. If a civil union license is not used within thirty-five days, it is void, and one of the parties shall return the civil union license to the county clerk and recorder that issued the license for cancellation.

**SECTION 6.** In Colorado Revised Statutes, **add** 22-1-145.5 as follows:

**22-1-145.5. Policies related to chosen names - definition.** (1) AS USED IN THIS SECTION, "LOCAL EDUCATION PROVIDER" MEANS A SCHOOL DISTRICT, A CHARTER SCHOOL AUTHORIZED BY A SCHOOL DISTRICT PURSUANT TO PART 1 OF ARTICLE 30.5 OF THIS TITLE 22, A CHARTER SCHOOL AUTHORIZED BY THE STATE CHARTER SCHOOL INSTITUTE PURSUANT TO PART 5 OF ARTICLE 30.5 OF THIS TITLE 22, OR A BOARD OF COOPERATIVE SERVICES CREATED AND OPERATING PURSUANT TO ARTICLE 5 OF THIS TITLE 22 THAT OPERATES ONE OR MORE PUBLIC SCHOOLS, OR A FACILITY SCHOOL APPROVED PURSUANT TO SECTION 22-2-407.

(2) IF A LOCAL EDUCATION PROVIDER OR ITS EMPLOYEES, AN EDUCATOR, OR A CONTRACTOR, AS DEFINED IN SECTION 22-1-143, CHOOSES TO ENACT OR ENFORCE A POLICY RELATED TO NAMES, THAT POLICY MUST BE INCLUSIVE OF ALL REASONS THAT A STUDENT MIGHT ADOPT A NAME THAT

PAGE 3-HOUSE BILL 25-1312

DIFFERS FROM THE STUDENT'S LEGAL NAME.

**SECTION 7.** In Colorado Revised Statutes, 22-32-109.1, **amend** (2)(a)(I) introductory portion and (2)(a)(I)(J) as follows:

**22-32-109.1. Board of education - specific powers and duties - safe school plan - conduct and discipline code - safe school reporting requirements - school response framework - school resource officers - definitions.** (2) **Safe school plan.** To provide a learning environment that is safe, conducive to the learning process, and free from unnecessary disruption, each school district board of education or institute charter school board for a charter school authorized by the charter school institute shall, following consultation with the school district accountability committee and school accountability committees, parents, teachers, administrators, students, student councils where available, and, where appropriate, the community at large, adopt and implement a safe school plan, or review and revise, as necessary in response to any relevant data collected by the school district, any existing plans or policies already in effect. In addition to the aforementioned parties, each school district board of education, in adopting and implementing its safe school plan, may consult with victims' advocacy organizations, school psychologists, local law enforcement, and community partners. The plan, at a minimum, must include the following:

(a) **Conduct and discipline code.** (I)  A concisely written conduct and discipline code that must be enforced uniformly, fairly, and consistently for all students. Copies of the code ~~shall~~ MUST be provided to each student upon enrollment at the preschool, elementary, middle, and high school levels and be posted or kept on file at each public school in the school district. The school district shall take reasonable measures to ensure that each student of each public school in the school district is familiar with the code. The code must include, but need not be limited to:

(J) A dress code policy that prohibits students from wearing apparel that is deemed disruptive to the classroom environment or to the maintenance of a safe and orderly school. The dress code policy may require students to wear a school uniform or may establish minimum standards of dress. THE DRESS CODE POLICY MUST ALLOW EACH STUDENT TO CHOOSE FROM ANY OF THE OPTIONS PROVIDED IN THE DRESS CODE POLICY.

**SECTION 8.** In Colorado Revised Statutes, 24-34-301, **amend** (9);

PAGE 4-HOUSE BILL 25-1312

**1-App-076**

and **add** (3.5) as follows:

**24-34-301. Definitions.** As used in parts 3 to 10 of this article 34, unless the context otherwise requires:

(3.5)  "CHOSEN NAME" MEANS A NAME THAT AN INDIVIDUAL REQUESTS TO BE KNOWN AS IN CONNECTION TO THE INDIVIDUAL'S DISABILITY, RACE, CREED, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER EXPRESSION, MARITAL STATUS, FAMILIAL STATUS, NATIONAL ORIGIN, OR ANCESTRY, SO LONG AS THE NAME DOES NOT CONTAIN OFFENSIVE LANGUAGE AND THE INDIVIDUAL IS NOT REQUESTING THE NAME FOR FRIVOLOUS PURPOSES.

(9) "Gender expression" means an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior, CHOSEN NAME, AND HOW THE INDIVIDUAL CHOOSES TO BE ADDRESSED.

**SECTION 9.**  In Colorado Revised Statutes, **add** 24-34-300.5 and 24-34-300.7 as follows:

**24-34-300.5. Short title.** THE SHORT TITLE OF PARTS 3 TO 8 OF THIS ARTICLE 34 IS THE "COLORADO ANTI-DISCRIMINATION ACT" OR "CADA".

**24-34-300.7. Legislative declaration.** (1) THE GENERAL ASSEMBLY FINDS AND DECLARES THAT EACH COLORADAN HAS THE RIGHT TO ACCESS FAIR EMPLOYMENT, HOUSING OPPORTUNITIES, PUBLIC ACCOMMODATIONS, AND ADVERTISING THAT IS FREE FROM DISCRIMINATION REGARDLESS OF THEIR MEMBERSHIP IN A PROTECTED CLASS, AS THOSE CLASSES ARE LISTED IN SECTIONS 24-34-402, 24-34-502, 24-34-601, AND 24-34-701. CADA PROHIBITS DISCRIMINATION BASED ON THESE PROTECTED CLASSES AND ENSURES THAT EVERY COLORADAN IS ABLE TO ENJOY FREEDOM FROM DISCRIMINATION.

(2) THE GENERAL ASSEMBLY FURTHER FINDS AND DECLARES THAT COLORADO HAS A LONG HISTORY OF SUPPORTING FREEDOM OF CHOICE FOR COLORADANS. THIS INCLUDES THE CHOICE TO MAKE DECISIONS RELATED TO SAFELY SEEKING HEALTH-CARE SERVICES, INCLUDING LEGALLY PROTECTED HEALTH-CARE ACTIVITIES, AS DEFINED IN SECTION 12-30-121 (1)(d), THAT SUPPORT MENTAL, PHYSICAL, AND EMOTIONAL WELL-BEING FOR

PAGE 5-HOUSE BILL 25-1312

COLORADANS, THEIR CHILDREN, AND THEIR FAMILY MEMBERS. IT IS THE PUBLIC POLICY OF COLORADO TO ENSURE THESE IMPORTANT DECISIONS CAN BE MADE WITHOUT UNNECESSARY GOVERNMENTAL INTERFERENCE.

**SECTION 10.** In Colorado Revised Statutes, 25-2-113.8, **repeal** (5) as follows:

**25-2-113.8. Birth certificate modernization act - new birth certificate following a change in gender designation - short title - definition.** (5) ~~The state registrar may only amend a gender designation for an individual's birth certificate one time upon the individual's request. Any further requests from the individual for additional gender designation changes require the submission of a court order indicating that the gender designation change is required.~~

**SECTION 11.** In Colorado Revised Statutes, 42-2-107, **amend** (2)(a)(III) as follows:

**42-2-107. Application for license or instruction permit - anatomical gifts - donations to Emily Keyes - John W. Buckner organ and tissue donation awareness fund - legislative declaration - rules - annual report - repeal.** (2) (a) (III) The department may only amend a sex designation for an individual's driver's license ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 12.** In Colorado Revised Statutes, 42-2-302, **amend** (2.5)(b) as follows:

**42-2-302. Department may or shall issue - limitations - rules.** (2.5) (b) The department may only amend a sex designation for an individual's identification card ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 13.** In Colorado Revised Statutes, 42-2-505, **amend** (1.5)(b) as follows:

PAGE 6-HOUSE BILL 25-1312

**42-2-505. Identification documents - individuals not lawfully present - rules.** (1.5) (b)   The department may only amend a sex designation for an individual's identification document ~~one time~~ THREE TIMES upon the individual's request. Any further requests from the individual for additional sex designation changes require the submission of a court order indicating that the sex designation change is required.

**SECTION 14.   Severability.** If any provision of this act or the application of this act to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

**SECTION 15.   Effective date.** This act takes effect upon passage; except that sections 11, 12, and 13 of this act take effect October 1, 2026.

**SECTION 16.    Safety clause.** The general assembly finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, or safety or for appropriations for

PAGE 7-HOUSE BILL 25-1312

the support and maintenance of the departments of the state and state institutions.


Julie McCluskie
SPEAKER OF THE HOUSE
OF REPRESENTATIVES

James Rashad Coleman, Sr.
PRESIDENT OF
THE SENATE


Vanessa Reilly
CHIEF CLERK OF THE HOUSE
OF REPRESENTATIVES

Esther van Mourik
SECRETARY OF
THE SENATE


APPROVED Friday May 16ᵗʰ 2025 at 11:12 Am
(Date and Time)


Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO


PAGE 8-HOUSE BILL 25-1312

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

       *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capac-
ity as the Director of the Colorado Civil Rights
Division, *et al.*,

       *Defendants*.

Case No. 1:25-cv-01572-RMR

**PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION
AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION....................................................................................................................1

BACKGROUND.......................................................................................................................2

I.      Colorado has a history of punishing protected speech. .................................................2

II.     Colorado adopts H.B. 25-1312 to punish dissenting views on sex and gender. ........................4

        A.  The "gender expression" and "chosen name" definitions. ....................................4

        B.  The Unwelcome Provision and Unwelcome Statements Provision. ....................5

III.    Plaintiffs file this lawsuit to protect their rights and their members' rights. .............................7

ARGUMENT .........................................................................................................................10

I.      Plaintiffs are likely to prevail on the merits. ...............................................................11

        A.  H.B. 25-1312's "gender expression" and "chosen name" definitions violate the First
            and Fourteenth Amendments. ...........................................................................11

            1.  The definitions violate the First Amendment. ...................................................11

            2.  The definitions are impermissibly vague. ........................................................18

        B.  The Unwelcome Provision and Unwelcome Statements Provision violate the First
            and Fourteenth Amendments. ...........................................................................19

            1.  The Provisions violate the First Amendment....................................................19

            2.  The Provisions are impermissibly vague. .......................................................25

II.     Plaintiffs satisfy the remaining preliminary-injunction criteria. .................................26

III.    The Court should not require an injunction bond. .....................................................26

CONCLUSION ...................................................................................................................27

**1-App-082**

## TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis*,
  6. F.4th 1160 (10th Cir. 2021) ........................................................................... 6, 20, 25

*303 Creative v. Elenis*,
  600 U.S. 570 (2023) ........................................................ 3-4, 7, 12-14, 17, 21-23

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ........................................................................................ 21

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ........................................................................ 26

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ........................................................................ 20

*Church on the Rock v. Albuquerque*,
  84 F.3d 1273 (10th Cir. 1996) .......................................................................... 15

*Creek Red Nation v. Jeffco Midget Football Ass'n*,
  175 F. Supp. 3d 1290 (D. Colo. 2016) ............................................................... 8

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*,
  533 F.3d 780 (9th Cir. 2008) ............................................................................ 20

*Doe 1 v. Marshall*,
  367 F. Supp. 3d 1310 (M.D. Ala. 2019) ............................................................ 13

*Elrod v. Burns*,
  427 U.S. 347 (1976) ......................................................................................... 26

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) .................................................................................... 20, 25

*Free the Nipple v. Fort Collins*,
  916 F.3d 792 (10th Cir. 2019) .......................................................................... 26

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ......................................................................................... 16

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ..................................................................................... 18-19

*Griffin v. Bryant*,
  30 F. Supp. 3d 1139 (D.N.M. 2014) .................................................................. 21

*Hobby Lobby Stores v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) .................................................................... 11, 26

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) .................................................................................. 1, 3, 20

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) ..................................................................................... 15, 21

*Janus v. AFSCME*,
    585 U.S. 878 (2018) ..................................................................................... 11, 24

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) ...........................................................................................14

*Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*,
    584 U.S. 617 (2018) .............................................................................................3

*Matal v. Tam*,
    582 U.S. 218 (2017) ..................................................................................... 21, 25

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010) ...........................................................................17

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ...................................................12-13, 15-17, 22-24

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ...............................................................................................15

*Moody v. NetChoice*,
    603 U.S. 707 (2024) ....................................................................................... 16-17

*NetChoice v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)..............................................................27

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ...........................................................................................13

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..................................................................................... 13-14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...........................................................................................13

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988). ..................................................................................2, 13, 20

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009)........................................................................26

*Rosenberger v. University of Virginia*,
    515 U.S. 819 (1995) ...........................................................................................14

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ...........................................................................................25

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*,
    502 U.S. 105 (1991) ...........................................................................................15

*Speech First v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022)........................................................................................14-15

*Stephenson v. Davenport Cmty. Sch. Dist.*,
  110 F.3d 1303 (8th Cir. 1997)...............................................................................................18

*Telescope Media Grp. v. Lucero*,
  936 F.3d 740 (8th Cir. 2019) ..........................................................................................1, 22

*United States v. Lesh*,
  107 F.4th 1239 (10th Cir. 2024) ...........................................................................................18

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................................................16

*Village of Hoffman Estates v. Flipside, Hoffman Estates*,
  455 U.S. 489 (1982) ...........................................................................................................18, 25

*Virginia v. Hicks*,
  539 U.S. 113 (2003) .................................................................................................................15

*West Virginia v. Barnette*,
  319 U.S. 624 (1943) .................................................................................................................11

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) .....................................................................................................................11

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..........................................................................................................11, 13

*Wyoming Gun Owners v. Gray*,
  83 F.4th 1224 (10th Cir. 2023).............................................................................................25

## Statutes, Regulations, & Rules

3 C.C.R. 708-1:81.6....................................................................................................................19

Colo. Rev. Stat. §24-34-301..............................................................................4-6, 12-18, 27

Colo. Rev. Stat. §24-34-306............................................................................................. 7, 12

Colo. Rev. Stat. §24-34-601.....................................................1, 4-6, 19, 20-23, 25, 27

Colo. Rev. Stat. §24-34-602............................................................................................. 7, 12

Colo. Rev. Stat. §24-34-605............................................................................................. 7, 12

Colo. Rev. Stat. §24-34-701............................................................... 6, 19, 21-23, 25, 27

Fed. R. Civ. P. 65.......................................................................................................................26

## Other Authorities

*Objectionable*, Merriam-Webster Dictionary, perma.cc/94D7-2QVY ............................................6

*Unwelcome*, Merriam-Webster Dictionary, perma.cc/X2KK-D5QJ ...........................................6

## INTRODUCTION

Anti-discrimination laws are important. Coloradans have a right to access public spaces, and the State of Colorado has a strong interest in protecting that right. Indeed, like many States, Colorado has long guaranteed that all persons shall have "full and equal" access to places of public accommodation. Colo. Rev. Stat. §24-34-601(2)(a). That law, the Colorado Anti-Discrimination Act, ensures that individuals are not denied access or goods based on their membership in a protected category.

But last month, Colorado adopted a new law—House Bill 25-1312—for an entirely different purpose. Unlike the Anti-Discrimination Act's existing prescriptions, which regulate *access* to public accommodations, the purpose of H.B. 25-1312 is to regulate *speech*. Specifically, the bill revises the definition of "gender expression," a protected category in Colorado law, and makes it unlawful for anyone who operates in a place of public accommodation to decline to use someone's "chosen name" or other terms by which they "choos[e] to be addressed," like preferred pronouns. *See* H.B. 25-1312 §8 (Compl. Ex. A).

Colorado's law as amended by H.B. 25-1312 is plainly unconstitutional. To be sure, States may prohibit acts of discrimination—denying access or service—but they may not regulate, let alone punish, the speech of those who operate in a place of public accommodation. *See Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) (States are "not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one.")*; Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019) ("[A]ntidiscrimination laws, as critically important as they are, must yield to the Constitution."). Yet Colorado law does exactly that. The new "gender expression" and "chosen name" definitions—along with Colorado's existing bans on published statements and communications that make individuals feel "unwelcome" in places of public

1

accommodation—violate the First and Fourteenth Amendments. They compel speech, they regulate based on content and viewpoint, they are overbroad, and they are impermissibly vague.

These laws have real-world consequences for many Coloradans, including Plaintiffs and their members. Lori Gimelshteyn and Erin Lee (who are members of Defending Education) and their respective organizations, CPAN and PKC, frequently host and attend events in places of public accommodation to express their views about the dangers of gender ideology. At those events and in their public statements, they want to use biologically accurate pronouns and names—what proponents of H.B. 25-1312 call "deadnaming" and "misgendering"—because they believe sex is fixed at birth and immutable. But Colorado law prohibits them from doing so. Similarly, Dr. Travis Morrell and Dr. Valeri Leswing, Colorado physicians who (along with Dr. Leswing's medical practice, Mountain Pediatrics) are members of Do No Harm, want to use biologically accurate names and pronouns with their patients because they also believe sex is immutable and because they believe proper medical care requires recognizing biological realities. But because of Colorado law, they cannot use their desired speech. These restrictions on Plaintiffs' speech are plainly unconstitutional.

Plaintiffs seek a preliminary injunction to protect their right to speak freely and to not be forced to parrot the State's views on matters of sex and gender. Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits, they will suffer irreparable harm without an injunction, and the balance of harms and public interest weigh in their favor. This Court should grant the motion and enjoin Defendants from enforcing the challenged provisions.

## BACKGROUND

### I.    Colorado has a history of punishing protected speech.

The First Amendment protects the right to speak freely, including "the decision of both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 797 (1988). Americans

do not forfeit their First Amendment rights when they are in a place of public accommodation. *303 Creative v. Elenis*, 600 U.S. 570, 592 (2023) ("[N]o public accommodations law is immune from the demands of the Constitution."). To the contrary, the Supreme Court has consistently affirmed that, "whatever state law may demand," business owners, event hosts, and others who operate in a place of public accommodation have "a First Amendment right to present their message undiluted by views they d[o] not share." *Id.* at 585-86 (citing *Hurley*, 515 U.S. at 572-73).

Unfortunately, Colorado has taken a different path. Colorado has repeatedly tried to use its public accommodation laws to coerce protected speech. Worse, it has done so specifically to silence views with which it disagrees, particularly on issues of sex and gender. The Colorado Civil Rights Commission, for example, declined to take action against bakeries that refuse to bake cakes expressing a religious message critical of same-sex marriage. *Masterpiece Cakeshop v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 633-34 (2018). But it *did* issue a cease-and-desist order and a suite of other remedial measures against a Christian baker who declined to bake a cake endorsing same-sex marriage. *Id.* at 625-30. When the U.S. Supreme Court reviewed that case, it confirmed what should have been obvious: even if Colorado could punish a hypothetical baker who "refused to sell *any* goods" to a class of customers, it could not force a baker to "use his artistic skills to make an expressive statement" about the propriety of same-sex marriage. *Id.* at 631-33 (emphasis added).

Yet Colorado persisted. Just a few years later, the Commission was back at the Supreme Court, arguing that its public accommodation laws could force a wedding website designer to create websites for same-sex marriages even though the designer firmly believed that "marriage should be reserved to unions between one man and one woman." *303 Creative*, 600 U.S. at 580-83. But Colorado's effort to (again) coerce speech out of business owners, the Court explained, did "not respect the First Amendment." *Id.* at 592. Yes, the designer's business was a public accommodation, so she could not deny

"'equal access'" to any class of customers. *Id.* at 590. But the designer was willing to work with any customer regardless of sexual orientation or gender identity. *Id.* at 597-98. She simply did not want to use her artistic skills to express a message—i.e., a custom website design—with which she disagreed. Those customized designs were "'pure speech,'" and Colorado could not apply its public accommodation laws to coerce "'expressive activity'" out of the designer. *Id.* at 587-92.

## II.  Colorado adopts H.B. 25-1312 to punish dissenting views on sex and gender.

Unfortunately, Colorado still has not taken the Supreme Court's lessons to heart. On May 16, Governor Jared Polis signed into law H.B. 25-1312, which enacts a number of controversial policies designed to promote gender ideology, the notion that someone can change their gender and that others should adjust their conduct and language to "affirm" the person's self-professed "gender identity." Section 8 of H.B. 25-1312 amends Colorado's Anti-Discrimination Act to compel Coloradans to refer to transgender-identifying individuals using state-approved language. A few particular provisions in the amended Anti-Discrimination Act are relevant here.

### A.  The "gender expression" and "chosen name" definitions.

"Gender expression" is one of many protected categories under the Colorado Anti-Discrimination Act. Before H.B. 25-1312, its definition was limited to appearance and conduct: "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, and behavior." Colo. Rev. Stat. §24-34-301(9) (eff. May 25, 2023). Thus, a business could not deny someone actual access or services because that person's dress or appearance did not conform to their biological sex. *See id.* §24-34-601(2)(a) (cannot "deny … full and equal enjoyment of … a place of public accommodation" based on "gender expression"); *cf. 303 Creative*, 600 U.S. at 594-95, 597-98.

4

**1-App-089**

H.B. 25-1312 amends that definition to include the use of a "chosen name" and "how the individual chooses to be addressed." *See* Colo. Rev. Stat. §24-34-301(9) (eff. May 16, 2025). And it further defines "chosen name" to mean any "name that an individual requests to be known as in connection to" a protected category, including "gender identity" and "gender expression." *Id.* §24-34-301(3.5) (eff. May 16, 2025). In other words, in addition to liability for denying access or services, those who operate in a place of public accommodation are now liable if they refuse to "addres[s]" or refer to someone using their chosen name, preferred pronouns, or other gender-affirming terms. If the speaker instead addresses or refers to a transgender-identifying individual using biologically accurate pronouns, birth names, or other non-gender-affirming terms—i.e., if the speaker "deadnames" or "misgenders" them, as proponents of H.B. 25-1312 call it—they have denied the individual the "full and equal enjoyment" of a public accommodation based on the individual's "chosen name" and preferred form of "addres[s]." *Id.* §§24-34-301(9); 24-34-601(2)(a). H.B. 25-1312 thus expands the definition of "gender expression" to cover not just conduct but also *speech* based on sex and gender.

H.B. 25-1312 creates only a narrow carveout for these new speech requirements. Individuals need not speak using the name that "an individual requests to be known as" if and only if the requested name "contain[s] offensive language" or when the person is "requesting the name for frivolous purposes." Colo. Rev. Stat. §24-34-301(3.5) The law offers no exception to its blanket requirement that Coloradans speak using an individual's preferred pronouns or other forms of "address." *Id.*

**B.    The Unwelcome Provision and Unwelcome Statements Provision.**

Colorado's prohibitions on disfavored speech do not stop there. The Colorado Anti-Discrimination Act also includes an Unwelcome Provision and an Unwelcome Statements Provision. Under the former, it is unlawful for any person who operates in a place of public accommodation to "directly or indirectly … publish" or otherwise distribute "any written, electronic, or printed communication,

5

**1-App-090**

notice, or advertisement that indicates … that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable" based on "gender expression" or any other protected category. *Id.* §24-34-601(2)(a). Likewise, under the latter, it is unlawful for any "person that is the owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation" to "directly or indirectly … publish" or otherwise distribute "any communication" that "[s]tates that the patronage, custom, presence, [or] frequenting … by any person or class of persons" is "unwelcome or objectionable or not acceptable, desired, or solicited" based on "gender expression" or any other protected category. *Id.* §24-34-701(1)(c).

Neither the Unwelcome Provision nor the Unwelcome Statements Provision define any of their key terms, but they "surely impl[y] a subjective element on behalf of the person" who claims to feel unwelcome. *303 Creative v. Elenis*, 6. F.4th 1160, 1213-14 (10th Cir. 2021) (Tymkovich, C.J., dissenting), *rev'd*, 600 U.S. 570 (2023); *see, e.g.*, *Unwelcome*, Merriam-Webster Dictionary (archived May 11, 2025), perma.cc/X2KK-D5QJ ("not wanted"); *Objectionable*, Merriam-Webster Dictionary (archived May 11, 2025), perma.cc/94D7-2QVY ("offensive").

As amended by H.B. 25-1312, then, the Colorado Anti-Discrimination Act also prohibits anyone who operates in a public accommodation from distributing any communication that offends a transgender-identifying person or makes them feel "unwelcome" because the communication refers to such persons without using their "chosen name" or other terms by which they "choos[e] to be addressed" or expresses opposition to the use of such terms. Colo. Rev. Stat. §§24-34-301(9), 24-34-601(2)(a), 24-34-701(1)(c). Such communications constitute a "discriminatory" and "unlawful" practice based on "gender expression." *Id.* §24-34-601(2)(a).

Anyone who violates Colorado's public accommodation laws—which, after H.B. 25-1312, means anyone who "deadnames" or "misgenders" someone in a public accommodation or who

6

**1-App-091**

publishes statements that make transgender individuals feel "unwelcome"—is subject to investiga-

tions, injunctive orders, lawsuits, and fines. Violators are reported to the Civil Rights Commission,

which can require "compulsory mediation," issue cease-and-desist letters, and order other equitable

relief like participation in mandatory re-education programs. *Id.* §§24-34-306(1)(a)(I), (2)(a), (9), 24-

34-605; *303 Creative*, 600 U.S. at 581. Violators can also be sued by "aggrieved" individuals and, upon

a finding of liability, be forced to pay hefty fines. *Id.* §24-34-602(1).

### III.   Plaintiffs file this lawsuit to protect their rights and their members' rights.

Plaintiffs are various non-profit organizations (Defending Education, Colorado Parent Advo-

cacy Network, Protect Kids Colorado, and Do No Harm), two individuals (Dr. Travis Morrell and

Dr. Valeri Leswing), and Dr. Leswing's medical practice, Mountain Pediatrics.

- Defending Education is a nationwide, grassroots membership association whose members include parents, students, and others concerned about the state of education in America. Perry Decl. ¶3. In particular, the organization opposes the spread of harmful gender ideology among America's children and in America's schools and works to protect its members' First Amendment right to address individuals using biologically accurate pronouns, names, and terms. *Id.* ¶¶4-5. DE has members in Colorado who share its views, including Ms. Lori Gimelshteyn, the Executive Director of Colorado Parent Advocacy Network, and Ms. Erin Lee, the Executive Director of Protect Kids Colorado. *Id.* ¶6.

- Colorado Parent Advocacy Network is a statewide, grassroots organization comprised of parents, educators, and other concerned Colorado citizens. Gimelshteyn Decl. ¶4. The organization's mission is to secure parental rights and promote a rigorous, non-political educational experience. *Id.* ¶¶4-5. In line with that mission, CPAN opposes the spread of controversial gender ideologies. *Id.* ¶4. CPAN accomplishes its mission through, among other means, public advocacy and education. *Id.*

- Protect Kids Colorado is a statewide, grassroots organization supported by parents, educators, and other concerned Colorado citizens. Lee Decl. ¶4. The organization works to secure parents' rights to make decisions about their children's wellbeing and education, to raise awareness about the prevalence of gender ideologies and the dangers of gender-affirming treatments, and to oppose government attempts to allow biological males to compete in women's sports. *Id.* ¶¶4-5, 9. PKC furthers this mission through, among other means, public advocacy and education. *Id.* ¶4.

7

**1-App-092**

- Do No Harm is a nationwide, grassroots membership organization whose members include healthcare professionals, students, patients, and policymakers. Rasmussen Decl. ¶3. DNH works to ensure that medicine is driven by scientific evidence rather than politics. *Id.* To that end, it opposes divisive trends like youth-focused gender ideology and gender-affirming medical treatments. *Id.* ¶¶3-4. DNH has members in Colorado who share its views, including Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics. *Id.* ¶6.

- Dr. Travis Morrell is a licensed physician and a double board-certified dermatologist and dermatopathologist who co-owns a medical practice in Grand Junction, CO. Morrell Decl. ¶¶3-4. Dr. Morrell treats many individual patients in his practice, including transgender-identifying, gender-dysphoric, and gender-questioning individuals. *Id.* ¶6.

- Dr. Valeri Leswing is a licensed physician and practicing pediatrician in Colorado. Leswing Decl. ¶¶3-4. Dr. Leswing treats many individual patients in her practice, including transgender-identifying, gender-dysphoric, and gender-questioning individuals. *Id.* ¶7.

- Mountain Pediatrics is Dr. Leswing's medical practice, located in Evergreen, CO. *Id.* ¶4. Dr. Leswing is the practice's sole owner and physician. *Id.*

Plaintiffs and their members are harmed by Colorado's speech restrictions. CPAN, PKC, and their leadership (including Ms. Gimelshteyn and Ms. Lee) hold traditional views on matters of sex and gender identity. Gimelshteyn Decl. ¶6; Lee Decl. ¶6. They believe that sex is determined at birth and immutable. *Id.* They believe that, if they were forced to affirm someone's non-biological "gender identity" or "gender expression," they would be affirming a lie. *Id.*

CPAN and PKC host events in places of public accommodation, and Ms. Gimelshteyn and Ms. Lee participate in these events. Gimelshteyn Decl. ¶10; Lee Decl. ¶10; *see Creek Red Nation v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1298 (D. Colo. 2016) ("organizations that conduct activities in facilities … that are open to the public" are subject to Colorado's public accommodation laws). In line with their beliefs, CPAN, PKC, Ms. Gimelshteyn, and Ms. Lee want to refer to individuals at these events using biological pronouns, birth names, and other biologically accurate terms, even if those pronouns, names, or terms conflict with an individual's self-professed gender identity or expression. Gimelshteyn Decl. ¶¶12-14; Lee Decl. ¶¶12-14. They do not want to be forced to use "gender-

8

**1-App-093**

affirming" language like chosen names or preferred pronouns. Gimelshteyn Decl. ¶29; Lee Decl. ¶29. Transgender-identifying individuals have attended their events in the past, and Ms. Gimelshteyn and Ms. Lee anticipate that transgender-identifying individuals will attend their events in the future. Gimelshteyn Decl. ¶13; Lee Decl. ¶13. CPAN, PKC, Ms. Gimelshteyn, and Ms. Lee also want to publish materials and statements—for example, educational resources for parents, social media posts, flyers advertising their events, videos of their events, and other materials distributed at their events—that refer to transgender-identifying individuals using biologically accurate terms. *See, e.g.*, Gimelshteyn Decl. Ex. B (social media post calling a transgender individual a "man ridiculing girls"); Lee Decl. Ex. E (post referring to a Colorado state representative as "Brian Titone" and a "man," even though Rep. Titone identifies as a woman and goes by "Brianna").

