No. 26-1101

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## APPELLANTS' APPENDIX VOLUME II

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026                    *Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

| Document | ECF No. | App. Page |
|---|---|---|
| District Court Docket | N/A | 1-App-1 |
| First Amended Complaint | 25 | 1-App-15 |
| Plaintiffs' Amended Motion for Preliminary Injunction | 27 | 1-App-81 |
| Exhibit to Amended Preliminary Injunction Motion: Sarah Perry Declaration | 27-1 | 1-App-114 |
| Exhibit to Amended Preliminary Injunction Motion: Lori Gimelshteyn Declaration | 27-2 | 1-App-118 |
| Exhibit to Amended Preliminary Injunction Motion: Erin Lee Declaration | 27-3 | 1-App-140 |
| Exhibit to Amended Preliminary Injunction Motion: Kristina Rasmussen Declaration | 27-4 | 1-App-161 |
| Exhibit to Amended Preliminary Injunction Motion: Travis Morrell Declaration | 27-5 | 1-App-165 |
| Exhibit to Amended Preliminary Injunction Motion: Valeri Leswing Declaration | 27-6 | 1-App-182 |
| Defendants' Motion for Discovery | 31 | 1-App-193 |
| Exhibit A to Defendants' Motion for Discovery: Defendants' Discovery Requests | 31-1 | 1-App-209 |
| Exhibit B to Defendants' Motion for Discovery: Defendants' Proposed Deposition Topics | 31-2 | 1-App-218 |
| Plaintiff's Opposition to Defendant's Motion for an Extension of Time | 32 | 1-App-220 |
| Joint Motion to Adopt a Scheduling Order | 43 | 1-App-230 |
| Defendants' Consolidated Opposition to Motions for Preliminary Injunction | 85 | 1-App-236 |

## VOLUME II

Excerpts of Appendix to Defendants'
Consolidated Opposition to Motions
for Preliminary Injunction ................................................... 85-1    2-App-1

Plaintiffs' Brief in Support of Motion for Preliminary
Injunction and in Opposition to Defendants' Motions
to Dismiss ...................................................................98    2-App-226

## VOLUME III

Excerpts of Appendix to Plaintiffs' Brief in Support
of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................ 98-1    3-App-1

## VOLUME IV

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................ 98-1    4-App-1

## VOLUME V

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss  ............................ 98-1    5-App-1

Courtroom Minutes for Preliminary Injunction
Motion Hearing Held on Feb. 19, 2026 and
Recommendation of United States Magistrate Judge......................... 101    5-App-21

Plaintiffs' Objections to Recommendation of United
States Magistrate Judge.................................................. 110    5-App-24

Exhibit A: Preliminary Injunction Hearing Transcript ..................110-1    5-App-39

Defendants' Response to Objections to Recommendation
of United States Magistrate Judge ...................................... 112    5-App-136

Order Adopting Recommendation of United
States Magistrate Judge and Denying Motion
for Preliminary Injunction .............................................. 115    5-App-149

Notice of Appeal........................................................ 118    5-App-173

Recommendation of United States Magistrate Judge
on Defendants' Motions to Dismiss ...................................... 125    5-App-175

## **VOLUME VI (SEALED)**

Sealed Appendix to Plaintiffs' Replies in Support
of their Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss.....................................99    6-App-1

## **VOLUME VII (SEALED)**

Second Restricted Appendix to Plaintiffs' Motion
for Preliminary Injunction and in Opposition
to Defendants' Motion to Dismiss....................................................... 100    7-App-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01572-RMR-MDB |
| COMMITTEE OF FIVE, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01668-RMR-MDB |
| DOXA ENTERPRISE, LTD.,<br><br>*Plaintiff*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-02177-RMR-MDB |

**2-App-001**

---

**APPENDIX TO DEFEDANTS' CONSOLIDATED OPPOSITION TO MOTIONS
FOR PRELIMINARY INJUNCTION**

---

TABLE OF CONTENTS

Document                                                                                                Page

Specific to Defending Education et al.:

Defending Education's Objections and Responses to Defendants' First

Set of Interrogatories* .................................................................................. 1

Excerpts of Deposition of Lori Gimelshteyn, Executive Director of Colorado

Parent Advocacy Network .......................................................................... 58

Excerpts of Deposition of Erin Lee, Executive Director of Protect Kids

Colorado ...................................................................................................... 81

Excerpts of Deposition of Travis Morrell M.D ........................................ 104

Excerpts of Deposition of Valeri Leswing M.D ....................................... 130

Supplemental Declaration of Valeri Leswing M.D ................................... 142

Aug. 18, 2025 email between counsel in *Defending Education* action ... 146

Specific to Committee of Five, Inc.:

XX-XY's Responses to CCRD and Commission Defendants' First Set of

Written Discovery Requests ...................................................................... 150

Excerpts of Rule 30(b)(6) Deposition of XX-XY (Jennifer Sey).............. 167

Specific to Doxa Enterprise, LTD:

Excerpts of Rule 30(b)(6) Deposition of Born Again Books

(Eric Smith)……………………………………………………………………184

Pertaining to all cases:

Declaration of Aubrey Sullivan, Director of the Colorado Civil Rights

Division ....................................................................................... 203

Declaration of Dr. Ilan H. Meyer ............................................................. 216


*2 pages of this document are being filed separately under restriction and in

Case No. 1:25-cv-01572-RMR-MDB only.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

<table>
<tr><td>

DEFENDING EDUCATION, *et al.*,

              *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,

              *Defendants*.

</td><td>

Case No. 1:25-cv-01572-RMR-KAS

</td></tr>
</table>

## PLAINTIFFS' OBJECTIONS AND RESPONSES
## TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs submit the following objections and responses to the Interrogatories from Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis ("Defendants"). *See* Dkt. 31-1.

### GENERAL OBJECTIONS

Plaintiffs make the following general objections to Defendants' Interrogatories, which apply to each request regardless whether the general objections are expressly incorporated into the specific objections below.

1. Plaintiffs object to each interrogatory to the extent it calls for information that is protected from discovery by the attorney-client privilege; the work-product doctrine; or constitutional and associational privileges, including the First Amendment right to associational privacy of Plaintiffs and their members; or that are otherwise protected from disclosure under the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the relevant statutory or case law, or any other applicable privilege, be it state, federal, or otherwise.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2.      Inadvertent transmission of such information or document(s) shall not be deemed a waiver of any privilege, immunity, or right (constitutional, statutory, evidentiary, or otherwise), and Plaintiffs reserve all of their rights to seek the return, destruction, or other protection of such inadvertently transmitted information, including the rights identified in the parties' stipulated protective order, *see* Dkt. 49.

3.      Plaintiffs object to Defendants' definitions and instructions to the extent they seek to impose any requirements or obligations in addition to, or different from, those set forth in federal or state law, the Federal Rules of Civil Procedure, the Local Rules of this Court, any applicable orders of this Court, or any stipulation or agreement of the parties.

4.      Plaintiffs object to each request to the extent it asks Plaintiffs—or any of Plaintiffs' attorneys, associates, employers, employees, representatives, or other persons acting through Plaintiffs, on Plaintiffs' behalf, or subject to Plaintiffs' control—to analyze or identify documents or other information that is not within the actual or constructive possession, custody, or control of Plaintiffs or any of the persons enumerated in this paragraph. Plaintiffs object to each request to the extent it asks Plaintiffs (or the persons enumerated in this paragraph) to prepare any document or other information that does not already exist.

5.      Plaintiffs object to Defendants' definitions of "You" and "Your" in paragraph 17 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

6.      Plaintiffs object to Defendants' definitions of "Defending Education," "Colorado Parent Advocacy Network," "Protect Kids Colorado," and "Do No Harm," and "Mountain West Dermatology" in paragraphs 18 through 22 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

**2-App-005**

**2**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

7.      Plaintiffs object to each interrogatory to the extent it calls for information that is in the public domain, and therefore of no greater burden for Defendants than Plaintiffs to obtain.

8.      Plaintiffs object to each interrogatory as overbroad, unduly burdensome, calling for information that is neither relevant to any issue in this action nor reasonably calculated to lead to the discovery of admissible evidence, and as an infringement of Plaintiffs and their members to associational privacy, to the extent each interrogatory seeks information about a Plaintiff's general membership, financial contributors, or other information unrelated to the standing of specific members that the Plaintiff relies upon for its associational standing.

9.      Plaintiffs object to each interrogatory to the extent it calls for legal conclusions, presents questions of pure law, calls for expert opinion, or exceeds the permissible number of interrogatories, including subparts.

10.     Plaintiffs object to each interrogatory as premature, overbroad, unduly burdensome, and improper, to the extent it seeks "all" evidence pertaining to "all" events, "all" complaints about misgendering and deadnaming, or all transgender patients treated by the plaintiff doctors, or otherwise purports to require Plaintiffs to marshal all evidence concerning any issue in dispute.

11.     Plaintiffs do not by these responses and objections waive any claim of privilege in whole or in part, or any right to object to any use of any information furnished by Plaintiffs.

3

**2-App-006**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**

As to Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, and Dr. Travis Morrell as to his speaking engagements, identify all events they operated and/or plan to operate and/or at which they have spoken and/or plan to speak in a place of public accommodation located in Colorado, including for each such event: (1) its date and location; (2) any advertising or marketing promoting the event, including social media posts; (3) the attendees; (4) a copy of all materials provided or made available to attendees, any schedules or agendas for the event, and any PowerPoint presentations shown at the event; (5) any payments collected for the event; (6) all contracts and/or agreements entered into with the place of public accommodation; and (7) all goods, services, facilities, privileges, advantages, or accommodations offered by them at the event.

**Response to Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all events" Plaintiffs have operated or spoken at in a place of public accommodation, as well as a list of all attendees and payments and "all materials," "all contracts and/or agreements," and "all goods, services, facilities, privileges, advantages, or accommodations" associated with such events. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it asks Plaintiffs to identify every time they have ever spoken or plan to speak in public. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory to the extent it calls for information, including the names or other identifying information of individuals who are Plaintiffs' members or who have attended Plaintiffs' events, that is protected by constitutional and associational privileges, including the First Amendment right to associational privacy. Plaintiffs object to this interrogatory to the extent

4

**2-App-007**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory on the grounds that the terms "goods, services, facilities, privileges, advantages, or accommodations" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it asks for a legal conclusion about the meaning of "place of public accommodation" or "goods, services, facilities, privileges, advantages, or accommodations." Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through seven subparts, some with multiple subparts within subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education.** Lori Gimelshteyn, the Executive Director of Colorado Parent Advocacy Network, and Erin Lee, the Executive Director of Protect Kids Colorado, are members of DE. Ms. Gimelshteyn attended each CPAN listed below. And Ms. Lee attended each PKC event listed below.

In addition, DE organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DE has co-sponsored events like the following. These events were open the general public unless otherwise noted.

| Event Title | Leadership Program of the Rockies Annual Retreat |
|---|---|
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 17-18, 2023   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |

5

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| | |
|---|---|
| Event Title | Leadership Program of the Rockies Annual Retreat |
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 16-17, 2024   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |
| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Description of Event | DE co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event was led by one of DE's members, CPAN Executive Director |

6

**2-App-009**

6

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | Lori Gimelshteyn, who also moderated the second of the event's two panels: a "Family Impact Panel." |
| Date and Location | April 6, 2025        The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | DE did not promote the retreat. CPAN and other co-sponsors promoted the event, but DE does not have a record of those advertisements. |
| Attendees | DE does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DE did not distribute materials at the event. CPAN and other co-sponsors distributed their own materials, but DE does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DE does not have a record of the contract. |
| Services, etc. offered | DE recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DE plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DE's own events, DE's members have attended, organized, and/or spoken at events in Colorado and elsewhere. DE personnel have, in their DE capacity, attended and/or spoken at non-DE events held in places of public accommodation in Colorado and elsewhere.

**Colorado Parent Advocacy Network.** CPAN is aware of the following past and future events. All events were open to the general public unless otherwise noted.

| Event Title | CPAN Official Launch Event |
|---|---|
| Description of Event | CPAN hosted its official launch event to introduce the organization to the public as a social welfare organization committed to restoring the parent's voice in education. The event also celebrated community leaders, educators, parents, and advocates who have made a tangible difference in the fight for academic excellence, transparency, and parental rights. |
| Date and Location | November 13, 2022    St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |

7

**2-App-010**

7

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Advertising or Marketing | CPAN promoted the event through social media, email campaigns, and a press release to local and statewide media outlets. |
| Attendees | 312 people reserved tickets through Eventbrite. |
| Materials provided at event | Attendees received a printed program with a schedule of events, speaker biographies, and a welcome message from CPAN Executive Director Lori Gimelshteyn. CPAN also distributed a one-page overview of CPAN's purpose and priorities, a flyer outlining opportunities to join and support the group, and a booklet highlighting the event's award recipients.<br><br>During the event, CPAN displayed a powerpoint presentation that highlighted the event's speakers and award recipients as well as CPAN's founding principles and policy goals. Two videos were also shown: America First Policy Institute's "American Dream" video and a trailer for a documentary entitled "Whose Children Are They?," both focusing on the themes of parental rights and educational integrity.<br><br>Attendees also received CPAN-branded literature, and members of the media received press packets. |
| Payments collected | Attendees registered through Eventbrite, but tickets were free. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver and secured a Certificate of Liability Insurance for the event. |
| Services, etc. offered | As noted above, attendees received printed materials, including a full agenda, speaker biographies, information about CPAN and its policy agenda. In addition, parking and facilities—including the event space and restrooms—were provided by the venue, and light refreshments were available. |

| | |
|---|---|
| Event Title | Power to the Parents Event |
| Description of Event | CPAN co-hosted this event bringing together parents, legal experts, policy leaders, and faith-based organizations to equip families to resist government overreach in education. The event featured a "Parental Rights Intensive," with keynote presentations including: "A Millennial Mom's Story," "Parent Pushback on Woke in Schools," and "Parental Rights: The Legal View."<br><br>The event also included two panel discussions: one with parents who discussed "Fighting Back Against School Overreach," and another with policy experts who discussed "Critical Advice for Parents." |
| Date and Location | March 12, 2023        St. Thomas More Catholic Church<br>                         8035 S. Quebec St.<br>                         Centennial, CO 80112 |
| Advertising or Marketing | CPAN was one of a few co-sponsoring groups who led promotional efforts for this event. Advertising included graphics on social media, email |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 150 people attended, including parents, educators, concerned citizens, community leaders, faith-based leader, legal professionals, and policy experts. |
| Materials provided at event | The event focused on live interaction. Attendees received informational materials from other co-sponsoring organizations, but CPAN has no record of those materials and did not distribute any of its own materials. |
| Payments collected | Donations were accepted, but attendees were not required to purchase a ticket or register in advance. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. |

| | |
|---|---|
| Event Title | CPAN Rally for Parent Rights to Oppose H.B. 23-1003 |
| Description of Event | CPAN hosted a rally on the west steps of the Colorado Capitol Building to oppose H.B. 23-1003, a bill that would authorize mental health screenings of children in schools without parental consent. The rally featured remarks from leading voices in the parental rights movement, including CPAN Executive Director Lori Gimelshteyn. Attendees were encouraged to bring homemade signs with messages like "Parents Know Best," "My Child, My Choice," and "Oppose H.B. 23-1003." |
| Date and Location | April 6, 2023          Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that nearly 200 people attended, including parents, educators, concerned citizens, community leaders, and legislators. |
| Materials provided at event | CPAN distributed printed materials outlining H.B. 23-1003's implications for parental rights, materials telling attendees how they could contact their legislators, and materials with general information about CPAN's advocacy efforts.<br><br>In addition to the in-person rally, CPAN hired a mobile digital truck that drove throughout the city of Denver on the day of the event with scrolling video content to raise awareness about H.B. 23-1003 and its threat to parental authority. |
| Payments collected | None |
| Contracts | CPAN executed a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building. As part of |

9

**2-App-012**

9

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | this agreement, CPAN paid a $50 deposit to secure access to electricity for the event. |
| Services, etc. offered | Attendees received access to the Capitol Building steps and printed materials about H.B. 23-1003 and CPAN's advocacy work. Speakers received use of sound equipment. |

| | |
|---|---|
| Event Title | School Safety Summit |
| Description of Event | CPAN hosted this summit to address the urgent issue of violence in schools through commonsense conversation and community engagement. Attendees included survivors, bereaved family members, and safety experts.<br><br>Two panels were held. The first, "Hearing from the Voices of the Victims," featured testimony from students and parents impacted by school shootings. The second, "Guided Perspective from Those Providing Proven Resources," offered insights from security and training professionals. |
| Date and Location | September 10, 2023   St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 250 people attended, including parents, educators, faith leaders, law enforcement professionals, public safety experts, community members and concerned citizens. |
| Materials provided at event | CPAN distributed a printed program that included a full schedule of events, speaker biographies, and an overview of panel topics. |
| Payments collected | Attendees purchased tickets both in advance and at the door, with seats available for $12, $15, and $18 depending on seat location. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. As part of the agreement, CPAN paid a facility rental fee. The contract also required CPAN to hire two uniformed law enforcement officers for on-site security. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. CPAN also organized on-site security. And CPAN provided complimentary bottled water to attendees. |

| | |
|---|---|
| Event Title | Rally at Cherry Creek School Board Meeting |
| Description of Event | CPAN partnered with Turning Point USA and nationally recognized speaker Pastor John Amanchukwu to organize a rally just before the Cherry Creek School Board meeting. The rally was a direct response to the Cherry Creek School District's refusal to remove sexually explicit materials— |

10

**2-App-013**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  |  |
|---|---|
|  | including books entitled *Gender Queer* and *All Boys Aren't Blue*—from school libraries despite repeated requests for their removal.<br><br>Pastor Amanchukwu traveled to Colorado to speak on the harm caused by exposing children to obscene content in schools. The event garnered national attention, including a viral post by X account @libsoftiktok. |
| Date and Location | October 9, 2023        Prairie Middle School parking lot<br>12600 E. Jewell Ave.<br>Aurora, CO 80012 |
| Advertising or Marketing | CPAN promoted the event through a press release and targeted email outreach to CPAN supporters in the Cherry Creek School District. CPAN also relied on social media posts and word-of-mouth advertising.<br><br>Following the event, CPAN posted a video discussing the district's refusal to remove obscene materials from its libraries. |
| Attendees | CPAN estimates that 75 people attended, including parents, concerned citizens, faith leaders, and education advocates. Some attendees had children attending Cherry Creek schools; others were local residents alarmed by the district's decisions; others were supporters of Turning Point USA and/or Pastor Amanchukwu. |
| Materials provided at event | CPAN distributed a flyer entitled "Protect Kids – Support Teachers – Save Cherry Creek." The flyer outlined Cherry Creek's plummeting academic performance, its safety and security failures, and its political indoctrination and secretive gender transition plans for students. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | None |

<br>

| Event Title | Gender Ideology Public Roundtable & Press Conference |
|---|---|
| Description of Event | CPAN partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024        Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. Other co-sponsoring organizations conducted their own advertising efforts, but CPAN does not have a record of those materials |

11

**2-App-014**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Attendees | CPAN estimates that 30 people attended, including parents, concerned citizens, educators, community advocates, and legislators. Several grassroots organizations attended as co-sponsors. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | The event organizers secured a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building for the press conference. An attending legislator also reserved an official meeting room inside the Capitol Building for the roundtable discussion. |
| Services, etc. offered | In addition to access to the Capitol Building space and facilities, CPAN provided lunch for attendees. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
| Description of Event | The Summit was a landmark event organized by CPAN that brought together nationally recognized medical experts, patient advocates, journalists, and parents to raise awareness about the harms of pediatric gender-affirming care. The Summit provided a forum for open dialogue on the urgent need for ethical standards in healthcare and education regarding children who face rapid onset gender dysphoria.<br><br>The event featured a panel with medical experts, a parent advocate, a journalist, and a detransitioner. (The panel included PKC Executive Director Erin Lee and Dr. Travis Morrell and was moderated by CPAN Executive Director Lori Gimelshteyn.) Attendees also participated in a Q&A session with panelists. |
| Date and Location | April 7, 2024          The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics and educational content on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 175 people attended, including parents, healthcare professionals, detransitioners and affected families, educators, policymakers and legislators, faith leaders, and representatives of allied organizations. |
| Materials provided at event | CPAN distributed a printed event program that included a schedule of events, speaker biographies, and panel descriptions. Additionally, a powerpoint presentation was displayed on-screen during portions of the event to highlight key themes and introduce speakers. |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  | CPAN released a video recording of the event afterwards. |
|---|---|
| Payments collected | Attendees purchased tickets in advance and at the door. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees. Water was also available. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |

| Event Title | Unite for School Choice Celebration |
|---|---|
| Description of Event | CPAN sponsored a celebration on the west steps of the Capitol Building that brought together parents, students, educators, concerned citizens, and other grassroots organizations to support charter schools and educational freedom. The event was organized in response to H.B. 24-1363, which would have significantly hindered the autonomy of charter schools across Colorado. |
| Date and Location | April 10, 2024          Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media posts, emails to supporters, flyers, and word of mouth. |
| Attendees | CPAN estimates that nearly 150 people attended, including parents, students, educators and charter school leaders, community leaders, legislators, and other concerned citizens. |
| Materials provided at event | Attendees received pre-printed signs and posters supporting school choice. CPAN also distributed informational flyers informing attendees how to contact their legislators and oppose H.B. 24-1363. Some attendees also received CPAN-branded paper flyers to show support for school choice. |
| Payments collected | None |
| Contracts | CPAN received a permit from the Division of Capital Assets to use the west steps of the Capitol Building. |
| Services, etc. offered | None |

| Event Title | National School Choice Week Celebration |
|---|---|
| Description of Event | CPAN partnered with Parents United America and other allied organizations to host Colorado's annual National School Choice Week Celebration in downtown Denver. The event promoted educational freedom. The event began at First Baptist Church of Denver, where 165 middle and high school students participated in a program that discussed the continuing relevance of the Constitution. Then, a crowd gathered on the west steps of |

13

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | the Capitol Building for the main celebration, where students, parents, educators, and Governor Jared Polis delivered remarks highlighting the necessity of school choice. |
| Date and Location | January 28, 2025        First Baptist Church of Denver<br>1373 Grant St.<br>Denver, CO 80203<br><br>Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, as well as emails and text messages to supporters. Co-sponsoring groups promoted the event as well, but CPAN does not have a record of their promotional materials. |
| Attendees | CPAN estimates that 275 people attended, including parents, students, educators and charter school leaders, community leaders, and Governor Jared Polis. |
| Materials provided at event | CPAN distributed printed programs during the First Baptist Church portion of the event. The programs included a schedule of events, a speaker list, and talking points about school choice in Colorado. |
| Payments collected | None |
| Contracts | CPAN executed a contract with the First Baptist Church of Denver and secured a permit for use of the west steps of the Capitol Building. |
| Services, etc. offered | Attendees received National School Choice Week branded items, included scarves, stickers, and signs. Attendees were also provided access to First Baptist Church's facilities, including seating, restrooms, and a stage area for speakers. Attendees also made use of the west steps of the Capitol Building. |

| Event Title | United for Truth Luncheon |
|---|---|
| Description of Event | CPAN hosted a private, invitation-only luncheon for families, advocates, and organizations united in their commitment to protecting children from harmful medical practices. The luncheon was timed to coincide with the Colorado House of Representatives' hearing on H.B. 25-1068. Attendees shared stories of how they have been impacted by the prevalence of gender ideology in medicine and education. |
| Date and Location | February 5, 2025        Independence Institute<br>727 E. 16th Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | The luncheon was an invitation-only event. Invitations were extended through email and text message. |
| Attendees | CPAN estimates that 36 people attended, including parents, advocacy leaders, medical professionals, policy experts, legislative staff, and allied organizations. |

14
**2-App-017**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Materials provided at event | None |
|---|---|
| Payments collected | None |
| Contracts | CPAN executed a contract with the Independence Institute to secure the venue for a luncheon and use of the venue's facilities. |
| Services, etc. offered | CPAN provided a catered lunch and access to the venue's facilities, including parking, seating, and restrooms. |

| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
|---|---|
| Description of Event | CPAN hosted the second summit in its Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. The first, "Medical, Legal, & Policy Perspectives," was moderated by Dr. Travis Morrell and included medical, policy, and legal experts. The second, a "Family Impact Panel," was moderated by CPAN Executive Director Lori Gimelshteyn and included families and clinical workers who have been impacted by so-called gender-affirming care. There was also a Q&A portion with panelists. |
| Date and Location | April 6, 2025          The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 200 people attended in person, including parents, medical professionals, educators, policymakers, and community advocates. Others watched a livestream. |
| Materials provided at event | CPAN distributed a printed event program that included a welcome message, schedule of events, speaker biographies, and co-sponsors. CPAN also used digital materials to introduce speakers and co-sponsors. Co-sponsors distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | Both in-person and livestream attendees purchased tickets in advance of the event. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. An addendum was signed to include a guest room block for attendees and panelists. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees, as well as a guest room block for attendees who booked a room at the hotel. The event also provided food and beverages. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, |

15

**2-App-018**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |
|---|---|

| | |
|---|---|
| Event Title | H.B. 25-1312 Press Conference |
| Description of Event | CPAN hosted a press conference to highlight the threat that H.B. 25-1312 poses to parental rights, free speech, and constitutional protections. The event featured remarks by CPAN Executive Director Lori Gimelshteyn along with other advocacy leaders. The event was co-sponsored by allied organizations, including Protect Kids Colorado.

The event also included testimony from parents who received support through CPAN's Incident Reporting Tool, which allows parents to submit reports of compelled speech, school safety concerns, controversial school lessons, and other dangers to Colorado youth. The parents explained how they lost custodial rights because they declined to affirm their children's gender identity declarations. CPAN later posted video of the parents' testimony—as well as Ms. Gimelshteyn's statements—to the organization's YouTube page.[1,2,3]

CPAN also announced that it had gathered nearly 35,000 petition signatures opposing H.B. 25-1312. |
| Date and Location | April 30, 2025          Capitol Building
                              200 E. Colfax Ave.
                              Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, emails, and text messages to supporters. Co-sponsoring groups also promoted the event, although CPAN does not have a record of those promotional materials. |
| Attendees | CPAN estimates that roughly 150 people attended, including members of the media, concerned parents, educators, faith leaders, and representatives of allied organizations. Others watched via livestream. |
| Materials provided at event | CPAN distributed a printed one-pager discussing "10 Reasons to Oppose H.B. 25-1312." CPAN also delivered boxes to members of the Colorado Senate containing petitions opposing H.B. 25-1312. Co-sponsoring organizations distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | None |
| Contracts | CPAN secured a permit for use of the Capitol Building west steps from the Division of Capital Assets. |

---

[1] youtube.com/watch?v=f-ef7Kb9xlc

[2] youtube.com/watch?v=9OMdZYpEsyw

[3] youtube.com/watch?v=KzjVwdTyKgg

16

**2-App-019**

16

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Services, etc. offered | CPAN provided printed informational materials and networking opportunities to attendees. CPAN Executive Director Lori Gimelshteyn and other co-sponsoring organization leaders made themselves available to members of the media for interviews. |
|---|---|

| Event Title | Press Conference on Soloman Galligan and H.B. 24-1034 |
|---|---|
| Description of Event | CPAN hosted a press conference in response to the 18th Judicial District Attorney's decision to dismiss all criminal charges against Soloman Galligan, a registered sex offender who attempted to kidnap an 11-year-old child from an elementary school. Despite video evidence and a criminal history, Galligan's charges were dropped under H.B. 24-1034 because he was deemed incompetent to stand trial. The press conference highlighted a disturbing statewide pattern in which violent offenders avoid criminal prosecution under Colorado's amended competency laws.<br><br>Speakers included CPAN Executive Director Lori Gimelshteyn along with a legislator, a law enforcement and safety expert, and a Colorado district attorney. Together, they encouraged the repeal of H.B. 24-1034. |
| Date and Location | July 23, 2025          Araphoe County Judicial Center<br>7325 S. Potomac St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the press conference through a press release, social media posts, emails, and CPAN's website. Co-sponsoring organizations promoted the event through their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that 35 people attended, including victims and their families, parents, civic leaders, elected officials, law enforcement representatives, advocacy organizations, and members of the media. |
| Materials provided at event | CPAN distributed a flyer outlining the Galligan case and other examples of H.B. 24-1034's impact. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | CPAN provided informational resources to attendees, including printed materials, expert speakers, and opportunities for media to interview speakers. The event also provided an opportunity for networking between community advocates, victims, and policymakers. |

| Event Title | CPAN Gilded Tribute Benefit Gala for Parental Rights & Educational Freedom |
|---|---|
| Description of Event | CPAN will host a gala to celebrate the organization's three years of advocacy for parental rights, school choice, and academic excellence. The event will also raise critical funds needed to sustain and expand the organization's |

17

**2-App-020**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | efforts. The gala will feature a formal dinner, silent auction, awards ceremony, and VIP reception. |
| Date and Location | September 19, 2025     The Vehicle Vault<br>18301 Lincoln Meadows Pkwy<br>Parker, CO 80134 |
| Advertising or Marketing | CPAN is promoting the gala though social media posts, email campaigns, and through allied organizations. CPAN is also distributing printed flyers and personal invitations to potential donors and community leaders. |
| Attendees | CPAN expects attendees to include supporters, donors, elected officials, community leaders, educators, and advocacy partners from across Colorado. |
| Materials provided at event | CPAN plans to distribute printed event programs that include a schedule of events, sponsor recognitions, and auction item listings. CPAN will also distribute packets to sponsors and VIPs in advance. Attendees will also receive digital follow-up materials highlighting CPAN's mission, impact, and post-event fundraising results. |
| Payments collected | Attendees will purchase tickets in advance of the gala. Payments will also be collected for VIP packages, sponsorship commitments, and the silent auction. |
| Contracts | CPAN has entered into a rental agreement with the Vehicle Vault for exclusive use of its venue for the duration of the gala. |
| Services, etc. offered | CPAN intends to offer a formal dinner, beverages, access to exclusive silent auction items, public recognition and speaking opportunities for sponsors, and special seating and networking opportunities for VIP ticket holders. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part III: Confronting Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments |
| Description of Event | CPAN plans to host the third event in its Rocky Mountain Summit series. CPAN anticipates that the event will include panel discussions on the effects of "gender-affirming care." |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be determined. |
| Advertising or Marketing | This event has not yet been advertised or marketed. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Materials have not yet been prepared for or distributed for this event. |
| Payments collected | CPAN anticipates that it will sell tickets in advance and at the door, as with CPAN's previous Rocky Mountain Summit events. |
| Contracts | CPAN has not yet reserved a venue for this event. |
| Services, etc. offered | CPAN has not yet coordinated facilities, refreshments, accommodations, or other services to offer at the event. |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

CPAN plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by CPAN as an organization, CPAN's leadership frequently attends and/or speaks at non-CPAN events held in places of public accommodation. For example, Ms. Lori Gimelshteyn is frequently invited to speak to local civic, political, and grassroots organizations in her role as CPAN Executive Director. At these events, Ms. Gimelshteyn relies on a standardized "Educate & Inform" presentation. The presentation explains the erosion of parental authority in schools, the growing prevalence of ideological and political agendas—including gender ideology—in school curricula, the misuse of mental health and social-emotional learning frameworks, the danger of so-called gender-affirming care, and the lack of transparency in educational materials, and highlights CPAN's work to oppose these trends.

**Protect Kids Colorado.** PKC is aware of the following past and future events. All events were/are open to the general public unless otherwise noted.

| Event Title | Gender Ideology Public Roundtable & Press Conference |
| --- | --- |
| Description of Event | PKC partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024  Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC advertised the event through flyers on social media, text messages to supporters, and emails to state legislators. Other co-sponsoring organizations conducted their own advertising efforts, but PKC does not have a record of those materials. |
| Attendees | PKC estimates that 10-15 legislators, 25-30 members of the public, and a few members of the press attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from Division of Capital Assets to host its event on the west steps of the Capitol Building. |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Services offered, etc. | In addition to access to the Capitol Building space and facilities, PKC provided lunch for attendees. |

| | |
|---|---|
| Event Title | Art Club Movie Showing |
| Description of Event | PKC hosted a screening of its documentary "Art Club," which highlights the threat of public school indoctrination and the transgender social contagion. The screening was accompanied by a Q&A with PKC Executive Director Erin Lee. The event was co-sponsored by the Denver University chapter of Turning Point USA. |
| Date and Location | April 10, 2024        Daniels College of Business<br>Denver University<br>2101 S. University Blvd.<br>Denver, CO 80208 |
| Advertising or Marketing | PKC and Turning Point promoted the event on social media and with flyers posted on campus. The flyers and social media posts indicated that the event was co-hosted by PKC and Turning Point. |
| Attendees | PKC estimates that 50-60 people were able to fit in the room for the event. Hundreds of others were outside of the room and the building, either due to capacity restrictions or because they wished to protest the event. |
| Materials provided at event | PKC distributed cards promoting the organization and supporting its girls-sports and parental-rights ballot initiatives. Turning Point distributed handouts promoting its own organization, but PKC does not have a record of those handouts. |
| Payments collected | None |
| Contracts | The venue was reserved by Turning Point in compliance with Denver University's procedures. |
| Services offered, etc. | PKC screened the film and allowed attendees to participate in a Q&A session with Erin lee. |

| | |
|---|---|
| Event Title | Save Girls Sport Rally |
| Description of Event | PKC co-sponsored a rally to protect sex-specific sports programs for girls and raise attention and support for 2023-2024 ballot measure #160, a PKC-backed measure to preserve girls sports leagues. The event was also sponsored by 1AMedia and Rocky Mountain Women's Network. PKC Executive Director Erin Lee spoke about the harms caused by biological males competing in female sports. |
| Date and Location | July 20, 2024        Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC and the event's other sponsors listed promoted the event on social media with materials that listed Erin Lee as a speaker and indicated that she is the "Founder of Protect Kids Colorado." |

20

**2-App-023**

20

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Attendees | PKC estimates that 20-30 members of the public and members of the press attended. |
|---|---|
| Materials provided at event | None |
| Payments collected | None |
| Contracts | 1AMedia applied for and obtained a permit from Division of Capital Assets to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | In addition to public speeches and access to the Capitol steps, the event provided petitions for attendees to sign in support of 2023-2024 ballot measure #160. |

| Event Title | PKC Signing & Notary Event |
|---|---|
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and a public notary to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC Executive Director Erin Lee spoke in support of the proposed ballot measures. |
| Date and Location | July 30, 2024          In The Zone Sports Bar 15600 W 44th Ave. Golden, CO 80403 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media. |
| Attendees | PKC estimates that 40-50 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the event's time, location, number of attendees, and menu—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. The event also offered a cash bar and food. |

| Event Title | PKC Signing & Notary Event |
|---|---|
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and public notaries to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC leadership—including |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  | Executive Director Erin Lee and PKC board members—spoke in support of the proposed ballot measures and in support of PKC's mission to protect Colorado children from dangerous gender ideology. |
|---|---|
| Date and Location | August 1, 2024        Wide Open Saloon<br>5607 US-85<br>Sedalia, CO 80135 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media and emails to PKC supporters. |
| Attendees | PKC estimates that 75-100 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. PKC also distributed thank-you cards and gift bags to volunteers. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the price, time, location, number of attendees, and use of the venue's audio system—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. PKC also distributed thank-you cards and gift bags to volunteers, as well as PKC-branded merchandise. The event also offered a cash bar and food. |

| Event Title | PKC Ballot Measure Press Conference |
|---|---|
| Description of Event | PKC board members and supporters assembled on the steps of the Capitol for a final update on 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). In addition to PKC supporters, members of the press attended and reported on the event. |
| Date and Location | August 5, 2024        Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that 10-15 PKC supporters and 2-3 members of the media attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | PKC Executive Director Erin Lee provided an update on the status of PKC's ballot initiatives. |

22

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Event Title | Stop The War On Children Rally |
| Description of Event | PKC co-sponsored a large rally at the Capitol Building with speakers from all over the country—parents of gender-confused children, detransitioners, legislators, and more—opposed to transgender ideology. The event was primarily sponsored by Gays Against Groomers. |
| Date and Location | October 5, 2024     Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 40-50 members of the public attended. A separate counter-protest was held on the public sidewalk outside our event. |
| Materials provided at event | Each of the event's co-sponsors, including PKC, distributed free branded merchandise. |
| Payments collected | None |
| Contracts | Gays Against Groomers secured a permit to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | Speeches delivered by event sponsors. |

| | |
|---|---|
| Event Title | *Lee v. Poudre* Press Conference |
| Description of Event | PKC hosted a press conference to update the public on the status of PKC Executive Director Erin Lee's personal lawsuit against Poudre School District. PKC then hosted a luncheon following the press conference. |
| Date and Location | January 21, 2025     Byron White Federal Courthouse<br>1823 Stout St.<br>Denver, CO 80257<br><br>Steuben's Uptown<br>523 E. 17th Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC promoted the event through emails and text messages to supporters. PKC also issued a press release. |
| Attendees | The press conference was open the public; the luncheon was by invitation only. PKC estimates that 20-30 members of the public attended either the press conference, the luncheon, or both. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC obtained a permit from the United States General Services Administration to host the press conference at the Byron White courthouse. PKC |

23

**23**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

24

| | also verbally contracted with Steuben's Uptown to reserve the restaurant's patio. |
|---|---|
| Services offered, etc. | Attendees received an update on Ms. Lee's lawsuit. Food was served at the luncheon as well. |

| | |
|---|---|
| Event Title | Save Girls Sports PKC Fundraising Event |
| Description of Event | PKC hosted a fundraiser in support of 2023-2024 ballot measure #160 (preserving sex-specific sports programs). The event was co-hosted by Gays Against Groomers and XX-XY Athletics. Representatives from each host organization spoke at the event, as did young female athletes affected by biological males participating in girls sports. |
| Date and Location | February 19, 2025        XX-XY Athletics <br> 260 Josephine St., 4th Floor <br> Denver, CO 80206 |
| Advertising or Marketing | PKC promoted the event with flyers distributed on social media and via email. Gays Against Groomers and XX-XY Athletics also promoted the event, but PKC does not have a record of their promotional efforts. |
| Attendees | The event was open to the public, though pre-registration was required. PKC estimates that about 60 people attended the event. |
| Materials provided at event | Attendees were given items—like shirts and stickers—promoting the "Save Girls Sports" message. PKC also distributed cards promoting PKC and its girls-sports and child-gender-transition ballot measures. |
| Payments collected | Attendees were required to register in advance but were not required to pay for admission. The event featured a live auction, and XX-XY Athletics also sold some of its clothing products; 100% of auction proceeds and 15% of clothing sales went to PKC. |
| Contracts | None |
| Services offered, etc. | Attendees were able to purchase clothing products and participate in a live auction. Wine and food were served. |

| | |
|---|---|
| Event Title | H.B. 25-1312 Press Conference |
| Description of Event | PKC hosted a press conference to highlight the effects of H.B. 25-1312 on parental rights and free speech. The event was co-hosted by Colorado Parent Advocacy Network. |
| Date and Location | April 30, 2025          Capitol Building <br> 200 E Colfax Ave. <br> Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that more than 50 members of the public attended, including PKC and CPAN supporters, parents of transgender-identifying children, and members of the press. |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Materials provided at event | None |
|---|---|
| Payments collected | None |
| Contracts | Co-host CPAN secured a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | None |

| Event Title | Giving Parents a Voice Townhall |
|---|---|
| Description of Event | PKC co-sponsored a town hall event to inform members of the public about Colorado House Bill 25-1312. The event was primarily sponsored by Moms for Liberty. PKC's Executive Director, Erin Lee, was a featured speaker and spoke about the harms caused by child gender transition. |
| Date and Location | May 1, 2025          Beck Recreation Center<br>800 Telluride St.<br>Aurora, CO 80011 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 80-100 members of the public attended. |
| Materials provided at event | Each of the event's co-sponsors had a booth at the event. PKC, at its booth, distributed PKC-branded merchandise, informational flyers about the danger of transgender ideology, and cards promoting PKC and its girls-sports and child-gender-transition ballot initiatives |
| Payments collected | None |
| Contracts | Moms for Liberty contracted with the venue. PKC does not have a record of the contract. |
| Services offered, etc. | PKC and other event co-sponsors provided information about H.B. 25-1312 and an opportunity for an open Q&A session. |

PKC plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by PKC as an organization, PKC's leadership frequently attends and/or speaks at non-PKC events held in places of public accommodation. PKC's Executive Director, Erin Lee, has averaged one to two speaking engagements per week since founding PKC. These events are often held in places of public accommodation, such as restaurants, hotels, event centers, libraries, and other public buildings. At these events, Ms. Lee is usually introduced as an advocate for parental rights and as the founder of PKC. When speaking,

**2-App-028**

25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ms. Lee often relies on a powerpoint presentation that explores the harms caused by transgender ideology, and Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation.

In addition, PKC volunteers are often in public spaces—including gun shows, county fairs, concerts, sporting events, car shows, public parks, restaurants, grocery stores, hair salons, and sports bars—gathering signatures to support PKC-backed ballot measures. When PKC volunteers are collecting signatures on behalf of PKC, they wear visible PKC volunteer badges.

**Do No Harm.** Dr. Travis Morrell is a member of DNH, has spoken at public events, and intends to speak at public events in the future, as described below. Dr. Valeri Leswing and Mountain Pediatrics are also members of DNH.

In addition, DNH organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DNH has co-sponsored events like the following. This event was open to the public.

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Description of Event | DNH co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. One of those panels, "Medical, Legal, & Policy Perspectives," was moderated by DNH member Dr. Travis Morrell and included medical, policy, and legal experts. |
| Date and Location | April 6, 2025        The Inverness Denver 200 Inverness Dr. West Englewood, CO 80112 |
| Advertising or Marketing | DNH posted about the Summit and their members' participation after the event.[4] CPAN and other co-sponsors also promoted the event, but DNH does not have a record of those advertisements. |
| Attendees | DNH does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DNH may have distributed a rack card with information about DNH's mission and opportunities to support its mission. CPAN and other co- |

---

[4] x.com/donoharm/status/1909274381101989994

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| | sponsors distributed their own materials, but DNH does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DNH does not have a record of the contract. |
| Services, etc. offered | DNH recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DNH plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DNH's own events, DNH's members have attended, organized, and/or spoken at events in Colorado and elsewhere.

**Dr. Travis Morrell.** Dr. Morrell is aware of the following past and future events at which he spoke or intends to speak. All events were/are open to the general public unless otherwise noted.

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | Moderated panel discussion on the effects of "gender-affirming" treatments |
| Date and Location | April 7, 2024          The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker.[5] As a speaker, however, Dr. Morrell was not responsible for advertising or marketing the event. He does not have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 100 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |

---

[5] x.com/CPANColorado/status/1770261143820337171

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. |

| | |
|---|---|
| Event Title | Diversity without Division: Is It Possible? |
| Event Host | FAIR Colorado (Foundation Against Intolerance & Racism) |
| Description of Event | A moderated panel discussion to share insights on diversity, equity, and inclusion initiatives |
| Date and Location | September 12, 2024    Junior Achievement Free Enterprise Center 6500 Greenwood Plaza Blvd., Greenwood Village, CO 80111 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media. Dr. Morrell personally promoted the event through a post on X that specifically identified Dr. Morrell as a speaker.[6] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 75 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell believes the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | The event offered seating for ticketed attendees, as well as light refreshments. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event included two moderated panel discussions on the effects of "gender-affirming" treatments |
| Date and Location | April 6, 2025    The Inverness Denver 200 Inverness Drive West Englewood, CO 80112 |

---

[6] x.com/MorrellMDmph/status/182681897434169189

28

**2-App-031**

28

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker. Dr. Morrell personally promoted the event through multiple posts on X.[7,8,9] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 150 people attended the event in person, and others watched a livestream of the event. |
| Materials provided at event | Dr. Morrell distributed paper handouts with information about an organization he leads: Colorado Principled Physicians. Dr. Morrell recalls that other co-sponsoring organizations distributed materials, but he does not have a record of those materials. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. Tickets were also required for the live-streaming audience, both in and outside of Colorado. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part III: Safeguarding Children from Gender-Affirming Treatment |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event will include panel discussions on the effects of "gender-affirming" treatments. |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be determined. |
| Advertising or Marketing | This event has not been advertised or marketed yet. Dr. Morrell anticipates that the event will be advertised and marketed similar to CPAN's previous "Rocky Mountain Summit" events. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Dr. Morrell has not prepared any materials to use or provide at the event. |
| Payments collected | To the best of Dr. Morrell's understanding, the event will be ticketed. As a speaker, Dr. Morrell does not plan to collect payments or tickets. |
| Contracts | Dr. Morrell anticipates that the event host will sign a contract with the venue. As a speaker, however, Dr. Morrell does not plan to sign any contracts. |

---

[7] x.com/MorrellMDmph/status/1907225349584478599
[8] x.com/MorrellMDmph/status/1908210234830807282
[9] x.com/MorrellMDmph/status/1902444732627689844

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Services, etc. offered | Dr. Morrell anticipates that the event will have ticketed seating and light refreshments. |
|---|---|

Dr. Morrell plans to speak at additional public events in the future.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Interrogatory No. 2**

As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals.

**Response to Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all instances" in which "any person" has complained about the use of certain words. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory on the grounds that the term "complained about" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education**. DE's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes CPAN Executive Director Lori Gimelshteyn and PKC Executive Director Erin Lee, as described below.

In addition, DE is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DE has received complaints and criticism like the following:

- On August 7, 2022, after DE filed a lawsuit in federal court challenging a school policy that required students and staff use preferred pronouns and chosen names and facilitated social

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transitioning of students without parental notification, a news outlet criticized DE's members "who can't accept the reality of being transgender." It accused DE of ignoring "the rights of transgender students protected under" state and federal civil rights laws and suggested there should be "consequences" for those, like DE's members, who refuse to speak using someone's preferred pronouns or chosen name.[10]

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[11]

- The Southern Poverty Law Center has declared DE a "hate group" based on its opposition to gender ideology in American schools.[12] The SPLC says DE "spew[s] homophobic and transphobic speech in the name of protecting their children's innocence, disregarding and disrespecting children in the LGBTQ community."[13]

- DE regularly receives hostile messages and comments from members of the public complaining about DE's opposition to gender ideology. These messages and comments attack DE and its leadership using terms like "bigots" and "dangerous extremists." One email told DE personnel, "YOU CAN GARGLE MY TRANS BALLS."

**Colorado Parent Advocacy Network.** To the best of its recollection, CPAN is aware of the

following instances in which someone has complained about the use of pronouns and/or names of

transgender individuals:

- CPAN held its official launch event on November 13, 2022. Before the event, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several emails from individuals urging the venue to cancel the event. According to the venue, these messages were ideological in nature and expressed disagreement with CPAN's stance on LGBTQ issues.

---

[10] Todd Dorman, *Linn-Mar lawsuit ignores rights of transgender kids*, The Gazette (archived Aug. 13, 2025), perma.cc/CRU3-5ZHA.

[11] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[12] *2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

[13] *Assault on Inclusive Education and How We're Fighting Back*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/47KW-2HS7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- Following CPAN's November 13, 2022 launch event, a transgender journalist who uses the name "Heidi Beedle" and "they" pronouns published a piece criticizing the event and CPAN's mission. The article described CPAN as an "anti-LGBTQ" organization and accused CPAN of associating with "transphobic" individuals.[14]

- Following CPAN's April 6, 2023 rally to oppose H.B. 23-1003, transgender journalist Heidi Beedle published an article critical of the rally. The article claimed that CPAN "often target[s] LGBTQ students in [its] activism."[15]

- In May 2023, CPAN Executive Director Lori Gimelshteyn received a "Thank You" card in the mail from the Satanic Temple, stating that a donation had been made in her name as a form of retaliation for her views.

- Before CPAN's September 10, 2024 School Safety Summit, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several hateful emails demanding that the event be cancelled. The emails accused CPAN of being a hate group because of its views on LGBTQ issues and parental rights. These messages prompted the venue to require CPAN to hire two uniformed law enforcement officers for on-site security as a condition of the venue rental.

- During CPAN's October 9, 2024 rally before a Cherry Creek School Board meeting, several individuals affiliated with a group known as the "Parasol Patrol," some of whom identify as transgender," were present and protested the rally. This group disrupted the event by driving vehicles through CPAN's crowd, using umbrellas to poke at attendees, and attempting to engage in verbal confrontation with attendees. After the rally, at the Board meeting itself, Parasol Patrol members filled the meeting room with signs and posters accusing CPAN of spreading misinformation about the content in Cherry Creek School District libraries.

- On April 6, 2025, at CPAN's Rocky Mountain Summit Part II, a group of more than 50 protesters gathered outside the venue. Many of the protesters wore rainbow attire and carried signs with slogans like, "Trans Rights Are Human Rights" and "Eliminate the TERFs." Before the Summit began, two of the protestors entered the venue. They began scanning the room and attempted to film the event space covertly. Police informed CPAN Executive Director Lori Gimelshteyn that the two protestors were behaving suspiciously. Ms. Gimelshteyn spoke to the protestors for approximately 15 minutes. They expressed disagreement with the substance of the Summit and complained that CPAN promoted voices that do not support gender-affirming care. The two protesters also stated that they disagreed with how CPAN and the Summit's speakers framed the issues of gender identity and pronoun usage.

---

[14] Heidi Beedle, *A New Conservative Group Uses Anti-LGBTQ Sentiment to Attack Colorado Public Schools*, Colorado Times Recorder (Dec. 1, 2022), perma.cc/YA3D-4DKA.

[15] Heidi Beedle, *'I'm a Pissed Off Grandma' – Republican Legislators Address Parent Rights Rally*, Colorado Times Recorder (Apr. 7, 2023), perma.cc/J497-3N56.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- On April 28, 2025, following CPAN's press conference opposing H.B. 25-1312—including its provisions regarding preferred pronouns and chosen names—CPAN Executive Director Lori Gimelshteyn attended the Colorado Senate Judiciary Committee hearing on the bill. When Ms. Gimelshteyn delivered testimony to the committee expressing opposition to the bill, several transgender individuals vocally snickered. One transgender individual spat in her hair. And when Ms. Gimelshteyn stepped out to use the restroom, several transgender individuals stood in her path in a manner she perceived as intimidating and designed to deter her from passing, though she was able to proceed past them. For her safety, Ms. Gimelshteyn had to be escorted from the Capitol Building to her vehicle by Capitol police after several transgender individuals again stood in her path in a manner she perceived as intimidating and designed to block her path. After this incident, Ms. Gimelshteyn filed a complaint with the Capitol police.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[16]

- In addition, CPAN Executive Director Lori Gimelshteyn has received online harassment on many occasions as a result of her views on sex, gender ideology, and pronoun/name usage. She has received hostile comments threatening to protest her speaking engagements and disparaging her because she opposes gender-affirming treatment for minors. Several messages have also complained that Ms. Gimelshteyn and CPAN intentionally use supposedly incorrect pronouns or "deadnames" in public statements and marketing materials.

   **Protect Kids Colorado.** To the best of its recollection, PKC is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In May 2021, Ms. Kimberly Chambers, a subject of PKC's "Art Club" documentary and an activist who had previously spoken to PKC Executive Director Erin Lee's daughter, encouraged Poudre School District, where PKC Executive Director Erin Lee's daughter attended school, to consider performing a "well-child check" on Ms. Lee and her daughter because Ms. Chambers believed Ms. Lee was not sufficiently affirming of her child's purported gender identity.

- On another occasion, on February 22, 2024, Ms. Kimberly Chambers made a post on Facebook calling Ms. Lee a "#ParentalRights terroris[t]." The post accused "groups like

---

[16] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

#ProtectKidsColorado" of "child hate indoctrination" and "encourag[ing]" "physical, emotional, legislative, and fatal violence" against transgender-identifying youth. The post suggested that PKC and similar groups were complicit in the murder of "Nex Benedict," a transgender-identifying youth. The post "[t]hank[ed]" the Gay, Lesbian, & Straight Education Network "for holding [PKC] accountable."

- From the fall of 2023 through the Spring of 2024, Ms. Kimberly Chambers made a series of posts criticizing PKC's and Executive Director Erin Lee's advocacy, with the hashtag "#ForCLee," a reference to Ms. Lee's formerly gender-confused daughter.

- In March 2024, PKC Executive Director Erin Lee filed a report with the Federal Bureau of Investigation regarding death threats she had received because of her advocacy on gender ideology issues. The FBI followed up with Ms. Lee to ask for additional information.

- Leading up to PKC's April 10, 2024 screening of the "Art Club" documentary at Denver University, over 1,000 Coloradans, including a state legislator, signed an open letter to "denounce" the event and "call on … the University of Denver to not allow this event." The petition complained that PKC promotes "harmful rhetoric" and accused PKC of holding "anti-transgender and anti-science stances." Hundreds of protestors showed up at the event itself, where they verbally and physically harassed PKC Executive Director Erin Lee and other attendees. For example, protestors said that Ms. Lee was transphobic and accused her of misgendering transgender-identifying people. During the event, protestors sent Ms. Lee physical threats on Instagram. Ms. Lee needed Denver police to escort her safely to her vehicle and off campus. One of her hired bodyguards was injured.

- On April 13, 2024, PKC Executive Director Erin Lee spoke at a rally on the steps of the Colorado Capitol building organized by #DontMessWithOurKids. More than 30 transgender individuals stood on an adjacent sidewalk to protest the event. Several of the transgender protesters came into the crowd of rally attendees and disrupted Ms. Lee's speech. State police removed the protesters. In light of previous events—like the threatening conduct Ms. Lee suffered during PKC's April 10, 2024 event at Denver University—Ms. Lee felt she needed to, and did, hire private security for this event.

- On April 1, 2025, during a Colorado House Judiciary Committee hearing, Representative Yara Zokaie called PKC and other parental rights groups "hate groups" and compared them to the "KKK" because they opposed H.B. 25-1312's "chosen name" and "gender expression" provisions. Representative Zokaie doubled down on her complaint—again calling PKC and related groups "hateful" and the "KKK"—on April 4, 2025, during floor debates over H.B. 25-1312.

- On May 19, 2025, Bee Gonzalez, a Colorado mother, posted a video on TikTok directly targeting PKC's Executive Director, Erin Lee. Ms. Lee had previously posted on X about Ms. Gonzalez's child, a biological girl who was socially transitioned at school without the knowledge or consent of the child's father. Ms. Lee's post called the child a "little girl,"

35

**2-App-038**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

referred to the child using female pronouns ("she" and "her"), and noted the child's so-called chosen name using scare quotes ("'Ollie'"). Ms. Lee explained that stories like this are why PKC opposes H.B. 25-1312. In her video, Ms. Gonzalez said that she was "publicly notifying … Erin Lee" that her "child's name is Ollie and their pronouns are they/them." Ms. Gonzalez insisted that Ms. Lee "not continue to publish things that intentionally misgender them." Ms. Gonzalez described Ms. Lee's posts as "atrocities" and threatened to take legal action against Ms. Lee if Ms. Lee continued to refer to the child with biologically accurate terms. Ms. Gonzalez also referred to Ms. Lee by name during public testimony in support of H.B. 25-1312 at a Colorado Senate Judiciary Committee hearing.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs (including PKC) and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[17]

- In addition, PKC Executive Director Erin Lee has received dozens of messages over social media and in person threatening her life or wishing for her death because of her public stance on transgender ideology. Individuals displeased with her speech have publicly posted information about her children's schools and/or sent threatening messages to the schools. Individuals have also made comments online and in person Ms. Lee saying they would harass her church. Ms. Lee has also been "doxed." She has been stalked. And her home was broken into in May of 2023.

**Do No Harm**. DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

In addition, DNH is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DNH has received complaints and criticism like the following:

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using

---

[17] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[18]

- The Southern Poverty Law Center has declared DNH an "Anti-LGBTQ+ Hate Group."[19]

- DNH has routinely received hostile commentary from members of the public who have staunchly opposed the organization's mission to curtail the unscientific and individually harmful practice of so-called gender affirming care for minors. These opponents have repeatedly attacked Do No Harm for challenging their preferred narratives and language concerning youth-focused gender ideology. They have shared odious comments on the Do No Harm website and posted offensive and sometimes shocking statements on social media, declaring DNH a "transphobic" and "bigot[ed]" organization. One user on X stated that "Orgs like [DNH] should be shutdown and investigated for unethical practices." In addition, DNH staff have received mail at their personal residences with hostile messages like "You are the HARM."

- In addition, DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

**Dr. Travis Morrell**. To the best of his recollection, Dr. Morrell is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In June 2024, the Colorado Medical Society voted on a proposal by Dr. Morrell to recognize that the definition of "female genital mutilation" includes some aspects of pediatric "gender-affirming" treatments, including "the alteration or removal of a minor's biologically healthy tissue that decreases potential innate adult functionality, and for which may involve the medical, hormonal, functional, or surgical treatments of gender dysphoria or gender incongruence." An assistant professor at the University of Colorado School of Medicine emailed his students, who would soon join Dr. Morrell in the medical profession, called Dr. Morrell's proposal "discriminatory and medically unconscionable," and encouraged the students to vote against the proposal.

- Also in June 2024, another professor at the University of Colorado School of Medicine emailed the leadership of the Colorado Medical Society to complain about Dr. Morrell's proposal

---

[18] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[19] *Anti-LGBTQ*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/NK5D-S35A; *see also 2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

regarding the definition of "female genital mutilation." The professor called the proposal "of-fensive," "deceptive," and "shameful." The professor called for the proposal to be "remove[d]" and "taken down." At least one member of the Colorado Medical Society's board of directors "[t]otally agree[d] with [those] sentiments" and indicated she would share the pro-fessor's complaint with other board members.

- On June 20, 2024, in a comment exchange on X regarding a post that highlighted the damage that gender-affirming care can do to a patient's reproductive abilities, a Colorado-based LGBTQIA+ activist organization told Dr. Morrell that he should "[b]e careful preaching" his views on the dangers of gender-affirming care "in Colorado" because "we have an active ban on conversion therapy" and Dr. Morrell "[w]ouldn't want an investigation …."

- On March 15, 2025, Dr. Morrell testified in favor of A.B. 104 (a proposed ban on gender-transition medical treatments for minors) in the Wisconsin State Assembly Committee on Health, Aging, and Long-Term Care. While testifying, Dr. Morrell was interrupted with cries of "Nazi" by an individual that Dr. Morrell believes was a transgender-identifying biological male. Wisconsin state police were required to keep the peace while Dr. Morrell was speaking, and at least one protester was removed by state policy shortly before or after Dr. Morrell's testimony.

- Dr. Morrell spoke at Colorado Parent Advocacy Network's Rocky Mountain Summit Part II on April 6, 2025. Medical professionals who attended Dr. Morrell's panel at the event were supposed to receive continuing medical education credits, approved by the Christian Medical and Dental Association. Before the event took place, however, activists filed complaints with the Accreditation Council on Continuing Medical Education, complaining that the event or-ganizers and speakers did not support so-called "gender-affirming care." The complainants sought to "flood [ACCME's] inbox and hold [the Summit speakers] accountable for their dan-gerous propaganda."[20] ACCME subsequently contacted CMDA to raise concerns about the "content validity" of Dr. Morrell's panel, and CMDA decided to "withhold credit for this event" so as to not "jeopardize [its] accreditation status with the ACCME."[21]

- Also leading up to the Rocky Mountain Summit Part II on April 6, 2025, activists encouraged people online to contact the venue—the Inverness Denver—and "voice [their] displeasure" and call on the Inverness to cancel the event. The activists complained that the event hosts supposedly "tortur[e] LGBT children" and that such beliefs are "not acceptable in Denver."[22]

- On April 6, 2025, at the Rocky Mountain Summit Part II itself, at least two individuals left the event during Dr. Morrell's panel. The two individuals were a father and his child who identifies as transgender. Before leaving, the father and child spoke with event staff and disagreed with

---

[20] *File a complaint against this BS propaganda*, Reddit (Apr. 1, 2025), bit.ly/3JekEvD.

[21] Valerie Richardson, *Organizer cites bias after losing CME credit for class on harms of 'gender-affirming care'*, The Washington Times (archived Aug. 14, 2025), bit.ly/45q9mM4.

[22] *CPAN – Anti LGBT hate group event in Denver*, Reddit (Apr. 2, 2025), bit.ly/4oxy9qB.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

the views they expected Dr. Morrell and the other panelists to express. In addition, roughly 40-60 protestors were outside the event venue—the Inverness Denver—during the event.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[23]

- Multiple people have left negative Google reviews for Dr. Morrell's practice, at least some of whom never received treatment from Dr. Morrell or otherwise visited his practice. A number of these reviews specifically complain about Dr. Morrell's views on sex and gender. For example, "Not safe for LGBTQ+ patients or POC, stay away"; "This dude is incredibly bigoted please do not use this horrible human's services"; "Not a safe physician for lgbt patients."[24]



---

[23] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.
[24] perma.cc/UR6K-EZ8Y

# PLACEHOLDER

## Original page to be filed under restriction

# PLACEHOLDER

41

## Original page to be filed under restriction

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Interrogatory No. 3**

As to Drs. Travis Morrell and Valeri Leswing's treatment of transgender patients, identify (1) the number of transgender patients each doctor has seen per year for each year since 2009, and (2) the number of patients that indicated they did not feel welcome in light of their use of pronouns and names of patients.

**Response to Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information about all transgender patients Drs. Morrell and Leswing have treated. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks certain information dating back to 2009. Plaintiffs object to this interrogatory on the grounds that the terms "did not feel welcome" and "has seen" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks information not in Plaintiffs' possession, custody, control, or personal knowledge. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through two subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Dr. Travis Morrell**

**(1)** Dr. Morrell does not ask for or keep records of his patients' gender identity. Nor does he keep records of whether a patient does or does not have gender dysphoria. Moreover, the number and type of patients Dr. Morrell treats in a given year varies based on the year, his clinical responsibilities, cultural trends, and other factors. To the best of his recollection:

From 2010 to 2011, Dr. Morrell worked as an obstetrics-gynecology resident physician at Loma Linda University Medical Center. He saw zero transgender patients in that time.

42

**2-App-045**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

From 2011 to 2012, Dr. Morrell continued in his role as an obstetrics-gynecology resident physician at the LLU Medical Center. In this time period, when on surgical rotations, Dr. Morrell saw approximately 1-3 patients per year who identified as "transsexual." (The term "transgender" was not widely used at the time.)

From 2012 to 2013, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Medical Center. He saw 0-2 patients per year who identified as "transsexual."

From 2013 to 2014, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Health Education Consortium. He saw 3-6 patients per year who identified as "transsexual."

From 2014 to 2017, Dr. Morrell trained as a dermatology resident at LLU Health. He saw 0-3 patients per year who identified as "transgender."

From 2017 to 2018, Dr. Morrell underwent advanced fellowship training at the University of Massachusetts and had limited direct interactions with patients.

Dr. Morrell joined his current practice, Mountain West Dermatology, in 2018. Since then, he has seen 1-4 patients per year who identify as "transgender."

**(2)** Before 2021, Dr. Morrell held the view that using an individual's preferred pronouns and/or chosen name was appropriate as a matter of politeness and because he believed that so-called gender-affirming treatments were sought mostly by consenting adults. He therefore generally addressed individuals, including his patients, using their preferred pronouns and/or chosen name. And no patients indicated they felt unwelcome due to his use of pronouns and/or names.

Dr. Morrell's views changed, however, as medical professionals in the United States increasingly prescribed so-called gender-affirming treatments for minors. Dr. Morrell had witnessed the harms of such treatment for adults, and the increased risk of harm and lack of clinical justification for

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

developing youth was immediately apparent to Dr. Morrell. Dr. Morrell came to believe that social transition, including the use of non-biological pronouns and names, harms individuals by reinforcing false beliefs and expectations about their bodies. Therefore, in the years since 2021, Dr. Morrell has refrained from addressing individuals, including his patients, using non-biological preferred pronouns and/or chosen names. When he has addressed or referred to individuals using pronouns and/or names, he has done so using biologically accurate pronouns and birth names.

Dr. Morrell enjoys treating all of his patients and endeavors to maintain positive and amicable relationships with them, regardless of their sex or gender identity. As such, none of Dr. Morrell's patients have told him that his use of biologically accurate pronouns and birth names—or his non-use of preferred pronouns and/or chosen names—makes them feel "unwelcome." He has, however, been the target of multiple negative reviews on Google that specifically complain about his views on sex and gender.

**Dr. Valeri Leswing**

**(1)** Dr. Leswing does not ask for or keep records of her patients' gender identity. Nor does she keep records of whether a patient does or does not have gender dysphoria. To the best of her recollection, Dr. Leswing estimates that she treats somewhere between two and ten transgender patients each year.

**(2)** Dr. Leswing ensures that all of her patients feel welcome and cared for in her practice. This includes any and all patients who experience gender dysphoria. Moreover, not all patients who leave Mountain Pediatrics specifically state their reasons for leaving. To the best of Dr. Leswing's recollection, however, 5-10 families have left her practice after explicitly complaining that Dr. Leswing does not provide so-called gender-affirming care.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Interrogatory No. 4**

As to Dr. Travis Morrell, describe the corporate structure of Mountain West Dermatology and his relationship to it, including (1) the contractual relationship between Mountain West Dermatology and its dermatologists, including any agreements between Dr. Travis Morrell and Mountain West Dermatology; (2) the number of professionals that are part of Mountain West Dermatology; and (3) any referral practice between the professionals that are part of Mountain West Dermatology.

**Response to Interrogatory No. 4**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through three subparts.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

**(1)** Mountain West Dermatology's physicians each own an equal share of the practice. Each physician's compensation is based on the money collected from each physician's own work, minus the physician's fair share of expenses. Like all of the physicians at Mountain West Dermatology, Dr. Morrell has signed an employment agreement with Mountain West Dermatology setting out, among other terms, his compensation and responsibilities as an employee of the practice.

**(2)** Mountain West Dermatology has nine physicians who work at, and are equal partners in, the practice.

**(3)** Each physician at Mountain West Dermatology has a panel of patients who generally return to that particular physician for follow-up visits. Mountain West Dermatology has no policy or practice requiring its physicians to refer to one another. Physicians do refer patients to one another, but the decision to refer, and to whom, is up to the individual physician and his or her best medical judgment. For example, one physician in the practice might refer to another if a patient's treatment

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

requires another physician's specific professional skills. But in the absence of such particularized need,

it is unusual for physicians in Mountain West Dermatology to see one another's patients.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Supplemental Interrogatory No. 1**

Describe Mountain West Dermatology P.C.'s practices and/or policies in assigning patients to and/or referring patients between the medical providers in Mountain West Dermatology P.C., including to assign, reassign, and/or refer patients to or from Dr. Travis Morrell because of his use of incorrect pronouns and deadnames of transgender individuals.

**Response to Supplemental Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Dr. Morrell believes this interrogatory is offensive and misplaced. As a physician, Dr. Morrell first and foremost wants to provide care for *all* of his patients, regardless of whether they share his views on sex and gender. Moreover, because Dr. Morrell relies on his practice for a living, he works hard to develop a steady stream of patients (both returning and new) that he can rely on for continued business. He does not want to send those patients to other physicians unless doing so is in a patient's best medical interests. As such, neither Dr. Morrell nor Mountain West Dermatology seeks to reassign or refer his patients to other physicians, either within or outside of Mountain West Dermatology.

No patients have been assigned, reassigned, and/or referred to or from Dr. Morrell because of his use of biological pronouns or birth names. Mountain West Dermatology does not have a policy and/or practice in place requiring referrals, or dictating a process for referrals, on account of a physician's pronoun or name usage or in any other circumstances.

47

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Supplemental Interrogatory No. 2**

Describe any instances in which any person has complained to any employee, representative, or provider at Mountain West Dermatology P.C. about Dr. Travis Morrell's use of incorrect pronouns and deadnames of transgender individuals, including any actions you took in response to such complaint.

**Response to Supplemental Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case. Plaintiffs object to this interrogatory on the grounds that the term "complained" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

No person has complained to an employee, representative, or provider at Mountain West Dermatology about Dr. Morrell's use of biological pronouns or birth names. Dr. Morrell has, however, received reviews on Google complaining about his views on sex and gender.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Supplemental Interrogatory No. 3**

Describe any services and/or treatments offered by Dr. Travis Morrell that cannot be provided by another physician in Mountain West Dermatology P.C.'s practice, and any instances where a patient could not receive care from the practice due to the patient being unwilling to be treated by Dr. Travis Morrell due to his policy regarding transgender patients.

**Response to Supplemental Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Though all physicians at Mountain West Dermatology are licensed to provide the full array of dermatological services, many patients seek out or are referred to Dr. Morrell because he is the only fellowship-trained and board-certified dermatopathologist at Mountain West. As such, Dr. Morrell handles Mountain West Dermatology's most challenging cases involving dermatopathology and re-lated procedures. He is the only physician at Mountain West who is able to evaluate biopsy specimens for most diagnoses, including the most serious dermatological diagnoses such as melanoma. Dr. Mor-rell receives multiple biopsy specimens on a daily basis that are sent to him because they cannot be interpreted by other physicians. To his knowledge, Dr. Morrell is the only physician within a 2- to 4-hour drive who regularly provides these services.

No patient has been denied or otherwise not received care from Mountain West Dermatology due to Dr. Morrell's beliefs about sex and gender or his use of biological pronouns or birth names.

50

*As to Interrogatory Answers Regarding Defending Education:*

Signed under penalty of perjury this __13__ day of August, 2025.

_____
Sarah Perry
On behalf of Defending Education

51

*As to Interrogatory Answers Regarding Colorado Parent Advo-
cacy Network:*

Signed under penalty of perjury this <u>15th</u> day
of August, 2025.

Lori Gimelshteyn
On behalf of Colorado Parent Advocacy Network

51

52

*As to Interrogatory Answers Regarding Protect Kids
Colorado:*

Signed under penalty of perjury this 14th day
of August, 2025.

Erin Lee
On behalf of Protect Kids Colorado

52

53

*As to Interrogatory Answers Regarding Do No Harm:*

Signed under penalty of perjury this __14__ day
of August, 2025.

_____

Kristina Rasmussen
On behalf of Do No Harm

53

*As to Interrogatory Answers Regarding Dr. Travis Morrell:*

Signed under penalty of perjury this __13__ day
of August, 2025.

_____

Travis Morrell, M.D., M.P.H.

54

55

*As to Interrogatory Answers Regarding Dr. Valeri Leswing
and Mountain Pediatrics:*

Signed under penalty of perjury this __11th__ day
of August, 2025.

Valeri Leswing, D.O.
On her own behalf and on behalf of Mountain Pediat-
rics

55

*As to Objections:*

Respectfully submitted on August 15, 2025,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

**2-App-059**

**56**

57

## CERTIFICATE OF SERVICE

I certify that on August 15, 2025, I emailed the foregoing to counsel for the Defendants.

*/s/ J. Michael Connolly*

*AB Litigation Services*

58

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

------------------------------------------------------

ZOOM DEPOSITION OF LORI GIMELSHTEYN
August 22, 2025

------------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

------------------------------------------------------

APPEARANCES:

    CONSOVOY MCCARTHY, PLLC
        By J. Michael Connolly, Esq.
            Paul Draper, Esq.
            1600 Wilson Boulevard, Suite 700
            Arlington, Virginia 22209
               Appearing via Zoom on behalf of
               Plaintiffs

    COLORADO ATTORNEY GENERAL'S OFFICE
        By Nora Q.E. Passamaneck
            Senior Assistant Attorney General
            Janna K. Fischer
            Senior Assistant Attorney General
            Dominick D. Schumacher
           Assistant Attorney General
            1300 Broadway, 10th Floor
            Denver, Colorado 80203
               Appearing via Zoom on behalf of
               Defendants CCRD, Sergio Cordova,
               Geta Asfaw, Mayuko Fieweger,
               Daniel S. Ward, Jade R. Kelly,
               and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

    COLORADO ATTORNEY GENERAL'S OFFICE
        By Lane Towery
          Assistant Attorney General
          1300 Broadway, 10th Floor
          Denver, Colorado 80203
            Appearing via Zoom on behalf of
            Colorado Attorney General

Also present:  Sarah Bomgardner

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of LORI GIMELSHTEYN, called by Defendants, was taken on Friday, August 22, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                     I N D E X

DEPOSITION OF LORI GIMELSHTEYN

| EXAMINATION BY: | | PAGE |
|---|---|---|
| Ms. Passamaneck | | 5 |
| Mr. Connolly | | 138 |

| EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Declaration of Lori Gimelshteyn | 24 |
| Exhibit 2 | Plaintiffs Objections and Responses to Defendants First Set of Interrogatories | 26 |
| Exhibit 3 | Photograph at Prairie Middle School parking lot at CPAN rally, DE_000192 | 57 |
| Exhibit 4 | A Guilded Tribute Benefit Gala advertisement, DE_000166 | 64 |
| Exhibit 5 | Educate and Inform PowerPoint presentation, DE_000180 | 71 |

*AB Litigation Services*

|  |  | INITIAL |
| --- | --- | --- |
| EXHIBITS (continued) |  | REFERENCE |
| Exhibit 6 | Educate and Inform PowerPoint presentation, DE_000180, native version | 78 |
| Exhibit 7 | Press Release, Colorado Parent Advocacy Network Official Launch Event, DE_000007 | 117 |
| Exhibit 8 | Power to the Parents Event advertisement, DE_000025 | 117 |

*AB Litigation Services*

organization.

Q.    (BY MS. PASSAMANECK)   Do you agree that CPAN is a nonprofit that operates to promote social welfare?

A.    Yes.

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A.    Again, I'm not an attorney, but yes.

Q.    (BY MS. PASSAMANECK)   Okay.  You agree that CPAN is not operated for the purpose of carrying on any trade or business for profit, correct?

A.    Yes.

Q.    So what does it mean for CPAN to be a social advocacy organization?

A.    It means that the Colorado Parent Advocacy Network exists to support advocacy for Coloradans -- parents, taxpayers, educators -- around issues that our organization is centered on.

Q.    So CPAN's main focus is advocacy; is that fair?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)   And --

*AB Litigation Services*

A.    I'm not sure I understand your question.

Q.    Okay.  Well, you mentioned both education and advocacy, and my question is, do you view CPAN's education of individuals as forwarding the advocacy goal of CPAN?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  Okay.  And CPAN advocates on behalf of certain public issues, correct?

A.    Yes.

Q.    Does CPAN petition the legislature?

A.    Yes.

Q.    And CPAN also facilitates litigation to advocate for these issues, correct?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  Okay.  Looking at your declaration, paragraph 4, you state, "The mission of CPAN is to defend the fundamental right of parents to direct the upbringing, care, and education of their children."  Do you see that?

A.    Yes.

Q.    So you and CPAN believe that parents have a fundamental right to direct all aspects of a

*AB Litigation Services*

Q. Sure. I'm in paragraph 4, and I'm walking through all of the different activities that you list that CPAN engages in, and then I've just gotten up to the word advocacy, the very last sentence. Do you see that?

A. I'm sorry. Your audio is going in and out. So I think you said it's in the last sentence?

Q. Correct. So the sentence starts, "CPAN furthers its mission through," and then there's a list of activities, and I've been walking through those activities. I've just gotten up to advocacy. Do you see that?

A. Yes.

Q. Is advocacy separate than all of the other activities we've just been going through?

A. No, it's part of. I would say it complements all the other activities.

Q. Is it fair to say that advocacy is the umbrella word that encompasses all of the other activities?

MR. CONNOLLY: Objection; form.

A. Yes.

Q. (BY MS. PASSAMANECK) And we didn't talk about litigation, but do you view litigation as an

*AB Litigation Services*

are public in order to host our events.

Q.    (BY MS. PASSAMANECK)    You agree that CPAN itself is not a place to eat, drink, sleep, or rest, correct?

MR. CONNOLLY:    Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)    And you agree that CPAN itself is not a sporting or recreational area or facility, correct?

MR. CONNOLLY:    Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)    CPAN is not a public transportation facility, correct?

MR. CONNOLLY:    Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)    CPAN is not a barbershop or bathhouse, correct?

MR. CONNOLLY:    Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)    CPAN is not a campsite or trailer camp?

MR. CONNOLLY:    Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)    CPAN is not a mortuary, undertaking parlor, or cemetery?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  And CPAN is not an educational institution, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A.    Yes.  I'm not an attorney, but yes.

Q.    (BY MS. PASSAMANECK)  And CPAN is not an institution for the sick, ailing, aged, or infirm?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  CPAN is not a swimming pool, bath, steam, massage parlor, gymnasium, or other establishment conducted to serve the health, appearance, or physical condition of a person?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  And CPAN is not a public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind, whether indoor or outdoor?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked

*AB Litigation Services*

to state a legal conclusion.

A.   Yes.

Q.   (BY MS. PASSAMANECK)   And CPAN is not a church, correct?

MR. CONNOLLY:   Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)   We've already marked as Exhibit 2 plaintiffs' responses to defendants' interrogatory responses -- I'm sorry, Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories, and that's Exhibit 2.

Do you mind pulling that up?

A.   Yes.

Q.   And did you help prepare the response as to CPAN?

A.   Can you say that one more time?

Q.   Sure.  These responses collect responses from a multiple -- from multiple plaintiffs.  You signed these on behalf of CPAN, correct?

MR. CONNOLLY:   Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)   Did you help prepare the response that was provided as to CPAN?

A.   Yes.

Q.   In Exhibit 2, if we turn to page 4,

*AB Litigation Services*

held or is planning to hold.

MR. CONNOLLY:  Objection; form.

A.    I will go through quickly.

Yes, I see 15.

Q.    (BY MS. PASSAMANECK)  Okay.  From your review, are there any events missing from this list?

A.    Yes.  We recently just hosted a press conference last Tuesday.

Q.    And where was that press conference?

A.    In front of the Colorado Supreme Court.

Q.    Okay.  Thank you.

Any others that are missing from this list?

A.    Not that I'm aware of.

Q.    And in collecting these events, you tried to be as complete as possible, correct?

A.    Yes.

Q.    Okay.

MR. CONNOLLY:  Nora, if you're going to start going through each one, we're at about an hour.  Should we take a quick break here?

MS. PASSAMANECK:  Sure.

(Break taken.)

Q.    (BY MS. PASSAMANECK)  So you've had a

*AB Litigation Services*

chance to look at the 15 events that were listed here, and you added one, which was a press conference at the Colorado Supreme Court. So a total of 16 events, correct?

A. Yes.

Q. Okay. Several of the events that CPAN held were at churches, correct?

A. Yes.

Q. And by my count, there were a total of four. We have the CPAN Official Launch Event, which was November 13th, 2022, at the St. Thomas More Catholic Church; is that right?

A. Yes.

Q. And then we have the Power to the Parents Event, March 12th, 2023, at the same church, correct?

A. Yes.

Q. And then we have the School Safety Summit, which was September 10th, 2023, also at the same church, correct?

A. Yes.

Q. And then as part of the National School Choice Week Celebration, you held an event July 28th, 2025 at the First Baptist Church of Denver, correct?

*AB Litigation Services*

A.    I believe it was January 28th, not July.

Q.    Thank you.  This was a typo, not a test of your memory.

Any other events held at churches?

A.    Sometimes we host our Educate and Inform events at churches, and sometimes I am invited to speak at churches across the state.

Q.    In holding any of these events, at no time was CPAN operating as a church, correct?

A.    Correct.

Q.    You're simply renting event space from a church, correct?

A.    Yes.

Q.    Okay.  At any of these events at churches, were you selling goods?

A.    No.

Q.    Were you offering services for money?

A.    Several of our events are ticketed and are available for a cost.

Q.    Were any of these church events ticketed events for cost?

A.    Yes.

Q.    Which ones?

A.    The School Safety Summit.

Q.    And how much did it cost for a ticket for

*AB Litigation Services*

2024?

MR. CONNOLLY:  Objection; form.

A.   Do you want me to go through --

Q.   (BY MS. PASSAMANECK)  Yeah.

A.   Do you want me to go through the events just to clarify that the dates and everything are correct or --

Q.   What I'm trying to do is group them so I don't have to ask you the same set of questions 15 times is literally what I'm trying to do, so -- but I also understand that I've misspoken on dates.

So why don't we just make sure.  I have five events.  And if you go to page 9, the first is what I see as being the first event held at the Capitol Building, and that was a CPAN Rally for Parent Rights to Oppose HB 23 --

A.   Yes, that's correct.

Q.   And that was held April 6th, 2023, correct?

A.   Correct, 2023.

Q.   And that was held on the west steps of the Capitol Building, correct?

A.   Yes.

Q.   And then on page 11 we have the Gender Ideology Public Roundtable and Press Conference

*AB Litigation Services*

that was at the Capitol Building.  Do you see that?

A.    Yes, February 28th, 2024.

Q.    Yes.  And that was also held on the Capitol steps, correct?

A.    The press conference was held on the Capitol steps.

Q.    The third one I have is on page 13, and that is the Unite for School Choice Celebration, and that was held April 10th, 2024, correct?

A.    I apologize, it looks like my internet was unstable.  Can you ask that -- the last thing I heard was, "The third one I have."

Q.    Sure.  The third one I have is Unite for School Choice Celebration held April 10th, 2024, on the west steps of the Capitol Building.

A.    Yes.

Q.    Okay.  And then on page 13 at the bottom, we have the National School Choice Week Celebration, which we already discussed part of it was at the First Baptist Church of Denver and another part was on the steps of the Capitol Building, correct?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  Okay.  And then,

*AB Litigation Services*

A.    Okay.  Great.  I did not hear your last question.

Q.    I'm going to start just with -- we're on the fifth event you've had at the Capitol steps, and what I have as the fifth one is the HB 25-1312 Press Conference held on April 30th, 2025.

A.    Yes.

MR. CONNOLLY:  Objection; form.

A.    Yes.

MR. CONNOLLY:  Lori, just so I know, so you can see the video of me and Nora, but your camera -- you can see the video of me and Nora, correct?

THE DEPONENT:  Yes.

MR. CONNOLLY:  Okay.  And just so you know, we cannot see you, but we can hear you.

THE DEPONENT:  Yes.

MR. CONNOLLY:  Okay.

MS. PASSAMANECK:  And to be very clear, Michael, I'm doing this as an accommodation so we can continue the deposition.  If this helps her hear the questions and be able to answer and the audio comes through, I'm fine with that.

So it's -- if you have an issue, though, I'm happy for you to speak up.

*AB Litigation Services*

steps, you received a permit from the Division of Capitol Assets, correct?

A.    Yes.

Q.    And in holding these events on the Capitol steps, did you follow the requirements for permitted events on the Capitol steps?

A.    Yes.

Q.    You didn't sell any goods at these events, correct?

A.    Correct.

Q.    You weren't offering any services on the Capitol steps, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A.    Can you restate the question, please?

Q.    (BY MS. PASSAMANECK)  You were not offering -- let me ask a different question.

You were simply providing information to anyone who would listen at these events, correct?

A.    Yes.

Q.    You weren't engaged in any commercial enterprises on these steps, correct?

A.    Yes.

Q.    Putting aside the Capitol steps events,

*AB Litigation Services*

to whoever would listen to your rally, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)   Turning back to Exhibit 2.  You had a press -- on pages 17 -- just page 17.  You held a press conference at the Solomon -- I'm sorry.  It's called the -- you held a Press Conference on Solomon Galligan and HB 24-1034 on July 23rd, 2025, at the Arapahoe County Judicial Center, correct?

A.   Yes.

Q.   And I don't see any contracts listed here.  You didn't get any permit to hold this event, correct?

A.   No.  It was on a public sidewalk.

Q.   Okay.  So just so I understand, you gathered at the sidewalk and shared information regarding Solomon Galligan and HB 24-1034; is that fair?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)   Anyone passing on the sidewalk could listen to your event, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

*AB Litigation Services*

Q.    (BY MS. PASSAMANECK)  You didn't control who could listen or attend your event, correct?

A.    Yes.

Q.    And you weren't selling any goods at this event, correct?

A.    Yes.

Q.    You were simply providing information to anyone who would listen, correct?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  You held a United for Truth Luncheon on February 5th, 2025, at the Independence Institute, and that's listed on pages 14 to 15.  Do you see that?

A.    Just a moment.

Yes.

Q.    This luncheon was a private invitation only event, correct?

A.    Yes.

Q.    So this luncheon was not open to the public, correct?

MR. CONNOLLY:  Objection; form.

A.    Yes.

Q.    (BY MS. PASSAMANECK)  And then, finally, you also held a number of events at The Inverness

*AB Litigation Services*

Denver, which is a hotel, correct?

A.   We've hosted two events.

Q.   Okay.  In particular, you held two different Rocky Mountain Summits at The Inverness Denver, correct?

A.   Yes, on Safeguarding Children from Gender-Affirming Treatment.

Q.   Thank you.  And for each of these events, you rented space in the hotel, correct?

A.   Yes.

Q.   You were at the hotel solely to put on these events, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  You were not renting out the entire hotel, correct?

A.   Yes.

Q.   You were not operating as the hotel, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

Q.   (BY MS. PASSAMANECK)  Now, both of these

*AB Litigation Services*

summits at The Inverness Denver were ticketed events, correct?

A.   Yes.

Q.   Could a person attend without a ticket?

A.   We offered a live stream, so there is the possibility that an individual could attend without purchasing a live stream ticket if they were in the same room as someone that did purchase a live stream ticket, and we did give seven tickets away at no cost.

Q.   How many hours did the Rocky Mountain Summit Part I last?

A.   Oh, my goodness.  I believe that it was two hours.  You said Part I?

Q.   Correct.

A.   Yeah.  I think it was two hours.

Q.   And how long was the Rocky Mountain Summit Part II?

A.   Three hours.

Q.   Okay.  And then you also mentioned, that was not included in this interrogatory response, that you held a press conference at the Colorado Supreme Court.  Do I have that right?

A.   Yes.

Q.   Do you recall the date that you held a

*AB Litigation Services*

Q.   (BY MS. PASSAMANECK)   And the purpose of the press release was to share information to the public, correct?

A.   Yes.

Q.   And, in fact, you were advocating for -- actually, strike that.

Okay.   Any other events that CPAN has had that we have not covered?

MR. CONNOLLY:   Objection; form.

A.   Not to my knowledge.

Q.   (BY MS. PASSAMANECK)   Okay.   Let's talk about future events that CPAN is planning.   My understanding is that CPAN is planning the Guilded Tribute Benefit Gala for Parental Rights and Educational Freedom; is that correct?

A.   Yes.

Q.   And you're planning to hold that event at the Vehicle Vault, correct?

A.   Yes.

Q.   What is the Vehicle Vault?

A.   It is an event venue.

Q.   I'm going to share my screen, and I've also put in the chat what I will mark as Exhibit 4. It is an image bearing a Bates number DE_000166.

(Exhibit 4 was marked.)

*AB Litigation Services*

STATE OF COLORADO       )

                        )   Ss. REPORTER'S CERTIFICATE
COUNTY OF DENVER        )

I, Lisa A. Dague, do hereby certify that I am a Certified Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 3rd day of September, 2025.

My commission expires December 23, 2028.

Lisa A. Dague
Certified Shorthand Reporter

*AB Litigation Services*

IN T E  NITED STATES DISTRICT CO RT
FOR T E DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

 OOM DEPOSITION OF ERIN LEE           August 21, 2025

-------------------------------------------------

Plaintiffs:

DEFENDIN  ED CATION, et al.,

v.

Defendants:

A BREY C. S LLIVAN, et al.

-------------------------------------------------

APPEARANCES:

        CONSOVOY MCCART Y, PLLC
            By  . Michael Connolly, Es .
               Paul Draper, Es .
               1600 Wilson Boulevard, Suite 700
               Arlington, Virginia 22209
                  Appearing via  oom on behalf of
                  Plaintiffs

        COLORADO ATTORNEY  ENERAL'S OFFICE
            By Nora Q.E. Passamaneck
               Senior Assistant Attorney  eneral
                anna K. Fischer
               Senior Assistant Attorney  eneral
               Dominick D. Schumacher
               Assistant Attorney  eneral
               1300 Broadway, 10th Floor
               Denver, Colorado 80203
                  Appearing via  oom on behalf of
                  Defendants CCRD, Sergio Cordova,
                   eta Asfaw, Mayuko Fieweger,
                  Daniel S. Ward,  ade R. Kelly,
                  and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

        COLORADO ATTORNEY  ENERAL'S OFFICE
             By Talia Kraemer
                Assistant Attorney  eneral
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                   Appearing via  oom on behalf of
                   Colorado Attorney  eneral

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the  oom deposition of ERIN LEE, called by Defendants, was taken on Thursday, August 21, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                          I N D E

DEPOSITION OF ERIN LEE

E AMINATION BY:                                        PA E

     Ms. Passamaneck                                     5

|  | | INITIAL |
| E  IBITS | | REFERENCE |
| Exhibit 1 | Declaration of Erin Lee | 19 |
| Exhibit 2 | Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories | 37 |
| Exhibit 3 | Movie Screening: Art Club with Erin Lee flyer | 44 |
| Exhibit 4 | Protect  irls Sports in Colorado flyer | 56 |
| Exhibit 5 | Text messages between Erin Lee and  ennifer Sey re: Andres Bissonette  utierre | 57 |
| Exhibit 6 |  iving Parents a Voice Town all flyer | 60 |

*AB Litigation Services*

|  |  | INITIAL |
|---|---|---|
| E  IBITS (continued) |  | REFERENCE |
| Exhibit 7 | (Not used.) | |
| Exhibit 8 | Colorado Federation of Republican Women District 8 Meeting, August 12, 2023, flyer | 63 |
| Exhibit 9 | Art Club PowerPoint presentation | 67 |
| Exhibit 10 | Notice of Parker Conservatives Meeting, September 4, 2024 | 65 |
| Exhibit 11 | TikTok video, Bee  on ale | 95 |

*AB Litigation Services*

a legal conclusion.

You may answer the  uestion, Ms. Lee.

A    Yes.

Q    (BY MS. PASSAMANECK)    And it is devoted to protecting kids and strengthening families in Colorado, correct?

A    Yes.

Q    And PKC advocates for policies that promote this mission, correct?

A    Correct.

Q    And that involves advocating for legislative change?

A    Correct.

Q    Does it include advocating to the executive branch?

MR. CONNOLLY:  Objection; form.

A    I'm not sure I understand, I'm sorry, when you say,  executive branch.

Q    (BY MS. PASSAMANECK)  Do you advocate, for example, to  overnor Polis?

A    Maybe not directly, but via public messaging, yes.

Q    And you also use the court system to advocate for this mission, correct?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

to give a yes or no answer.  I do not believe it's kind or loving to tell a child that they were born in the wrong body or that something is fundamentally wrong with them and needs to be changed.

Q    If a child tells their parent, Listen, I want my name now to be River instead of  oe, is it okay for the parent to call that child River?

MR. CONNOLLY:  Objection; form.

A    I'll say, again, that's not an easy yes or no answer.  There's too much nuance.  I do not believe it's kind or loving or right to tell a child that they are not their biological sex.

Q    (BY MS. PASSAMANECK)  So the difference is about it being tied to biological sex as opposed to categories of names that might be nicknames or other names that aren't tied to a name that does not reflect biological sex; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's correct.  Children go by nicknames.  But, again, I don't believe it's kind or right to push a child into believing they are the opposite sex or rejecting their biological sex.

Q    (BY MS. PASSAMANECK)  In paragraph 4 of your declaration, in particular, the last sentence,

*AB Litigation Services*

you list a number of activities that PKC engages in
to further its mission.  Do you see that?

A   Yes.

Q   So PKC engages in coalition-building;
advocacy; petitions and ballot initiatives;
engagement on local, state, and national policies;
educational campaigns; and, if necessary,
litigation.  Is that all correct?

A   Correct.

Q   Okay.  So is it fair to say that these
activities are all advocacy activities?

MR. CONNOLLY:  Objection; form.
Objection; misstates the testimony.

A   Sorry.  I'm reading through.  Yes, I
would perceive those all as advocacy.

Q   (BY MS. PASSAMANECK)  PKC is not making
any sales to the public, correct?

A   Correct.

Q   Not selling any goods?

A   We are not.  We did have a partnership
with  - Y Athletics on a co-branded T-shirt that
did not come to fruition.  So we did take money,
but we refunded it.  And that was through  - Y.
The proceeds just would have gone to Protect Kids.

Q   That was a fundraising effort, correct?

*AB Litigation Services*

uestion?

A    Yes.

Q    Okay.  You highlight these two events that are in restaurants in this paragraph.  Do you see that?

A    Yes.

Q    Based on your understanding, the places of public accommodation that you used in your declaration in paragraph 10, are these the only examples of places of public accommodation that PKC has engaged?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I would say no.  We -- again, we have thousands of volunteers all over the state in all kinds of public spaces.

Q    (BY MS. PASSAMANECK)  Will you agree that PKC is not a place to eat, drink, sleep, or rest, or any combination thereof?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked a legal conclusion.

A    (Nodded head.)

Q    (BY MS. PASSAMANECK)  I saw you nod your

*AB Litigation Services*

head.  Was that a yes?

A    That's correct.

Q    And you agree that PKC is not a sporting or recreation area or facility, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  And PKC is not a public transportation facility?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  PKC is not a barber shop or a bathhouse, correct?

MR. CONNOLLY:  Objection; form.

A    That is correct.

Q    (BY MS. PASSAMANECK)  PKC is not a swimming pool, bath, steam or massage parlor, gymnasium, or other establishment conducted to serve the health, appearance, or physical condition of a person?

MR. CONNOLLY:  Objection; form.

A    Correct.  PKC is none of those things, but we do operate in those places.

Q    (BY MS. PASSAMANECK)  Which places in that list I just read off?

A    We should probably go back to the

beginning, if you wouldn't mind.

Q     Okay.  We'll go through these, but I just want to make sure that PKC is not any of those facilities, correct?

MR. CONNOLLY:  Objection; form.  Objection; vague.

A     Correct.

Q     (BY MS. PASSAMANECK)  Okay.  PKC is not a campsite or trailer camp, correct?

A     Correct.

MR. CONNOLLY:  Objection; form.

Q     (BY MS. PASSAMANECK)  PKC is not a dispensary, clinic, hospital, convalescent home, or other institution for the sick, ailing, aged, or infirm, correct?

MR. CONNOLLY:  Objection; form.

A     Correct.

Q     (BY MS. PASSAMANECK)  I'm sorry, what was that?

A     Correct.

Q     Thank you.  PKC is not a mortuary, undertaking parlor, or cemetery, correct?

MR. CONNOLLY:  Objection; form.

A     Correct.

Q     (BY MS. PASSAMANECK)  And PKC is not an

*AB Litigation Services*

educational institution, correct?

MR. CONNOLLY:  Objection; form.

A    We are not a physical educational institution, but we are an institution that promotes education.

Q    (BY MS. PASSAMANECK)  And as an institution that provides education, you have no physical location, correct?

MR. CONNOLLY:  Objection; form.

A    We do have a physical address, but not out of which we are educating people, correct.

Q    (BY MS. PASSAMANECK)  Thank you.  And PKC is not a public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind, whether indoor or outdoor?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked a legal conclusion.

A    That is correct, but we do operate in all of these places.

Q    (BY MS. PASSAMANECK)  nderstood.  But you're not any of those facilities, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked

*AB Litigation Services*

for a legal conclusion.

A     Correct.

(Exhibit 2 was marked.)

Q     (BY MS. PASSAMANECK)  I've dropped into the chat what I would like to mark as Exhibit 2. This is a document titled  Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories.

A     I have it open.

Q     It's a long document that includes -- are you familiar with what interrogatories are?

A     I'm not a lawyer, but I have discussed the document with my lawyers.

Q     Okay.  Very high level, these are  uestions that the defendants posed to plaintiffs and that plaintiffs wrote written responses for. There are several responses that are from PKC.  Do you understand that?

A     Yes.

Q     Okay.  And I understand this is a long document because there are six different plaintiffs.  And I only want to direct your attention to those responses from PKC.   ave you seen those responses before?

MR. CONNOLLY:  Ms. Lee, please review the

*AB Litigation Services*

MR. CONNOLLY: Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK) Okay. Let's focus on the events that you identified in this interrogatory response. You held a ender Ideology Public Roundtable and Press Conference on the steps of the capitol building in February 2024. Do you see that?

A    Yes.

Q    And you're aware that to hold an event on the steps of the capitol building, you need to receive a permit from the Division of Capitol Assets, correct?

A    Correct.

Q    And you've held a number of different events on the capitol steps, correct?

A    Correct.

Q    Looking through this response, I also see the Save irls Sports Rally, uly 20th, 2024; the PKC Ballot Measure Press Conference held August 5th, 2024; and the Stop the War on Children Rally, October 5th, 2024?

A    Correct.

MR. CONNOLLY: Objection; form.

A    And the initial event, the ender

*AB Litigation Services*

A    We did not.  A legislator reserved it on our behalf, which is, I believe, re uired in that case.

Q    Was the room open to anyone who wanted to attend?

A    Yes, it was.

Q    And, again, there was no -- you did not engage in any commercial activity in that basement conference room during this roundtable event, correct?

A    We did not.  We did provide lunch for anyone who attended.

Q    You also -- the next event listed starting on page 20 is an Art Club Movie Showing. Do you see that?

A    Yes.

Q    You held a movie screening of the documentary Art Club at the Daniels College of Business in April 2024, correct?

A    Correct.

Q    I'll just drop this.  I think it's easiest for me to drop in the chat.  We'll mark it as Exhibit 3.

(Exhibit 3 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know when

*AB Litigation Services*

you have it.  I would just like you to identify

whether this is the flyer for that event.

A     Yes, that's the flyer.

Q     Okay.  And so this was an event

cosponsored by the Denver  niversity Chapter of

Turning Point?

A     That's correct.

Q     As a cosponsor, what was PKC's role as

opposed to Turning Point's role?

MR. CONNOLLY:  Objection; form.

A     We shared e ual responsibility of

publici ing the event to garner attendance, but

Protect Kids Colorado was the sole speaker at the

event showing the film, and then myself and our

chairman, Kevin Lundberg, speaking.

Q     Turning Point reserved the venue at the

 niversity of Denver, correct?

MR. CONNOLLY:  Objection; form.

A     Correct.  A  niversity of Denver student

reserved that space, and then we were actually

moved to a different room because of threats made

against the event.

Q     (BY MS. PASSAMANECK)  Because a Denver

 niversity student reserved the room, you can't

speak to the terms and conditions placed on the

*AB Litigation Services*

correct.  Thank you for the correction.

Michael is reminding us not for you just to agree with everything I say because I might get my pages wrong.

T E DEPONENT:  e is correct, 21 and 22.

MS. PASSAMANECK:  Thank you.  Again, that wasn't a test and that wasn't a -- I'm not trying to trick you with any of these  uestions.  I'm literally just making sure I'm matching up your testimony with what the interrogatory says.

So thank you for that, Michael.  Let me just start over.

MR. CONNOLLY:  We did not think that at all.

Q    (BY MS. PASSAMANECK)  Starting on pages 21 to 22, there are two events described that were held at restaurants, correct?

A    Correct.

Q    A PKC Signing and Notary Event at the In The  one Sports Bar and a PKC Signing and Notary Event at the Wide Open Saloon, correct?

A    Correct.

Q    Okay.  And the purpose of these events were for people to sign petitions on ballot measures, right?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A    The purpose of these events was -- yes, signing was a factor, but it was also they were educational events on the issues themselves, and we provided notary services for our volunteers to return their petitions at the end of the signature-gathering period.

Q    (BY MS. PASSAMANECK)  So folks were signing petitions, and you were also giving information on these issues so they could make an informed decision on signing these petitions; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  You weren't selling any goods at any of these events, right?

MR. CONNOLLY:  Objection; form.

A    Protect Kids Colorado was not selling goods, although there was food and drink available for attendees.

Q    (BY MS. PASSAMANECK)  You weren't operating as the restaurants at either of these events, right?

A    Correct.

MR. CONNOLLY:  Objection; form.

**AB Litigation Services**

Q    (BY MS. PASSAMANECK)  You weren't engaged in any commercial activity at these events, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  You also held, if we go to page 23, a press conference at the Byron White Federal Courthouse followed by a luncheon at Steuben's ptown.  Do you see that?

A    I do.

Q    The press conference was regarding the Tenth Circuit arguments in your action against the Poudre School District, correct?

A    That's correct.

Q    The press conference was open to anyone who was walking down the street, right?

A    That is correct.

Q    You weren't selling any goods at that event, correct?

A    Correct.

Q    You weren't engaged in any commercial activity, correct?

A    Correct.

Q    You were providing information on the Tenth Circuit argument that had just occurred,

*AB Litigation Services*

correct?

A    That is correct.

Q    And the lunch at Steuben's was a private event, correct?

A    That's correct.

Q    So basically it's the e uivalent of me making a reservation for myself and 20 friends at a restaurant, right?

MR. CONNOLLY:  Objection; form.

A    I don't know that I would classify it that way.  I mean, I reached out in my PKC capacity and we did advertise it in my PKC capacity to fellow parents.

Q    (BY MS. PASSAMANECK)  Who was the luncheon open to?

A    It was open to all who attended the press conference.  So we made it known at that point that we were -- we then had a reservation, and all were welcome to attend.

Q    When you say,  all were welcome,  if I was walking down the street and I just heard the invitation, I could come to that luncheon?

A    Yes.

Q    And did any strangers that you did not know come to that luncheon?

*AB Litigation Services*

record.

(Break taken.)

Q    (BY MS. PASSAMANECK)  The events where PKC offered food, I believe it was the basement of the capitol building for the first press conference, and then the event at Steuben's.  Did PKC charge individuals?

MR. CONNOLLY:  Objection; form.

A    We did not.

Q    (BY MS. PASSAMANECK)  And the events at the restaurants that were the notary signing events, did PKC charge individuals to sign petitions?

A    We did not.

Q    Did PKC charge individuals for food?

A    No.

Q    Did PKC get a discount on the food offered by the restaurant?

A    We did not.

Q    You mentioned an event with  - Y, which is a clothing line, correct?

A    Yes.

Q    In fact, you held a Save  irls Sports PKC fundraising event at the office of  - Y, correct?

A    Correct.

Appellate Case: 26-1101    Document: 19-2    Date Filed: 06/08/2026    Page: 108

*AB Litigation Services*

Q    So  - Y didn't have a storefront for this event.  It was actually in their corporate office; is that fair?

MR. CONNOLLY:  Objection; form.

A    I'm not sure how they classify that office.  It does have a storefront, and they did have merchandise available for sale.  The proceeds came to PKC.

Q    (BY MS. PASSAMANECK)     - Y was selling the goods, not PKC, though, correct?

MR. CONNOLLY:  Objection; form.

A    That's correct.

MS. PASSAMANECK:  I'm going to drop into the chat what I will mark as Exhibit 4.

(Exhibit 4 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know when you've had a chance to open Exhibit 4.

A    I've got it open.

Q    And is this the flyer for the event with  - Y?

A    Yes.

Q    And this promotes an evening of shopping with   - Y, correct?

A    Correct.

Q    During this event, was PKC -- scratch

*AB Litigation Services*

Q    Does security prevent certain individuals from attending?

A    No.  Anyone who registered was welcome to attend.  They were just there in case of anyone turning potentially violent towards us.

Q    And what, if anything, occurred with this individual and him acting shifty?

MR. CONNOLLY:  Objection; form.

A    We just kept careful observation.  Our security team alerted us that they were uncomfortable with his nervous behavior, and so they kept an eye on him, and we were just trying to figure out his intent.

Q    (BY MS. PASSAMANECK)  And was this individual male presenting?

A    Yes.

Q    We can put down Exhibit 5.

You also sponsored an event called  ive Parents a Voice Town  all at the Beck Recreation Center, right?

A    Correct.

Q    And the purpose of that event was to provide information about  ouse Bill 25-1312, right?

A    Yes.

*AB Litigation Services*

STATE OF COLORADO    )

                     )  ss. REPORTER'S CERTIFICATE
CO NTY OF DENVER     )

I, Lisa A. Dague, do hereby certify that I am a Certified Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 4th day of September, 2025.

My commission expires December 23, 2028.

Lisa A. Dague
Certified Shorthand Reporter

*AB Litigation Services*

IN T E  NITED STATES DISTRICT CO RT
FOR T E DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

 OOM DEPOSITION OF TRAVIS MORRELL, M.D., MP
August 25, 2025

-------------------------------------------------

Plaintiffs:

DEFENDIN  ED CATION, et al.,

v.

Defendants:

A BREY C. S LLIVAN, et al.

-------------------------------------------------

APPEARANCES:

        CONSOVOY MCCART Y, PLLC
            By  . Michael Connolly, Es .
                Paul Draper, Es .
                1600 Wilson Boulevard, Suite 700
                Arlington, Virginia 22209
                   Appearing via  oom on behalf of
                   Plaintiffs

        COLORADO ATTORNEY  ENERAL'S OFFICE
            By  anna K. Fischer
                Senior Assistant Attorney  eneral
                Nora Q.E. Passamaneck
                Senior Assistant Attorney  eneral
                Dominick D. Schumacher
                Assistant Attorney  eneral
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                   Appearing via  oom on behalf of
                   Defendants CCRD, Sergio Cordova,
                    eta Asfaw, Mayuko Fieweger,
                   Daniel S. Ward,  ade R. Kelly,
                   and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

    COLORADO ATTORNEY  ENERAL'S OFFICE
        By Talia Kraemer
          Assistant Attorney  eneral
          1300 Broadway, 10th Floor
          Denver, Colorado 80203
            Appearing via  oom on behalf of
            Colorado Attorney  eneral

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the oom deposition of TRAVIS MORRELL, M.D., MP , called by Defendants, was taken on Monday, August 25, 2025, commencing at 9:03 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E

DEPOSITION OF TRAVIS MORRELL, M.D., MP

| E AMINATION BY: | | PA E |
|---|---|---|
| Ms. Fischer | | 5 |

| E IBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Declaration of Dr. Travis Morrell | 20 |
| Exhibit 2 | Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories | 32 |
| Exhibit 3 | Article in Restoring America: Medical schools have embraced radicalism, by Travis Morrell, September 26, 2024 | 73 |
| Exhibit 4 | Article in The Publica: Exclusive: Trans Activist Medical Students Override Colorado Medical Society Vote Against ender Affirming Surgery for Minors, une 14, 2024 | 87 |

*AB Litigation Services*

|                | INITIAL |
| E IBITS (continued) | REFERENCE |

Exhibit 5    Social media exchange                    91

Exhibit 6    Dr. Morrell's website                    116

Exhibit 7    Amended Employment and                   119
             Compensation Agreement (2022)

*AB Litigation Services*

A    I have a phone that's on do not disturb. I can throw it in the other room if you want. I was waiting for the text to get onto the  oom.

Q    No, it's fine that it's there as long as it's on do no disturb and you're not consulting it.

Do you have any programs or documents open on your computer other than  oom?

A     oom and the web browser that I used to open  oom.

Q    And is anyone else in the room with you today?

A    No.

Q     ave you ever been deposed before?

A    No.

Q     ave you ever been a party to a lawsuit before?

A    No.

Q     ave you ever had a civil complaint filed against you?

A    No.

Q    Ever had a criminal complaint filed against you?

A    No.

Q     ave you ever had a disciplinary complaint under the Colorado Medical Board or

*AB Litigation Services*

another administrative body?

A    No.

Q    ave you ever testified in court?

A    No.

Q    ave you ever testified before a legislative body?

A    Yes.

Q    Okay.  What were those circumstances?

A    I have testified in a few states regarding bills regarding pediatric gender-affirming care, and I have testified in Colorado on bills, usually related to gender-affirming care for kids.

Q    Okay.  ow many times have you testified in Colorado?

A    I don't know.  My guess is six to ten times.  Six to eight.

Q    And how many times in other states?

A    I would say two times.  I have also testified in Colorado on a scope of practice bill, I think.

Q    ave you ever been an expert in litigation?

A    No.

Q    Now, you understand that today this is

*AB Litigation Services*

contributed either anonymously or edited or as a group or, you know, reviewed, or whatever, probably, I'm sure, countless articles on this topic and other topics.  I can't imagine.

Q    And did you write any of these articles at the re uest of someone else?

MR. CONNOLLY:  Objection; form.

A    I mean, I wanted to write all of the articles that I've written.

Q    (BY MS. FISC ER)  But has anybody ever asked you specifically to write one?

A    I mean, every -- I mean, lots of articles come up with -- people have an idea.  Your professor has an idea.  It's -- I don't know that -- I don't know that I've ever been approached like,  ey, will you write this article, and then write the article.

Lots of articles, academically or popularly, come up in discussions.  I don't -- I've never been -- I've never been asked to write an article -- I've never been directly asked to write an article.

Q    And have you written any articles on behalf of Mountain West?

A    No.

*AB Litigation Services*

gender-affirming care.  I've spoken on kind of

associated topics, like e uity and inclusion, at

other times, such as at the Denver Tech Center last

September.

Q    Okay.  And we'll get to the ones you've

listed in your declaration.  Did you get paid for

your time at these speaking engagements?

A    No.  I --

Q    Did you take --

A     o ahead.  Sorry.

Q    No.   o ahead and finish.

A    I -- I may have gotten some, like,

transportation reimbursement to maybe the FAIR one

in September last year, maybe, like, reimbursement,

but no payment or honorarium.

Q    And did you pay money to participate at

these speaking engagements?

A    No.

Q    And did you speak in your personal

capacity?

A    Yes.

Q    So not on behalf of Mountain West?

A    So you've asked -- I feel like you've

asked that  uestion in different angles, different

times.  I've never spoken publicly about Mountain

West -- I can't think of any time, ever, in more than a personal, like, interaction,  i, how are you, or something, interviewing somebody or something, except for the one time about the preventative care on TV several years ago, six years ago.

Q    And you didn't speak in your capacity as head of CPP?

A    I don't know what that means.  I definitely talk about CPP when I'm speaking at some events.  I don't know that there's, like, a formal way that I -- I don't know if there's a formal -- there's no form or something that I fill out to represent them, so I don't -- I don't know.

If you're asking when I have represented CPP, I would say the -- this -- this April event and next year in April, CPP does -- I mean, I think I do -- I probably do represent them at the April event.

Q    I've dropped another exhibit into the chat that I'm going to ask you to download and open up.  Let me know when you're there.

A    I have the file open.

Q    Okay.  And these are the interrogatory responses that counsel produced to us in this

*AB Litigation Services*

then I'm sure I would have -- I'm sure I would have, you know, shared, reposted CPAN's tweets or something.

Q   (BY MS. FISC ER)  So just for the record, this event was held April 7, 2024?

A   Yes.

Q   This response says the purpose of your talk at Rocky Mountain Summit Part I was to discuss the effects of gender-affirming treatments; is that right?

A   Yes.  We had a detransitioner at the event and other adults and talked about the harms of gender-affirming treatments.

Q   And you were not offering medical services at the Rocky Mountain Summit Part I?

MR. CONNOLLY:  Objection; form.

A   Yeah.  At no place outside of Mountain West Dermatology have I offered medical services since 2018.

Q   (BY MS. FISC ER)  Did you offer medical -- scratch that.

ave you ever offered medical services outside of a practice?

A   I -- I mean, I've been -- I've worked in residencies and fellowships.  I've worked for

*AB Litigation Services*

universities.  I've always practiced medicine with a -- I'm not an attorney.  I don't know how you define practice, but I've always practiced medicine as part of a practice.

Q   So you were not -- so going back to the Rocky Mountain Summit Part I, you were not selling a product at this event?

MR. CONNOLLY:  Objection; form.

A   I -- I don't think I sold any products outside of my practice for years.

Q   (BY MS. FISC ER)  You weren't providing another service?

MR. CONNOLLY:  Objection; form. Objection; vague.

A   Yeah.  I don't know what that means, but I think I've delineated the only two times I've -- two places I've received income for -- I can think of for over five, almost seven years -- no, more than seven years.  I was not providing any service other than speaking.

Q   (BY MS. FISC ER)  You weren't engaged in any commercial activity?

MR. CONNOLLY:  Objection; form.

A   To simplify your day, I don't think I've engaged in -- I can't think of any commercial

*AB Litigation Services*

activity I've engaged in.  I mean, maybe I've sold -- I don't even know if I've sold anything on eBay or at a garage sale.  But I can't think of any commercial activity that I've done in seven years except for practice medicine at Mountain West, and then we talked about consulting.

Q    (BY MS. FISC ER)  So when you spoke at this event, did you share any opinions about gender ideology?

A    Yes.

Q    What did you say?

A    I don't recall.

Q    Did you say anything about your refusal to use pronouns matching gender identity and chosen names?

MR. CONNOLLY:  Objection; form.

A    This was before 1312.  So that was definitely not as immediate in anyone's life at that time, and I -- but I don't recall.

Q    (BY MS. FISC ER)  Turning back to Exhibit 1.  I'm going to call your attention to paragraph 9, which is on page 3.

A    Paragraph 9, page 3?

Q    Correct.

A    Okay.  I'm looking at it.

Appellate Case: 26-1101   Document: 19-2   Date Filed: 06/08/2026   Page: 123

**AB Litigation Services**

A   Because she introduced herself by her birth name.

Q   ow were you aware she was transgender?

A   She stated publicly that she had considered herself transgender in the past.

Q   So moving on to the next event you listed, called Diversity Without Division: Is It Possible?  And if you need a reference, I'm looking at Exhibit 2, page 28.  This event was put on by FAIR Colorado; is that right?

A   Let me just get to Exhibit 2, please. Sorry, you said page 21?

Q   28.

A   Okay.  Yes.  This event was put on by FAIR Colorado.

Q   And it was September 12, 2024?

A   Yes.

Q   Were you involved in organi ing this event?

A   No.

Q   And what is FAIR Colorado?

A   FAIR Colorado is a nationwide nonprofit that promotes civil liberties and antidiscrimination.

Q   Were tickets sold to this event?

*AB Litigation Services*

Q   And you spoke at this event, correct?

A   Yes.

Q   And you did not sell any products at this event?

MR. CONNOLLY:  Objection; form.

A   No, and I didn't do any commercial services.

Q   (BY MS. FISC ER)  And you did not offer any medical services?

MR. CONNOLLY:  Objection; form.

T E CO RT REPORTER:  Was there an answer?

A   I'm sorry.  [ said no.  [ apologi e.

Q   (BY MS. FISC ER)  Now, your panel's purpose was to share insights on diversity, e uity, and inclusion initiatives; is that accurate?

A   Yes.

Q   What insights did you share?

A   I don't remember.

Q   Did you share your opinions about gender ideology?

A   I would have talked about diversity, e uity, and inclusion initiatives, which are used in businesses.  I would have emphasi ed their use in health care.

I would have probably, almost certainly,

*AB Litigation Services*

what age.  These aren't necessarily -- they're not lewd or lascivious or, you know, meant to be disturbing talks; but, of course, some components of it would be, I think, with parental discretion.

Q    (BY MS. FISC ER)  So your participation in Rocky Mountain Summit Part II was limited to organi ing and moderating this panel; is that right?

MR. CONNOLLY:  Objection; form.

A    I helped -- let's see.  I offered to help in more ways.  Lori  imelshteyn basically took care of everything.  I helped seek out a couple sponsors, one of which was Do No  arm.  I helped -- well, I organi ed that panel, so I helped invite speakers.

Q    (BY MS. FISC ER)  But you did not offer any medical services at Rocky Mountain Summit Part II?

A    I have not offered medical services outside of Mountain West Dermatology since being in Colorado.

Q    And you were not selling a product at Rocky Mountain Summit Part II?

A    I was not selling a product.

Q    And you were not providing a service?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.
Objection; vague.

A    I don't -- I don't know what service means, but I wasn't selling or peddling or offering any service beyond my speech.

Q    (BY MS. FISC ER)  You weren't engaged in any commercial activity at Rocky Mountain Summit Part II?

A    I was not.

Q    Now, during your panel moderation at Rocky Mountain Summit Part II, did you share your opinions about gender ideology?

A    Yes.

Q    What did you say?

A    I don't recall, but that was the theme of the event.

Q    Did you say anything about your desire to not use pronouns matching gender identity and chosen names?

MR. CONNOLLY:  Objection; form.

A    Well, as I recall, the Bill 1312 was -- had been declared and was starting to work its way through the legislature in Colorado, and so I definitely spoke about the dangers of this bill restricting speech, restricting speech of

*AB Litigation Services*

that is Exhibit 3, you do not use any individual's birth name instead of their chosen name, correct?

MR. CONNOLLY:  Objection; form.

A    No.  I'm writing about how the State is discriminating against people that have beliefs that don't go along with the State of Colorado's.

Q    (BY MS. FISC ER)  And this article does not use the pronouns for any individual that they don't use; is that correct?

MR. CONNOLLY:  Objection; form.

A    So, again, it does -- no.  I'm addressing the treatment and -- the gender-affirming treatment, but I'm not addressing the pronouns directly in this article.

Q    (BY MS. FISC ER)  Now, in any of these other articles you referenced that you've published, do any of those articles mention Mountain West?

A    I do not address Mountain West in these articles.

Q    Do these articles advertise any of your speaking engagements?

MR. CONNOLLY:  Objection; form.  Objection; vague.

Sorry.  What articles are we speaking of?

*AB Litigation Services*

going to very comfortably and normally use

appropriate biological language.

I can give other examples if you'd like.

Q    (BY MS. FISC ER)  So to clarify, since you said a lot of words there, when you refer to Dr. Bowers, you would use pronouns that Dr. Bowers doesn't use?

A    I would use Dr. Bowers' biological pronouns, yes.

Q    I'm going to ask you to look back at Exhibit 1, which is your declaration, and I'm going to direct your attention to page 16 -- or paragraph 16, which starts at the bottom of page 5.

A    Yes, I see it.

Q    You say you are active on social media. When you publish on social media, is your account in your personal name?

A    Yes.

Q    Do you publish statements as the head of CPP on social media?

A    I have at times referenced my -- I have at times referenced my association with CPP.  CPP has its own account, and -- but I post under my name, Travis Morrell, with my picture, usually just

*AB Litigation Services*

as myself.

Q    Do you manage CPP's social media account?

A    I -- I have a volunteer do that.  So occasionally I will send information or send a post, but someone else manages the account.

Q    Do you post on social media on behalf of Mountain West?

A    No.

Q    I'm going to -- it's the same exhibit, so Exhibit 1.  I'm going to ask you to scroll down to page 13 to Exhibit A -- I'm sorry, page 12.

A    Yeah.

Q    So what is this?

A    It is a post on    .

Q    Is it a post that you made?

A    Yes.

Q    And is it from your personal account?

A    Yes.

Q    And this post doesn't advertise your medical services, correct?

A    No post on    advertises my medical services.

Q    And this post doesn't say that you're affiliated with Mountain West, correct?

A    Correct.

AB Litigation Services

Q     And it doesn't advertise one of your speaking engagements?

MR. CONNOLLY:  Objection; form.

A     This post does not, but this is the account that we referenced earlier that I do promote speaking engagements.

Q     (BY MS. FISCHER)  And this post refers to Representative Titone?

MR. CONNOLLY:  Objection; form.

Q     (BY MS. FISCHER)  Go ahead and answer, Dr. Morrell.

A     I apologize.  I thought I did.  Yes, this does reference Representative Titone.

Q     Was Representative Titone ever a patient of yours?

A     Keep in mind that I don't know if it's even legal for me to answer that question, but no, Representative Titone is not a patient of mine and never has been.

Q     Have you ever met the representative?

A     Representative Titone and I -- let's see. I have -- we have -- I have definitely replied to Representative Titone's Twitter posts, including Representative Titone spreading misinformation about males being able to lactate for children, and

*AB Litigation Services*

A    This post does not.  It's on the account that I use for that.

Q    (BY MS. FISC ER)  Did you make these posts in your professional capacity as a doctor or in your personal capacity?

MR. CONNOLLY:  Objection; form.

A    In my personal capacity.

Q    (BY MS. FISC ER)  I'm going to ask you to take a look at Exhibit 2 again, that's interrogatory responses, and I'm going to ask you to scroll to page 31.   ust let me know when you're there.

A    ust a second.  Okay.  I'm sorry.  I'm in Exhibit 2.  You said page 31?

Q    Yes.  It should say Interrogatory Number 2 at the top.

A    Yes.  I am in -- I am at that paragraph.

Q    And so Interrogatory 2 asked the plaintiffs in the lawsuit to identify all instances in which any person has complained about use of incorrect pronouns and names of transgender individuals; is this right?

MR. CONNOLLY:  Objection; form.

A    It says -- I'm sorry.  I'm looking at the response.  So Interrogatory Number 2 says, Identify

*AB Litigation Services*

A    So, no.  To my knowledge, I've never received negative reviews from my treatment of a specific patient.  These reviews have been in response to my public actions on this topic.

Q    ave you ever seen a patient's name you recogni e on a  oogle review that refers to your -- let me strike that.

ave you ever seen a patient's name on a negative  oogle review of your practice that you recogni ed?

A    Again, I don't know if just standard practice and professional rules and standards of confidentiality allow me to answer that, I'm told.

But that being said, I can tell you that, to my knowledge, all of the negative reviews -- none of the negative reviews on mine are my patients, and some of the negative reviews, I not only know they are not my patients; I can tie them to a specific event by their name related to my public actions.

Q    Okay.  So going back to Exhibit 1, your declaration.  I'm going to call your attention to Exhibit C, which is on the very last page of the declaration.  It's numbered 16.

A    Exhibit C.   ot it.

AB Litigation Services

so things might -- I think patients might perceive things, but it doesn't need to be -- the goal is not to be -- the goal is not to purposely invoke controversy.

The goal is to build trust and compassion and take care of the patient. That's the goal. My practice -- the goal in my practice is not to -- this is not the goal of my practice. It's something that I ethically have to hold to in my practice.

Q    So you don't -- at an initial consultation with a patient, you don't introduce yourself by saying, My name is Dr. Morrell, and I only use birth names and pronouns that match biological sex?

MR. CONNOLLY:  Objection; form.

A    Yeah.  Again, we have normal, natural conversations.  I wouldn't bring up -- I would only bring something like that up if it came up naturally or if they brought it up in detail. Otherwise, we are going to have a naturally evolving conversation.

Q    (BY MS. FISC ER)  So you can't say whether your transgender patients are aware you won't refer to them using pronouns that match their

*AB Litigation Services*

gender identity?

MR. CONNOLLY:  Objection; form.

Objection; misstates testimony.

A    Yeah, I think that's a misstatement.  I think if and when they hear me or have heard me state a prior name or use biological pronouns, then they -- that's what they are aware of.

Q    (BY MS. FISC ER)  So turning back to paragraph 6 of your declaration, you say,  When I have addressed these patients or discussed these patients with my colleagues, I have used biologically accurate pronouns and birth names.  Is that accurate?

A    Yes.

Q    So how do you know a patient's birth name?

A    So you're starting to ask me about, like, basically, patients that I know and take care of.  So, again, I believe some of this is going to be public.  And so I don't like to speak and I'm not allowed to speak -- it's my professional responsibility not to speak about patients.  I don't speak to my wife about patients.

But just, in general, again, no one in -- people in real life don't introduce themselves and

AB Litigation Services

general.

Q    And have you ever refused to treat a patient because that patient was transgender?

A    Absolutely not.  In fact, I would like to take care of any patient who wishes to see me and treat them with respect and compassion.

Q    So you are willing to treat anyone who walks through the front door of your practice?

A    Yes.

Q    Have you made Mountain West aware of this lawsuit?

A    No.

Q    Are your fellow physicians aware of this lawsuit, that you know of?

A    Not to my knowledge.

Q    Now, does your online bio or any of your online materials say you won't treat a transgender patient?

MR. CONNOLLY:  Objection; form.

A    If you're speaking about Mountain West Dermatology, the Mountain West Dermatology website, no.

Q    (BY MS. FISCHER)  Any other websites?

A    Well --

MR. CONNOLLY:  Objection; form.

AB Litigation Services

STATE OF COLORADO    )

                     )  ss. REPORTER'S CERTIFICATE
CO NTY OF DENVER     )




        I, Lisa A. Dague, do hereby certify that

I am a Certified Shorthand Reporter and Notary

Public within the State of Colorado; that previous

to the commencement of the examination, the

deponent was duly sworn to testify to the truth.

        I further certify that this deposition

was taken in shorthand by me at the time and place

herein set forth and was thereafter reduced to

typewritten form, and that the foregoing

constitutes a true and correct transcript.

        I further certify that I am not related

to, employed by, nor of counsel for any of the

parties or attorneys herein, nor otherwise

interested in the result of the within action.

        In witness whereof, I have affixed my

signature this 4th day of September, 2025.

        My commission expires December 23, 2028.



                    Lisa A. Dague
                    Certified Shorthand Reporter

*AB Litigation Services*

IN T E  NITED STATES DISTRICT CO RT
FOR T E DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

 OOM DEPOSITION OF VALERI LESWIN , D.O.
August 27, 2025

-------------------------------------------------

Plaintiffs:

DEFENDIN  ED CATION, et al.,

v.

Defendants:

A BREY C. S LLIVAN, et al.

-------------------------------------------------

APPEARANCES:

        CONSOVOY MCCART Y, PLLC
            By  . Michael Connolly, Es .
                Paul Draper, Es .
                1600 Wilson Boulevard, Suite 700
                Arlington, Virginia 22209
                   Appearing via  oom on behalf of
                   Plaintiffs

        COLORADO ATTORNEY  ENERAL'S OFFICE
            By Dominick D. Schumacher
                Assistant Attorney  eneral
                 anna K. Fischer
                Senior Assistant Attorney  eneral
                Nora Q.E. Passamaneck
                Senior Assistant Attorney  eneral
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                   Appearing via  oom on behalf of
                   Defendants CCRD, Sergio Cordova,
                    eta Asfaw, Mayuko Fieweger,
                   Daniel S. Ward,  ade R. Kelly,
                   and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

COLORADO ATTORNEY  ENERAL'S OFFICE
       By Lane Towery
           Assistant Attorney  eneral
           1300 Broadway, 10th Floor
           Denver, Colorado 80203
               Appearing via  oom on behalf of
               Colorado Attorney  eneral

Also present:  Sarah Bomgardner

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the  oom deposition of VALERI LESWIN , D.O., called by Defendants, was taken on Wednesday, August 27, 2025, commencing at 1:02 p.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E

DEPOSITION OF VALERI LESWIN , D.O.

E AMINATION BY:                                    PA E

    Mr. Schumacher                                  4


                                                INITIAL
E   IBITS                                       REFERENCE

Exhibit 1    Plaintiffs' Objections and            29
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 2    Declaration of Dr. Valeri             85
             Leswing

AB Litigation Services

it hopefully a little bit more clearly.  When you choose not to use names or pronouns associated with --

THE DEPONENT:  Hold on.

(Discussion off the record.)

Q    (BY MR. SCHMACHER)  So just to restate my last question.  Is it fair to say that when you choose not to use a pronoun or name associated with somebody's new gender identity, that you're not doing that with the intent to denigrate anybody, right?

A    Correct.

MR. CONNOLLY:  Objection; form.

Q    (BY MR. SCHMACHER)  And it's not your intent to harass anyone, correct?

A    Correct.

Q    It's not your intent to discourage patients from coming into your practice just because they are transgender or nonbinary, correct?

A    Correct.

Q    Would you agree that you provide the same quality of service to patients, regardless of whether they are transgender, nonbinary, or cisgender?

A    Yes.

*AB Litigation Services*

you have three  chromosomes, you are male.  If you are  YYY, you are male.  If you are  0, as in somebody with Turner's, because you don't have a Y chromosome, you are female.

So there's not a genetic condition where you don't have a sex.

Q    (BY MR. SC  MAC ER)  You said,  In the past.   as that changed?

A    Prior to five years ago or perhaps ten years ago, depending on the academic you're talking to, anytime you had a Y chromosome, you were always identified as male.  Now, there's more ambiguity because people are unhappy with that clear distinction.  And so, now, they are going to say if you're  naught, which would be Turner Syndrome, we're not sure.  But that's not been the case for 100 years plus prior to that.

So I'm not sure where the geneticists want to fall on this now, but I don't know that it's all that relevant one way or another.

Q    You are not a geneticist, correct?

A    Correct.

Q    Regarding the patient interactions that we've discussed today, did any of those patients file complaints with the Colorado Medical Board?

A    No, not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with the Colorado Civil Rights Division, or CCRD?

A    Not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with any other organi ation?

A    Not to my knowledge.

Q    Your practice of only using pronouns and names associated with one's sex at birth, is that -- strike that.

Your practice of only using names and pronouns associated with sex at birth, has that always been how you operate?

A    Yes.

Q    And do you still only use names and pronouns associated with somebody's sex at birth?

A    Since the recent law, I've felt compelled to not use either.

Q    And when you use the term  since the recent law,  are you talking about  ouse Bill 25-1312, which was passed in approximately May of 2025?

A    Yes.

*AB Litigation Services*

Q    So since May of 2025, you have felt compelled to not use names or pronouns?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    When I'm dealing with patients who I'm unsure of, I just have to refer to them generically as  the patient  instead of being able to talk to them like you would in polite conversation with their name, how are you doing.  It has to be something more generic.

Q    (BY MR. SC  MAC ER)  Are you afraid to use a legal name on someone's medical records?

MR. CONNOLLY:  Objection; form.

A    I'm concerned that the State will come after me if I refer appropriately to the patient in a chart by their biological sex or naturally by their biological pronouns, including using their given birth name.

MR. CONNOLLY:  Dr. Leswing, are you okay? Do you need to take a break?

T E DEPONENT:  (Shook head.)

MR. CONNOLLY:  Okay.

Q    (BY MR. SC  MAC ER)  Can you explain a little bit more about your concern that the State will come after you?

*AB Litigation Services*

A    It's un uestionable that in the State of Colorado, people have been targeted for their views on trans issues.  And knowing that I've been in this community for a long time and knowing that the community knows how strongly I feel about not harming children, it's not at all inconceivable that I would be directly and actively targeted by somebody who didn't come in to actually seek care, but by somebody who came in to make a point of backing me into a position where I have to choose between doing what I think is deeply harmful for their child or following some bi arre speech code that the State has decided is critical.

Q    Who are you concerned specifically would target you?

A    Any family or parent who wanted to be the person that made themself famous by making a stand for what they consider are trans rights.

Q    What about  B 25-1312 makes you believe that you're now likely to be targeted?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    Even if I wasn't directly targeted, if a family came in and they want me to call their

*AB Litigation Services*

A    I do.

Q    And what is this document?

A    I believe, in lawyer speak, it's my declaration.

Q    Scrolling down -- it's an 11-page PDF. Scrolling down to page 9, there's what appears to be a photograph, the final page, stating,  Pursuant to 28  .S. Code 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on  une 11th, 2025,  and then a signature representing to be yours.  Is that your signature?

A    Yes.

Q    So you believe that the declaration is -- these are your words, correct?

A    Correct.

Q    If you would, please, scroll to paragraph 14, which is on page 5.  If you would just review that paragraph, and let me know when you're ready.

A    Okay.

Q    So you want to publish materials expressing your belief that sex is fixed at birth and immutable, correct?

A    Correct.

Q    Where do you want to publish those

*AB Litigation Services*

materials?

A    I've considered doing a formal review on Facebook under my Mountain Pediatrics page, reviewing the literature for people so they can see it, and openly having a discussion there.

Q    ow long have you been planning to or considering publishing those materials?

A    Probably two or three years.

Q    ave you made any progress on writing these materials?

A    I stopped considering that as much after the law was passed, because I think it will lead to further anger in people who disagree with me.

Q    Did you start writing those materials?

A    enerally when I write, I kind of spend a lot of time thinking about it in my head, and then I kind of write it all in one big spree.  And so I haven't actually written anything.  I've just contemplated how I would do it.

Q    And it's your belief that in the current climate, it would be controversial, and folks might be upset with you about publishing it?

A    Correct.

Q    And for that reason, you have decided not to go forward and publish it?

*AB Litigation Services*

A    Correct.

Q    And the Facebook page you want to publish it on, that's Mountain Pediatrics' Facebook page?

A    Correct.

Q    That's not your personal page.  That's completely controlled by Mountain Pediatrics, right?

A    I don't have a personal page, so, yes.

Q    Looking at paragraph 15, which references an internal Exhibit A that can be found on page 11 of this PDF, you discuss wanting to publish a statement on Mountain Pediatrics' page regarding gender ideology, preferred pronouns, and chosen names; is that right?

A    Correct.

Q    ow long have you wanted to publish this statement?

A    Probably six, nine, ten months, something like that.

Q    And why have you not done so?

A    I don't want to generate further angst and anger in my community.

Q    And your goal with the statement that you want to publish is to inform potential patients that you're not going to use preferred pronouns or

*AB Litigation Services*

STATE OF COLORADO    )

                                   )   ss. REPORTER'S CERTIFICATE
CO NTY OF DENVER        )

I, Lisa A. Dague, do hereby certify that I am a Certified Shorthand Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 8th day of September, 2025.

My commission expires December 23, 2028.

Lisa A. Dague
Certified Shorthand Reporter

*leri Les  in  - 08/2 /2025*                                   *3*

**2-App-144**

**141**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION, *et al.*,

    *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

    *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

### SUPPLEMENTAL DECLARATION OF DR. VALERI LESWING

1.    I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.    I am a licensed physician in the State of Colorado and a practicing pediatrician. I own and operate my own medical practice—Mountain Pediatrics—in Evergreen, CO. My practice focuses on providing complete pediatric care for children and young adults, including comprehensive well care, physicals, and visits for illness or injury. I am the practice's sole owner and physician. *See* Leswing Decl. (Doc. 27-6) ¶¶3-4.

3.    This past August, my two children left home to attend college in Texas and Utah. Now that my children live outside of Colorado, I intend to travel more frequently, both for personal trips and to visit my children. To facilitate my increased travel, starting in December, I plan to reduce Mountain Pediatrics' staff and hours of operation and use a new office space on a flexible basis to allow for greater freedom in my schedule.

1

4.      Specifically, my plans are to:

a.      Reduce my in-office hours. I currently spend a fixed 4 days in Mountain Pediatrics' office each week, with about 3.5 days devoted to treating patients. Over the next few months, I plan to begin treating patients in person on a more flexible basis, and I anticipate spending fewer hours physically in the office.

b.      Switch to a new office for patient visits. Mountain Pediatrics is currently located in an office suite in Evergreen, CO. My last day treating patients in this office suite will likely be in mid-December. After that, I intend to use another office suite at the same address for in-person patient visits.

c.      Reduce Mountain Pediatrics' support staff, as I anticipate fewer total in-office hours and less or no need for administrative support.

5.      Although I plan to adjust my schedule for greater flexibility, I intend to maintain an active practice with the same scope of treatment, "providing complete pediatric care for children and young adults from newborns to college students, including comprehensive well care, physicals, and visits for illness or injury" for "patients up to 25 years old." Leswing Decl. (Doc. 27-6) ¶3. I intend to continue treating existing patients and accepting new patients. I still "anticipate treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future." *Id.* ¶7. Both I and Mountain Pediatrics remain members of Do No Harm, and I understand my practice remains subject to Colorado's laws governing places of public accommodation. *See id.* ¶¶4-5; Colo. Rev. Stat. §24-34-600.3(1)(a)(V).

6.      I continue to "believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity," and "I want to exercise my fundamental constitutional right to speak in a manner that reflects those views to best serve the medical needs of all my patients." Leswing Decl. (Doc. 27-6) ¶¶6-16. But, because Colorado law as amended by H.B. 25-1312 threatens to punish so-called deadnaming and misgendering, I remain unable to address or refer to individuals in my medical practice using biologically accurate terms inconsistent with an individual's supposed gender identity or otherwise speak consistently with my belief that sex is determined at birth and immutable. *Id.* ¶¶23-26. I continue to fear—with my new schedule as before—that I will be targeted, harassed, reported, and/or investigated based on my speech. *Id.* ¶¶22-23.

7.      Finally, on October 28, 2025, I issued a statement indicating that Mountain Pediatrics will be closing its current physical location on November 25, 2025. *See* Mountain Pediatrics, www.mountainpeds.com. As discussed above, this statement is a reflection of that physical office location closing its doors and does not reflect any plans to stop providing care through Mountain Pediatrics for the foreseeable future. I anticipate issuing a new statement in the next several weeks informing the community about the new path for Mountain Pediatrics' continued operation and how they can receive care.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 13, 2025.

_____
Valeri Leswing, D.O.

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01572-RMR-MDB |
| COMMITTEE OF FIVE, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01668-RMR-MDB |
| DOXA ENTERPRISE, LTD.,<br><br>*Plaintiff*,<br><br>v.<br><br>AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-02177-RMR-MDB |

1

## DECLARATION OF AUBREY SULLIVAN

I, Aubrey Sullivan, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.   I am the Director of the Colorado Civil Rights Division ("Division"), a position I have held since June 2016. Before becoming Director, I served as an investigator for the Division for 5 years; I also served as the Division's Alternative Dispute Resolution and Outreach Supervisor for 2.5 years. I have been a licensed Colorado attorney since October 25, 2010, and have experience working as a civil litigator at a large national law firm.

2.   As Director of the Division, I am familiar with the statutes and regulations governing the Division, as well as the procedures and practices used by the Division when fulfilling its statutory duty of enforcing Colorado's anti-discrimination laws in the area of public accommodations.

3.   As Director of the Division, I am familiar with the statutes applicable to the Division, the regulations promulgated by the Colorado Civil Rights Commission ("Commission"), and the procedures and practices used by the Division and Commission when fulfilling their statutory duties of enforcing Colorado's anti-discrimination laws in the area of public accommodations.

4.   I submit this Declaration in three actions: *Defending Education et al. v. Sullivan et al.*, No. 1:25-cv-01572 (the "*Defending Education* Action"), *Committee of Five v. Sullivan et al.*, No. 1:25-cv-01668 (the "*XX-XY* Action"), and *Doxa Enterprises v. Sullivan et al.*, No. 1:25-cv-02177 (the "*Doxa* Action").

2

**2-App-150**

**I.   Summary of Standard Procedures of the Division and Commission**

5.  In a typical public accommodations case, the Division and Commission follow the below standard procedures and practices:

    a.   Any person who believes they have been aggrieved by a violation of Colorado's Anti-discrimination Act ("CADA") may file a charge of discrimination with the Division. The Attorney General or the Commission may also file a charge, upon determination that an alleged discriminatory practice imposes a significant societal or community impact. If the charge meets CADA's jurisdictional requirements, the Division receives and investigates such charges upon the filing of a charge by a complainant; it does not seek out violations or solicit charges from prospective complainants. Upon receipt of a complainant's charge, the Division serves a copy of the charge and a notice on all parties, including the respondent.

    b.   The Division may invite the parties to meet in an attempt to mediate and informally resolve the charge at any stage of the administrative process before the issuance of a determination of probable cause or no probable cause.

    c.   If the Division receives an allegation of discrimination that it believes is within its jurisdiction, the Division conducts an investigation into the alleged facts underlying the charge. Such investigation may include requests for production of documents or information from the parties; witness interviews; and obtaining statements, testimony, evidence, or inspections of places or things reasonably

3

**2-App-151**

calculated to lead to the discovery of evidence relevant to the allegations or circumstances of the charge.

d.  If the Division does not believe it has jurisdiction, it does not conduct an investigation and notifies the parties.

e.  After the Division's investigation, the Division Director or their authorized designee determines whether probable cause for crediting the allegations in the charge exists. If it is determined, based upon the information gathered during the investigation that probable cause for crediting the allegations of a charge does not exist, the Director or their designee dismisses the charge and notifies the parties of the determination. However, if it is determined based upon the information gathered during the investigation that probable cause for crediting the allegations of a charge exists, the Director or their designee notifies the parties of such determination in writing and orders the parties to attempt to resolve the charge through conciliation (compulsory mediation); the notice also states the specific legal authority and jurisdiction of the Commission, the Division and the matters of fact and law asserted.

f.  A third possibility also exists—the Director or their designee may, without deciding the merits of the alleged act of discrimination, dismiss a charge for other reasons, including but not limited to: voluntary withdrawal of the charge by the complainant, settlement, or a request for issuance of a right to sue notice from the complainant.

4

**2-App-152**

g.  The conciliation process entails negotiation of a mutual agreement between the parties by a mediator. The conciliation process is designed to result in a voluntary agreement that resolves the charge. The assigned mediator determines when conciliation efforts are unsuccessful and a voluntary agreement is not likely to result. The Division may also terminate its efforts to conciliate if the parties fail or refuse to make a good faith effort to resolve the dispute.

h.  When the Director or their designee determines that further efforts at conciliation will be futile, he or she reports that fact to the Commission. For public accommodation and employment matters, the Division makes a recommendation on whether the matter should be set for an administrative hearing. As part of its preparation to report to the Commission, the Division conducts an internal probable cause review by a three-member panel. After considering the information in the case file, and consulting with legal counsel, the panel votes on whether to recommend to the Commission that the matter be set for an administrative hearing.

6.  Throughout the charge and investigation process, the Division remains a neutral investigative agency. The law requires the Division, the Director, and the Commission to "presume that the conduct of any respondent is not unfair or discriminatory until proven otherwise." C.R.S. § 24-34-305(3).

## II.  History of the Prohibition of Discrimination Based on Gender Identity and Gender Expression

7.  CADA has protected individuals based on their sexual orientation, gender identity,

5

**2-App-153**

**207**

and gender expression since the enactment of Senate Bill (S.B.) 08-200 in 2008. Specifically, in 2008, "sexual orientation" was added as a protected class and was defined to include "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08–200).

8. In 2009, the Commission promulgated 3 C.C.R. § 708-1:81.6, covering sexual orientation harassment. That regulation clarifies that "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" may create "an environment that is subjectively and objectively hostile" and therefore violate CADA. This regulation is still in effect and applies to housing, employment, and public accommodations discrimination.

9. In 2021, "gender expression" and "gender identity" were separated out as distinct protected classes. See 2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108).

10. In May 2025, H.B. 25-1312 amended the definition of "gender expression" to expressly include an individual's "chosen name, and how the individual chooses to be addressed." *See* H.B. 25-1312 § 8, codified at C.R.S. § 24-34-301(3.5), (9).

11. Whether a place of public accommodation would violate CADA by failing and/or refusing to use an individual's chosen name based on gender identity and/or how the individual chooses to be addressed based on gender identity would be highly fact specific and contains both subjective and objective elements. As a result, a place of public accommodation's announcement of a desire to use, and/or ultimate failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Rather, it requires a close analysis of all facts and context of the usage and the circumstances related to the usage,

6

including how such usage relates to providing any good, service, facility, privilege, advantage, or accommodation to the general public.

12. To the best of my knowledge during my tenure at the Division, the Division has not found probable cause in any public accommodations case based upon a respondent place of public accommodation's failure to use an individual's chosen name and/or how the individual chooses to be addressed.

13. To the best of my knowledge during my tenure at the Division, the Division has found probable cause in only two public accommodations cases wherein the complainant alleged discrimination based upon gender identity or gender expression. The charges did not involve allegations of any failure to use an individual's chosen name and/or how the individual chooses to be addressed.

14. To the best of my knowledge during my tenure at the Division, the Division has received no complaints of discrimination under the unwelcome clause or Part 7 of CADA based on a failure to use an individual's chosen name and/or how the individual chooses to be addressed.

15. To the best of my knowledge during my tenure at the Division, the Division has received two complaints of discrimination in public accommodations on the basis of gender identity, gender expression, or sexual orientation in which misgendering was part of the alleged discrimination. Neither resulted in a finding of probable cause. In both instances, the alleged misgendering was secondary to additional conduct, including the use of anti-LGBTQ slurs. Both complaints pre-date the passage of H.B. 25-1312.

16. To the best of my knowledge during my tenure at the Division, the Division has never found probable cause of discrimination under Parts 6 or 7 of CADA based on an advocacy organization being a place of public accommodation.

### III.    *Defending Education* Plaintiffs

17. I have reviewed the Amended Complaint in the *Defending Education* action and the Amended Motion for Preliminary Injunction and Brief in Support, both filed June 13, 2025. I am aware that Plaintiffs assert that:

    a. Colorado Parent Advocacy Network (CPAN) is a 501(c)(4) organization that "advocates for educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." *DE* Action, ECF No. 25, Am. Compl. ¶ 52; *see also DE* Action, ECF No. 27-2, Gimelshteyn Decl. ¶ 4 (describing CPAN as a "social advocacy organization organized under Colorado law"). CPAN advocates through "network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and information resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy, and, if necessary, litigation." *DE* Action, ECF No. 25, Am. Compl. ¶ 52.

    b. Protect Kids Colorado (PKC) is a "grassroots, 501(c)(4) organization devoted to protecting kids and strengthening families in Colorado." *DE* Action, ECF No.

25, Am. Compl. ¶ 75 PKC's activities include "coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies; educational campaigns; and, if necessary, litigation." *Id*.

c. Dr. Travis Morrell is a medical doctor who practices as part of Mountain West Dermatology in Grand Junction, Colorado. *DE* Action, ECF No. 27-5, Morrell Decl. ¶ 4. Separate from his practice, he also "regularly speaks and writes on the issues of sex and gender as they relate to the medical profession," and expresses his views on social media and in-person at hotels and restaurants. *DE* Action, ECF No. 25, Am. Compl. ¶¶ 109-110.

d. Dr. Valerie Leswing and her medical practice, Mountain Pediatrics, operate in Evergreen, Colorado. I understand that Dr. Leswing has treated children and young adults with gender dysphoria and believes that these patients are best served if she and her staff refrain from using chosen names associated with any change in gender identity and only use pronouns and gendered language matching a patient's sex assigned at birth. *DE* Action, ECF No. 25, Am. Compl. ¶¶ 120-29.

18. Based on my review, it does not appear that Plaintiffs CPAN or PKC offer any good, service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions. Entities do not offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, "coalition-building," or the other advocacy efforts identified by those Plaintiffs.

9

19. For the same reasons, it also does not appear that Dr. Morrell offers any good, service, facility, privilege, advantage, or accommodation to the general public when he engages in public speaking, publications, or social media activities unrelated to his provision of health care services through his medical practice.

20. To the best of my knowledge during my tenure at the Division, no complaints have ever been filed against any of the *Defending Education* Plaintiffs: CPAN; PKC; Dr. Morrell; Dr. Leswing; Mountain Pediatrics; Defending Education; and Do No Harm under Parts 6 or 7 of CADA alleging discrimination based on sexual orientation, gender identity, or gender expression.

21. Without a complainant, the Division would have no reason or jurisdiction to investigate any *Defending Education* Action Plaintiff. As stated above, the Division does not seek out violations in the first instance or solicit charges from prospective complainants. It is only after a complainant files a charge that the Division becomes involved.

## IV.    XX-XY Athletics (*XX-XY* Action)

22. I have reviewed the Complaint filed in the *XX-XY* action, filed on May 27, 2025. I am aware that XX-XY asserts that:

    a. "It is common practice for XX-XY Athletics to publish, post, and circulate communications and advertisements referring to transgender individuals by their given name on social media, in public appearances, and elsewhere." *XX-XY* Action, ECF No. 1, Compl. ¶ 135.

**2-App-158**

**212**

b. "[I]t is common practice for XX-XY Athletics to publish, post, and circulate communications and advertisements referring to transgender individuals using pronouns and terminology that match their biological sex, making these communications inconsistent with 'how the individual chooses to be addressed.'" *XX-XY* Action, ECF No. 1, Compl. ¶ 136.

c. "XX-XY Athletics happily sells its products to anyone, regardless of any protected characteristics, including gender expression." *XX-XY* Action, ECF No. 1, Compl. ¶ 137.

d. "XX-XY Athletics will not knowingly refer to anyone—customer, prospective customer, athlete, public figure, or member of the public—using a 'chosen name,' pronouns, honorifics, or other language contrary to the person's biological sex." *XX-XY* Action, ECF No. 1, Compl. ¶ 138.

e. XX-XY Athletics published a statement on the social media site X providing, among other statements:

> "We will not knowingly use biologically inaccurate language—not names, not pronouns, not honorifics, nor anything else. While we will happily sell our products to anyone, we will decline any and all requests from customers, prospective customers, or anyone else to use biologically inaccurate language. And we will continue to use language that is biologically accurate, no matter who it offends or who declines to buy from us because of it."
>
> *XX-XY* Action, ECF No. 1-1, Compl. Ex. A.

11

213

23. To the best of my knowledge during my tenure at the Division, no complaints have ever been filed against XX-XY under Parts 6 or 7 of CADA alleging discrimination based on sexual orientation, gender identity, or gender expression. Without a complainant, the Division would have no reason or jurisdiction to investigate XX-XY.

24. Because the analysis is fact-specific and contains both subjective and objective elements, and because there is no complainant, there is insufficient information to determine whether XX-XY's conduct violates CADA.

## V.    Born Again Used Books (*Doxa* Action)

25. I have reviewed the Complaint in *Doxa Enterprises*, filed July 16, 2025. I am aware the Plaintiff asserts that:

   a.  Born Again Used Books is a closely held bookstore which operates pursuant to a set of Christian beliefs. *Doxa* Action, ECF No. 1, Compl. ¶¶ 23-27. It sells both secular and non-secular books with an emphasis on Christian titles. *Doxa* Action, ECF No. 1, Compl. ¶¶ 28-32.

   b.  As part of its beliefs, Born Again believes that "god created two genders, male and female," and therefore calling a biological woman a man or vice versa would offend "biological reality" and "be a lie and violate our beliefs as Christians." *Doxa* Action, ECF No. 4-3, Motion for Preliminary Injunction, Exhibit B. After the passage of H.B. 25-1312, Born Again drafted a policy stating that "owners and employees will not use 'gender neutral' pronouns or neologisms . . . [and] will not refer to or address a biological female as 'Mr.,' 'he,' a 'man,' or any similarly biologically inaccurate language." Motion for

12

**215**

Preliminary Injunction, *Doxa* Action, ECF No. 4-2, Exhibit A. If a person "request[s] to use a pronoun or form of address that would violate" the Language Policy, Born Again states that it will "respectfully and charitably decline and instead use a form of address that does not contradict the individual's biological sex, such as the person's first or last name." *Id*.

c. Born Again operates a blog on its website in which is discusses its business and religious beliefs. *Doxa* Action, ECF No. 1, Compl. ¶¶ 34, 60. Born Again claims that after the passage of H.B. 25-1312, it decided it would like to publish a statement on its blog explaining its pronoun and language policy. *Doxa* Action, ECF No. 1, Compl. ¶¶84-87.

26. No complaint has been filed against Born Again with the Division. Without a complainant, the Division would have no reason or jurisdiction to investigate Born Again.

27. Because the analysis is fact-specific and contains both subjective and objective elements, and because there is no complainant, there is insufficient information to determine whether Born Again's conduct violates CADA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day November, 2025.

*s/ Aubrey Sullivan*
Aubrey Sullivan
Director
Colorado Civil Rights Division

13

**2-App-161**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01572-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| COMMITTEE OF FIVE, INC., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-01668-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| DOXA ENTERPRISE, LTD., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-02177-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |

217

## DECLARATION OF DR. ILAN H. MEYER

I, Dr. Ilan H. Meyer, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1. I was retained by the Colorado Attorney General's (COAG) office to provide expert testimony in the cases of *Defending Education et al. v. Sullivan et al.* (Case No. 1:25-cv-01572-RMR-MDB), *Committee of Five, Inc. v. Sullivan et al.* (Case No. 1:25-cv-01668-RMR-MDB), and *Doxa Enterprises, Ltd. v. Sullivan et al.* (Case No. 1:25-cv-02177-RMR-MDB). I am not being compensated by COAG for this service, but I will be reimbursed for any expenses required as part of this work, for example, travel expenses should I be required to travel to appear in person in matters related to this case.

2. Since July 2011, I have been a full-time employee at The Williams Institute, University of California Los Angeles (UCLA) School of Law in Los Angeles, California, a research center dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy.[1]

3. COAG asked me to address how the failure to use a transgender person's "chosen name and how the individual chooses to be addressed" as reflecting of their gender identity and expression impacts transgender people's health and wellbeing.[2]

---

[1] Williams Institute (n.d.). *Experts: Ilan H. Meyer*. Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/experts/ilan-h-meyer/

[2] Colo. Rev. Stat. § 24-34-301(9) (2024)

**2-App-163**

## I.       Qualifications

4.       I am the Williams Institute Distinguished Senior Scholar of Public Policy.

5.       My original theoretical and empirical research focuses on the relationships among stigma and prejudice, minority social status and identity, and mental health and well-being. I have studied populations defined by sexual orientation (lesbian, gay, bisexual, and heterosexual), gender (men, women, transgender), and race/ethnicity (African Americans, Latinos, and Whites). For this work I received recognition, including by the American Psychological Association (Presidential Citation) and the National Institutes of Health (Sexual and Gender Minority Distinguished Investigator Award).[3]

6.       Further information regarding my background and experience, as well as a list of my publications, can be found in my *curriculum vitae*, which is attached as Exhibit A to this declaration. As reflected in my *curriculum vitae*, I have published over 140 original, peer-reviewed articles, chapters, reviews, and editorials in scholarly journals and books. I have made numerous presentations and invited addresses at professional conferences and meetings. I have received grants for my research from federal, state, and private funders. Most recently, I have been the Principal Investigator of two National Institutes of Health-funded studies of stress, identity, and health among LGBT

---

[3] American Psychological Association. (2019). *Ilan H. Meyer, PhD, awarded 2019 APA Presidential Citation*. https://www.apa.org/about/governance/president/citation/ilan-h-meyer American Psychological Association; Center for Population Research. (2022, August 14). *Congratulations to faculty affiliate Ilan H. Meyer for his 2022 NIH SGM Distinguished Investigator Award*. UCLA. https://ccpr.ucla.edu/2022/08/14/congratulations-to-faculty-affiliate-iian-meyer-for-his-2022-nih-sgm-distinguished-investigator-award/

**2-App-164**

**218**

populations in the United States and other studies and projects at the Williams Institute.[4]

7.      Prior to arriving at the Williams Institute, from July 1994 until June 2011, I served in different roles at Columbia University in New York City. My last position there was as Professor of Clinical Sociomedical Sciences and Deputy Chair for Masters Programs in Sociomedical Sciences at Columbia University's Mailman School of Public Health.  There, I taught graduate-level courses on research methods; stigma, prejudice, and discrimination; and sexual and gender minority issues in public health. I have also taught other related topics in the past and continue to teach classes as a guest lecturer at UCLA and elsewhere in the United States and abroad. I have served as mentor to junior faculty, postdoctoral fellows, and graduate students and I have served on more than 20 dissertation committees in the U.S. and Europe.

8.      I have served as an expert on issues related to sexual orientation and gender identity either at trial or hearings or through declarations and reports as listed in Exhibit A (curriculum vita). Including, in the past eight years the following cases:

- Amicus Brief (2017) – U.S. Supreme Court in *Masterpiece Cakeshop v. Colorado Civil Rights Commission brief of amici curiae Ilan H. Meyer, PhD, and other social scientists and legal scholars who study the LGB population in support of respondents.* 584 U.S. 617 (2018)

---

[4] Generations Study. https://www.generations-study.com/; TransPop. https://www.transpop.org/

- Expert Witness (2017) – *United States of America vs. Andries Snyman* CR 16-50102

- Expert Report (2018) – In the Matter of Margaret Namulyanga, Respondent, in removal proceedings, United States Department of Justice Executive Office for Immigration Review Immigration court, New York, NY

- Consultation (2018) – U.S. Supreme Court appeal of death penalty conviction re jury comments. Charles Russell Rhines, Petitioner, v. State of South Dakota, Respondent.

- Amicus Brief (2022) – U.S. Supreme Court in *303 Creative v. Elenis, brief for Ilan H. Meyer, PhD, and other social scientists and legal scholars as amici curiae supporting respondents.* 600 U.S. 570 (2023)

- Expert Witness (2022) – *Missouri State v. Richard Emery*, 1811-CR04421-01. Capital case, penalty phase testimony.

- Amicus Brief (2025) – *Chiles v. Salazar Brief of Amici Curiae of Williams Institute Scholars in Support of Respondents*, No. 24-539 (U.S. Aug. 26, 2025).

## II.    Methodology

9.      In this report, I rely on my reading and interpretation of current scientific peer-reviewed literature in different disciplines that may include, but are not limited to, psychology, sociology, epidemiology, public health, and medicine. My analysis follows established social science rules of evidence. In evaluating the relevant literature, I rely on the following: (a) theory, (b) hypotheses posed based on theory, (c) empirical

**2-App-166**

evidence that assess these hypotheses using quantitative and qualitative methods, and (d) conventions and rules about causal inference developed in these disciplines over decades of methodological writings.

10.    The scientific method allows for testing of theory-based hypotheses that can be nullified using statistical analysis and causal inference. Statistical analysis provides, in any test of hypotheses, estimates of the rate of error for some of the various ways that error can affect the results. For example, it can assess the impact of sampling error to inform the researcher of how precise a particular value is, such as a population parameter (for example, the proportion of the population that holds a particular attitude). Other evaluations of error include, but are not limited to, assessments of the methods for sampling, for example, where potential biases can be assessed to understand whether the sample obtained by the researcher represents the population to which the researcher is generalizing his or her results. The existence of methodological limitations in any one study, or even in a group of studies, does not by itself discredit a study, the area of investigation, or the conclusions that are drawn from this study or area of investigation.

11.    Relying on conventions of scientific research methodology and causal inference, as a scientist I use my judgment about the significance and potential impact of the various limitations in any particular study or group of studies to form conclusions about the questions under study. For these reasons, like other scientists, I base my conclusions on a review of the cumulative evidence, a critical assessment of the theoretical bases for a study, the hypotheses tested, the methodology used, inference

**2-App-167**

conventions and rules, and my years of experience as a researcher. In choosing which literature to consult, I judge the quality of evidence, including, for example, but not exclusively, the type and prestige of the journal where a peer-reviewed article was published, the purpose of the article (e.g., review vs. original research), and the quality and rigor of the methodology used. My decisions about which scientific articles to review, how many scientific articles to consult, and what weight to give to any one scientific article were based solely on scientific merit. In making these decisions for this report, I relied on my experience and judgment about the best methods to assess the question under study.

## III.    Findings

**Transgender people are a stigmatized group subject to discrimination and violence.**

12.    "Transgender" is an umbrella term referring to individuals whose gender identity differs from the sex they were assigned at birth. There are about 2.1 million adults (ages 18 and older) and 724,000 youth (ages 13-17) who identify as transgender in the United States.[5] Not all transgender people necessarily identify with the term "transgender" but in this report I use the term "transgender" for brevity. Other terms that transgender people may identify with, with or without the term "transgender" include "man," "woman," and "nonbinary," for example. Transgender people may also use

---

[5] Herman, J.L. and Flores, A.R. (2025). *How many adults and youth identify as transgender in the United States?* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf

different pronouns including he/him, she/her, and they/them. These terms, and others, are personal expressive labels a person may choose to express their gender identity.

13.     Transgender people have historically experienced—and continue to experience—both de facto and de jure discrimination across several aspects of public and private life.[6] Transgender people are also more likely than their non-transgender counterparts, also referred to as cisgender people, to be victims of violence and hate crimes.[7]

[6] Sears, B. Castleberry, N.M., Lin, A., & Mallory, C. (2024). *LGBTQ people's experiences of workplace discrimination and harassment.* The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/publications/lgbt-workplace-discrimination/; Romero, A. P., Goldberg, S. K., & Vasquez, L. A. (2020). *LGBT people and housing affordability, discrimination, and homelessness*. Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/publications/lgbt-housing-instability/; Kosciw, J. G., Clark, C. M., & Menard, L. (2022). *The 2021 National School Climate Survey: The experiences of LGBTQ youth in our nation's schools*. GLSEN. https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf; Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding*. National Academies Press. https://doi.org/10.17226/13128

[7] Flores, A. R., Stotzer, R. L., Meyer, I. H., & Langton, L. L. (2022). Hate crimes against LGBT people: National crime victimization survey, 2017-2019. *PLoS one*, *17*(12). https://doi.org/10.1371/journal.pone.0279363; Flores, A. R., Meyer, I. H., Langton, L., & Herman, J. L. (2021). Gender identity disparities in criminal victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health*, *111*(4), 726-729. https://doi.org/10.2105/AJPH.2020.306099; Meyer, I. H., & Flores, A. R. (2025). *Anti-LGBT victimization in the United States: Results from the National Crime Victimization Survey (2022–2023)* . The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/publications/anti-lgbt-victimization-us/

**Stigma against transgender people leads to excess stress and related adverse health outcomes.**

14.    Lesbian, gay, bisexual, and transgender (LGBT) people's experiences in a stigmatizing society have been described as leading to "minority stress."[8] Stress in general can lead to adverse mental and physical health outcomes.[9] Minority stress is stress that is caused by anti-LGBT stigma and prejudice. Because it is related to anti-LGBT stigma and prejudice, it is a unique source of stress that affects LGBT people specifically, placing them at excess risk for adverse health outcomes. For example, job loss is a significant stressor for anyone; people may lose a job for any number of reasons, but LGBT people may also lose a job due to anti-LGBT discrimination, putting them at risk for excess exposure to stress and related adverse outcomes.[10]

[8] Meyer I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological bulletin, 129*(5), 674–697. https://doi.org/10.1037/0033-2909.129.5.674; Frost, D. M., & Meyer, I. H. (2023). Minority stress theory: Application, critique, and continued relevance. *Current Opinion in Psychology, 51*, 101579. https://doi.org/10.1016/j.copsyc.2023.101579; Hatzenbuehler, M. L., & Pachankis, J. E. (2016). Stigma and minority stress as social determinants of health among lesbian, gay, bisexual, and transgender youth: Research evidence and clinical implications. *Pediatric Clinics of North America, 63*(5), 985–997. https://doi.org/10.1016/j.pcl.2016.07.003

[9] Thoits, P. A. (2010). Stress and health: Major findings and policy implications. *Journal of Health and Social Behavior, 51*(Suppl.), S41–S53. https://doi.org/10.1177/0022146510383499; Nurius, P. & Hoy-Ellis, C. (2013). Stress Effects on Health. *Encyclopedia of Social Work.* https://oxfordre.com/socialwork/view/10.1093/acrefore/9780199975839.001.0001/acrefore-9780199975839-e-1045.

[10] Sears, B. Castleberry, N.M., Lin, A., & Mallory, C. (2024). *LGBTQ people's experiences of workplace discrimination and harassment.* The Williams Institute, UCLA School of Law.  https://williamsinstitute.law.ucla.edu/publications/lgbt-workplace-discrimination/; Kopparam, R. (2022, June 29). New U.S. Census Bureau data show significant economic disparities among the LGBTQ+ community. *Washington Center for*

15.     Another stressor is the excess exposure to violence experienced by LGBT people in the U.S.[11] According to National Crime Victimization Survey (NCVS) data from 2022 and 2023, gay, lesbian, and bisexual people experienced 106.4 violent victimizations per 1,000 persons, and transgender people experienced victimization at a rate of 93.7 per 1,000, compared with 21.1 per 1,000 among non-LGBT persons.[12] LGBT people also experienced a higher rate of serious violence, defined as rape or sexual assault, robbery, or aggravated assault, than non-LGBT people (53.7 per 1,000 vs. 8.5 per 1,000).[13]

16.     Another form of minority stress is rejection by family and communities. Anti-LGBT stigma leads to interpersonal expressions of prejudice against LGBT people,

*Equitable Growth*. https://equitablegrowth.org/new-u-s-census-bureau-data-show-significant-economic-disparities-among-the-lgbtq-community/ Frost, D. M., & Meyer, I. H. (2023). Minority stress theory: Application, critique, and continued relevance. *Current Opinion in Psychology, 51*, 101579. https://doi.org/10.1016/j.copsyc.2023.101579

[11] Federal Bureau of Investigation. (2025, August 5). *Hate crime in the United States incident analysis.* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime; Truman, J. L., & Morgan, R. E. (2022). *Violent victimization by sexual orientation and gender identity, 2017–2020* (NCJ 304277). Bureau of Justice Statistics. https://bjs.ojp.gov/library/publications/violent-victimization-sexual-orientation-and-gender-identity-2017-2020

[12] Meyer, I. H., & Flores, A. R. (2025). *Anti-LGBT victimization in the United States: Results from the National Crime Victimization Survey (2022–2023)* . The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Anti-LGBT-Violence-Feb-2025.pdf

[13] Meyer, I. H., & Flores, A. R. (2025). *Anti-LGBT victimization in the United States: Results from the National Crime Victimization Survey (2022–2023)* . The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Anti-LGBT-Violence-Feb-2025.pdf

including societal and familial rejection.[14] Unlike racial and ethnic minorities who most often grow up in families that match their race and ethnicity, LGBT people are most often raised by heterosexual non-transgender parents who may have internalized societal anti-LGBT stigmatizing attitudes, leading to family rejection and even violence.[15] This rejection can lead to adverse outcomes, such as a higher likelihood of homelessness, system involvement, truancy and poor health outcomes.[16]

---

[14] What We Know Project. (2017, December). *What does the scholarly research say about the link between family acceptance and LGBT youth well-being?* Cornell University. https://perma.cc/T9TV-3XSA; Katz-Wise, S. L., Rosario, M., Tsappis, M., & Austin, S. B. (2016). Lesbian, gay, bisexual, and transgender youth and family acceptance. *Pediatric Clinics of North America, 63*(5), 1011–1025. https://pmc.ncbi.nlm.nih.gov/articles/PMC5127283/

[15] Gordon, A. R., & Meyer, I. H. (2007). Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. *Journal of LGBT Health Research, 3*(3), 55–71. https://doi.org/10.1080/15574090802093562; Koken, J. A., Bimbi, D. S., & Parsons, J. T. (2009). Experiences of familial acceptance–rejection among transwomen of color. *Journal of Family Psychology, 23*(6), 853–860. https://doi.org/10.1037/a0017198; Katz-Wise, S. L., Rosario, M., Tsappis, M., & Austin, S. B. (2016). LGBT youth and family acceptance. *Pediatric Clinics of North America, 63*(5), 1011–1025. https://pmc.ncbi.nlm.nih.gov/articles/PMC5127283/

[16] Robinson, B. A. (2018). Conditional families and lesbian, gay, bisexual, transgender, and queer youth homelessness: Gender, sexuality, family instability, and rejection. *Journal of Marriage and Family, 80*(2), 383–399. https://doi.org/10.1111/jomf.12466; Baams, L., Wilson, B. D. M., & Russell, S. T. (2019). LGBTQ youth in unstable housing and foster care. *Pediatrics, 143*(1). https://doi.org/10.1542/peds.2017-4211; Lowry, R., Holtzman, D., Truman, B., Kann, L., & Yamakawa, Y. (2022). Associations between school absence and school violence by sexual identity. *American Journal of Preventive Medicine, 63*(3), 384–393. https://doi.org/10.1016/j.amepre.2022.03.026; Klein, A., & Golub, S. A. (2016). Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults. *LGBT health, 3*(3), 193–199. https://doi.org/10.1089/lgbt.2015.0111

17.　　These examples of stressors are considered *major events* in the stress literature; however, minority stress also includes other expressions of stigma and prejudice that can sometimes seem to be minor experiences and events but have similar consequences for health and well-being. Some of these stressors involve internalization of anti-LGBT social attitudes. For example, LGBT people who internalize this social stigma struggle with self-acceptance and may be afraid or hesitant to acknowledge their sexual orientation or gender identity, expecting to be rejected.[17]

18.　　Even day-to-day events and experiences—sometimes called "everyday discrimination" or "microaggressions," defined as "behaviors and statements that communicate hostile or derogatory messages toward members of marginalized groups"[18]—have an impact on people with stigmatized identities because of their social meaning.[19]  The experience of disrespect and derision conveys strong negative social

---

[17] Valdiserri, R. O., Holtgrave, D. R., Poteat, T. C., & Beyrer, C. (2018). Unraveling Health Disparities Among Sexual and Gender Minorities: A Commentary on the Persistent Impact of Stigma. *Journal of Homosexuality*, *66*(5), 571–589. https://doi.org/10.1080/00918369.2017.1422944 ; Rood, B. A., Maroney, M. R., Puckett, J. A., Berman, A. K., Reisner, S. L., & Pantalone, D. W. (2017). Identity concealment in transgender adults: A qualitative assessment of minority stress and gender affirmation. *American Journal of Orthopsychiatry, 87*(6), 704–713. https://doi.org/10.1037/ort0000303

[18] Kimber, B., Oxlad, M., & Twyford, L. (2024). The impact of microaggressions on the mental health of trans and gender-diverse people: A scoping review. *International Journal of Transgender Health*, 1–21. https://doi.org/10.1080/26895269.2024.2380903

[19] Meyer I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological bulletin*, *129*(5), 674–697. https://doi.org/10.1037/0033-2909.129.5.674.

---

2-App-173

attitudes that have been learned by the stigmatized person over a lifetime. As such

these experiences promulgate and advance societal anti transgender attitudes.

19.    Because minority stress represents added stress as compared with

similarly situated non-LGBT people, it contributes to any adverse health and mental

health outcomes that are caused by stress exposure generally. Thus, research has

shown that LGBT youth and adults, when compared to their non-LGBT peers, are more

susceptible to depression, anxiety, self-harm, substance use, and suicide attempts

because of the minority stressors they face.[20]

20.    One of the stressors that is unique to transgender people is gender non-

affirmation. Gender affirmation refers treating a person with dignity as consistent with

their gender identity. It is "an interpersonal, interactive process whereby a person

receives social recognition and support for gender identity and expression"[21]; gender

---

[20] White Hughto, J. M., Reisner, S. L., & Pachankis, J. E. (2015). Transgender stigma and health: A critical review of stigma determinants, mechanisms, and interventions. *Social Science & Medicine, 147*, 222–231. https://doi.org/10.1016/j.socscimed.2015.11.010; de Lange, J., Baams, L., van Bergen, D. D., Bos, H. M. W., & Bosker, R. J. (2022). Minority stress and suicidal ideation and suicide attempts among LGBT adolescents and young adults: A meta-analysis. *LGBT Health, 9*(4), 222–237. https://doi.org/10.1089/lgbt.2021.0106; Kidd, J. D., Tettamanti, N. A., Kaczmarkiewicz, R., Corbeil, T. E., Dworkin, J. D., Jackman, K. B., Hughes, T. L., Bockting, W. O., & Meyer, I. H. (2023). Prevalence of substance use and mental health problems among transgender and cisgender U.S. adults: Results from a national probability sample. *Psychiatry Research, 325*, 115339. https://doi.org/10.1016/j.psychres.2023.115339

[21] Bockting, W., Coleman, E., Deutsch, M. B., Guillamon, A., Meyer, I., Meyer, W., 3rd, Reisner, S., Sevelius, J., & Ettner, R. (2016). Adult development and quality of life of transgender and gender nonconforming people. *Current Opinion in Endocrinology, Diabetes, and Obesity, 23*(2), 188–197. https://doi.org/10.1097/MED.0000000000000232

**2-App-174**

**228**

non-affirmation refers to the denial of such recognition and support. The theoretical framework underlying gender affirmation is related to the Identity Threat Model of Stigma that suggests that stigma-related stressors can threaten one's identity and sense of self, leading to adverse mental health outcome (e.g., depression and anxiety).[22]

21.    Gender affirmation takes many forms and includes social aspects, and institutional and interpersonal acts.[23] The ability to obtain documents, such as a driver's license or passport that correctly represents a person's identity and appearance is an example of a social institutional gender affirming act.[24] Research showed that in 2015, 55% of transgender people had no IDs with the correct gender marker.[25] Both these examples are related to interpersonal interactions that can be made easier or more stressful based on how the transgender person is perceived and treated. For example,

---

[22] Sevelius, J. M. (2013). Gender affirmation: A framework for conceptualizing risk behavior among transgender women of color. *Sex Roles, 68*(11–12), 675–689. https://doi.org/10.1007/s11199-012-0216-5

[23] Lelutiu-Weinberger, C., English, D., & Sandanapitchai, P. (2020). The roles of gender affirmation and discrimination in the resilience of transgender individuals in the US. *Behavioral Medicine*, *46*(3–4), 175–188. https://doi.org/10.1080/08964289.2020.1725414

[24] Restar, A., Jin, H., Breslow, A., Reisner, S. L., Mimiaga, M., Cahill, S., & Hughto, J. M. W. (2020). Legal gender marker and name change is associated with lower negative emotional response to gender-based mistreatment and improve mental health outcomes among trans populations. *SSM - Population Health*, *11*, 100595. https://doi.org/10.1016/j.ssmph.2020.100595

[25] Herman, J.L. & O'Neill, K. (2021). *Gender marker changes on state ID documents: State-level policy impacts*. The Williams Institute, UCLA School of Law. https://williamsinstitute.law.ucla.edu/publications/gender-marker-policies/

when traveling and presenting documents to a TSA agent, accurate documents make the transaction easier. A study of transgender adults in the U.S. showed that transgender people who *did not* possess a driver's license that matched their gender identity were questioned by a TSA agent at the airport (26%) more than those who had a driver's license that *did* match their gender identity (9%).[26]

22.    Research has shown that compared with people with lower gender affirming experiences, transgender people with greater gender affirming experiences fare better in terms of their mental health.[27] For example, a study of the impact of having personal identification documents (IDs) that matched one's gender identity found that transgender people with such IDs had lower prevalence of serious psychological distress (a measure of anxiety and depression symptoms) and less suicidal ideation than transgender people who did not have such IDs,[28] indicating a protective health effect of gender affirmation.

---

[26] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The report of the 2015 U.S. Transgender Survey. Washington*, DC: National Center for Transgender Equality. https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

[27] Hughto, J. M. W., Gunn, H. A., Rood, B. A., Pantalone, D. W., & Meyer, I. H. (2020). Social and medical gender affirmation experiences are inversely associated with mental health problems in a U.S. non-probability sample of transgender adults. *Archives of Sexual Behavior, 49*(7), 2635–2647. https://doi.org/10.1007/s10508-020-01655-5

[28] Scheim, A. I., Perez-Brumer, A. G., & Bauer, G. R. (2020). Gender-concordant identity documents and mental health among transgender adults in the USA: a cross-sectional study. *The Lancet. Public health*, *5*(4), e196–e203. https://doi.org/10.1016/S2468-2667(20)30032-3

23.     Another gender affirmation site is how people in the public sphere, such as places of public accommodation, interact with transgender individuals with respect to their gender identity and name.[29] A gender affirming interpersonal interaction is one in which the transgender person is treated with respect and dignity and referred to by the name and gender pronouns that match their identity and appearance. A gender non-affirming interaction is one in which the transgender person is intentionally referred to with gender pronouns and a name that do not match their gender identity and presentation, for example referring to a transgender woman as "Sir," conveying rejection and disapproval of the person.

24.     It is these interpersonal interactions that are the focus of this case: whether people interacting with the transgender person use their "chosen name and how the individual chooses to be addressed" as reflecting of their gender identity and expression.[30]

25.     Until 2016, Massachusetts public accommodation law did not include protection for transgender individuals.[31] A 2013 survey of Massachusetts residents

---

[29] Reisner, S. L., White Hughto, J. M., Dunham, E. E., Heflin, K. J., Begenyi, J. B. G., Coffey-Esquivel, J., & Cahill, S. (2015). Legal protections in public accommodations settings: A critical public health issue for transgender and gender-nonconforming people. *The Milbank Quarterly, 93*(3), 484–515. https://doi.org/10.1111/1468-0009.12127

[30] *Colo. Rev. Stat. § 24-34-301(9) (2024).*

[31] Healey, M. (2016, September 1). *Gender identity guidance for public accommodations.* Office of the Attorney General, Commonwealth of Massachusetts. https://www.mass.gov/doc/ag-healey-gender-identity-guidance-for-public-accommodations-9-1-16/download

found that over a one-year period, 65% of transgender adults had experienced public accommodations discrimination in the year prior to being surveyed. The five most common discrimination settings were transportation (36%), retail (28%), restaurants (26%), public gatherings (25%), and health care (24%). Factors predicting discrimination in public accommodations included being a transgender woman, low income, young age, and being a person of color. That discrimination was associated with a greater risk of adverse emotional and physical symptoms, including emotional symptoms for the past 30 days, a positive screen for clinical depression in the past 7 days, negative physical symptoms in the past 30 days, and a gastrointestinal diagnosis. Significantly, each additional site of public accommodation discrimination experienced by the person was associated an increase of risk for adverse outcomes.[32]

26.    A review of quantitative and qualitative studies on gender-specific microaggressions experienced by transgender people, such as incorrect use of gendered terminology, invasive questions, being stared at in public, and being sexualized found significant associations with "increased emotional exhaustion, stress, anxiety, depression, suicidal ideation and attempts, and decreased quality of life."[33]

[32] Reisner, S. L., White Hughto, J. M., Dunham, E. E., Heflin, K. J., Begenyi, J. B. G., Coffey-Esquivel, J., & Cahill, S. (2015). Legal protections in public accommodations settings: A critical public health issue for transgender and gender-nonconforming people. *The Milbank Quarterly, 93*(3), 484–515. https://doi.org/10.1111/1468-0009.12127

[33] Kimber, B., Oxlad, M., & Twyford, L. (2024). The impact of microaggressions on the mental health of trans and gender-diverse people: A scoping review. *International Journal of Transgender Health*, 1–21. https://doi.org/10.1080/26895269.2024.2380903

27.     Among youth and young adults, the ability to use a chosen name at home, school, and work, was significantly associated with lower levels of depression and suicidality and with higher self-esteem.[34] And using a chosen name in more of these contexts (home, school, work, and with friends), was associated with lower depression, suicidal ideation, and suicidal behavior. That is, depression, suicidal ideation, and suicidal behavior were lowest when chosen names could be used in all four contexts.[35] Another study among youth found that regardless of frequency, being misgendered was significantly associated with feeling stigmatized. In turn, feeling stigmatized was associated with negative emotions such as anger and shame, lowered self-esteem related to others' perception of their appearance, and feelings of inauthenticity.[36]

## IV.     Summary

28.     Anti-discrimination laws that recognize gender identity and expression as protected traits serves to protect transgender people against harm that is caused by minority stress.

---

[34] Pollitt, A. M., Ioverno, S., Russell, S. T., Li, G., & Grossman, A. H. (2019). Predictors and Mental Health Benefits of Chosen Name Use among Transgender Youth. *Youth & society, 2019*, 10.1177/0044118X19855898.
https://doi.org/10.1177/0044118X19855898

[35] Russell, S. T., Pollitt, A. M., Li, G., & Grossman, A. H. (2018). Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine, 63*(4), 503–505.
https://doi.org/10.1016/j.jadohealth.2018.02.003

[36] McLemore, K. A. (2018). A minority stress perspective on transgender individuals' experiences with misgendering. *Stigma and Health, 3*(1), 53–64. https://doi.org/10.1037/sah0000070

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of November, 2025.

/s/ _____

Dr. Ilan H. Meyer
Distinguished Senior Scholar of Public Policy
The Williams Institute at UCLA School of Law

**EXHIBIT A**
**Curriculum Vitae**

**Ilan H. Meyer, Williams Distinguished Senior Scholar of Public Policy, The Williams
Institute, UCLA Law School**
Email: MEYER@law.ucla.edu
NIH eRA Commons:  MEYERL

### § 5 EDUCATION

Tel Aviv University, Tel Aviv, Israel -- B.A. Psychology, Special Education, 1981

New School for Social Research, New York, NY -- M.A. Psychology, 1987

Columbia University, School of Public Health New York, NY – Ph.D. Sociomedical Sciences/

Social Psychology 1993,

Dissertation title: *Prejudice and Pride: Minority Stress and Mental Health in Gay Men*.

Bruce G. Link, Ph.D. Sponsor

#### I.    Traineeship

1987-1992: Pre-doctoral NIMH Fellow in Psychiatric Epidemiology - Columbia University

(T32 MH 13043)

1993 -1995: Postdoctoral Fellow, Health Psychology, The Graduate Center at CUNY

1995 -1996: NIMH Research Fellow in Psychiatry (AIDS), Memorial Sloan-Kettering Cancer

Center

### § 6 PREVIOUS EMPLOYMENT

Assistant Professor of Clinical Public Health (part-time), Mailman School of Public Health,
Columbia University, November 1994

**2-App-181**

235

Assistant Professor of Clinical Public Health, (full-time), Mailman School of Public Health, Columbia University, November 1996

Assistant Professor of Public Health, Sociomedical Sciences (full-time), Mailman School of Public Health, Columbia University, September 1998

Associate Professor of Clinical Sociomedical Sciences, Mailman School of Public Health, Columbia University, July 2003

Deputy Chair for Masters Programs, Department of Sociomedical Sciences, Mailman School of Public Health, Columbia University, February 2004

Visiting Scholar, Russell Sage Foundation, New York, NY 2006 – 2007

Professor of Clinical Sociomedical Sciences, Mailman School of Public Health, Columbia University, July 1010

Professor Emeritus Sociomedical Sciences, Mailman School of Public Health, Columbia University, July 2011

Adjunct Professor, Community Health Sciences, Fielding School of Public Health, University of California, Los Angeles, July 2018

## **UCLA SERVICE**

### **§ 7 ACADEMIC AND ADMINISTRATIVE TITLES**

Williams Distinguished Senior Scholar for Public Policy, The Williams Institute at UCLA School of Law, July 2011 – Present

Adjunct Professor, Community Health Sciences
UCLA Fielding School of Public Health

Member, Faculty Advisory Committee, LGBTQ Studies Program at UCLA

### **§ 8 LAW SCHOOL COURSES TAUGHT**

None

**2-App-182**

**236**

## § 9 LAW SCHOOL COMMITTEE MEMBERSHIP

Williams Institute Management Committee

## § 10 LAW SCHOOL--OTHER SERVICE

None

## § 11 OTHER UNIVERSITY TEACHING

**Columbia University Departmental and University Committees**
Doctoral Admissions Committee – 2011
Coordinator, MPH Research Track – till 2002
Coordinator, MPH Admissions 2002 – 2003
MPH Committee 2003 – 2011
Curriculum committee 2003 – 2011
School MPH Admissions Committee 2002 – 2011
Department of Sociomedical Sciences Steering Committee 2007 – 2011
Department of Sociomedical Sciences Subcommittee on Revenue Generation 2008
Mailman School of Public Health Steering Committee, (elected) 2008 – 2011

**Teaching Experience and Responsibilities**
**Courses**
1. Introduction to Health Psychology (1995 - 2003), Columbia University, Mailman School of Public Health

2. Research Seminar in Gay and Lesbian Issues in Public Health (1997 – 2011), Columbia University, Mailman School of Public Health

3. Stigma, Prejudice and Discrimination as Social Stressors (2004 - 2011), Columbia University, Mailman School of Public Health

4. Masters Integrative Project (2005 - 2011), Columbia University, Mailman School of Public Health

5. Survey Research Methods in Sociomedical Sciences (2009 - 2011), Columbia University, Mailman School of Public Health

6. Health Disparities, Health Equity, and Sexual Minority Populations, UCLA, Fielding School of Public Health, Spring 2019

7. LGBT Health Certificate Program (2015 - 2023), George Washington University

**2-App-183**

237

8. Senior Seminar in International Development Studies (2016), UCLA Andrew Park.

9. Law and Sexuality (2018), UCLA, Adam Romero

10. Lesbian, gay, bisexual, and transgender (LGBT) health: a population perspective (2019), University of North Carolina, Shoshana Goldberg

11. December 2, 2020 – Guest lecture Introduction to Community Health Sciences (James Macinko, UCLA FSPH)

12. May 19, 2020 – Guest lecture UCLA social welfare Psychology and Cognitive Science;

13. 12/2/2020 – Guest Lecture Introduction to Community Health Sciences UCLA Fielding School of Public Health

14. February 5, 2021 -- INQYR International Student Training Network, training webinar for international students (minority stress and health in LGBT populations)

15. 9/8/2021 Guest Lecture, UCLA Law (Law 326) - Health Law and Policy

16. CHS210: Introduction to Community Health Sciences class, Fielding School of Public Health, UCLA, October 24, 2022

17. Discuss careers in public health for Gary Harper's SOAR fellowship students at University of Michigan, October 12, 2022

**I.**

**II.       Dissertation Committees**

- Sponsor: Lesley Sept (completed 2002) – *Evaluation of a tailored HIV prevention web site*

- Sponsor:  Parisa Tehranifar (completed 2004) – *African American adolescents perceptions of everyday racism and their psychological responses— D*istinguished Dissertation; Best Dissertation ASA

- Sponsor: Paul Teixeira (defense 2007) – *Condom use among gay men: The impact of reactance and affect on safer sex practices*

- Sponsor: Alicia Lukachko (defense 2009) – *Racial identity, discrimination, discrimination and religiosity and use of mental health services among African Americans*

- Edward Alessi (NYU) – Dissertation: *Association of stressful life events and with posttraumatic stress disorder (PTSD) in a racially and ethnically diverse sample lesbian, gay, bisexual (LGB), and heterosexuals.*

- David Frost (CUNY Graduate Center) – Dissertation: *Stigma, intimacy, and well-being: A personality and social structures approaches*

- Dissertation committee Saanjh Aakash Kishore**,** UCLA Psychology, 2013

-  Dissertation committee Melissa Boone, Columbia University, Sociomedical Sciences and Psychology, 2013

- Dissertation committee Geoffrey Stephen Carastathis, Psychology Edity Cowan University, Australia, 2013

- Dissertation committee Nadav Antebi, Columbia University, Mailman School of Public Health, 2016

- Dissertation committee Alexander Martos, Columbia University, Mailman School of Public Health, 2016

- Dissertation committee Avery Walker, Chatham University, "'Why Paris is still burning':   A comparative study among Men of African Descent on the effects of gender presentation and sexual behaviors on connection to community," 2016

- Dissertation committee Evan Krueger, Fielding School of Public Health, "Understanding sexual identity discordances: Social stress correlates and mental health consequences," 2017

- Dissertation committee Shannon L. Dunlap, UCLA Luskin School of Public Affairs "Transgender adolescent and parent perceptions of stress and support related to gender identity development and expression," 2020

- Dissertation committee Gabriel van Beusekom  University of Amsterdam, The Netherlands, "Gender Nonconformity, Same-Sex Attraction, and Mental Health," 2018

- Dissertation committee, Sara Matsuzaka, Fordham University, April 2020

- Dissertation committee Allen Mallory, University of Texas, Austin, 2020

- Dissertation committee Krystal Kittle, University of Massachusetts, Boston 2020

- Dissertation committee Zelly Rose Atlan, Reykjavik University in Iceland, 2021

- Dissertation committee Olakunle Oginni, King's College London, UK, 2021

- Dissertation committee Meg Bishop, UT Austin: PhD dissertation committee. Dissertation defense, 7/6/2022

- Dissertation committee Silje-Håvard Bolstad, University of Agder, Norway: PhD dissertation committee , 2022

- Dissertation committee James Huỳnh, UCLA Fielding PhD dissertation, 2022

## § 12 ACADEMIC SENATE COMMITTEE MEMBERSHIP

N/A

## § 13 ACADEMIC SENATE--OTHER SERVICE

N/A

## § 14 OTHER UNIVERSITY SERVICE AND ACTIVITIES

Taught 7-session California Center for Population Research - Proposal Writing Workshop (https://moodle2.sscnet.ucla.edu/course/view/ccpr--workshop).


Member, Faculty Advisory Committee, LGBTQ Studies Program at UCLA



## § 15 ADDITIONAL ACADEMIC AND OTHER APPOINTMENTS

Adjunct Professor Community Health Sciences, UCLA Fielding School of Public Health

## § 16 MEMBERSHIPS IN PROFESSIONAL SOCIETIES

American Public Health Association
American Psychological Association


**2-App-186**

American Sociological Association
American Association for Public Opinion Research

### § 17 SERVICE TO PROFESSIONAL SOCIETIES AND ORGANIZATIONS

American Civil Liberties Union: Position paper on Gender Identity Disorder and Psychiatric Diagnosis (with Sharon Schwartz)
1993 – 2002  Co-Chair - Science Committee, American Psychological Association, Division 44 (Lesbian and Gay Issues)

### § 17A COMMUNITY SERVICE

Gay Men's Health Crisis: Oral Sex & HIV Risk Among Gay Men (with David Nimmons)

1999 – 2000    Member, working group preparing a white paper on LGBT health disparities for consideration by US HHS of inclusion of sexual orientation in Healthy People 2010

1999- 2000     Member Healthy People 2010 workgroup on sexual orientation

2012 (March) -- (Co-authored with J. Pizer, press release) Uganda Bill Concerning Same-Sex *Relationships and Human Rights Advocacy.*

2012 (March 12) -- (Co-authored with J. Pizer, press release) Analysis and Data On Tennessee's "Don't Say Gay" Bill.

2012 (March 14) -- (Co-authored with J. Pizer) Letter to Governor Gary R. Herbert, Utah Re: House Bill 363 by Rep. Wright (Sen. Dayton) – *Potential Impacts On At-Risk Youth And Licensed Educational Professionals From Health Information Ban.*

2012 (March 28) -- (Co-authored with J. Pizer, press release) *Extending Marriage To Same-Sex Couples in Illinois Will Have Positive Effects For 23,049 Couples Raising 7,662 Children.*

2012 (May 4) – (Co-authored with J. Pizer) Letter to Missouri House Committee on Elementary and Secondary Education, Jackson Missouri re: HB 2051 (Cookson) – *Potential impacts on at-risk youth and licensed education professionals from ban on information about sexual orientation, including about the existence of lesbian, gay, bisexual and transgender people.*

2013 (May 14) – *Promoting the Well-being of Gay and Bisexual Male and Transgender Youth of Color –Working Together for Action.*  A summit organized by the Williams Institute, with support from the Liberty Hill Foundation.  Organized meeting and presented *Project Access - Recommendations for Serving GBTQ Male Youth of Color.*

### § 17B CONSULTING ACTIVITIES -- EXPERT WITNESS, DECLARATIONS AND REPORTS

1. Expert witness (2010) -- testimony in Perry v. Schwarzenegger, 704 F. Supp.2d 921 (N.D. Cal. 2010)

2. Expert report (2010) – Written testimony in application for asylum, withholding of removal, and/or withholding under the convention against torture. Removal proceedings before Immigration Judge, United States Department of Justice, Executive Office for Immigration Review

3. Expert testimony (2011) – before the United States Commission on Civil Rights briefing on peer-to-peer violence and bullying in K-12 public schools;

4. Expert report (2012) – Written testimony in hearing before Immigration Judge on the validity of asylum granted to bisexual man, United States Department of Justice, Executive Office for Immigration Review;

5. Expert Consultation (2013) – Charles Patrick Pratt, et al. vs. Indian River Central School District; Indian River Central School District Board of Education. Case settled prior to trial.

6. Expert Declaration (2013) – Garden State Equality v. Doe, Superior Court of New Jersey, MER L-1729-11.

7. Expert Declaration (2013) – Cleopatra De Leon, et al. v. Rick Perry, Civil Action No. 5:-13-cv-982.  United States District Court for the Western District of Texas, San Antonio Division.

8. Expert Declaration (2013) – Washington State v. Arlene Flowers, Inc. No. 13-2-00871-5

9. Expert Consultant (2014) – Pat PJ Newton vs. Town of Shannon MS

10. Expert witness (2014) – U.S. v. Gary Douglas Watland, Defendant. Criminal Action No. 1:11-cr-00038-JLK-CBS.

11. Expert Declaration (2014)– European Court of Human Rights.  Bayev v. Russia (No. 67667/09), Kiselev v. Russia (No. 44092/12), and Alekseyev v. Russia (No. 56717/12)

12. Expert witness (2016) – Sexual Minorities Uganda v. Scott Lively United States District Court District of Massachusetts Springfield Division. Civil Action 3:12-CV-30051 (MAP)

13. Expert Declaration (2016) – [A180860003]MA(Afghanistan) v Secretary of State for the Home Department, United Kingdom

14. Amicus Brief (2017) -- U.S. Supreme Court in *Masterpiece Cakeshop v. Colorado Civil Rights Commission brief of amici curiae Ilan H. Meyer, PhD, and other social scientists and legal scholars who study the LGB population in support of respondents*

15. Expert Witness (2017) – *United States of America vs. Andries Snyman* CR 16-50102

16. Expert Report (2018) – In the Matter of Margaret Namulyanga, Respondent, in removal proceedings United States Department of Justice Executive Office for Immigration Review Immigration court New York, NY

17. Consultation (2018) – SCOTUS appeal of death penalty conviction re jury comments. Charles Russell Rhines, Petitioner, V. State of South Dakota, Respondent.

18. Expert testimony (2021) – Missouri *State v. Richard Emery1811-CR04421-01,*

19. Expert testimony (2021) -- Hunter et al v. U.S. Department of Education et al in U.S. District Court District of Oregon (Eugene) Case #: 6:21-cv-00474-AA.

20. Amicus Brief (2022) -- U.S. Supreme Court in *303 Creative, LLC & Laurie Smith v Aubrey Elenis, et al., brief of amici curiae Ilan H. Meyer, PhD, and other social scientists and legal scholars as amici curiae supporting respondent.*

21. Congress oversight committee hearing Anti-LGBTQI+ Extremism and Violence in the United States, December 14, 2022

### § 17C OTHER PROFESSIONAL ACTIVITIES

- 2001 – 2011 Faculty, the Center for Gender, Sexuality and Health, Department of Sociomedical Sciences, Mailman School of Public Health, Columbia University

- 2003   Member, Working Group – Men who have sex with men (MSM) of color summit, Los Angeles, CA, May 29-30

**2-App-189**

- 2004 – 2011  Faculty, The Robert Wood Johnson Foundation Health & Society Scholars Program at Columbia University

- 2004   Leader, Working Group on Stigma, prejudice and discrimination. The Robert Wood Johnson Health and Society Scholars Program at Columbia. Mailman School of Public Health, Columbia University

- 2008 – 2011  Faculty, The Center for the Study of Social Inequalities and Health, Mailman School of Public Health, Columbia University

- 2008 – 2011    Faculty -- New York State Psychiatric Institute, HIV Center for Clinical and Behavioral Studies

- 2008 – 2011    Faculty -- Center for Population Research in LGBT Health, The Fenway Institute

- 2013 – Present  Affiliate, California Center for Population Research

**I.    Mentorships**

1. John Blosnich. West Virginia University, Public Health Sciences, Social & Behavioral Theory.  Mentor through Center for Population Research in LGBT Health (Fenway Institute, Boston, MA).

2. Richard Nobles.  Department of Psychology, University of Washington.  Consultant on NIMH individual NRSA grant.

3. Keren Lehavot.  Department of Psychology, University of Washington.  Consultant on NIMH individual NRSA grant.

4. Natasha Davis.  Columbia University Teachers College. Mentor on supplemental diversity NIMH grant (MH066058).

5. David Barnes -- Columbia University Mailman School of Public health, Department of Epidemiology, Psychiatric Epidemiology Training program.

6. Naa Oyo Kwate, Ph.D.,  Research Scientist, Postdoctoral Award, Department of Defense, Breast Cancer Research Program, Department of Defense

7. Jennifer Stuber, Ph.D.,  Scholar, Robert Wood Johnson Foundation Health and Society Scholars

8. Kimberley Balsam, Ph. D., University of Washington.  Consultant, NIMH K-Award application

**244**

9. Carolyn Wong, Ph.D.,  University of Southern California.  Consultant, K-Award application.

10. José A. Bauermeister, MPH, PhD, University of Michigan, Mentor, K-Award application.

11. Huso Yi, Ph.D., Columbia University, HIV Center, Mentor, K-Award application.

12. Rahwa Haile, Ph.D., Columbia University, HIV Center for Clinical and Behavioral Studies, Mentor.

13. Tracy McFarlane, Ph.D.,  Columbia University, Psychiatric Epidemiology Training Program, Mentor.

14. Laura Durso, Williams Institute UCLA School of Law, post-doctoral fellow.

15. Ethan Meirish, Ph.D., Boston College, Fenway mentorship program

16. Brian Davis Fulbright graduate student scholarship to Japan

17. Ashley Borders, Ph.D., Assistant Professor, Department of Psychology, The College of New Jersey

18. Alexander Martos, MPH, Doctoral Candidate, Columbia University Mailman School of Public Health Department of Sociomedical Sciences, "LGBT Health Services: Emergence, Evolution, and Contemporary Landscape (Diversity supplement: 3R01HD078526-02S2).

19. Annesa Flentje, Ph.D., Clinical Psychology Fellow, University of California, San Francisco San Francisco General Hospital, Department of Psychiatry, "Gene expression outcomes in interventions for substance using HIV+ sexual minority men" (1 K23 DA039800-01).

20. Allegra Gordon, Ph.D., Fellow, Harvard University, Children's Hospital. "Changes in the Social and Policy Environment as Predictors of Substance Use and Health-Related Quality of Life Among Sexual Minorities"  (1 F32 DA042506-01).

21. Shannon Dunlap, MA, (doctoral student, Luskin School of Public Affairs, Social Work).  Investigating the Impact of Transgender-Related Minority Stress and Parent-Adolescent Relationship Functioning on Adolescent Mental Health.  (American Psychological Foundation, Roy Scrivner Memorial Research Grant; NICHD F31).

22. Paul Wesson, Ph.D. (UCSF). To understand why minority populations are disproportionately impacted with new HIV diagnoses, even after controlling for behavioral risk factors and prevention strategies. Moving beyond identifying minority identify as a correlate of infection and seeking to understand what social and structural exposures facilitate risk is critically important in identifying the residual drivers of infection and ensuring equity in "Getting to Zero" public health initiatives (NIAID K01AI145572-01A1).

## § 18 SERVICE ON EDITORIAL BOARDS/EDITORIAL SERVICE TO SCHOLARLY PUBLICATIONS

1993 – present  Ad hoc reviewer for leading scientific journals, including (partial list), AIDS Education and Prevention: An interdisciplinary Journal, American Journal of Public Health, Archives of General Psychiatry, Epidemiology, Journal of Health and Social Behavior, Journal of Consulting and Clinical Psychology, Journal of Counseling Psychology, Sex Roles: A Journal of Research, Women and Health, Self and Identity, Developmental Psychology
2000 – 2001    Guest Editor, American Journal of Public Health, Special Issue on LGBT Health, published June 2001
2006    Co-editor, Social Science & Medicine, Special Issue on Prejudice, stigma, and Discrimination in Health
2009 – 2012 Editorial Board – Journal of Health and Social Behavior (ASA Journals)
2013 – present Editorial Board – Journal of LGBT Health (Mary Ann Liebert, Inc.)
2013 – present Consulting Editor – Journal of Sexual Orientation and Gender Diversity (APA Journals)
2016    Reviewer Population Association of American Annual Meeting.

## § 19 SERVICE TO EDUCATIONAL AND GOVERNMENTAL AGENCIES

2003    Member, Working Group -- Workplace discrimination research and prevention, National Institute of Occupational Safety and Health (NIOSH), Cincinnati, OH, September 29-30

## § 20 INVITED LECTURES, PAPERS AT MEETINGS, AND SIMILAR ACTIVITIES

I.    **Conference Presentations** *(since 2011, partial list)*

- Frost, D.M., Lehavot, K., & Meyer, I.H. (2011, August).  Minority Stress and Physical Health among Sexual Minorities.  Poster presented at the American Psychological Association 2011 Annual Convention, Washington, DC.

- Meyer, I.H. (Naomi Goldberg first author) (2012, May 4). Intimate Partner Violence in LGB Populations: Data from the California Health Interview Survey.  Population Association of America, San Francisco, CA.

- Meyer, I.H. (Discussant) (2013, July 31) -- Emerging Directions and Novel Applications of Minority Stress Theory.  Presented at the American Psychological Association 2013 Annual Convention, Honolulu, HI.

- Meyer, I.H. (Conversation Hour) (2013, August 2) – Is Minority stress theory still relevant to LGB populations? A Discussion.  Presented at the American Psychological Association 2013 Annual Convention, Honolulu, HI.

- Meyer I.H. (2013, October/November).  Symposium:  Cross cutting issues in LGBT Health and Public Policy from the Williams Institute.  Annual meeting of the American Public Health Association.

- Meyer, I.H. (2014, August). Same-sex marriage equality: opportunities for research on minority stress, resilience, and health of LGB populations. American Psychological Association Annual Convention.

- Meyer, I.H. (2014, August).  Individual vs. community resilience in minority stress of LGBT people.  American Psychological Association Annual Convention.

- Meyer, I.H. (2015, August).  A brief focused qualitative interview to assess lesbian, gay, bisexual identity and minority stress. American Psychological Association Annual Convention.

- Meyer, I.H. (2015, August).  Research on minority stress in the post-equality era in the United States. American Psychological Association Annual Convention.

- Meyer, I. H. (2015, August).  Bullying and Victimization of LGBT Youth: Perspectives on the Key Issues in Research and Practice. American Psychological Association Annual Convention.

- Meyer, I.H. (2016). Symposium organizer and presenter.  Minority stress, resilience, and health of sexual and gender minority people: An international perspective.  31st International Congress of Psychology, Yokohama, Japan.

- Meyer, I.H. (2016).  Blazing a Trail Without Losing the Path: How the History of LGBTQ Public Opinion Research Can Lead Emerging Issues and Questions.  American Association for Public Opinion Research, Denver, CO

- Meyer, I. H., Brown, T.N.T., Herman, J.L., Reisner, S.L., Bockting, W.O. (2017, February 3).  Health Status among Transgender Adults in Select U.S. Regions in the Behavioral Risk Factor Surveillance System, 2014.  USPATH. Los Angeles, CA

- Meyer, I.H., Bockting, W.O., Herman, J. L., Reisner, S.L. (2017, February 3). TransPop: An Innovative New Study of the U.S. Transgender Population using Probability Sampling. USPATH.  Los Angeles, CA

- Marken, S. & Meyer, I.H. Estimating the LGBT population: How interview mode impacts estimates of the LGBT population in the U.S., May 17, 2017. Paper presented at the 2018 meeting of the American Association of Public Opinion Research (AAPOR), Denver, CO.

- Ilan H. Meyer, Stephanie Marken, Stephen Russell, Margueritta Lightfoot, David M. Frost, Phillip Hammack, & Bianca D.M. Wilson, An innovative 2-step method to the design of a national probability study of lesbian, gay and bisexual (LGB) people. May 17, 2017. Paper presented at the 2018 meeting of the American Association of Public Opinion Research (AAPOR), Denver CO.

- Meyer, I.H., & Wilson, B., Limiting Voice to Expand Social Justice? Debates in LGBT Public Policy Scholarship, August 11, 2018, American Psychological Association, San Francisco, CA

- Meyer, I.H. Generations: A study of life and health of LGB people in a changing society, paper presented October 4, 2018 at the annual conference of the Interdisciplinary Association for Population Health Science (IAPHS). Washington DC.

- Meyer, I.H., Marken, S., Auter, Z., Wilson, D.M.B., & Conron, K. (2019). Asking about sexual orientation in a national general population survey: Do expanded response options improve survey performance with sexual minority respondents? Paper Presented at the annual meeting of the American Association for Public Opinion Research (AAPOR), Toronto, CA, May 16, 2019

- Meyer, I.H. Epidemiology of suicide ideation and attempt in 3 cohorts of LGB people in the U.S., paper presented at the annual meeting of the European Symposium on Suicide and Suicidal Behaviour, Copenhagen, Denmark, August 25, 2022.

- Meyer, I.H., Schumm, P., LeFauve, K., English, N., & O'Muircheartaigh, C. Identifying LGBT adults through a Household Roster. Paper presented at the 78th Annual Conference of the American Association for Public Opinion Research (AAPOR), Philadelphia, PA, May 10-12, 2023.

- O'Muircheartaigh, C., Schumm, P., English, N., LeFauve, K., & Meyer, I.H. Tailoring a Sample Design: Designing a Sample to Test Recruitment

**248**

Strategies for a National Sample of the Older LGBT Population. Paper presented at the 78th Annual Conference of the American Association for Public Opinion Research (AAPOR), Philadelphia, PA, May 10-12, 2023.

- English, N., LeFauve, K., Schumm, P., Meyer, I.H., Marlar, J., Willcoxon, & O'Muircheartaigh, C. Experiments on Response Rate and Response Composition in Recruiting a National Probability Sample of the Older LGBT Population. Paper presented at the 78th Annual Conference of the American Association for Public Opinion Research (AAPOR), Philadelphia, PA, May 10-12, 2023.

- LeFauve, K., Schumm, P., English, N., Meyer, I.H., Marlar, J., Willcoxon, & O'Muircheartaigh, C. Targeted Advance Letters to Identify Underrepresented Populations. Paper presented at the 78th Annual Conference of the American Association for Public Opinion Research (AAPOR), Philadelphia, PA, May 10-12, 2023.

- Avripas, S., Johns, M.M., Hansen, C., Michaels, S., Malory, C., & Meyer, I.H. Relationships between State -Level Policies and American Attitudes Toward LGBTQ+ Civil Rights. Paper presented at the 78th Annual Conference of the American Association for Public Opinion Research (AAPOR), Philadelphia, PA, May 10-12, 2023.

### II.    Invited Presentations *(since 2015, partial list)*

1. (2015)  First Amendment concerns. Sexual Liberty meeting, Harvard School of Law

2. (2015, March 21).  Shifting Social Climates and the Health of Sexual Minorities
in the United States.  Claremont Symposium on Applied Social Psychology Sexual Orientation, Psychological Science, and Social Policy, Clermont, CA

3. (2015, April 21). Minority stress and the health of lesbians, gay men, bisexuals, and transgender people.  Catholic University of Chile, Santiago, Chile

4. (2015, May 14). The shifting social climate and the health of sexual minorities in the United States:  New research questions and new research methodologies.  NORC, University of Chicago, Chicago, IL

5. (2015, June 21).  Challenges and opportunities in linking psychological science and social policy.  Society for the Psychological Study of Social Issues. Washington DC

6. (2015, July 15).  Gala Speaker – George Washington University LGBT Health Certificate Program.

7. (2015, August 23).  The shifting social environment and the health of sexual minorities.  American Sociological Association, Chicago, IL

8. (2015, November 10).  Columbia University and New York Psychiatric Institute, New York, NY

9. (2015, November 16).  Aging in LGBT people.  SAGE.  Denver, CO

10. (2016, May 10).  LGBT Bullying Symposium: Translating Research to Action to Improve the Health of All Youth.  Harvard University T.H. Chan School of Public Health.

11. (2016, May).  From The One Human Family Town to All the Others": The 2015 SCOTUS Same-Sex Marriage Ruling's Implications for Legal Services Providers and Their LGBT Clients.  ABA, Group Legal Services Association. Key West, FL

12. (2016, May 5-7).   Minority stress in eating disorders.  Academy for Eating Disorders, ICED, San Francisco, CA

13. (2016, June 3).  Stigma mini-conference, Columbia University, New York NY.

14. (2016, June 6).  Minority stress and shifting social climate.  New York City Department of Health.

15. (2016, July 6). Invited Keynote:  Minority stress and the health of LGBT populations.  Stress and Anxiety Research Society, Zagreb, Croatia

16. (2016, July). Invited Keynote.  Minority Stress, Resilience, and Health Disparities in LGBT Populations.  31st International Congress of Psychology, Yokohama, Japan.

17. (2016, October 8).  Will Marriage equality improve LGBT lives?  Reaching Out MBA, Dallas, TX

18. (2016, November 15). Williams Webinar:  How Prejudice and Stigma Harm the Health and Well-Being of LGBT People

19. (2017, January 18). Minority Stress and the Health of Sexual and Gender Minorities: Challenges and Innovations in Population Studies.  California Center for Population Research.  UCLA, Los Angeles, CA

20. (2017, February, 1).  New findings on the incarceration of sexual minorities in the United States.  Equality California Fair Share Conference, Sacramento, CA

21. (2017, February 1).  Minority stress and health disparities in sexual and gender minorities.  Equality California Fair Share Conference, Sacramento, CA

22. (2017, April 4). Minority stress and health disparities in sexual and gender. Johns Hopkins University.

23. 2017 June 29 – July 6: Various presentation on health of LGBT people delivered in Beijing, China, sponsored by Yale University's Tsai China Center, including:

    a.   July 1, 2017 -- Chinese Psychological Society at Peking University
    b.   July 3, 2017 – Beijing Normal University faculty and students
    c.   July 5, 2017 – United Nations Development Programme, Asia
    d.   July 4, 2017 – Beijing LGBT Center
    e.   July 5, 2017 – Yale Club in Beijing
    f.   July 6, 2017 –Dr. Fu online training

24. July 19, 2017 -- Comparing Two Versions of a 2-step Assessment for Identifying Transgender Respondents in a National Sample of U.S. Adults, 7th Conference of the European Survey Research Association (ESRA), Lisbon, Portugal

25. August 8, 2017 -- Social Psychology Group Pontificia Universidad Catolica de Chile, Santiago, Chile

26. August 9, 2017 -- Escuela de Psicología, Universidad de Santiago de Chile, , Santiago, Chile

27. October 14, 2017 -- Williams Institute Founders Council "Are liberalizing social conditions improving the lives of LGB people across generations?"

28. November 1, 2017 – UCLA School of Law "New Data on Sexual Minority Adults and Youth Behind Bars in the United States"

29. May 8, 2018 -- Research on mental health of sexual and gender minorities: Overview and historical context. Berlin, Germany, Queer Nations, Ein queerer Leuchtturm für Berlin

30. October 10, 2018 -- Are more liberal social conditions improving the lives of LGB people? 2e Congres LGBTI onderzoek in de lage landen State-of-the-art en een blik op de toekomst Amsterdam, NL

31. February 18, 2019 -- Universidad de la Costa, Barranquilla, Colombia

32. February 28, 2019 – UCSF LGBTI Research Group, San Francisco, UCSF

33. March 6, 2019 – Eugene Litwak Lecture in Sociomedical Sciences, Columbia University, Mailman School of Public Health, New York

34. April 8, 2019 – Colombian Psychological Association (Colegio Colobiano de Psicólogos), Bogota, Colombia

35. April 12, 2019 – Keynote, Rutgers University-Newark/Rutgers Law School conference on LGBTQ health & resilience

36. May 3, 2019 – American Foundation for Suicide Prevention, Columbia South Carolina

37. May 21, 2019 -- American Foundation for Suicide Prevention, Queens, NY

38. June 19, 2019 – Paul Hasting LGBT Pride

39. September 5, 2019 – Keynote address, Findings from a U.S. Transgender Population Study, USPATH annual conference, Washington DC, 9/5/19

40. February 13, 2020 -- Minority stress and the health of LGBT populations. Invited address, Ohio State University, College of Public Health. Columbus, Ohio

41. April 3, 2020 --  Williams webinar: Disrupting Inequality: Poverty, Violence and Suicide Among LGBT People and What To Do About It

42. May 13, 2020 – Williams webinar: Colombia report and discussion

43. May 14, 2020 -- Australia suicide switchboard discussion suicide in LGBT populations

44. July 15, 2020 – Invited presentation for the NIH Stigma Scientific Interest Group

45. September 22, 2020 -- Investigative Reporters and Editors presentation

46. October 11, 2020 – SORS presentation at Alliance for Constitutional Sex Offense Laws (ACSOL)

47. November 18, 2020 – LGBT health presentation at Pink Competency conference, FRI, The Norwegian Organization for Gender and Sexual Diversity, Oslo, Norway

48. November 18, 2020 – LGBT data presentation at AARP California

49. November 24, 2020 – Mexico research review and agenda (Williams Institute convening)

50. December 16, 2020 – Presentation on LGBTQ mental health –Population Mental Health forum for the Harvard T.H. Chan School of Public Health (Karestan Koenen)

51. January 12, 2021 – Victimization of Sexual and Gender Minorities in the US: Results from the National Crime Victimization Survey

52. January 25, 2021 -- "No Data, No Justice" AARP panel discussion

53. February 9, 2021 – WI webinar Sex Offense Civil Commitment: An LGBTQ and Racial Justice Issue

54. March 2, 2021 -- Queer Incarceration Panel

55. June 24, 2021 – LA County public defender office on policing and criminal justice in LGBT populations

56. June 28, 2021-- SGMRO Scientific Webinar Series: Minority Stress and Health of Transgender People: Results from NIH-funded TransPop Survey

57. June 29, 2021 -- Minority Stress and the Health of LGBT Populations. The International Society for Sexually Transmitted Diseases Research, Amsterdam, The Netherlands, STI & HIV World Congress 2021 via Zoom

58. 4/7/2022-- LGBTQ+ Health Equity Summit Services Closing Keynote Minority Stress and LGBTQ Health

59. 5/10/2022 -- LGBTQ People on Sex Offender Registries: Results from a National Survey. Williams Institute Webinar

60. 6/15/2022 – Beijing Center lecture series, Lecture 1 Foundation of minority stress research

61. 6/21/2022 – Beijing Center lecture series, Lecture 2 Generations and TransPop research findings

62. Meyer, I.H. Minority stress and the health of LGBT population. University of Agder, Kristianstad, Norway

63. Meyer, I.H. Minority stress: Legal and public policy implications, NIH SGM Research Investigator Awards, September 15, 2022

64. Meyer, I.H. Results from the Sex Offender Registry Study. ACSOL Annual Conference. Via Zoom

65. Commentary on conservative LGBT research. Presented *Health Justice: Engaging Critical Perspectives in Health Law and Policy,* UCLA School of Law, October 7, 2022

66. Williams Webinar: LGBTQ Rights at the Supreme Court: What to Expect in 303 Creative v. Elenis, December 13, 2022

67. Minority stress and the health of LGBT population. European Union INSIGHT project, LGBTI+ Health Care and Wellbeing: Leaving No One Behind, University of Athens, Athens, Greece, November 3, 2023

68. Minority stress and the health of LGBT population. LGBTQ well-being in the 21st Century: Paradigms, Challenges and Possibilities. LGBTQ+ division of the Hungarian Psychological Association, Budapest, Hungary November 17, 2023

69. Workshop: LGBTQ health research: Past advances and challenges for the future. LGBTQ well-being in the 21st Century: Paradigms, Challenges and Possibilities. LGBTQ+ division of the Hungarian Psychological Association, Budapest, Hungary November 17, 2023

### III.    Public Education *(since 2015, partial list)*

American Foundation for Suicide Prevention Omaha NE (2016)
American Foundation for Suicide Prevention Atlanta GE (2016)
American Foundation for Suicide Prevention, St. Louis, MO (2017, April 7)
American Foundation for Suicide Prevention, Columbia, SC (2019)
American Foundation for Suicide Prevention, Queens, NY (2019)

§20a  OTHER PROFESSIONAL ACTIVITIES

### §21    AWARDS, HONORS, COMMENDATIONS

- Distinguished Dissertation - Columbia University, Graduate School of Arts and Sciences

255

- Barbara Snell Dohrenwend Award for published/publishable paper

- Marisa De Castro Benton Dissertation Award for outstanding contribution to the Sociomedical sciences - Columbia University

- Honorable Mention, Best Dissertation - American Sociological Association, Mental Health Section

- Mark Freedman Award for outstanding research on lesbian/gay issues - Association of Lesbian & Gay Psychologists

- Distinguished Scientific Contribution Award -- American Psychological Association Division 44.

- May 2010 – Inaugural Faculty Mentoring Award – Department of Sociomedical Sciences, Columbia University's Mailman School of Public Health

- August 2011 -- Outstanding Achievement Award – The Committee on Lesbian, Gay, Bisexual, and Transgender Concerns 2011

- August 2013 – Distinguished Professional Contribution Award – The Society for the Psychological Study of Lesbian, Gay, Bisexual and Transgender Association.

- April 2018 -- California Psychological Association (CPA) Distinguished Scientific Contribution in Psychology award.

- August 2019, American Psychological Association Presidential Citation

- September 2022, National Institutes of Health Sexual and Gender Minority Distinguished Investigator Award

### §22    FELLOWSHIPS AND RESEARCH GRANTS

1. Project Title: Random Digit Dialing Survey of Gay/Bisexual Men
Project #, PI, and dates: Meyer, 5/1/95 – 5/1/96
Source and support amount: American Suicide Foundation, New York State Psychiatric Institute, $5,000
Role: Principal Investigator
2. Project title: Decreasing the Need for Emergency Asthma Care in Harlem
Project #, PI, and dates:  5R01HL051492, Ford, 9/1/96 – 7/31/99
Source and support amount: National Heart, Lung, and Blood Institute $1,800,000 (est.)
Role: Project Director
3. Project Title: Columbia Center for Children's Environmental Health

Project #, PI, and dates: Perrera, 8/1/98 – 7/ 31/03

Source and support amount: National Institute for Environmental Health Sciences, $901,730 (annual)

Role: Co-Investigator

4.　Project Title: Community Outreach for Asthma Care in Harlem

Project #, PI, and dates:  Meyer, 8/1/99 – 10/1/00

Source and support amount: New York State Department of Health, $350,000

Role: Principal Investigator

5.　Project Title: Head Start for Asthma

Project #, PI, and dates: Ford, 9/30/99 – 9/ 29/02

Source and support amount: Centers for Disease Control and Prevention (CDC), $350,000 (annual)

Role: Co-Investigator

6.　Project Title: Survey of Women's Health and Sexuality

Project #, PI, and dates: Meyer, 3/1/00 – 3/1/01

Source and support amount:  Gay and Lesbian Medical Association, Lesbian Health Fund, $7,500

Role: Principal Investigator

7.　Project Title: Vulnerabilities and strengths in the face of sexual prejudice in lesbians, gay men, and bisexuals

Project #, PI, and dates: Meyer, 10/31/01 – 10/30/03

Source and support amount: American Psychological Foundation, $50,000

Role: Principal Investigator

**8.　Project Title: Prejudice as Stress – writing manuscript**

Project #, PI, and dates: 5 G13 LM007660, Meyer, 9/30/02 – 9/29/05

Source and support amount: National Library of Medicine, $163,500

Role: Principal Investigator

**9.　Project Title: Measurement of Major Stressful Events over Life Courses**

Project #, PI, and dates: R01MH059627, Dohrenwend, 2/1/03 – 2/ 31/04

Source and support amount: National Institute of Mental Health, $276,000 (annual)

Role: Co-Investigator

**10.　Project Title: Stress, Identity, and Mental Health in Diverse Minority Populations**

Project #, PI, and dates: R01 MH066058, Meyer, 4/1/03 – 3/31/07

Source and support amount: National Institute of Mental Health, $1,861,700

Role: Principal Investigator

**11.　Project title: Stigma, prejudice and discrimination in public health.**

Project #, PI, and dates: Meyer, 9/1/04 – 5/31/06

Source and support amount: The Robert Wood Johnson Health & Society Scholars at Columbia University, $42,000

Role: Principal Investigator

**12.　Project Title: Cultural and Contextual Determinants of Alcohol Use Among African American Women: A Multidisciplinary Approach to Breast Cancer Risk**

Project #, PI, and dates: BC031019, Kwate, 9/1/04 – 8/31/07

Source and support amount: Department of Defense, Breast Cancer Research Program, $402,206

Role: Mentor to Dr. Kwate, PI.

**13.        Project Title: Diversity supplement doctoral student, Natasha Davis**

Project #, PI, and dates: Supplement to 5 R01 MH066058, Meyer, 4/22/05 – 3/31/07

Source: National Institute of Mental Health, $42,000 (est. annual)

Role: Principal Investigator

**14.        Project Title: Prejudice and stress in minority populations**

Project #, PI, and dates: Meyer, 9/1/07 – 7/31/07

Source of support and amount:  Russell Sage Foundation,

Role: Visiting Scholar

**15.    Project title: HIV Center for Clinical and Behavioral Studies**

Project #, PI, and dates:  P30 MH43520 (Ehrhardt) 02/01/08 - 01/31/11

Source and support: NIMH $1,483,545

Role: Investigator

Project description:  This large multidisciplinary AIDS research center focuses on HIV prevention science among neglected populations at risk for HIV infection, with a commitment to underserved inner-city populations and innovative research based on new scientific approaches to prevention that emphasize sexual risk and its broader context of gender, ethnicity, and culture. Research also focuses on interventions with HIV-infected populations, including those for stress, coping, and medical adherence.

**16.    Project title: Minority HIV/AIDS Research Initiative (MARI): Sexual risk-taking among young Black men who have sex with men: exploring the social and situational contexts of HIV risk, prevention, and treatment**

Project #, PI, and dates:  U01 PS 000700-01  (Wilson) 9/30/07 – 6/30/2011

Source and support: CDC, $592,720

Project description:  The 3-year project will research contextual risk and protective factors linked to HIV risk among young Black men who have sex with men (BMSM).

Role: Mentor, Co-investigator

**17.  Project title: Developmental infrastructure for population research**

Project #, PI, and dates :  Bradford (PI)        2007-2012

Source and support:  NICHD R21HD051178 – *No funds requested for faculty*

Role: Research Faculty

**18.    Project title: On the content of our character: The myth of meritocracy and African American health.**

Project #, PI, and dates:  July 1, 2009 – December 14, 2012

Source and support: Robert Wood Johnson Foundation Investigator Award in Health Policy. $202,353 ($57,783 to UCLA for  2012)

Role: Co-PI

Project description: The proposed study aims to investigate some of the ill health effects of meritocratic ideology (MI).  We propose to describe the distribution and variation of MI in the United States across historical periods and geographic regions and to assess the relationship between MI ideologies and other ideologies that more explicitly advance inequality. We then aim

to describe narratives of MI among African Americans and assess their impact on their physical and mental health.

**19. Project title:  ACCESS: Assessing the experiences and needs lf gay, bisexual, and transgender youth of color**

Project #, PI, and dates:  Ilan Meyer 2011 – 2012

Source of Support:  California Endowment, Liberty Hill Foundation, $35,000

Role: PI

**20. Project title:  Needs Assessment of People with HIV/AIDS**

Project #, PI, and dates: Brad Sears, 2013-2014

Source of Support:  Ford Foundation, *part of $250,000 to the Institute*

Role: Co-PI (with Brad Sears)

**21. Project title:  Sexual victimization of men**

Project #, PI, and dates: Brad Sears, 2013-2014

Source of Support:  Ford Foundation, *part of $250,000 to the Institute*

Role: Co-PI  (with Brad Sears)

**22. Project title: Generations: Identity Stress and Health in Three Cohorts of LGB individuals**

Project #, PI, and dates: 5R01HD078526, Ilan H. Meyer, 09/04/2014 – 05/31/2020

*Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD), $3,402,550

**24. TransPop: U.S. Transgender Population Health Survey**

Project #, PI, and dates:  3R01HD078526-01A1S1, Ilan H. Meyer, 3/25/2015 – 3/24/2016

*Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD, supplement) --  $285,000

**25. Sampling LGBT populations in large population samples: sensitivity and specificity**

Project #, PI, and dates:  3R01HD078526-02S1, Ilan H. Meyer, 3/25/2015 – 3/24/2016

NIH Office of Research on Women's Health (ORWH) --  $200,000

**26. Research supplement to support diversity – Alexander Martos "LGBT health services delivery"**

Project #, PI, and dates:  3R01HD078526-02S2, Ilan H. Meyer, 9/4/15 – 5/31/2018

*Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD, supplement) --  $224,892

**27. Minority stress, substance/alcohol use, and non-prescription testosterone use among transgender female-to-males**

Project #, PI, and dates: 1R03DA042226, Michael Parent,  09/30/2016 – 08/31/2017

National Institute on Drug Abuse (NIDA) --  $122,863

**28. U.S. Transgender Population Health Survey**

Project #, PI, and dates:  R01HD090468, Ilan H. Meyer, 1/1/17 – 12/31/2018

*Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD) -- $828,248

**29. Life Experiences of LGBT People in Colombia**, USAID/Astrea, 11/2018 – 11/2019, $239,049

**30. Sex offender registry study (SORS),**  Calamus Foundation, 6/1/19 – 5/31/21, $22,500.

**31. California Prisons implementation of SB 132 transgender, nonbinary, and intersex housing**. Freedom Fund Network, 09/2021-08/2023, $50,000

**32. Understanding the Impact of Cannabis Marketing on Cannabis use Disparities Among Sexual and Gender Minority Youth.** Ian Holloway, PI, CA-California Bureau of Cannabis Control 9/2021 – 9/2023, $414,183

**33. Prejudice, Mental Health, and Substance Use Among Gender Minority Emerging Adults with Binary and Non-Binary Gender Identities.** Sabra Katz-Wise, PI, NIDA, 7/2021-3/2023 $148,516

**34. Improving Mortality Data through Postmortem Measurement of Sexual Orientation and Gender Identity.** John Blosnich, PI, NIMH, 9/2020 – 8/2022, $74,648 (No Cost Extension, 8/2023)

**35. Sampling & Measurement Strategies for the National LGBT Aging Project**. Colm O'Muircheartaigh, PI, NIA 9/2021-5/2024, $151,443

## §23    BIBLIOGRAPHY

Books:
Meyer, I.H. & Northridge, M.E. (Eds.). (2007). The health of sexual minorities: Public health perspectives on lesbian, gay, bisexual and transgender populations. New York: Springer.

Reports:
1. Mallory, C., Meyer, I.H., Johns, M.M., Hansen, C., Michaels, S., & Avripas, S. (2023). Public Attitudes Toward the Use of Religious Beliefs to Discriminate Against LGBTQ People. Los Angeles, CA., The Williams Institute.

2. Simonich, C., Tentindo, W., Domenchelli, V., & Meyer I. H. (2023). The California Parole Board's Treatment of Transgender Individuals. Los Angeles, CA., The Williams Institute.

3. √** Bouton, L.J.A., Brush, A.M., & Meyer, I.H. (2023). *LGBT Adults aged 50 and older in the U.S. during the COVID-19 pandemic. .* Los Angeles, CA: The Williams Institute, UCLA School of Law.

4. √* Meyer, I.H., Bouton, L., Maszak-Prato, S., Stemple, L., Lave, T.R. (2022). LGBTQ People on Sex Offender Registries in the US. Los Angeles, CA: The Williams Institute, UCLA School of Law.

5. √\* Meyer, I.H., Wilson, B.D.M., & O'Neill, K. (2021). LGBTQ People in the US: Select Findings from the Generations and TransPop Studies. (Data Interactive). Los Angeles, CA: The Williams Institute, UCLA School of Law.

6. Wilson, B. D. M. & Meyer, I. H. (2021). Nonbinary LGBTQ Adults in the United States. Los Angeles, CA: The Williams Institute, UCLA School of Law.

7. √\*\* Hoppe, T., Meyer, I.H., De Orio, S., Vogler, S., & Armstrong, M. (2020). *Civil Commitment of People Convicted of Sex Offenses in the United State.* Los Angeles, CA: The Williams Institute, UCLA School of Law.

8. √\* Meyer, I.H. & Choi, S.K. (2020). Differences Between LGB Democrats and Republicans in Identity and Community Connectedness.  Los Angeles, CA: The Williams Institute, UCLA School of Law.

9. √ \*\*Wilson, B. D. M., Choi, S. K., Harper, G. W., Lightfoot, M., Russell, S., & Meyer, I.H. (2020). *Homelessness among LGBT adults.* Los Angeles, CA: The Williams Institute, UCLA School of Law.

10. The Colombia Collaborative Project authors include (listed alphabetically): Soon Kyu Choi, Shahrzad Divsalar, Jennifer Flórez-Donado, Krystal Kittle, Andy Lin, Ilan H. Meyer, and Prince Torres-Salazar (2019). *Stress, Health, and Well-being of LGBT People in Colombia: Results from A National Survey.* Los Angeles, CA: The Williams Institute, UCLA School of Law.

11. Meyer, I.H. (6/27/2019). How Do You Measure the LGBT Population in the U.S.? Gallup Methodology Blog. Accessed online 8/12/19: https://news.gallup.com/opinion/methodology/259457/measure-lgbt-population.aspx

12. Meyer, I.H. (1/22/2019). Lesbians, gay men, and bisexuals in U.S. jails and prisons.  SAMSHA's Gains Newsletter, accessed online 1/31/19: https://www.prainc.com/lesbians-gay-men-bisexuals-jails-prisons/

13. Choi, S.K., Kittle, K. & Meyer, I.H. (2018). Aging LGB Adults in California: Findings from the 2015–2016 California Health Interview Survey. Los Angeles, CA: The Williams Institute, UCLA School of Law.

14. Choi, S.K. & Meyer, I.H. (2016). LGBT Aging: A Review of Research Findings, Needs, and Policy Implications. Los Angeles, CA: The Williams Institute, UCLA School of Law.

15. Miyashita, A., Hasenbush, A., Wilson, B.D.M., Meyer, I.H., Nezhad, S., & Sears, B. (2015). HIV legal assessment of needs study: A comprehensive survey of people living with HIV/AIDS in Los Angeles. Los Angeles, CA: The Williams Institute, UCLA School of Law.

Chapters:
1. √* Meyer, I.H. with the Generations Research Team. (2020). Theory as a Practical Tool in Research and Intervention.  In Ron Stall, et al. (Eds.), *LGBT Health Research Methods*.  Baltimore, MD: Johns Hopkins University Press.

2. Goldberg, N.G., Mallory, C., Hasenbush,A., Stemple, L., & Meyer, I.H. (2019). Police and the Criminalization of LGBT People. In Eric Miller and  Tamara Lave (Eds.), *Cambridge Handbook on Policing in the United States* (374 - 391. New York, NY: Cambridge University Press.

3. Meyer, I.H., Frost, D.M., & Nezhad, S. (2014). Minority stress and suicide in lesbians, gay men, and bisexuals.  In Peter B. Goldblum, Dorothy Espelage, Joyce Chu, & Bruce Bongar, (Eds), *The Challenge of Youth Suicide and Bullying* (pp. 177 – 190). New York, NY: Oxford University Press.

4. Meyer, I.H. & Frost, D.M. (2013).  Minority stress and the health of sexual minorities.  In Charlotte J. Patterson and Anthony R. D'Augelli (Eds.), Handbook of Psychology and Sexual Orientation (pp. 252 – 266).  NY: Oxford University Press.

5. Meyer, I.H. (2011).  The health of sexual minorities.  In: Andrew Baum, Tracey A. Revenson, & Jerome Singer (Eds.), Handbook of Health Psychology, 2nd Edition (pp. 595 – 616). NY: Psychology Press, Taylor & Francis Group.

6. Meyer, I.H. & Ouellette, S.C. (2009). Unity and purpose at the intersections of racial/ethnic and sexual identities. In Phillip L. Hammack and Bertram J. Cohler (Eds.), The story of sexual identity: Narrative perspectives on the gay and lesbian life course (pp. 79 – 106). NY: Oxford University Press.

7. Meyer, I.H. (2007). Prejudice and discrimination as social stressors. In I.H. Meyer and M.E. Northridge (Eds.), The health of sexual minorities: Public

**2-App-207**

health perspectives on lesbian, gay, bisexual and transgender populations (pp. 242 – 267). New York: Springer.

Articles:

1. Sundet, I., Bouton, L. J., Divsalar, S., & Meyer, I. H. (2025). Correlates of Treatment Satisfaction among Adults Convicted of Sex Offenses. International Journal of Offender Therapy and Comparative Criminology, 0(0). https://doi.org/10.1177/0306624X251324980

2. Jackman, K. B., Bockting, W. O., Divsalar, S., Luhur, W., Leonard, S. I., Lin, A., & Meyer, I. H. (2025). Prevalence and correlates of nonsuicidal self-injury among transgender people: Results from a U.S. probability sample. *Psychology of Sexual Orientation and Gender Diversity*. Advance online publication. https://doi.org/10.1037/sgd0000794

3. Meyer, I, Bouton, L, Lauderdale, D. (2024) Mental and physical health conditions limiting activities in a national sample of older LGBT adults, *Innovation in Aging*, Volume 8, Issue Supplement_1, December 2024, Page 37, https://doi.org/10.1093/geroni/igae098.0111

4. Hoatson T, Wang Y-C, Korkodilos R, Meyer IH, Herman J, Reisner SL, Stamoulis C, Katz-Wise SL. (in press). Substance use prevalence among transgender young adults across identity and life experiences. Annals of LGBTQ Public and Population Health. doi: 10.1891/LGBTQ-2023-0037

5. Wang, Y. C., Hoatson, T., Stamoulis, C., Herman, J., Reisner, S. L., Meyer, I. H., & Katz-Wise, S. L. (2024). Psychological distress and suicidality among transgender young adults in the United States. *Journal of Adolescent Health*.

6. Reisner, S.L., Choi, S.K., Herman, J.L. et al. Sexual orientation in transgender adults in the United States. BMC Public Health 23, 1799 (2023). https://doi.org/10.1186/s12889-023-16654-z

7. Mallory, A. B., Russell, S. T., & Meyer, I. H. (2023). Intersections of race, gender, and sexual identity attributions toward discrimination and mental health across three cohorts of lesbian, gay, and bisexual adults. *Psychology of Sexual Orientation and Gender Diversity*. Advance online publication. https://doi.org/10.1037/sgd0000675

8. Lefevor, G. T., Bouton, L. J. A., Davis, E. B., Skidmore, S. J., & Meyer, I. H. (2023). Correlates of Christian religious identification and deidentification among sexual and gender minorities: A U.S. probability sample. *Psychology*

*of Sexual Orientation and Gender Diversity.* Advance online publication. https://doi.org/10.1037/sgd0000686

9.  Kidd, J.D., Tettamanti, N.A., Kaczmarkiewicz, R., Corbeil, T.E., Dworkin, J.D. Jackman, K.B., Hughes, T.L., Bockting, W.O., & Meyer, I.H. (2023). Prevalence of substance use and mental health problems among transgender and cisgender U.S. adults: Results from a national probability sample, *Psychiatry Research*, 326, 115339, https://doi.org/10.1016/j.psychres.2023.115339.

10. Frost D.M., & Meyer, I.H. (2023). Minority Stress Theory: Application, Critique, and Continued Relevance. *Current Opinion in Psychology,* 51:101579. *https://doi.org/10.1016/j.copsyc.2023.101579*

11. Flores AR, Wilson BDM, Langton LL, Meyer IH (2023) Violent victimization at the intersections of sexual orientation, gender identity, and race: National Crime Victimization Survey, 2017–2019. *PLOS ONE* 18(2): e0281641. https://doi.org/10.1371/journal.pone.0281641

12. √** Blosnich, J.R., Coulter, R.W.S., Henderson, E.R., Goldbach, J.T., Meyer, I.H. (2023). Correcting a false research narrative: A commentary on Sullins (2022). *Archives of Sexual Behavior.*

13. √** Flores, A.R., Stotzer, R.L., Meyer, I.H., & Langton, L.L. (2022). Hate crimes against LGBT people: National Crime Victimization Survey, 2017-2019. PLOS One. https://doi.org/10.1371/journal.pone.0279363

14. √* Meyer, I. H. and J. R. Blosnich (2022). "Commentary: Absence of behavioral harm following non-efficacious sexual orientation change efforts: A retrospective study of United States sexual minority adults, 2016–2018." Frontiers in Psychology 13. https://doi.org/10.3389/fpsyg.2022.997513

**15.** √*** Clark, K.A., Harvey, T.D., Hughto, J.W., & Meyer, I.H. (2022). Mental Health Among Sexual and Gender Minority Youth Incarcerated in Juvenile Corrections, *Pediatrics*, 150(6):e2022058158

16. √*** Russell, S. T., et al. (2022). Distribution and prevalence of health in a national probability sample of three cohorts of sexual minority adults in the United States. *LGBT Health.*

17. √** la Roi, C., Frost, D.M., Mallory, A., Lin, A., & Meyer, I.H. (2022). Sexual identity and birth cohort differences in social support and its link with well-being among non-transgender sexual minority individuals. *Archives of Sexual Behavior.* https://doi.org/10.1007/s10508-022-02366-9

18. √** Frost, D.M., Fingerhut, A.W., & Meyer, I.H. (2022). Social change and relationship quality among sexual minority individuals. *Journal of Marriage and Family*. DOI: 10.1111/jomf.12827

19. √** Frost, D. M., Meyer, I. H., Lin, A., Wilson, B. D., Lightfoot, M., Russell, S. T., & Hammack, P. L. (2022). Social Change and the Health of Sexual Minority Individuals: Do the Effects of Minority Stress and Community Connectedness Vary by Age Cohort?. *Archives of Sexual Behavior*, 1-18.

20. √** Hammack, P. L., Grecco, B., Wilson, B., & Meyer, I. H. (2021). "White, Tall, Top, Masculine, Muscular": Narratives of Intracommunity Stigma in Young Sexual Minority Men's Experience on Mobile Apps. *Archives of sexual behavior*. Advance online publication. https://doi.org/10.1007/s10508-021-02144-z

21. √** Poteat, T. C., Divsalar, S., Streed Jr, C. G., Feldman, J. L., Bockting, W. O., & Meyer, I. H. (2021). Cardiovascular disease in a population-based sample of transgender and cisgender adults. *American journal of preventive medicine, 61*(6), 804-811.

22. √** Krueger, E. A., Westmoreland, D. A., Choi, S. K., Harper, G. W., Lightfoot, M., Hammack, P. L., & Meyer, I. H. (2021). Mental health among Black and Latinx sexual minority adults leading up to and following the 2016 US presidential election: Results from a natural experiment. *LGBT health*, *8*(7), 454-462.

23. √*** Del Río-González, A. M., Zea, M. C., Flórez-Donado, J., Torres-Salazar, P., Abello-Luque, D., García-Montaño, E. A., García-Roncallo, P. A., & Meyer, I. H. (2021). Sexual Orientation and Gender Identity Change Efforts and Suicide Morbidity Among Sexual and Gender Minority Adults in Colombia. *LGBT health*, *8*(7), 463–472. https://doi.org/10.1089/lgbt.2020.0490

24. √** Feldman, JL, Luhur, WE, Herman, JL, Poteat, T, Meyer, IH. Health and health care access in the US transgender population health (TransPop) survey. *Andrology*. 2021; 9: 1707– 1718. https://doi.org/10.1111/andr.13052

25. √* Meyer, I.H., Blosnich, J.R., Choi, S.K., Harper, G.W., & Russell, S.T. (2021). Suicidal Behavior and Coming Out Milestones in Three Cohorts of Sexual Minority Adults. *LGBT Health, 8*, (340-348). *IDOI: 10.1089/lgbt.2020.0466*

26. √* Meyer IH, Russell ST, Hammack PL, Frost DM, Wilson BDM (2021) Minority stress, distress, and suicide attempts in three cohorts of sexual

2-App-210

minority adults: A U.S. probability sample. PLoS ONE 16(3):
https://doi.org/10.1371/journal.pone.0246827.

27. √** Flores, A. R., Meyer, I.H., Langton, L., & Herman, J.L. (2021). Gender
Identity Disparities in Criminal Victimization: National Crime Victimization
Survey, 2017-2018. Am J Public Health,
111, 726_729,https://doi.org/10.2105/AJPH.2020.306099

28. √* Meyer, I.H., Pachankis, J.E. & Klein, D.N. (2021) Do Genes Explain
Sexual Minority Mental Health Disparities?. *Arch Sex Behav* 50(3), 731-737.
https://doi.org/10.1007/s10508-020-01909-

29. √** Holloway, I. W., Krueger, E. A., Meyer, I. H., Lightfoot, M., Frost, D. M.,
& Hammack, P. L. (2020). Longitudinal trends in PrEP familiarity, attitudes,
use and discontinuation among a national probability sample of gay and
bisexual men, 2016-2018. Plos One, 15(12), e0244448.
https://doi.org/10.1371/journal.pone.0244448

30. √** Flores, A. R., Langton, L., Meyer, I. H., & Romero, A. P. (2020).
Victimization rates and traits of sexual and gender minorities in the United
States: Results from the National Crime Victimization Survey, 2017. Science
Advances, 6(40), eaba6910.

31. √** Soon Kyu Choi, MPP, MSc, Krystal Kittle, MS, Ilan H Meyer, PhD,
Health Disparities of Older Adults in California: The Role of Sexual Identity
and Latinx Ethnicity, *The Gerontologist*, 2020;,
gnaa184, https://doi.org/10.1093/geront/gnaa184

32. √** Sevelius, JM, Poteat, T, Luhur, WE, Reisner, SL., Meyer, IH (2020). HIV
Testing and PrEP Use in a National Probability Sample of Sexually Active
Transgender People in the United States, JAIDS Journal of Acquired
Immune Deficiency Syndromes: 84(5) 437-442 doi:
10.1097/QAI.0000000000002403

33. √** Blosnich, J. Henderson, E.R., Coulter, R.W.S., Goldbach, J.T., & Meyer,
I.H. (2020). Sexual Orientation Change Efforts, Adverse Childhood
Experiences, and Suicide Ideation and Attempt Among Sexual Minority
Adults, United States, 2016–2018. *American Journal of Public Health* 110,
1024_1030, https://doi.org/10.2105/AJPH.2020.305637

34. √* Meyer, I.H., Marken, S., Russell, S.T., Frost, D.M., Wilson, B.D.M. (2020). An innovative approach to the design of a national probability sample of sexual minority adults. *LGBT Health.* 7(2), 101-108.

35. √** Goldberg, S. K., Rothblum, E. D., Russell, S. T., & Meyer, I. H. (2020). Exploring the Q in LGBTQ: Demographic characteristic and sexuality of queer people in a U.S. representative sample of sexual minorities. *Psychology of Sexual Orientation and Gender Diversity, 7*(1), 101–112. https://doi.org/10.1037/sgd0000359

36. √** Flentje, A. Heck, N. C., Brennan, J. M., & Meyer, I. H. (2019). The relationship between minority stress and biological outcomes: A systematic review.  *Journal of Behavioral Medicine.* Advance online publication. https://doi.org/10.1007/s10865-019-00120-6.

37. √* Meyer, I.H. (2019). Rejection sensitivity and minority stress: A challenge for clinicians and interventionists. *Archives of Sexual Behavior*, 49, 2287-2289. https://doi.org/10.1007/s10508-019-01597-7.

38. √** Martos, A., Fingerhut, A., Wilson, P., Meyer, I.H. (2019). Utilization of LGBT-specific clinics and providers across three cohorts of lesbian, gay, and bisexual people in the United States. *Social Science & Medicine—Population Health.* Advance online publication. https://doi.org/10.1016/j.ssmph.2019.100505.

39. √*** Guzmán-González, M., Barrientos, J., Gómez, F., Meyer, I.H., Bahamondes, J., Cárdenas, M. (2019). Romantic Attachment and Relationship Satisfaction in Gay Men and Lesbians in Chile. *Journal of Sex Research, 57:8, 1026-1035,* DOI: 10.1080/00224499.2019.1671949

40. Rothblum, E.D., Krueger, E.A., Kittle, K.R., & Meyer, I.H. (2019). Asexual and non-asexual respondents from a U.S. population-based study of sexual minorities.  *Archives of Sexual Behavior*, published online 6/18/19. https://doi.org/10.1007/s10508-019-01485-0

41. Frost, D. M., Hammack, P. H., Wilson, B. D. M., Russell, S., Lightfoot, M., & Meyer, I. H. (2019). The qualitative interview in psychology and the study of social change: Sexual identity development, minority stress, and health in the Generations study. *Qualitative Psychology*. Advance online publication. http://dx.doi.org/10.1037/qup0000148.

42. Henderson ER, Meyer IH, Herman JL, Blosnich JR. (2019). Considerations on Sampling in Transgender Health Disparities Research. *LGBT Health*. Published Online:11 Jul 2019https://doi.org/10.1089/lgbt.2019.0069

43. Meyer, I.H., Luo, F., Wilson, B.D.M., Stone, D.M. (2019). Sexual Orientation enumeration in State Antibullying Statutes in the United States: Associations with Bullying and Suicide Ideation and Attempts Among Youth. *LGBT Health*, 6, ahead of print DOI: 10.1089/lgbt.2018.0194. PMID: 30638436 PMCID: PMC6555145

44. Hongying, D. & Meyer, I.H. (2019). A Population Study of Health Status Among Sexual Minority Older Adults in Select U.S. Geographic Regions. *Health Education & Behavior*, ahead of print, https://doi.org/10.1177/1090198118818240 PMID: 30606058 PMCID:

45. la Roi, C., Meyer, I. H., & Frost, D. M. (2019). Differences in sexual identity dimensions between bisexual and other sexual minority individuals: Implications for minority stress and mental health. American Journal of Orthopsychiatry, 89(1), 40-51. doi:10.1037/ort0000369

46. Chavkin, W., Abu-Odeh, D., Clune-Taylor, C., Dubow, S., Ferber, M., & Meyer, I.H. (2018). Balancing Freedom of Conscience and Equitable Access. *American Journal of Public Health* 108, 1487-1488. doi: 10.2105/AJPH.2018.304711, PMID: 30303726. PMCID: PMC6187787

47. Hammack, P.L., Meyer, I.H., Krueger, E.A., Lightfoot, M., & Frost, D.M. (2018). HIV testing and pre-exposure prophylaxis (PrEP) use, familiarity, and attitudes among gay and bisexual men in the United States: A national probability sample of three birth cohorts. *PLOS One*, 13(9):e0202806. doi.org/10.1371/journal.pone.0202806 PMID: 30192791 PMCID: PMC6128476

48. Martos, A.J., Wilson, P. A., Gordon, A.R., Lightfoot, M., and Meyer, I.H. (2018). "Like Finding a Unicorn:" Healthcare Preferences Among Lesbian, Gay, and Bisexual People in the United States. *Social Science & Medicine. 208*, 126-133. https://doi.org/10.1016/j.socscimed.2018.05.020 PMID: 29803970 PMCID: PMC6382457

49. Krueger, E. A., Meyer, I.H., Upchurch D.M. (2018). Sexual Orientation Group Differences in Perceived Stress and Depressive Symptoms Among Young Adults in the United States. *LGBT Health, 5(4),* 242-249. doi.org/10.1089/lgbt.2017.0228. PMID: 29741980 PMCID: PMC5994153

50. Cardenas, M., Barrientos, J., Meyer, I.H. Gomez, F., Guzman, M., & Bahamondes, J.   (2018).   Direct and Indirect Effects of Perceived Stigma on Posttraumatic Growth in Gay Men and Lesbian Women in Chile.  *Journal of Traumatic Stress, 31, 5-13. https://doi.org/10.1002/jts.22256,* PMID: 29412480 PMCID:

51. Hammack, P., Frost, D.M., Meyer, I.H., Pletta, D. (2018).  Gay men's health and identity: Social change and the life course.  *Archives of Sexual Behavior, 47,* 59–74. doi.org/10.1007/s10508-017-0990-9 PMID: 28585157 PMCID: PMC5903851

52. Martos, A.J., Wilson, P.A., & Meyer, I.H. (2017).  Lesbian, gay, bisexual, and transgender (LGBT) health services in the United States:  Origins, evolution, and contemporary landscape.  PLoS ONE 12(7): e0180544 https://doi.org/10.1371/journal.pone.0180544 PMID: 28692659 PMCID: PMC5503273

53. Cochran, S.D, Meyer, I.H., & Mays, V.M. (2017). Advancing the Health of Lesbian, Gay, and Bisexual Adults. JAMA Internal Medicine 177, no. 2: 288-288. (Letter) PMID: 28166347 PMCID: PMC6226239

54. Wilson, B. D., Jordan, S. P., Meyer, I. H., Flores, A. R., Stemple, L., & Herman, J. L. (2017). Disproportionality and disparities among sexual minority youth in custody. *Journal of Youth and Adolescence.* doi:10.1007/s10964-017-0632-5 PMID: 28093665 PMCID: PMC5844288

55. Meyer, I.H. Brown, T.N.T., Herman, J.L., Reisner, S.L., & Bockting, W.O. (2017).  Demographic Characteristics and Health Status among Transgender Adults in Select U.S. Regions in the Behavioral Risk Factor Surveillance System, 2014.  *American Journal of Public Health **107**, 582-589,* doi.org/10.2105/AJPH.2016.303648 PMID: 28207334 PMCID: PMC5343705

56. Meyer, I.H., Flores, A.R., Stemple, L., Romero, A.P., Wilson, B.D.M., & Herman, J.L. (2017).  Incarceration Rates and Traits of Sexual Minorities in the United States: National Inmate Survey, 2011–2012.  *American Journal Public Health*, 107:234–240. doi:10.2105/AJPH.2016.303576 PMID: 27997242 PMCID: PMC5227944

   a.  Commentary -- Stemple, L. & Meyer, I.H. (2017). The unspoken horror of incarcerated LGBT people.  *Advocate*, February 23, 2017.

57. Meyer, I. H. (2016). Does an improved social environment for sexual and gender minorities have implications for a new minority stress research

agenda? *Psychology of Sexualities Review*, *7*(1), 81 - 90. doi:10.1093/jsh/shv066 PMID: 27642514 PMCID: PMC5019488

58. Meyer, I. H. (2016). The elusive promise of LGBT equality. *American Journal of Public Health*, *106*(8), 1356-8. doi:10.2105/AJPH.2016.303221. PMID: 27400347 PMCID: PMC4940645

59. Stemple, L., Flores, A. & Meyer, I.H. (2016). Sexual Victimization Perpetrated by Women: Federal Data Reveal Surprising Prevalence. *Aggression and Violent Behavior.*

60. Bockting, Walter; Coleman, Eli; Deutsch, Madeline B.; Guillamon, Antonio; Meyer, Ilan; Meyer, Walter III; Reisner, Sari; Sevelius, Jae; Ettner, Randi (2016). Adult development and quality of life of transgender and gender nonconforming people. Current Opinion in Endocrinology, Diabetes & Obesity. 23(2):188-197. PMID: 26835800 PMCID: PMC4809047

61. Wilson, P.A., Meyer, I.H., Antebi, N., Boone, M.R., Cook, S.H., & Cherenack, E. (2016). Profiles of Resilience and Psychosocial Outcomes among Young Black Gay and Bisexual Men. *American Journal of Community Psychology*, ahead of print. PMID: 27217318 PMCID:

62. Frost, D. M., Meyer, I. H., & Schwartz, S. (2016). Social support networks among diverse sexual minority populations. *The American Journal of Orthopsychiatry*, *86*(1), 91-102. doi:10.1037/ort0000117 PMID: 26752447 PMCID: PMC4878705

63. Wight, R. G., LeBlanc, A. J., Meyer, I. H., & Harig, F. A. (2015). Internalized gay ageism, mattering, and depressive symptoms among midlife and older gay-identified men. *Social Science & Medicine*, *147*, 200-208. doi:10.1016/j.socscimed.2015.10.066 PMID: 26588435 PMCID: PMC4689679

64. Lukachko, A., Meyer, I., & Hankerson, S. (2015). Religiosity and mental health service utilization among African-Americans. J Nerv Ment Dis, 203(8), 578-82. doi:10.1097/NMD.0000000000000334 PMID: 26172387 PMCID: PMC4535188

65. Meyer, I. H. (2015). Resilience in the study of minority stress and health of sexual and gender minorities. *Psychology of Sexual Orientation and Gender Diversity*, *2*(3), 209-213. doi:10.1037/sgd0000132

66. Frost, D. M., Meyer, I. H., & Hammack, P. L. (2015). Health and well-being in emerging adults' same-sex relationships: Critical questions and directions

for research in developmental science. *Emerging Adulthood*, 3(1) 3-13. DOI: 10.1177/2167696814535915 PMID: 27588221 PMCID: PMC5004769

67. Calabrese, S.K., Meyer, I.H., Overstreet, N.M., Haile, R., & Hansen, N.B. (2015). Discrimination and mental health among Black sexual minority women: Race- and gender based disparities within the sexual minority community. *Psychology or Women Quarterly, 287 – 304.* doi: 10.1177/0361684314560730 PMID: 26424904 PMCID: PMC4584150

68. Meyer, I.H. (2014). Minority stress and positive psychology: Convergences and divergences to understanding LGBT health. *Psychology of Sexual Orientation and Gender Diversity*, 1(4), 348-349. http://dx.doi.org/10.1037/sgd0000070

69. Martos, A., Nezhad, S., & Meyer, I.H. (2014). Variations in Sexual Identity Milestones Among Lesbians, Gay Men and Bisexuals. *Sexuality Research and Social Policy*. DOI: 10.1007/s13178-014-0167-4 PMID: 27695579 PMCID: PMC5042327

70. Borders, A., Guillén, L.A., Meyer, I.H. (2014). Rumination, Sexual Orientation Uncertainty, and Psychological Distress in Sexual Minority University Students. *The Counseling Psychologist, 42*, 497-523. http://dx.doi.org/10.1177/0011000014527002

71. Meyer, I.H., Teylan, M., & Schwartz, S. (2014). The Role of Help-Seeking in Preventing Suicide Attempts Among Lesbians, Gay Men, and Bisexuals. *Suicide and Life-Threatening Behavior* (2014): doi:10.1111/sltb.12104. PMID: 24825437 PMCID: PMC4871112

72. Stemple, L. & Meyer, I.H. (2014). The Sexual Victimization of Men in America: New Data Challenge Old Assumptions. *American Journal of Public Health,* online before publication. DOI: 10.2105/AJPH.2014.301946 PMID: 24825225 PMCID: PMC4062022

73. Bostwick, W.B., Meyer, I.H., Aranda, F., Russell, S., Hughes, T., Birkett, M., & Mustanski, B. (2014). Mental Health and Suicidality among Racially Diverse Sexual Minority Youth. *American Journal of Public Health.* online before publication. DOI: 10.2105/AJPH.2013.301749 PMID: 24825217 PMCID: PMC4062032

74. Cook, Jonathan E, Valerie Purdie-Vaughns, Ilan H Meyer, and Justin T A Busch. "Intervening Within and Across Levels: A Multilevel Approach to

Stigma and Public Health." *Social Science & Medicine* 103 (2014):
doi:10.1016/j.socscimed.2013.09.023. PMID: 24513229 PMCID:

75. Hatzenbuehler, M. L., Birkett, M., Van Wagenen, A., & Meyer, I. H. (2014).
Protective school climates and reduced risk for suicide ideation in sexual
minority youths. *American Journal of Public Health*, 104, 279 - 286. DOI:
10.2105/AJPH.2013.301508 PMID: 24328634 PMCID: PMC3935661

76. Alessi, E. J., Martin, J. I., Gyamerah, A., & Meyer, I. H. (2013). Prejudice
events and traumatic stress among heterosexuals and lesbians, gay men, and
bisexuals. *Journal of Aggression, Maltreatment & Trauma*, *22*(5), 510-526.
doi:10.1080/10926771.2013.785455 PMID: 24415898 PMCID: PMC3885323

77. Wong, C. F., Schrager, S. M., Holloway, I. W., Meyer, I. H., & Kipke, M. D.
(2013). Minority stress experiences and psychological well-being: The impact
of support from and connection to social networks within the Los Angeles
house and ball communities. *Prevention Science : The Official Journal of the
Society for Prevention Research.* doi:10.1007/s11121-012-0348-4 PMID:
23412944 PMCID: PMC3796016

78. Frost, D. M., Lehavot, K., Meyer, I. H. (2013).  Minority stress and physical
health among sexual minority individuals. Journal of Behavioral
Medicine.  DOI: 10.1007/s10865-013-9523-8. PMID: 23864353 PMCID:
PMC3895416

79. Meyer, I.H, & Bayer, R. (2013). School-Based Gay-Affirmative Interventions:
First Amendmen.t and Ethical Concerns. *American journal of public health*
103, 10, 1764-1771. DOI: 10.2105/AJPH.2013.301385 PMID: 23948002
PMCID: PMC3780740

80. Barnes D. & Meyer, I.H. (2012). Religious Affiliation, Internalized
Homophobia, and Mental Health in Lesbians, Gay Men, and Bisexuals.
*Journal of Orthopsychiatry, 82* (4), 505 – 515. DOI: 10.1111/j.1939-
0025.2012.01185.x  PMID: 23039348 PMCID: PMC3523746

81. Goldberg N.G. & Meyer, I.H. (2012).  Sexual Orientation Disparities in
History of Intimate Partner Violence –Results from the California Health
Interview Survey.  Journal of Interpersonal Violence. Published online ahead
of print DOI: 10.1177/0886260512459384   PMID: 23008053 PMCID:

82. Durso, L. & Meyer, I.H. (2012).  Patterns and predictors of disclosure of
sexual orientation to healthcare providers among lesbians, gay men, and
bisexuals.  Sexuality Research & Social Policy. Published online ahead of

print DOI 10.1007/s13178-012-0105-2. PMID: 23463442 PMCID: PMC3582401

83. O'Donnel, S., Meyer, I.H., & Schwartz, S. (2011). Increased risk for suicide attempts in Black and Latino lesbians, gay men, and bisexuals.  American Journal of Public Health. Published online ahead of print April 14, 2011: e1-e4. doi:10.2105/AJPH.2010.300032 PMID: 21493928, PMCID: PMC3093285

84. Kwate, N.O. & Meyer, I.H. (2011). On sticks and stones and broken bones stereotypes and African American health.  Du Bois Review: Social Science Research on Race, 8 (1), 191 – 198. DOI: 10.1017/S1742058X11000014

85. Frost, D.M. & Meyer, I.H. (2011).  Measuring Community Connectedness among Diverse Sexual Minority Populations. Journal of Sex Research. First Published Online April 19, 2011 (iFirst) DOI: 10.1080/00224499.2011.565427. PMID: 21512945   PMCID: PMC3143245

86. Meyer, I.H., Ouellette, S.C., Haile, R., & McFarlane, T.A. (2011). "We'd Be Free": Narratives of Life Without Homophobia, Racism, or Sexism.  Sexuality Research and Social Policy, 8, 204-214. DOI: 10.1007/s13178-011-0063-0 PMID: 24009487 PMCID: PMC3760739

87. Alessi, E. J., Meyer, I. H., & Martin, J. I. (2011). PTSD and Sexual Orientation: An Examination of Criterion A1 and Non-Criterion A1 Events. *Psychological Trauma: Theory, Research, Practice, and Policy*, 5(2), Mar 2013, 149-157. doi: 10.1037/a0026642 PMID: 26113955 PMCID: PMC4477838

88. Meyer, I.H. (2011).  The Little Things: The Impact of Prejudice in the Everyday Lives of LGBT People. http://www.huffingtonpost.com/ilan-h-meyer-phd/lgbt-prejudice_b_1004408.html, October 11, 2011.  Advocate pictorial: http://www.advocate.com/news/daily-news/2011/11/03/how-would-your-life-be-different-if-homophobia-did-not-exist

89. Meyer, I.H. (2011).  Op-ed: HPV Infection Is a Gay Men's Health Crisis.  *The Advocate*. http://www.advocate.com/Politics/Commentary/Oped_HPV_Infection_Is_a_Gay_Men_Health_Crisis/, October 28, 2011.

90. Meyer, I. H. (2011).  Gay Rights Across the Globe. http://www.huffingtonpost.com/ilan-h-meyer-phd/gay-rights-across-the-glo_b_1143891.html, December 13, 2011.

91. Schwartz, S. & Meyer, I.H. (2010). Mental health disparities research: The impact of within and between group analyses on tests of social stress

**2-App-218**

hypotheses. Social Science & Medicine, 70(8), 1111-1118. DOI: 10.1016/j.socscimed.2009.11.032 PMID: 20100631. PMCID: PMC3828206

92. Feldman, M.B., & Meyer, I.H. (2010). Comorbidity and age of onset of eating disorders in gay men, lesbians, and bisexuals. *Psychiatry Research*. doi:10.1016/j.psychres.2009.10.013 PMID: 20483473. PMCID: PMC3726047

93. Kwate, N.O. & Meyer, I.H. (2010). The Myth of meritocracy and African American health. American Journal of Public Health. (Published online ahead of print August 19, 2010: e1-e4. doi:10.2105/AJPH.2009.186445). PMID: 1883002; PMCID: PMC2936997

94. Meyer, I.H. (2010). Identity, stress, resilience in lesbians, gay men, and bisexuals of color. The Counseling Psychologist, 38(3), 442-454 . DOI: 10.1177/0011000009351601 PMID: 24347674 PMCID: PMC3860594

95. Schwartz, S. & Meyer, I.H. (2010). Reflections on the stress model: A response to Turner. Social Science & Medicine, 70(8), 1121-1122. doi:10.1016/j.socscimed.2009.11.038

96. Meyer, I.H. (2010). The right comparisons in testing the minority stress hypothesis: Comment on Savin-Williams, Cohen, Joyner, and Rieger. Archives of Sexual Behavior. Published online: August 2010. doi: 10.1007/s10508-010-9670-8. PMID: 20809370 PMCID: PMC4373410

97. Kwate, N.O. & Meyer, I.H. (2009). Association between residential exposure to outdoor alcohol advertising and problem drinking among African American women in New York City. American Journal of Public Health. 99, 228-30. PMID: 19059857; PMCID: PMC2622787

98. Narváez, R. F., Meyer, I.H., Kertzner, R.M., Ouellette, S.C. & Gordon, A.R.(2009). A qualitative approach to the intersection of sexual, ethnic, and gender identities. Identity, 9(1), 63-86. doi: 10.1080/15283480802579375 PMID: 27683200 PMCID: PMC5036453

99. Frost, D.M., & Meyer, I.H. (2009). Internalized homophobia and relationship quality among lesbians, gay men, and bisexuals. Journal of Counseling Psychology, 56, 97–109. PMID: 20047016  PMCID: PMC2678796

100.    Meyer, I.H. & Wilson, P. (2009). Sampling lesbian, gay, and bisexual populations. Journal of Counseling Psychology, 56, 23–31. doi:10.1037/a0014587.

101.    Kertzner, R. M., Meyer, I. H., Frost, D. M., & Stirratt, M. J. (2009). Social and psychological well-being in lesbians, gay men, and bisexuals: The effects of race, gender, age, and sexual identity. Journal of Orthopsychiatry, 79(4), 500-510. DOI: 10.1037/a0016848 PMID: 20099941 PMCID: PMC2853758.

102.    Kwate, N.A. & Meyer, I.H. (2009).  Individual and group racism and problem drinking among African American women. Journal of Black Psychology. OnlineFirst, published on December 11, 2009 as doi:10.1177/0095798409355795.

103.    Stirratt, M. J., Meyer, I. H., Ouellette, S. C., & Gara, M. (2008). Measuring identity multiplicity and intersectionality: Hierarchical Classes Analysis (HICLAS) of sexual, racial, and gender identities. Self & Identity, 7 (1), 89 – 111. doi: 10.1080/15298860701252203

104.    Meyer, I.H., Dietrich, J.D., & Schwartz, S. (2008). Lifetime prevalence of mental disorders and suicide attempts in diverse lesbian, gay, and bisexual populations. American Journal of Public Health, 98, 1004 – 1006. DOI: 10.2105/AJPH.2006.096826  PMID: 17901444   PMCID: PMC2377299

105.    Meyer, I. H., Schwartz, S., & Frost, D. M. (2008). Social patterning of stress and coping: Does disadvantaged social statuses confer more stress and fewer coping resources? Social Science & Medicine, 67, 368-79. DOI: 10.1016/j.socscimed.2008.03.012 PMID: 18433961  PMCID: 2583128

106.    Stuber, J.S., Meyer, I.H., & Link, B.G. (2008).  Stigma, prejudice, discrimination and health.  An introduction to special issue, Social Science & Medicine. 67, 351- 7. DOI: 10.1016/j.socscimed.2008.03.023 PMID: 18440687 PMCID: PMC4006697

107.    Feldman, M. B., & Meyer, I. H. (2007). Eating disorders in diverse lesbian, gay, and bisexual populations. International Journal of Eating Disorders, 40, 218 – 226. DOI: 10.1002/eat.20360 PMID: 17262818   PMCID: 2080655

108.    Feldman, M.B. & Meyer, I.H. (2007). Childhood abuse and eating disorders in gay and bisexual men. International Journal of Eating Disorders, 40, 418 – 423. DOI: 10.1002/eat.20378 PMID: 17506080 PMCID: PMC2042584

109. Gordon, A. & Meyer, I.H. (2007). Gender nonconformity as a target of prejudice, discrimination and violence against LGB individuals. Journal of LGBT Health Research, 3(3), 55–71.  PMID: 19042905 PMCID:

110. Young, R. & Meyer, I.H. (2005). The trouble with "MSM" and "WSW": Erasure of the sexual-minority person in public health discourse. American Journal of Public Health, 95, 1144-1149. DOI: 10.2105/AJPH.2004.046714 PMID: 15961753 PMCID: 1449332

111. Meyer, I.H. (2005). Book review: Lesbian and gay psychology: New perspectives by Adrian Coyle and Celia Kitzinger. Culture, Health & Sexuality: An International Journal for Research, Intervention and Care, 7(2), 179 - 182.

112. Pesola, G. R., Xu, F., Ahsan, H., Sternfels, P., Meyer, I.H., & Ford, J.G. (2004). Predicting asthma morbidity in Harlem emergency department patients. Academic Emergency Medicine, 11(9), 944-950. PMID: 15347544

113. Meyer, I.H., Whyatt, R.M., Perera, F.P., & Ford, J.G. (2003). Risk for asthma in 1-year-old infants residing in New York City high-risk neighborhoods. Journal of Asthma, 40 (5), 545 – 550. DOI: 10.1197/j.aem.2004.03.020 PMID: 14529104 PMCID:

114. Meyer, I.H. (2003). Prejudice as stress: Conceptual and measurement problems. American Journal of Public Health, 93, 262-265. DOI: 10.2105/ajph.93.2.262 PMID: 12554580 PMCID: 1447727

115. Meyer, I.H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. Psychological Bulletin, 129, 674–697. DOI: 10.1037/0033-2909.129.5.674 PMID: 12956539 PMCID: 2072932

    b. Reprinted as:  Meyer, I.H. (2013). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychology of Sexual Orientation and Gender Diversity*, 1(S), 3-26.

116. Kertzner, R., Meyer, IH., & Dolezal, C. (2003). Psychological Well-Being in Midlife Older Gay Men. In G. Herdt & B. de Vries (Eds.) Gay and Lesbian Aging Research and Future Directions (pp 97-115). NY: Springer Publishing Company.

117. Perera, F.P., Illman, S.M., Kinney, P.L., Whyatt, R.M., Kelvin, E.A., Shepard, P., Evans, D., Fullilove, M., Ford, J.G., Miller, R.L., Meyer, I., &

Rauh, V.  (2002). The challenge of preventing environmentally related disease in young children: Community-based research in New York City, Environmental Health Perspectives, 110(2), 197-204. DOI: 10.1289/ehp.02110197 PMID: 11836150 PMCID: PMC1240736

118.    Northridge, M.E., Meyer, I.H., & Dunn, L. (2002). Overlooked and Underserved in Harlem: A population-based survey of adults with asthma. Environmental Health Perspectives, 110, Supplement 2, 217-220. DOI: 10.1289/ehp.02110s2217 PMID: 11929731 PMCID: PMC1241166

119.    Meyer, I.H., Sternfels, P., Fagan, J.K., & Ford, J.G. (2002). Asthma-related limitations in sexual functioning: An important but neglected area of quality of life. American Journal of Public Health, 92, 770-772. DOI: 10.2105/ajph.92.5.770 PMID: 11988445 PMCID: PMC1447159

120.    Lewin, S. & Meyer, I.H. (2002). Torture and ill-treatment based on sexual identity: the roles and responsibilities of health professionals and their institutions. Health and Human Rights, 6(1), 161-176.

121.    Meyer, I. H., Rossano, L., Ellis, J., & Bradford, J. (2002). A brief telephone interview to identify lesbian and bisexual women in random digit dialing sampling. Journal of Sex Research, 39, 139-144. DOI: 10.1080/00224490209552133 PMID: 12476246 PMCID:

122.    Meyer, I.H. (2002). Smearing the queer: Medical bias in the health care of gay men by Michael Scarce (Essay Review). International Journal of Epidemiology, 31(2), 501-503. doi: 10.1093/ije/31.2.501

123.    Ford, J.G. Meyer, I.H., Sternfels, P, Findley, S.E., McLean, D.E., Fagan, J.K., & Richardson, L. (2001). Patterns and predictors of asthma-related emergency department use in Harlem. Chest, 120, 1129-1135. DOI: 10.1378/chest.120.4.1129 PMID: 11591549 PMCID:

124.    Meyer, I.H., Sternfels, P., Fagan, J.K., Copeland, L., & Ford, JG. (2001). Characteristics and Correlates of Asthma Knowledge Among Emergency Department Users in Harlem. Journal of Asthma, 38(7), 531-539. PMID: 11714075 PMCID:

125.    Meyer, I. H. (2001). Why lesbian, gay, bisexual, and transgender public health? American Journal of Public Health, 91, 856-859. DOI: 10.2105/ajph.91.6.856 PMID: 11392921 PMCID: PMC1446455

126.    Lewin, S. & Meyer, I.H. (2001). Torture, ill-treatment, and sexual identity. The Lancet, 358, Dec 1, 1899-1900. DOI: 10.1016/S0140-6736(01)06894-5 PMID: 11741651 PMCID:

127.    Meyer, I. H. & Schwartz, S. (2000). Social issues as public health: Promise and peril. American Journal of Public Health, 90, 1189-1191. DOI: 10.2105/ajph.90.8.1189 PMID: 10936991 PMCID: PMC1446330

128.    Dean, L., Meyer, I. H., Sell, R. L., Sember, R., Silenzio, V., Bowen, D. J., Bradford, J., Rothblum, E. D., Scout, White, J., Dunn, P., Lawrence, A., Wolfe, D., & Xavier, J. (2000). Lesbian, gay, bisexual, and transgender health: Findings and concerns. Journal of the Gay and Lesbian Medical Association, 4, 102-151. doi: 10.1023/A:1009573800168

129.    Siegel, K. & Meyer, I. H. (1999). Hope and resilience in suicide ideation and behavior of gay and bisexual men following notification of HIV infection. AIDS Education & Prevention, 11, 53-64. PMID: 10070589 PMCID:

130.    Meyer, I. H. & Colten, M. E. (1999). Sampling gay men: Random digit dialing versus sources in the gay community. Journal of Homosexuality, 37, 99-110. DOI: 10.1300/J082v37n04_06 PMID: 10482333 PMCID:

131.    Meyer, I. H. & Dean, L. (1998). Internalized homophobia, intimacy, and sexual behavior among gay and bisexual men. In G.M. Herek (Ed.), Stigma and sexual orientation: Understanding prejudice against lesbians, gay men, and bisexuals (pp. 160-186). Psychological Perspectives on Lesbian and Gay Issues, Series Editors B. Greene & G.M. Herek. Thousand Oaks, CA: Sage.  http://dx.doi.org/10.4135/9781452243818.n8

132.    Siegel, K., Lune, H. & Meyer, I.H. (1998). Stigma management among gay/bisexual men with HIV/AIDS. Qualitative Sociology, 21, 3-24. doi: 10.1023/A:1022102825016

133.    REPRINTED: D.H. Kelly and E.J. Clarke (Eds.), Deviant behavior: A text-reader in the sociology of deviance (pp. 263 – 281). NY: Worth Publishers.

134.    Meyer, I.H. (1998). Oral sex – Fellatio. In Raymond A. Smith (Ed.) Encyclopedia of AIDS: A social, political, cultural, and scientific record of the HIV epidemic (p. 384 – 386). Chicago: Fitzroy Dearborn Publishers.

135.    Meyer, I. H., Muenzenmaier, K., Cancienne, J., & Struening, E. (1996). Reliability and validity of a measure of sexual and physical abuse histories

among women with serious mental illness. Child Abuse and Neglect, 20, 213-219. PMID: 8734551 PMCID:

136.      Nimmons, D. & Meyer, I.H. (1996). Oral sex & HIV risk among gay men: Research summary. NY: Gay Men's Health Crisis report.

137.      Meyer, I. H. (1995). Minority stress and mental health in gay men. Journal of Health and Social Behavior, 36, 38-56. PMID: 7738327 PMCID:

138.      REPRINTED: Meyer, I. H. (2003). Minority stress and mental health in gay men. In L. Garnets & D. C. Kimmel (Eds.), Psychological perspectives on lesbian and gay male experiences (2nd Ed., pp. 699 - 731). New York: Columbia University Press.

139.      Meyer, I., Empfield, M., Engel, D., & Cournos, F. (1995). Characteristics of HIV-positive chronically mentally ill inpatients. Psychiatric Quarterly, 66, 201-207. PMID: 7568528 PMCID:

140.      Meyer, I. H. & Dean, L. (1995). Patterns of sexual behavior and risk taking among young New York City gay men. AIDS Education & Prevention, 7, 13-23. PMID: 8664094 PMCID:

141.      Dean, L. & Meyer, I. (1995). HIV prevalence and sexual behavior in a cohort of New York City gay men (aged 18-24). Journal of Acquired Immune Deficiency Syndromes and Human Retrovirology, 8, 208-211. PMID: 7834405 PMCID:

142.      Meyer, I., Cournos, F., Empfield, M., Schrage, H., Silver, M., Rubin, M., & Weinstock, A. (1993). HIV seroprevalence and clinical characteristics of severe impatient mentally ill homeless. Journal of Social Distress and the Homeless, 2, 103-116. doi: 10.1007/BF01074224

143.      Empfield, M., Cournos, F., Meyer, I., McKinnon, K., Horwath, E., Silver, M., Schrage, H., & Herman, R. (1993). HIV seroprevalence among homeless patients admitted to a psychiatric inpatient unit. The American Journal of Psychiatry, 150, 47-52. DOI: 10.1176/ajp.150.1.47 PMID: 8417579 PMCID:

144.      Meyer, I., McKinnon, K., Cournos, F., Empfield, M., Bavli, S., Engel, D., & Weinstock, A. (1993). HIV seroprevalence among long-stay patients in a state psychiatric hospital. Hospital & Community Psychiatry, 44, 282-284. PMID: 8444444 PMCID:

2-App-225

145.      Muenzenmaier, K., Meyer, I., Struening, E., & Ferber, J. (1993).
Childhood abuse and neglect among women outpatients with chronic mental
illness. Hospital & Community Psychiatry, 44, 666-670. PMID: 8192738
PMCID:

146.      Cournos, F., McKinnon, K., Meyer-Bahlburg, H., Guido, J. R., &
Meyer, I. (1993). HIV risk activity among persons with severe mental illness:
Preliminary findings. Hospital & Community Psychiatry, 44, 1104-1106.
PMID: 8288184 PMCID:

147.      Meyer, I., Cournos, F., Empfield, M., Agosin, B., & Floyd, P. (1992).
HIV prevention among psychiatric inpatients: a pilot risk reduction study.
Psychiatric Quarterly 63, 187-197. PMID: 1488461 PMCID:

148.      Meyer, I.H. (1992). Book Review: Inventing AIDS by Cindy Patton.
Women & Health, 18(1), 137-142.

149.      Cournos, F., Empfield, M., Horwath, E., McKinnon, K., Meyer, I.,
Schrage, H., Currie, C., & Agosin, B. (1991). HIV seroprevalence among
patients admitted to two psychiatric hospitals. The American Journal of
Psychiatry, 148, 1225-1230. DOI: 10.1176/ajp.148.9.1225 PMID: 1883002
PMCID:

**OTHER**

2009 Interview with Dr. Van Nuys
http://www.mentalhelp.net/poc/view_index.php?idx=119&w=9 or
http://tinyurl.com/br6ojl


OutCasting Episode 40: Minority stress — a conversation with Ilan H. Meyer, Ph.D.
http://mfpg.org/index.php/outcasting/87-outcasting/outcasting-episodes/205-outcasting-episode-0040-minority-stress-ilan-meyer

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

       *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official ca-
pacity as the Director of the Colorado Civil
Rights Division, *et al.*,

       *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... ii

INTRODUCTION..................................................................................................1

ARGUMENT .......................................................................................................2

    I.  Plaintiffs are entitled to a preliminary injunction because they are likely to
    succeed on the merits. ...............................................................................4

        A.  Defendants offer no defense of the challenged laws on the merits............4

        B.  Plaintiffs have standing because their speech is being chilled right
           now. ...............................................................................................5

        C.  Defendants' contrary standing arguments get the law and the facts
           wrong. .......................................................................................... 12

           1.  Plaintiffs are subject to CADA...................................................... 13

           2.  CADA as amended by H.B. 25-1312 prohibits misgendering and
              deadnaming. ................................................................................ 17

           3.  Dr. Morrell and Dr. Leswing face a credible threat of
              enforcement. ............................................................................... 21

        D.  The Attorney General is a proper defendant. ...........................................25

        E.  Plaintiffs' claims are ripe .......................................................................30

    II.  The remaining factors favor a preliminary injunction. .........................................30

    III.  A preliminary injunction is appropriate here. ........................................................36

        A.  The requested injunction is appropriately tailored. ..................................36

        B.  The requested injunction is not disfavored. .............................................38

    IV.  Defendants' motions to dismiss fail for the same reasons. ................................39

CONCLUSION .................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021) ..........................................2-3, 8, 10, 12, 19, 24, 27, 28

*303 Creative v. Elenis*,
  600 U.S. 570 (2023) ...........................................................................................2, 9

*Action NC v. Strach*,
  216 F. Supp. 3d 597 (M.D.N.C. 2016)......................................................................40

*Adefila v. Select Specialty Hospital*,
  28 F. Supp. 3d 517 (M.D.N.C. 2014)........................................................................32

*Antonyuk v. James*,
  120 F.4th 941, 1016 (2d Cir. 2024) ....................................................................8, 20

*Awad v. Ziriax*,
  670 F.3d 1111 (10th Cir. 2012) ...............................................................................35

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979) ......................................................................................5, 7, 24

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ....................................................................................28

*Brown v. Herbert*,
  850 F. Supp. 2d 1240 (D. Utah 2012) .........................................................................7

*Chamber of Commerce v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ...........................................................................26, 29

*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ..............................................................4, 9, 24, 27

*Christian Healthcare Ctrs., Inc. v. Nessel*,
  117 F.4th 826 (6th Cir. 2024) ..................................................................................19

*Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*,
  236 F.3d 1174 (10th Cir. 2000) ...............................................................................22

*Citizens United v. Gessler*,
  773 F.3d 200 (10th Cir. 2014) .................................................................................31

*Craig v. Masterpiece Cakeshop*,
  370 P.3d 272 (Colo. Ct. App. 2015) ..........................................................................17

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) ................................................................................32-33

*Darren Patterson Christian Acad. v. Roy*,
  699 F. Supp. 3d 1163 (D. Colo. 2023) ..................................................................7, 27

*Dean v. United States*,
556 U.S. 568 (2009) ................................................................................ 3, 19

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025) ....................................................................... 40

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .................................................................................. 17

*Fischer v. Thomas*,
52 F.4th 303 (6th Cir. 2022) .......................................................................... 9

*Flanagan v. Munger*,
890 F.2d 1557 (10th Cir. 1989) ..................................................................... 35

*Free Speech Coalition v. Anderson*,
119 F.4th 732 (10th Cir. 2024) ..................................................................... 28

*Free the Nipple v. Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ............................................... 31, 34, 38, 39

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*,
949 F.3d 116 (3d Cir. 2020) ........................................................................... 5

*Henry v. Wellpath LLC*,
2024 WL 5323679 (D. Colo. Jan. 16 2024) ................................................... 16

*Hobby Lobby Stores v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) ..................................................................... 31

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................................................................................. 13

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ................................................................................. 1, 4

*Idaho Org. of Res. Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) ............................................................. 8

*iMatter Utah v. Njord*,
774 F.3d 1258 (10th Cir. 2014) ...................................................................... 5

*Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*,
601 F.2d 809 (5th Cir. 1979) ......................................................................... 8

*IRI v. Walker*,
450 F.3d 1082 (10th Cir. 2006) ................................................................. 6, 30

*Jackson Federation of Teachers. v. Fitch*,
799 F.Supp.3d 571 (S.D. Miss. 2025) ............................................................ 37

*Kansas v. DOE*,
739 F. Supp. 3d 902 (D. Kan. 2024) .............................................................. 36

*Koons v. Reynolds,*
  649 F. Supp. 3d 14 (D.N.J. 2023) ............................................................................... 9

*Labrador v. Poe,*
  144 S. Ct. 921 (2024) .................................................................................................. 38

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................................... 39

*Masterpiece Cakeshop Inc. v. Elenis,*
  445 F. Supp. 3d 1226 (D. Colo. 2019) ...................................... 8, 10, 25, 29, 32

*Masterpiece Cakeshop v. CCRC,*
  584 U.S. 617 (2018) ..................................................................................................... 9

*Masterpiece Cakeshop v. Scardina,*
  556 P.3d 1238 (Colo. 2024) ........................................................................................ 9

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ......................................................................... 4, 6, 22

*Peace Ranch v. Bonta,*
  93 F.4th 482 (9th Cir. 2024) .................................................................................. 8, 27

*Peck v. McCann,*
  43 F.4th 1116 (10th Cir. 2022) ................................................. 1, 7, 9, 24, 27

*PGA Tour v. Martin,*
  532 U.S. 661 (2001) .................................................................................................... 16

*Planned Parenthood of Kansas v. Andersen,*
  882 F.3d 1205 (10th Cir. 2018) .................................................................................. 4

*Principle Homecare, LLC v. McDonald,*
  2025 WL 622876 (S.D.N.Y. Feb. 26, 2025) ........................................................... 40

*Reno v. ACLU,*
  521 U.S. 844 (1997) ...................................................................................................... 4

*Rocky Mountain Gun Owners v. Polis,*
  121 F.4th 96 (10th Cir. 2024) .................................................................................. 31

*San Francisco v. Trump,*
  783 F. Supp. 3d 1148 (N.D. Cal. 2025) .................................................................. 19

*SBA List v. Driehaus,*
  573 U.S. 149 (2014) ................................................... 5, 7, 8, 10-11, 27, 30

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010) .................................................................................. 19

*Scott v. Allen,*
  153 F.4th 1088 (10th Cir. 2025) ......................................................................... 2, 5-6

*Scott v. Hiller*,
   2022 WL 4726038 (D. Colo. Oct. 3, 2022) ................................................................ 27

*See Deep South Today v. Murrill*,
   779 F. Supp. 3d 782 (M.D. La. 2025) ...................................................................... 29

*SisterSong Women of Color Reprod. Just. Collective v. Kemp*,
   410 F. Supp. 3d 1327 (N.D. Ga. 2019) .................................................................... 20

*Spicer v. Biden*,
   2022 WL 2663823 (D.D.C. July 11, 2022) ............................................................... 40

*Stalder v. Colo. Mesa University*,
   551 P.3d 679 (Colo. Ct. App. 2024) ......................................................................... 15

*Stenberg v. Carhart*,
   530 U.S. 914 (2000) .................................................................................................. 20

*Taylor v. Siegelman*,
   230 F. Supp. 2d 1284 (N.D. Ala. 2002) .................................................................... 40

*Telescope Media Grp. v. Lucero*,
   936 F.3d 740 (8th Cir. 2019) .................................................................................... 34

*Trump v. CASA*,
   606 U.S. 831 (2025) .................................................................................................. 37

*United Food & Com. Workers Union Loc. 751 v. Brown Grp*,
   517 U.S. 544 (1996) .................................................................................................. 13

*United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Regional Transit Authority*,
   163 F.3d 341 (6th Cir. 1998) .................................................................................... 38

*United States v. Stevens*,
   559 U.S. 460 (2010) .................................................................................................. 20

*United States v. Texas*,
   144 F.4th 632 (5th Cir. 2025) ................................................................................... 16

*United States v. Texas*,
   144 S. Ct. 797 (2024) ................................................................................................ 38

*Utah Ass'n of Counties. v. Bush*,
   455 F.3d 1094 (10th Cir. 2006) ................................................................................ 37

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) .................................................................................................... 7

*Virginia v. Hicks*,
   539 U.S. 113 (2003) .................................................................................................. 37

*Vitagliano v. County of Westchester*,
   71 F.4th 130 (2d Cir. 2023) ................................................................................. 24-25

*West Alabama Women's Ctr. v. Williamson*,
  900 F.3d 1310 (11th Cir. 2018) ................................................................................ 20

**Statutes & Regulations**

28 C.F.R. Part 36, App. C ........................................................................................ 16

3 C.C.R. 708-1:10.8(A)(3) ....................................................................................... 26

3 C.C.R. 708-1:81.6 ............................................................................................ 31-32

Colo. Rev. Stat. §24-34-301 ................................................. 7, 10, 13, 15, 18-19, 32, 39

Colo. Rev. Stat. §24-34-306 ................................................................................ 8, 10, 26

Colo. Rev. Stat. §24-34-600.3 ................................................................................... 14

Colo. Rev. Stat. §24-34-601 ................................................. 3, 5, 7, 10, 14-16, 18, 25, 32

Colo. Rev. Stat. §24-34-701 ........................................................... 5, 7, 14-15, 18, 25

Mich. Comp. Laws. § 37.2302 .................................................................................. 19

## INTRODUCTION

Nearly nine months ago, Colorado enacted new legislation (House Bill 25-1312) that changed the definition of "gender expression," a protected category in the Colorado Anti-Discrimination Act. Under the new law, it is now illegal for anyone who operates in a place of public accommodation to decline to use someone's chosen name or preferred pronouns or make someone feel unwelcome by opposing the use of such language. *See* PI.Mot. (Dkt.27) at 4-7. Unlike existing anti-discrimination laws that guarantee *access* to public accommodations, the new law regulates *speech*, punishing so-called misgendering and deadnaming. This prohibition on the commonplace use of biological pronouns and names is plainly unconstitutional; states may not punish speech (especially on politically salient topics like sex and gender) just because they disagree with its message. *See Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995). So Plaintiffs, who believe that sex is fixed and want to use language consistent with that belief, promptly sought a preliminary injunction to protect their First Amendment rights.

In the face of that preliminary-injunction motion, Defendants—tellingly—offer no defense of the challenged laws on the merits. *See generally* PI.Opp. (Dkt.85); AG.MTD (Dkt.81); CCRD.MTD (Dkt.82). They do not dispute that the challenged laws, if applied to Plaintiffs' speech, would violate the First Amendment. Instead, Defendants devote all of their briefing to challenging Plaintiffs' standing. But standing for First Amendment claims at the preliminary-injunction stage is an "'extremely low'" bar, *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022), and Plaintiffs easily surpass it. Plaintiffs want to refer to transgender-identifying individuals using biological pronouns and birth names, as they did

before H.B. 25-1312. But CADA now makes that illegal. Defendants agree that at least *some* acts of misgendering and deadnaming violate the law; they insist they have a "clear" interest in using CADA to stamp out such "discrimination," Pl.Opp. 43-44; and they have prosecuted entities for similar language in the past.

That is a straightforward recipe for chilled speech. Which is why the Tenth Circuit, rejecting many of the same arguments Defendants try here, already found standing in another case raising the *same* kind of pre-enforcement challenge (First and Fourteenth Amendment claims) against the *same* law (CADA) to protect the *same* kind of speech (speech on sex and gender). *See 303 Creative v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021). The Supreme Court, in turn, not only found standing but *granted* the requested injunction. 600 U.S. 570, 583, 588, 602-03 (2023).

Defendants contort CADA's text (or ignore it entirely) to avoid reaching the same result here, but they cannot escape liability by rewriting the law mid-litigation. This Court should grant the preliminary injunction and deny the motions to dismiss.

### ARGUMENT

Standing for a First Amendment pre-enforcement challenge is not a high bar. Because of the "'unique interests'" in "'the First Amendment context,'" courts "'apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits.'" *Scott v. Allen*, 153 F.4th 1088, 1095 (10th Cir. 2025). Plaintiffs satisfy this lenient test because their speech is currently being chilled. *See id.* at 1094.

Defendants' arguments against standing get the law and the facts wrong. To start, they say that CPAN, PKC, and Dr. Morrell are not subject to CADA when they host events

2
2-App-234

in places of public accommodation. But CADA's text plainly regulates any "person" who operates "in" a place of public accommodation. Colo. Rev. Stat. §24-34-601. Next, they try to impose additional non-statutory elements onto CADA's misgendering and dead-naming bans to avoid applying them to Plaintiffs' speech. *See* Pl.Opp. 23 ("deadnaming and misgendering are not *per se* CADA violations"). But Defendants cannot rescue an unconstitutional statute by adding extra words to the text, *see Dean v. United States*, 556 U.S. 568, 572 (2009), and Plaintiffs' speech violates the law even on Defendants' exceedingly narrow reading. Finally, Defendants say Dr. Morrell and Dr. Leswing have nothing to fear because none of their patients have filed formal discrimination complaints before. But H.B. 25-1312 is a *new* law, and the doctors *have* been severely criticized for their speech in the past. *See 303 Creative*, 6 F.4th at 1173 ("potential liability is inherent in the manner they intend to operate").

Defendants' remaining arguments fare no better. Plaintiffs' claims are ripe for the same reasons they have standing. The Attorney General is a proper defendant in a pre-enforcement challenge to CADA, as judges in this district and the Tenth Circuit have confirmed. The equities favor an injunction because constitutional violations are *always* an irreparable injury and the State has no interest in enforcing an unconstitutional law. And the relief Plaintiffs seek is appropriately tailored to their injury. This Court can and should enter an injunction that bars Colorado from enforcing CADA in a manner that violates Plaintiffs' First and Fourteenth Amendment rights while allowing the State to enforce those laws to prevent *actual* denials of service.

**I.     Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits.**

Plaintiffs likely have standing and are likely to prevail on their First and Fourteenth Amendment claims. Defendants' contrary arguments fail on both the law and the facts.

**A.     Defendants offer no defense of the challenged laws on the merits.**

Most First Amendment preliminary-injunction cases turn on the merits, not standing. *Cf. Chiles v. Salazar,* 116 F.4th 1178, 1195 (10th Cir. 2024) ("Standing in the First Amendment context is assessed with some leniency."); *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018) (the "most important preliminary-injunction factor" is "the merits"). It is telling, then, that across 90 pages of consolidated briefing, Defendants make no effort to defend the constitutionality of Colorado's laws.

Defendants don't dispute that Plaintiffs' speech is constitutionally protected. Nor do they dispute that the challenged laws, if applied to that speech, would violate Plaintiffs' constitutional rights. In fact, Defendants don't even explain what the challenged laws *mean*, refusing to say whether Plaintiffs' speech is prohibited by CADA or what speech *would be* prohibited. *E.g.*, PI.Opp. 28 (claiming it is "context- and fact-dependent").

Defendants don't argue the merits for a reason: CADA as amended by H.B. 25-1312 is flagrantly unconstitutional. Using or refusing to use names and pronouns "advance[s] a viewpoint on gender identity," *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021), and the government cannot punish individuals for expressing their viewpoints, *Hurley*, 515 U.S. at 579. Nor can it punish speech based on a broad law whose terms nobody (not even the government) understands. *See Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("vagueness" has an "obvious chilling effect on free speech"). Yet that is exactly

what the new law does. It threatens legal penalties for those who use biologically accurate language, *see, e.g.*, Pls' App'x (PA) 805:20-807:14 (Division's agreement that a bartender who addresses a transgender patron using the patron's "birth name" and biologically accurate pronouns may violate CADA even if the customer otherwise "gets all the services that the restaurant offers"), and it vaguely prohibits all statements that "directly or indirectly" make someone feel "unwelcome" in a place of public accommodation based on their gender identity or expression, Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701(1)(c).

Defendants' refusal to engage the merits is fatal, especially in the First Amendment context. *See iMatter Utah v. Njord*, 774 F.3d 1258, 1263 (10th Cir. 2014) ("'[W]hen a law infringes on the exercise of First Amendment rights," the government "bears the burden of establishing its constitutionality.'"). To secure an injunction, Plaintiffs need only show that their speech is *arguably* covered by the law, that Defendants *might* enforce the law against them, and that such application *colorably* violates the First Amendment. *See SBA List v. Driehaus*, 573 U.S. 149, 162 (2014); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979); *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 132 (3d Cir. 2020). Plaintiffs have made that showing.

### B.    Plaintiffs have standing because their speech is being chilled right now.

Refusing to defend the challenged laws on the merits, Defendants instead try to attack Plaintiffs' standing. But Plaintiffs readily satisfy the "lenien[t]" test for pre-enforcement standing. *Scott*, 153 F.4th at 1095.

The Tenth Circuit and the Supreme Court have repeatedly explained the criteria for pre-enforcement standing. *See, e.g.*, *Scott*, 153 F.4th at 1094; *SBA List*, 573 U.S. at

159. "[A] plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *Scott*, 153 F.4th at 1094. In speech cases, this test is satisfied when the plaintiff shows a "'chilling effect'" on the exercise of their First Amendment rights tied to a "'credible threat of future prosecution.'" *Id.* In turn, to establish a chilling effect, Plaintiffs need only show (1) "that in the past they have engaged in the type of speech affected by the challenged government action," (2) "a present desire, though no specific plans, to engage in such speech" again, and (3) "a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced" against them. *IRI v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006).

**1.** No one disputes that the first two elements are met here. Each Plaintiff has, on multiple occasions, referred to transgender-identifying individuals using biological pronouns and birth names that do not match those individuals' preferred terminology. *See, e.g.*, Gimelshteyn Decl. (Dkt.27-2) ¶¶12-17; Lee Decl. (Dkt.27-3) ¶¶12-17; Morrell Decl. (Dkt.27-5) ¶6; Leswing Decl. (Dkt.27-6) ¶7; PA 56-57, 91:3-93:20, 94:16-95:25, 129:8-139:14, 140:13-142:13, 144:2-145:8, 224:1-8, 286-330; Pls' Second Restricted App'x (PSRA) 9:11-16, 14:7-15:23, 17:12-22, 19:21-20:7, 23:14-25:7. And all Plaintiffs desire to do so in the future. *See* Gimelshteyn Decl. ¶¶7-9, 14-15, 18, 29; Lee Decl. ¶¶7-9, 14-15, 18, 29; Morrell Decl. ¶¶5, 7-13, 28; Leswing Decl. ¶¶6, 8-14, 26. This speech is certainly constitutionally protected. *See Meriwether*, 992 F.3d at 508, 511-12. And it is affected by CADA, which, as amended by H.B. 25-1312, prohibits language that (1) fails to use an individual's "chosen name" or other terms by which they "choos[e] to be addressed" or (2)

causes an individual, even indirectly, to feel unwelcome because they use a chosen name or other non-biological terms. Colo. Rev. Stat. §§24-34-301(9), 24-34-601(2)(a), 24-34-701; Pl.Opp. 5-6 (agreeing that such language violates the law in at least some circumstances). In other words, Plaintiffs *have* engaged in and *want to* engage in so-called misgendering and deadnaming, but that speech is now subject to CADA.

**2.** Plaintiffs have also shown a credible threat of enforcement. This requirement "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1133. "'[T]he evidentiary bar that must be met is extremely low.'" *Id.* The threat of enforcement is credible as long as "is not imaginary or wholly speculative." *Babbitt*, 442 U.S. at 302. And all of the factors that affect the likelihood of enforcement favor Plaintiffs here. *See SBA List*, 573 U.S. at 164-66. Most importantly, H.B. 25-1312 is a new law, and Defendants have not disavowed enforcement. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Additionally, Defendants have a history of enforcing the law against similar conduct, and the fact that anyone can file a complaint alleging discrimination compounds the risk that Plaintiffs will be targeted. *See SBA List*, 573 U.S. at 164-66.

First, courts assume a likelihood of enforcement for new laws. *See Am. Booksellers*, 484 U.S. at 393 ("[W]e see no reason to assume" that a "newly enacted law will not be enforced."); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1176 (D. Colo. 2023) (noting a "'strong presumption of enforcement'" for "new" laws); *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012) (same). H.B. 25-1312 is a brand-new law, enacted just *one* business day before Plaintiffs filed this lawsuit, and its

adoption was the subject of intense "public interest." *Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1256 (D. Colo. 2019). The Court is "entitled to assume that [state] agencies will not disregard such a recent," public, and forceful "expression of the legislature's will." *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979); *see also Antonyuk v. James*, 120 F.4th 941, 1016 (2d Cir. 2024) (similar).

Second, although they "have had ample opportunity to" do so, Defendants "notably" have not "disavow[ed] their intent to enforce" CADA against Plaintiffs. *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1035 (D. Idaho 2025); *see also SBA List*, 573 U.S. at 165. They have "made no … promise" that they will not enforce the law's speech prohibitions against Plaintiffs when they misgender, deadname, or use language that makes transgender-identifying people feel unwelcome in a place of public accommodation. *303 Creative*, 6 F.4th at 1174. To the contrary, when someone files a charge of discrimination, the Division is statutorily obligated to "make a prompt investigation of the charge." Colo. Rev. Stat. §24-34-306(2)(a); *see also* PA 739:12-25. And Colorado insists that it has "clear, longstanding," and "compelling" interests in enforcing CADA, both generally and specifically against misgendering and deadnaming. PI.Opp. 43-44; *see also 303 Creative*, 6 F.4th at 1174 ("Colorado's strenuous assertion that it has a compelling interest in enforcing CADA indicates that enforcement is anything but speculative.").

Refusal to disavow enforcement on its own establishes a credible threat of enforcement. *See Peace Ranch v. Bonta*, 93 F.4th 482, 490 (9th Cir. 2024) (pre-enforcement standing "often rises or falls with the enforcing authority's willingness to disavow enforcement"). It is dispositive even when the law at issue is a longstanding one, *see,*

*e.g.*, *Peck*, 43 F.4th at 1124, 1127, 1132-33 (challenged statute existed for sixteen years),

but it especially fatal here because H.B. 25-1312 is, again, a new piece of legislation, *see,*

*e.g.*, *Koons v. Reynolds*, 649 F. Supp. 3d 14, 29 (D.N.J. 2023) ("Absent a concession by

Defendants that they do not intend to enforce the newly enacted legislation, Plaintiffs have

averred credible threats of prosecution."). And Defendants' non-disavowal has especially

"heavy weight" here, as there is "nothing" else to guarantee that Plaintiffs will not be pun-

ished for violating CADA's speech rules. *Chiles*, 116 F.4th at 1198.

Third, the record shows that Defendants have used CADA in the past to punish

alleged discrimination based on gender identity and gender expression. *See, e.g.*, Pls'

Restricted App'x (PRA) 19-23, 167-76 (finding probable cause where establishments de-

clined to allow transgender-identifying biological males in women's restroom); *cf. Fischer*

*v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (finding a threat of enforcement where the

defendant had previously launched investigations into "similar conduct"). Defendants

have repeatedly tried to use CADA to coerce protected speech on issues of sex and

gender. *See, e.g.*, Pl.Mot. 3-4 (cataloguing the State's efforts to punish nonconforming

speech on these issues); *Masterpiece Cakeshop v. CCRC*, 584 U.S. 617 (2018); *303*

*Creative v. Elenis*, 600 U.S. 570 (2023). And Defendants have enforced CADA to punish

nonconforming speech on gender identity specifically. The Colorado Civil Rights Division,

for example, "found probable cause that discrimination occurred" where a bakery refused

to prepare a custom cake "to celebrate [a would-be customer's] gender transition and

identity as a transgender woman." *Masterpiece Cakeshop v. Scardina*, 556 P.3d 1238,

1242 (Colo. 2024). That probable cause determination, as one judge found,

2-App-242

"demonstrated a willingness to enforce the statute," *Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253, 1256, and Plaintiffs fear they will be similarly punished, *see* PA 168:18-170:25, 233:3-22, 234:7-19 (explaining that Plaintiffs fear they will be targeted because Masterpiece Cakeshop was targeted).

Indeed, the Division has repeatedly found probable cause based solely on a respondent's use of language that did not match a transgender individual's preferred pronouns or chosen name. *See, e.g.*, PRA 139-42 (finding probable cause where blood bank listed transgender-identifying biological male as "male" in donor profile); *id.* at 72-79, 101-10 (all likewise finding probable cause solely based on misgendering or deadnaming). That is the same speech in which Plaintiffs want to engage here, and it is precisely what H.B. 25-1312 now prohibits. *See* Colo. Rev. Stat. §§24-34-301(3.5), (9), 24-34-601(2)(a).

Finally, the threat of enforcement is "bolstered by the fact that authority to file a complaint" is "not limited" to the Division, the Commission, or the Attorney General. *SBA List*, 573 U.S. at 164. Instead, "any person" can file a charge alleging discrimination. Colo. Rev. Stat. §24-34-306(1)(a)(I). That means anyone who wishes to make use of Plaintiffs' services or attend one of their events but feels unwelcome due to Plaintiffs' use of biologically accurate language "may file a complaint and initiate a potentially burdensome administrative hearing against" Plaintiffs. *303 Creative*, 6 F.4th at 1174; *see also* PA 740:7-741:25 (respondents accused of discrimination must, for example, provide "financial information," "personnel files, "emails or text messages," and answer written questions under threat of subpoena). Thus, Plaintiffs "must fear not only charges brought by Colorado, but charges brought by any person who might" disagree with their speech. *Id.*

10

And the nature of Plaintiffs' activities makes this risk even more severe: as advocacy organizations and physicians with public-facing medical practices, they "are easy targets." *SBA List*, 573 U.S. at 164. Indeed, because their views on sex and gender are publicly known and "the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from" individuals who try to attend Plaintiffs' events or patronize their medical practices *because* of their views on sex and gender. *Id.*; *see, e.g.*, Gimelshteyn Decl. ¶24: Lee Decl. ¶24; PA 217:11-13, 223:17-25 ("anyone who googles [Dr. Morrell] could find out [his] personal beliefs on this subject"); PA 246:1-18 (explaining that Dr. Leswing has "been in this community for a long time" and "the community knows" her views, so it is "not at all inconceivable that [she] would be directly and actively targeted by somebody" who wanted to "mak[e] a stand for what they consider are trans rights"); PA 747:18-750:19 (noting the Division may entertain complaints filed by activist groups).

Nor is that risk hypothetical. Quite the opposite. Transgender individuals regularly attend CPAN's and PKC's events, and both Dr. Morrell and Dr. Leswing regularly treat transgender patients. *See* PA 107:22-109:21, 110:10-111:6, 143:2-3, 224:1-8, 239:17-23. And transgender individuals regularly file complaints with the Division alleging discrimination specifically—and sometimes solely—because they were misgendered or deadnamed. *E.g.*, PRA 127 (attorney called client by "dead name" and attorney's staff used the "wrong pronouns"); 24, 43-48, 59, 70-71, 80-81, 111-14, 125-26, 128, 130 (all similar). The Division, as noted above, has found probable cause in some of those cases. And others have filed complaints against medical providers who, like Dr. Leswing and

Dr. Morrell, refuse to provide so-called gender-affirming care or refer to patients using biologically accurate terms that do not correspond to the patient's gender identity. *E.g.*, *id.* at 25-26 (medical insurance provider declined to cover facial feminization surgery); 40-42 (surgeon misgendered complainant and refused to perform bilateral mastectomy).

Misgendering and deadnaming are, in fact, especially likely to invite controversy and complaints. As Defendants' own expert testified, transgender-identifying individuals take misgendering and deadnaming very seriously. PA 643:24-644:7. They perceive it as "hurt[ful]," "stigmatiz[ing]," and "upset[ting]." *Id.* at 640:16-642:5, 644:3-7. And they often feel "offended" because such language is, in their eyes, a rejection of their "identity." *Id*. at 644:3-4, 645:4-19; *see also id.* at 645:20-648:13 (discussing the "research" document-ing transgender individuals' tendency to react negatively to misgendering and deadnam-ing). In Plaintiffs' experience, too, transgender individuals react very negatively when oth-ers refuse to use their chosen name or preferred pronouns. *See, e.g.*, PA 146:20-23, PSRA 15:6-23 (explaining that people get very "upset" when Plaintiffs use biological, ra-ther than so-called gender-affirming, language). It is no great leap to fear that some of those individuals may file complaints.

### C.   Defendants' contrary standing arguments get the law and the facts wrong.

Defendants do not dispute that they have enforced CADA in the past to punish purported discrimination based on transgender identity. They don't dispute that anyone can file a complaint forcing Plaintiffs into the Division's "potentially burdensome adminis-trative" process. *303 Creative*, 6 F.4th at 1174. And they pointedly do not disavow the authority to enforce CADA against Plaintiffs. Instead, they try to rewrite CADA to avoid

applying it to Plaintiffs' speech, and they selectively cite the record to downplay H.B. 25-1312's chilling effect.[*] But CADA's plain text squarely applies to Plaintiffs and their speech, and ample record evidence confirms that Plaintiffs have a credible fear of enforcement if they violate the law.

### 1. Plaintiffs are subject to CADA.

Defendants start by trying to dodge CADA altogether, at least as it applies to CPAN, PKC, and Dr. Morrell (during his speaking engagements). Of course, Defendants don't—and couldn't—disagree that CPAN, PKC, their supporters, and Dr. Morrell want to refer to transgender-identifying individuals using pronouns and names that reflect an individual's biology rather than their gender identity, in apparent violation of CADA's new "gender expression" and "chosen name" provisions. Colo. Rev. Stat. §24-34-301(3.5), (9); *see* PA 98:18-20, 119:16-19, 192:5-24, 198:9-199:8. Defendants don't dispute that CPAN, PKC, and Dr. Morrell want to express that speech in places of public accommodation, including hotels, restaurants, outdoor spaces, event spaces, and other public venues. *See, e.g.*, PA 20-38, 40-43 (cataloguing events in places of public accommodation);

---

[*] Defendants don't dispute that Plaintiffs Defending Education and Do No Harm have associational standing through their members. *See* Pl.Opp. 26. Indeed, DE and DNH easily satisfy the requirements for associational standing. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Their members (including Lori Gimelshteyn, Erin Lee, Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics) "would otherwise have standing to sue in their own right." *Id.* The First Amendment interests this lawsuit seeks to "protect are germane to [the associations'] purpose." *Id.*; *see also* Perry Decl. (Dkt.27-1) ¶¶3-4, 6-8; Rasmussen Decl. (Dkt.27-4) ¶¶3-4, 6-8. And "neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp*, 517 U.S. 544, 546 (1996) ("'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members").

PA 85:22-86:1, 121:16-122:11, 123:12-21, 182:16-23, 195:1-25, 200:23-202:15, 268-85.

And Defendants don't dispute that CPAN, PKC, and Dr. Morrell may be targeted and re-ported for their speech. Indeed, Plaintiffs have been harassed, accused of transphobia, and threatened with legal action for their refusal to affirm non-biological gender identities. *See, e.g.*, PA 45-52, 86:24-87:24, 100:22-102:5, 103:1-6, 104:7-12, 124:4-128:6, 146:20-155:23, 156:19-162:8, 203:2-206:6, 207:22-211:19, 213:21-214:20, 252-67.

Instead, Defendants argue that CADA does not apply to CPAN, PKC, or Dr. Morrell *at all* because they are not "places of public accommodation." PI.Opp. 19-22. In other words, in Defendants' view, only a literal place of public accommodation—and not the individual or entity who operates the public accommodation—is subject to CADA. That vision of CADA has no basis in the law's text and is not supported by any of the cases that have addressed the issue.

Start with the text. Defendants correctly note that CADA defines a "place of public accommodation" to include "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public." Colo. Rev. Stat. §24-34-600.3. The law then prohibits "[d]iscrimination in places of public accommodation." Colo. Rev. Stat. §24-34-601; *see also id.* §24-34-701. From this, Defendants argue that, to be subject to CADA's prohibitions, "the entity at issue must" itself *be* a place of public accommodation that "offers 'goods, services, facilities, privi-leges, advantages, or accommodations to the public." PI.Opp. 20.

That argument has no basis in law. CADA does not prohibit discrimination *by* a place of public accommodation—it prohibits discrimination by "persons" who are *in* a

place of public accommodation. Section 601 of CADA is titled "Discrimination *in* places of public accommodation." It says (in truncated form) that "[i]t is a discriminatory practice and unlawful for *a person* … to … deny to an individual or a grou[p] because of … gender identity … the full and equal enjoyment of the … facilities … of a place of public accommodation or … to publish … any … communication … that indicates that the full and equal enjoyment of the … facilities … of a place of public accommodation will be … denied … or that an individual's … presence at a place of public accommodation is unwelcome, objectionable, or undesirable because of … gender identity." Colo. Rev. Stat. §24-34-601(2)(a) (emphasis added). Part 7 likewise says that "[a] *person* that is the … lessee … of any place of public accommodation … shall not … publish … any communication" that discriminates in various ways based on gender identity. *Id.* §24-34-701(1) (emphasis added). The statute, in other words, does not regulate the physical place of public accommodation; it regulates the person operating in the place of public accommodation. And the term "person," per CADA's own definitions, includes "individuals, limited liability companies, partnerships, associations, corporations," or their "legal representatives." *Id.* §24-34-301(15)(a). It certainly does not exclude "advocacy organizations" or individuals from its coverage. *Contra* Pl.Opp. 21; *see* PA 757:12-21 (Division's agreement that an entity otherwise subject to CADA is not exempted merely because it is "also engaged in issue advocacy"); PRA 27-39 (finding probable cause that a non-profit violated CADA).

Caselaw agrees. Colorado courts generally read CADA to have the same scope as equivalent federal laws. *See, e.g.*, *Stalder v. Colo. Mesa University*, 551 P.3d 679, 683 (Colo. Ct. App. 2024) (reading CADA "consistently with" the Americans with Disabilities

Act). This court does the same. *Henry v. Wellpath LLC*, 2024 WL 5323679, at *11 (D. Colo. Jan. 16, 2024). And those federal anti-discrimination laws *do* apply to entities—including otherwise private organizations—who host events in places of public accommodation. *See, e.g.*, *PGA Tour v. Martin*, 532 U.S. 661, 677 (2001) (An "even[t]" hosted by a private organization is "comfortably within the coverage" of the ADA when it is hosted in "a public accommodation."). Although such entities are not themselves public accommodations, they are liable if they "discriminate against any 'individual' in the 'full and equal enjoyment of'" the "'accommodations.'" *Id.* Federal regulations read anti-discrimination law the same way: "An entity that is not in and of itself a public accommodation … may become a public accommodation when," for example, "it leases space for a conference … at a hotel [or] convention center." 28 C.F.R. Part 36, App. C. Accordingly, because CPAN, PKC, and Dr. Morrell regularly conduct events in places of public accommodation, they are subject to CADA's rules governing "[d]iscrimination *in* places of public accommodation." Colo. Rev. Stat. §24-34-601 (emphasis added).

Defendants' insistence that CADA applies only to actual "places of public accommodation" changes nothing. "[A] state cannot insulate unconstitutional laws from legal challenges simply by making a nonbinding promise [during litigation] to enforce such laws in ways wholly divorced from their text and plain meaning." *United States v. Texas*, 144 F.4th 632, 683 (5th Cir. 2025).

In any event, Defendants' actions belie their argument. The Division's enforcement history proves that CADA's prohibitions extend to those who operate in a place of public accommodation. The Division has filed formal complaints against individuals whose

conduct allegedly denied others equal access to a place of public accommodation. *See, e.g.*, *Craig v. Masterpiece Cakeshop*, 370 P.3d 272, 278 (Colo. Ct. App. 2015) (naming the owner "personally," in addition to the place of public accommodation itself, was proper because, among other reasons, "he was the person whose conduct was at issue").

Finally, even if Defendants were correct that CADA imposes liability only on literal places of public accommodation, Plaintiffs would *still* have standing. Even on Defendants' theory, public venues like hotels and restaurants are subject to CADA and can violate the law if they refuse to respect an individual's chosen name or preferred pronouns. *See* PA 789:15-795:15, 805:20-807:14. Those venues are unlikely to lease space to CPAN, PKC, and Dr. Morrell out of fear that their practice of deadnaming and misgendering will incur liability for the venue itself. And that injury is an independent basis for standing. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 384-85 (2024) ("[G]overnment regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff."). It is also a very *real* injury for CPAN, PKC, and Dr. Morrell, all of whom have hosted events where the venue has received complaints from members of the public regarding their stance on gender identity issues. *See, e.g.*, Gimelshteyn Decl. ¶28; Lee Decl. ¶18; PA 99:12-16, 103:1-2, 127:3-8, 211:20-212:11, 259-60.

### 2. CADA as amended by H.B. 25-1312 prohibits misgendering and deadnaming.

Next, Defendants suggest that even if Plaintiffs *are* subject to CADA, they needn't fear enforcement because "deadnaming and misgendering are not *per se* CADA violations." Pl.Opp. 23; CCRD.MTD 20. But CADA prohibits all deadnaming and misgendering, and Defendants cannot rewrite the statute mid-litigation to avoid a pre-enforcement

challenge. Besides, even if Defendants' reading of CADA were correct, Plaintiffs' desire to intentionally and repeatedly misgender and deadname would still violate the law.

CADA makes it unlawful to "directly or indirectly" deny a person "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" based on "gender expression." Colo. Rev. Stat. §24-34-601(2)(a). It is also unlawful to publish or circulate written, electronic, or printed materials that indicate such enjoyment will be denied or that an individual's presence is "unwelcome," "objectionable," "unacceptable," "undesirable," or not "solicited" because of their "gender expression." *Id.* §§24-34-601(2)(a), 24-34-701. In turn, CADA (as amended by H.B. 25-1312) defines "gender expression" to include a "chosen name" and "how the individual chooses to be addressed." *Id.* §24-34-301(9).

Under CADA's plain text, in other words, it is illegal to misgender or deadname someone—full stop. Speakers may not make someone feel "unwelcome" or deny them equal enjoyment of a public accommodation by refusing to use their "chosen name" or other terms by which they "choos[e] to be addressed." *Id.* §§24-34-301(9), 24-34-601(2)(a). That is what it *means* to "deadname" or "misgender" someone. *See* PI.Opp. 1 n.2; PA 767:1-12. And that is what Plaintiffs want to do. *See* Gimelshteyn Decl. ¶¶7, 12, 14-15, 18; Lee Decl. ¶¶7, 12, 14-15, 18; Morrell Decl. ¶¶6-12; Leswing Decl. ¶¶7-13. The law requires nothing more for a violation to occur. Proving the point, the Sixth Circuit, evaluating a similar Michigan law, held that refusal to "use a transgender [person's] preferred pronouns … arguably den[ies] to transgender individuals the privilege, enjoyed by cisgender individuals, of using pronouns … in accordance with their gender identity."

*Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 845 (6th Cir. 2024); *see* Mich. Comp. Laws. § 37.2302.

Resisting this straightforward conclusion, Defendants conjure additional elements that are not present in the law's text. But litigants cannot "'rea[d] words or elements into a statute that do not appear on its face.'" *Dean*, 556 U.S. at 572. Specifically, Defendants say misgendering and deadnaming are unlawful only if the speech was "subjectively" and "objectively" discriminatory. PI.Opp. 19. Elsewhere, they say that misgendering and deadnaming must be intentional, repeated, or hostile to violate CADA. *See* PI.Opp. 42; CCRD.MTD 28; PA 6, 11, 761:7-16, 770:25-771:23. CADA, however, contains no such limitations. The law prohibits speech that fails to respect a "chosen name" or other forms of "addres[s]," not speech that fails to respect them intentionally, repeatedly, or with hostility. Colo. Rev. Stat. §24-34-301(9). Those words are nowhere in the statute.

Even if CADA were somehow ambiguous on this point, Plaintiffs would still have a credible fear that the law will be applied to their speech. "A well-founded fear of enforcement may be based in part on a plaintiff's reasonable interpretation of what conduct is proscribed," even "if a narrower reading of the statute is available." *San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1181 (N.D. Cal. 2025); *see also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) ("[W]hen an ambiguous statute arguably prohibits certain protected speech, a reasonable fear of prosecution can provide standing for a First Amendment challenge."). So, because at least "*some*" of Plaintiffs' speech "arguably" violates the law, they have standing. *303 Creative*, 6 F.4th at 1173. Defendants cannot overcome that presumption merely by adopting an exceedingly narrow reading of the law.

*See SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 410 F. Supp. 3d 1327, 1339 (N.D. Ga. 2019).

Nor can Defendants defeat Plaintiffs' standing simply by promising not to enforce the statute unless their non-textual requirements are met. *See supra* 16. "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *West Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018) (citing *Stenberg v. Carhart*, 530 U.S. 914, 940-41 (2000)). "The First Amendment," in other words, "does not leave [Plaintiffs] at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). And a defendant's "lack of enthusiasm or initiative does not rebut the presumption 'that the government will enforce the law,'" particularly when, as here, the challenged law is a "'recent'" one. *Antonyuk*, 120 F.4th at 1016.

Finally, even if Defendants were *right* that CADA punishes misgendering or dead-naming only when it is done intentionally, repeatedly, or in a "hostile" manner, Plaintiffs would still have standing because their speech easily violates the law even on that narrow interpretation. Plaintiffs certainly do not misgender or deadname on accident; they do so on purpose because they believe biological pronouns and birth names reflect reality and because they believe it is harmful to affirm the falsehood that someone can have a gender different from their sex. Gimelshteyn Decl. ¶¶6-8; Lee Decl. ¶¶6-8; Morrell Decl. ¶¶5, 9; Leswing Decl. ¶¶6, 10; *see also* PA 765:3-10 (Division's testimony that a CADA violation can occur when someone is "intentionally deadnamed or misgendered"). When they use biologically accurate language to refer to transgender-identifying individuals, they do so

repeatedly, even after being asked to use language that reflects an individual's non-biological gender identity instead. *See* PA 101:24-103:5, 817:7-818:3, 103:18-25, 144:13-145:8, 192:19-24, 240:23-241:6; PSRA 39-41, 9:11-16, 14:1-15:23, 17:12-22, 23:14-25:7.

In discovery, the Division agreed this kind of speech violates CADA. "A reasonable person," they acknowledge, could "conclude that the intentional deadnaming of a transgender-identifying person [is] objectively hostile, intimidating, or offensive." PA 775:13-25. Even a "single instance of misgendering or deadnaming" may rise "to the level of harassment." *Id.* at 821:24-822:6; *see also id.* at 823:16-24. Their own expert agreed that transgender people usually and "reasonabl[y]" perceive such speech to be "hostile." *Id.* at 709:25-711:14. Indeed, the Division couldn't "imagine a scenario" where it *wouldn't* be "objectively hostile" to intentionally misgender or deadname "in a place of public accommodation." *Id.* at 824:25-825:17. And the "subjective" element is satisfied whenever a complainant "assert[s]" that it was. *Id.* at 767:13-768:5. In the Division's eyes, for example, someone can violate CADA by "misgendering and deadnaming individuals" in a hotel, "repeatedly" deadnaming a restaurant patron and "refer[ring] to [them] by he/him pronouns," or "repeatedly" and "purposefully" "misgendering and deadnaming … patients" in a medical practice. *Id.* at 789:15-795:15, 802:11-804:4, 805:20-807:14. Plaintiffs, who engage in exactly that kind of speech, rightly fear that CADA will be used against them.

### 3. Dr. Morrell and Dr. Leswing face a credible threat of enforcement.

Finally, Defendants make light of the chilling effect on Dr. Morrell's and Dr. Leswing's speech in their medical practices. Defendants agree that the doctors' speech may violate CADA, PA 802:11, but say any resulting chill is minimal because it is not certain

that their patients will file a charge of discrimination against them, PI.Opp. 22-26. But a "plaintiff need not demonstrate to a certainty that [they] will be prosecuted, only that [they] ha[ve] an actual and well-founded fear that the law will be enforced against [them]." *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1192 (10th Cir. 2000) (cleaned up). Dr. Morrell and Dr. Leswing plainly satisfy this standard.

Contra Defendants, it is "guaranteed" that Dr. Morrell and Dr. Leswing would dead-name and misgender patients but for H.B. 25-1312. PI.Opp. 23. Both doctors have seen and continue to see transgender patients. Morrell Decl. ¶6; Leswing Decl. ¶7. Both have misgendered and deadnamed in the past. Morrell Decl. ¶6; Leswing Decl. ¶7. And both would deadname and misgender in the future if Colorado law did not make that speech illegal. Morrell Decl. ¶¶5-12, 28; Leswing Decl. ¶¶6-14, 26; PA 56-57, 77 ¶6. Indeed, pronouns and names are common in everyday speech, and both doctors have explained that they *want* to use biologically accurate terms with transgender individuals because it is important for those who struggle with their gender identity to hear their biological sex affirmed. *See, e.g.*, Morrell Decl. ¶¶9, 17; Leswing Decl. ¶¶10, 16; PA 183:1-187:8, 188:1-190:20, 193:2-194:20, 227:9-228:7; PSRA 20:2-4, 26:9-21. Even if Dr. Morrell or Dr. Leswing wanted to avoid gendered language, that would be impossible, as they cannot treat patients *without* using pronouns and names or otherwise referencing a patient's sex. *See* PA 218:24-219:12 (explaining that, "at a certain point you're going to use pronouns and people's name in a visit"); *id.* at 215:16-216:11, 226:2-24 (similar); *id.* at 242:25-243:25 ("the biological gender is always relevant"); *Meriwether*, 992 F.3d at 499, 517 (it is "impossible" to not "use any pronouns or sex-based terms at all").

Both Dr. Morrell and Dr. Leswing, moreover, have been strongly condemned for their speech. Multiple patients of Dr. Leswing have complained to her about her use of biological pronouns and/or birth names. *See* PSRA 1-3. And at least "5-10 families have left her practice after explicitly complaining that [she] does not provide so-called gender-affirming care." PA 57; *see also* PSRA 7:3-18:23, 19:12-27:8. Dr. Morrell, who in addition to his medical practice also writes and speaks extensively on the topic of gender identity, has likewise been the target of "aggressive and threatening messages from individuals because of [his] speech." Morrell Decl. ¶23; *see also* PA 176:1-180:4, 181:19-182:23. He has been protested; activists have successfully campaigned to withdraw Continuing Medical Education accreditation for his speaking engagements; and multiple individuals have left negative Google reviews for his medical practice complaining, among other things, that he is supposedly "[n]ot a safe physician for lgbt patients." Morrell Decl. ¶23 & Ex. C; *see also* PA 199:24-200:10, 211:20-212:21.

Defendants don't deny that Dr. Morrell and Dr. Lewing have faced criticism and complaints for their views, but note that their patients have not yet filed formal charges of discrimination against them with the Division. *See* PI.Opp. 23, 25. But that is not surprising. Before H.B. 25-1312, CADA did not prohibit their speech. And since H.B. 25-1312, they have stayed silent because of the new law. *See* PA 225:24-226:1-3 ("Following 1312," Dr. Morrell is "definitely going to avoid" "us[ing] biologically appropriate pronouns and birth names with [his] patients" "for fear of the Civil Rights Commission or other lawsuits."); *id.* at 220:20-222:9 (describing "fears regarding 1312" and potential liability for his practice); *id.* at 244:19-245:18 ("Since [HB 25-1312], I've felt compelled not to use …

names or pronouns" because, "in the State of Colorado, people have been targeted for their views on trans issues."); *id.* at 246:24-247:9 ("I feel now forced to refer to [patients] androgynously … so that the family doesn't have the ability to seek punitive legal action.").

In any event, that Dr. Morrell and Dr. Leswing have not yet faced formal complaints of discrimination does nothing to diminish their fear of future enforcement. They want to misgender and deadname, which can invite negative reactions and complaints. *See* PA 643:21-644:13, 709:13-710:16, 713:3-22 (Defendants' expert explaining that transgender individuals feel mistreated and frequently object to misgendering and deadnaming); *303 Creative*, 6 F.4th at 1173 ("[Plaintiffs'] potential liability is inherent in the manner they intend to operate."). If they *had* been the target of formal complaints before, that would certainly bolster their fear of enforcement, but "such evidence is [not] *necessary* to make out an injury in fact." *Vitagliano v. County of Westchester*, 71 F.4th 130, 139 (2d Cir. 2023); *see Chiles*, 116 F.4th at 1191 (finding a credible threat of enforcement where "Colorado ha[d] never disavowed" enforcement, even though the State had "never actually enforced the" law); *Peck*, 43 F.4th at 1132-33 (same).

For good reason. If Defendants were correct that Dr. Morrell and Dr. Leswing have standing only when formal "complaints have been filed against [them]," PI.Opp. 23, then that would mean that *no one* has standing to bring a pre-enforcement challenge. Potential plaintiffs would have to wait until someone has formally accused them of discrimination. But that can't be right. "[A] plaintiff need not first expose himself to actual … prosecution to be entitled to challenge the statute." *Babbitt*, 442 U.S. at 302 (cleaned up). "[R]equiring an overt threat to enforce would run afoul of the Supreme Court's admonition" and "put

24

the challenger to the choice between abandoning his rights or risking prosecution." *Vitagliano*, 71 F.4th at 139 (cleaned up). The Constitution imposes no such dilemma.

Finally, Defendants argue that Dr. Leswing has no standing to challenge CADA's application to statements that she wishes to publish on her website expressing her opposition to the use of preferred pronouns and chosen names. Such publications would fall within CADA's scope. *See* Colo. Rev. Stat. §§24-34-601(2)(a), 24-34-701 (prohibiting publications that make an individual feel "unwelcome" or indicate that an individual will be denied equal enjoyment of a place of public accommodation). But because she considered posting them *before* H.B. 25-1312 as well, Defendants say that "any chill she purportedly incurred is the product of her own fear of controversy and not of a credible fear of enforcement under H.B. 25-1312." Pl.Opp. 24-25. Not so. While Dr. Leswing has considered posting such statements for some time, she ultimately decided against it only "after the law was passed." PA 248:6-250:3. And it only makes sense that Dr. Leswing's desire to publish these statements is greater now, "because [her] desire to publish the statement[s] is partly the product of recent events," including H.B. 25-1312's passage. *Masterpiece Cakeshop*, 445 F. Supp. 3d at 1257; *see also* PA 78-79 ¶10.

### D.    The Attorney General is a proper defendant.

Defendants raise two jurisdictional arguments unique to the Attorney General. First, they argue that Plaintiffs lack standing against him in particular because he has yet to exercise his statutory authority to file a charge of discrimination. *See* Pl.Opp. 32-33; AG.MTD 12-14. Second, they say he is protected by sovereign immunity. *See* Pl.Opp. 35-40; AG.MTD 6-12. Both arguments fail.

**1.** Plaintiffs have standing to sue the Attorney General for the same reasons they have standing to sue the Commission and Division Defendants: they want to engage in speech (including misgendering and deadnaming) that CADA (as amended by H.B. 25-1312) prohibits, and they credibly fear that Defendants will enforce the law against them. H.B. 25-1312 was passed recently, Defendants (including the Attorney General) have not disavowed enforcement, and Defendants in fact *have* used CADA to punish similar speech and conduct before. *See supra* 7-12.

The Attorney General makes just one argument in response, arguing that he has not yet exercised his statutory authority to file charges of discrimination with the Division. *See* Pl.Opp. 32; AG.MTD 13. But this response fails for two reasons. First, the Attorney General has enforced CADA in other ways. Per CADA and Commission regulations, the Attorney General prosecutes charges of discrimination on the Division's behalf at administrative hearings. *See* 3 C.C.R. 708-1:10.8(A)(3) (the "case in support of the complaint shall be presented … by the attorney general's office"); Colo. Rev. Stat. §24-34-306(8); *see also* AG.MTD 9-10 (agreeing that "lawyers employed by the Attorney General's office represent the Commission … in furtherance of its goals and interests"). The Attorney General also enforces subpoenas issued by the Division to entities accused of discrimination. *See* PA 742:6-15. Those functions show past enforcement even apart from the Attorney General's authority to file charges of discrimination. *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 757-58 (10th Cir. 2010) (performing functions "for [other] state officials upon request" and representing "state agencies" in litigation "demonstrate[s] standing to seek a preliminary injunction").

Second, the Attorney General's argument focuses entirely on a single non-dispositive factor. Although "past enforcement" is "good evidence" of future enforcement, *SBA List*, 573 U.S. at 164, it is not required it to establish standing, *see, e.g.*, *Roy*, 699 F. Supp. 3d at 1176 ("Even if this factor weighed against a finding of" a credible threat of enforcement, "that would not torpedo Plaintiff's claims."). To the contrary, as explained above, courts in this circuit regularly find a credible threat of enforcement in cases where defendants have not previously enforced the challenged law. *Supra* 8-9,24-25; *see also, e.g.*, *Chiles*, 116 F.4th at 1198; *Peck*, 43 F.4th at 1132-33; *Scott v. Hiller*, 2022 WL 4726038, at *6 (D. Colo. Oct. 3, 2022). That is because refusal to disavow *future* enforcement, rather than past enforcement itself, is usually the dispositive factor. *See Bonta*, 93 F.4th at 490 (the test "often rises or falls with the enforcing authority's willingness to disavow enforcement"). And the Attorney General has not disavowed enforcement here.

In any event, this Court does not have to tread new ground. The Tenth Circuit has already held that the Attorney General is a proper defendant in pre-enforcement challenges to CADA. *See 303 Creative*, 6 F.4th at 1175. In *303 Creative*, the Attorney General raised the same standing arguments he makes here, insisting that the plaintiffs lacked standing against him because his power to file charges of discrimination was, in his view, only a "limited enforcement authority" and he exercised that authority only "rarely." Appellee's Br. at 31, No. 19-1413 (filed Apr. 23, 2020). The Tenth Circuit rejected that argument, holding that the Attorney General's "authority to enforce CADA" by filing "'charges'" of discrimination, even if "'limited,'" made him a proper defendant. 6 F.4th at 1175; *see also* Gimelshteyn Decl. ¶22; Lee Decl. ¶22; Morrell Decl. ¶21; Leswing Decl. ¶20 (all

expressing concern that the "Attorney General … can institute investigations on [his] own, without a report"). The Commission and Division Defendants may have *greater* enforcement authority, of course, but Article III does not "limit a suit to only the most culpable defendants; rather, causation merely requires that the plaintiff's injury is 'fairly traceable' to [each] defendan[t]." 6 F.4th at 1175.

The Attorney General doesn't dispute that *303 Creative* resolved the question of standing against the Attorney General. Instead, he attacks the decision's logic, claiming that the Tenth Circuit "treated all defendants equivalently in assessing whether there was a credible threat of enforcement." PI.Opp. 32 n.5. But he's wrong: the decision evaluated standing against each defendant separately and held that "the prospect of … charges brought by the Attorney General" meant that the plaintiffs' injuries were "'fairly traceable'" to him and an injunction against him would "redress" the plaintiffs' fears. 6 F.4th at 1175.

**2.** The Attorney General's sovereign immunity argument largely rehashes his standing argument and fails for the same reasons. *See Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) ("The Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." (cleaned up)). As the Attorney General agrees, *Ex parte Young* allows lawsuits against state officers in their official capacity when the officer has "some connection with the enforcement of the challenged statute," even if he has no "special" responsibility for enforcing the law. *Free Speech Coalition v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (cleaned up). Here,

the Attorney General has the authority to enforce CADA, and he has "demonstrated" a "willingness to exercise" that authority. *Id.* (cleaned up).

Again, the Attorney General has the authority to enforce CADA in at least two ways: he can file charges of discrimination, and he prosecutes charges filed by others when those charges are set for administrative hearings. Either authority is sufficient to overcome the Attorney General's sovereign immunity. *See Edmondson*, 594 F.3d at 758, 760 (the "authority to 'initiate or appear in [an] action'" satisfies *Ex parte Young*); *Master-piece Cakeshop*, 445 F. Supp. 3d at 1253 (the Attorney General "has a duty to enforce" CADA because he "must represent the Commission at a hearing in support of the com-plaint"). The Attorney General replies that his responsibility for prosecuting charges comes only after the Commission chooses to hold a hearing in the first place, *see* AG.MTD 9-10, but duties performed "for [other] state officials upon request" still satisfy the *Ex parte Young* exception. *Edmondson*, 594 F.3d at 758, 760.

The Attorney General has also demonstrated a willingness to exercise his author-ity. He doesn't dispute that he regularly prosecutes charges of discrimination at hearings. *See Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253 ("The Attorney General has demon-strated a willingness" to "represent[t] the Commission in proceedings to enforce [CADA]," so he is "a proper defendant."). And, although he has not previously exercised his power to file a charge of discrimination on his own initiative, he has not disavowed that authority. *See Deep South Today v. Murrill*, 779 F. Supp. 3d 782, 808, 812 (M.D. La. 2025) ("[P]rior enforcement is not a requirement [for *Ex parte Young*], only that Defendants have a duty and willingness to enforce the Act, have refused to disavow enforcement, and have the

29
**2-App-261**

power to enforce the law."). Instead, he joins the Commission and Division Defendants in claiming a "compelling" interest in enforcing the law. PI.Opp. 43.

### E.      Plaintiffs' claims are ripe

Defendants conclude with a perfunctory ripeness argument. *See* PI.Opp. 33-34; CCRD.MTD 29-30; AG.MTD 12. But standing and ripeness, as Defendants acknowledge, generally "'boil down to the same question.'" PI.Opp. 34 (quoting *SBA List*, 573 U.S. at 157 n.5). And Defendants' ripeness argument merely repeats their standing argument. *Id.* (acknowledging that their "ripeness" and "standing" arguments rely on "the same rea- sons"). So it fails for all the same reasons.

"The ripeness challenge fails here because the Plaintiffs' alleged injury is already occurring." *Walker*, 450 F.3d at 1098. CADA as amended by H.B. 25-1312 currently "chills the exercise of the Plaintiffs' First Amendment rights." *Id.* Plaintiffs are subject to CADA's prohibitions on misgendering and deadnaming, *supra* 6-7, 13-17, their use of biological pronouns and birth names would violate those prohibitions, *supra* 17-21, and they credibly fear that they will be accused of discrimination—and forced through a potentially burden- some administrative process—if they engage in such speech, *supra* 7-12. "Assuming for the moment that the Plaintiffs' legal theory is correct," which we must at the motion-to- dismiss stage, this "alleged injury does not depend on any uncertain, contingent future events, and the courts would gain nothing by allowing the issues in the case to develop further. Accordingly, the controversy is ripe for adjudication." *Walker*, 450 F.3d at 1098.

### II.      The remaining factors favor a preliminary injunction.

In First Amendment cases, the likelihood of success on the merits is generally "the determinative factor." *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir.

2013). So, because Plaintiffs are likely to succeed on their constitutional claims, "the re-maining preliminary-injunction factors present little difficulty." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014).

*Irreparable Harm.* It is a "well-settled" rule that constitutional violations are always an irreparable injury. *Free the Nipple v. Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019); *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 128 (10th Cir. 2024) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."). And Plaintiffs are likely to succeed on their First and Four-teenth Amendment claims (which, again, Defendants do not dispute), so they have es-tablished irreparable harm as well. *See Free the Nipple*, 916 F.3d at 806 (these inquiries "collaps[e]" together for "constitutional claims").

Defendants' irreparable harm arguments largely repackage their standing argu-ments, which, as explained above, are without merit. To start, Defendants accuse Plain-tiffs of "delay," PI.Opp. 41, but Plaintiffs filed this lawsuit as quickly as possible: just one business day after H.B. 25-1312 was signed into law. To circumvent that straightforward conclusion, Defendants suggest that Plaintiffs could have sought an earlier injunction against one of the Commission's harassment regulations, which the Division interprets to prohibit some instances of misgendering and deadnaming. *See* 3 C.C.R. 708-1:81.6. But that argument fails for at least three reasons.

First, the regulation has a different scope than H.B. 25-1312. It covers "harass-ment" specifically and punishes only "severe or pervasive conduct that creates an envi-ronment that is subjectively and objectively hostile, intimidating, or offensive," *id.*; *cf.*

31
2-App-263

*Adefila v. Select Specialty Hospital*, 28 F. Supp. 3d 517, 525 (M.D.N.C. 2014) ("'the se-vere or pervasive test'" is a "'high bar'"), it has an exhaustion requirement forcing ag-grieved parties to "take advantage" of the offending entity's "remedial measures" before filing a complaint with the Division, 3 C.C.R. 708-1:81.6(B), and the Division has never relied on the regulation as a basis for liability outside of the employment context, *see* PA 780:19-784:3, 785:14-786:9; PRA 101-10, 115-24. By contrast, H.B. 25-1312 dramati-cally expanded CADA to prohibit not just severe or pervasive harassment but *all* refusals to use someone's "chosen name" or other terms by which they "choos[e] to be ad-dressed." Colo. Rev. Stat. §24-34-301(9); PA 788:12-19 (Division's agreement that "har-assment" is just one "type of discrimination that can occur under CADA"). It also has no exhaustion requirement and covers public accommodations in addition to employers. *See* Colo. Rev. Stat. §24-34-601. As the Division says, the regulation and CADA are "two different" things. PA 760:9-13; *see also id.* at 772:21-773:2 (agreeing that the regulation's extra requirements are "not in the Colorado Anti-Discrimination Act"). And whatever the regulations say, Defendants are "charged with enforcing CADA." *Id.* at 808:18-20.

Second, given the considerable "public interest" surrounding H.B. 25-1312's re-cent passage, it is "not difficult to find it likely" that members of the public will be eager to enforce it. *Masterpiece Cakeshop*, 445 F. Supp. 3d at 1256. And third, even assuming Plaintiffs could have sought relief sooner, "'tardiness is not particularly probative in the context of ongoing, worsening injuries" like chilled speech. *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). "Each instance in which" Plaintiffs "restrain" their "speech contribute[s] to the constitutional injury [they] suffer." *Id.* An injunction, no matter how late

in the day, will prevent that injury from compounding further. That is why "'courts are loath to withhold relief solely on th[e] ground'" of "'delay.'" *Id.* (emphasis omitted).

Defendants also dismiss Plaintiffs' allegations of chilled speech as "hypothetical." Pl.Opp. 42. But the record shows that Plaintiffs' speech rights are being injured *right now*. They have all been forced to "chang[e] their practices" out of fear that they will be punished for nonconforming speech. *Contra* Pl.Opp. 42. For example, Erin Lee and Lori Gimelshteyn (the executive directors of PKC and CPAN, respectively) "often speak about" specific transgender individuals at their events and feel it is "really important" to use biologically accurate language when discussing them. PA 164:9-10; *see also id.* at 120:21-23, 94:25-95:2, 96:22-97:8, 98:10-13. Before H.B. 25-1312, they "felt comfortable" doing so. *Id.* at 166:15-20; *see also id.* at 112:8-17. But since H.B. 25-1312 was passed, Ms. Lee and Ms. Gimelshteyn have been forced to "do mental gymnastics" to "avoid using [the] names" of those individuals or referring to them with gendered language. *Id.* at 163:16-165:5; *see also id.* at 113:1-114:15. CPAN, moreover, has cancelled at least one event for fear of running afoul of the law. *See id.* at 72-72 ¶¶5-9, 89:14-90:11.

Dr. Morrell and Dr. Leswing likewise now feel compelled to address patients using gender-neutral language where they would normally use (and would prefer to keep using) biological pronouns. *See supra* 22-23; PA 191:15-18, 209:15 ("[P]rior to … 1312, it was typical for me to" use "biological pronouns."); *id.* at 244:19-247:9, 251:714 ("I feel now forced to refer to [patients] androgynously … so that the family doesn't have the ability to seek punitive legal action."). And Dr. Leswing has avoided posting statements about her beliefs on her website, not because she is worried about "provoking controversy in her

community," *contra* PI.Opp. 42, but because she is worried that posting controversial statements about gender identity will cause "people who disagree" with her to get "upset" and potentially report her for discrimination, PA 78-79 ¶10, 248:11-23; Leswing Decl. ¶24.

Plaintiffs' fears are justified. Though Defendants claim "the Division has not found probable cause in any case based on misgendering and deadnaming," PI.Opp. 42, the record shows otherwise. Even under the heightened "harassment" standard embodied in the Commission's existing regulations, the Division has found probable cause in at least two cases based solely on misgendering or deadnaming. *See supra* 10; PRA 2-3 ¶3 (acknowledging a finding of probable cause for alleged misgendering and/or deadnaming).

***Balance of Harms and the Public Interest.*** As with irreparable harm, that Plaintiffs' constitutional rights are being violated tips the remaining factors in Plaintiffs' favor. "[E]ven a temporary loss" of constitutional rights outweighs any harm that a preliminary injunction might cause to a defendant. *Free the Nipple*, 916 F.3d at 806. And it is "'always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* at 807.

Defendants complain that the requested injunction would create a "draconian limitation on antidiscrimination enforcement." PI.Opp. 43. Not so. The Constitution does not force Colorado—or this Court—to decide between violating Plaintiffs' constitutional rights and allowing discrimination to run rampant in Colorado. Instead, the Court can take the much more constitutionally sound path and enter an injunction that bars Defendants from enforcing CADA in a manner that violates Plaintiffs' First and Fourteenth Amendment rights while allowing them to enforce the law to prohibit *actual* denials of service. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019) ("[T]he government

34
2-App-266

may prohibit 'the *act* of discriminating against individuals in the provision of publicly available goods, privileges, and services,'" but it may not "'declare another's speech itself to be a public accommodation.'" (cleaned up)). The State's general interest in "'eliminating discrimination'" does not entitle it to run roughshod over Plaintiffs' constitutional rights. *See Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen the law [at issue] is likely unconstitutional," there is no state interest that outweighs a plaintiff's interest "in having [their] constitutional rights protected.").

Defendants also claim a special interest in punishing the use of biological pronouns and birth names because, they say, transgender individuals take great offense at misgendering and deadnaming and face a greater risk of emotional harm as a result. *See* PI.Opp. 43-44. But this contention suffers from the same flaw: *no* state interest justifies applying an unconstitutional law in a manner that violates Coloradans' speech rights, *Awad*, 670 F.3d at 1131, and a "heckler's veto" definitely doesn't justify it, *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) (The State "cannot justify" speech restrictions "simply because some members of the public find plaintiffs' speech offensive."). It also relies on a faulty premise: The studies cited by Defendants and their expert fail to establish any causal relationship between misgendering or deadnaming and negative mental health outcomes. *See, e.g.*, PA 668:8-25 ("it is … true to say they did not prove causal associations"); *see also id.* at 684:18-23, 690:5-18, 692:14-18, 695:4-13. In fact, many of those studies found *no* connection—causal or otherwise—between misgendering and deadnaming and more serious health consequences like suicide. *See, e.g., id.* at 666:6-13, 667:19-23, 677:6-680:1, 108:15-21. More to the point, Defendants do not cite

35
**2-App-267**

any study that specifically evaluates the effect that misgendering and deadnaming in places of public accommodation has on health outcomes for transgender individuals. *See id.* at 703:6-706:11. But that is the only speech at issue here.

On the other hand, if Defendants are correct that transgender individuals find misgendering and deadnaming to be a uniquely upsetting experience, then that shows why Plaintiffs need a preliminary injunction. If transgender individuals generally perceive misgendering and deadnaming to be "hostile" and "discriminatory" and that reaction is "reasonable," then they are likely to file complaints against those, like Plaintiffs, who use such speech. *Id.* at 643:21-644:13, 709:13-710:16, 713:3-22; *see also supra* 12, 21.

## III.   A preliminary injunction is appropriate here.

Sensing the weakness of their arguments on the merits *and* standing, Defendants try a series of grab-bag arguments challenging the supposedly "broad" nature of Plaintiffs' requested relief. PI.Opp. 44-45; *see also id.* at 16-17. All of those objections fail.

### A.   The requested injunction is appropriately tailored.

First, Defendants challenge the scope of the requested relief. They oppose an injunction that would provide relief for any member of Defending Education or Do No Harm beyond those named in the complaint. PI.Opp. 45. But Defendants unsurprisingly cite no law to support this argument. When an association seeks relief on behalf of its members, as Defending Education and Do No Harm do here, the "traditional approach" is to afford "preliminary injunctive relief to" all "the members of [the] plaintiff organizations." *Kansas v. DOE*, 739 F. Supp. 3d 902, 934 (D. Kan. 2024) (cleaned up); *see id.* at 934-35 (granting a "broad" preliminary injunction to associations "with members all over the country"). Defendants correctly note that Plaintiffs' complaint "only presents facts regarding the named

Plaintiffs," PI.Opp. 45, but that's how associational standing is *supposed* to work: "[I]f even one member of the association would have had standing to sue in his or her own right, that is sufficient" for all members to secure relief. *Utah Ass'n of Counties. v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006).

Defendants also invoke the Supreme Court's recent decision in *Trump v. CASA*, which held that federal courts lack the authority to impose so-called "universal injunctions" that prohibit enforcing the law "against *anyone*, anywhere." 606 U.S. 831, 837 n.1 (2025). The decision clarified, however, that federal courts do have the authority to enter—and *should* enter—injunctions that "provide complete relief to each plaintiff with standing to sue." *Id.* at 861. And as courts that have evaluated preliminary-injunction requests after *CASA* have explained, providing complete relief to plaintiffs may in some cases require injunctions that "control in a statewide fashion." *Jackson Federation of Teachers. v. Fitch*, 799 F.Supp.3d 571, 585 (S.D. Miss. 2025). First Amendment overbreadth challenges like this one, for instance, require enjoining "*all* enforcement" to avert harms to "society as a whole." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

Even if a statewide injunction is inappropriate here, Plaintiffs are entitled to a preliminary injunction that protects at least the named Plaintiffs and the Plaintiff associations' members. *See* Compl. (Dkt.1) at 56-57 (requesting, in part, a "preliminary … injunction barring Defendants from enforcing" CADA "as applied" to Plaintiffs' speech).

**B.    The requested injunction is not disfavored.**

Next, Colorado says the requested injunction is "disfavored" because it would "up-set the existing status quo" and give Plaintiffs "all the relief they could recover after a full trial on the merits." Pl.Opp. 16-17. Not so.

The "status quo" is a "tricky metric," *United States v. Texas*, 144 S. Ct. 797, 798 n.2 (2024), and it is impossible to apply "in a principled way across all cases," *Labrador v. Poe*, 144 S. Ct. 921, 931 (2024) (Kavanaugh, J., concurring). That's why courts do not apply a "blanket rule of 'preserving the status quo.'" *Id.* Instead, the "essential factor" for a preliminary injunction is "likelihood of success on the merits," where Plaintiffs clearly prevail. *Id.*; *see also United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Regional Transit Authority*, 163 F.3d 341, 348 (6th Cir. 1998) ("'[T]he focus always must be on prevention of injury …, not merely on preservation of the status quo.'").

But if the status quo does matter, it favors Plaintiffs, not Defendants. Properly understood, the "status quo" is "'the last peaceable uncontested status existing between the parties before the dispute developed.'" *Free the Nipple*, 916 F.3d at 798 n.3. And this dispute developed when Colorado passed H.B. 25-1312, amending CADA to prohibit constitutionally protected speech (including the use of biological pronouns and birth names) in which Plaintiffs had previously engaged and want to continue engaging. *See supra* 6-7, 31-33. The relevant status quo is therefore "the status existing *before* [Colorado] enacted" H.B. 25-1312. *Free the Nipple*, 916 F.3d at 798 n.3. Defendants respond (again) that, although H.B. 25-1312 is new, the Commission's harassment regulation already prohibited some forms of misgendering and deadnaming and the challenged "'unwelcome'

provisions" have been part of CADA for years. *See* PI.Opp. 16. But that response (again) fails: H.B. 25-1312 expanded CADA to punish *all* refusals to use someone's "chosen name" or other forms of "addres[s]," Colo. Rev. Stat. §24-34-301(9), stretching liability far beyond the more limited category of speech implicated by the harassment regulation and adding to the kind of speech that can violate the Unwelcome Provisions. *See supra* 31-32; PI.Mot. 6, 22-25. Simply put, H.B. 25-1312 changed the game.

The requested injunction also would not give Plaintiffs "all the relief" that a full trial would give them. *Contra* PI.Opp. 17. A "preliminary injunction falls into the all-the-relief category only if its effect, once complied with, cannot be undone." *Free the Nipple*, 916 F.3d at 798 n.3 (cleaned up). That is not the case here. If Plaintiffs "lose on the merits after a trial," then the Court can "put the toothpaste back in the tube" by lifting the injunction and allowing Colorado to "fully enforce its" laws. *Id.*

## IV.   Defendants' motions to dismiss fail for the same reasons.

Defendants also filed two motions to dismiss. *See* Dkts. 81, 82. But those motions just repeat—largely verbatim—the same standing, ripeness, and sovereign-immunity arguments that Defendants make in their preliminary-injunction opposition. The motions to dismiss should be denied for all the reasons explained above.

If anything, Defendants' jurisdictional arguments are even *weaker* for their motions to dismiss. "[T]he manner and degree of evidence required" to establish standing varies "at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And the threshold for standing is lower at the motion-to-dismiss stage than at the preliminary-injunction stage. *See, e.g.*, *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 113-

14 (2d Cir. 2025) ("The burden for establishing standing at the dismissal stage is lower" than the "burden for establishing Article III standing for the purposes of a motion for a preliminary injunction."); *Action NC v. Strach*, 216 F. Supp. 3d 597, 628 (M.D.N.C. 2016) ("[T]he standard for determining whether Article III standing exists at the preliminary injunction stage carries a higher burden" than the "motion to dismiss stage.").

In other words, because Plaintiffs' likelihood of standing is sufficient to satisfy the requirements for "entry of a preliminary injunction," it is *necessarily* "sufficient to survive a motion to dismiss." *Spicer v. Biden*, 2022 WL 2663823, at *1 (D.D.C. July 11, 2022); *see also Principle Homecare, LLC v. McDonald*, 2025 WL 622876, at *17 (S.D.N.Y. Feb. 26, 2025); *Taylor v. Siegelman*, 230 F. Supp. 2d 1284, 1288 n.7 (N.D. Ala. 2002).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and deny Defendants' motions to dismiss.


Dated: February 11, 2026                Respectfully submitted,

                                        */s/ J. Michael Connolly*
                                        J. Michael Connolly
                                        Cameron T. Norris
                                        Paul R. Draper
                                        CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Suite 700
                                        Arlington, VA 22209
                                        (703) 243-9423
                                        mike@consovoymccarthy.com
                                        cam@consovoymccarthy.com
                                        paul@consovoymccarthy.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 11, 2026, I e-filed the foregoing brief with the Clerk of the

Court using the Court's ECF system., which will email everyone requiring notice.

/s/ *J. Michael Connolly*
Counsel for Plaintiffs