Dr. Morrell and Dr. Leswing similarly hold "scientific, objective, and reproducible views on matters of sex and gender identity." Morrell Decl. ¶5; Leswing Decl. ¶6. They believe that "affirming an individual's non-biological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria." Morrell Decl. ¶9; *see* Leswing Decl. ¶10 (similar). Accordingly, Dr. Morrell and Dr. Leswing do not want to be forced to use "chosen names" or "preferred pronouns" when addressing their patients. Morrell Decl. ¶10; Leswing Decl. ¶11. When they treat patients in their medical practices, they want to use biological pronouns, birth names, and other biologically accurate terms. Morrell Decl. ¶¶10-12; *e.g., id.* ¶10 ("Can you please perform a urine pregnancy test for Sarah" or "Let's send his penile biopsy specimen to the lab"); Leswing Decl. ¶¶11-13; *e.g., id.* ¶11 ("Scott needs his meningitis vaccine" or "Please check Luna's urine for white blood cells"). When Dr. Morrell writes or speaks publicly about issues of sex and gender (which he frequently does), he wants to refer to individuals using birth names and biologically accurate pronouns and other terms. *Id.* ¶¶14-16. And

9

Dr. Leswing, for her part, wishes to issue a public statement notifying potential patients that she will not refer to them using chosen names, preferred pronouns, or other non-biological terms. Leswing Decl. ¶¶14-15.

Because of H.B. 25-1312, however, CPAN, PKC, Ms. Gimelshteyn, Ms. Lee, Dr. Morrell, Dr. Leswing, and Mountain Pediatrics must stop addressing or referring to individuals in places of public accommodation (e.g., at CPAN and PKC events or in the medical practices) by their birth names (instead of "chosen name"), by their biological pronouns (instead of their "preferred pronouns"), and by other terms that are not gender-affirming. Gimelshteyn Decl. ¶25; Lee Decl. ¶25; Morrell Decl. ¶24; Leswing Decl. ¶23. They also must now refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns, birth names, and other terms inconsistent with their purported gender identity or gender expression or express opposition to the use of non-biological terms. Gimelshteyn Decl. ¶¶25-26; Lee Decl. ¶25-26; Morrell Decl. ¶25; Leswing Decl. ¶24.

Plaintiffs self-censor because they fear that, if they engage in this type of speech, they will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties. Gimelshteyn Decl. ¶25; Lee Decl. ¶25; Morrell Decl. ¶24; Leswing Decl. ¶23. Dr. Morrell and Dr. Leswing also fear that their medical practices will be investigated and punished for their speech, and Dr. Morrell fears that his partners will terminate his ownership interest or otherwise compel him to disassociate from his medical practice if the practice is investigated and punished on account of his speech. Morrell Decl. ¶25; Leswing Decl. ¶23. Plaintiffs filed this lawsuit to restore their right to express their deeply held beliefs.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction because they are "likely to succeed on the merits" of their claims that Colorado's laws violate the First and Fourteenth Amendments. *Winter v.*

*Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). In constitutional cases, like this one, that is usually "'the determinative factor.'" *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). But Plaintiffs satisfy the other preliminary injunction factors as well: they are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities" favors an injunction, and "an injunction is in the public interest." *Winter*, 555 U.S. at 20. This Court should enter a preliminary injunction.

## I.       Plaintiffs are likely to prevail on the merits.

Plaintiffs are likely to prevail on the merits of their claims because the challenged definitions, the Unwelcome Provision, and the Unwelcome Statements Provision violate the First and Fourteenth Amendments, both on their face and as applied.

### A.       H.B. 25-1312's "gender expression" and "chosen name" definitions violate the First and Fourteenth Amendments.

The "gender expression" and "chosen name" definitions violate the First Amendment in multiple ways: they compel speech, they discriminate based on content and viewpoint, and they are overbroad. The definitions also violate the Fourteenth Amendment because they are vague and thereby invite arbitrary enforcement.

#### 1.       The definitions violate the First Amendment.

***Compelled Speech.*** The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. AFSCME*, 585 U.S. 878, 892 (2018) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia v. Barnette*, 319 U.S. 624, 642 (1943). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command." *Janus*, 585 U.S. at 892.

11
**1-App-096**

Many Coloradans, including Plaintiffs and their members, believe that sex is fixed at birth and immutable. Perry Decl. ¶7; Gimelshteyn Decl. ¶6; Lee Decl. ¶6; Rasmussen Decl. ¶7; Morrell Decl. ¶5; Leswing Decl. ¶6. They do not want to be forced to affirm that a biological male is actually a female (or vice versa) by referring to him or her using a chosen name or non-biological preferred pronouns. Gimelshteyn Decl. ¶¶6, 8; Lee Decl. ¶¶6, 8; Morrell Decl. ¶¶5, 9; Leswing Decl. ¶¶6, 11. Doing so would contradict their deeply held beliefs and, as they see it, harm the individual by encouraging him or her to believe a lie about themselves. Gimelshteyn Decl. ¶8; Lee Decl. ¶8; Morrell Decl. ¶9; Leswing Decl. ¶10. But that is exactly what the definitions of "gender expression" and "chosen name" require. They force those who operate in a place of public accommodation to refer to individuals how they "choos[e] to be addressed"—with "chosen name[s]" and preferred pronouns rather than birth names and biological pronouns. Colo. Rev. Stat. §24-34-301(3.5), (9). If someone operating a public accommodation *doesn't* use the State's preferred language (i.e., if they "misgender" or "deadname" someone) they can be hit with investigations, cease-and-desist orders, and lawsuits. *Id.* §§24-34-306(1)(a)(I), (2)(a), (9), 24-34-602(1), 24-34-605. As a consequence, the revised definitions compel Coloradans to "communicate" the "message" that "[p]eople can have a gender identity inconsistent with their sex." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021).

The Supreme Court's decision in *303 Creative* demands the conclusion that the revised definitions unconstitutionally compel speech. There, Colorado argued that its public accommodation laws could force a wedding website designer to create websites for same-sex marriages even though the designer firmly believed that "marriage should be reserved to unions between one man and one woman." 600 U.S. at 580-83. But that, said the Court, "would not respect the First Amendment." *Id.* at 592. Though the designer's business was a public accommodation, her custom website creations were "'pure speech,'" and Colorado could not apply its public accommodation laws to coerce "'expressive

12
**1-App-097**

activity'" out of her. *Id.* at 587-92 (emphasis added). All the more so here. If anything is "pure speech,"
it is the actual words Coloradans use to address one another, especially when those words express a
view about something as fundamental as sex and gender. *See Meriwether*, 992 F.3d at 508 ("Pronouns
can and do convey a powerful message implicating a sensitive topic of public concern.")

That the challenged definitions do not literally require Coloradans to speak is of no conse-
quence. Even if speakers could avoid the Anti-Discrimination Act's penalties by holding their tongues,
compelled silence is compelled speech. *Riley*, 487 U.S. at 796-97. Moreover, using pronouns and names
is a "'virtual necessity'" for engaging in any conversation. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325
(M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715). It would be "impossible" for Coloradans to not
"use any pronouns" or any names when discussing an individual. *Meriwether*, 992 F.3d at 517. In prac-
tice, then, the law forces Coloradans to "carr[y] the government['s] message" about sex and gender.
*Doe 1*, 367 F. Supp. 3d at 1326.

***Content Discrimination.*** H.B. 25-1312's new definitions also punish speech based on its con-
tent. A policy "is content based if a law applies to particular speech because of the topic discussed or
the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But governments
have "'no power to restrict expression because of its message, its ideas, its subject matter, or its con-
tent.'" *Id.* "Content-based regulations" are therefore "presumptively invalid," *R.A.V. v. City of St. Paul*,
505 U.S. 377, 382 (1992), and "any restriction based on the content of the speech must satisfy strict
scrutiny," *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

The definitions of "gender expression" and "chosen name" are content-based on their face.
They specifically cover—and *only* cover—speech that involves the use of terms by which an "individ-
ual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). And they require addressing an individual
by their "chosen name" when that name is used "in connection to the individual's disability, race,

13
**1-App-098**

creed, color, religion, sex, sexual orientation, gender identity, gender expression, marital status, familial status, national origin, or ancestry." *Id.* §24-34-301(3.5). For example, a store owner violates the law if he calls a transgender individual by their birth name; but he does not violate the law if he calls an individual a pejorative name because of his weight, height, clothes, or other unlisted category. The definitions thus impermissibly impose "differential burdens upon speech on account of the topics discussed, and dra[w] facial distinctions" based on "any of a long list of characteristics." *Speech First v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (cleaned up).

As content-based laws, the definitions must satisfy strict scrutiny. But Colorado cannot satisfy that test. *See Kennedy v. Bremerton School District*, 597 U.S. 507, 524 (2022) (burden is on the state to show a compelling interest and narrow tailoring). Though Colorado may have an interest in ensuring equal *access* to places of public accommodation, it has no compelling interest in suppressing speech on issues of significant public concern like sex and gender. *303 Creative*, 600 U.S. at 583-84, 588-89. Even if it did, H.B. 25-1312's definitions are not narrowly tailored. "In fact the only interest distinctively served by th[is] content limitation is that of displaying the [State's] special hostility towards" traditional views on sex and gender. *R.A.V.*, 505 U.S. at 396. Again, *303 Creative* is on point. There, the Supreme Court held that Colorado did not have a "'compelling interest'" sufficient to justify forcing a website designer to create websites for same-sex weddings. 600 U.S. at 588-92. That holding requires the same conclusion here.

***Viewpoint Discrimination.*** Worse yet, the definitions punish the use of pronouns, names, and other gendered language based on the viewpoint expressed by the speaker. Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. University of Virginia*, 515 U.S. 819, 829 (1995). "'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or

disagreeable.'" *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). While content-based restrictions "are subject to strict scrutiny," viewpoint-based restrictions are subject to "even more critical judicial treatment." *Church on the Rock v. Albuquerque*, 84 F.3d 1273, 1279 (10th Cir. 1996). Indeed, viewpoint-based restrictions are always "prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018); *see Cartwright*, 32 F.4th at 1126 ("Restrictions … based on viewpoint are prohibited, seemingly as a per se matter." (cleaned up)).

H.B. 25-1312's viewpoint discrimination is apparent on its face. Its revised "chosen name" and "gender expression" definitions punish speech about transgender-identifying individuals when that speech uses *birth* names and *biological* pronouns, but not when it uses "chosen name[s]" or other terms by which "an individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). But "refus[ing] to address" an individual with their chosen name or pronouns "advance[s] a viewpoint on gender identity." *Meriwether*, 992 F.3d at 509. It affirms that "sex is fixed in each person from the moment of conception, and that it cannot be changed, regardless of an individual's feelings or desires." *Id.* Prohibiting that expression while allowing the opposite is classic viewpoint discrimination. In addition, Colorado requires speakers to use a chosen name only when it is "request[ed] … in connection to" a specific list of protected characteristics and only when the requested name is not "offensive" or "frivolous." Colo. Rev. Stat. §24-34-301(3.5). The State, in other words, "'disapprov[es] of'" a particular "'subset of messages it finds offensive.'" *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

***Overbreadth.*** The First Amendment prohibits regulations of speech that "punish a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up). This "expansive remedy" guards against the possibility that "an overbroad law may deter or 'chill' constitutionally protected speech." *Id.* The freedoms protected by First Amendment, in other words, "'need breathing space to survive,'" so the

15

**1-App-100**

government may regulate speech "'only with narrow specificity.'" *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). And a policy is overbroad "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).

As explained above, the "gender expression" and "chosen name" definitions are unconstitutional in a substantial number of applications because they compel speech and discriminate based on content and viewpoint. Consider, for example, a restaurant waiter who agrees to serve a biologically male customer who identifies as a woman, but addresses the person as "sir" rather than "ma'am" because the waiter believes sex is immutable. Or a doctor who uses biological pronouns when speaking about a transgender-identifying patient with colleagues. Or a store clerk who addresses a long-time customer as "Jack" even though the customer now identifies as "Jane." These are all examples of protected speech, *see Meriwether*, 992 F.3d at 511-12, but they are all prohibited because of the challenged definitions, Colo. Rev. Stat. §24-34-301(3.5), (9).

But the definitions' unconstitutional applications aren't just substantial relative to any legitimate applications; they are substantial "in an absolute sense" too. *Williams*, 553 U.S. at 292. Because the pre-H.B. 25-1312 definition of "gender expression" already prohibited discriminatory conduct—a public accommodation could not deny access or services based on an individual's "dress" or "appearance"—the *main* function of the revised definitions is to compel (or punish) protected speech: the use of a chosen name as opposed to a birth name, or the use of preferred pronouns as opposed to biological pronouns.

In other words, coercing speech on "a sensitive topic of public concern," *Meriwether*, 992 F.3d at 508, is the law's "heartland applicatio[n]," *Moody v. NetChoice*, 603 U.S. 707, 744 (2024). Every time someone in a public accommodation addresses or speaks about another person, they have to either censor their speech or parrot the State's view about the mutability of sex and gender. That is a "heavy

16
**1-App-101**

weight for [Coloradans] to bear," *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 252 (3d Cir. 2010), and must be given "significant" weight in the overbreadth analysis, *NetChoice*, 603 U.S. at 744.

*As Applied.* Facial overbreadth aside, H.B. 25-1312's revised definitions are also unconstitutional as applied. Plaintiffs and their members operate in places of public accommodations. *See* Gimelshteyn Decl. ¶10; Lee Decl. ¶10; Morrell Decl. ¶4; Leswing Decl. ¶4. And their speech is among the many examples of expression covered by the law. CPAN, PKC, Ms. Gimelshteyn, and Ms. Lee do not want to be forced to use "chosen names" or "preferred pronouns." *See* Gimelshteyn Decl. ¶¶7-18; Lee Decl. ¶¶7-18. In line with their mission and beliefs, they want to use birth names, biological pronouns, and other biologically accurate terms in their speech at their public events and in their writings about transgender individuals. *Id.* Dr. Morrell and Dr. Leswing similarly do not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to transgender patients, Morrell Decl. ¶¶10-16; Leswing Decl. ¶¶11-16, or when speaking publicly about transgender individuals, Morrell Decl. ¶15; Leswing Decl. ¶14. Instead, they want to use birth names and biological pronouns in both their oral and written communications. Morrell Decl. ¶¶10-16; *e.g., id.* ¶10 ("Can you please perform a urine pregnancy test for Sarah" or "Let's send his penile biopsy specimen to the lab"); Leswing Decl. ¶¶11-16; *e.g., id.* ¶11 ("Scott needs his meningitis vaccine" or "Please check Luna's urine for white blood cells").

Their speech is unquestionably "protected speech." *303 Creative*, 600 U.S. at 587; *see Meriwether*, 992 F.3d at 511-12. But their speech is unlawful under H.B. 25-1312's definition of discrimination based on "gender expression" and "chosen name[s]." Colo. Rev. Stat. §24-34-301(3.5), (9). As explained above, H.B. 25-1312 is unconstitutional as applied because it compels Plaintiffs' and their members' speech and punishes their speech based on its content and viewpoint.

### 2.    The definitions are impermissibly vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This doctrine addresses two concerns: it ensures that "'regulated parties know what is required of them so they may act accordingly,'" and it ensures that "'those enforcing the law do not act in an arbitrary or discriminatory way.'" *United States v. Lesh*, 107 F.4th 1239, 1247 (10th Cir. 2024); *see Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311 (8th Cir. 1997) ("a central purpose of the vagueness doctrine" is to prevent "'arbitrary and discriminatory enforcement'").

The need for clarity is especially critical when First Amendment freedoms are at stake, as they are here. If a challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982).

H.B. 25-1312's definitions of "gender expression" and "chosen name" are vague on their face and as applied. The bill redefines "gender expression" to include the use of a "chosen name, and how the individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). But the State has not explained what forms of "addres[s]" it will require Coloradans to honor. Likewise, the bill defines a "chosen name" to mean any "name that an individual requests to be known as … so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." *Id.* §24-34-301(3.5). But it offers no detail on what "language" the State considers "offensive" or what "purposes" it considers "frivolous."

The definitions "lac[k] the necessary precision and guidance" to ensure "those enforcing the law do not act in an arbitrary or discriminatory way." *Lesh*, 107 F.4th at 1247 (cleaned up). Instead, Coloradans who operate in places of public accommodation are left to guess as to how Defendants

will choose to enforce these terms, which will "inevitably lead [Coloradans] to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109.[1]

### B.    The Unwelcome Provision and Unwelcome Statements Provision violate the First and Fourteenth Amendments.

Like H.B. 25-1312's new definitions, the Unwelcome Provision and Unwelcome Statements Provision compel speech, discriminate based on content and viewpoint, and are overbroad. And their terms are, again, impermissibly vague in violation of the Fourteenth Amendment.

### 1.    The Provisions violate the First Amendment

The Unwelcome Provision makes it unlawful to "directly or indirectly … publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates" that an individual's presence at a place of public accommodation is "unwelcome, objectionable, unacceptable, or undesirable" based on a protected characteristic. Colo. Rev. Stat. §24-34-601(2)(a). The Unwelcome Statements Provision likewise makes it unlawful to "directly or indirectly" publish such materials that "stat[e] that … any person or class of persons … is unwelcome or objectionable or not acceptable, desired, or solicited." *Id.* §24-34-701(1)(c). These prohibitions violate the First Amendment.

***Compelled Speech.*** To start, the Provisions compel speech. Because they ban unwelcome, objectionable, unacceptable, or undesirable speech, they effectively require Coloradans who operate in a place of public accommodation to either (1) alter their publications, statements, and

---

[1] The Colorado Civil Rights Commission has also adopted a regulation that prohibits "[u]nlawful harassment" based on "sexual orientation," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6. To the extent this Rule is interpreted to punish Plaintiffs' speech, it violates the First and Fourteenth Amendments for the same reasons as H.B. 25-1312.

communications so that their speech does not offend listeners based on a protected characteristic or (2) refrain from making supposedly offensive statements altogether. But states cannot "compel [a] speaker to alter the[ir] message" to make it "more acceptable to others." *Hurley*, 515 U.S. at 581. Even if Colorado were merely requiring speakers to remove "offensive" language from their publications, that is still unconstitutional compulsion. The First Amendment prohibits *all* compulsion, whether the speech being compelled is "ideological" or not. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004). And Colorado surely cannot prohibit offensive speech altogether. *Riley*, 487 U.S. at 796-97 (compelled silence is compelled speech).

*Viewpoint and Content Discrimination.* The Provisions also regulate speech based on its viewpoint and content. In particular, they punish speech based on a listener's or recipient's subjective reaction: if a statement makes an individual *feel* "unwelcome, objectionable, unacceptable, or undesirable," it is unlawful. Colo. Rev. Stat. §24-34-601(2)(a); *see 303 Creative*, 6. F.4th at 1213-14 (Tymkovich, C.J., dissenting) (the terms "surely impl[y] a subjective element").

It is well-established that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also, e.g.*, *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute … would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations."). Plus, because the Unwelcome Provision and Unwelcome Statements Provision turn on membership in a protected category, they effectively prohibit statements critical of a named group while permitting supportive statements: a sign that speaks negatively about members of a particular "race" or states that a business does not enjoy serving them, for example, is prohibited because it would make those individuals feel "unwelcome," but a sign expressing the opposite view—praising that race—is permitted. Colo. Rev.

20

**1-App-105**

Stat. §§24-34-601(2)(a), 24-34-701(1)(c). "'It is difficult to imagine'" a *less* viewpoint-neutral policy than one that allows "'laudatory'" speech "'while prohibiting a different point of view (negatively critical) on a particular subject matter.'" *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1184 (D.N.M. 2014). And even if Colorado law punished only those publications and communications that were *truly* offensive, "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *see Iancu*, 588 U.S. at 394 (same).

Because the Provisions discriminate on viewpoint, they are flatly prohibited. Even if they discriminated based only on content, they cannot satisfy strict scrutiny because, again, the State has no interest in suppressing speech as opposed to conduct. *303 Creative*, 600 U.S. at 583-84, 588-89. And even if it did, the Provisions are not narrowly tailored because they prohibit more speech than is "necessary" to ensure Coloradans are able to access and enjoy places of public accommodation. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Instead, the Provisions thwart *all* speech that displeases people who happen to fall within a protected category.

***Overbreadth.*** The Unwelcome Provision and Unwelcome Statements Provision *always* target pure speech: they specifically prohibit "publish[ing]" or otherwise distributing "any communication, paper, poster, folder, manuscript, book, pamphlet, writing, print, letter, notice, or advertisement of any kind, nature, or description." Colo. Rev. Stat. §24-34-701(1); *see id.* §24-34-601(2)(a) (likewise banning "any written, electronic, or printed communication, notice, or advertisement."). And as the above discussion shows, *most* of the speech they punish is protected speech. When they force a public accommodation to remove offensive language from its statements, they are compelling speech. When they impose liability based on a listener's reaction to published statements, they are regulating based on content. And when they prohibit critical or offensive speech while allowing favorable or non-offensive speech, they are regulating based on viewpoint.

Take a retail business owner, for example, who posts a sign in his store saying, "Transgender-ism Is A Mental Illness!" That is surely protected speech—it advances a view on whether an individual's non-biological gender identity should be affirmed or corrected, *Meriwether*, 992 F.3d at 509—but it just as surely could make a transgender individual feel "unwelcome" in the store based on gender identity. Or consider a Christian-owned bookstore with a banner in its religious books section stating, "The Bible is the only true word of God." Again, that is protected speech, but it might make a Muslim imam feel that his presence is "undesirable" because of his religious creed. Or consider a Palestinian-born doctor who posts on social media that "Israel is an apartheid state!" That post ex-presses a view about a salient political issue, but a Jewish patient who reads the post might feel that his presence in the doctor's practice is "objectionable."

These are not mere "incidental" regulations of speech, either. *Telescope Media Grp.*, 936 F.3d at 757. The Unwelcome Provision and Unwelcome Statements Provision do not simply prohibit state-ments indicating that an individual will actually be denied service or access because of a protected characteristic. *Id.* In fact, *other* provisions already do that. *See* Colo. Rev. Stat. §24-34-601(2)(a) (sepa-rately prohibiting statements "indicat[ing] that" an individual "will be refused"); *id.* §24-34-701(1)(b) (prohibiting statements that "any of the accommodations, rights, privileges, advantages, or conven-iences of the place shall or will be refused, withheld from, or denied to any person or class of persons"). The Provisions go beyond such incidental regulation and target speech that has nothing to do with access. *See 303 Creative*, 600 U.S. at 587-92 (public accommodation laws may ensure equal access, but they may not target pure speech).

***As Applied.*** The Unwelcome Provision and Unwelcome Statements Provision are also un-constitutional as applied. Plaintiffs and their members want to refer to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns and chosen

22
**1-App-107**

names. They want to speak out against the dangers of gender ideology and gender-affirming care. And they want to notify the public that they will not use chosen names, preferred pronouns, or other so-called gender-affirming language to refer to people at their events or in their practices. But the Unwelcome Provision and Unwelcome Statements Provision prohibit them from publishing statements or sending communications expressing those views because that speech would "stat[e]" or "indicat[e]" that an individual's presence is "unwelcome, objectionable, unacceptable, or undesirable" based on their "gender expression." Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

CPAN, PKC, Ms. Gimelshteyn, and Ms. Lee want to "publish materials—for example, flyers advertising [their] events, videos and presentations from the events, social media posts, educational resources for parents, and other materials distributed at [their] events—that refer to individuals using biological pronouns and birth names." Gimelshteyn Decl. ¶15; Lee Decl. ¶15; *see, e.g.,* Lee Decl. Ex. E (opposing the policies of a transgender-identifying Colorado state representative who uses the chosen name "Brianna Titone" and instead referring to Titone as a "man" and "Brian"). They also "regularly publis[h] materials" that "inform … Coloradans about the prevalence of gender ideology … and the danger of so-called 'gender-affirming care.'" Gimelshteyn Decl. ¶16; Lee Decl. ¶16. These statements are "'pure'" and "protected speech." *303 Creative*, 600 U.S. at 587; *see Meriwether*, 992 F.3d at 509, 511-12. But because these statements would make someone feel, among other things, "unwelcome" at one of their events, their speech would be unlawful under the Unwelcome Provision and Unwelcome Statements Provision. Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

Dr. Morrell and Dr. Leswing are in a similar position. When they write comments about their patients in their medical records, they want to refer to those patients using biologically accurate pronouns and birth names. Morrell Decl. ¶12; *see, e.g., id.* ("Her rash is most consistent with subacute cutaneous lupus erythematosus" or "Jennifer has been taking oral contraceptives for over one

month"); Leswing Decl. ¶13; *see, e.g., id.* ("She is feeling much better, and her headaches have completely resolved."). Dr. Morrell and Dr. Leswing want to publish these notes on their patients' online portals and provide patients with printed copies upon request. Morrell Decl. ¶12; Leswing Decl. ¶13. They also want to publish statements explaining their views on gender ideology. For example, Dr. Morrell is active on social media, where—consistent with his belief that sex is immutable—he "regularly publish[es] content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns or chosen names." Morrell Decl. ¶16; *see, e.g., id.* Ex. A (calling State Representative Titone "Brian" and referring to "his" lifestyle). Dr. Morrell also "write[s] on the issues of sex and gender as they relate to the medical profession" and publishes his writing in major outlets. *Id.* ¶14. In his writing, he "oppose[s] gender ideology … and raise[s] awareness about the dangers of gender-affirming care." *Id.* And Dr. Leswing, for her part, wants to publish statements on her practice's Facebook page notifying potential patients that she will not use chosen names, preferred pronouns, or other so-called gender-affirming language because that language would harm rather than help her patients. Leswing Decl. ¶¶14-15.

Dr. Morrell's and Dr. Leswing's statements are protected speech; they advance a viewpoint on sex, gender ideology, and the dangers of gender-affirming care. *See Meriwether*, 992 F.3d at 509, 511-12. But again, their speech is made unlawful by the Unwelcome Provision and Unwelcome Statements Provision because a transgender-identifying individual who reads their content might feel, among other things, "unwelcome" in their medical practices.

Plaintiffs and their members must therefore adjust their speech to avoid offending individuals based on their gender identity and gender expression. The Provisions compel their speech because they force them to endorse the State's view of sex and gender, *Janus*, 585 U.S. at 892, punish them based on the content of their speech because they make that speech unlawful based on the listener's

reaction, *Forsyth County*, 505 U.S. at 134, and discriminate against them based on their viewpoint because they punish "offens[ive]" language, *Matal*, 582 U.S. at 243.

### 2.    The Provisions are impermissibly vague.

The Unwelcome Provision and Unwelcome Statements Provision are also impermissibly vague both on their face and as applied. Like the challenged "gender expression" and "chosen name" definitions, the Provisions leave their key terms undefined. They promise to punish statements that state or indicate that an individual's presence is "unwelcome, objectionable, unacceptable, or undesirable," Colo. Rev. Stat. §24-34-601(2)(a); *see id.* §24-34-701(1)(c) (using the same terms), but they offer no detail as to what kind of statements Defendants consider unwelcoming, objectionable, unacceptable, or undesirable. Nor do they explain whether and how Defendants will consider a statement's context in making that determination. *See 303 Creative*, 6. F.4th at 1215 (Tymkovich, C.J., dissenting) (quoting Colorado's concession that application of the Unwelcome Provision "depend[s] on the context"). Likewise, the Provisions purport to cover not only the "direc[t]" publication or communication of unwelcoming statements, but also statements made "*in*directly." Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c) (emphasis added). Yet nowhere do the Provisions describe—nor have Defendants clarified—what kinds of "indirect" publication or communication the State will punish.

The Provisions give no "'explicit standards'" to constrain Defendants' discretion in enforcing them. *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023). Rather, they "leav[e] to [Defendants] the job of shaping [the Provisions'] contours through their enforcement decisions" on an "'*ad hoc* and subjective basis.'" *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J., concurring). The "stringent vagueness test" for laws implicating speech—and again, the Provisions *always* regulate speech—demands much more than that. *Village of Hoffman Estates*, 455 U.S. at 499.

25

**1-App-110**

## II.    Plaintiffs satisfy the remaining preliminary-injunction criteria.

Because Plaintiffs are likely to prevail on its constitutional claims, they readily meet the other preliminary injunction criteria. *See, e.g.*, *Hobby Lobby Stores*, 723 F.3d at 1145.

***Irreparable Harm:*** "[I]n the context of constitutional claims," the "likelihood of success on the merits" and "a demonstration of irreparable injury" collapse into a single inquiry. *Free the Nipple v. Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). It is "well-settled law" that violating or threatening a constitutional right is always an irreparable harm. *Id.*; *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). This case proves the point. Without a preliminary injunction, Plaintiffs and their members will be deprived of their First and Fourteenth Amendment rights, a harm for which there is no "[a]dequa[te]" or easily ascertainable "monetary remedy." *Free the Nipple*, 916 F.3d at 806.

***Balance of Harms and Public Interest:*** "When a constitutional right hangs in the balance, … even a temporary loss usually trumps any harm to the defendant." *Id.* (cleaned up). Any interest Colorado has in enforcing its "likely unconstitutional" law therefore "do[es] not outweigh [Plaintiffs'] in having [their] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). And it is "'always in the public interest to prevent the violation of a party's constitutional rights.'" *Free the Nipple*, 916 F.3d at 807. These factors strongly favor a preliminary injunction here.

## III.    The Court should not require an injunction bond.

"[T]rial courts have wide discretion under Rule 65(c) in determining whether to require security" for a preliminary injunction. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (cleaned up); *see* Fed.R.Civ.P.65(c). No bond is needed here because Colorado will not incur any monetary loss as a result of the injunction and because courts often waive the bond requirement when constitutional rights are at stake. *See, e.g.*, *RoDa Drilling Co.*, 552 F.3d at 1215; *NetChoice v. Reyes*, 748 F.

Supp. 3d 1105, 1132 (D. Utah 2024). Waiving the bond requirement is especially appropriate here because Plaintiffs are likely to succeed on the merits of their claims and Colorado will incur no damages from an injunction that simply stops it from violating the Constitution.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and enjoin Defendants from enforcing the "gender expression" and "chosen name" definitions as amended by H.B. 25-1312, *see* Colo. Rev. Stat. §24-34-301(3.5) & (9), the Unwelcome Provision, *see id.* §24-34-601(2)(a), the Unwelcome Statements Provision, *see id.* §24-34-701(1)(c), and any materially similar statutory or regulatory provisions in full and as applied to Plaintiffs and their members.

Dated: June 13, 2025

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

**RULE 7.1(a) STATEMENT**

Pursuant to Local Civil Rule 7.1(a), I hereby certify that on June 12, 2025, I contacted counsel for Defendants by email to notify them of Plaintiffs' intent to file the foregoing motion and to inquire as to Defendants' position. Defendants oppose the motion.

/s/ *J. Michael Connolly*
Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on June 13, 2025, I e-filed the foregoing motion with the Clerk of the Court using the Court's ECF system., which will email everyone requiring notice.

/s/ *J. Michael Connolly*
Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

     *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

     *Defendants*.

Case No. _____

**DECLARATION OF SARAH PERRY**

1.     I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.     I am the Vice President and Legal Fellow of Defending Education ("DE").

3.     DE is a nationwide, grassroots, 501(c)(3) non-profit membership organization whose members include parents, students, and others concerned about the state of education in America. DE's mission is to prevent the politicization of both K-12 and higher education, including government attempts to usurp parents' rights and to silence students who express dissenting views. DE furthers its mission through network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful school policies to DE's members and other parents; advocacy; and, if necessary, litigation.

4.     DE strongly opposes the spread of harmful gender ideology, and DE strives to protect the right of its members to speak freely about these topics. In line with that mission,

1
**1-App-114**

DE regularly litigates on behalf of its members to protect their right to refer to individuals using biologically accurate pronouns and/or birth names, even where those pronouns or names are inconsistent with an individual's self-professed gender identity. *See, e.g.*, *Parents Defending Education v. Olentangy Local Sch. Dist.*, 109 F.4th 453 (6th Cir. 2024), *rehearing en banc granted*, 120 F.4th 536 (6th Cir. 2024). Likewise, DE files amicus briefs encouraging courts to protect the right to speak using biologically accurate pronouns and birth names. *E.g.*, Amicus Brief of Parents Defending Education, *L.M. v. Middleborough*, 103 F.4th 854 (1st Cir. Oct. 2, 2023); Amicus Brief of Parents Defending Education, *L.M. v. Middleborough*, No. 24-410 (U.S. Nov. 12, 2024).

5.      DE also publishes informational resources to educate parents, students, and advocacy groups about the scope of, and threats to, their constitutional speech rights. For example, DE tracks and publicizes school policies that infringe on students' and teachers' free speech rights. *See IndoctriNation Map (Free Speech)*, Defending Education (visited May 18, 2025), bit.ly/4iH5Sts. It also publishes educational resources on topics like the First Amendment to help parents and students navigate school speech restrictions. *See First Amendment*, Defending Education (visited May 18, 2025), bit.ly/42AvROt.

6.      DE's membership includes individuals in Colorado that share DE's opposition to the politicization of America's schools and the spread of harmful gender ideology. Those members include Lori Gimelshteyn, the Executive Director of Colorado Parent Advocacy Network, and Erin Lee, the Executive Director of Protect Kids Colorado.

7.     Many of DE's members, including Ms. Gimelshteyn and Ms. Lee, hold traditional views and opinions on matters of sex and gender identity. In particular, DE's members believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity or gender expression.

8.     DE's members want to exercise their fundamental constitutional right to speak in a manner that reflects those views. In line with their belief that sex is determined at birth and immutable, when DE's members speak to or about individuals, they want to refer to those individuals using biologically accurate pronouns and/or birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

9.     Because of Colorado House Bill 25-1312, however, Defending Education's members are unable to effectively exercise their constitutionally protected right to speak or publish material in a manner that reflects their sincere belief that sex is immutable and fixed at birth. DE brought this suit to protect their constitutional right to speak freely on these issues of vital public concern.

3

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 18, 2025.

_____

Sarah Perry
Vice President and Legal Fellow
Defending Education

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

> *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

> *Defendants.*

Case No. 1:25-cv-01572-RMR

**DECLARATION OF LORI GIMELSHTEYN**

1.    I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.    I am a member of Defending Education.

3.    I am the Executive Director of Colorado Parent Advocacy Network ("CPAN"). In my role as Executive Director, I run the organization on a day-to-day basis and am its lead spokesperson.

4.    CPAN is a statewide, grassroots, 501(c)(4) non-profit, social advocacy organization organized under Colorado law. The organization is based in the State of Colorado. The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children. CPAN is committed to restoring an educational environment in Colorado that is academically rigorous, non-ideological, safe, and transparent. In furtherance of this mission, CPAN advocates for educational excellence, school accountability, and

parental rights, and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives. CPAN furthers this mission through network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and informational resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy; and, if necessary, litigation.

5.    Much of CPAN's programming and advocacy focuses on K-12 education. The organization encourages schools to prioritize educational quality over politics, opposes the teaching of gender ideology, and defends the free speech rights of students, parents, and educators. CPAN regularly offers informational resources and hosts public events about the state of education in Colorado. *E.g.*, *School Safety Summit*, bit.ly/4ddPLCj; *Whose Children Are They?*, bit.ly/3GPKXHm; *Protecting Taxpayers & Prioritizing Academic Achievement In Our Schools*, bit.ly/4mbybTF; *Colorado's National School Choice Week*, bit.ly/3EQR7Xc.

6.    CPAN supports traditional views and opinions on matters of sex and gender identity. In particular, CPAN and I believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. CPAN and its leadership want to exercise our fundamental constitutional right to speak in a manner that reflects those views.

7.    In line with our belief that sex is determined at birth and immutable, when CPAN or its leaders (including me) speak about individuals, we want to refer to those

individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

8.     When CPAN and I use birth names and biologically accurate pronouns, we are not doing so to be malicious or hurtful. We do so because this expression reflects our deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If we were to refer to a biological male as a "she" instead of a "he," we would be lying to ourselves and to others. We would be communicating an idea and belief that we firmly disagree with.

9.     Our use of birth names and biologically accurate pronouns is also critical to CPAN's mission. We vehemently oppose government attempts to promote harmful and false practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and that cannot change based on personal prefer-ence. Being compelled to use an individual's preferred pronouns or names would prevent us from expressing our core beliefs—and, in effect, surrender the debate before it begins.

10.     CPAN hosts meetings, summits, and other events in places of public accom-modation. These events are open to the public, including parents and other interested individuals. CPAN is therefore subject to Colorado laws governing places of public accom-modation. *See, e.g.*, Colo. Rev. Stat §24-34-601 (prohibiting "discrimination in places of public accommodation"); *Creek Red Nation v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1298 (D. Colo. 2016) ("[P]ublic accommodation" includes "organizations that conduct activities in

facilities … that are open to the public."). For example, in April 2024, CPAN leased space in the Inverness Hilton, a hotel in Englewood Colorado, to host a "Summit on Safeguarding Children from Gender-Affirming Care." We hosted a second summit on the same topic at the same hotel in April 2025. Both summits were open to the public and widely advertised. *See* Exs. C, D.

11. CPAN plans to host additional public events in the future and has agreements in place to lease space in places of public accommodation for those events.

12. At its public events, CPAN, its officers (including myself), and other attendees frequently discuss specific individuals, including transgender individuals. When we do so, we have used biologically accurate pronouns and birth names, rather than "preferred pronouns" and "chosen names." For example, we have discussed Representative Brian Titone and how he identifies as a woman and goes by the name "Brianna," and Kevin Smotherman (who ran for the State Senate) and how he identifies as a woman and goes by the name "Vivian." In line with our beliefs about sex and gender, when CPAN, its officers, and attendees discuss specific individuals, we want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. As another example, to highlight the prevalence of gender ideology in American media, we will call out biologically male celebrities who claim to be women, and say things like, "Dylan Mulvaney is a man pretending to be a woman. 'She' is actually a 'he' and does not know the experience of American girls."

13. Transgender-identifying individuals have attended CPAN's public events in the past, and we anticipate that transgender-identifying individuals will attend our events in the future. For example, at our last event, a transgender-identifying individual showed up at our event and told me he had come because he was concerned that we were not going to represent the perspective of the transgender community at our event. I told him that our event was designed to highlight the harms of gender ideology, not to promote the other side's views. At the same event, two different parents each brought one of their children. One child identifies as transgender and the other identifies as nonbinary. We also had protestors outside of our event, many of whom identify as transgender.

14. At those events, when CPAN, its officers, or other attendees have referred to transgender individuals, we have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, we want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

15. CPAN and I also want to publish materials—for example, flyers advertising CPAN events, videos and presentations from the events, social media posts, educational resources for parents, and other materials distributed at our events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, in March 2025, to raise awareness about the danger that "gender-affirming care" poses to children, CPAN

published a post on X about a Colorado teacher who harbored a 17-year-old transgender-identifying child without the parent's consent. Though the child, who goes by "Onyx," identified as a boy, CPAN's post referred to her as "a teen girl." Ex. E.

16.   CPAN and I regularly publish materials that comment on state and local policy proposals, highlight developing news stories in the education and gender space, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of so-called "gender-affirming care." These published materials include petitions supporting or opposing legislation, social media posts, informative videos, documentaries, investigative reports, opinion pieces in widely circulated newspapers and online publications, gender issue guidelines, and other resources. In April 2025, for example, CPAN published an infographic informing Coloradans about the threat to parental rights and free speech posed by Colorado House Bill 25-1312. Ex. A.

17.   Our published materials often refer to specific individuals, including transgender individuals. For example, in March 2024, CPAN published a post on X responding to a video featuring Dylan Mulvaney, a transgender activist. Though Mulvaney identifies as a woman, our tweet referred to Mulvaney using his biological sex: "That is a man ridiculing girls." Ex. B.

18.   In line with our belief that sex is immutable and determined at birth, CPAN and I want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's

preferred pronouns or conflict with an individual's self-professed gender identity or gender expression. CPAN and I also want to refer to individuals in published materials using individuals' birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

19.    However, Colorado's public accommodation laws as amended by Colorado House Bill 25-1312 make it impossible for CPAN and our leadership to effectively exercise our constitutionally protected right to speak in a manner that reflects our sincere belief that sex is immutable and fixed at birth.

20.    H.B. 25-1312 redefines "gender expression," a protected category in Colorado law, to include the use of a "chosen name" or other terms by which an "individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). In other words, it is now considered "discriminatory" and "unlawful" for those operating in a place of public accommodation to refer to transgender-identifying individuals using their birth name or non-preferred pronouns—i.e., to "deadname" or "misgender" them. *Id.* §§24-34-301(3.5), (9), 24-34-601(2)(a). I understand the Colorado Civil Rights Division has also adopted regulations that prohibit "[u]nlawful harassment," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6.

21.    Colorado law also prohibits publishing or distributing statements that make an individual feel "unwelcome" at a place of public accommodation based on a protected characteristic. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c). So, now that H.B. 25-1312 has expanded "gender expression" to include chosen names and other preferred forms of address, it is also

7
**1-App-124**

illegal to publish any statement or send any communication that makes an individual feel un-welcome because that statement or communication deadnames, misgenders, or opposes the use of chosen names, preferred pronouns, or other gender-affirming terms.

22.    H.B. 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines. Violators can be reported to the Colorado Civil Rights Commission. *Id.* §24-304-306(1)(a)(I). The Commission, led by the Director, "investigat[es]" reports and, upon finding a violation, can order violators to "cease and desist" speech that deadnames or misgenders an individual. *Id.* §24-34-306(2)(a), (9). The Commission can also order parties "to take affirmative action," *id.* §24-34-605, including "participation in mandatory educational pro-grams," *303 Creative v. Elenis*, 600 U.S. 570, 581 (2023). The Colorado Attorney General, the Director, and Commissioners can institute investigations on their own, without a report. *Id.* §24-304-306(1)(b).

23.    H.B. 25-1312 also threatens private lawsuits and financial penalties. Those who deadname or misgender can be sued by the "aggrieved" party and, upon a finding of liability, compelled to pay "monetary damages" or a "statutory fine of five thousand dollars … for each violation." Colo. Rev. Stat. §24-34-602(1)(a)(I)-(II) (eff. May 22, 2025).

24.    Because of the public nature of CPAN's and my expression, we are well-known among the transgender activist community in Colorado. We have become a frequent target of harassment and intimidation by individuals and groups who oppose our mission. We have received aggressive and threatening emails and messages from individuals because of my speech. I have received death threats because of my work. After I testified against HB 25-

8

**1-App-125**

1312, an individual spat in my hair. I have been called a "Nazi" and a "white supremacist." I once received a thank-you card from the Satanic Temple, thanking me for "motivating a generous donation" that had been made in my name. Protestors regularly attend our events. I have also been sued in my personal capacity over my work combatting harmful gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn & Erin Lee*, No. 2024SA63 (Col. S. Ct. filed Feb. 28, 2024). Given my past experience, I have no doubt that there are individuals who will want to report CPAN or me or sue us because of our speech.

25.    Because H.B. 25-1312 threatens to punish deadnaming and misgendering, CPAN and its leadership, including myself, must stop referring to individuals using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at our public events and in our published materials. I fear that, if we continue to engage in speech (either orally or through written and electronic means) that refer to individuals using biologically accurate pronouns, birth names, or other terms, we will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties. I also fear that I will be sued personally, *e.g.*, for refusing to "address" an individual using their "chosen name" or other preferred terms. *Id.* §24-34-301(3.5), (9); *see* §24-34-602(1)(a) ("*Any person*" who commits a discriminatory act may be sued (emphasis added)).

26.    H.B. 25-1312's punishments for disfavored speech also mean that we must refrain from "publish[ing]" materials in connection with our public events that refer to

9
**1-App-126**

individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

27.    Because H.B. 25-1312 renders CPAN unable to speak candidly about biological sex or publish materials that contain such speech, our ability to inform parents about dangerous gender ideology in Colorado schools is greatly diminished. Likewise, our ability to organize support for or opposition to political candidates, ballot measures, legislation, school board policies, or other measures is compromised. Because of H.B. 25-1312, CPAN is no longer allowed to use our preferred language at our public events or in our publications. Nor can we discuss specific news stories involving transgender-identifying individuals.

28.    As Executive Director of CPAN, I am in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is my experience that these parents and citizens will be less likely to support CPAN if they believe the organization may face legal penalties, including fines, for so-called discriminatory speech. Also in my experience, venues will be less willing to host our public events if CPAN is branded a "discriminatory" organization.

29.    CPAN and I do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. We want to continue to speak, publish materials, and host events consistent with our belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet we are unable to effectively exercise our speech rights because of H.B. 25-1312's prohibitions and penalties.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 12, 2025.

_Lori A. Gimelshteyn_

Lori Gimelshteyn
Executive Director
Colorado Parent Advocacy Network

# Exhibit A

## STOP HB25-1312

**🚨 Parents' Rights Under Attack! 🚨**
**Colorado's HB25-1312 isn't about protecting kids—it's about stripping parents of their rights and forcing RADICAL policies into your home.**

✕ **Courts would punish parents for standing by biological reality.**
✕ **Schools would be required to push gender ideology, overriding parents entirely.**
✕ **Parents who oppose gender medicalization would lose custody battles.**

**Parenting the nation's children isn't in the Constitution, but the right to life without government interference is! (14th Amendment)**

**FIGHT BACK BEFORE IT'S TOO LATE!**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**



**To the DEMOCRAT sponsors of this bill— Representatives Lorena Garcia and Rebekah Stewart, Senators Faith Winter and Chris Kolker —we have to ask:**

- **Have you read the Constitution you swore to uphold?**
- **Do you understand that compelled speech— forcing someone to use language that violates their conscience—is a First Amendment violation?**
- **Do you really believe a parent should lose custody of their child for refusing to use a pronoun?**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**



- **Do you trust these people to tell your child who they can love?**
- **Do you trust these people to make a law about your child's genitals?**
- **Do you trust these people to defend YOUR parental rights?**

 Rep. Stewart

 Sen. Winter

Sen. Kolker

 Rep. Garcia

**That's what Rep. Lorena Garcia, Sen. Chris Kolker, Rep. Rebekah Stewart, and Sen. Faith Winter are doing on HB25-1312**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**



**To the majority of this committee—the SEVEN DEMOCRATS who will determine the outcome of this bill—we ask you to look inward:**
- **Would you want your own parental judgment overridden by the state?**
- **If your child were confused, would you want a judge making life-altering decisions based on feelings?**
- **Are you prepared to defend this vote to the families you serve, knowing it would give the law power take your own children from you?**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**

13

**1-App-130**



**This bill guts parental rights, chills speech, exposes our state to constitutional lawsuits, and costs taxpayers $14.1 million in a single year—including:**

- **$3.3 million to overhaul Medicaid systems,**
- **$2.6 million to revise unemployment and workforce systems,**
- **$7.2 million risk to our DMV upgrade due to compliance issues with DRIVES.**

**MILLIONS OF TAXPAYER DOLLARS, GONE.**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**



**Here's what you can do...**

- **Join CPAN to stay updated on HB25-1312**
- **Attend Rocky Mountain Summit on Safeguarding Children from Gender Affirming Treatment to learn from experts how to truly protect the most vulnerable.**

**STAND FOR THE INNOCENT!**

**JOIN THE MOVEMENT ! www.ColoradoParents.org**

14

**1-App-131**

# Exhibit B

 **Jaimee Michell** ✔ @thegaywhostrayd · Mar 13, 2024    ⊘ ···
Dylan Mulvaney just released a music video on how to... you guessed it... be a girl. The level of rage this makes me feel is off the Richter.

I had to suffer and see it, so now you do too.



3:07

💬 53          🔁 21          ♡ 101          �archive 33K          🔖  ⬆️

 **Colorado Parent Advocacy Network** ✔    ⊘ ···
@CPANColorado

That is a man ridiculing girls. Sick on so many levels.

10:52 PM · Mar 13, 2024 · **146** Views

💬          🔁          ♡ 2          🔖          ⬆️

# Exhibit C



# Exhibit D

















# Exhibit E

**Colorado Parent Advocacy Network** ✔
@CPANColorado

🚨**You need to see this!**

A teacher in Colorado made this Facebook post while harboring a 17-year-old girl without parental consent—raising money to pay a lawyer, calling the teen girl a "young transman," and planning to change her name and gender marker.

**THEN LISTEN TO THE RECORDED CALL!** The teen's mother, Cindy, shows up to bring her daughter home.
JoAnn Smotherman, the teacher, replies:
👉 "I'm going to call "Onyx's" attorney."



2:31 PM · Mar 28, 2025 · **33.2K** Views

💬 29          ⟲ 247          ♡ 375          🔖 56          ↥

💬 Read 29 replies

**1-App-139**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

　　　　　　*Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

　　　　　　*Defendants.*

Case No. 1:25-cv-01572-RMR

**DECLARATION OF ERIN LEE**

1.　　I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.　　I am a member of Defending Education.

3.　　I am the Executive Director of Protect Kids Colorado ("PKC"). In my role as Executive Director, I run the organization on a day-to-day basis and am its lead spokesperson.

4.　　PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado. The organization aims to restore the principle that parents have a fundamental right to make decisions about their children's well-being and education. It hopes to raise awareness about the prevalence of false gender ideologies and the dangers of so-called gender-affirming treatments. PKC furthers this mission through coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies; educational campaigns; and, if necessary, litigation.

5. Much of PKC's programming focuses on K-12 education and school transparency. The organization raises awareness about the prevalence of controversial gender ideology in Colorado's public schools, warns parents of the need to closely monitor their children's education, and hosts public events on those same topics. *E.g.*, Emily Washburn, *'Art Club' Documentary — One Family's Escape from Gender Ideology, and the Bigger Trend Sweeping the Nation*, The Daily Citizen (Feb. 6, 2024), perma.cc/RZ94-YRPY.

6. PKC supports traditional views and opinions on matters of sex and gender identity. In particular, PKC and I believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. PKC and its leadership want to exercise our fundamental constitutional right to speak in a manner that reflects those views.

7. In line with our belief that sex is determined at birth and immutable, when PKC or its leaders (including me) speak about individuals, we want to refer to those individuals using biologically accurate pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

8. When PKC and I use birth names and biologically accurate pronouns, we are not doing so to be malicious or hurtful. We do so because this expression reflects our deeply held beliefs that sex is fixed in each person from the moment of conception and cannot be changed. If we were to refer to a biological male as a "she" instead of a "he," we would be lying to ourselves and to others. We would be communicating an idea and belief that we firmly disagree with.

9.      Our use of birth names and biologically accurate pronouns is also critical to PKC's mission. We vehemently oppose government attempts to promote harmful and false practices concerning gender identity, such as allowing biological males to compete in women's sports. Using birth names and biological pronouns sends a powerful message and reminder that a person was born a male or a female and cannot change their sex based on personal preference. If we were forced to identify an individual by his or her "preferred" pronoun and names, then we have already lost the debate.

10.     PKC hosts meetings and other events in places of public accommodation. These meetings are open to parents and other interested members of the public. PKC is therefore subject to Colorado laws governing places of public accommodation. *See, e.g.*, Colo. Rev. Stat §24-34-601 (prohibiting "discrimination in places of public accommodation"); *Creek Red Nation v. Jeffco Midget Football Ass'n*, 175 F. Supp. 3d 1290, 1298 (D. Colo. 2016) ("[P]ublic accommodation" includes "organizations that conduct activities in facilities … that are open to the public."). For example, in July and August 2024, PKC leased space in Denver-area restaurants to host signature-gathering events in support of its ballot initiatives. PKC publicized these events on social media. *See, e.g.*, Exs. C, D.

11.     PKC plans to host additional public events in the future and is actively seeking to lease space in places of public accommodation for those events.

12.     At its public events, PKC, its officers (including myself), and other attendees frequently discuss specific individuals, including transgender individuals. When we do so, we have used biologically accurate pronouns and birth names, rather than "preferred pronouns"

3

and "chosen names." In line with our beliefs about sex and gender, when PKC and its officers discuss specific individuals, we want to refer to those individuals using their birth names and biologically accurate pronouns, rather than their chosen names, preferred pronouns, or other terms that correspond with their self-professed gender identity or gender expression. For example, a powerful way to oppose allowing biological males to compete in women's sports is to speak the truth that the person was born a male. We often say things like, "That swim meet was deeply unfair. It was won by a biological male who was born William Thomas but now calls himself Lia Thomas. He should not have been allowed to compete in an event for female athletes."

13.   Transgender-identifying individuals have attended PKC's public events in the past, and we anticipate that transgender-identifying individuals will attend our events in the future. For example, a few weeks ago, we sponsored an event at a recreation center that was open to the public. An individual who I know to identify as transgender came to the event.

14.   At those events, when PKC, its officers, or other attendees have referred to transgender individuals, we have used biological pronouns and other biologically accurate terms, regardless of whether those pronouns or terms conform to the individuals' preferred forms of address, gender identity, or gender expression. In the future, we want to continue discussing and referring to transgender-identifying attendees using biologically accurate terms and birth names.

15.   PKC and I also want to publish materials—for example, flyers advertising PKC events, videos of our events, educational resources for parents, social media posts, and other

4

materials distributed at our events—that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression. For example, PKC has in the past opposed the positions of Colorado State Representative "Brianna Titone." Titone identifies as a woman and goes by the name "Brianna." But in my capacity as Executive Director of PKC, I refer to him using his biological sex and his birth name, Brian Titone. *See, e.g.*, Ex. E. We want to be able to publish materials that say things like, "Tell Brian Titone to stop his attacks on Colorado families."

16.     PKC and I regularly publish materials that comment on state and local policy proposals, highlight developing news stories involving gender ideology and children, advise parents on how to navigate the Colorado school system, and inform parents and other Coloradans about the prevalence of gender ideology in Colorado schools and the danger of so-called "gender-affirming care." These published materials include petitions, social media posts, informative videos, gender issue guidelines, opinion pieces in widely circulated newspapers and online publications, and other resources. For example, in April 2025, PKC published a guide on reasons to oppose Colorado House Bill 25-1312, emphasizing the threat to free speech posed by the bill's chosen name provisions. Ex. A.

17.     Our published materials often refer to specific individuals, including transgender individuals. For example, in March 2025, PKC posted a video on Instagram of a transgender-identifying student athlete in Oregon. Although the athlete identifies as a girl and

uses the chosen name "Ada," PKC's video referred to him with his birth name, "Aayden," and identified him as a "male" and not a "girl." Ex. B.

18.    In line with our belief that sex is immutable and determined at birth, PKC and I want to publish materials that refer to individuals using biologically accurate pronouns and other gendered terms, even if those biologically accurate pronouns differ from an individual's preferred pronouns or conflict with an individual's self-professed gender identity or gender expression. PKC and I also want to refer to individuals in published materials using individuals' birth names rather than names chosen by individuals to match their self-professed gender identity or gender expression.

19.    However, Colorado's public accommodation laws as amended by Colorado House Bill 25-1312 make it impossible for PKC, our leadership, and our volunteers to effectively exercise our constitutionally protected right to speak in a manner that reflects our sincere belief that sex is immutable and fixed at birth.

20.    H.B. 25-1312 redefines "gender expression," a protected category in Colorado law, to include the use of a "chosen name" or other terms by which an "individual chooses to be addressed." Colo. Rev. Stat. §24-34-301(9). In other words, it is now considered "discriminatory" and "unlawful" for those operating in a place of public accommodation to refer to transgender-identifying individuals using their birth name or non-preferred pronouns—i.e., to "deadname" or "misgender" them. *Id.* §§24-34-301(3.5), (9), 24-34-601(2)(a). I understand the Colorado Civil Rights Division has also adopted regulations that prohibit "[u]nlawful

harassment," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6.

21.    Colorado law also prohibits publishing or distributing statements that make an individual feel "unwelcome" at a place of public accommodation based on a protected characteristic. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c). So, now that H.B. 25-1312 has expanded "gender expression" to include chosen names and other preferred forms of address, it is also illegal to publish any statement or send any communication that makes an individual feel unwelcome because that statement or communication deadnames, misgenders, or opposes the use of chosen names, preferred pronouns, or other gender-affirming terms.

22.    H.B. 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines. Violators can be reported to the Colorado Civil Rights Commission. *Id.* §24-304-306(1)(a)(I). The Commission, led by the Director, "investigat[es]" reports and, upon finding a violation, can order violators to "cease and desist" speech that deadnames or misgenders an individual. *Id.* §24-34-306(2)(a), (9). The Commission can also order parties "to take affirmative action," *id.* §24-34-605, including "participation in mandatory educational programs," *303 Creative v. Elenis*, 600 U.S. 570, 581 (2023). The Colorado Attorney General, the Director, and Commissioners can institute investigations on their own, without a report. *Id.* §24-304-306(1)(b).

23.    H.B. 25-1312 also threatens private lawsuits and financial penalties. Those who deadname or misgender can be sued by the "aggrieved" party and, upon a finding of liability,

compelled to pay "monetary damages" or a "statutory fine of five thousand dollars … for each violation." Colo. Rev. Stat. §24-34-602(1)(a)(I)-(II) (eff. May 22, 2025).

24.     Because of the public nature of PKC's and my expression, we are well-known among the transgender activist community in Colorado. We have received aggressive and threatening emails and messages from individuals because of my speech. I have received death threats because of my activities (as recently as about six weeks ago), and I have reported these threats to the FBI and to the sheriff's office. I have been called a "bigot" a "Nazi," a "transphobe," an "anti-trans zealot," a "terrorist," a "murderer," a "child abuser," and a "Christian nationalist." I have also been sued in my personal capacity over my work combatting harmful gender ideology. *See Mary Elizabeth Childs v. Lori Gimelshteyn & Erin Lee*, No. 2024SA63 (Col. S. Ct. filed Feb. 28, 2024). Given my past experience, I have no doubt that there are individuals who will want to report me and PKC or sue us because of our speech.

25.     Because H.B. 25-1312 threatens to punish deadnaming and misgendering, PKC and its leadership, including myself, must stop referring to individuals using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression" at our public events and in our published materials. I fear that, if we engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, we will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties. I also fear that I will be sued personally for refusing to "address" an

8
**1-App-147**

individual using their "chosen name" or other preferred terms. *Id.* §24-34-301(3.5), (9); *see* §24-34-602(1)(a) ("*Any person*" who commits a discriminatory act may be sued (emphasis added)).

26.    H.B. 25-1312's punishments for disfavored speech also mean that we must refrain from "publish[ing]" materials in connection with our public events that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

27.    Because H.B. 25-1312 renders PKC unable to speak candidly about biological sex or publish materials that contain such speech, our ability to inform parents about dangerous gender ideology in Colorado schools is greatly diminished. Likewise, our ability to organize support for or opposition to political candidates, ballot measures, legislation, school board policies, or other measures is compromised. Because of H.B. 25-1312, PKC is no longer allowed to use our preferred language at our public events or in our publications. Nor can we oppose specific political figures with our preferred language, such as Representative Titone, as explained above.

28.    As Executive Director of PKC, I am in constant communication with parents and other Colorado citizens concerned about the spread of gender ideology and the state of Colorado schools. It is my experience that these parents and citizens will be less likely to share information with PKC, volunteer with PKC, or otherwise support our mission if they believe the organization or its supporters may face legal penalties, including fines, for so-called discriminatory speech. Also in my experience, venues will be less willing to host our public events if PKC is branded a "discriminatory" organization.

29.    PKC and I do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. We want to continue to speak, publish materials, and host events consistent with our belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet we are unable to effectively exercise our speech rights because of H.B. 25-1312's prohibitions and penalties.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge.


Executed on June 12, 2025.

_____
Erin Lee
Executive Director
Protect Kids Colorado

# Exhibit A



# 10 REASONS TO OPPOSE CO HB-1312

## *An unconstitutional attack on parental rights, free speech and truth.

### 1. Parental Rights Under Attack
Colorado's new bill says parents must support their child's wish to change gender—or be labeled abusive. That's not protection; it's an assault on our right to raise our kids.

### 2. Forced Complicity in Harm
No parent should be forced to go along with something they see as harmful. 'Gender-affirming care' means irreversible drugs and surgeries for kids—decisions they're too young to fully understand.

### 3. "Gender-Affirming Care" Is Abuse
Call it what it is: experimental treatments that can sterilize kids or alter their bodies forever. I believe that's abuse, not care, and parents shouldn't be punished for saying no or exercising caution.

### 4. Custody at Risk
Refuse to affirm your child's gender transition? This bill lets courts use that against you in custody battles. It's a weapon to silence parents who want to protect their kids. Applied in custody situations, CPS investigations, and opens the door for courts to take anyone's child away.

### 5. Kids Deserve Time, Not Rushed Decisions
Most kids with gender confusion grow out of it naturally if given time. Why force permanent choices on them—and punish parents who want to wait and explore options?

### 6. State Overreach
This isn't about safety; it's about control. If the state can dictate how I respond to my child's identity, what's next? Parents know their kids better than any lawmaker.

### 7. Ideology Over Evidence
This bill pushes an ideology that says affirmation is the only answer. It ignores science and ties parents' hands, forcing us to comply or lose everything.

### 8. Free Speech
This bill is an attack on ALL Coloradans' free speech rights, targeting any place of public accommodation (meaning anywhere the public can go – Churches, private schools, cake bakeries.)

### 9. Charter School Attack
Charter schools dress code is explicitly targeted in this bill. It opens the door for the state to weaponize OCR complaints against schools that don't fall in line with gender ideology, threatening their charters and very existence.

### 10. Thought Crime
This bill defines even *threatening* to misgender someone as discrimination, effectively creating punishment for thought crimes. It also goes after the press's ability to report biological and fundamental truth.

## What can you do???
**Call your senators. Send them all emails. Sign the CPAN petition.
Prepare to show up to testify! Pastor rally Thursday 4/17 @ 2:30!**

**1-App-152**

# Exhibit B



# Exhibit C

**ProtectKidsColorado**
@ProtectKidsCO



🚨 Tonight in Golden!! Last minute signing opportunity @ In the Zone!



12:05 PM · Jul 30, 2024 · **3,782** Views

# Exhibit D



**ProtectKidsColorado**
@ProtectKidsCO

‼️ 🚩 Last chance to sign petitions is Thursday night at Wide Open Saloon in Sedalia 4–6pm!! Other times: Berthoud New Freedom Cafe W/Th 7-2, COS Briargate Church W/Th 8:30-4, Bow Mar King Soopers Wed 2:30-6pm 9820 S Belleview, Littleton King Soopers 2-5pm 8126 S Wadsworth



10:37 AM · Jul 31, 2024 · **2,896** Views

💬 7        🔁 9        ♡ 14        🔖 2        ↑

# Exhibit E

← **Post**

 **Erin for Parental Rights** ✅    ⊘  ⋯
@Erin4Parents

Mentally ill man who pretends to be a woman, Brian Titone, tells us why *WE* will now have to pay for his breast implants and facelift — as well as untraceable wrong–sex hormone injections for children.

Within the hour, this bill will pass 2nd reading.

leg.colorado.gov/bills/hb25-1309



2:35 PM · Apr 4, 2025 · **19.8K** Views

💬 137        ⟲ 333        ♡ 741        🔖 66        ⬆️

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION, *et al.*,

     *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

     *Defendants.*

Case No. 1:25-cv-01572-RMR

## DECLARATION OF KRISTINA RASMUSSEN

1.     I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.     I am the Executive Director of Do No Harm ("DNH").

3.     DNH is a nationwide, grassroots, 501(c)(3) non-profit organization whose members include healthcare professionals, students, patients, and policymakers. DNH's mission is to ensure that medicine is driven by scientific evidence rather than politics. To that end, DNH seeks to highlight and counteract divisive trends in medicine, such as "Diversity, Equity, and Inclusion" practices and youth-focused gender ideology. DNH opposes the use of chosen names, preferred pronouns, and so-called gender-affirming medical treatments. DNH furthers its mission through network- and coalition-building; educational resources to raise awareness about divisive trends in the medical field; engagement on local, state, and national policies; advocacy; and, if necessary, litigation.

1

**1-App-161**

4.      DNH strongly opposes gender ideology and so-called gender affirming care, and DNH strives to protect the right of those in the medical professional to speak freely on those topics. In line with that mission, DNH regularly litigates on behalf of its members to protect their speech rights. *See, e.g., Khatibi v. Hawkins*, No. 2:23-cv-06195 (Dec. 22, 2023). DNH also files amicus briefs opposing the spread of harmful gender ideology. *See, e.g.*, Amicus Brief of Do No Harm, *Nat'l Urban League v. Donald Trump*, No. 1:25-cv-00471 (Mar. 13, 2025), ECF No. 40.

5.      DNH also publishes educational resources to inform medical professionals, parents, and others about the harm caused by gender ideology and gender-affirming care. *E.g., Hormonal Interventions for Minors with Gender Dysphoria Cause Significant Harm*, Do No Harm (archived May 14, 2025), perma.cc/6AWU-TE6Q; *Parent Resource: Protect Children from Gender Ideology* (Aug. 25, 2023), perma.cc/J6NF-5F3F; *Research – Gender Ideology* (visited May 14, 2025), bit.ly/42VOb4I. DNH also produces content warning its members about the threat that gender ideology poses to their speech rights. *E.g., Examining Gender Ideology and Free Speech with Simon Amaya Price* (archived May 14, 2025), perma.cc/9S5M-6CTE.

6.      DNH's membership includes individuals in Colorado that share DNH's opposition to the politicization of the medical profession and the spread of harmful gender ideology. Those members include Dr. Travis Morrell, a physician who practices in Grand Junction, CO; Dr. Valeri Leswing, a physician who practices in Evergreen, CO; and Mountain Pediatrics, Dr. Leswing's medical practice.

7. Many of DNH's members, including Dr. Morrell and Dr. Leswing, hold traditional views and opinions on matters of sex and gender identity. In particular, DNH's members believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity or gender expression.

8. DNH's members want to exercise their fundamental constitutional right to speak in a manner that reflects those views. In line with their belief that sex is determined at birth and immutable, when DNH's members speak to or about individuals, they want to refer to those individuals using biologically accurate pronouns and/or birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

9. However, because of Colorado law as amended by House Bill 25-1312, DNH's members are unable to effectively exercise their constitutionally protected right to speak or publish material in a manner that reflects their sincere belief that sex is immutable and fixed at birth. DNH brought this suit to protect their constitutional right to speak freely on these issues of vital public concern.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 12, 2025.

_____
Kristina Rasmussen
Executive Director
Do No Harm

4

**1-App-164**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION, *et al.*,

    *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

    *Defendants.*

Case No. 1:25-cv-01572-RMR

### DECLARATION OF DR. TRAVIS MORRELL

1.　I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.　I am a member of Do No Harm.

3.　I am a licensed physician and a double board-certified dermatologist and dermatopathologist. I also obtained a Master of Public Health degree. My medical practice focuses on the diagnosis and treatment of serious skin conditions, including melanoma, carcinoma, autoimmune disease, and cutaneous effects of systemic disorders. Previously, I practiced in the areas of obstetrics & gynecology, family medicine, and preventive medicine. I received my medical degree from the Loma Linda University School of Medicine.

4.　I currently work in a shared medical practice: Mountain West Dermatology PC. *See Meet Dr. Morrell*, Mountain West Dermatology (archived June 11, 2025), perma.cc/F7E8-UJJN. My practice is located in Grand Junction, Colorado. I treat many individuals in my

1

**1-App-165**

practice, and my practice is subject to Colorado's laws governing places of public accommodation. *See, e.g.*, Colo. Rev. Stat. §24-34-601(1) ("place of public accommodation" includes "any place offering services … to the public" and any "establishment conducted to serve the health, appearance, or physical condition of a person").

5.    I hold scientific, objective, and reproducible views on matters of sex and gender identity. In particular, I believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. I want to exercise my fundamental constitutional right to speak in a manner that reflects those views.

6.    I have treated transgender-identifying, gender-dysphoric, and gender-questioning patients in my medical practice in the past, and I anticipate treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future. When I have addressed these patients or discussed these patients with my colleagues, I have used biologically accurate pronouns and birth names. I do not address or refer to patients using "chosen names" connected to their "gender expression" or preferred pronouns that conflict with the patient's biological sex. In a patient's records, I refer to all patients using biologically accurate terms.

7.    Addressing and referring to patients using accurate terms is important to my work as a physician. Determining the proper course of treatment or advising patients on their treatment's risks, for example, might depend on a patient's biological sex, so it is important that I am able to clearly communicate (both to patients and to other medical professionals) whether a patient is male or female.

2

**1-App-166**

8.      In addition, as a medical doctor, I am trained to treat patients holistically. I have difficult discussions with patients about psychiatric disorders, habits and behaviors that may impact them both dermatologically and overall, such as alcohol abuse, smoking, anxiety, body dysmorphia, self-harm, and, relevant here, gender dysphoria. In these cases, it is vital that I be able to address the root cause. The medical treatment of gender dysphoria with cross-sex hormones and surgery may impact many aspects of the patient's health, even in areas that might appear unrelated. Surgical procedures, particularly in areas involved with sex-reassignment, may cause extensive scarring. Cross-sex hormones affect the entire body, including the skin, where testosterone can cause severe cystic acne in some cases. It is of tremendous importance that I am permitted to provide accurate information regarding the risks associated with these interventions. Affirmation of the patient's subjective experience under these circumstances is potentially deleterious to their health which should, at all times, be the primary concern.

9.      I also believe that affirming an individual's non-biological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria. "Social transition," involving "chosen names" and "pronouns," has been found to contribute to increased medicalization and its harmful effects. Therefore, as a medical professional with an obligation not to harm my patients, I believe it would be wrong to address a male patient using feminine pronouns or his "chosen name" or address a woman using masculine pronouns or her "chosen name." If I were to do so, I would be affirming a lie and harming my patients.

3

10. In line with my beliefs, when transgender patients are in my office, I do not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to them. When I discuss patients with other medical professionals or employees in my office (such as other doctors, schedulers, or medical assistants), I want to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, I might say, "Can you please perform a urine pregnancy test for Sarah"; "Let's send his penile biopsy specimen to the lab"; or "What were the results of her pregnancy test?" My patients will inevitably hear these statements—both because I will make them in front of the patient and because my workspace is immediately outside my patient rooms so that sound carries throughout the space.

11. Moreover, because I believe that gender ideology is so harmful, I want to be able to address individuals (both orally and in written communications) directly by their birth name and not a "chosen name." Calling a biological male by a female's name (or vice versa) would further indulge the person's delusions that he or she can change or has changed his or her gender.

12. When I write comments about my patients in medical records, I want to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, I might say, "Her rash is most consistent with subacute cutaneous lupus erythematosus," or "Jennifer has been taking oral contraceptives for over one month." These

medical notes would be available to the patient on their online portal. Patients can also receive a printed copy of these notes by asking the front desk.

13.     I also want to publish materials that refer to individuals using biological pronouns and birth names, even if those pronouns or names conflict with an individual's self-professed gender identity or gender expression.

14.     I regularly speak and write on the issues of sex and gender as they relate to the medical profession. In those speaking engagements and publications, I oppose gender ideology (including the use of chosen names and preferred pronouns) and raise awareness about the dangers of gender-affirming care. *E.g.*, Travis Morrell, *Medical Schools Have Embraced Radicalism*, Washington Examiner (Sept. 26, 2024), perma.cc/79SM-SKVS; *Rocky Mountain Summit on Safeguarding Children from Gender-Affirming Care*, CPAN (archived May 12, 2025), perma.cc/WQM6-PQXN. I am also the founder and chair of Colorado Principled Physicians, a group dedicated to protecting free speech in the medical profession and opposing gender-affirming care.

15.     My speaking engagements are held in places of public accommodation, including hotel event spaces and restaurants. Transgender individuals have attended my events, and I anticipate that they will attend them in the future. At my speaking events, I have referred to transgender individuals by their biological pronouns (instead of their "preferred pronouns") and their birth names (instead of their "chosen names"). I want to continue to speak in this manner in the future. Speaking the truth is critical to my work.

16.     I am also active on social media, where—consistent with my belief that sex is immutable—I regularly publish content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than pre-ferred pronouns or chosen names. For example, I have opposed the policies of Colorado State Representative "Brianne Titone." Titone identifies as a woman and goes by the name "Bri-anne," but my social media posts refer to Titone using his accurate sex and his birth name, Brian. *See, e.g.*, Exs. A, B. I want to continue to publish materials that say things like, "Oppose Brian Titone because his policies hurt Colorado's children," or "Even though Brian's post says he can 'get some clear liquid to seep out of the nips,' that is not breastmilk and he cannot breastfeed."

17.     I do not use birth names or biologically accurate pronouns to be mean or hurt-ful. I do so because that speech reflects my belief that sex is fixed in each person from the moment of conception and cannot be changed, and because I believe that affirming a patient's non-biological gender identity or gender expression would harm rather than help the patient.

18.     However, Colorado's public accommodation laws as amended by Colorado House Bill 25-1312 makes it impossible for me to effectively exercise my constitutionally pro-tected right to speak in a manner that reflects my beliefs.

19.     H.B. 25-1312 redefines "gender expression," a protected category in Colorado law, to include the use of a "chosen name" or other terms by which an "individual chooses to be addressed" in connection with the person's "gender expression." Colo. Rev. Stat. §24-34-301(9). In other words, it is now considered "discriminatory" and "unlawful" for those

6

**1-App-170**

operating in a place of public accommodation to refer to transgender-identifying individuals using their birth name or non-preferred pronouns—i.e., to "deadname" or "misgender" them. *Id.* §§24-34-301(3.5), (9), 24-34-601(2)(a). I understand the Colorado Civil Rights Division has also adopted regulations that prohibit "[u]nlawful harassment," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6.

20.     Colorado law also prohibits publishing or distributing statements that make an individual feel "unwelcome" at a place of public accommodation based on a protected characteristic. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c). So, now that H.B. 25-1312 has expanded "gender expression" to include chosen names and other preferred forms of address, it is also illegal to publish any statement or send any communication that makes an individual feel unwelcome because that statement or communication deadnames, misgenders, or opposes the use of chosen names, preferred pronouns, or other gender-affirming terms.

21.     H.B. 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines. Violators can be reported to the Colorado Civil Rights Commission. *Id.* §24-304-306(1)(a)(I). The Commission, led by the Director, "investigat[es]" reports and, upon finding a violation, can order violators to "cease and desist" speech that deadnames or misgenders an individual. *Id.* §24-34-306(2)(a), (9). The Commission can also order parties "to take affirmative action," *id.* §24-34-605, including "participation in mandatory educational programs," *303 Creative v. Elenis*, 600 U.S. 570, 581 (2023). The Colorado Attorney General, the

7

**1-App-171**

Director, and Commissioners can institute investigations on their own, without a report. *Id.*

§24-304-306(1)(b).

22.    H.B. 25-1312 also threatens private lawsuits and financial penalties. Those who

deadname or misgender can be sued by the "aggrieved" party and, upon a finding of liability,

compelled to pay "monetary damages" or a "statutory fine of five thousand dollars … for each

violation." Colo. Rev. Stat. §24-34-602(1)(a)(I)-(II) (eff. May 22, 2025).

23.    Because of the public nature of my expression, I am known among the

transgender activist community in Colorado. I regularly receive direct messages, reply posts,

and emails challenging or disagreeing with the views that I have expressed. Sometimes the

speech is respectful. Often it is not. I have received aggressive and threatening messages from

individuals because of my speech. At my last public speaking event in April, about 40-60 peo-

ple protested our event. After the protest was announced, the conference center required us

to hire two armed deputies for the event. I have been called a "Nazi" and had my speech

interrupted. Activists recently organized a successful campaign to pressure the Accreditation

Council for Continuing Medical Education (ACCME) to cancel the Continuing Medical Edu-

cation (CME) credit that was to be made available for one of my speeches. Last year, a number

of people whom I have never treated "review bombed" me on Google Reviews by posting

fake reviews and giving me one star. One individual posted that I was "Not a safe physician

for lgbt patients." Ex. C. Given my extensive history of harassment, I have no doubt that there

are individuals who will want to report me or sue me because of my speech.

24.     Because H.B. 25-1312 threatens to punish deadnaming and misgendering, I must stop addressing or referring to individuals in my medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported "gender identity" or "gender expression." I fear that, if I continue to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, I will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties.

25.     I also fear that my medical practice will be investigated by the Civil Rights Division, sued by individuals, and face financial or equitable penalties if I engage in speech that refers to individuals using biologically accurate pronouns, birth names, or other non-gender-affirming terms. Because I am a co-owner of the practice, I am injured by any financial or equitable penalties imposed on the practice. And I do not want my practice or my colleagues to face financial or reputational harm if the State brands the practice a "discriminatory" business on account of my speech. I fear that, if my practice or colleagues face the threat of investigation or punishment because of my speech, they will refuse to refer patients to me, terminate my ownership, and otherwise compel me to disassociate from the practice.

26.     H.B. 25-1312's punishments for disfavored speech also mean that I must refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

27.      Because H.B. 25-1312 renders me unable to speak candidly about biological sex in my practice or publish materials and communications that contain such speech, my ability to treat patients is compromised. Likewise, my ability to give speeches and publish content promoting my view that sex is immutable, and that medical professionals should address patients using accurate terms, is greatly diminished. As is my ability to oppose legislation and politicians who promote harmful gender ideology. Because of H.B. 25-1312, I am no longer allowed to use my preferred language in my practice or my publications.

28.      I do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. I want to continue to speak, publish materials, send communications, and treat patients consistent with my belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet I am unable to effectively exercise my speech rights because of Colorado law.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 12, 2025.

_____
Travis Morrell, M.D., M.P.H.

11

**1-App-175**

# Exhibit A



**Travis Morrell, MD MPH** ✔
@MorrellMDmph

"Brian Titone is weaponizing government to steal our money so he can pay for his lavish TRA lifestyle." 😂 😂 also 🧐

5:19 PM · May 2, 2025 · **15** Views

# Exhibit B



**Travis Morrell, MD MPH** ✓
@MorrellMDmph

Wow, Rep Titone was literally saying "this is the right thing to do..." and his own party just ended the speech before it happened.



**Val L** ✓ @SuperOfMyHome · May 7

Cluckers and duffers literally adjourned the day while Tit One was pleading an amendment. Guess they're done with their token trans.

AMENDMENTS TO THE COMMITTEE OF THE WHOLE
THE COLORADO STATE HOUSE OF REPRESENTATIVES     May 6, 2025

THE COLORADO CHANNEL

0:16

**Colorado House 2025 Legislative Day 119 Part 2**

9:38 AM · May 7, 2025 · **132** Views

💬        ⟲        ♡ 4        🔖 1        ↑

15
**1-App-179**

# Exhibit C



Hunter Tolison
Local Guide · 8 reviews · 12 photos

★★★★★  11 months ago

Not a safe physician for lgbt patients

👍 1        ≪ Share

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

      *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

      *Defendants.*

Case No. 1:25-cv-01572-RMR

**DECLARATION OF DR. VALERI LESWING**

1.      I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.      I am a member of Do No Harm.

3.      I am a licensed physician in the State of Colorado and a practicing pediatrician. My medical practice focuses on providing complete pediatric care for children and young adults from newborns to college students, including comprehensive well care, physicals, and visits for illness or injury. I treat patients up to 25 years old. Previously, I practiced pediatric emergency medicine and completed Fellowship Training in Pediatric Emergency Medicine at Dallas Children's Hospital. I am an expert in pre-hospital medical care for children and was a Fellow of the American Academy of Pediatrics for over a decade. I received my medical degree from Nova Southeastern University's College of Osteopathic Medicine.

1

**1-App-182**

4.      I currently operate my own medical practice: Mountain Pediatrics. *See Our Staff*, Mountain Pediatrics (archived June 6, 2025), perma.cc/EFK6-LEDL. I am the practice's sole owner and physician. My practice is located in Evergreen, CO. I treat many individuals in my practice, and my practice is subject to Colorado's laws governing places of public accommodation. *See* Colo. Rev. Stat. §24-34-601(1) ("place of public accommodation" includes "any place offering services … to the public" and any "establishment conducted to serve the health, appearance, or physical condition of a person").

5.      My practice, Mountain Pediatrics, is a member of Do No Harm.

6.      I hold scientific, objective, and reproducible views on matters of sex and gender identity. In particular, I believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity. I want to exercise my fundamental constitutional right to speak in a manner that reflects those views to best serve the medical needs of all my patients.

7.      I have treated transgender-identifying, gender-dysphoric, and gender-questioning patients in my medical practice in the past, and I anticipate treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future. When I have addressed these patients or discussed these patients with my colleagues, I have used biologically accurate pronouns and birth names. I do not address or refer to patients using "chosen names" connected to their "gender expression" or preferred pronouns that conflict with the patient's biological sex. In a patient's records, I refer to all patients using biologically accurate terms.

2

**1-App-183**

8. Addressing and referring to patients using accurate terms is important to my work as a physician. Diagnosing conditions, determining the proper course of treatment, or advising patients on a treatment's risks might depend on a patient's biological sex, so it is important that I am able to clearly communicate (to patients, to their parents, and to other medical professionals) whether a patient is male or female. A biologically female child, for example, is significantly more prone to urinary tract infections than a biologically male child. A biological boy can suffer testicular torsion while a biological girl cannot. In such situations, it is critical that I am able to use biologically accurate terms when speaking with patients, their parents, and my colleagues. For example, "Susie needs treatment with antibiotics because, as a girl, she faces a higher risk of UTI."

9. As a pediatrician, I provide treatment for many non-adult-specific medical conditions that my patients might encounter, including psychiatric disorders. Treating those conditions requires difficult discussions with patients about harmful habits and behaviors like alcohol abuse, smoking, anxiety, body dysmorphia, self-harm, and—relevant here—gender dysphoria. In these cases, it is vital that I be able to address the root cause of their concerns.

10. I also believe strongly that affirming an individual's non-biological gender identity or gender expression is profoundly harmful to the individual because it encourages them to believe a falsehood about themselves, suggests they are somehow inadequate as they currently are, and discourages them from seeking proper care to address their underlying gender dysphoria. "Social transition," involving "chosen names" and "pronouns," has been found to contribute to increased medicalization and its harmful effects. Therefore, as a medical

professional with an obligation not to harm my patients, I believe it would be wrong to address a male patient using feminine pronouns or his "chosen name" or address a woman using masculine pronouns or her "chosen name." If I were to do so, I would be affirming a lie and harming my patients.

11.    In line with my beliefs, when transgender-identifying patients are in my office, I do not want to be forced to use "chosen names" or "preferred pronouns" when addressing or referring to them. When I discuss patients with other medical professionals or employees in my office, I want to refer to them using biologically accurate pronouns and birth names, even if those pronouns and names conflict with an individual patient's self-professed gender identity or gender expression. For example, I might say "Scott needs his meningitis vaccine" or ask my medical assistant to "Please check Luna's urine for white blood cells." My patients will inevitably hear these statements—both because I will make them in front of the patient and because the physical layout of my office is such that sound carries throughout the space.

12.    Moreover, because I believe that gender ideology is so harmful, I want to be able to address individuals (both orally and in written communications) directly by their birth name and not a "chosen name." Calling a biological male by a female's name (or vice versa) would further reinforce his or her delusions that he or she can change or has changed his or her gender and suggest that his or her actual gender is somehow wrong and something to be hidden or lied about.

13.    When I write comments about my patients in medical records, I want to refer to them using biologically accurate pronouns and birth names, even if those pronouns and

names conflict with an individual patient's self-professed gender identity or gender expression. For example, I might say, "Caleb is doing well today and is excited about his plans for the summer" or "She is feeling much better, and her headaches have completely resolved." These medical notes are available to the patient in their medical records, both digitally and in printed paper copies upon request.

14.    I also want to publish materials expressing my belief that sex is fixed at birth and immutable and that it is wrong and medically harmful to address or refer to someone using non-biological pronouns, chosen names, or other terms.

15.    For example, my practice maintains a Facebook page to advertise our services and communicate with the public. *See* Ex.A. Given the increasing prevalence of gender ideology and the use of so-called preferred pronouns and chosen names, I want to post a statement on our Facebook page explaining to potential patients that, because I have an obligation as a physician not to harm my patients, I will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names.

16.    I do not use birth names or biologically accurate pronouns to be mean or hurtful. I do so because that speech reflects my belief that sex is fixed in each person from the moment of conception and cannot be changed, and because I believe that affirming a patient's non-biological gender identity or gender expression would harm rather than help the patient.

17.    However, Colorado's public accommodation laws as amended by Colorado House Bill 25-1312 make it impossible for me to effectively exercise my constitutionally protected right to speak in a manner that reflects my beliefs.

18.     H.B. 25-1312 redefines "gender expression," a protected category in Colorado law, to include the use of a "chosen name" or other terms by which an "individual chooses to be addressed" in connection with the person's "gender expression." Colo. Rev. Stat. §24-34-301(9). In other words, it is now considered "discriminatory" and "unlawful" for those operating in a place of public accommodation to refer to transgender-identifying individuals using their birth name or non-preferred pronouns—i.e., to "deadname" or "misgender" them. *Id.* §§24-34-301(3.5), (9), 24-34-601(2)(a). I understand the Colorado Civil Rights Division has also adopted regulations that prohibit "[u]nlawful harassment," which it defines to include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 C.C.R. 708-1:81.6.

19.     Colorado law also prohibits publishing or distributing statements that make an individual feel "unwelcome" at a place of public accommodation based on a protected characteristic. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c). So, now that H.B. 25-1312 has expanded "gender expression" to include chosen names and other preferred forms of address, it is also illegal to publish any statement or send any communication that makes an individual feel unwelcome because that statement or communication deadnames, misgenders, or opposes the use of chosen names, preferred pronouns, or other gender-affirming terms.

20.     H.B. 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines. Violators can be reported to the Colorado Civil Rights Commission. *Id.* §24-304-306(1)(a)(I). The Commission, led by the Director, "investigat[es]" reports and, upon finding a violation, can order violators to "cease and desist" speech that deadnames or

misgenders an individual. *Id.* §24-34-306(2)(a), (9). The Commission can also order parties "to take affirmative action," *id.* §24-34-605, including "participation in mandatory educational programs," *303 Creative v. Elenis*, 600 U.S. 570, 581 (2023). The Colorado Attorney General, the Director, and Commissioners can institute investigations on their own, without a report. *Id.* §24-304-306(1)(b).

21.    H.B. 25-1312 also threatens private lawsuits and financial penalties. Those who deadname or misgender can be sued by the "aggrieved" party and, upon a finding of liability, compelled to pay "monetary damages" or a "statutory fine of five thousand dollars … for each violation." Colo. Rev. Stat. §24-34-602(1)(a)(I)-(II) (eff. May 22, 2025).

22.    Because my beliefs and expression about sex and gender are unpopular in some circles, I worry that my practice, my employees, and I will be targeted and harassed by those who hold contrary views. I feel that I must warn my employees, and have warned my employees, that my desire not to address transgender-identifying individuals using so-called chosen names, preferred pronouns, or other non-biological terms may cause some patients to react in a hostile manner or make us a target for supporters of gender ideology. Given the controversial nature of gender ideology and so-called deadnaming and misgendering, I have no doubt that there are individuals who will want to report my practice and me or sue us because of my speech.

23.    Because H.B. 25-1312 threatens to punish deadnaming and misgendering, I must stop addressing or referring to individuals in my medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's

purported "gender identity" or "gender expression." I fear that, if I continue to engage in speech (either orally or through written and electronic means) that refers to individuals using biologically accurate pronouns, birth names, or other terms, my practice and I will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties.

24.     H.B. 25-1312's punishments for disfavored speech also mean that I must refrain from "publish[ing]" materials that refer to individuals using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression or materials explaining that I will refer to patients in my practice using such language. *Id.* §§24-34-601(2)(a), 24-34-701(1)(c).

25.     Because H.B. 25-1312 renders me unable to speak candidly about biological sex in my practice or publish materials and communications that contain such speech, my ability to treat patients is compromised. Likewise, my ability to publish content explaining my view that sex is immutable, and that medical professionals should address patients using accurate terms, is greatly diminished. Because of H.B. 25-1312, I am no longer allowed to use my preferred language in my practice or in public statements.

26.     I do not want to be compelled to speak in a particular way about an individual's sex, gender identity, or gender expression. I want to continue to speak, publish statements, send communications, and treat patients consistent with my belief that sex is determined at birth and immutable, regardless of an individual's internal perceptions about their identity. Yet I am unable to effectively exercise my speech rights because of Colorado law.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is

true and correct to the best of my knowledge.

Executed on June 11, 2025.

_____
Valeri Leswing, D.O.

# Exhibit A



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

DEFENDING EDUCATION, et al.,

Plaintiffs,

v.

AUBREY C. SULLIVAN, et al.,

Defendants.

## MOTION FOR LIMITED EXPEDITED AND JURISDICTIONAL DISCOVERY

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities (the "CCRD and Commission Defendants"), by and through undersigned counsel, hereby respectfully move under Federal Rule of Civil Procedure 26(d)(1) for leave to take: (1) jurisdictional discovery to respond to the Amended Complaint (ECF 25), and (2) limited, expedited discovery regarding Plaintiffs' Amended Motion for Preliminary Injunction (ECF 27).

### D.C. COLO.LCivR 7.1 Certificate of Conferral

Defendants conferred with Plaintiffs regarding this motion by videoconference and through multiple emails. Plaintiffs oppose the motion, asserting that CCRD and Commission Defendants' requested discovery is overbroad and they need prompt relief for their asserted First Amendment injury.[1] For the reasons described below, CCRD and

---

[1] During, Plaintiffs stated that they were open to CCRD and Commission Defendants taking three depositions, yet rejected any jurisdictional discovery for responding to the Amended Complaint, and further rejected CCRD and Commission Defendants' proposed written discovery (despite requesting to serve five requests). The parties were thus unable to reach agreement on the scope of expedited discovery.

Commission Defendants disagree. Defendant the Attorney General takes no position on this discovery motion, as he intends to assert a sovereign immunity defense in his response to the Amended Complaint. However, he reserves the right to participate in any granted discovery to the extent he remains a party in the case.

## INTRODUCTION

In this lawsuit, Plaintiffs assert that recent amendments to the definition of gender expression under Parts 6 and 7 of the Colorado Anti-Discrimination Act ("CADA"), which prohibits certain discriminatory acts in places of public accommodation, are unconstitutional under the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. Courts generally allow jurisdictional discovery, where, as here, the existing record is insufficient, and the party seeking discovery has a good faith belief that it will uncover facts necessary to ascertain the court's jurisdiction over the case.

As outlined below, CCRD and Commission Defendants seek leave to conduct limited expedited discovery as to key jurisdictional issues for which there is an insufficient record: (1) whether Plaintiffs qualify as "places of public accommodation;" and (2) whether Plaintiffs' intended conduct is likely to subject them to a charge of discrimination and thus whether any asserted injury is imminent or instead purely speculative. These key issues are central to this Court's jurisdiction and standing, and discovery will allow CCRD and Commission Defendants to present these arguments fulsomely in a motion to dismiss and opposition to the PI Motion. Accordingly, CCRD and Commission Defendants seek leave to conduct the limited jurisdictional discovery sought herein.

## BACKGROUND

**II.    Plaintiffs and their Claims**

Plaintiffs are four advocacy groups, two practicing physicians, and one of the plaintiff-physician's medical practice. All plaintiffs assert that they believe gender is fixed at birth and immutable, and they seek to address individuals by names they believe to be "biologically accurate" rather than names consistent with individuals' gender identity. Plaintiffs seek to advocate their beliefs at public events and in writings. Plaintiffs Travis Morrell and Valeri Leswing, both physicians, also wish to address patients by names and pronouns inconsistent with their gender identity.

Plaintiffs assert that several provisions of CADA arguably prohibit their speech and are unconstitutional under the Free Speech Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment (ECF 25, Amended Complaint). Their PI Motion (ECF 27) asks this Court to preliminarily enjoin Defendants from enforcing portions of Colo. Rev. Stat. §§ 24-34-301, 24-34-601, and 24-34-701 as revised by House Bill 25-1312, which went into effect May 16, 2025.

CCRD and Commission Defendants intend to file a motion to dismiss the Amended Complaint that will, among other defenses, seek dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction, and further raise these arguments in its opposition to the PI Motion.

**III.    The Colorado Anti-Discrimination Act**

CADA protects Coloradans' access to public accommodations, as well as fair employment and housing opportunities, that are free from discrimination, regardless of an individual's membership in a protected class. *See* Colo. Rev. Stat. § 24-34-300.7.

3
**1-App-195**

Persons aggrieved by a discriminatory or unfair practice may file a charge alleging a violation of CADA with the Colorado Civil Rights Division ("CCRD"), which investigates the complaint and determines whether probable cause exists to support the charge. *Id.* § 24-34-306(1)-(2). If the CCRD finds probable cause, and a period of mediation fails, then CCRD reports as such to the Colorado Civil Rights Commission (the "Commission"), which may convene a formal hearing. *Id.* § 24-34-306(4). CADA also authorizes the Commission, a commissioner, or the Attorney General to file a charge with CCRD when an alleged discriminatory practice "imposes a significant societal or community impact." *Id.* § 24-34-306(1)(b).

Plaintiffs do not allege that they have been the subject of any complaint under CADA. Rather, they raise facial and as-applied challenges to portions of Parts 6 and 7 of CADA, both of which prohibit certain discriminatory acts with respect to places of public accommodation. *Id*. §§ 24-34-601(2)(a), 24-34-701.

Under Part 6, a place of public accommodation is (a) "any place of business engaged in any sales to the public" or (b) "any place offering services, facilities, privileges, advantages, or accommodations to the public." Nonexclusive examples include "any business offering wholesale or retail sales to the public"; "any place to eat, drink, sleep, or rest, or any combination thereof"; "a dispensary, clinic, hospital, convalescent home, or other institution for the sick, ailing, aged, or infirm; and "any public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind whether indoor or outdoor." *Id.* § 24-34-601(1).

Part 7 defines public accommodation by reference to federal disability discrimination law. *See id.* § 24-34-703 (cross-referencing § 24-34-301); *id.* § 24-34-

301(16) (providing that "public accommodation" has the same meaning as in Title III of the Americans with Disabilities Act of 1990 ("ADA"), its amendments, and implementing regulations). In turn, the ADA provides that private entities qualify as "public accommodations" if they fall within one of twelve enumerated categories and their operations affect commerce. *See* 42 U.S.C. § 12181(7). Those categories include places of lodging; auditoriums, convention centers, or other places of public gathering; and professional offices of health care providers and other service establishments. *Id.*

"Gender identity," "gender expression," and "sexual orientation" are all protected characteristics under CADA. *See, e.g.*, Colo. Rev. Stat. § 24-34-601. "Sexual orientation" was added as a protected class in 2008 and was defined at the time to include "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08–200). In 2009, CCRD promulgated a rule clarifying that unlawful harassment based on sexual orientation can, depending on the circumstances, include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 CCR 708-1, Rule 81.6(A)(4). "Gender expression" and "gender identity" were added as distinct protected classes in 2021. *See* 2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108). Most recently, HB 25-1312 amended the definition of "gender expression" to mimic the existing rule to expressly include an individual's "chosen name, and how the individual chooses to be addressed," thereby effectively codifying Rule 81.6. *See* H.B. 25-1312 § 8, *codified at* Colo. Rev. Stat. § 24-34-301(3.5), (9).

## LEGAL STANDARDS

A party is generally entitled to discovery on factual issues raised by a motion to dismiss for lack of jurisdiction. *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d

1320, 1326 (10th Cir. 2002). A court abuses its discretion in denying jurisdictional discovery "if the denial results in prejudice to a litigant," which occurs when "pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* (quotation marks and alteration omitted). "The burden of demonstrating a legal entitlement to jurisdictional discovery . . . is on the party seeking the discovery." *Breakthrough Mngm't Grp. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1189 n.11 (10th Cir. 2010).

The Court may also exercise its discretion to grant expedited discovery in advance of a Rule 26(f) conference where a party is seeking a preliminary injunction, so long as the party seeking discovery shows good cause. *Qwest Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D. Colo. 2003) (citations omitted); *see also* Fed. R. Civ. P. 26 Adv. Comm. Notes (1993 amendments to subdivision (d)) (expedited discovery is appropriate "in some cases, such as those involving requests for a preliminary injunction"); *Metal Bldg. Components, L.P. v. Caperton,* No. CIV-04-0256 MV/DJS, 2004 WL 7337726, at *3 (D.N.M. Apr. 2, 2004) (same). Courts in the Tenth Circuit have repeatedly found "good cause" exists for expedited discovery in such cases. *See Advantage Sales & Mktg. LLC v. Gold*, No. 18-CV-00312-RM, 2018 WL 6252781, at *1 (D. Colo. Feb. 13, 2018); *Icon Health & Fitness, Inc. v. Johnson Health Tech N.Am., Inc.,* No. 10-CV-00209, 2011 WL 13136539, at *3 (D. Utah Mar. 1, 2011); *Metal Bldg. Components, L.P.,* 2004 WL 7337726 at *3.

In assessing whether "good cause" exists, courts consider the reasonableness of the request, including:

(1) whether a preliminary injunction is pending;
(2) the breadth of the discovery requests;

(3) the purpose for requesting the expedited discovery;
(4) the burden on the defendants to comply with the requests; and
(5) how far in advance of the typical discovery process the request was made.

*Denver Homeless Out Loud v. Denver,* No. 20-CV-2985-WJM-SKC, 2020 WL 6585795, at *2 (D. Colo. Nov. 10, 2020) (quotations and citations omitted). "[G]ood cause may be found where the . . . need for expedited discovery outweighs the possible prejudice or hardship to the [responding party]." *Metal Bldg. Components, L.P.,* 2004 WL 7337726, at *4.

## ARGUMENT

CCRD and Commission Defendants are entitled to limited, expedited discovery both to address the open questions of Plaintiffs' standing for purposes of a Rule 12(b)(1) Motion, and to respond to Plaintiffs' PI Motion.

**I.    CCRD and Commission Defendants are entitled to jurisdictional discovery to determine Plaintiffs' standing.**

Plaintiffs assert that H.B. 25-1312 subjects them to a threat of enforcement proceedings under CADA, based on their wish to refer to individuals using their "birth names" (referred to here as "deadnaming") and "biologically accurate pronouns" (referred to here as "misgendering"), in lieu of individuals' names and pronouns that reflect their gender identity, at public events, in their advocacy and publications, and in the plaintiff-doctors' medical practices. To establish standing, Plaintiffs must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotations and citation omitted).  Plaintiffs' allegations do not definitively establish these elements,

and instead raise serious questions about whether Plaintiffs have standing to assert their claims.

First, it is unclear from Plaintiffs' filings whether two of the organizational plaintiffs, Colorado Parent Advocacy Network ("CPAN") and Protect Kids Colorado ("PKC"), could qualify as "places of public accommodation" and thus be subject to Parts 6 and 7 of CADA at all. CPAN and PKC say they fear CADA will be enforced against them as places of public accommodation because they "host meetings, summits, and other events in places of public accommodation," and those events are "open to the public." Am. Compl. ¶ 58 (CPAN); *see* Am. Compl. ¶ 81 (making similar allegations for PKC); *see also* Decl. of Lori Gimelshteyn, ECF 27-2 ¶ 10; Decl. of Erin Lee, ECF 27-3 ¶ 10. However, courts have only treated organizations as subject to antidiscrimination laws governing places of public accommodation in limited circumstances. *See, e.g.*, *Creek Red Nation LLC v. JeffCo Midget Football Ass'n Inc.*, 175 F. Supp. 3d 1290, 1297 (D. Colo. 2016) (noting Title II of the Civil Rights Act applies to "membership organizations that are closely connected to a facility or structure") (citing *Welsh v. BoyScouts of America*, 993 F.2d 1267, 1272 (7th Cir. 1993); *see also id.* at 1298 (applying CADA to a football program conducting "activities in facilities, such as parks and sports fields, that are open to the public").

Relevant to this inquiry is the nature of the relationship between the organization and a place of public accommodation, as well as the specific antidiscrimination law at issue. *See, e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 677 (2001) (golf association was covered by Title III of the ADA, which applies to persons that lease or operate places of public accommodation, when conducting events on golf courses that were

places of public accommodation); *Clegg v. Cult Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994) (rejecting Title II discrimination claim where the defendant organization's activities did not "depend upon or emanate from any particular facility or location" and defendant was not "closely connected with a place of public accommodation") (quotation marks omitted). Also relevant to this inquiry is whether CPAN or PKC offer any "goods, services, facilities, privileges, advantages, or accommodations" during their public events. Colo. Rev. Stat. § 24-34-601(2)(a); *see also Jensen v. United First Financial*, No. 2:09–cv–00543DAK, 2009 WL 5066683 at *6 (D. Utah Dec. 16, 2009) (concluding that Title III of the ADA "may potentially apply" to business holding training and recruitment sessions in hotels and convention centers, because attendees derived benefits and privileges from attendance). To evaluate how these events are in fact "public," CCRD and Commission Defendants need discovery regarding the contours and scope of these events.

Second, Dr. Morrell alleges that he holds speaking engagements in places of public accommodation and that he fears CCRD action against Mountain West Dermatology, the medical practice at which he is a co-owner and one of several practitioners. Am. Compl. ¶¶ 110, 116; Decl. of Dr. Travis Morrell, ECF 27-5 ¶¶ 15, 25. Whether Dr. Morrell's speaking engagements could subject him to CADA enforcement raises the same questions described above with respect to the organizational plaintiffs. Further, Dr. Morrell as an individual is not a "place of public accommodation," *see* Colo. Rev. Stat. § 24-34-601(1), and thus the relevant question with respect to his medical practice is whether Dr. Morrell's actions might deprive individuals of the full and equal enjoyment of Mountain West Dermatology's services, as opposed to Dr. Morrell's

individual services. To evaluate his standing, it is necessary to establish in greater detail the nature of his relationship with Mountain West Dermatology and the services it offers to the public, as well as how Mountain West Dermatology's patients are treated by its multiple practitioners.

Third, the Amended Complaint and PI raise questions about whether any Plaintiff's interactions with the public are likely to subject them to a charge of discrimination and thus whether any asserted injury is imminent or purely speculative, as relevant to the question of standing. All Plaintiffs represent that they fear their refusal to use names and pronouns consistent with individuals' gender identity will subject them to charges of discrimination, but none identifies any complaints made against them to date, even though transgender status has long been a protected class under CADA and the CCRD Rule has been in effect since 2009. Instead, they allege that transgender individuals have attended their events and that some opposed to their views have protested and criticized them. Am. Compl. ¶¶ 61, 68, 84, 91, 110, 113. Further factual development is needed to determine the likelihood that Plaintiffs' actions could result in a charge that they are unlawfully discriminating against individuals in places of public accommodation.

## II.    CCRD and Commission Defendants have established good cause to grant expedited discovery on Plaintiffs' PI Motion.

CCRD and Commission Defendants are also entitled to discovery for its response to the PI Motion—if Plaintiffs cannot establish standing and both their claims and their PI Motion necessarily fails. Further, all the "good cause" factors weigh in favor of granting expedited discovery for purposes of the PI Motion.

First, Plaintiffs seek a preliminary injunction preventing Defendants from enforcing §§ 24-34-301(3.5) & (9), 24-34-601(2)(a), and 24-34-701(1)(c), as well as "any materially similar statutory or regulatory provisions in full and as applied to Plaintiffs and their members." PI Motion at 27. This broad request would prohibit the CCRD from investigating certain complaints, thwarting the important antidiscrimination interests furthered by CADA. Indeed, it would insulate Plaintiffs from CADA enforcement for a broader range of conduct than that described in the Complaint. A preliminary injunction is an "extraordinary remedy," *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), and discovery would enable the Court to consider Plaintiffs' request on a more developed record.

The second and third factors focusing on the breadth and purpose of the requested discovery similarly weigh in favor of discovery. The thrust of Plaintiffs' Amended Complaint and PI Motion is that their desire to misgender or deadname individuals may violate CADA, subjecting them to investigation and enforcement actions. As outlined in more detail in Section III below, CCRD and Commission Defendants' proposed discovery is targeted at determining the validity of those claims. For example, discovery regarding the nature of CPAN, PKC, and Dr. Morrell's events at places of public accommodation may reveal that these activities are not subject to CCRD's jurisdiction. *See* Ex. A, Interrogatory No. 1 & Request for Production No. 2. Similarly, discovery focused on Dr. Morrell's relationship with Mountain West Dermatology, and his statements to his patients and the public, may show that Dr. Morrell's activities would not amount to public accommodation discrimination under

11
**1-App-203**

CADA. *See generally* Ex. A. Any remaining requests are focused on identifying whether any Plaintiff faces a real threat of being subject to a charge of discrimination, or whether their fears are speculative. Each of these elements is critical to Plaintiffs' ability to show a likelihood of success on the merits and their risk of irreparable harm, which they must prove to obtain preliminary relief. Moreover, this discovery is not overbroad and is comparable in scope to discovery permitted in other cases and targeted at clarifying issues raised by the PI Motion. *See, e.g.*, *Advantage Sales & Mktg. LLC*, 2018 WL 6252781, at *1-2 (approving a request for deposition of opposing party and service of four requests for production of documents, including "[a]ll documents concerning or reflecting a communication with any client or customer" over six months); *Icon Health & Fitness,* 2011 WL 13136539, at *2-3 (allowing depositions and service of multiple detailed requests for production, including pertaining to issues raised in declarations supporting preliminary injunction motion).

The fourth factor regarding burden on Plaintiffs also weighs in favor of permitting discovery. Plaintiffs have filed an extensive PI Motion, accompanied by six declarations raising factual questions. All of CCRD and Commission Defendants' discovery requests seek information on matters that Plaintiffs themselves raised and relied on in their Amended Complaint and PI Motion (such as information about the organizational Plaintiffs' events at places of public accommodation) and should be readily available to Plaintiffs (such as details about Dr. Morrell's medical practice). CCRD and Commission Defendants' targeted requests do not unreasonably burden Plaintiffs given the significant impacts to the State—and its ability to protect Colorado citizens from discriminatory practices—from the relief they seek.

The fifth "good cause" factor, which concerns the timing of the discovery requests, also weighs in favor of permitting expedited discovery. Expedited discovery is appropriate at this juncture given that it will help resolve both whether Plaintiffs have standing to bring these claims and the factual issues raised in the PI Motion, and the requests are not too far in advance of the normal discovery process. *See Denver Homeless Out Loud,* 2020 WL 6585795, at *7. Indeed, during the parties' conferral, Plaintiffs indicated that they, too, would benefit from discovery regarding the preliminary injunction, belying any claim that discovery is inappropriate at this stage of the case.

Finally, good cause exists because the "need for expedited discovery outweighs the possible prejudice" to Plaintiffs. *Metal Bldg. Components, L.P.,* 2004 WL 7337726, at *4. Plaintiffs would suffer no harm from postponing consideration of their PI Motion, because they are under no imminent threat of enforcement for violating the statutes they challenge. HB25-1312 did not enact a sea change in the relevant law. Transgender status has been a protected class under CADA since 2008, and CCRD's rules have made clear that unlawful harassment based on sexual orientation can, depending on the circumstances, include misgendering or deadnaming individuals since 2009. Further, the Amended Complaint identifies no charges filed with the CCRD over the past sixteen years, and no action taken by CCRD or the Commission, to investigate or prosecute any public accommodation for misgendering or deadnaming anyone—let alone enforcement action based on the kinds of conduct Plaintiffs say they wish to engage in. Nor are Plaintiffs currently subject to ongoing investigations or enforcement actions by CCRD. Based on this history, Plaintiffs face no threat of imminent harm if a ruling on their PI Motion is delayed to accommodate the limited discovery required to

allow a full and informed consideration of their request for "extraordinary" relief. *Enter.*

*Mgmt. Consultants, Inc.*, 883 F.2d at 888-89.

### III.    CCRD and Commission Defendants' proposed discovery is tailored to the issues of standing and responding to the PI motion.

To determine standing and given the large number of plaintiffs, CCRD and

Commission Defendants propose serving only two document requests and four

interrogatories (provided in Exhibit A), and to take five short depositions.[2]

Proposed Interrogatory No. 1 is directed to the contours of Plaintiffs' speaking

events, which will provide facts to determine whether Plaintiffs would be treated as

places of public accommodation subject to CADA when engaging in the conduct

described in the Amended Complaint and PI Motion, as well as whether the conduct

Plaintiffs wish to engage in would amount to prohibited discrimination. Proposed

Interrogatory No. 2 asks Plaintiffs to identify all instances in which any person has

complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender

individuals, and Interrogatory No. 3 asks Drs. Travis Morrell and Valeri Leswing for the

numbers of (1) their transgender patients and (2) those that indicated they did not feel

welcome in light of their use of pronouns and names of patients. Both these

interrogatories are directed to whether Plaintiffs' interactions with the public are likely

to subject them to a charge of discrimination and thus whether any asserted injury is

imminent or purely speculative. Proposed Interrogatory No. 4 asks Dr. Morrell to

---

[2] Defendants anticipate these depositions will take less than a half day and are cognizant of limiting unnecessary discovery. To the extent the case proceeds to traditional discovery, Defendants will endeavor to limit any additional discovery or continued depositions of these entities and individuals to the presumptive limits or will seek leave of court to exceed the written discovery and deposition length provided in the scheduling order.

describe the corporate structure of Mountain West Dermatology and his relationship to it, and proposed Request for Production No. 1 seeks Dr. Morrell's communications with Mountain West Dermatology regarding CADA, House Bill 25-1312, and his misgendering and deadnaming patients. These requests are directed to whether Dr. Morrell himself is a public accommodation and whether he has a credible fear that his practice may be subject to investigation/prosecution in light of his actions. *See* ECF 27-5, ¶ 25. Finally, Request for Production No. 2 seeks documents relied upon in answering the interrogatories.

The depositions CCRD and Commission Defendants seek include the two individual doctors, Dr. Morrell and Dr. Leswing; a representative witness from each of two organizational plaintiffs, CPAN and PKC that conduct events; and a deposition of Mountain West Dermatology as to how it has or would assign transgender patients in light of Dr. Morrell's intent to misgender and deadname this patients (topics for deposition subpoena provided as Exhibit B).

For the discovery schedule, and considering Plaintiffs' interest in prompt resolution of their PI Motion, CCRD and Commission Defendants request that (a) all written discovery be produced within two weeks of any order granting discovery, and (b) all depositions be completed within four weeks of any order granting discovery.

## CONCLUSION

For the reasons described above, CCRD and Commission Defendants respectfully request that the Court issue an Order authorizing them to conduct the discovery set forth in this motion.

Dated this 27th day of June, 2025.

PHILIP J. WEISER
Attorney General

For Defendants Aubrey C. Sullivan, Sergio
Cordova, Geta Asfaw, Mayuko Fieweger, Daniel
S. Ward, Jade R. Kelly and Eric Artis:

*s/ Janna K. Fischer*
Kathleen Spalding
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

DEFENDING EDUCATION, et al.,

Plaintiffs,

v.

AUBREY C. SULLIVAN, et al.,

Defendants.

---

### DEFENDANTS' DISCOVERY REQUESTS

---

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities, by and through their attorneys of record, hereby serve this set of Discovery Requests to Plaintiffs pursuant to Fed. R. Civ. P. 26, 33 and 34.

### <u>INSTRUCTIONS</u>

1.    A copy of written answers and objections to the following discovery requests shall be served upon Defendants' counsel of record, no later than the date provided in the Court's Order Granting Defendants' Motion for Limited Expedited and Jurisdictional Discovery.

2.    Please respond to each Request fully and separately, setting forth the text of each immediately prior to your response.

3.    These Requests are of a continuing nature so as to require

**1-App-209**                    **Defendants' Exhibit A**

supplemental responses as additional responsive information is discovered or becomes available.

4.    Any objection must state with specificity the grounds for objection to the particular Request and must also state whether any responsive information is being withheld on the basis of that objection. If objection is made to part of a Request, that part shall be specified. Any ground not stated in a timely objection will be deemed waived unless your failure to object is excused for good cause shown. When a response contains both privileged and non-privileged information, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.

5.    If a claim of privilege or work product is asserted concerning any documents for which identification or production is requested, provide the following: (1) the date of the document; (2) its subject matter; (3) the type of document (e.g. letter, memo, report, minutes and the like); (4) the identities of each person(s) who prepared, authored, received, viewed, or has had possession, custody, or control of the document since it was created and; (5) the privilege claimed and the basis therefore; (6) any further information necessary to assess the applicability of the privilege or immunity; and (7) the information required by Federal Rule of Civil Procedure 26(b)(5).

6.    If any documents for which identification is requested have been lost

2

**1-App-210**                              **Defendants' Exhibit A**

and/or are no longer in existence, provide the following: (1) the date of the document; (2) its subject matter; (3) the type of document (e.g. letter, memo, report, minutes, and the like); (4) the identities of all persons who prepared, authored, received, viewed, or has had possession, custody or control of the document since it was created; (5) the identities of all persons who had a copy of the document; and (6) an explanation as to why the document is no longer in your possession.

7.      To the extent the option to produce business records in response to an interrogatory pursuant to Federal Rule of Civil Procedure 33(d) is invoked, specify the business records in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained. If the document has more than one page, refer to the page and section where the answer to the interrogatory can be found.

8.      Answers to Interrogatories are to be signed by the person so answering under oath and as required by law, and the objections, if any, shall be signed by the attorney making them.

9.      If you cannot answer any Request in full, answer to the extent possible and explain why you cannot answer the remainder of the Request. In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," or "every," the intended meaning is inclusive rather than exclusive.

10.      If you find the meaning of any term in these Requests to be unclear,

3

**Defendants' Exhibit A**

then you should assume a reasonable meaning, identify that assumed meaning, and respond to the Requests on the basis of that assumed meaning.  In order to avoid unnecessary delays and discovery disputes, please seek clarification of any request from Defendants' counsel as soon as possible if you consider any request to be vague, ambiguous, or overly burdensome.  Defendants' counsel stands willing to confer regarding any request and to clarify it, if necessary. Similarly, if you believe you require additional time to adequately respond to these requests, please confer with Defendants' counsel as soon as possible.

11.     These discovery requests are continuing in nature.  You have a duty to amend your responses to these discovery requests if you learn that your prior responses are incomplete or incorrect in some material respect and if the additional or corrective information has not otherwise been made known to Defendants during the discovery process or in writing.  See Fed. R. Civ. P. 26(e).

## DEFINITIONS

12.     "Communication" shall mean all transmittals of information whether written, oral, or in any other form, from any person to any other person, and includes, but is not limited to, emails, text messages, social media posts, letters, correspondence, and documented or undocumented telephone conversations.

13.     "Describe" shall mean to make known in detail.

14.     The connectives "and" and "or" shall be construed either conjunctively

4

**1-App-212**                    **Defendants' Exhibit A**

or disjunctively whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production all responsive facts and documents which might otherwise be construed to be outside of their scope.

15.    The singular form of a word shall be interpreted as plural and the plural form of a word shall be interpreted as singular whenever appropriate in order to bring within the scope of these Interrogatories and Requests for Production, which might otherwise be construed to be outside of their scope.

16.    "Document" or "documentation" shall mean any handwritten, typewritten, printed, recorded, or graphic material in any form, including originals, copies, and drafts, including without limitation, any correspondence, minutes of meetings, written memoranda or communications, e-mail, text messages, social media posts, transcripts of testimony, studies, reports, notes, notebooks, telephone message slips, diaries, computer diskettes or printouts, contracts, work papers, books, bookkeeping entries, bills, invoices, calendar entries, microfilm or microfiche, together with all other items which are subject to request for production pursuant to the Federal Rules of Civil Procedure.

17.    "You" or "Your" shall include, in addition to Plaintiffs, counsel for Plaintiffs, and all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Plaintiff.

5

**1-App-213**                    **Defendants' Exhibit A**

18.    Defending Education shall include, in addition to Defending Education, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Defending Education.

19.    Colorado Parent Advocacy Network shall include, in addition to Colorado Parent Advocacy Network, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Colorado Parent Advocacy Network.

20.    Protect Kids Colorado shall include, in addition to Protect Kids Colorado, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Protect Kids Colorado.

21.    Do No Harm shall include, in addition to Do No Harm, all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may have obtained information for or on behalf of Do No Harm.

22.    Mountain West Dermatology shall include, in addition to Mountain West Dermatology P.C., all agents, servants, employees, representatives, officers, governing boards or committees, and others who are in possession of or who may

**1-App-214**                    **Defendants' Exhibit A**

have obtained information for or on behalf of Mountain West Dermatology P.C.

### INTERROGATORIES

INTERROGATORY NO. 1:  As to Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, and Dr. Travis Morell as to his speaking engagements, identify all events they operated and/or plan to operate and/or at which they have spoken and/or plan to speak in a place of public accommodation located in Colorado, including for each such event: (1) its date and location; (2) any advertising or marketing promoting the event, including social media posts; (3) the attendees; (4) a copy of all materials provided or made available to attendees, any schedules or agendas for the event, and any PowerPoint presentations shown at the event; (5) any payments collected for the event; (6) all contracts and/or agreements entered into with the place of public accommodation; and (7) all goods, services, facilities, privileges, advantages, or accommodations offered by them at the event.

INTERROGATORY NO. 2:  As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals.

INTERROGATORY NO. 3:  As to Drs. Travis Morrell and Valeri Leswing's treatment of transgender patients, identify (1) the number of transgender patients each doctor has seen per year for each year since 2009, and (2) the number of

**1-App-215**                    **Defendants' Exhibit A**

patients that indicated they did not feel welcome in light of their use of pronouns and names of patients.

INTERROGATORY NO. 4:  As to Dr. Travis Morrell, describe the corporate structure of Mountain West Dermatology and his relationship to it, including (1) the contractual relationship between Mountain West Dermatology and its dermatologists, including any agreements between Dr. Travis Morrell and Mountain West Dermatology; (2) the number of professionals that are part of Mountain West Dermatology; and (3) any referral practice between the professionals that are part of Mountain West Dermatology.

## REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:  As to Dr. Travis Morrell, all communications he has had with Mountain West Dermatology regarding the Colorado Anti-Discrimination Act, House Bill 25-1312 and/or Dr. Travis Morell's use of incorrect pronouns and deadnames of transgender individuals.

REQUEST FOR PRODUCTION NO. 2:  All documents identified, referenced, or relied upon in responding to the interrogatories.

RESPECTFULLY SUBMITTED this __th day of _____, 2025.

PHILIP J. WEISER

Attorney General

8

**1-App-216**                    **Defendants' Exhibit A**

For Defendants Aubrey C. Sullivan, Sergio Cordova, Geta Asfew, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly and Eric Artis:

*s/ Janna K. Fischer*
Kathleen Spalding
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

9

**1-App-217**                    **Defendants' Exhibit A**

Proposed Topics for Deposition Subpoena to Mountain West Dermatology P.C.

INSTRUCTIONS

1.  Should You find the meaning of any term in the topics to be unclear, You should assume a reasonable meaning, state what that assumed meaning is, and be prepared to respond to the topic on the basis of that assumed meaning.

2.   If You object to any deposition topic in whole or in part, state with specificity the deposition topic or part of the topic that You object to and the basis for each objection.  If You object to any topic in whole or in part on the basis of privilege, set forth the subject matter that will be withheld and the nature of the privilege claimed.

3.  If You refuse to provide a designation based in whole or in part on the grounds of burdensomeness, describe in detail the burden imposed and the effort that would be required to provide testimony responsive to the request.

TOPICS

Defendants direct Mountain West Dermatology P.C. to designate a representative or representatives of for examination on the following topics.

1.  Mountain West Dermatology P.C.'s practices and/or policies in assigning patients to and/or referring patients between the medical providers in Mountain West Dermatology P.C., including to assign, reassign, and/or refer patients to or from Dr. Travis Morell because of his use of incorrect pronouns and deadnames of transgender individuals.

2.  Any instances in which any person has complained to any employee, representative, or provider at Mountain West Dermatology P.C. about Dr. Travis

**1-App-218**                    **Defendants' Exhibit B**

Morrell's use of incorrect pronouns and deadnames of transgender individuals, including any actions you took in response to such complaint.

3. Any services and/or treatments offered by Dr. Travis Morrell that cannot be provided by another physician in Mountain West Dermatology P.C.'s practice, and any instances where a patient could not receive care from the practice due to the patient being unwilling to be treated by Dr. Travis Morell due to his policy regarding transgender patients.

**Defendants' Exhibit B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

          *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,

          *Defendants*.

Case No. 1:25-cv-01572-RMR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR AN EXTENSION OF TIME**

Six weeks ago, Plaintiffs filed a motion for a preliminary injunction to preserve their First Amendment rights, the loss of which is *per se* irreparable harm. Instead of responding to that motion, the State of Colorado asks the Court to put it on hold indefinitely so that the State can take essentially full written and deposition discovery into Plaintiffs and another third party. The State makes this request even though it refuses to promise not to prosecute Plaintiffs and even though the State never claims that it is unable to file its opposition on time. Indeed, the State appears to have multiple arguments it intends to raise in opposition to the preliminary-injunction motion that require no discovery at all.

There is a far more logical path for the Court to take. The Court should order the State to file its preliminary-injunction opposition on July 7, as scheduled. The parties should then complete briefing on the State's motion for expedited discovery (which Plaintiffs will oppose). At that point, the Court can either rule on Plaintiffs' preliminary-injunction motion or, if it agrees with the State, it can

1
**1-App-220**

order limited, expedited discovery. That is a far more efficient schedule than the one offered by the State, and it more appropriately reflects the expedited relief that Plaintiffs seek.

The State's motion for an extension of time should be denied. Alternatively, in light of the upcoming July 4th holiday, Plaintiffs would not oppose a short one-week extension of the State's deadline to file its opposition to the preliminary-injunction motion.

## BACKGROUND

Plaintiffs are two organizations with members in Colorado, two Colorado-based parents-rights organizations, two Colorado doctors, and a Colorado-based medical practice. On May 19, 2025, Plaintiffs filed a complaint alleging that Colorado law, as amended by House Bill 25-1312, violates their rights under the First and Fourteenth Amendments to the United States Constitution. Specifically, Plaintiffs challenged H.B. 25-1312's ban on so-called deadnaming and misgendering, reflected in the bill's revised definitions of "gender expression" and "chosen name," as well as Colorado's existing bans on discriminatory statements and discriminatory communications. *See* Dkt.1 ¶¶115-53 (Complaint); Colo. Rev. Stat. §§24-34-301(3.5), (9), 24-34-601(2)(a), 24-34-701(1)(c) (eff. May 16, 2025). Plaintiffs alleged that Colorado's laws are unconstitutional because they compel speech, discriminate based on content and viewpoint, are overbroad, and are impermissibly vague.

On May 20, Plaintiffs filed a motion seeking a preliminary injunction to prevent the State from enforcing the challenged laws. Dkt.7. Plaintiffs argued that they are entitled to a preliminary injunction because they are likely to succeed on the merits, they will suffer irreparable harm without an injunction, and the balance of harms and public interest weigh in their favor. *Id.* at 9-25. On May 22, this Court ordered the State to respond to Plaintiffs' motion no later than 21 days after Plaintiffs filed proof of service. Dkt.11. After Plaintiffs did so on May 27, Dkt.14, the State's response became due on June 17.

On June 13, Plaintiffs filed an amended complaint (adding two additional parties) and an amended preliminary-injunction motion. Dkts.25, 27. The State's response to Plaintiffs' amended preliminary injunction motion is due on July 7.

Starting in early June, the parties had a few conversations and email exchanges in which they discussed the possibility of limited discovery. From the beginning, Plaintiffs maintained that discovery was unwarranted at this stage—both because of the stage of the litigation and because the State could not justify its need for expedited discovery. To avoid motions practice and ensure an expeditious resolution of their preliminary-injunction motion, however, Plaintiffs indicated that they were open to limited depositions of some of the declarants if depositions could be done quickly and would not delay resolution of Plaintiffs' motion. The State did not accept this compromise. On Friday, June 20, the State told Plaintiffs that it now wanted extensive discovery, including document productions, interrogatories, four depositions, and a third-party deposition of Mountain West (which is not a plaintiff). Later that day, Plaintiffs responded that they would not agree to such extensive discovery, which had "far expanded in scope" since the State's original proposal. Plaintiffs emphasized that they needed relief now because "First Amendment violations are *per se* irreparable injury."

On Tuesday, June 24, the State informed Plaintiffs that it would file a motion for expedited discovery and a motion for an extension of time to respond to the amended complaint and to the amended preliminary-injunction motion. Later that day, Plaintiffs told the State that they opposed the motions, except they would not oppose an extension of time for the State to respond to the complaint. Plaintiffs explained that "an opposition would be very helpful in clarifying what, if any, discovery the State actually needs to oppose our motion." Plaintiffs also told the State that, while they continued to believe that discovery is unwarranted, they would not oppose filing supplemental briefs if the Court ultimately granted the State's request for expedited discovery.

3

**1-App-222**

On Friday afternoon, June 27—more than five weeks after Plaintiffs filed their preliminary-injunction motion—the State filed a motion for expedited discovery. Dkt.31. The State asks this Court to order document production, interrogatories, four party depositions, and a third-party deposition—with written discovery completed in just two weeks and the five depositions completed in just four weeks (presumably within the second two-week period). *See* Dkt.31 at 15; Dkt.31-1; Dkt.31-2. Plaintiffs' response to the State's discovery motion is due on July 18. Plaintiffs will oppose the State's motion.

Along with its discovery motion, the State also filed a motion for an extension of time to respond to Plaintiffs' amended complaint and amended preliminary-injunction motion. Dkt.30. The State's motion for an extension of time is based entirely on its request for expedited discovery; the State appears to have multiple arguments it intends to make that do not require any discovery, and it has never indicated that it is unable to respond by the July 7 deadline. *See id.* at 2-5. Plaintiffs oppose the motion for an extension of time to respond to the preliminary-injunction motion but do not oppose the motion for an extension of time to respond to the amended complaint.

## ARGUMENT

The Court should deny the State's motion for an extension of time because (1) a timely opposition will help Plaintiffs and the Court understand what, if any, discovery is actually needed; (2) the State will suffer no prejudice if the extension is denied because it can file a supplemental brief if the Court ultimately grants its motion for expedited discovery; and (3) Plaintiffs will be prejudiced if the extension is granted because it would virtually guarantee that their preliminary-injunction motion would not be resolved for months, during which time their speech will continue to be chilled.

*First*, requiring the State to file its opposition to the preliminary-injunction motion on July 7 will assist the Court and Plaintiffs in evaluating what discovery, if any, is actually needed at this stage.

4

**1-App-223**

In its motion for expedited discovery, the State vaguely asserts that it needs discovery because "the existing record is insufficient" and discovery "will uncover facts necessary to ascertain the court's jurisdiction." Dkt.31 at 2. The State seeks nonspecific information about "the contours" of Plaintiffs' events and "the nature" of Dr. Morrell's medical practice. *Id.* at 9-10. Yet the State never explains *why* a particular piece of discovery will show that Plaintiffs lack standing to pursue their claims. It appears that the State simply wants to conduct full discovery now rather than through the normal course. But "[c]ourts should deny" discovery where "the request is 'based on little more than a hunch that it might yield jurisdictionally relevant facts.'" *Perez v. Indian Harbor Ins. Co.*, 613 F. Supp. 3d 1171, 1178 (N.D. Cal. 2020); *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023) (jurisdictional discovery "cannot be a 'fishing expedition'").

Indeed, "'expedited discovery is not the norm,'" *Planned Parenthood v. Gillespie*, 2018 WL 1904845, at *2 (E.D. Ark. Mar. 20, 2018), and "a pending preliminary injunction motion … is not sufficient to warrant expedited discovery," *NAACP v. U.S. Election Integrity Plan*, 2022 WL 1443057, at *1 (D. Colo. May 6, 2022). That makes sense, because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). And preserving the parties' relative positions—especially in cases like this, where the plaintiffs face an ongoing injury to their First Amendment rights—requires acting with "haste," so preliminary injunctions are "customarily granted on the basis of … evidence that is less complete than in a trial on the merits." *Id.*

Here, Plaintiffs continue to be puzzled as to why this case would be an exception. The State suggests that expedited discovery might turn up some piece of evidence showing that Plaintiffs "lack standing." Dkt.30 at 3. But it is not hard for a plaintiff to "sufficiently alleg[e] a chilling effect that amounts to a cognizable injury." *Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1239 (10th Cir. 2023).

**1-App-224**

Standing in the First Amendment context is "'not police[d] … with much gusto,'" is "'not meant to be difficult to satisfy,'" and requires only "'plausible claim[s].'" *Id.* at 1240. Plaintiffs have satisfied that lenient standard here. *See* Dkt.27 at 13-15, 22, 27-31. The State's insistence on a need for expedited discovery is especially puzzling because it is Plaintiffs' burden to prove that they likely have standing. *See Speech First v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020) (explaining that the "'degree of evidence required'" to show standing adjusts in "'successive stages of the litigation,'" and at "the preliminary injunction stage, the movant must clearly show only that each element of standing is *likely* to obtain" (emphasis added)); *Tennessee v. DOE*, 104 F.4th 577, 587 (6th Cir. 2024) (same).

Moreover, if the State is taking discovery, then Plaintiffs would likely need to take discovery as well. For example, it appears that the State will argue that Plaintiffs have nothing to fear because the State has not enforced an old regulatory provision that purports to ban "harassment" through "deadnaming" and "misgendering." Dkt.30 at 4-5; Dkt.31 at 13-14. But Plaintiffs cannot properly formulate the discovery they need until the State actually identifies its defenses, including any declarations filed with its opposition. Such "inefficient … piecemeal discovery" is unwarranted. *Pino v. Trujillo*, 2018 WL 11514381, at *4 (D.N.M. Dec. 7, 2018).

***Second***, denying an extension will not prejudice the State. The State appears to have multiple arguments it intends to make in its opposition that require no discovery. Nor does it claim that it needs more time to draft its opposition (it couldn't; Plaintiffs' motion was filed six weeks ago). Indeed, the State has responded to similar preliminary-injunction motions on quicker timelines, without discovery. *E.g.*, *303 Creative v. Elenis*, 1:16-cv-02372 (D. Colo. Sept. 20, 2016), Dkts.6, 38 (less than one month). Moreover, if this Court ultimately grants the State's request for expedited discovery, Plaintiffs would not oppose allowing the State to file a supplemental brief at the conclusion of discovery. The State never explains why this approach would be infeasible.

***Third***, an extension of time will unquestionably prejudice Plaintiffs. Plaintiffs filed their preliminary-injunction motion because they need immediate relief to safeguard their First Amendment rights. *See* Dkt.27 at 7, 31. But the State's schedule will impose unwarranted delays. Briefing on the State's motion for expedited discovery will take weeks. (Plaintiffs' opposition is due on July 18.) The State seeks an additional four weeks of discovery, including third-party discovery from an entity that is not a party to this lawsuit (Mountain West), plus three additional weeks to file their opposition and their motion to dismiss. Dkt.30 at 5; Dkt.31 at 15. Even assuming all of the State's discovery could be completed within that short time period, Plaintiffs would likely need to conduct their own discovery, which they could not effectively do until they know the defenses the State intends to raise. Put together, that would likely mean many months until this Court would even be in a position to rule on Plaintiffs' preliminary-injunction motion. That extension is inappropriate given the constitutional interests at stake: "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *cf. Free the Nipple v. Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("When a constitutional right hangs in the balance, … 'even a temporary loss' usually trumps any harm to the defendant.").

The State argues that "Plaintiffs face no threat of imminent harm if a ruling on their PI motion is delayed." Dkt.30 at 5. But Plaintiffs are being injured *right now*. They must refrain from expressing their sincere views about sex and gender "because [Colorado law] threatens to punish" their speech. Dkt.25 ¶¶69, 92, 115, 133. That "*chilling effect* on [their] desire to exercise [their] First Amendment rights" is a present and "ongoing" injury. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). And that injury compounds every day a preliminary injunction is not entered.

The State notes that it has not yet initiated "investigations or enforcement actions" against Plaintiffs based on the challenged provisions. Dkt.30 at 5. But the State has never promised to refrain from such enforcement. That refusal weighs heavily in favor of standing and against delaying resolution of Plaintiffs' motion. *See 303 Creative v. Elenis*, 600 U.S. 570, 583 (2023) (plaintiff had standing to challenge Colorado public accommodations law because "Colorado has declined to disavow future enforcement" (cleaned up)); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (similar). As the Supreme Court has explained, when plaintiffs face the threat of prosecution under a "newly enacted law" like H.B. 25-1312 and the State does not forswear enforcement, that gives rise to a "well-founded fear that the law will be enforced against" the plaintiffs. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). The resulting "self-censorship" is "a harm that can be realized even without an actual prosecution." *Id.*

Plaintiffs' schedule, by contrast, is far more workable and less prejudicial to all involved. The State would file its opposition to the preliminary-injunction motion on July 7, and Plaintiffs could file a reply shortly thereafter. The parties would simultaneously complete briefing on the State's motion for expedited discovery. At this point, the Court would have all the motions fully briefed. The Court could then either rule on the preliminary-injunction motion or, if it agrees with the State, allow particularized and limited expedited discovery. The State would suffer no prejudice from this schedule and it would preserve Plaintiffs' ability to receive expedited relief on their preliminary-injunction motion.

**CONCLUSION**

For the foregoing reasons, the Court should deny the State's motion for an extension of time to respond to Plaintiffs' amended motion for a preliminary injunction or, alternatively, grant an extension of no more than one week to account for the upcoming holiday. Plaintiffs do not oppose the State's request for an extension of time to respond to Plaintiffs' amended complaint.

Dated: June 29, 2025

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on June 29, 2025, I e-filed the foregoing motion using the Court's ECF system,

which will email everyone requiring notice.


/s/ *J. Michael Connolly*
Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

               *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,

               *Defendants.*

Case No. 1:25-cv-01572-RMR

**JOINT MOTION TO ADOPT A SCHEDULING ORDER**

Currently pending before this Court are Plaintiffs' motion for a preliminary injunction and CCRD and Commission Defendants' motion for limited expedited and jurisdictional discovery. *See* Dkts. 27, 31. Plaintiffs' opposition to CCRD and Commission Defendants' motion is due on July 18, CCRD and Commission Defendants' reply is due on August 1, and the Court has set a hearing for August 6. In the interests of compromise and preserving party and judicial resources, the parties request that the Court vacate the August 6 hearing (as well as an August 19 scheduling conference) and adopt the schedule identified below. This scheduling order will eliminate the need for the Court to rule on CCRD and Commission Defendants' motion for discovery, provide opportunities for discovery for all parties, and allow for an efficient resolution of Plaintiffs' motion for a preliminary injunction and the Defendants' forthcoming 12(b)(1) motion to dismiss. Because Plaintiffs' opposition to the CCRD and Commission Defendants' motion for expedited discovery is due on July 18, the parties respectfully request that the Court rule on this joint motion as soon as possible.

1.      On May 19, Plaintiffs filed their complaint, alleging that Colorado law, as amended by House Bill 25-1312, violates their rights under the First and Fourteenth Amendments to the U.S. Constitution. Dkt. 1.

2.      On May 20, Plaintiffs filed a motion seeking a preliminary injunction to prevent Defendants from enforcing the challenged laws. Dkt. 7.

3.      On May 20, the Court issued an order setting a scheduling/planning conference for August 19. Dkt. 9.

4.      On June 13, Plaintiffs filed an amended complaint and an amended preliminary-injunction motion. Dkts. 25, 27.

5.      On June 27, Defendants filed a motion for an extension of deadlines to respond to the amended complaint and the amended preliminary-injunction motion and CCRD and Commission Defendants filed a motion for limited expedited and jurisdictional discovery. Dkts. 30, 31.

6.      On July 1, the Court issued an order setting a hearing on the motion for discovery for August 6. The Court ordered that Plaintiffs' opposition to the motion was due on July 18 and CCRD and Commission Defendants' reply was due on August 1. Dkt. 36.

7.      On July 1, the Court issued an order granting Defendants' motion for an extension of the deadlines. Dkt. 38.

8.      "Discovery and scheduling are matters within the district court's broad discretion." *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1310 (10th Cir. 2010). Here, the parties' proposed schedule is warranted because it will preserve party and judicial resources, provide opportunities for discovery to all parties, and allow for the expeditious resolution of the parties' pending and forthcoming motions. Accordingly, the parties request that the Court vacate the August 6 hearing and the August 19 scheduling conference and adopt the following schedule:

2

**1-App-231**

| July 25, 2025 | The parties will submit a proposed protective order to the Court. |
|---|---|
| Aug. 15, 2025 | Plaintiffs will complete responses to CCRD and Commission Defendants' written discovery requests, *see* Dkt. 31-1, as well as three additional interrogatories that have been agreed to by the parties. Plaintiffs reserve the right to object to the substance of the discovery requests. |
| Aug. 18-29, 2025 | CCRD and Commission Defendants may conduct depositions of Erin Lee, Lori Gimelshteyn, Dr. Travis Morrell, and Dr. Valeri Leswing. |
| Sept. 19, 2025 | Defendants will file (1) their opposition to Plaintiffs' motion for a preliminary injunction; and (2) their 12(b)(1) motion to dismiss. |
| Sept. 24, 2025 | Plaintiffs will serve written discovery, if any, on CCRD and Commission Defendants. Plaintiffs are limited to two interrogatories and three document requests. If Plaintiffs believe more discovery is needed after reviewing Defendants' filings, and if an agreement cannot be reached among the parties, Plaintiffs may seek leave from the Court. CCRD and Commission Defendants reserve the right to object to the substance of the requests. |
| Oct. 29, 2025 | Defendants will complete responses to Plaintiffs' written discovery requests, if any are served. |
| Nov. 3-14, 2025 | Plaintiffs may conduct depositions of any of Defendants' declarants and/or a 30(b)(6) deposition of the Colorado Civil Rights Division or the Colorado Civil Rights Commission. |
| Dec. 3, 2025 | Plaintiffs will file (1) an opposition to the Rule 12(b)(1) motion to dismiss; and (2) a reply in support of their preliminary-injunction motion. |
| Dec. 17, 2025 | Defendants will file a reply in support of their Rule 12(b)(1) motion. If Plaintiffs' opposition to the 12(b)(1) motion is filed earlier, Defendants will file their reply within 14 days of Plaintiffs' opposition. |

### CONCLUSION

For the foregoing reasons, the parties respectfully request that the Court (1) vacate the August 6 hearing and the August 19 scheduling conference; and (2) adopt the discovery and briefing schedule proposed by the parties.

July 11, 2025                                    Respectfully submitted,

                                                */s/ J. Michael Connolly*
                                                J. Michael Connolly
                                                Cameron T. Norris
                                                Paul R. Draper
                                                CONSOVOY MCCARTHY PLLC
                                                1600 Wilson Blvd., Suite 700
                                                Arlington, VA 22209
                                                (703) 243-9423
                                                mike@consovoymccarthy.com
                                                cam@consovoymccarthy.com
                                                paul@consovoymccarthy.com

                                                *Counsel for Plaintiffs*

                                                PHILIP J. WEISER
                                                Attorney General

                                                *s/ Janna K. Fischer*


                                                Nora Q.E. Passamaneck
                                                Senior Assistant Attorney General
                                                Helen Norton
                                                Deputy Solicitor General
                                                Janna K. Fischer
                                                Senior Assistant Attorney General
                                                Dominick D. Schumacher
                                                Assistant Attorney General
                                                1300 Broadway, 10th Floor
                                                Denver, CO 80203
                                                Telephone: (720) 508-6000
                                                FAX: (720) 508-6032

                                                *Counsel for Defendants CCRD, Sergio Cordova, Geta Asfaw,
                                                Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric
                                                Artis*

                                                *For Defendant Philip J. Weiser:*

                                                *s/ Talia Kraemer*


                                                Talia Kraemer
                                                Senior Assistant Attorney General
                                                Lane Towery

4

**1-App-233**

Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

*Counsel for Defendant Philip J. Weiser*

## CERTIFICATE OF SERVICE

I certify that on July 11, 2025, I e-filed the foregoing motion using the Court's ECF system, which will email everyone requiring notice.

/s/ *J. Michael Connolly*
Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01572-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| | |
| COMMITTEE OF FIVE, INC., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-01668-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| DOXA ENTERPRISE, LTD., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-02177-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |

---

**DEFENDANTS' CONSOLIDATED OPPOSITION TO
MOTIONS FOR PRELIMINARY INJUNCTION**

---

TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 2

    I.   Background ............................................................................................... 2

        A.  CADA's Public Accommodations Provisions ........................................ 3

        B.  Protected Characteristics Under CADA ............................................... 5

        C.  CADA's Complaint Process ................................................................. 6

    II.  Plaintiffs' Allegations and Claims ........................................................... 6

        A.  Defending Education ("DE") and Do No Harm ("DNH") (*DE* Action) ....................... 6

        B.  CPAN (*DE* Action) ........................................................................... 7

        C.  PKC (*DE* Action) ............................................................................. 8

        D.  Dr. Travis Morrell (*DE* Action) ......................................................... 9

        E.  Dr. Valeri Leswing and Mountain Pediatrics (*DE* Action) .................. 10

        F.  Committee of Five d/b/a XX-XY Athletics (*XX-XY* Action) ................. 12

        G.  Doxa Enterprises d/b/a Born Again (*Doxa* Action) ........................... 13

ARGUMENT .................................................................................................. 15

    I.   Plaintiffs bear a heavy burden of establishing entitlement to extraordinary
       relief. .................................................................................................. 15

    II.  Plaintiffs have failed to establish that they are likely to succeed on the merits
       of their claims ..................................................................................... 17

        A.  Plaintiffs have not made a clear showing that they are likely to establish
           standing. ....................................................................................... 18

        B.  Plaintiffs have not made a clear showing that their claims are ripe. ..... 33

        C.  All claims against the Attorney General are barred by sovereign immunity. ........ 36

    III.  The remaining preliminary injunction factors favor Defendants .............................. 41

**1-App-238**

## TABLE OF CONTENTS

A.  Plaintiffs have not demonstrated irreparable harm. ............................................. 41

B.  The balance of harms and public interest favor Defendants................................ 43

IV. The Court cannot grant the broad relief Plaintiffs seek ............................................. 44

CONCLUSION.......................................................................................................... 45

iv

**1-App-239**

## INTRODUCTION

For years, the Colorado Anti-Discrimination Act ("CADA") has prohibited discrimination by places of public accommodation on the basis of "sexual orientation," "gender expression," and "gender identity," among other protected characteristics. Yet it was not until 2025 when Colorado enacted H.B. 25-1312—clarifying "gender expression" to include an individual's "chosen name, and how the individual chooses to be addressed"—that three separate actions now challenge CADA on constitutional grounds. These actions, asserting both as-applied and facial challenges, request injunctive relief broadly enjoining Defendants from enforcing the "gender expression" and "chosen name" definitions as amended by H.B. 25-1312, along with CADA's other long-standing public accommodation provisions. But in their speedy run to the courthouse, Plaintiffs have failed to establish standing and ripeness, much less that the other preliminary injunction factors weigh in favor of the broad relief they request.

Plaintiffs in these three actions are four advocacy organizations, two medical doctors, and one medical practice (the *Defending Education* action ("*DE* action")); a clothing retailer ("XX-XY" in the "*XX-XY* action"); and a bookstore ("Born Again" in the "*Doxa* action").[1] Plaintiffs wish to deadname and misgender[2] transgender individuals in

---

[1] Because all these actions challenge CADA and had pending Motions for Preliminary Injunction, U.S. Magistrate Judge Braswell requested that the parties consider some form of consolidated briefing. *DE* Action, ECF No. 71. To that end, Defendants agreed to file consolidated briefs addressing all three actions. *DE* Action, ECF Nos. 74, 75. Defendants have also filed consolidated Motions to Dismiss.

[2] "Deadnaming" and "misgendering" describe referring to a transgender or non-binary person with names or pronouns inconsistent with that person's gender identity.

personal interactions, speeches, advertisements, and published writings. Notably absent from the Complaints, however, are any allegations that Plaintiffs will likely violate CADA's public accommodation provisions or that they have a credible fear of enforcement. No complaints against them have been filed with the Colorado Civil Rights Division (the "Division"), and the Division has not received any complaints in the public accommodation context based solely on misgendering or deadnaming. As a result, whether and how Plaintiffs might interact with transgender individuals, and whether Plaintiffs may ultimately violate CADA through those interactions is entirely hypothetical. This is especially so where Plaintiffs each assert that they treat all members of the public with respect and do not withhold their goods and services from anyone on the basis of a protected class. Each Plaintiff has therefore failed to show a likelihood of success on the merits because each has failed to establish standing to challenge CADA or that their claims are ripe. And as to the Attorney General, all Plaintiffs' claims are barred by sovereign immunity.

Plaintiffs also have not made a "strong showing" on the other factors as required for the preliminary relief Plaintiffs seek here. Plaintiffs' alleged harms do not outweigh the potential statewide impacts of the relief they seek, and the public interest weighs in favor of the State's ability to enforce CADA. This Court should not grant broad protection against a hypothetical injury that has not occurred and may never occur.

## I. BACKGROUND

Enacted over 45 years ago, Parts 6 and 7 of CADA prohibit places of public accommodation and their employees from engaging in certain discriminatory acts.

C.R.S. §§ 24-34-601(2)(a), 24-34-701; *see also* C.R.S. § 24-34-300.7; H.B. 1355, 1979 Colo. Sess. Laws. 937-38, available at https://scholar.law.colorado.edu/session-laws-1951-2000/8050.

### A.   CADA's Public Accommodations Provisions

Part 6 applies to "place[s] of public accommodation." C.R.S. § 24-34-601(2)(a). Part 6's Accommodation Clause makes it unlawful for a "place of public accommodation," "directly or indirectly, to refuse, withhold from, or deny to an individual or a group," because of their protected status, "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." C.R.S. § 24-34-601(2)(a). In short, it ensures that places of public accommodation do not deny the "full and equal enjoyment" of the accommodation's services based on protected class status.

Part 6's Communication Clause prohibits communications by a place of public accommodation that indicate its plans to engage in conduct that is made unlawful by the Accommodation Clause. The Communication Clause's Publication Provision makes it unlawful "directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual" because of their protected status. *Id.* The Communication Clause's Unwelcome Provision makes it unlawful to publish a statement that indicates "that an individual's patronage or presence at a place of public accommodation is unwelcome,

3

**1-App-242**

objectionable, unacceptable, or undesirable" because of their protected status. *Id.*
These provisions seek to prevent places of public accommodation from making
statements aimed at discouraging individuals from seeking out their goods, services,
facilities, privileges, advantages or accommodations because of those individuals'
protected traits. *See generally Blow v. North Carolina*, 379 U.S. 684, 684-85 (1965)
(holding that a sign in a restaurant window saying "whites only" communicates an intent
to deny full and equal enjoyment of its goods and services in violation of Title II of the
Civil Rights Act of 1964).

Part 7, applicable to "person that is the owner, lessee, proprietor, manager,
superintendent, agent, or employee of any place of public accommodation," makes it
unlawful to publish any statement that: (a) "[i]s intended or calculated to discriminate or
actually discriminates against any person or class of persons on account of" their
protected status "in the matter of furnishing or neglecting or refusing to furnish to them
or any one of them . . . any accommodation, right, privilege, advantage, or
convenience;" (b) "[s]tates that any of the accommodations, rights, privileges,
advantages, or conveniences of the place shall or will be refused, withheld from, or
denied to any person or class of persons on account of" their protected status; or (c)
"[s]tates that the patronage, custom, presence, frequenting, dwelling, staying, or lodging
at the place by any person or class of persons belonging to or purporting to be of any
particular [protected status] is unwelcome or objectionable or not acceptable, desired, or
solicited" (the "Unwelcome Advertisements Clause"). C.R.S. § 24-34-701(1).

4

### B.   Protected Characteristics Under CADA

"Gender identity," "gender expression," and "sexual orientation" are all protected characteristics under CADA. *See, e.g.*, C.R.S. § 24-34-601. "Sexual orientation" was added as a protected class in 2008 and was defined at the time to include "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200). In 2009, the Commission promulgated a rule clarifying that unlawful harassment based on sexual orientation can include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 CCR 708-1, Rule 81.6(A)(4). "Gender expression" and "gender identity" were added as distinct protected classes in 2021. *See* 2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108). In May 2025, H.B. 25-1312 amended the definition of "gender expression" to include an individual's "chosen name, and how the individual chooses to be addressed." *See* H.B. 25-1312 § 8, *codified at* C.R.S. § 24-34-301(9). H.B. 25-1312 further defines "chosen name" as "a name that an individual requests to be known as in connection to the individual's disability, race, creed, color, religion, sex, sexual orientation, gender identity, gender expression, marital status, familial status, national origin, or ancestry . . . ." C.R.S. § 24-34-301(3.5).

CADA does not treat misgendering and deadnaming as *per se* unlawful practices. Determining whether a place of public accommodation's acts of misgendering and deadnaming or communications of its policies regarding misgendering and deadnaming amount to a CADA violation would be highly fact-specific and dependent on surrounding circumstances. C.R.S. §§ 24-34-601(2)(a), 24-34-701(1); Defs.' Appx. ("DA") pp. 208-09, Sullivan Dec. ¶ 11. A CADA violation would require both a showing

5

**1-App-244**

that a complainant subjectively experienced the public accommodation's actions as constituting discrimination prohibited by CADA, and that a reasonable customer in the same circumstances would too. *Id.*

### C.    CADA's Complaint Process

Any aggrieved person may file charges of discrimination under CADA with the Division, as may the Attorney General or Commission. C.R.S. § 24-34-306(1)(b), (2)(a). The filing of a charge is the first of a multi-step process outlined by C.R.S. § 24-34-306. *See also* DA pp. 205-07, Sullivan Dec. ¶ 5 (outlining steps). Throughout the process the Division and Commission must "presume that the conduct of any respondent is not unfair or discriminatory until proven otherwise." C.R.S. § 24-34-305(3). The Division is responsible for investigating any charge and determining whether it is supported by probable cause, and it remains a neutral investigative agency throughout the process. DA p. 207, Sullivan Dec. ¶ 6. If the Division finds probable cause of discrimination, the Commission has authority to set the case for an administrative hearing or issue the complainant a notice of right to sue. *Id.* p. 206, ¶ 5(h); C.R.S. § 24-34-306(4).

## II.    Plaintiffs' Allegations and Claims

All Plaintiffs across the three actions assert that they believe gender is fixed at birth and immutable, and that CADA prevents them from exercising their First Amendment rights to address individuals by names and/or pronouns they believe to be "biologically accurate" rather than those consistent with individuals' gender identity.

### A.    Defending Education ("DE") and Do No Harm ("DNH") (DE Action)

Both DE and DNH are "nationwide, grassroots, 501(c)(3) non-profit membership

**1-App-245**

organization[s]." *DE* Action, ECF No. 25, Am. Compl. ¶¶ 46, 97. DE's members include Colorado Parent Advocacy Network ("CPAN") executive director Lori Gimelshteyn and Protect Kids Colorado's ("PKC") executive director Erin Lee, and DNH's members include Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics. *Id*. ¶¶ 49, 99. DE and DNH assert standing through their members and are not claiming to have suffered injury as an organization. *See* DA p. 146, Aug. 18, 2025 email.

### B.    CPAN (*DE* Action)

"CPAN is a statewide, grassroots, 501(c)(4) non-profit organization" with a mission "to defend the fundamental right of parents to direct the upbringing, care, and education of their children." *DE* Action, ECF No. 25, Am. Compl. ¶ 51. CPAN is an advocacy organization—it advocates against "policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." *Id.* ¶ 52; *see also DE* Action, ECF No. 27-2, Gimelshteyn Dec. ¶ 4. All of its activities are directed towards advocacy. DA p. 62, Gimelshteyn Tr. 29:15-20 (CPAN "exists to support advocacy for Coloradans"); *see also id.* pp. 63-64, 31:2-17; 38:1-23 (agreeing that "advocacy is the umbrella word" that encompasses CPAN's activities).

To further its advocacy mission, CPAN hosts meetings, summits, and other events at different locations in Colorado, including at various public areas such as the steps of the Colorado State Capitol, the parking lot at Prairie Middle School, on the sidewalk outside the Arapahoe County Judicial Center, and outside the Colorado Supreme Court. DA pp. 68, 71-73, 75, 78-79, Gimelshteyn Tr. 46:5-11; 50:12-51:24;

7

**1-App-246**

53:3-7; 59:4-11; 62:20-24; DA pp. 7-18, DE Pls.' ROG Resp. No. 1. CPAN did not offer any goods, services, facilities, advantages, or accommodations at these events; it was simply expressing its views. DA pp. 74-76, 79, Gimelshteyn Tr. 55:8-10; 55:19-24; 59:4-21; 60:4-10; 64:1-4. CPAN also rented event space at the Inverness Hotel for two "summits," *id*. p. 77, 61:3-7, held a private, invitation-only event at the Independence Institute, *id*. p. 76, 60:11-23, and held events at churches. *Id.* p. 69-70, 47:6-48:10.

### C.    PKC (*DE* Action)

"PKC is a statewide, grassroots, 501(c)(4) non-profit organization devoted to protecting kids and strengthening families in Colorado." *DE* Action, ECF No. 25, Am. Compl. ¶ 75. PKC is an advocacy organization—"it advocates for policies that promote its mission." DA p. 85, Erin Lee Tr. 22:4-10; *see also id.* pp. 86-87, 26:24-27:15 (agreeing that all activities it engages in are advocacy). PKC does not sell any goods to the public. *Id.* p. 87, 27:16-18.

To further its advocacy mission, PKC hosts various events, including press conferences, movie showings, signature-gatherings, and rallies at different locations in Colorado. DA pp. 19-25, DE Pls.' ROG Resp. No. 1. For example, PKC held events in public areas, including the steps of the Colorado State Capitol and the Byron White Federal Courthouse. *Id.*; DA p. 93, Lee Tr. 41:3-23. PKC also co-sponsored a movie screening at the University of Denver's Daniels College of Business, *id.* pp. 94-95, 44:13-20, 45:4-7; and held events at restaurants—two to have people sign petitions on ballot measures, *id.* pp. 96-97, 50:15-51:14, and a third as a private luncheon. *Id.* p. 99, 53:3-5. In holding these events at restaurants, PKC neither operated as a restaurant nor

engaged in commercial activity. *Id.* pp. 97-98, 51:21-52:5. Finally, PKC held a fundraiser at which clothing retailer XX-XY sold goods, *id.* pp. 100-01, 55:23-25, 56:9-12, and a "town hall" at a recreation center. *Id.* p. 102, 59:18-25.

### D.   Dr. Travis Morrell (*DE* Action)

Dr. Travis Morrell is a medical doctor who practices as part of Mountain West Dermatology in Grand Junction, Colorado. *DE* Action, ECF No. 27-5, Morrell Dec. ¶ 4. Dr. Morrell asserts that he uses "biologically accurate pronouns and birth names" in treating transgender patients. *Id.* ¶ 6. At the same time, he testified that he has "normal natural conversations" with his patients, and he would only bring up his use of birth names and pronouns "if it came up naturally or if they brought it up in detail." DA p. 126, Morrell Tr. 111:11-22. As a result, he acknowledges that patients would only be aware of his use of pronouns and birth names "if and when they hear me or have heard me state a prior name or use biological pronouns." *Id.* pp. 126-27, 111:23-112:7. None of his patients has complained about his deadnaming and/or misgendering. DA p. 48, Morrell Supp. ROG Resp. 2. Dr. Morrell further asserts that he "enjoys treating all of his patients" and "endeavors to maintain positive and amicable relationships" with them. *Id.* p. 44, DE Pls.' ROG Resp. No. 1. He states that he "would like to take care of any patient who wishes to see me and treat them with respect and compassion." DA p. 128, Morrell Tr. 127: 2-6.

Separate from practicing medicine, he regularly "speak[s] and write[s] on the issues of sex and gender as they relate to the medical profession," and—speaking on his own behalf rather than on behalf of his practice—publishes content on social media

that deadnames and/or misgenders public figures who have never been his patients. *DE* Action, ECF No. 25, Am. Compl. ¶ 109; *DE* Action, ECF No. 27-5, Morrell Dec. ¶¶ 14, 16; DA pp. 27-30, DE Pls.' ROG Resp. No. 1 (listing three speaking events); DA p. 121, Morrell Tr. 80:16-19 (social media in personal name); 82:18-19 (subject of one of his social media posts has never been his patient). He carries out these activities in his personal capacity—he speaks on his own behalf and his writings are not on behalf of, and do not address, his practice at Mountain West. DA pp. 110, 112, 120, 122, 124, Morrell Tr. 27:23-25; 29:19-30:6; 75:15-20; 81:9-25; 84:3-7. Further, during speaking engagements, he is not offering medical services or offering any products. *Id.* pp. 113-15, 116-19, 36:14-19; 37:5-38:6; 52:6-15; 54:1-12; 65:19-66:9.

Dr. Morrell has received criticism on various social media accounts based on his public speaking and social media posts, and although he has received negative Google reviews for his medical practice, he asserts that none are from his patients and that they "have been in response to my public actions on [the topic of gender identity]." *Id.* p. 125, 100:1-20; DA pp. 37-38, DE ROG Resp. No. 2. No one has filed a complaint with the Division against Dr. Morrell. DA p. 212, Sullivan Dec. ¶ 20.

### E. Dr. Valeri Leswing and Mountain Pediatrics (*DE* Action)

Dr. Leswing, a medical doctor, is the sole owner and only doctor at Mountain Pediatrics, a pediatrics practice in Evergreen, Colorado. *DE* Action, ECF No. 27-6, Leswing Dec. ¶ 4. She asserts that she "ensures that all of her patients feel welcome and cared for in her practice." DA p. 44, DE ROG Resp. No. 3. She states that she will treat any patient and provides the same quality of service to all her patients, whether

10

they are transgender, nonbinary, or cisgender. DA p. 133, Leswing Tr. 56:17-25. At the same time, Dr. Leswing only uses "biologically accurate pronouns and birth names" in treating transgender patients, including when addressing patients or discussing them with her colleagues. *DE* Action, ECF No. 27-6, Leswing Dec. ¶ 7. Dr. Leswing has deadnamed and/or misgendered a number of patients. Restricted DA pp. 39-41, Pls.' ROG Resp. No. 2. Although at least some of these patients have not returned to Mountain Pediatrics, *id.*, no one has filed a complaint against her with the Division. DA pp. 134-35, Leswing Tr. 64:23-65:9.

She asserts that she wants to publish materials expressing her beliefs, including a statement on her practice's Facebook page "explaining to potential patients that, because I have an obligation as a physician not to harm my patients, I will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names." ECF No. 27-6, Leswing Dec. ¶ 15. She testified that for the past "two or three years," she had been considering publishing on her Mountain Pediatrics Facebook page a review of medical literature that she says supports her views, but that she has not actually written anything. DA pp. 138-39, Leswing Tr. 80:21-81:19. She further testified that she has been considering publishing on the Mountain Pediatrics Facebook page a statement regarding gender ideology, preferred pronouns, and chosen names, but had not because she "didn't want to generate further angst and anger in my community." *Id.* p. 140, 82:9-22.

Dr. Leswing testified that since the passage of H.B. 25-1312, she is concerned that "the State may come after me" if she deadnames or misgenders a patient, or that

11

she will be "targeted by somebody who didn't come in to actually seek care" or "any family or parent who wanted to be the person that made themselves famous by making a stand for what they considered are trans rights."[3] *Id.* pp. 136-37, 66:11-67:18.

### F.    Committee of Five d/b/a XX-XY Athletics (*XX-XY* Action)

XX-XY is an online, athletic-apparel retailer that also hosts pop-up shops at various locations in Colorado. *XX-XY* Action, ECF No. 1, Compl. ¶¶ 32-38. It communicates with the public at pop-up events, through speaking events and public engagements, and virtually through online advertising, email, posts on social media, and online review boards. *Id.* ¶¶ 42-44; DA pp. 181-82, XX-XY Tr. 57:21-58:5. XX-XY's brand messaging "focuses almost exclusively on protecting women's sports from the unfair inclusion of biologically male athletes," *XX-XY* Action, ECF No. 1, Compl. ¶ 48, and it "frequently" deadnames and misgenders transgender athletes in its advertising. *Id.* ¶¶ 68-69, 72-86.

XX-XY asserts that it will follow this misgendering and deadnaming practice when referring to customers and other members of the public and issued a Policy to this effect on social media the same day H.B. 25-1312 passed. *Id.* ¶¶ 92-102; *see also id.* Ex. A. How this Policy plays out in practice, however, is unclear. The majority of XX-XY's sales take place online, and for these transactions XX-XY has no way of knowing

---

[3] On November 14, *DE* Action Plaintiffs provided a Supplemental Declaration of Dr. Leswing, asserting that she is closing her current office, but plans to continue treating patients and continues to fear prosecution given H.B. 25-1312. *See* DA pp. 142-45, Leswing Suppl. Decl. Although she does not address any plans to issue any written statements, Defendants address those facts for completeness.

a customer's gender identity or whether customers are using pronouns that match their sex assigned at birth. DA pp. 170-71, 175-76, XX-XY Tr. 10:23-11:9; 35:24-36:12. Further, XX-XY states that it "would love for everybody to buy our products," and "[a]nyone is free to purchase any item that they want" from XX-XY. *Id.* pp. 170, 173, 10:19-22; 18:16-19. In fact, XX-XY is aware of two transgender people who have purchased XX-XY products and expressed public support for the brand's message. *Id.* pp. 172-73, 17:9-21; 18:5-11; DA p. 159, XX-XY ROG Resp. No. 3 at 10. XX-XY has not been the subject of any complaint filed with the Division, either before or after H.B. 25-1312. DA p. 176, XX-XY Tr. 36:17-25.

### G.   Doxa Enterprises d/b/a Born Again (*Doxa* Action)

Born Again Used Books ("Born Again"), is a bookstore in Colorado Springs, Colorado that sells used books featuring Christian themes. Born Again operates its business pursuant to a set of Christian beliefs and states that it will not use gendered language—including pronouns, salutations, or forms of address—matching a person's gender identity if that gender identity differs from what Born Again believes to be that person's sex assigned at birth. *Doxa* Action, ECF No. 4-2, at 1.

Though it claims to have operated its bookstore pursuant to these beliefs for years, it was only after the passage of H.B. 25-1312 that Born Again drafted a "Policy on Using Biologically Accurate Language" ("Language Policy"), providing that "owners and employees will not use 'gender neutral' pronouns or neologisms . . . [and] will not refer to or address a biological female as 'Mr.,' 'he,' a 'man,' or any similarly biologically inaccurate language." *Id.* ECF No. 4-2, at 1. If a person "request[s] to use a pronoun or

13

**1-App-252**

form of address that would violate" the Language Policy, Born Again states that it will "respectfully and charitably decline and instead use a form of address that does not contradict the individual's biological sex, such as the person's first or last name." *Id*. That name can be anything, even if associated with a gender identity that is not traditionally associated with one's sex assigned at birth. DA pp. 197-98, Doxa Tr. 46:17-47:5. Born Again also drafted a post for its business's blog explaining its faith-based reasons for the Policy ("Blog Post"). *Doxa* Action, ECF No. 4-3. Purportedly concerned about violating CADA, Born Again has not published either its Language Policy or Blog Post. DA p. 199, Doxa Tr. 57:13-20. Born Again has nonetheless informed its employees of the Policy and it is in effect. *Id.* p. 196, 43:9-21.

Like the other Plaintiffs, Born Again asserts that everyone is "worthy of dignity and respect" and that it will welcome all customers even while following its policy. Doxa Action, ECF No. 1, ¶ 4. In March 2025, a family came into the store looking for a specific book. DA pp. 186-87, Doxa Tr. 23:15-24:3. Perceiving a teenager to be male with long hair, an employee told one of the adults, "I just helped your son, and we looked for that book and we don't have it," to which the adult replied, "we don't have a son." *Id.* at p. 187, 24:4-9. The conversation ended there, and the four individuals continued browsing the store on their own. *Id.* at p. 188, 27:1-22. In another interaction in May 2025, two individuals that appeared to an employee to be transgender perused the store. *Id.* at pp. 191-92, 30:17-31:15. Feeling "uncertain and kind of nervous about how to address them," the employee greeted them without using any gendered language. *Id.* at pp. 189-90, 28:15-21; 29:6-8. Finally, in August 2025, two individuals that the owner believed to

14

**1-App-253**

be transgender visited the store. *Id.* at p. 193, 32:5-20. Both an employee and the

owner, Eric Smith, assisted them in looking for a book and refrained from using

gendered language during their interactions. *Id.* at p. 194, 33:4-15. Born Again has

never been the subject of any Division complaints. DA p. 215, Sullivan Dec. ¶ 26.

### ARGUMENT

**I.   Plaintiffs bear a heavy burden of establishing entitlement to extraordinary relief.**

 "A preliminary injunction is an extraordinary remedy, the exception rather than

the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir.

2019). One may be granted "only when the movant's right to relief is clear and

unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

This is especially the case where "the particular sort of remedy sought here—a pre-

enforcement preliminary injunction—is particularly fraught," as "there is no freestanding

constitutional right to pre-enforcement review in federal court." *Uber Tech. Inc. v. Moss*,

No. 1:25-cv-00096-DDD-KAS, 2025 WL 1420940 at *3 (D. Colo. Jan. 31, 2025) (citing

*Whole Woman's Health v. Jackson*, 595 U.S. 30, 52 (2021) (Thomas, J. concurring in

part and dissenting in part)).

In general, a plaintiff must establish (1) a substantial likelihood of success on the

merits, (2) that it will suffer irreparable injury absent the injunction, (3) that the balance

of equities favors the plaintiff, and (4) that an injunction is in the public interest. *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge when the

defendant is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Certain

preliminary injunctions are considered "disfavored," and then the plaintiff has an even higher burden: it "must make a strong showing" that "the likelihood-of-success-on-the-merits and the balance-of-harms factors . . . tilt in [its] favor." *Free the Nipple v. City of Ft. Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

The preliminary injunctions Plaintiffs seek here—seeking not only to enjoin the application of H.B. 25-1312 to Plaintiffs, but also to enjoin Defendants from applying any portion of CADA to Plaintiffs' policies and practices of refusing to use names and/or pronouns consistent with transgender persons' gender identity, and further to enjoin Defendants from applying Part 6's "Unwelcome Provision" and Part 7's "Unwelcome Advertisement Clause" against anyone—is "disfavored" for at least two reasons. *See DE* Action ECF No. 27, pp. 15-16, 21-22; *see also XX-XY* Action ECF No. 15, p. 2; *Doxa* Action ECF No. 4-1, p. 2. First, Plaintiffs request an injunction that would upset the existing status quo by "changing the last peaceable uncontested status existing between the parties before the dispute develop[ed]." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070-71 (10th Cir. 2009). Although H.B. 25-1312 has been in effect only since May 16, 2025, the "unwelcome" provisions that Plaintiffs challenge facially have been in effect since 1979, *see* H.B. 1355, 1979 Colo. Sess. Laws. 937-38, available at https://scholar.law.colorado.edu/session-laws-1951-2000/8050; gender identity has been protected since 2008; and since 2009 the Division has understood that unlawful discrimination based on gender identity can, depending on the circumstances, include deliberate misgendering or deadnaming. *See* 3 CCR 708-1, Rule 81.6(A)(4). An injunction prohibiting the implementation and enforcement of H.B.

16

**1-App-255**

25-1312 would thus alter the status quo. *See Colorado Motor Carriers Ass'n v. Town of Vail*, 153 F.4th 1052, 1065-66 (10th Cir. 2025) (status quo would be disturbed by a preliminary injunction after more than a year of the original ordinance being in effect).

Second, Plaintiffs' requested injunction is disfavored because it would afford them all the relief they could recover after a full trial on the merits. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005). Their PI Motions seek the same injunctive relief as their complaints. *Compare DE* Action, ECF No. 27 at 27 *with* ECF No. 25 at 56; *compare XX-XY* Action, ECF No. 1 at 49-50 *with* ECF No. 15 at 1-2; *compare* Doxa Action, ECF No. 1 at 40-41 *with* ECF No. 4 at 1-3. Plaintiffs therefore bear a "heavier burden." *Free the Nipple*, 916 F.3d at 797.

## II. Plaintiffs have failed to establish that they are likely to succeed on the merits of their claims.

Justiciability requirements, including standing and ripeness, serve several key functions. First, they ensure quality judicial decision-making by ensuring that federal courts are presented only with concrete controversies that "sharpen[] the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions[.]" *Schaffer v. Clinton*, 240 F.3d 878, 883 (10th Cir. 2001) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). They also avoid the unwise use of scarce judicial resources to resolve speculative or conjectural disputes that may never come to fruition. *See Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 119 F.3d 1437, 1443 (10th Cir. 1997) ("The case or controversy requirement of Article III admonishes federal courts to avoid 'premature adjudication' and to abstain from 'entangling themselves in abstract

17

**1-App-256**

disagreements'") (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)).

As outlined below, Plaintiffs' hypothetical and abstract claims are not justiciable because they do not provide this Court with developed facts and controversies necessary for quality judicial decision-making and for the wise use of judicial resources.

### A.   Plaintiffs have not made a clear showing that they are likely to establish standing.

Plaintiffs have the burden of establishing standing for their claims, and "[a]t the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). Plaintiffs must establish: "(1) [they] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339.

For a pre-enforcement challenge, "[t]he threatened injury must be *certainly impending* and not merely speculative," because "a claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (emphasis added). As a result, "a plaintiff bringing a First Amendment claim can show standing by alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution

18

thereunder,' or by alleging 'a credible threat of future prosecution' plus an 'ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). For establishing a "chilling effect," "evidence that in the past they have engaged in the type of speech affected by the challenged government action" ensures that the claim is "concrete and particularized." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

No Plaintiff has made a clear showing that they have engaged in speech proscribed by CADA, nor that there exists a credible threat of prosecution, nor that H.B. 25-1312 has a chilling effect on their speech. *DE* Action plaintiffs CPAN and PKC are not places of public accommodation, and for all the other Plaintiffs any potential violation of CADA is purely hypothetical given that they all state they will provide goods and services to anyone and express a desire to treat everyone with respect. None of the Plaintiffs is the subject of a complaint to the Division, and the Division has yet to receive any complaints against any individual or entity based solely on misgendering or deadnaming. DA pp. 209, 212, 214-15, Sullivan Dec. ¶¶ 15, 20, 23, 26. As a result, the facts necessary to show a CADA violation—that the interaction is subjectively and objectively experienced as discrimination prohibited by CADA—have not occurred, and very well may not occur. *Id*.

1. **CPAN and PKC have not shown they are places of public accommodation *(DE* Action).**

CPAN and PKC lack standing to challenge CADA because they offer no goods,

19

**1-App-258**

services, facilities, privileges, advantages, or accommodations to the public that would

bring them within the plain words of CADA. They therefore neither engage in conduct

proscribed by CADA nor have any credible threat of prosecution.

Part 6 of CADA defines a "place of public accommodation" as "any place of

business engaged in any sales to the public and any place offering services, facilities,

privileges, advantages, or accommodations to the public." C.R.S. § 24-34-600.3; *see

also id.* (listing examples). Part 6 further prohibits discrimination by a place of public

accommodation in the provision of those "goods, services, facilities, privileges,

advantages, or accommodations of a place of public accommodation." *Id.* § 24-34-

601(2)(a). Part 7 similarly prohibits discrimination in the provision of goods and services

by persons who own or operate places of public accommodation. *Id.* § 24-34-701(1)

(prohibiting activities tied to provision of "lodging, housing, schooling, or tuition or any

accommodation, right, privilege, advantage, or convenience," "accommodations, rights,

privileges, advantages, or conveniences of the place," or "patronage, custom, presence,

frequenting, dwelling, staying, or lodging at the place").

Clear from these definitions is that to be covered by CADA's rules for places of

public accommodation, the entity at issue must be offering "goods, services, facilities,

privileges, advantages, or accommodations" to the general public. But CPAN and PKC

offer no "services, facilities, privileges, advantages, or accommodations" as required by

CADA; instead, they are advocacy organizations holding events for the purpose of

expressing their views. DA pp. 63-64, Gimelshteyn Tr. 31:2-17; 38:1-23 (agreeing that

for CPAN's activities listed in *DE* Action, ECF No. 27-2, Gimelshteyn Dec. ¶ 4,

20

**1-App-259**

"advocacy is the umbrella word that encompasses all of the other activities"); *Id.* pp. 74-76, 55:8-10; 55:19-24; 59:4-21; 60:4-10; 64:1-4 (CPAN did not sell goods at various events); DA p. 85, Lee Tr. 22:4-10; *see also id.* pp. 86-87, 26:24-27:15 (agreeing that all activities PKC engages in are advocacy); *Id.* p. 87, 27:16-18 (agreeing that PKC does not sell goods). The Division has never found probable cause for a CADA violation by an advocacy organization—entities do not "offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, 'coalition-building,' or the other advocacy efforts identified by CPAN or PKC." DA pp. 211-12, Sullivan Dec. ¶¶ 18, 20.

Nor are CPAN's and PKC's activities transformed into offering "goods, services, facilities, privileges, advantages, or accommodations" by holding those activities at locations enumerated in CADA as places of public accommodation. As CPAN and PKC acknowledge, they are not any of the "places of public accommodation" listed by CADA. DA p. 65, Gimelshteyn Tr. 42:2-44:6; DA pp. 88-92, Lee Tr. 33:18-37:2. Nor are they stepping into the shoes of any of the locations where they hold events; they are simply customers and/or users of those spaces. *Compare with PGA Tour, Inc. v. Martin*, 532 U.S. 661, 680-81 (2001) (professional golf association offered the public the "privilege" of competing in its tournaments such that the ADA applied to those tournaments even when held at private clubs). For example, CPAN was not acting as the Inverness Hotel when it held its "summits" there—it did not sell lodging (or any other good or service) or otherwise operate as a hotel, but instead simply rented space for its advocacy activities. DA p. 77, Gimelshteyn Tr. 61:3-21. The same applies for PKC holding ballot signing

21

events and a luncheon at various restaurants—PKC did not sell food (or any other good or service) or otherwise operate as a dining establishment but instead used those spaces as a customer. DA pp. 96-97, Lee Tr. 50:15-51:14, 51:21-52:5.

> ## 2. Dr. Morrell has not shown that he engages in conduct proscribed by CADA or that he faces a credible threat of enforcement (*DE* Action).

Dr. Morrell bases his claim on both his speech made in his personal capacity outside his medical practice, and his speech in interacting with patients in his practice.

As to the former, this conduct is not covered by CADA and he thus has no credible fear of enforcement. During these activities, Dr. Morrell is not acting as or on behalf of a place of public accommodation because he does not offer goods, services, facilities, privileges, advantages, or accommodations to the public. DA p. 212, Sullivan Dec. ¶ 19. As he admits, he is not offering any medical services or products through these activities. DA pp. 113-19, Morrell Tr. 36:14-19; 37:5-38:6; 52:6-15; 54:1-12; 65:19-66:9. Nor are these events tied in any manner to his medical services. He conducts these advocacy activities under his personal name and in his personal capacity; he does not even address his practice at Mountain West. *Id.* pp. 110-12, 120, 122, 124, 27:23-25; 29:19-30:6; 75:15-20; 81:9-25; 84:3-7.

As to instances where he *might* deadname and misgender patients in his medical practice, Dr. Morrell has not established that he has engaged in or intends to engage in any conduct arguably proscribed by CADA, and any potential enforcement is speculative. A CADA violation would require both a showing that a complainant subjectively experienced the public accommodation's actions as constituting

22

**1-App-261**

discrimination prohibited by CADA , and that a reasonable customer in the same circumstances would, too. DA p. 208-09, Sullivan Dec. ¶ 11.  Applied here, although Dr. Morrell uses "biologically accurate pronouns and birth names" in treating transgender patients, *DE* Action ECF No. 27-5, Morrell Dec. ¶ 6, none of his patients has complained to him, let alone to the Division or the Colorado Medical Board. DA p. 48, Morrell Supp. ROG Resp. No. 2; DA pp. 108-09, Morrell Tr. 6:18-7:2. And although he prefers to misgender and deadname, it is not guaranteed that he will do so, even to a transgender patient. As he admits, Dr. Morrell "endeavors to maintain positive and amicable relationships" with his patients. DA p. 44, DE ROG Resp. No. 3. He testified that he has "normal natural conversations" with his patients, and he would only bring up his use of birth names and pronouns "if it came up naturally or if they brought it up in detail." DA p. 126, Morrell. Tr. 111:11-22. As a result, he acknowledges that patients would only be aware of his use of pronouns and birth names "if and when they hear me or have heard me state a prior name or use biological pronouns." *Id.* pp. 126-27, 111:23-112:7. Finally, even if he did misgender or deadname a patient, that alone would not make his conduct arguably covered by CADA, because deadnaming and misgendering are not *per se* CADA violations. DA p. 208-09, Sullivan Dec. ¶ 11.

This speculation of what may happen in the future also fails to support a credible fear of enforcement. No complaints have been filed against Dr. Morrell with the Division, and the Division has received no complaints generally based on misgendering or deadnaming alone. *See* DA p. 209, 212, 214-15, Sullivan Dec. ¶¶ 15, 20, 23, 26. His theory—requiring that he have transgender patients, an opportunity to deadname them,

23

**1-App-262**

their choosing to complain to the Division, the Division finding probable cause, and the

Commission bringing an enforcement action—is a theory that "relies on a highly

attenuated chain of possibilities" and thus "does not satisfy the requirement that

threatened injury must be certainly impending." *See Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 413 (2013).

> **3.    Dr. Leswing and Mountain Pediatrics have not shown that they face a credible threat of enforcement or that they have experienced a chilling effect (*DE* Action).**

Dr. Leswing offers two theories as to why she has a credible threat of future

enforcement. Each fails.

*First*, she asserts that H.B. 25-1312 has chilled her from publishing materials

expressing her beliefs, including a statement on her practice's Facebook page

"explaining to potential patients that . . . I will not refer to them using biologically

inaccurate terms like preferred pronouns and chosen names." *DE* Action*, ECF No. 27-6,

Leswing Dec. ¶ 15. Such materials do not, in and of themselves, state that any patient

will be denied the full and equal enjoyment of Mountain Pediatrics' accommodations in

violation of CADA, as misgendering and/or deadnaming are not *per se* CADA violations

and require a fact-dependent analysis. *See* DA p. 208, Sullivan Dec. ¶ 11. And in any

event, per her own testimony, she considered but declined to publish these statements

well before the passage of H.B. 25-1312. Dr. Leswing testified that for the past "two or

three years," she had been considering publishing on her Mountain Pediatrics Facebook

page a literature review, but that she has not actually written anything. DA pp. 138-39,

Leswing Tr. 80:21-81:19. She further testified that she has been considering publishing

24

on the Mountain Pediatrics Facebook page a statement regarding gender ideology, preferred pronouns, and chosen names, but "didn't want to generate further angst and anger in my community." *Id.* p. 140, 82:9-22. Because this concern predated H.B. 25-1312, any chill she purportedly incurred is the product of her own fear of controversy and not of a credible fear of enforcement under H.B. 25-1312. *See Clapper*, 568 U.S. at 417. "[S]uch a fear is insufficient to create standing." *Id*.

*Second*, Dr. Leswing asserts that she is concerned that "the State may come after me" if she deadnames or misgenders a patient, or that she will be "targeted by somebody who didn't come in to actually seek care" or by "any family or parent who wanted to be the person that made themselves famous by making a stand for what they considered are trans rights." DA pp. 136-37, Leswing Tr. 66:11-67:18. This theory fails to establish standing where there have been no complaints to the Division or enforcement by the Commission, whether against Dr. Leswing for her admitted deadnaming and/or misgendering individuals, *id.* pp. 134-35, 64:23-65:9, or even against other medical providers or others based on similar conduct. *See* DA pp. 209-12, Sullivan Dec. ¶¶ 15, 20; *cf. 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021) (credible threat where state had a "history of past enforcement against nearly identical conduct"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) ("*SBA List*") (credible threat where statute had already been enforced against plaintiff).

Under these facts, Dr. Leswing has made no showing that her feared patient-complainant is real, likely, or impending. *Cf. Peck*, 43 F.4th at 1132 ("To meet the requirement of showing a credible threat . . . [a plaintiff] must demonstrate an objectively

25

justified fear of real consequences." (quotation marks omitted)). Just like Dr. Morrell, her theory—requiring that she have transgender patients, an opportunity to deadname them, their choosing to complain to the Division, the Division finding probable cause, and the Commission bringing an enforcement action—is a theory that "relies on a highly attenuated chain of possibilities" and thus "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 413.

### 4. DNH and DE do not have standing (*DE* Action).

DNH and DE assert associational standing only—they do not assert any injury as an organization. *See* DA p. 146, Aug. 18, 2025 email. Because DNH's and DE's members—i.e., the other plaintiffs addressed above in II.A.1—have no standing, DNH and DE likewise lack standing. *See Colorado by & Through Colorado Dep't of Nat. Res., v. United States Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 963 (D. Colo. 2018) (An uninjured association has standing to bring suit on behalf of its members only if "its members would otherwise have standing to sue in their own right.") (citation omitted).

### 5. XX-XY has not shown that it engages in conduct proscribed by CADA or that it faces a credible threat of enforcement (*XX-XY* Action).

XX-XY fails to make a clear showing of standing for two reasons. *First*, it is unclear whether XX-XY has in fact engaged in conduct proscribed by CADA and/or will do so in the future. For example, XX-XY asserts that it violates CADA because its advertisements, social media, and website deadname and misgender public figures. *XX-XY* Action, ECF No. 15-1, PI Mem. at 6, 8-9; *XX-XY* Action, ECF No. 1-1, Compl. Ex. A. But there is a difference between statements about the general topic of

26

transgender athletes' participation in women's sports, and statements that address XX-XY's willingness to offer goods and services to the public, or the terms, conditions, and circumstances under which such services will be offered. XX-XY itself makes this distinction—while XX-XY advocates its position on women's sports, it states that it will gladly sell products to anyone, and purports to treat everyone with dignity and respect. DA p. 178-81, XX-XY Tr. 54:17-57:12; *XX-XY* Action, ECF No. 1-1, Compl. Ex. A. That potential customers may not patronize XX-XY's business because they disagree with its messages does not establish a CADA violation either. Regardless of an individual's protected status, a customer may choose not to patronize XX-XY because of its message, as XX-XY's CEO, Jennifer Sey, readily admitted. DA p. 177, XX-XY Tr. 53:7-8 ("Whether or not those people who disagree (with the brand's message) are trans identified or not is somewhat irrelevant.").

XX-XY also theorizes that its written pronoun policy—published on social media the same day it filed its Complaint in this action, *see XX-XY* Action, ECF No. 1-1—violates the Communication Clause. Again, misgendering and deadnaming are not *per se* CADA violations: whether or when such conduct would violate CADA depends on context. *See* DA pp. 208-09, Sullivan Dec. ¶ 11. And applied to XX-XY's sales of clothing, it is unclear when XX-XY would even be in a position to apply this policy. As Ms. Sey admitted in deposition, XX-XY's website does not ask individuals to confirm whether their gender identity or name matches their sex assigned and name given at birth. DA p. 174, XX-XY Tr. 34:4-20. And for in-person interactions with customers, names "rarely come up." *Id*. p. 174, at 30:18-24 ("[I]f you think about your experience in

27

a retail shop, you're probably not sharing your name."). At the same time, XX-XY

asserts that "anyone is free to purchase any item that they want," *id.* p. 170, 10:21-22,

and some of XX-XY's interactions with transgender individuals have resulted in those

individuals' purchase of XX-XY's goods. *Id.* pp. 172-73, 17:9-21; 18:6-11; DA p. 159,

ROG Resp. at 10. XX-XY's "'some day' intentions—without any description of concrete

plans, or indeed even any specification of *when* that some day will be—do not support a

finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defs. of

Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original).

Further, even if some situation arose where XX-XY refused to use pronouns

consistent with a customer's gender identity, whether that instance would amount to

discrimination in violation of CADA would be context- and fact-dependent, requiring an

analysis of both the complainant's subjective experience and how a reasonable

customer would experience the same conduct. *See* DA pp. 208-09, 214, Sullivan Dec.

¶¶ 11, 24. Specifically, a transgender individual would need to visit an XX-XY pop-up

shop, some circumstance would need to arise where XX-XY is alerted to that

individual's chosen name and/or pronouns (e.g., through inquiry by XX-XY or request by

the individual), and—despite XX-XY's assertions that it will gladly sell items to anyone—

the interaction would need to be subjectively and objectively experienced as

discrimination prohibited by CADA. This speculation cannot amount to a "clear showing"

that XX-XY is "likely" to establish standing, because a theory of standing that relies on a

"highly attenuated chain of possibilities[] does not satisfy the requirement that the

threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

*Second*, as to credible fear of enforcement, there is no past enforcement against the same conduct; in fact, no complaints have been filed against XX-XY, and the Division has never found probable cause in any public accommodations case based upon a respondent's failure to use names or pronouns consistent with an individual's gender identity. *See* DA pp. 209, 214, Sullivan Dec. ¶¶ 15, 23. Further, XX-XY's assertions that Colorado has "repeatedly prosecuted businesses like XX-XY," *XX-XY Action*, ECF No. 15-1, PI Mem. at 10, is not relevant to this inquiry, which is not whether CADA has ever been enforced against a retail business for any reason but instead turns on whether a plaintiff can show "past enforcement against *the same conduct*." *303 Creative LLC*, 6 F.4th at 1174 (emphasis added); *see also SBA List*, 573 U.S. at 164 (finding credible threat where statute had already been enforced against plaintiff). The cases cited by XX-XY do not involve past enforcement of CADA based on misgendering and/or deadnaming (indeed, there is no such past enforcement); they instead involve situations where the business at issue stated that it would refuse certain requests for goods or services by certain individuals (when XX-XY asserts that it will sell its products to anyone). *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 621-22 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570, 580 (2023).[4]

---

[4] The other decision cited by XX-XY concerns a pre-enforcement challenge (i.e., where the statute has not been enforced) to a different statute that has nothing to do with public accommodations, Colorado's Universal Preschool Program. *See Darren Patterson Christian Acad. v. Roy*, 765 F. Supp. 3d 1194, 1197 (D. Colo. 2025), appeal pending, No. 25-1187 (10th Cir.).

29

**6.    Born Again has not shown that it engages in conduct proscribed by CADA or faces a credible threat of enforcement (*Doxa* Action).**

Born Again asserts that CADA prevents it from using pronouns and titles based on a person's sex at birth (and consistent with Born Again's Christian beliefs), as well as from publishing its Pronoun Policy and Pronoun Blog Post explaining its beliefs and usage of pronouns and honorifics. *Doxa* Action, ECF 4-1 at 3-10. As explained with the other Plaintiffs above, announcing an intent to avoid names or pronouns consistent with a customer's gender identity does not amount to a *per se* CADA violation. DA p. 208-09, 215, Sullivan Dec. ¶¶ 11, 27. Moreover, Born Again's Pronoun Policy is limited to refusing to use pronouns and honorifics consistent with gender expression and identity where inconsistent with sex at birth. Born Again will instead use a form of address that avoids such words, by using the person's first or last name, or even an individual's chosen name consistent with gender identity. DA pp. 195, 197-98, Doxa Tr. 37:10-25; 46:17-47:5.

It is unclear how Born Again's policy might ever amount to discrimination in violation of CADA. For example, if an individual Born Again knows to be transgender enters the store, pursuant to the Policy Born Again would simply refer to them by name. Or where Born Again does *not* know if the person is transgender, the employee would simply greet that individual and possibly request their name (which does not require pronouns or honorifics). And even if the employee used an honorific only to be corrected by the individual, the Born Again employee could simply avoid using pronouns going forward. This is precisely what Born Again has done when individuals have

30

**1-App-269**

entered the store where employees are unsure of their sex at birth. *See* DA pp. 186-91, Doxa Tr. 23:15-24:9; 27:1-22; 28:15-21; 29:6-8; 30:17-31:15, 32:5-20; 33:4-15. Whether a hypothetical future customer might experience such interactions as discrimination in violation of CADA is purely speculative. Nor has Born Again introduced any evidence showing they are likely to establish that a reasonable customer would, under those circumstances, experience these interactions as such.

Born Again likewise has no credible fear of enforcement. As with XX-XY, there is no past enforcement against the same conduct, no complaints have been filed against Born Again, and the Division has never found probable cause in any public accommodations case based upon misgendering or deadnaming. *See* DA pp. 209, 215, Sullivan Dec. ¶¶ 15, 26. Born Again also cites the same cases as XX-XY, which are distinguishable for the same reasons above.

And while Born Again has reported that some employees generally greet customers with gendered language and are "nervous" about doing so when unsure of a customer's gender expression or gender identity and for purported concern of violating CADA, DA p. 189, Doxa Tr. 28:5-21; *see id*. at pp. 190, 200-01, Doxa Tr. 29:4-8, 66:1-6, 66:25-67:19, accidental misgendering would not violate CADA because it does not involve intentionally treating individuals differently based on their gender identity. DA pp. 208-09, Sullivan Dec. ¶ 11. Born Again's concerns do not present a "certainly impending" threat of harm, *Clapper*, 568 U.S. at 410, and cannot be the basis for standing.

31

### 7. All Plaintiffs lack a credible fear of enforcement by the Attorney General.

As to the Attorney General, there is no evidence that any Plaintiff faces a credible threat of enforcement. No Plaintiff has identified any past instance in which the Attorney General has filed any charge with the Division alleging any violation of CADA by anyone, let alone a complaint related to misgendering or deadnaming. To the extent the Attorney General's filing of a charge with the Division could be considered "enforcement," this weighs strongly against any credible threat of enforcement as to the Attorney General. *303 Creative LLC*, 6 F.4th at 1174.[5] Nor have Plaintiffs identified any reason why the Attorney General's longstanding trend of leaving CADA enforcement entirely to the Division and Commission is likely to change. Given this consistent history, the fact that CADA permits the Attorney General to file a charge with the Division is not sufficient to establish a credible threat. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1204-06 (D. Colo. 2023) (finding that "long history of non-enforcement" and lack of any "apparent reason why [the defendants] would change their policy of never pursuing civil enforcement actions under that law" weighed against finding credible threat of enforcement); *see also Bella Health & Wellness v. Weiser*, 793 F.

---

[5] In *303 Creative*, the Tenth Circuit treated all defendants equivalently in assessing whether there was a credible threat of enforcement. 6 F.4th at 1174. But because a plaintiff must have standing for each form of relief sought, *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000), Plaintiffs must establish standing specifically as to their requests for an injunction against the Attorney General. *See Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1205 (D. Colo. 2023) ("[S]tanding is generally evaluated for each claim and as to *each defendant*, not collectively.").

32

Supp. 3d 1320, 1337-38 (D. Colo. 2025) (reasoning similarly for Attorney General); *cf.*

*Peck*, 43 F.4th at 1132 ("To meet the requirement of showing a credible threat . . . [a

plaintiff] must demonstrate an objectively justified fear of real consequences." (quotation

marks omitted)).

### B.    Plaintiffs have not made a clear showing that their claims are ripe.

The ripeness doctrine is designed "to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements." *Nat'l

Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quotations

omitted). The ripeness inquiry "focuses not on whether the plaintiff was in fact harmed,

but rather whether the harm asserted has matured sufficiently to warrant judicial

intervention." *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004) (quotation

omitted). A "claim is not ripe for adjudication if it rests upon 'contingent future events

that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United

States*, 523 U.S. 296, 300 (1998) (quotation omitted).

Ripeness is a temporal constraint "drawn both from Article III limitations on

judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v.

Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). For Article III ripeness, a

threatened injury must be "sufficiently 'imminent.'" *Am. C.L. Union v. Johnson*, 194 F.3d

1149, 1155 (10th Cir. 1999) (quoting *Nat'l Treasury Emps. Union v. United States*, 101

F.3d 1423, 1428 (D.C. Cir. 1996)). For prudential ripeness, the inquiry "examines both

the fitness of the issues raised . . . for judicial review and the hardship to the parties

from withholding review*." Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012)

(quotations and citation omitted). The analysis is "relaxed somewhat" in the context of a First Amendment facial challenge, requiring a court to consider "(1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499-1500 (10th Cir. 1995).

For the same reasons that Plaintiffs lack standing, Plaintiffs have not shown any threatened injury that is sufficiently imminent to establish Article III ripeness. *See supra* Argument § II(A) (outlining bases for lack of standing); *see SBA List*, 573 U.S. at 157 n.5 (observing that, in pre-enforcement challenges, standing and ripeness often "boil down to the same question") (quotation omitted). Nor have Plaintiffs made a clear showing that they are likely to establish facts supporting prudential ripeness. Plaintiffs have shown no hardship where CADA does not even apply to CPAN, PKC, and Dr. Morrell based on his personal activities, and CADA has precluded discrimination based on gender identity and gender expression for years without any enforcement against any Plaintiff or against any entity solely based on deadnaming or misgendering. Moreover, as to XX-XY and Born Again, they have not established whether and how they may engage in conduct arguably proscribed by CADA, or that there is a credible threat of enforcement. Nor have Doctors Morrell and Leswing established any chilling effect in their practices, for all the same reasons above as to standing. Finally, these claims are not fit for review; these facts show that the claims do not present a "clean-cut and concrete" controversy suitable for this Court to decide. *Renne v. Geary*, 501 U.S. 312, 322 (1991).

34

***

In sum, in challenging the scope of CADA's protections of transgender individuals, Plaintiffs fail to present facts establishing that there is any real controversy for this Court to address—some Plaintiffs are not places of public accommodation, other Plaintiffs say they wish to deadname and misgender in providing goods and services but offer no indication how such events would both come to pass nor that they would subjectively and objectively be experienced as constituting discrimination prohibited by CADA. No Plaintiff has a credible fear of any imminent CADA enforcement where no complaints have been filed with the Division against any Plaintiff and the Division has received no complaints based on misgendering or deadnaming alone. The Court should decline Plaintiffs' invitation to weigh in on hypothetical and speculative future interactions without any concrete facts establishing a case or controversy. *See Keyes*, 119 F.3d at 1443.

### C.      All claims against the Attorney General are barred by sovereign immunity.

Plaintiffs are also unlikely to succeed on the merits of their claims against the Attorney General because those claims are barred by sovereign immunity. Eleventh Amendment sovereign immunity "precludes unconsented suits in federal court against a state and arms of the state." *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009). State officials sued in their official capacities are immune because they are "an arm of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977), and "such suits are no different

35

from a suit against the State itself," *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quotations omitted). The only potentially applicable exception to this immunity—*Ex parte Young*, 209 U.S. 123 (1908)—does not apply here.

*Ex parte Young* recognizes that in certain circumstances, a plaintiff may seek prospective relief against a state official to enjoin alleged ongoing violations of federal law. *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024). But it is a "narrow exception." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). To come within the *Young* exception, the state official whom a plaintiff seeks to enjoin must have (1) "a particular duty to enforce" the challenged statute and (2) "a demonstrated willingness to exercise that duty." *Free Speech Coal.*, 119 F.4th at 736 (citations omitted). An official's enforcement authority is critical to the exception. Otherwise, the lawsuit "is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. And "when a state law explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official *absent some evidence* that the defendant is connected to the enforcement of the challenged law." *Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013) (emphasis added).

Neither element of the *Young* test is met here. First, the Attorney General has no "particular duty" to enforce CADA. Plaintiffs point to his ability to file a charge of discrimination under § 24-34-306. *DE* Action, ECF No. 25, Am. Compl. ¶¶ 21, 39; *XX-XY* Action, ECF No. 1, Compl. ¶¶ 18, 160; *Born Again* Action, ECF No. 1, Compl. ¶¶ 21, 134. But under that statute, the Attorney General has neither an affirmative duty to act,

36

**1-App-275**

nor the independent power to enforce CADA related to public accommodations. CADA is generally enforced by the Division and Commission, upon the filing of a charge by an aggrieved individual. Under § 24-34-306(1)(b), the Attorney General *may* file a discrimination charge with the Division—and only after he determines any alleged discriminatory practice "imposes a significant societal or community impact." If the Attorney General files a charge, he does so "in the same manner" as an individual complainant, *id*., which is to say the Division—not the Attorney General—investigates and has discretion to make a probable cause finding about the Attorney General's charge, and the Commission—not the Attorney General—has the sole authority to enforce CADA at a hearing.

In other cases, the Tenth Circuit has held that a state attorney general is entitled to sovereign immunity where he was not required to sue on behalf of a victim of discrimination, *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010), or where an independent board was authorized to enforce a challenged law, *Hendrickson*, 992 F.3d at 967. Although those cases did not involve permissive power to file a complaint with an enforcement authority, they nonetheless support that the Attorney General's authority as an individual complainant to an independent enforcement body falls short of having a "particular duty" to enforce. *Edmondson*, 594 F.3d at 760 (holding that Oklahoma attorney general was entitled to sovereign immunity for challenge to portion of statute designating certain conduct as discriminatory practice because attorney general lacked authority to prosecute that kind of discriminatory practice and statute placed enforcement authority in human-rights

37

**1-App-276**

commission); *Hendrickson*, 992 F.3d at 967 (holding that New Mexico attorney general was entitled to sovereign immunity where challenged law empowered the independent Public Employee Labor Relations Board—not the attorney general—to enforce state's exclusive representation law). Analogously, here the Division and Commission carry out enforcement; the Attorney General lacks independent authority to enforce CADA.

Though one district court has held that the Attorney General has a duty to enforce CADA because lawyers in the Attorney's General office represent the Commission in administrative enforcement actions, *see Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1253 (D. Colo. 2019), this Court should decline to follow that case. *See Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado*, 255 F. Supp. 3d 1064, 1085 (D. Colo. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). When lawyers employed by the Attorney General's office represent the Commission, they serve as its agents and act in furtherance of its goals and interests. In that scenario, the Attorney General acts with no independent or discretionary enforcement authority that need be enjoined. *See* Colo. RPC 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation[.]"). Rather, the Commission, as the client, directs the enforcement action. *See* C.R.S. § 24-34-306(4) (the Commission "shall issue" notice and complaint). In fact, when lawyers from the Attorney General's office represent a state agency client,

38

they do so out of a general statutory obligation.[6] *E.g.*, *id.* § 24-31-101(1)(a) (the Attorney General "[s]hall act as the chief legal representative of the state and be the legal counsel and advisor of each department, division, office, board, commission, bureau, and agency of state government"). Applying the *Young* exception based on the Attorney General's office's role in representing the Commission would thus amount to finding the exception met because of the Attorney General's generalized role as legal counsel for state entity clients. Such general legal duties have been repeatedly deemed insufficient to draw the Attorney General into *Ex parte Young*'s exception to sovereign immunity. *See, e.g.*, *Free Speech Coal.*, 119 F.4th at 739; *Edmondson*, 594 F.3d at 760.

Nor does the Tenth Circuit's decision in *303 Creative* suggest that *Ex parte Young* applies. There, the Tenth Circuit described Colorado as having "conceded" that the Attorney General has "limited enforcement authority" under CADA in addressing traceability for purposes of the plaintiff's standing. 6 F.4th at 1175. But that is not an identical question to whether the Attorney General has a "particular duty to enforce" for

---

[6] This fact distinguishes this case from *Bella Health and Wellness v. Weiser*, where the Court determined the Attorney General had a particular duty to enforce the Colorado Medical Practice Act because of a "specific, statutorily enumerated duty to prosecute those charges that have been referred to him by the inquiry panel." 793 F. Supp. 3d 1320, 1335 (D. Colo. 2025). CADA does not contain such a "specific, statutorily enumerated duty to prosecute." *Compare* C.R.S. § 12-240-125(5)(d) ("The attorney general shall prosecute those charges . . . ."), *with id.* § 24-34-306(8) ("The case in support of the complaint shall be presented at the hearing by one of the commission's attorneys or agents."). Instead, the Commission's rules identify the "attorney general's office" as its attorney for administrative enforcement actions. *See* 8 CCR 708-1, Rule 10.7(A)(3).

39

purposes of sovereign immunity. And to put a finer point on it, Colorado does *not* concede here that the Attorney General has limited authority to enforce CADA and instead asserts that he may simply file a charge of discrimination for investigation by the Division and potential prosecution by the Commission just like any other complainant (though he has no obligation to do so). *See* C.R.S. § 24-34-306(1)(b).

As to the second *Ex parte Young* element, Plaintiffs allege no facts showing the Attorney General has ever exhibited a "demonstrated willingness" to exercise his limited, permissive authority to serve as a complainant under § 24-34-306(1)(b). Plaintiffs have not identified any instance in which a Colorado Attorney General has ever filed a charge with the Division, let alone a complaint related to misgendering or deadnaming. Similarly, Plaintiffs have not plausibly alleged or provided any evidence to show that the Attorney General has any future intent to file a charge with the Division. Nor have Plaintiffs shown how their respective activities could create a "significant societal or community impact" sufficient to justify the filing of a discrimination charge by the Attorney General.

Because the Attorney General lacks a particular duty to enforce CADA and Plaintiffs have failed to provide some evidence that the Attorney General has a demonstrated willingness to exercise even his limited discretion to serve as a complainant, suit against him is barred by sovereign immunity.[7]

---

[7] While it is the Attorney General's position that all claims against him are barred by sovereign immunity, he joins in the remaining arguments in this Opposition in the alternative, in the event this Court disagrees.

40

### III.   The remaining preliminary injunction factors favor Defendants.

When a preliminary injunction is not ripe for review and the plaintiff does not have standing, the Court need not address the preliminary injunction factors. *See Hadre v. Markey*, No. 20-CV-3594-PAB-KMT, 2021 WL 1541714, at *7 (D. Colo. Apr. 19, 2021). Nonetheless, Plaintiffs have also failed to carry their burden on the remaining preliminary injunction factors. *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022) (to obtain a preliminary injunction, plaintiff must succeed on each preliminary injunction factor).

#### A.   Plaintiffs have not demonstrated irreparable harm.

Plaintiffs argue that any continued violation of their constitutional rights establishes irreparable harm, but they are not entitled to a presumption of irreparable injury based on this claim alone. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 128 (10th Cir. 2024).

Plaintiffs' delay in challenging the Division's enforcement of its rules relating to deadnaming or misgendering in public accommodations, along with their lengthy delay in facially challenging portions of CADA that have been in place for decades, undercuts their claim of irreparable injury. *Kan. Health Care Ass'n, v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (quotations omitted); *see also Archer*, 638 F. Supp. 3d at 1261 (holding that plaintiff's four-month delay in seeking preliminary injunction, spent asking questions of the enforcing agency, undermines irreparable injury). The only change H.B. 25-1312 made was to add "chosen name" as part of the definition of "gender expression," which has been a protected trait since

41

**1-App-280**

2022, and the Division has had a rule in place since 2009 clarifying that unlawful harassment based on sexual orientation (at the time defined to include transgender status) can, depending on the circumstances, include deadnaming or misgendering. 3 CCR 708-1, Rule 81.6(A)(4). The other provisions have been in effect for decades.

Nor have Plaintiffs shown that CADA has chilled them from speaking or will do so in the future absent a preliminary injunction: the advocacy organizations, Dr. Morrell, and Born Again have not changed their practices in light of CADA; Dr. Leswing's self-censorship is based on her concerns about provoking controversy in her community, not CADA enforcement; and XX-XY actually published its policy *because of* H.B. 25-1312 and continues to misgender and deadname individuals on social media. *XX-XY* Action, ECF 1-1; DA p. 182, XX-XY Tr. 58:9-12. Further, although the Division has long considered CADA to prohibit, under certain circumstances, intentional deadnaming or misgendering of individuals in public accommodations, the Division has not found probable cause in any case based on misgendering and deadnaming, and there are no discrimination charges pending against Plaintiffs. DA pp. 207-09, 212, 214-15, Sullivan Dec. ¶¶ 7-9, 15, 20, 23, 26. Plaintiffs' allegations are thus both belated and theoretical, and insufficient to establish that they will likely suffer irreparable injury if a preliminary injunction is not entered. *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (holding the injury must be "certain, actual and not theoretical" (internal quotations omitted)); *see also Winter*, 555 U.S. at 22 (a plaintiff must show "irreparable injury is *likely* in the absence of an injunction") (emphasis in original).

42

### B.     The balance of harms and public interest favor Defendants.

Plaintiffs also cannot succeed on the final two preliminary injunction factors. *See Winter*, 555 U.S. at 26 (noting the "importance of" these factors). In terms of potential harm to Plaintiffs, their speech is not reasonably chilled, and they face no imminent threat of enforcement. On the other side of the balance of equities, Plaintiffs seek a sweeping injunction that would prevent the Division and Commission from advancing the State's compelling antidiscrimination interests and would bar CADA's enforcement against far more conduct than that described in the complaints, because they ask this Court to enjoin Defendants from enforcing broad provisions of CADA that reach far beyond the acts of misgendering or deadnaming. *See DE* Action, ECF No. 27 at 32 (asking to "enjoin Defendants from enforcing the 'gender expression' and 'chosen name' definitions as amended by H.B. 25-1312, *see* Colo. Rev. Stat. § 24-34-301(3.5) & (9), the Unwelcome Provision, *see id.* §24-34-601(2)(a), the Unwelcome Statements Provision, *see id.* §24-34-701(1)(c), and any materially similar statutory or regulatory provisions in full and as applied to Plaintiffs and their members"); *XX-XY* Action, ECF No. 15, p.2 (similar); *Doxa* Action, ECF No. 4, p. 2 (similar). "[G]overnments in this country have a 'compelling interest' in eliminating discrimination in places of public accommodation." *303 Creative*, 600 U.S. at 590; *see also Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("[O]ur democratically elected representatives are in a better position . . . to determine the public interest[.]"). Such a draconian limitation on antidiscrimination enforcement would not serve the public interest.

Transgender individuals have historically been—and continue to be—subjected

to discrimination in public and private spheres. DA p. 223, Dr. Ilan Meyer Dec. ¶ 13. The

effects of that discrimination can cause adverse health outcomes and well-being for the

individuals subjected to that stress. *Id.* p. 224, ¶ 14; *see also id.* pp.225-27, 230-33, ¶¶

15-18, 22, 25-26. And these harms result specifically from experiences of discrimination

in places of public accommodation: for example, a 2013 survey of Massachusetts

residents found that over a one-year period, in the years before transgender status was

added as a protected trait under the state's antidiscrimination laws, 65% of transgender

adults had experienced discrimination in public accommodations, including in

transportation, retail, restaurants, public gatherings, and health care. *Id.* pp. 231-32, ¶

25. Those experiences of discrimination were associated with a greater risk of

emotional and physical harm. *Id.* Colorado has a clear, longstanding interest in

preventing the harms associated with discrimination, and the Court should not

undermine those long-standing protections because of the narrow issues raised by

Plaintiffs related to H.B. 25-1312.

    **IV.**    **The Court cannot grant the broad relief Plaintiffs seek.**

       Plaintiffs ask the Court to enjoin enforcement of certain CADA provisions both "in

full" and as to Plaintiffs and their members. *DE* Action, ECF No. 27 at 27; *XX-XY* Action,

ECF No. 15 at 2; *Doxa* Action, ECF No. 4 at 2. Beyond the jurisdictional issues, this

broad relief is not appropriate for at least two reasons.

       First, federal courts are not authorized to enter "universal injunctions" that

"prohibit[] the Government from enforcing the law against *anyone*, anywhere." *See*

*Trump v. CASA, Inc.*, 606 U.S. 831, 837 n.1 (2025). Declaratory and injunctive relief

cannot "directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id*. at 2552 (quotation omitted)). "[T]o allow all persons subject to the statute to be treated as parties to a lawsuit 'would confound the established order of judicial proceedings.'" *Id*. (quotation omitted)).

Second, to the extent DE and DNH are requesting relief for members of their organizations other than the named Plaintiffs, the Court should deny such broad and amorphous relief. The *DE* Action PI Motion only presents facts regarding the named Plaintiffs. Beyond any plaintiff-member of DNH or DE, there are no facts elucidating what harms any other members of DNH or DE assert they are experiencing.

## CONCLUSION

Plaintiffs have not made the "strong showing" that is required for the injunctive relief they seek. *See Free the Nipple*, 916 F.3d at 797. Plaintiffs' requests for a preliminary injunction should be denied.

RESPECTFULLY SUBMITTED this 21st day of November, 2025.

> PHILIP J. WEISER
> Attorney General
>
> For Defendants Aubrey C. Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly and Eric Artis:
>
> *s/ Nora Q.E. Passmaneck*
> Nora Q.E. Passamaneck
> Senior Assistant Attorney General
> Helen Norton
> Deputy Solicitor General
> Janna K. Fischer
> Senior Assistant Attorney General
> Dominick D. Schumacher

45

Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032

For Defendant the Attorney General in his official capacity:

s/ *Lane Towery*

Talia Kraemer
Senior Assistant Attorney General
Lane Towery
Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, Colorado  80203
Telephone:  (720) 508-6000
talia.kraemer@coag.gov
lane.towery@coag.gov

**1-App-285**

## CERTIFICATE OF SERVICE

On June 8, 2026, I e-filed this appendix with the Court, which will email everyone

requiring notice.


Dated: June 8, 2026                                          /s/ J. Michael Connolly
                                                            Counsel for Appellants