No. 26-1101

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## APPELLANTS' APPENDIX VOLUME III

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

| Document | ECF No. | App. Page |
|---|---|---|
| District Court Docket | N/A | 1-App-1 |
| First Amended Complaint | 25 | 1-App-15 |
| Plaintiffs' Amended Motion for Preliminary Injunction | 27 | 1-App-81 |
| Exhibit to Amended Preliminary Injunction Motion: Sarah Perry Declaration | 27-1 | 1-App-114 |
| Exhibit to Amended Preliminary Injunction Motion: Lori Gimelshteyn Declaration | 27-2 | 1-App-118 |
| Exhibit to Amended Preliminary Injunction Motion: Erin Lee Declaration | 27-3 | 1-App-140 |
| Exhibit to Amended Preliminary Injunction Motion: Kristina Rasmussen Declaration | 27-4 | 1-App-161 |
| Exhibit to Amended Preliminary Injunction Motion: Travis Morrell Declaration | 27-5 | 1-App-165 |
| Exhibit to Amended Preliminary Injunction Motion: Valeri Leswing Declaration | 27-6 | 1-App-182 |
| Defendants' Motion for Discovery | 31 | 1-App-193 |
| Exhibit A to Defendants' Motion for Discovery: Defendants' Discovery Requests | 31-1 | 1-App-209 |
| Exhibit B to Defendants' Motion for Discovery: Defendants' Proposed Deposition Topics | 31-2 | 1-App-218 |
| Plaintiff's Opposition to Defendant's Motion for an Extension of Time | 32 | 1-App-220 |
| Joint Motion to Adopt a Scheduling Order | 43 | 1-App-230 |
| Defendants' Consolidated Opposition to Motions for Preliminary Injunction | 85 | 1-App-236 |

## VOLUME II

Excerpts of Appendix to Defendants'
Consolidated Opposition to Motions
for Preliminary Injunction ..................................................... 85-1    2-App-1

Plaintiffs' Brief in Support of Motion for Preliminary
Injunction and in Opposition to Defendants' Motions
to Dismiss ................................................................................ 98    2-App-226

## VOLUME III

Excerpts of Appendix to Plaintiffs' Brief in Support
of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................ 98-1    3-App-1

## VOLUME IV

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ........................... 98-1    4-App-1

## VOLUME V

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ........................... 98-1    5-App-1

Courtroom Minutes for Preliminary Injunction
Motion Hearing Held on Feb. 19, 2026 and
Recommendation of United States Magistrate Judge ....................... 101    5-App-21

Plaintiffs' Objections to Recommendation of United
States Magistrate Judge ............................................................ 110    5-App-24

Exhibit A: Preliminary Injunction Hearing Transcript .................. 110-1    5-App-39

Defendants' Response to Objections to Recommendation
of United States Magistrate Judge ............................................. 112    5-App-136

Order Adopting Recommendation of United
States Magistrate Judge and Denying Motion
for Preliminary Injunction ....................................................... 115    5-App-149

Notice of Appeal ...................................................................... 118    5-App-173

Recommendation of United States Magistrate Judge
on Defendants' Motions to Dismiss ........................................... 125    5-App-175

## **VOLUME VI (SEALED)**

Sealed Appendix to Plaintiffs' Replies in Support
of their Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss....................................99    6-App-1

## **VOLUME VII (SEALED)**

Second Restricted Appendix to Plaintiffs' Motion
for Preliminary Injunction and in Opposition
to Defendants' Motion to Dismiss........................................................ 100    7-App-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*,<br><br>    *Plaintiffs*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-01572-RMR-MDB |
| COMMITTEE OF FIVE, INC., d/b/a XX-XY ATHLETICS,<br><br>    *Plaintiff*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-01668-RMR-MDB |
| DOXA ENTERPRISES, LTD. d/b/a BORN AGAIN USED BOOKS,<br><br>    *Plaintiff*,<br><br>vs.<br><br>AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:25-cv-02177-RMR-MDB |

**APPENDIX TO PLAINTIFFS' REPLIES IN SUPPORT OF THEIR MOTIONS FOR
PRELIMINARY INJUNCTION AND RESPONSES IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**Document**

**Page No.**

**Specific to *Defending Education***

Division and Commission Defendants' Responses to Defending Education Plaintiffs' First Set of Interrogatories .................................................................... 1

Defending Education Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories ................................................................................ 14

Supplemental Declaration of Lori Gimelshteyn .................................................. 71

Second Supplemental Declaration of Dr. Valeri Leswing ................................... 76

Excerpts of Deposition of Lori Gimelshteyn ...................................................... 81

Excerpts of Deposition of Erin Lee .................................................................... 115

Excerpts of Deposition of Travis Morrell, M.D .................................................. 172

Excerpts of Deposition of Valeri Leswing, D.O. ............................................... 236

CPAN Complaint ................................................................................................ 252

Morrell Complaints ............................................................................................ 253

PKC Complaints ................................................................................................ 258

CPAN April 7, 2024 Event Contract .................................................................. 268

CPAN September 19, 2025 Event Contract ....................................................... 273

PKC January 21, 2025 Event Contract .............................................................. 284

CPAN Educate & Inform Presentation ............................................................... 286

PKC Art Club Presentation ................................................................................ 310

Defending Education Plaintiffs' Video Links ...................................................... 331

**Specific to *XX-XY Athletics***

Division and Commission Defendants' First Supplemental Responses to XX-XY Athletics' First Set of Interrogatories and Requests for Production ............ 332

XX-XY Athletics' Supplemental Responses to CCRD and Commission Defendants' First Set of Written Discovery Requests ....................................... 345

XX-XY Athletics Document Production .............................................................. 364

Excerpts of 30(b)(6) Deposition of XX-XY Athletics (Jennifer Sey) ................. 454

**Specific to *Born Again Used Books***

Division and Commission Defendants' Responses to Born Again Plaintiff's First Set of Interrogatories and Requests for Production .................................. 500

Born Again Plaintiff's Responses to CCRD and Commission Defendants' First Set of Written Discovery Requests .......................................................... 517

Excerpts of 30(b)(6) Deposition of Born Again Used Books (Eric Smith) ........ 527

**Pertaining to all cases**

Supplemental Declaration of Aubrey Sullivan ................................................... 550
CCRD Public Accommodation Discrimination 101 Presentation...................... 554
CCRD Sexual Orientation, Gender Identity, and Gender Expression
Discrimination ................................................................................................ 602
Excerpts of Deposition of Ilan Meyer, Ph.D. ................................................... 634
Excerpts of 30(b)(6) Deposition of Colorado Civil Rights Division (Aubrey
Sullivan) .......................................................................................................... 733

Confidential – Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-MDB

DEFENDING EDUCATION, et al.,

Plaintiffs,

v.

AUBREY C. SULLIVAN, et al.,

Defendants.

---

### DIVISION AND COMMISSION DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

---

Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis, in their official capacities (the "Division and Commission Defendants") hereby provide their responses to Plaintiffs' First Set of Interrogatories.

### INTERROGATORIES

1. Identify and describe all final actions concerning 3 C.C.R. §708-1, Rule 81.6(A)(4) since 2009, including (a) the charging party(ies) and the respondent(s); (b) the alleged aggrieved party(ies); (c) the allegations or findings concerning the "misus[e] [of] an individual's preferred name, form of address, or gender-related pronoun"; and (d) the final disposition, including any measures the respondent(s) agreed or were ordered to take or any act or practice the respondent(s) agreed or were ordered to cease.

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request seeks information or documents which may not be disclosed pursuant to C.R.S. § 24-34-306(3). Consistent with C.R.S. § 24-34-306(3) and the December 5, 2025 email from Janna Fischer to Plaintiffs' counsel, Division and Commission Defendants will exclude information identifying any charging parties and/or aggrieved

1

Case No. 1:25-cv-01572-RMR-MDB    Document 98-1    filed 02/11/26    USDC Colorado
pg 5 of 82B
Confidential – Subject to Protective Order
Appellate Case: 26-1101    Document: 19-3    Date Filed: 06/08/2026    Page: 9

parties and respondents. Division and Commission Defendants further object to the extent to this request as unduly burdensome as asking to "identify and describe" "all final actions" "since 2009." Division and Commission's case management system, CaseConnect, includes case information and/or case documents dated 2016 and later.

**RESPONSE**: Subject to Division and Commission's objections, in the attached Exhibit A, Division and Commission Defendants describe actions against places of public accommodations that included allegations of "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." Pursuant to Federal Rule of Civil Procedure 33(d), Division and Commission Defendants further identify cases involving such allegations in the context of places of public accommodation (CCRD003847-3978), housing (CCRD003734-3846), and employment (CCRD003324-3733).

2.    Explain whether Plaintiffs' desired speech, as outlined in their declarations, *see* Dkt.27-2 ¶¶12-18; Dkt.27-3 ¶¶12-18; Dkt.27-5 ¶¶6-16; Dkt.27-6 ¶¶7-15, violates the Colorado Anti-Discrimination Act and its implementing regulations. If Defendants cannot provide a definitive answer, then explain why they cannot do so and provide the framework and factors that would need to be considered in order to make such a determination.[1]

**OBJECTIONS**: Division and Commission Defendants object to the extent that this request calls for a legal conclusion. Division and Commission Defendants further object to the extent that this request is compound.

**RESPONSE**: Subject Division and Commission Defendants' objections, the speech at issue raised by Plaintiffs describes (1) interactions and/or verbal statements in which individuals are misgendered and/or deadnamed, *see* Dkt.27-2 ¶¶12-14 (CPAN's statements and interactions at events); Dkt.27-3 ¶¶12-14 (PKC statements and interactions at events); Dkt.27-5 ¶¶6-12 (Dr. Morrell, interactions with patients); *id.*

---

[1] Via a December 9, 2025 email from Plaintiffs' counsel Michael Connolly, Plaintiffs provided this interrogatory in lieu of the one served November 26, 2025.

2

**2**

Case No. 1:25-cv-01572-RMR-MDB    Document 98-1    filed 02/11/26    USDC Colorado
pg 6 of 82B
Confidential – Subject to Protective Order

¶14-15 (Dr. Morrell, statements at events); Dkt.27-6 ¶¶7-13 (Dr. Leswing, interactions with patients); and (2) publications in which individuals are misgendered and/or deadnamed.  *See* Dkt.27-2 ¶¶15-18 (CPAN publications); Dkt.27-3 ¶¶15-18 (PKC publications); Dkt.27-5 ¶ 16 (Dr. Morrell, publications); Dkt.27-6 ¶¶14-15 (Dr. Leswing, publications). This response addresses each category of speech separately, first outlining the framework and then applying it to each Plaintiff.

**Interactions with Individuals**

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not found probable cause in any public accommodations case solely based upon a respondent place of public accommodation's failure to use an individual's chosen name and/or how the individual chooses to be addressed. Moreover, the complaints based on gender identity and/or gender expression that the Division has received and refer to statements made by employees have often alleged additional conduct. *See, e.g.*, Sullivan Suppl. Decl. Ex. A. The same holds true for complaints based on an employee of a place of public accommodation making verbal statements directed at an individual's race, religion, or any other protected trait in that they generally allege additional conduct. *See, e.g.*, CCRD1268-1298 (

); CCRD402-436 (

); CCRD1403-1565 (

Confidential – Subject to Protective Order

████████████████████████████). The lack of complaints based on verbal statements alone highlights the difficulty of speculating about purely hypothetical propositions.

In general, a violation of C.R.S.§ 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation" requires three findings. First, the public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status (this means, for example, that this threshold requirement is not met in cases of accidental misgendering or accidental deadnaming because they do not involve the intentional choice to treat the individual differently based on gender identity). Second, the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity. Third, the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity. All three steps must be satisfied to establish a CADA violation—and the same analysis would apply to any complaint that a public accommodation's interactions with a customer and directed to that customer's protected class status denied that individual the full and equal enjoyment of the goods, services, facilities, privileges,

4

Case No. 1:25-cv-01572-RMR-MDB    Document 98-1    filed 02/11/26    USDC Colorado
Confidential – Subject to Protective Order
pg 8 of 82B
Appellate Case: 26-1101    Document: 19-3    Date Filed: 06/08/2026    Page: 12

advantages, or accommodations of the place of public accommodation.

To the extent the Division received a Complaint based on a public accommodation's failure to use an individual's chosen name and/or pronouns matching gender identity, the Division would be guided by its Intake & Investigations Manual, as well as the regulations governing CADA. The Intake & Investigations Manual provides that public accommodation violations occur when an individual "is denied 'full and equal enjoyment of a place of public accommodation.' This may include restricted access, harassing treatment, differential pricing, the posting or publishing discriminatory material, and more." Manual, at 11. Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment. Titled "Sexual Orientation Harassment," 3 CCR 708-1-81.6 provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
> (1) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;
>
> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, intentional misgendering or deadnaming must rise to the

5

Confidential – Subject to Protective Order

level of harassment to deny that individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation—i.e., it must create a hostile environment on the basis of sexual orientation.

This framework reflects that not every incidence of intentional misgendering or deadnaming amounts to harassment on the basis of gender identity. In other words, a place of public accommodation's failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed, by itself, is not *per se* unlawful discrimination under CADA. Any analysis would need to consider the full circumstances of the interaction between the customer and the place of public accommodation to determine whether a reasonable person, under the circumstances experienced by the complainant, would experience the interaction as harassment and/or would otherwise experience the full course of conduct as denying them full and equal enjoyment of the place of public accommodation's goods, services, facilities, privileges, advantages, or accommodations based on their gender identity. Relevant circumstances may include, for example:

1. The social context in which the conduct occurred;
2. Whether the conduct included indicia that the use was malicious, ill-willed, derogatory, insulting, demeaning, abusive, pejorative; or disparaging;
3. The frequency of the conduct with respect to the individual complainant;
4. Whether the conduct was severe or pervasive;
5. Whether the complainant asked the place of public accommodation to start or stop the alleged conduct (here, use of pronouns, names, or gendered language that is different from how the individual wants to be referred to), and how the place of public accommodation responded to such requests;
6. Whether the conduct caused a person to leave the place of public accommodation without making a purchase or enjoying the privileges, benefits, or advantages of the place of public accommodation which they had intended to use;
7. Whether the conduct caused a person to not attempt to patronize a place of public accommodation because of their protected trait(s);

Confidential – Subject to Protective Order

8. Whether the conduct occurred in the context of other potentially discriminatory conduct, such as an actual denial of service or the use of slurs or epithets targeting a complainant's protected trait(s);

9. Whether the place of public accommodation expressed a preference not to serve certain individuals or groups of individuals because of those individuals' protected traits; and

10. Whether the place of public accommodation had a history of discriminatory conduct.

Turning to application of this framework, CPAN, PKC, and Dr. Morrell when speaking in his personal capacity and outside this medical practice, are not "places of public accommodation." They do not offer any good, service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions. None is a "place of business offering services or products to the public, such as restaurants, hotels, libraries, schools, hospitals, bars, etc." Manual, at 55 (citing C.R.S. § 24-34-601(1)). Specifically:

- Colorado Parent Advocacy Network (CPAN) is a 501(c)(4) organization that "advocates for educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." *DE* Action, ECF No. 25, Am. Compl. ¶ 52; *see also DE* Action, ECF No. 27-2, Gimelshteyn Decl. ¶ 4 (describing CPAN as a "social advocacy organization organized under Colorado law"). CPAN advocates through "network- and coalition-building; investigative reporting; engagement on local, state, and national policies; disclosure of harmful local and statewide school policies; public education efforts including summits and information resources; direct support for families navigating complex systems; strategic communications and media outreach; advocacy, and, if necessary, litigation." *DE* Action, ECF No. 25, Am. Compl. ¶ 52.

- Protect Kids Colorado (PKC) is a "grassroots, 501(c)(4) organization devoted to protecting kids and strengthening families in Colorado." *DE* Action, ECF No. 25, Am. Compl. ¶ 75. PKC's activities include "coalition-building; advocacy; petitions and ballot initiatives; engagement on local, state, and national policies;

Confidential – Subject to Protective Order

educational campaigns; and, if necessary, litigation." *Id*.

CPAN and PKC are not places of public accommodation because these entities do not offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, "coalition-building," or the other advocacy efforts identified by those Plaintiffs. And although they have held events at locations that are places of public accommodations (such as hotels and restaurants), they were simply customers and/or users of those spaces, not offering goods or services of those places. Further, Dr. Morrell does not offer any good, service, facility, privilege, advantage, or accommodation to the general public when he engages in public speaking, publications, or social media activities unrelated to his provision of health care services through his medical practice.

As to Drs. Morrell's and Leswing's interactions and statements within their medical practice regarding patients, there is insufficient information to answer this interrogatory, as the interrogatory does not describe the interactions with the patients in any detail or provide any other facts that would enable the Division and Commission Defendants to determine whether the facts amount to a violation of C.R.S. § 24-34-601(2)(a)'s provision providing that "[i]t is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, gender identity, gender expression, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation."

**Publications**

The Division does not seek out violations or solicit charges from prospective complainants. As a result and as a practical matter, the Division would not analyze the

Confidential – Subject to Protective Order

publications without receiving a complaint that includes an assertion by the complainant that the statement at issue communicates that the complainant would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

The Division analyzes all charges of discrimination in a consistent and standard manner, regardless of protected class status, as outlined by C.R.S. § 24-34-306. The Division further builds off its knowledge base as it analyzes charges that raise similar allegations as prior cases. The Division has not received any complaints of discrimination based on a place of public accommodation's written communication regarding a failure to use an individual's chosen name and/or how the individual chooses to be addressed. In general, however, a written communication that expressly announces plans to deny full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation would violate these provisions. For example, a sign stating "Whites Only" would violate CADA because it states that certain persons will be denied service based on race and/or that they are unwelcome, objectionable, unacceptable or undesirable at the place of public accommodation because of their race.

In reviewing a complaint based on the Policy, the Division would be guided by the Intake and Investigations Manual, which provides as follows:

> To prevail on a claim of discriminatory communication of a refusal to provide the full and equal enjoyment of goods, services, benefits or privileges of a place of public accommodation, the evidence must show:
>
> (1) the Respondent is a place of public accommodation;

**9**

(2) the Respondent directly or indirectly published, circulated, issued, displayed, posted or mailed a written, electronic or printed communication notice or advertisement;

(3) the notice or advertisement indicated that the full and equal enjoyment of goods, services, benefits or privileges provided by Respondent will be refused, withheld from or denied to a person or persons based on their protected class;
or

(4) the notice or advertisement indicated that the presence of a person or persons of a protected class is unwelcome, objectionable, unacceptable or undesirable at the Respondent's place of public accommodation.

Manual at 77.

These inquiries, and in particular (3) and (4), are viewed objectively. In other words, from the perspective of a reasonable person in the complainant's circumstances, the notice or advertisement must communicate that they would be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on a protected trait, or that their patronage or presence at a place of public accommodation would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait.

Applying this framework, CPAN, PKC, and Dr. Morrell when speaking in his personal capacity and outside his medical practice, are not "places of public accommodation" as described above. As to the written statements of the other Plaintiffs, the written statements do not state an intent to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any Plaintiff based on a protected trait or that their patronage or presence would be unwelcome, objectionable, unacceptable, or undesirable because of a protected trait. The written statements do not state, for example, that transgender individuals are not

10

Confidential – Subject to Protective Order

welcome, that transgender individuals cannot purchase certain goods or receive certain services, or that transgender individuals will be charged more for goods or services.

Misgendering and deadnaming are not *per se* CADA violations—whether or when such conduct would violate CADA instead depends on context. Highlighting the fact-intensive nature of whether refusing to use an individuals' chosen name or pronouns, 3 CCR 708-1-81.6, titled "Sexual Orientation Harassment," provides:

> Unlawful harassment is conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation. Prohibited conduct includes, but is not limited to, the following:
>
> (1) Asking unwelcome personal questions about an individual's sexual orientation;
>
> (2) Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation;
>
> (3) Using offensive names or terminology regarding an individual's sexual orientation;
>
> (4) Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun; or
>
> (5) Harassing, subjecting to differential treatment, discharging, demoting, or denying promotion opportunities or employment benefits to an individual because of open discussion or other communication or presentation related to an individual's gender expression, gender identity, or sexual orientation.

As provided in the regulation, "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" reflects the accommodation's intentionally different treatment of individuals based on protected class status, but to be actionable, such misuse must rise to the level of harassment, i.e., it must create a hostile environment on the basis of sexual orientation, gender identity, gender expression, or other protected class status.

Although the publications may suggest and/or state an intent to treat individuals

11

differently based on gender identity, the publications do not establish that their

application will create an environment that is subjectively and objectively hostile to

individuals based on their gender identity. As a result, the publications, standing alone,

do not violate the various CADA provisions directed to written communications. Whether

any Plaintiff ultimately interacts with individual based on those publications and whether

such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would

depend on the specific facts of the interaction.


       Respectfully submitted this 23rd day of December, 2025.


       PHILIP J. WEISER
       Attorney General

       For Defendants Aubrey C. Sullivan, Sergio
       Cordova, Geta Asfaw, Mayuko Fieweger, Daniel
       S. Ward, Jade R. Kelly and Eric Artis:

       *s/ Nora Q.E. Passamaneck*
       Nora Q.E. Passamaneck
       Senior Assistant Attorney General
       Helen Norton
       Deputy Solicitor General
       Janna K. Fischer
       Senior Assistant Attorney General
       Dominick D. Schumacher
       Assistant Attorney General
       1300 Broadway, 10th Floor
       Denver, CO 80203
       Telephone: (720) 508-6000
       FAX: (720) 508-6032

Confidential – Subject to Protective Order

## VERIFICATION

I, Aubrey Sullivan, a citizen of the United States and a resident of the State of Colorado, hereby state under penalty of perjury that the foregoing responses to the interrogatories and requests for production are true and correct to the best of my knowledge.

Executed this 23rd day of December, 2025 at Denver, Colorado.

_s/ Aubrey Sullivan_
Aubrey Sullivan

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

<table>
<tr><td>

DEFENDING EDUCATION, *et al.*,

           *Plaintiffs,*

v.

AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*,

           *Defendants.*

</td><td>

Case No. 1:25-cv-01572-RMR-KAS

</td></tr>
</table>

**PLAINTIFFS' OBJECTIONS AND RESPONSES
TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

Plaintiffs submit the following objections and responses to the Interrogatories from Defendants Aubrey Sullivan, Sergio Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade R. Kelly, and Eric Artis ("Defendants"). *See* Dkt. 31-1.

**GENERAL OBJECTIONS**

Plaintiffs make the following general objections to Defendants' Interrogatories, which apply to each request regardless whether the general objections are expressly incorporated into the specific objections below.

1.      Plaintiffs object to each interrogatory to the extent it calls for information that is protected from discovery by the attorney-client privilege; the work-product doctrine; or constitutional and associational privileges, including the First Amendment right to associational privacy of Plaintiffs and their members; or that are otherwise protected from disclosure under the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the relevant statutory or case law, or any other applicable privilege, be it state, federal, or otherwise.

1

**14**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

2.      Inadvertent transmission of such information or document(s) shall not be deemed a waiver of any privilege, immunity, or right (constitutional, statutory, evidentiary, or otherwise), and Plaintiffs reserve all of their rights to seek the return, destruction, or other protection of such inadvertently transmitted information, including the rights identified in the parties' stipulated protective order, *see* Dkt. 49.

3.      Plaintiffs object to Defendants' definitions and instructions to the extent they seek to impose any requirements or obligations in addition to, or different from, those set forth in federal or state law, the Federal Rules of Civil Procedure, the Local Rules of this Court, any applicable orders of this Court, or any stipulation or agreement of the parties.

4.      Plaintiffs object to each request to the extent it asks Plaintiffs—or any of Plaintiffs' attorneys, associates, employers, employees, representatives, or other persons acting through Plaintiffs, on Plaintiffs' behalf, or subject to Plaintiffs' control—to analyze or identify documents or other information that is not within the actual or constructive possession, custody, or control of Plaintiffs or any of the persons enumerated in this paragraph. Plaintiffs object to each request to the extent it asks Plaintiffs (or the persons enumerated in this paragraph) to prepare any document or other information that does not already exist.

5.      Plaintiffs object to Defendants' definitions of "You" and "Your" in paragraph 17 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

6.      Plaintiffs object to Defendants' definitions of "Defending Education," "Colorado Parent Advocacy Network," "Protect Kids Colorado," and "Do No Harm," and "Mountain West Dermatology" in paragraphs 18 through 22 to the extent that these definitions purport to include persons or entities other than Plaintiffs who are not parties to this action.

2

**3-App-018**

**15**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

7.     Plaintiffs object to each interrogatory to the extent it calls for information that is in the public domain, and therefore of no greater burden for Defendants than Plaintiffs to obtain.

8.     Plaintiffs object to each interrogatory as overbroad, unduly burdensome, calling for information that is neither relevant to any issue in this action nor reasonably calculated to lead to the discovery of admissible evidence, and as an infringement of Plaintiffs and their members to associational privacy, to the extent each interrogatory seeks information about a Plaintiff's general membership, financial contributors, or other information unrelated to the standing of specific members that the Plaintiff relies upon for its associational standing.

9.     Plaintiffs object to each interrogatory to the extent it calls for legal conclusions, presents questions of pure law, calls for expert opinion, or exceeds the permissible number of interrogatories, including subparts.

10.     Plaintiffs object to each interrogatory as premature, overbroad, unduly burdensome, and improper, to the extent it seeks "all" evidence pertaining to "all" events, "all" complaints about misgendering and deadnaming, or all transgender patients treated by the plaintiff doctors, or otherwise purports to require Plaintiffs to marshal all evidence concerning any issue in dispute.

11.     Plaintiffs do not by these responses and objections waive any claim of privilege in whole or in part, or any right to object to any use of any information furnished by Plaintiffs.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**

As to Defending Education, Colorado Parent Advocacy Network, Protect Kids Colorado, Do No Harm, and Dr. Travis Morrell as to his speaking engagements, identify all events they operated and/or plan to operate and/or at which they have spoken and/or plan to speak in a place of public accommodation located in Colorado, including for each such event: (1) its date and location; (2) any advertising or marketing promoting the event, including social media posts; (3) the attendees; (4) a copy of all materials provided or made available to attendees, any schedules or agendas for the event, and any PowerPoint presentations shown at the event; (5) any payments collected for the event; (6) all contracts and/or agreements entered into with the place of public accommodation; and (7) all goods, services, facilities, privileges, advantages, or accommodations offered by them at the event.

**Response to Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all events" Plaintiffs have operated or spoken at in a place of public accommodation, as well as a list of all attendees and payments and "all materials," "all contracts and/or agreements," and "all goods, services, facilities, privileges, advantages, or accommodations" associated with such events. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it asks Plaintiffs to identify every time they have ever spoken or plan to speak in public. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory to the extent it calls for information, including the names or other identifying information of individuals who are Plaintiffs' members or who have attended Plaintiffs' events, that is protected by constitutional and associational privileges, including the First Amendment right to associational privacy. Plaintiffs object to this interrogatory to the extent

4

**3-App-020**

**17**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory on the grounds that the terms "goods, services, facilities, privileges, advantages, or accommodations" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it asks for a legal conclusion about the meaning of "place of public accommodation" or "goods, services, facilities, privileges, advantages, or accommodations." Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through seven subparts, some with multiple subparts within subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education.** Lori Gimelshteyn, the Executive Director of Colorado Parent Advocacy Network, and Erin Lee, the Executive Director of Protect Kids Colorado, are members of DE. Ms. Gimelshteyn attended each CPAN listed below. And Ms. Lee attended each PKC event listed below.

In addition, DE organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DE has co-sponsored events like the following. These events were open the general public unless otherwise noted.

| Event Title | Leadership Program of the Rockies Annual Retreat |
|---|---|
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 17-18, 2023   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |

5

**18**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| | |
|---|---|
| Event Title | Leadership Program of the Rockies Annual Retreat |
| Description of Event | DE co-sponsored the annual retreat for the Leadership Program of the Rockies, a nine-month program that trains leaders in America's founding principles. |
| Date and Location | February 16-17, 2024   The Broadmoor<br>1 Lake Ave.<br>Colorado Springs, CO 80906 |
| Advertising or Marketing | DE did not promote the retreat. The Leadership Program of the Rockies and other retreat co-sponsors promoted the event, but DE does not have a record of those materials. |
| Attendees | The retreat was limited to Leadership Program participants. Speakers and other guests also attended. DE does not have a record of attendance. |
| Materials provided at event | DE did not distribute any materials at the event. The Leadership Program may have distributed its own materials, but DE does not have a record of those materials. |
| Payments collected | DE recalls that Leadership Program participants pay a portion of the cost of their participation, but DE did not collect those payments and does not have a record of those payments. |
| Contracts | DE does not have a record of any contract between the Leadership Program and the venue. |
| Services, etc. offered | DE does not have a record of services, but recalls that the venue provided accommodations, a conference room facility for attendees, and food and beverages. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Description of Event | DE co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event was led by one of DE's members, CPAN Executive Director |

6

**19**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  | Lori Gimelshteyn, who also moderated the second of the event's two panels: a "Family Impact Panel." |
|---|---|
| Date and Location | April 6, 2025        The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | DE did not promote the retreat. CPAN and other co-sponsors promoted the event, but DE does not have a record of those advertisements. |
| Attendees | DE does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DE did not distribute materials at the event. CPAN and other co-sponsors distributed their own materials, but DE does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DE does not have a record of the contract. |
| Services, etc. offered | DE recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DE plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DE's own events, DE's members have attended, organized, and/or spoken at events in Colorado and elsewhere. DE personnel have, in their DE capacity, attended and/or spoken at non-DE events held in places of public accommodation in Colorado and elsewhere.

**Colorado Parent Advocacy Network.** CPAN is aware of the following past and future events. All events were open to the general public unless otherwise noted.

| Event Title | CPAN Official Launch Event |
|---|---|
| Description of Event | CPAN hosted its official launch event to introduce the organization to the public as a social welfare organization committed to restoring the parent's voice in education. The event also celebrated community leaders, educators, parents, and advocates who have made a tangible difference in the fight for academic excellence, transparency, and parental rights. |
| Date and Location | November 13, 2022    St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |

**3-App-023**

**20**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Advertising or Marketing | CPAN promoted the event through social media, email campaigns, and a press release to local and statewide media outlets. |
| Attendees | 312 people reserved tickets through Eventbrite. |
| Materials provided at event | Attendees received a printed program with a schedule of events, speaker biographies, and a welcome message from CPAN Executive Director Lori Gimelshteyn. CPAN also distributed a one-page overview of CPAN's purpose and priorities, a flyer outlining opportunities to join and support the group, and a booklet highlighting the event's award recipients. |
| | During the event, CPAN displayed a powerpoint presentation that highlighted the event's speakers and award recipients as well as CPAN's founding principles and policy goals. Two videos were also shown: America First Policy Institute's "American Dream" video and a trailer for a documentary entitled "Whose Children Are They?," both focusing on the themes of parental rights and educational integrity. |
| | Attendees also received CPAN-branded literature, and members of the media received press packets. |
| Payments collected | Attendees registered through Eventbrite, but tickets were free. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver and secured a Certificate of Liability Insurance for the event. |
| Services, etc. offered | As noted above, attendees received printed materials, including a full agenda, speaker biographies, information about CPAN and its policy agenda. In addition, parking and facilities—including the event space and restrooms—were provided by the venue, and light refreshments were available. |

| | |
|---|---|
| Event Title | Power to the Parents Event |
| Description of Event | CPAN co-hosted this event bringing together parents, legal experts, policy leaders, and faith-based organizations to equip families to resist government overreach in education. The event featured a "Parental Rights Intensive," with keynote presentations including: "A Millennial Mom's Story," "Parent Pushback on Woke in Schools," and "Parental Rights: The Legal View." |
| | The event also included two panel discussions: one with parents who discussed "Fighting Back Against School Overreach," and another with policy experts who discussed "Critical Advice for Parents." |
| Date and Location | March 12, 2023  St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN was one of a few co-sponsoring groups who led promotional efforts for this event. Advertising included graphics on social media, email |

**3-App-024**

21

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  |  |
|---|---|
|  | invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 150 people attended, including parents, educators, concerned citizens, community leaders, faith-based leader, legal professionals, and policy experts. |
| Materials provided at event | The event focused on live interaction. Attendees received informational materials from other co-sponsoring organizations, but CPAN has no record of those materials and did not distribute any of its own materials. |
| Payments collected | Donations were accepted, but attendees were not required to purchase a ticket or register in advance. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. |


| Event Title | CPAN Rally for Parent Rights to Oppose H.B. 23-1003 |
|---|---|
| Description of Event | CPAN hosted a rally on the west steps of the Colorado Capitol Building to oppose H.B. 23-1003, a bill that would authorize mental health screenings of children in schools without parental consent. The rally featured remarks from leading voices in the parental rights movement, including CPAN Executive Director Lori Gimelshteyn. Attendees were encouraged to bring homemade signs with messages like "Parents Know Best," "My Child, My Choice," and "Oppose H.B. 23-1003." |
| Date and Location | April 6, 2023          Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that nearly 200 people attended, including parents, educators, concerned citizens, community leaders, and legislators. |
| Materials provided at event | CPAN distributed printed materials outlining H.B. 23-1003's implications for parental rights, materials telling attendees how they could contact their legislators, and materials with general information about CPAN's advocacy efforts.<br><br>In addition to the in-person rally, CPAN hired a mobile digital truck that drove throughout the city of Denver on the day of the event with scrolling video content to raise awareness about H.B. 23-1003 and its threat to parental authority. |
| Payments collected | None |
| Contracts | CPAN executed a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building. As part of |

9

**3-App-025**

**22**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | this agreement, CPAN paid a $50 deposit to secure access to electricity for the event. |
| Services, etc. offered | Attendees received access to the Capitol Building steps and printed materials about H.B. 23-1003 and CPAN's advocacy work. Speakers received use of sound equipment. |

| Event Title | School Safety Summit |
|---|---|
| Description of Event | CPAN hosted this summit to address the urgent issue of violence in schools through commonsense conversation and community engagement. Attendees included survivors, bereaved family members, and safety experts.<br><br>Two panels were held. The first, "Hearing from the Voices of the Victims," featured testimony from students and parents impacted by school shootings. The second, "Guided Perspective from Those Providing Proven Resources," offered insights from security and training professionals. |
| Date and Location | September 10, 2023    St. Thomas More Catholic Church<br>8035 S. Quebec St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the event through flyers on social media, email invitations and text messages to supporters, verbal invitations and flyers at CPAN's Educate & Inform events (see below), and word of mouth. |
| Attendees | CPAN estimates that 250 people attended, including parents, educators, faith leaders, law enforcement professionals, public safety experts, community members and concerned citizens. |
| Materials provided at event | CPAN distributed a printed program that included a full schedule of events, speaker biographies, and an overview of panel topics. |
| Payments collected | Attendees purchased tickets both in advance and at the door, with seats available for $12, $15, and $18 depending on seat location. |
| Contracts | CPAN executed a Facility Usage License Agreement with the Archdiocese of Denver. As part of the agreement, CPAN paid a facility rental fee. The contract also required CPAN to hire two uniformed law enforcement officers for on-site security. |
| Services, etc. offered | Parking and facilities—including the event space and restrooms—were provided by the venue. CPAN also organized on-site security. And CPAN provided complimentary bottled water to attendees. |

| Event Title | Rally at Cherry Creek School Board Meeting |
|---|---|
| Description of Event | CPAN partnered with Turning Point USA and nationally recognized speaker Pastor John Amanchukwu to organize a rally just before the Cherry Creek School Board meeting. The rally was a direct response to the Cherry Creek School District's refusal to remove sexually explicit materials— |

10

**3-App-026**

**23**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | including books entitled *Gender Queer* and *All Boys Aren't Blue*—from school libraries despite repeated requests for their removal. |
| | Pastor Amanchukwu traveled to Colorado to speak on the harm caused by exposing children to obscene content in schools. The event garnered national attention, including a viral post by X account @libsoftiktok. |
| Date and Location | October 9, 2023    Prairie Middle School parking lot 12600 E. Jewell Ave. Aurora, CO 80012 |
| Advertising or Marketing | CPAN promoted the event through a press release and targeted email outreach to CPAN supporters in the Cherry Creek School District. CPAN also relied on social media posts and word-of-mouth advertising. |
| | Following the event, CPAN posted a video discussing the district's refusal to remove obscene materials from its libraries. |
| Attendees | CPAN estimates that 75 people attended, including parents, concerned citizens, faith leaders, and education advocates. Some attendees had children attending Cherry Creek schools; others were local residents alarmed by the district's decisions; others were supporters of Turning Point USA and/or Pastor Amanchukwu. |
| Materials provided at event | CPAN distributed a flyer entitled "Protect Kids – Support Teachers – Save Cherry Creek." The flyer outlined Cherry Creek's plummeting academic performance, its safety and security failures, and its political indoctrination and secretive gender transition plans for students. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | None |

| | |
|---|---|
| Event Title | Gender Ideology Public Roundtable & Press Conference |
| Description of Event | CPAN partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024    Capitol Building 200 E. Colfax Ave. Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, verbal invitations at CPAN's Educate & Inform events (see below), and word of mouth. Other co-sponsoring organizations conducted their own advertising efforts, but CPAN does not have a record of those materials |

**24**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Attendees | CPAN estimates that 30 people attended, including parents, concerned citizens, educators, community advocates, and legislators. Several grassroots organizations attended as co-sponsors. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | The event organizers secured a Facility Use Agreement with the Division of Capital Assets to reserve the west steps of the Colorado Capitol Building for the press conference. An attending legislator also reserved an official meeting room inside the Capitol Building for the roundtable discussion. |
| Services, etc. offered | In addition to access to the Capitol Building space and facilities, CPAN provided lunch for attendees. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
| Description of Event | The Summit was a landmark event organized by CPAN that brought together nationally recognized medical experts, patient advocates, journalists, and parents to raise awareness about the harms of pediatric gender-affirming care. The Summit provided a forum for open dialogue on the urgent need for ethical standards in healthcare and education regarding children who face rapid onset gender dysphoria.<br><br>The event featured a panel with medical experts, a parent advocate, a journalist, and a detransitioner. (The panel included PKC Executive Director Erin Lee and Dr. Travis Morrell and was moderated by CPAN Executive Director Lori Gimelshteyn.) Attendees also participated in a Q&A session with panelists. |
| Date and Location | April 7, 2024   The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics and educational content on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 175 people attended, including parents, healthcare professionals, detransitioners and affected families, educators, policymakers and legislators, faith leaders, and representatives of allied organizations. |
| Materials provided at event | CPAN distributed a printed event program that included a schedule of events, speaker biographies, and panel descriptions. Additionally, a powerpoint presentation was displayed on-screen during portions of the event to highlight key themes and introduce speakers. |

12

**3-App-028**

**25**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

|  | CPAN released a video recording of the event afterwards. |
|---|---|
| Payments collected | Attendees purchased tickets in advance and at the door. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees. Water was also available. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |

| Event Title | Unite for School Choice Celebration |
|---|---|
| Description of Event | CPAN sponsored a celebration on the west steps of the Capitol Building that brought together parents, students, educators, concerned citizens, and other grassroots organizations to support charter schools and educational freedom. The event was organized in response to H.B. 24-1363, which would have significantly hindered the autonomy of charter schools across Colorado. |
| Date and Location | April 10, 2024        Capitol Building
200 E. Colfax Ave.
Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media posts, emails to supporters, flyers, and word of mouth. |
| Attendees | CPAN estimates that nearly 150 people attended, including parents, students, educators and charter school leaders, community leaders, legislators, and other concerned citizens. |
| Materials provided at event | Attendees received pre-printed signs and posters supporting school choice. CPAN also distributed informational flyers informing attendees how to contact their legislators and oppose H.B. 24-1363. Some attendees also received CPAN-branded paper flyers to show support for school choice. |
| Payments collected | None |
| Contracts | CPAN received a permit from the Division of Capital Assets to use the west steps of the Capitol Building. |
| Services, etc. offered | None |

| Event Title | National School Choice Week Celebration |
|---|---|
| Description of Event | CPAN partnered with Parents United America and other allied organizations to host Colorado's annual National School Choice Week Celebration in downtown Denver. The event promoted educational freedom. The event began at First Baptist Church of Denver, where 165 middle and high school students participated in a program that discussed the continuing relevance of the Constitution. Then, a crowd gathered on the west steps of |

13

26

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| | the Capitol Building for the main celebration, where students, parents, educators, and Governor Jared Polis delivered remarks highlighting the necessity of school choice. |
| Date and Location | January 28, 2025       First Baptist Church of Denver<br>1373 Grant St.<br>Denver, CO 80203<br><br>Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, as well as emails and text messages to supporters. Co-sponsoring groups promoted the event as well, but CPAN does not have a record of their promotional materials. |
| Attendees | CPAN estimates that 275 people attended, including parents, students, educators and charter school leaders, community leaders, and Governor Jared Polis. |
| Materials provided at event | CPAN distributed printed programs during the First Baptist Church portion of the event. The programs included a schedule of events, a speaker list, and talking points about school choice in Colorado. |
| Payments collected | None |
| Contracts | CPAN executed a contract with the First Baptist Church of Denver and secured a permit for use of the west steps of the Capitol Building. |
| Services, etc. offered | Attendees received National School Choice Week branded items, included scarves, stickers, and signs. Attendees were also provided access to First Baptist Church's facilities, including seating, restrooms, and a stage area for speakers. Attendees also made use of the west steps of the Capitol Building. |

| | |
|---|---|
| Event Title | United for Truth Luncheon |
| Description of Event | CPAN hosted a private, invitation-only luncheon for families, advocates, and organizations united in their commitment to protecting children from harmful medical practices. The luncheon was timed to coincide with the Colorado House of Representatives' hearing on H.B. 25-1068. Attendees shared stories of how they have been impacted by the prevalence of gender ideology in medicine and education. |
| Date and Location | February 5, 2025       Independence Institute<br>727 E. 16th Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | The luncheon was an invitation-only event. Invitations were extended through email and text message. |
| Attendees | CPAN estimates that 36 people attended, including parents, advocacy leaders, medical professionals, policy experts, legislative staff, and allied organizations. |

14

**3-App-030**

**27**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| Materials provided at event | None |
|---|---|
| Payments collected | None |
| Contracts | CPAN executed a contract with the Independence Institute to secure the venue for a luncheon and use of the venue's facilities. |
| Services, etc. offered | CPAN provided a catered lunch and access to the venue's facilities, including parking, seating, and restrooms. |

| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
|---|---|
| Description of Event | CPAN hosted the second summit in its Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. The first, "Medical, Legal, & Policy Perspectives," was moderated by Dr. Travis Morrell and included medical, policy, and legal experts. The second, a "Family Impact Panel," was moderated by CPAN Executive Director Lori Gimelshteyn and included families and clinical workers who have been impacted by so-called gender-affirming care. There was also a Q&A portion with panelists. |
| Date and Location | April 6, 2025      The Inverness Denver<br>200 Inverness Dr. West<br>Englewood, CO 80112 |
| Advertising or Marketing | CPAN promoted the event with graphics on social media, email invitations and text messages to supporters, and a press release. Partner organizations advertised with their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that nearly 200 people attended in person, including parents, medical professionals, educators, policymakers, and community advocates. Others watched a livestream. |
| Materials provided at event | CPAN distributed a printed event program that included a welcome message, schedule of events, speaker biographies, and co-sponsors. CPAN also used digital materials to introduce speakers and co-sponsors. Co-sponsors distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | Both in-person and livestream attendees purchased tickets in advance of the event. |
| Contracts | CPAN executed a contract with the Inverness Denver for use of the hotel's conference room facilities and audio/visual equipment. An addendum was signed to include a guest room block for attendees and panelists. |
| Services, etc. offered | The venue provided access to parking and a professional conference room facility for attendees, as well as a guest room block for attendees who booked a room at the hotel. The event also provided food and beverages. Attendees also received printed materials. CPAN's partner organizations distributed their own materials and resources at tables at the event, |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | although CPAN does not have a record of these materials. Attendees also had access to networking opportunities with speakers, professionals, and advocacy leaders. |
|---|---|

| | |
|---|---|
| Event Title | H.B. 25-1312 Press Conference |
| Description of Event | CPAN hosted a press conference to highlight the threat that H.B. 25-1312 poses to parental rights, free speech, and constitutional protections. The event featured remarks by CPAN Executive Director Lori Gimelshteyn along with other advocacy leaders. The event was co-sponsored by allied organizations, including Protect Kids Colorado.<br><br>The event also included testimony from parents who received support through CPAN's Incident Reporting Tool, which allows parents to submit reports of compelled speech, school safety concerns, controversial school lessons, and other dangers to Colorado youth. The parents explained how they lost custodial rights because they declined to affirm their children's gender identity declarations. CPAN later posted video of the parents' testimony—as well as Ms. Gimelshteyn's statements—to the organization's YouTube page.[1, 2, 3]<br><br>CPAN also announced that it had gathered nearly 35,000 petition signatures opposing H.B. 25-1312. |
| Date and Location | April 30, 2025          Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | CPAN promoted the event through social media graphics, emails, and text messages to supporters. Co-sponsoring groups also promoted the event, although CPAN does not have a record of those promotional materials. |
| Attendees | CPAN estimates that roughly 150 people attended, including members of the media, concerned parents, educators, faith leaders, and representatives of allied organizations. Others watched via livestream. |
| Materials provided at event | CPAN distributed a printed one-pager discussing "10 Reasons to Oppose H.B. 25-1312." CPAN also delivered boxes to members of the Colorado Senate containing petitions opposing H.B. 25-1312. Co-sponsoring organizations distributed their own materials, but CPAN does not have a record of those materials. |
| Payments collected | None |
| Contracts | CPAN secured a permit for use of the Capitol Building west steps from the Division of Capital Assets. |

---

[1] youtube.com/watch?v=f-ef7Kb9xlc
[2] youtube.com/watch?v=9OMdZYpEsyw
[3] youtube.com/watch?v=KzjVwdTyKgg

**29**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| Services, etc. offered | CPAN provided printed informational materials and networking opportunities to attendees. CPAN Executive Director Lori Gimelshteyn and other co-sponsoring organization leaders made themselves available to members of the media for interviews. |

| | |
|---|---|
| Event Title | Press Conference on Soloman Galligan and H.B. 24-1034 |
| Description of Event | CPAN hosted a press conference in response to the 18th Judicial District Attorney's decision to dismiss all criminal charges against Soloman Galligan, a registered sex offender who attempted to kidnap an 11-year-old child from an elementary school. Despite video evidence and a criminal history, Galligan's charges were dropped under H.B. 24-1034 because he was deemed incompetent to stand trial. The press conference highlighted a disturbing statewide pattern in which violent offenders avoid criminal prosecution under Colorado's amended competency laws.<br><br>Speakers included CPAN Executive Director Lori Gimelshteyn along with a legislator, a law enforcement and safety expert, and a Colorado district attorney. Together, they encouraged the repeal of H.B. 24-1034. |
| Date and Location | July 23, 2025          Araphoe County Judicial Center<br>7325 S. Potomac St.<br>Centennial, CO 80112 |
| Advertising or Marketing | CPAN promoted the press conference through a press release, social media posts, emails, and CPAN's website. Co-sponsoring organizations promoted the event through their own materials, but CPAN does not have a record of those materials. |
| Attendees | CPAN estimates that 35 people attended, including victims and their families, parents, civic leaders, elected officials, law enforcement representatives, advocacy organizations, and members of the media. |
| Materials provided at event | CPAN distributed a flyer outlining the Galligan case and other examples of H.B. 24-1034's impact. |
| Payments collected | None |
| Contracts | None |
| Services, etc. offered | CPAN provided informational resources to attendees, including printed materials, expert speakers, and opportunities for media to interview speakers. The event also provided an opportunity for networking between community advocates, victims, and policymakers. |

| | |
|---|---|
| Event Title | CPAN Gilded Tribute Benefit Gala for Parental Rights & Educational Freedom |
| Description of Event | CPAN will host a gala to celebrate the organization's three years of advocacy for parental rights, school choice, and academic excellence. The event will also raise critical funds needed to sustain and expand the organization's |

17

**3-App-033**

30

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  | efforts. The gala will feature a formal dinner, silent auction, awards cere-mony, and VIP reception. |
|---|---|
| Date and Location | September 19, 2025      The Vehicle Vault<br>18301 Lincoln Meadows Pkwy<br>Parker, CO 80134 |
| Advertising or Marketing | CPAN is promoting the gala though social media posts, email campaigns, and through allied organizations. CPAN is also distributing printed flyers and personal invitations to potential donors and community leaders. |
| Attendees | CPAN expects attendees to include supporters, donors, elected officials, community leaders, educators, and advocacy partners from across Colorado. |
| Materials provided at event | CPAN plans to distribute printed event programs that include a schedule of events, sponsor recognitions, and auction item listings. CPAN will also distribute packets to sponsors and VIPs in advance. Attendees will also receive digital follow-up materials highlighting CPAN's mission, impact, and post-event fundraising results. |
| Payments collected | Attendees will purchase tickets in advance of the gala. Payments will also be collected for VIP packages, sponsorship commitments, and the silent auction. |
| Contracts | CPAN has entered into a rental agreement with the Vehicle Vault for ex-clusive use of its venue for the duration of the gala. |
| Services, etc. offered | CPAN intends to offer a formal dinner, beverages, access to exclusive silent auction items, public recognition and speaking opportunities for sponsors, and special seating and networking opportunities for VIP ticket holders. |

| Event Title | Rocky Mountain Summit Part III: Confronting Institutional Failure to Pro-tect Children from the Harms of Gender-Affirming Treatments |
|---|---|
| Description of Event | CPAN plans to host the third event in its Rocky Mountain Summit series. CPAN anticipates that the event will include panel discussions on the ef-fects of "gender-affirming care." |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be deter-mined. |
| Advertising or Marketing | This event has not yet been advertised or marketed. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Materials have not yet been prepared for or distributed for this event. |
| Payments collected | CPAN anticipates that it will sell tickets in advance and at the door, as with CPAN's previous Rocky Mountain Summit events. |
| Contracts | CPAN has not yet reserved a venue for this event. |
| Services, etc. offered | CPAN has not yet coordinated facilities, refreshments, accommodations, or other services to offer at the event. |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

CPAN plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by CPAN as an organization, CPAN's leadership frequently attends and/or speaks at non-CPAN events held in places of public accommodation. For example, Ms. Lori Gimelshteyn is frequently invited to speak to local civic, political, and grassroots organizations in her role as CPAN Executive Director. At these events, Ms. Gimelshteyn relies on a standardized "Educate & Inform" presentation. The presentation explains the erosion of parental authority in schools, the growing prevalence of ideological and political agendas—including gender ideology—in school curricula, the misuse of mental health and social-emotional learning frameworks, the danger of so-called gender-affirming care, and the lack of transparency in educational materials, and highlights CPAN's work to oppose these trends.

**Protect Kids Colorado.** PKC is aware of the following past and future events. All events were/are open to the general public unless otherwise noted.

| Event Title | Gender Ideology Public Roundtable & Press Conference |
|---|---|
| Description of Event | PKC partnered with allied organizations to invite detransitioners, parents, doctors, and legislators to a roundtable discussion in the Capitol and a press conference on the Capitol steps to discuss the harms caused by gender ideology. |
| Date and Location | February 28, 2024        Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC advertised the event through flyers on social media, text messages to supporters, and emails to state legislators. Other co-sponsoring organizations conducted their own advertising efforts, but PKC does not have a record of those materials. |
| Attendees | PKC estimates that 10-15 legislators, 25-30 members of the public, and a few members of the press attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from Division of Capital Assets to host its event on the west steps of the Capitol Building. |

**3-App-035**

**32**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Services offered, etc. | In addition to access to the Capitol Building space and facilities, PKC provided lunch for attendees. |


| | |
|---|---|
| Event Title | Art Club Movie Showing |
| Description of Event | PKC hosted a screening of its documentary "Art Club," which highlights the threat of public school indoctrination and the transgender social contagion. The screening was accompanied by a Q&A with PKC Executive Director Erin Lee. The event was co-sponsored by the Denver University chapter of Turning Point USA. |
| Date and Location | April 10, 2024    Daniels College of Business<br>Denver University<br>2101 S. University Blvd.<br>Denver, CO 80208 |
| Advertising or Marketing | PKC and Turning Point promoted the event on social media and with flyers posted on campus. The flyers and social media posts indicated that the event was co-hosted by PKC and Turning Point. |
| Attendees | PKC estimates that 50-60 people were able to fit in the room for the event. Hundreds of others were outside of the room and the building, either due to capacity restrictions or because they wished to protest the event. |
| Materials provided at event | PKC distributed cards promoting the organization and supporting its girls-sports and parental-rights ballot initiatives. Turning Point distributed handouts promoting its own organization, but PKC does not have a record of those handouts. |
| Payments collected | None |
| Contracts | The venue was reserved by Turning Point in compliance with Denver University's procedures. |
| Services offered, etc. | PKC screened the film and allowed attendees to participate in a Q&A session with Erin lee. |


| | |
|---|---|
| Event Title | Save Girls Sport Rally |
| Description of Event | PKC co-sponsored a rally to protect sex-specific sports programs for girls and raise attention and support for 2023-2024 ballot measure #160, a PKC-backed measure to preserve girls sports leagues. The event was also sponsored by 1AMedia and Rocky Mountain Women's Network. PKC Executive Director Erin Lee spoke about the harms caused by biological males competing in female sports. |
| Date and Location | July 20, 2024    Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC and the event's other sponsors listed promoted the event on social media with materials that listed Erin Lee as a speaker and indicated that she is the "Founder of Protect Kids Colorado." |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Attendees | PKC estimates that 20-30 members of the public and members of the press attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | 1AMedia applied for and obtained a permit from Division of Capital Assets to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | In addition to public speeches and access to the Capitol steps, the event provided petitions for attendees to sign in support of 2023-2024 ballot measure #160. |

| | |
|---|---|
| Event Title | PKC Signing & Notary Event |
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and a public notary to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC Executive Director Erin Lee spoke in support of the proposed ballot measures. |
| Date and Location | July 30, 2024          In The Zone Sports Bar<br>15600 W 44th Ave.<br>Golden, CO 80403 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media. |
| Attendees | PKC estimates that 40-50 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the event's time, location, number of attendees, and menu—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. The event also offered a cash bar and food. |

| | |
|---|---|
| Event Title | PKC Signing & Notary Event |
| Description of Event | PKC hosted a signature-gathering event in support of 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). PKC provided petitions for the public to sign and public notaries to notarize volunteers' petitions. PKC also distributed literature supporting the petition, and PKC leadership—including |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | Executive Director Erin Lee and PKC board members—spoke in support of the proposed ballot measures and in support of PKC's mission to protect Colorado children from dangerous gender ideology. |
| Date and Location | August 1, 2024          Wide Open Saloon<br>5607 US-85<br>Sedalia, CO 80135 |
| Advertising or Marketing | PKC promoted the event through flyers posted on social media and emails to PKC supporters. |
| Attendees | PKC estimates that 75-100 people attended the event to sign or drop off petitions, listen to Erin Lee's speech, socialize, and otherwise support the ballot measures. |
| Materials provided at event | PKC provided copies of the text of the proposed ballot measures, as well as petitions for supporters to sign. PKC also distributed thank-you cards and gift bags to volunteers. |
| Payments collected | PKC did not directly collect payments for the event. Attendees were able to purchase food and drinks from a cash bar. |
| Contracts | PKC agreed on terms—including the price, time, location, number of attendees, and use of the venue's audio system—via text with the venue's manager. |
| Services offered, etc. | PKC provided petitions for attendees to sign as well as notary services. PKC also distributed thank-you cards and gift bags to volunteers, as well as PKC-branded merchandise. The event also offered a cash bar and food. |


| Event Title | PKC Ballot Measure Press Conference |
|---|---|
| Description of Event | PKC board members and supporters assembled on the steps of the Capitol for a final update on 2023-2024 ballot measures #142 (parental notification requirement) and #160 (preserving sex-specific sports programs). In addition to PKC supporters, members of the press attended and reported on the event. |
| Date and Location | August 5, 2024          Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that 10-15 PKC supporters and 2-3 members of the media attended. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC applied for and obtained a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | PKC Executive Director Erin Lee provided an update on the status of PKC's ballot initiatives. |

35

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Event Title | Stop The War On Children Rally |
| Description of Event | PKC co-sponsored a large rally at the Capitol Building with speakers from all over the country—parents of gender-confused children, detransitioners, legislators, and more—opposed to transgender ideology. The event was primarily sponsored by Gays Against Groomers. |
| Date and Location | October 5, 2024      Capitol Building<br>200 E. Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 40-50 members of the public attended. A separate counter-protest was held on the public sidewalk outside our event. |
| Materials provided at event | Each of the event's co-sponsors, including PKC, distributed free branded merchandise. |
| Payments collected | None |
| Contracts | Gays Against Groomers secured a permit to host the event at the Capitol Building. PKC does not have a record of the contract. |
| Services offered, etc. | Speeches delivered by event sponsors. |

| | |
|---|---|
| Event Title | *Lee v. Poudre* Press Conference |
| Description of Event | PKC hosted a press conference to update the public on the status of PKC Executive Director Erin Lee's personal lawsuit against Poudre School District. PKC then hosted a luncheon following the press conference. |
| Date and Location | January 21, 2025      Byron White Federal Courthouse<br>1823 Stout St.<br>Denver, CO 80257<br><br>Steuben's Uptown<br>523 E. 17th Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC promoted the event through emails and text messages to supporters. PKC also issued a press release. |
| Attendees | The press conference was open the public; the luncheon was by invitation only. PKC estimates that 20-30 members of the public attended either the press conference, the luncheon, or both. |
| Materials provided at event | None |
| Payments collected | None |
| Contracts | PKC obtained a permit from the United States General Services Administration to host the press conference at the Byron White courthouse. PKC |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | also verbally contracted with Steuben's Uptown to reserve the restaurant's patio. |
| Services offered, etc. | Attendees received an update on Ms. Lee's lawsuit. Food was served at the luncheon as well. |

| | |
|---|---|
| Event Title | Save Girls Sports PKC Fundraising Event |
| Description of Event | PKC hosted a fundraiser in support of 2023-2024 ballot measure #160 (preserving sex-specific sports programs). The event was co-hosted by Gays Against Groomers and XX-XY Athletics. Representatives from each host organization spoke at the event, as did young female athletes affected by biological males participating in girls sports. |
| Date and Location | February 19, 2025      XX-XY Athletics<br>260 Josephine St., 4th Floor<br>Denver, CO 80206 |
| Advertising or Marketing | PKC promoted the event with flyers distributed on social media and via email. Gays Against Groomers and XX-XY Athletics also promoted the event, but PKC does not have a record of their promotional efforts. |
| Attendees | The event was open to the public, though pre-registration was required. PKC estimates that about 60 people attended the event. |
| Materials provided at event | Attendees were given items—like shirts and stickers—promoting the "Save Girls Sports" message. PKC also distributed cards promoting PKC and its girls-sports and child-gender-transition ballot measures. |
| Payments collected | Attendees were required to register in advance but were not required to pay for admission. The event featured a live auction, and XX-XY Athletics also sold some of its clothing products; 100% of auction proceeds and 15% of clothing sales went to PKC. |
| Contracts | None |
| Services offered, etc. | Attendees were able to purchase clothing products and participate in a live auction. Wine and food were served. |

| | |
|---|---|
| Event Title | H.B. 25-1312 Press Conference |
| Description of Event | PKC hosted a press conference to highlight the effects of H.B. 25-1312 on parental rights and free speech. The event was co-hosted by Colorado Parent Advocacy Network. |
| Date and Location | April 30, 2025      Capitol Building<br>200 E Colfax Ave.<br>Denver, CO 80203 |
| Advertising or Marketing | PKC issued a press release promoting the event. |
| Attendees | PKC estimates that more than 50 members of the public attended, including PKC and CPAN supporters, parents of transgender-identifying children, and members of the press. |

**37**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Materials provided at event | None |
| Payments collected | None |
| Contracts | Co-host CPAN secured a permit from the Division of Capital Assets to host its event on the west steps of the Capitol Building. |
| Services offered, etc. | None |

| | |
|---|---|
| Event Title | Giving Parents a Voice Townhall |
| Description of Event | PKC co-sponsored a town hall event to inform members of the public about Colorado House Bill 25-1312. The event was primarily sponsored by Moms for Liberty. PKC's Executive Director, Erin Lee, was a featured speaker and spoke about the harms caused by child gender transition. |
| Date and Location | May 1, 2025          Beck Recreation Center<br>800 Telluride St.<br>Aurora, CO 80011 |
| Advertising or Marketing | PKC and other co-sponsors promoted the event with a flyer distributed on social media and via email. The flyer listed PKC as a co-sponsor. |
| Attendees | PKC estimates that 80-100 members of the public attended. |
| Materials provided at event | Each of the event's co-sponsors had a booth at the event. PKC, at its booth, distributed PKC-branded merchandise, informational flyers about the danger of transgender ideology, and cards promoting PKC and its girls-sports and child-gender-transition ballot initiatives |
| Payments collected | None |
| Contracts | Moms for Liberty contracted with the venue. PKC does not have a record of the contract. |
| Services offered, etc. | PKC and other event co-sponsors provided information about H.B. 25-1312 and an opportunity for an open Q&A session. |

PKC plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to reserve space in places of public accommodation for those events.

In addition to the above events organized and (co-)sponsored by PKC as an organization, PKC's leadership frequently attends and/or speaks at non-PKC events held in places of public accommodation. PKC's Executive Director, Erin Lee, has averaged one to two speaking engagements per week since founding PKC. These events are often held in places of public accommodation, such as restaurants, hotels, event centers, libraries, and other public buildings. At these events, Ms. Lee is usually introduced as an advocate for parental rights and as the founder of PKC. When speaking,

38

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Ms. Lee often relies on a powerpoint presentation that explores the harms caused by transgender ideology, and Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation.

In addition, PKC volunteers are often in public spaces—including gun shows, county fairs, concerts, sporting events, car shows, public parks, restaurants, grocery stores, hair salons, and sports bars—gathering signatures to support PKC-backed ballot measures. When PKC volunteers are collecting signatures on behalf of PKC, they wear visible PKC volunteer badges.

**Do No Harm.** Dr. Travis Morrell is a member of DNH, has spoken at public events, and intends to speak at public events in the future, as described below. Dr. Valeri Leswing and Mountain Pediatrics are also members of DNH.

In addition, DNH organizes, hosts, or (co-)sponsors many events around the country. For example, in Colorado, DNH has co-sponsored events like the following. This event was open to the public.

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Description of Event | DNH co-sponsored the second event in CPAN's Rocky Mountain Summit series. The event highlighted the dangers of pediatric gender-affirming care. The event included two panels. One of those panels, "Medical, Legal, & Policy Perspectives," was moderated by DNH member Dr. Travis Morrell and included medical, policy, and legal experts. |
| Date and Location | April 6, 2025        The Inverness Denver 200 Inverness Dr. West Englewood, CO 80112 |
| Advertising or Marketing | DNH posted about the Summit and their members' participation after the event.[4] CPAN and other co-sponsors also promoted the event, but DNH does not have a record of those advertisements. |
| Attendees | DNH does not have a record of attendance but estimates that nearly 200 people attended in person. Others watched a livestream. |
| Materials provided at event | DNH may have distributed a rack card with information about DNH's mission and opportunities to support its mission. CPAN and other co- |

---

[4] x.com/donoharm/status/1909274381101989994

26

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

|  |  |
|---|---|
|  | sponsors distributed their own materials, but DNH does not have a record of those materials. |
| Payments collected | The event was ticketed. DNH did not manage the sale or collection of tickets. |
| Contracts | CPAN contracted with the venue. DNH does not have a record of the contract. |
| Services, etc. offered | DNH recalls that the venue provided access to parking and a professional conference room facility for attendees. The hotel also provided catered food and beverages. Attendees also received printed materials from DNH and other co-sponsors, but DNH does not have a record of materials or services offered by other groups. |

DNH plans to organize and/or (co-)sponsor additional public events in the future.

In addition to DNH's own events, DNH's members have attended, organized, and/or spoken at events in Colorado and elsewhere.

**Dr. Travis Morrell.** Dr. Morrell is aware of the following past and future events at which he spoke or intends to speak. All events were/are open to the general public unless otherwise noted.

| Event Title | Rocky Mountain Summit Part I: Safeguarding Children from Gender-Affirming Care |
|---|---|
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | Moderated panel discussion on the effects of "gender-affirming" treatments |
| Date and Location | April 7, 2024       The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker.[5] As a speaker, however, Dr. Morrell was not responsible for advertising or marketing the event. He does not have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 100 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |

---

[5] x.com/CPANColorado/status/1770261143820337171

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. |

| | |
|---|---|
| Event Title | Diversity without Division: Is It Possible? |
| Event Host | FAIR Colorado (Foundation Against Intolerance & Racism) |
| Description of Event | A moderated panel discussion to share insights on diversity, equity, and inclusion initiatives |
| Date and Location | September 12, 2024    Junior Achievement Free Enterprise Center<br>6500 Greenwood Plaza Blvd.,<br>Greenwood Village, CO 80111 |
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media. Dr. Morrell personally promoted the event through a post on X that specifically identified Dr. Morrell as a speaker.[6] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 75 people attended. |
| Materials provided at event | Dr. Morrell did not use or provide any materials for his portion of the event. He does not have a record of materials used or provided by other speakers or the event host. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell believes the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | The event offered seating for ticketed attendees, as well as light refreshments. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part II: Safeguarding Children from Gender-Affirming Treatment |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event included two moderated panel discussions on the effects of "gender-affirming" treatments |
| Date and Location | April 6, 2025    The Inverness Denver<br>200 Inverness Drive West<br>Englewood, CO 80112 |

---

[6] x.com/MorrellMDmph/status/182681897434169189

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| Advertising or Marketing | Dr. Morrell recalls that the event was promoted through social media and other means, with materials that specifically identified Dr. Morrell as a speaker. Dr. Morrell personally promoted the event through multiple posts on X.[7,8,9] He does not otherwise have a record of any advertising or marketing materials not already in the public domain. |
| Attendees | Dr. Morrell was a speaker and did not track attendance. He estimates that roughly 150 people attended the event in person, and others watched a livestream of the event. |
| Materials provided at event | Dr. Morrell distributed paper handouts with information about an organization he leads: Colorado Principled Physicians. Dr. Morrell recalls that other co-sponsoring organizations distributed materials, but he does not have a record of those materials. |
| Payments collected | The event was ticketed. As a speaker, Dr. Morrell did not collect payments or tickets. |
| Contracts | Dr. Morrell recalls that the event host had a contract with the venue. But, as a speaker, Dr. Morrell did not sign any contracts and does not have a record of any contracts. |
| Services, etc. offered | Ticketed attendees had access to the event and to the venue itself: parking and a conference room facility at the Inverness Denver. Dr. Morrell also recalls that light refreshments were provided. Tickets were also required for the live-streaming audience, both in and outside of Colorado. |

| | |
|---|---|
| Event Title | Rocky Mountain Summit Part III: Safeguarding Children from Gender-Affirming Treatment |
| Event Host | Colorado Parent Advocacy Network |
| Description of Event | This event will include panel discussions on the effects of "gender-affirming" treatments. |
| Date and Location | April 2026 in Denver, CO, the specific date and location still to be determined. |
| Advertising or Marketing | This event has not been advertised or marketed yet. Dr. Morrell anticipates that the event will be advertised and marketed similar to CPAN's previous "Rocky Mountain Summit" events. |
| Attendees | The event has not yet taken place. |
| Materials provided at event | Dr. Morrell has not prepared any materials to use or provide at the event. |
| Payments collected | To the best of Dr. Morrell's understanding, the event will be ticketed. As a speaker, Dr. Morrell does not plan to collect payments or tickets. |
| Contracts | Dr. Morrell anticipates that the event host will sign a contract with the venue. As a speaker, however, Dr. Morrell does not plan to sign any contracts. |

---

[7] x.com/MorrellMDmph/status/1907225349584478599
[8] x.com/MorrellMDmph/status/1908210234830807282
[9] x.com/MorrellMDmph/status/1902444732627689844

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

43

| Services, etc. offered | Dr. Morrell anticipates that the event will have ticketed seating and light refreshments. |
|---|---|

Dr. Morrell plans to speak at additional public events in the future.

43

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Interrogatory No. 2**

As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals.

**Response to Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks a response that identifies "all instances" in which "any person" has complained about the use of certain words. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks the requested information about Defending Education and Do No Harm because these organizations have standing through their individual members. Plaintiffs object to this interrogatory on the grounds that the term "complained about" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it calls for Plaintiffs to produce information not in their possession, custody, control, or personal knowledge or information that is already in the public domain and therefore of no greater burden for Defendants to obtain. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Defending Education**. DE's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes CPAN Executive Director Lori Gimelshteyn and PKC Executive Director Erin Lee, as described below.

In addition, DE is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DE has received complaints and criticism like the following:

- On August 7, 2022, after DE filed a lawsuit in federal court challenging a school policy that required students and staff use preferred pronouns and chosen names and facilitated social

31

**3-App-047**

**44**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transitioning of students without parental notification, a news outlet criticized DE's members "who can't accept the reality of being transgender." It accused DE of ignoring "the rights of transgender students protected under" state and federal civil rights laws and suggested there should be "consequences" for those, like DE's members, who refuse to speak using someone's preferred pronouns or chosen name.[10]

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[11]

- The Southern Poverty Law Center has declared DE a "hate group" based on its opposition to gender ideology in American schools.[12] The SPLC says DE "spew[s] homophobic and transphobic speech in the name of protecting their children's innocence, disregarding and disrespecting children in the LGBTQ community."[13]

- DE regularly receives hostile messages and comments from members of the public complaining about DE's opposition to gender ideology. These messages and comments attack DE and its leadership using terms like "bigots" and "dangerous extremists." One email told DE personnel, "YOU CAN GARGLE MY TRANS BALLS."

**Colorado Parent Advocacy Network.** To the best of its recollection, CPAN is aware of the

following instances in which someone has complained about the use of pronouns and/or names of

transgender individuals:

- CPAN held its official launch event on November 13, 2022. Before the event, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several emails from individuals urging the venue to cancel the event. According to the venue, these messages were ideological in nature and expressed disagreement with CPAN's stance on LGBTQ issues.

---

[10] Todd Dorman, *Linn-Mar lawsuit ignores rights of transgender kids*, The Gazette (archived Aug. 13, 2025), perma.cc/CRU3-5ZHA.

[11] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[12] *2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

[13] *Assault on Inclusive Education and How We're Fighting Back*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/47KW-2HS7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- Following CPAN's November 13, 2022 launch event, a transgender journalist who uses the name "Heidi Beedle" and "they" pronouns published a piece criticizing the event and CPAN's mission. The article described CPAN as an "anti-LGBTQ" organization and accused CPAN of associating with "transphobic" individuals.[14]

- Following CPAN's April 6, 2023 rally to oppose H.B. 23-1003, transgender journalist Heidi Beedle published an article critical of the rally. The article claimed that CPAN "often target[s] LGBTQ students in [its] activism."[15]

- In May 2023, CPAN Executive Director Lori Gimelshteyn received a "Thank You" card in the mail from the Satanic Temple, stating that a donation had been made in her name as a form of retaliation for her views.

- Before CPAN's September 10, 2024 School Safety Summit, the venue informed CPAN Executive Director Lori Gimelshteyn that it had received several hateful emails demanding that the event be cancelled. The emails accused CPAN of being a hate group because of its views on LGBTQ issues and parental rights. These messages prompted the venue to require CPAN to hire two uniformed law enforcement officers for on-site security as a condition of the venue rental.

- During CPAN's October 9, 2024 rally before a Cherry Creek School Board meeting, several individuals affiliated with a group known as the "Parasol Patrol," some of whom identify as transgender," were present and protested the rally. This group disrupted the event by driving vehicles through CPAN's crowd, using umbrellas to poke at attendees, and attempting to engage in verbal confrontation with attendees. After the rally, at the Board meeting itself, Parasol Patrol members filled the meeting room with signs and posters accusing CPAN of spreading misinformation about the content in Cherry Creek School District libraries.

- On April 6, 2025, at CPAN's Rocky Mountain Summit Part II, a group of more than 50 protesters gathered outside the venue. Many of the protesters wore rainbow attire and carried signs with slogans like, "Trans Rights Are Human Rights" and "Eliminate the TERFs." Before the Summit began, two of the protestors entered the venue. They began scanning the room and attempted to film the event space covertly. Police informed CPAN Executive Director Lori Gimelshteyn that the two protestors were behaving suspiciously. Ms. Gimelshteyn spoke to the protestors for approximately 15 minutes. They expressed disagreement with the substance of the Summit and complained that CPAN promoted voices that do not support gender-affirming care. The two protesters also stated that they disagreed with how CPAN and the Summit's speakers framed the issues of gender identity and pronoun usage.

---

[14] Heidi Beedle, *A New Conservative Group Uses Anti-LGBTQ Sentiment to Attack Colorado Public Schools*, Colorado Times Recorder (Dec. 1, 2022), perma.cc/YA3D-4DKA.

[15] Heidi Beedle, *'I'm a Pissed Off Grandma' – Republican Legislators Address Parent Rights Rally*, Colorado Times Recorder (Apr. 7, 2023), perma.cc/J497-3N56.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- On April 28, 2025, following CPAN's press conference opposing H.B. 25-1312—including its provisions regarding preferred pronouns and chosen names—CPAN Executive Director Lori Gimelshteyn attended the Colorado Senate Judiciary Committee hearing on the bill. When Ms. Gimelshteyn delivered testimony to the committee expressing opposition to the bill, several transgender individuals vocally snickered. One transgender individual spat in her hair. And when Ms. Gimelshteyn stepped out to use the restroom, several transgender individuals stood in her path in a manner she perceived as intimidating and designed to deter her from passing, though she was able to proceed past them. For her safety, Ms. Gimelshteyn had to be escorted from the Capitol Building to her vehicle by Capitol police after several transgender individuals again stood in her path in a manner she perceived as intimidating and designed to block her path. After this incident, Ms. Gimelshteyn filed a complaint with the Capitol police.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[16]

- In addition, CPAN Executive Director Lori Gimelshteyn has received online harassment on many occasions as a result of her views on sex, gender ideology, and pronoun/name usage. She has received hostile comments threatening to protest her speaking engagements and disparaging her because she opposes gender-affirming treatment for minors. Several messages have also complained that Ms. Gimelshteyn and CPAN intentionally use supposedly incorrect pronouns or "deadnames" in public statements and marketing materials.

**Protect Kids Colorado.** To the best of its recollection, PKC is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In May 2021, Ms. Kimberly Chambers, a subject of PKC's "Art Club" documentary and an activist who had previously spoken to PKC Executive Director Erin Lee's daughter, encouraged Poudre School District, where PKC Executive Director Erin Lee's daughter attended school, to consider performing a "well-child check" on Ms. Lee and her daughter because Ms. Chambers believed Ms. Lee was not sufficiently affirming of her child's purported gender identity.

- On another occasion, on February 22, 2024, Ms. Kimberly Chambers made a post on Facebook calling Ms. Lee a "#ParentalRights terroris[t]." The post accused "groups like

---

[16] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

**47**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

#ProtectKidsColorado" of "child hate indoctrination" and "encourag[ing]" "physical, emotional, legislative, and fatal violence" against transgender-identifying youth. The post suggested that PKC and similar groups were complicit in the murder of "Nex Benedict," a transgender-identifying youth. The post "[t]hank[ed]" the Gay, Lesbian, & Straight Education Network "for holding [PKC] accountable."

- From the fall of 2023 through the Spring of 2024, Ms. Kimberly Chambers made a series of posts criticizing PKC's and Executive Director Erin Lee's advocacy, with the hashtag "#ForCLee," a reference to Ms. Lee's formerly gender-confused daughter.

- In March 2024, PKC Executive Director Erin Lee filed a report with the Federal Bureau of Investigation regarding death threats she had received because of her advocacy on gender ideology issues. The FBI followed up with Ms. Lee to ask for additional information.

- Leading up to PKC's April 10, 2024 screening of the "Art Club" documentary at Denver University, over 1,000 Coloradans, including a state legislator, signed an open letter to "denounce" the event and "call on … the University of Denver to not allow this event." The petition complained that PKC promotes "harmful rhetoric" and accused PKC of holding "anti-transgender and anti-science stances." Hundreds of protestors showed up at the event itself, where they verbally and physically harassed PKC Executive Director Erin Lee and other attendees. For example, protestors said that Ms. Lee was transphobic and accused her of misgendering transgender-identifying people. During the event, protestors sent Ms. Lee physical threats on Instagram. Ms. Lee needed Denver police to escort her safely to her vehicle and off campus. One of her hired bodyguards was injured.

- On April 13, 2024, PKC Executive Director Erin Lee spoke at a rally on the steps of the Colorado Capitol building organized by #DontMessWithOurKids. More than 30 transgender individuals stood on an adjacent sidewalk to protest the event. Several of the transgender protesters came into the crowd of rally attendees and disrupted Ms. Lee's speech. State police removed the protesters. In light of previous events—like the threatening conduct Ms. Lee suffered during PKC's April 10, 2024 event at Denver University—Ms. Lee felt she needed to, and did, hire private security for this event.

- On April 1, 2025, during a Colorado House Judiciary Committee hearing, Representative Yara Zokaie called PKC and other parental rights groups "hate groups" and compared them to the "KKK" because they opposed H.B. 25-1312's "chosen name" and "gender expression" provisions. Representative Zokaie doubled down on her complaint—again calling PKC and related groups "hateful" and the "KKK"—on April 4, 2025, during floor debates over H.B. 25-1312.

- On May 19, 2025, Bee Gonzalez, a Colorado mother, posted a video on TikTok directly targeting PKC's Executive Director, Erin Lee. Ms. Lee had previously posted on X about Ms. Gonzalez's child, a biological girl who was socially transitioned at school without the knowledge or consent of the child's father. Ms. Lee's post called the child a "little girl,"

**48**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

referred to the child using female pronouns ("she" and "her"), and noted the child's so-called chosen name using scare quotes ("'Ollie'"). Ms. Lee explained that stories like this are why PKC opposes H.B. 25-1312. In her video, Ms. Gonzalez said that she was "publicly notifying … Erin Lee" that her "child's name is Ollie and their pronouns are they/them." Ms. Gonzalez insisted that Ms. Lee "not continue to publish things that intentionally misgender them." Ms. Gonzalez described Ms. Lee's posts as "atrocities" and threatened to take legal action against Ms. Lee if Ms. Lee continued to refer to the child with biologically accurate terms. Ms. Gonzalez also referred to Ms. Lee by name during public testimony in support of H.B. 25-1312 at a Colorado Senate Judiciary Committee hearing.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs (including PKC) and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[17]

- In addition, PKC Executive Director Erin Lee has received dozens of messages over social media and in person threatening her life or wishing for her death because of her public stance on transgender ideology. Individuals displeased with her speech have publicly posted information about her children's schools and/or sent threatening messages to the schools. Individuals have also made comments online and in person Ms. Lee saying they would harass her church. Ms. Lee has also been "doxed." She has been stalked. And her home was broken into in May of 2023.

**Do No Harm**. DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and for their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

In addition, DNH is frequently the target of complaint and criticism for its use of pronouns and names and for its views on sex and gender. For example, DNH has received complaints and criticism like the following:

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using

---

[17] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

**49**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[18]

- The Southern Poverty Law Center has declared DNH an "Anti-LGBTQ+ Hate Group."[19]

- DNH has routinely received hostile commentary from members of the public who have staunchly opposed the organization's mission to curtail the unscientific and individually harmful practice of so-called gender affirming care for minors. These opponents have repeatedly attacked Do No Harm for challenging their preferred narratives and language concerning youth-focused gender ideology. They have shared odious comments on the Do No Harm website and posted offensive and sometimes shocking statements on social media, declaring DNH a "transphobic" and "bigot[ed]" organization. One user on X stated that "Orgs like [DNH] should be shutdown and investigated for unethical practices." In addition, DNH staff have received mail at their personal residences with hostile messages like "You are the HARM."

- In addition, DNH's members in Colorado have received complaints and criticism for their use of pronouns and names and their views on sex and gender. This includes Dr. Travis Morrell, Dr. Valeri Leswing, and Mountain Pediatrics, as described below.

**Dr. Travis Morrell**. To the best of his recollection, Dr. Morrell is aware of the following instances in which someone has complained about the use of pronouns and/or names of transgender individuals:

- In June 2024, the Colorado Medical Society voted on a proposal by Dr. Morrell to recognize that the definition of "female genital mutilation" includes some aspects of pediatric "gender-affirming" treatments, including "the alteration or removal of a minor's biologically healthy tissue that decreases potential innate adult functionality, and for which may involve the medical, hormonal, functional, or surgical treatments of gender dysphoria or gender incongruence." An assistant professor at the University of Colorado School of Medicine emailed his students, who would soon join Dr. Morrell in the medical profession, called Dr. Morrell's proposal "discriminatory and medically unconscionable," and encouraged the students to vote against the proposal.

- Also in June 2024, another professor at the University of Colorado School of Medicine emailed the leadership of the Colorado Medical Society to complain about Dr. Morrell's proposal

---

[18] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.

[19] *Anti-LGBTQ*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/NK5D-S35A; *see also 2024 Hate Map – Virginia*, Southern Poverty Law Center (archived Aug. 13, 2025), perma.cc/9ZC4-VCZ4.

50

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

regarding the definition of "female genital mutilation." The professor called the proposal "of-fensive," "deceptive," and "shameful." The professor called for the proposal to be "remove[d]" and "taken down." At least one member of the Colorado Medical Society's board of directors "[t]otally agree[d] with [those] sentiments" and indicated she would share the pro-fessor's complaint with other board members.

- On June 20, 2024, in a comment exchange on X regarding a post that highlighted the damage that gender-affirming care can do to a patient's reproductive abilities, a Colorado-based LGBTQIA+ activist organization told Dr. Morrell that he should "[b]e careful preaching" his views on the dangers of gender-affirming care "in Colorado" because "we have an active ban on conversion therapy" and Dr. Morrell "[w]ouldn't want an investigation …."

- On March 15, 2025, Dr. Morrell testified in favor of A.B. 104 (a proposed ban on gender-transition medical treatments for minors) in the Wisconsin State Assembly Committee on Health, Aging, and Long-Term Care. While testifying, Dr. Morrell was interrupted with cries of "Nazi" by an individual that Dr. Morrell believes was a transgender-identifying biological male. Wisconsin state police were required to keep the peace while Dr. Morrell was speaking, and at least one protester was removed by state policy shortly before or after Dr. Morrell's testimony.

- Dr. Morrell spoke at Colorado Parent Advocacy Network's Rocky Mountain Summit Part II on April 6, 2025. Medical professionals who attended Dr. Morrell's panel at the event were supposed to receive continuing medical education credits, approved by the Christian Medical and Dental Association. Before the event took place, however, activists filed complaints with the Accreditation Council on Continuing Medical Education, complaining that the event or-ganizers and speakers did not support so-called "gender-affirming care." The complainants sought to "flood [ACCME's] inbox and hold [the Summit speakers] accountable for their dan-gerous propaganda."[20] ACCME subsequently contacted CMDA to raise concerns about the "content validity" of Dr. Morrell's panel, and CMDA decided to "withhold credit for this event" so as to not "jeopardize [its] accreditation status with the ACCME."[21]

- Also leading up to the Rocky Mountain Summit Part II on April 6, 2025, activists encouraged people online to contact the venue—the Inverness Denver—and "voice [their] displeasure" and call on the Inverness to cancel the event. The activists complained that the event hosts supposedly "tortur[e] LGBT children" and that such beliefs are "not acceptable in Denver."[22]

- On April 6, 2025, at the Rocky Mountain Summit Part II itself, at least two individuals left the event during Dr. Morrell's panel. The two individuals were a father and his child who identifies as transgender. Before leaving, the father and child spoke with event staff and disagreed with

---

[20] *File a complaint against this BS propaganda*, Reddit (Apr. 1, 2025), bit.ly/3JekEvD.

[21] Valerie Richardson, *Organizer cites bias after losing CME credit for class on harms of 'gender-affirming care'*, The Washington Times (archived Aug. 14, 2025), bit.ly/45q9mM4.

[22] *CPAN – Anti LGBT hate group event in Denver*, Reddit (Apr. 2, 2025), bit.ly/4oxy9qB.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**52**

the views they expected Dr. Morrell and the other panelists to express. In addition, roughly 40-60 protestors were outside the event venue—the Inverness Denver—during the event.

- On August 7, 2025, a Colorado newspaper published an article criticizing Plaintiffs and their members for filing this lawsuit. The article claimed that Plaintiffs' refusal to compromise their beliefs by using someone's non-biological preferred pronouns or chosen name is "bigotry defended by sham." Plaintiffs' desire to refer to transgender-identifying individuals using biologically accurate terms, the article said, is "a deliberate act of disrespect" and "harassment" and a violation of "Colorado's anti-discrimination framework."[23]

- Multiple people have left negative Google reviews for Dr. Morrell's practice, at least some of whom never received treatment from Dr. Morrell or otherwise visited his practice. A number of these reviews specifically complain about Dr. Morrell's views on sex and gender. For example, "Not safe for LGBTQ+ patients or POC, stay away"; "This dude is incredibly bigoted please do not use this horrible human's services"; "Not a safe physician for lgbt patients."[24]



---

[23] Editorial Board, *Colorado transgender 'deadnaming' lawsuit is indefensible bigotry*, The Sentiel Colorado (Aug. 7, 2025), perma.cc/2S42-6H3C.
[24] perma.cc/UR6K-EZ8Y

**52**

53

# PLACEHOLDER

## Original page to be filed under restriction

53

54

# PLACEHOLDER

Original page to be filed under restriction

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Interrogatory No. 3**

As to Drs. Travis Morrell and Valeri Leswing's treatment of transgender patients, identify (1) the number of transgender patients each doctor has seen per year for each year since 2009, and (2) the number of patients that indicated they did not feel welcome in light of their use of pronouns and names of patients.

**Response to Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks information about all transgender patients Drs. Morrell and Leswing have treated. Plaintiffs object to this interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case because it seeks certain information dating back to 2009. Plaintiffs object to this interrogatory on the grounds that the terms "did not feel welcome" and "has seen" are vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks information not in Plaintiffs' possession, custody, control, or personal knowledge. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through two subparts.

Subject to and without waiving its objections, Plaintiffs respond as follows:

**Dr. Travis Morrell**

**(1)** Dr. Morrell does not ask for or keep records of his patients' gender identity. Nor does he keep records of whether a patient does or does not have gender dysphoria. Moreover, the number and type of patients Dr. Morrell treats in a given year varies based on the year, his clinical responsibilities, cultural trends, and other factors. To the best of his recollection:

From 2010 to 2011, Dr. Morrell worked as an obstetrics-gynecology resident physician at Loma Linda University Medical Center. He saw zero transgender patients in that time.

42

**3-App-058**

**55**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

From 2011 to 2012, Dr. Morrell continued in his role as an obstetrics-gynecology resident physician at the LLU Medical Center. In this time period, when on surgical rotations, Dr. Morrell saw approximately 1-3 patients per year who identified as "transsexual." (The term "transgender" was not widely used at the time.)

From 2012 to 2013, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Medical Center. He saw 0-2 patients per year who identified as "transsexual."

From 2013 to 2014, Dr. Morrell worked as a family medicine and preventive medicine resident physician at the LLU Health Education Consortium. He saw 3-6 patients per year who identified as "transsexual."

From 2014 to 2017, Dr. Morrell trained as a dermatology resident at LLU Health. He saw 0-3 patients per year who identified as "transgender."

From 2017 to 2018, Dr. Morrell underwent advanced fellowship training at the University of Massachusetts and had limited direct interactions with patients.

Dr. Morrell joined his current practice, Mountain West Dermatology, in 2018. Since then, he has seen 1-4 patients per year who identify as "transgender."

**(2)** Before 2021, Dr. Morrell held the view that using an individual's preferred pronouns and/or chosen name was appropriate as a matter of politeness and because he believed that so-called gender-affirming treatments were sought mostly by consenting adults. He therefore generally addressed individuals, including his patients, using their preferred pronouns and/or chosen name. And no patients indicated they felt unwelcome due to his use of pronouns and/or names.

Dr. Morrell's views changed, however, as medical professionals in the United States increasingly prescribed so-called gender-affirming treatments for minors. Dr. Morrell had witnessed the harms of such treatment for adults, and the increased risk of harm and lack of clinical justification for

43

**56**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

developing youth was immediately apparent to Dr. Morrell. Dr. Morrell came to believe that social transition, including the use of non-biological pronouns and names, harms individuals by reinforcing false beliefs and expectations about their bodies. Therefore, in the years since 2021, Dr. Morrell has refrained from addressing individuals, including his patients, using non-biological preferred pronouns and/or chosen names. When he has addressed or referred to individuals using pronouns and/or names, he has done so using biologically accurate pronouns and birth names.

Dr. Morrell enjoys treating all of his patients and endeavors to maintain positive and amicable relationships with them, regardless of their sex or gender identity. As such, none of Dr. Morrell's patients have told him that his use of biologically accurate pronouns and birth names—or his non-use of preferred pronouns and/or chosen names—makes them feel "unwelcome." He has, however, been the target of multiple negative reviews on Google that specifically complain about his views on sex and gender.

### Dr. Valeri Leswing

**(1)** Dr. Leswing does not ask for or keep records of her patients' gender identity. Nor does she keep records of whether a patient does or does not have gender dysphoria. To the best of her recollection, Dr. Leswing estimates that she treats somewhere between two and ten transgender patients each year.

**(2)** Dr. Leswing ensures that all of her patients feel welcome and cared for in her practice. This includes any and all patients who experience gender dysphoria. Moreover, not all patients who leave Mountain Pediatrics specifically state their reasons for leaving. To the best of Dr. Leswing's recollection, however, 5-10 families have left her practice after explicitly complaining that Dr. Leswing does not provide so-called gender-affirming care.

**57**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Interrogatory No. 4**

As to Dr. Travis Morrell, describe the corporate structure of Mountain West Dermatology and his relationship to it, including (1) the contractual relationship between Mountain West Dermatology and its dermatologists, including any agreements between Dr. Travis Morrell and Mountain West Dermatology; (2) the number of professionals that are part of Mountain West Dermatology; and (3) any referral practice between the professionals that are part of Mountain West Dermatology.

**Response to Interrogatory No. 4**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules. Plaintiffs object to this interrogatory as an attempt to exceed the permissible number of interrogatories through three subparts.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

**(1)** Mountain West Dermatology's physicians each own an equal share of the practice. Each physician's compensation is based on the money collected from each physician's own work, minus the physician's fair share of expenses. Like all of the physicians at Mountain West Dermatology, Dr. Morrell has signed an employment agreement with Mountain West Dermatology setting out, among other terms, his compensation and responsibilities as an employee of the practice.

**(2)** Mountain West Dermatology has nine physicians who work at, and are equal partners in, the practice.

**(3)** Each physician at Mountain West Dermatology has a panel of patients who generally return to that particular physician for follow-up visits. Mountain West Dermatology has no policy or practice requiring its physicians to refer to one another. Physicians do refer patients to one another, but the decision to refer, and to whom, is up to the individual physician and his or her best medical judgment. For example, one physician in the practice might refer to another if a patient's treatment

**58**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59

requires another physician's specific professional skills. But in the absence of such particularized need,

it is unusual for physicians in Mountain West Dermatology to see one another's patients.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Supplemental Interrogatory No. 1**

Describe Mountain West Dermatology P.C.'s practices and/or policies in assigning patients to and/or referring patients between the medical providers in Mountain West Dermatology P.C., including to assign, reassign, and/or refer patients to or from Dr. Travis Morrell because of his use of incorrect pronouns and deadnames of transgender individuals.

**Response to Supplemental Interrogatory No. 1**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Dr. Morrell believes this interrogatory is offensive and misplaced. As a physician, Dr. Morrell first and foremost wants to provide care for *all* of his patients, regardless of whether they share his views on sex and gender. Moreover, because Dr. Morrell relies on his practice for a living, he works hard to develop a steady stream of patients (both returning and new) that he can rely on for continued business. He does not want to send those patients to other physicians unless doing so is in a patient's best medical interests. As such, neither Dr. Morrell nor Mountain West Dermatology seeks to reassign or refer his patients to other physicians, either within or outside of Mountain West Dermatology.

No patients have been assigned, reassigned, and/or referred to or from Dr. Morrell because of his use of biological pronouns or birth names. Mountain West Dermatology does not have a policy and/or practice in place requiring referrals, or dictating a process for referrals, on account of a physician's pronoun or name usage or in any other circumstances.

47
**3-App-063**

**60**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**61**

**Supplemental Interrogatory No. 2**

Describe any instances in which any person has complained to any employee, representative, or provider at Mountain West Dermatology P.C. about Dr. Travis Morrell's use of incorrect pronouns and deadnames of transgender individuals, including any actions you took in response to such complaint.

**Response to Supplemental Interrogatory No. 2**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case. Plaintiffs object to this interrogatory on the grounds that the term "complained" is vague and ambiguous. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

No person has complained to an employee, representative, or provider at Mountain West Dermatology about Dr. Morrell's use of biological pronouns or birth names. Dr. Morrell has, however, received reviews on Google complaining about his views on sex and gender.

48

**61**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**Supplemental Interrogatory No. 3**

Describe any services and/or treatments offered by Dr. Travis Morrell that cannot be provided by another physician in Mountain West Dermatology P.C.'s practice, and any instances where a patient could not receive care from the practice due to the patient being unwilling to be treated by Dr. Travis Morrell due to his policy regarding transgender patients.

**Response to Supplemental Interrogatory No. 3**

Plaintiffs object to this interrogatory as overbroad, unduly burdensome, not proportional to the needs of this case, and seeking irrelevant information. Plaintiffs object to this interrogatory to the extent it seeks to impose an obligation not required by the Federal Rules of Civil Procedure or the local rules.

Subject to and without waiving its objections, Dr. Morrell responds as follows:

Though all physicians at Mountain West Dermatology are licensed to provide the full array of dermatological services, many patients seek out or are referred to Dr. Morrell because he is the only fellowship-trained and board-certified dermatopathologist at Mountain West. As such, Dr. Morrell handles Mountain West Dermatology's most challenging cases involving dermatopathology and related procedures. He is the only physician at Mountain West who is able to evaluate biopsy specimens for most diagnoses, including the most serious dermatological diagnoses such as melanoma. Dr. Morrell receives multiple biopsy specimens on a daily basis that are sent to him because they cannot be interpreted by other physicians. To his knowledge, Dr. Morrell is the only physician within a 2- to 4-hour drive who regularly provides these services.

No patient has been denied or otherwise not received care from Mountain West Dermatology due to Dr. Morrell's beliefs about sex and gender or his use of biological pronouns or birth names.

63

*As to Interrogatory Answers Regarding Defending Education:*

Signed under penalty of perjury this ___13___ day
of August, 2025.

_____
Sarah Perry
On behalf of Defending Education

**3-App-066**

**63**

**64**

*As to Interrogatory Answers Regarding Colorado Parent Advocacy Network:*

Signed under penalty of perjury this __15th__ day
of August, 2025.


*Lori A. Gimelshteyn*
Lori Gimelshteyn
On behalf of Colorado Parent Advocacy Network

**64**

*As to Interrogatory Answers Regarding Protect Kids Colorado:*

Signed under penalty of perjury this 14th day of August, 2025.

Erin Lee
On behalf of Protect Kids Colorado

65

*As to Interrogatory Answers Regarding Do No Harm:*

Signed under penalty of perjury this __14__ day
of August, 2025.

Kristina Rasmussen
On behalf of Do No Harm

**66**

Appellate Case: 26-1101    Document: 19-3    Date Filed: 06/08/2026    Page: 74

67

*As to Interrogatory Answers Regarding Dr. Travis Morrell:*

Signed under penalty of perjury this ⟨13⟩ day
of August, 2025.

_____

Travis Morrell, M.D., M.P.H.

67

68

*As to Interrogatory Answers Regarding Dr. Valeri Leswing and Mountain Pediatrics:*

Signed under penalty of perjury this ⎯11ᵗʰ⎯ day of August, 2025.

Valeri Leswing, D.O.
On her own behalf and on behalf of Mountain Pediatrics

**68**

**69**

*As to Objections:*

Respectfully submitted on August 15, 2025,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

**3-App-072**

**69**

**CERTIFICATE OF SERVICE**

I certify that on August 15, 2025, I emailed the foregoing to counsel for the Defendants.

*/s/ J. Michael Connolly*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

        *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official ca-
pacity as Director of the Colorado Civil
Rights Division, *et al.*,

        *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

**SUPPLEMENTAL DECLARATION OF LORI GIMELSHTEYN**

1.     I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.     I am the Executive Director of the Colorado Parent Advocacy Network ("CPAN"). In my role as Executive Director, I run the organization on a day-to-day basis and am its lead spokesperson.

3.     As explained in my previous declaration, CPAN is a statewide, grassroots, 501(c)(4) non-profit social advocacy organization organized under Colorado law. CPAN advocates for, among other things, educational excellence, school accountability, and parental rights and opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives.

**71**

4.      CPAN regularly hosts meetings, summits, and other events in furtherance of its mission. Many of those events are catalogued in Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories. Additionally, since Plaintiffs submitted their interrogatory responses, CPAN has hosted or co-hosted several additional events in places of public accommodation, including:

a.      CPAN's Gilded Tribute Benefit Gala, hosted at The Vehicle Vault, a museum and event space, in Parker, CO, on September 19, 2025;

b.      a Parliamentary Operations Training, hosted at the offices of the Independence Institute in Denver, CO, on January 2 and 3, 2026;

c.      the Constitution Connection Program for middle- and high-school students, hosted at the First Baptist Church in Denver, CO, on January 27, 2026; and

d.      Colorado's National School Choice Week Celebration, hosted on the West Steps of the Colorado State Capitol in Denver, CO, on January 27, 2026.

5.      As Plaintiffs' interrogatory responses indicated, CPAN also planned to host its third annual "Rocky Mountain Summit" in April 2026 in Denver, CO. As its theme, the Summit was going to address the "Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments." I anticipated hosting this year's Summit at the same location as previous Summits: The Inverness Denver hotel in Englewood, CO.

6.      Upon further consideration, however, CPAN has decided not to host the 2026 Rocky Mountain Summit. The Summit, in line with its theme, would feature conversations on a variety of issues relating to transgender identity, including the harm caused

72

by "preferred pronouns," "chosen names," and other so-called gender-affirming language. As such, it is possible that speakers and/or other attendees at the Summit would refer to transgender-identifying individuals using biologically accurate pronouns and birth names that conflict with those individuals' self-professed gender identity or gender expression.

7.    The annual Rocky Mountain Summit, moreover, is usually CPAN's most publicized event and garners significant community interest. As such, and because Colorado law as amended by H.B. 25-1312 threatens to punish so-called misgendering and deadnaming, I fear that CPAN, the Summit's speakers, and I would be subjected to discrimination complaints, investigated by the Colorado Civil Rights Division, and/or face financial or equitable penalties if we host the 2026 Summit as planned.

8.    But for Colorado law, CPAN would proceed with its plans to host the 2026 Rocky Mountain Summit.

9.    In previous years, CPAN required Rocky Mountain Summit attendees to purchase tickets for entry to the event. And CPAN anticipated selling tickets for the 2026 Rocky Mountain Summit as well. The annual Summit, moreover, is generally one of CPAN's most well-attended events, with many ticket-buyers. As such, the cancellation of the 2026 Summit represents a significant loss of funding for CPAN.

10.    Over the next few months, CPAN intends to reduce its normal quantity of public events and focus on fundraising efforts. CPAN hopes to raise enough funds over the next few months to hire a dedicated fundraiser and possibly additional staff. CPAN anticipates returning to a regular schedule of public events in support of its mission after completing its fundraising efforts.

**73**

11.     Though CPAN will reduce its normal schedule of events over the next few months, I anticipate that it will continue to host events in places of public accommodation in connection with its fundraising efforts. I anticipate that at least some of these events will be open to the public and will include speakers who discuss the importance of CPAN's work opposing gender ideology and so-called gender-affirming care. In addition, I plan to continue visiting and speaking to local civic and political groups about the dangers of gender ideology and gender-affirming care. On average, I have one or two such speaking engagements each month, and I anticipate maintaining that frequency.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February __9__, 2026.

_Lori A. Gimelshteyn_
Lori Gimelshteyn

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

     *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, *et al.*,

     *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

**SECOND SUPPLEMENTAL DECLARATION OF DR. VALERI LESWING**

1.　　I am over the age of eighteen and under no mental disability or impairment. I have personal knowledge of the following facts and, if called as a witness, would competently testify to them.

2.　　I am a licensed physician in the State of Colorado and a practicing pediatrician. I own and operate my own medical practice—Mountain Pediatrics—in Evergreen, CO. My practice focuses on providing complete pediatric care for children and young adults. I am the practice's sole owner and physician.

3.　　As explained in my first supplemental declaration (from November 13, 2025), after my two children left home to attend out-of-state colleges in August 2024, I decided to travel more frequently for personal trips and to visit my children. Accordingly, I planned to adjust Mountain Pediatrics' staff and hours of operation and use a new office space on a flexible basis to allow for greater freedom in my schedule.

1

**3-App-079**

**76**

4.      Since I submitted my first supplemental declaration, Mountain Pediatrics has completed the transition to a new schedule, location, and format for patient visits. Specifically:

a.      I am now treating patients both in person and through telehealth appointments. For in-person appointments, I am using a new office space located in the same complex as Mountain Pediatrics' previous office.

b.      I began seeing patients in person in Mountain Pediatrics' new office space and conducted my first telehealth appointments the week of February 2, 2026. I have additional in-person and telehealth appointments scheduled for the future. Although I have transitioned to a more flexible schedule, I anticipate that, moving forward, I will spend at least one day treating patients in person and at least one day conducting telehealth appointments most weeks.

c.      Mountain Pediatrics continues to employ an office manager to assist me with billing, handling patient records, and other administrative tasks.

5.      On February 1, 2026, I updated Mountain Pediatrics' website to reflect the practice's new schedule and location. *See* www.mountainpeds.com/visits. The updated website also explains that I am now seeing patients both in person and through telehealth visits. Visitors are able to schedule both in-person and telehealth appointments using the website.

6.      I continue to be available to treat existing patients, and I have appointments scheduled with existing patients in the near future. I also continue to accept new patients and have already conducted one telehealth appointment with a new patient.

2

77

7.      Although I have shifted to a more flexible schedule and now treat patients both in person and through telehealth appointments, I maintain an active practice with the same scope of treatment, providing complete pediatric care for children and young adults from newborns to patients up to 25 years old. My views, fears, and intentions outlined in my original declaration (from June 11, 2025) thus remain the same.

8.      I still anticipate treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future. Both I and Mountain Pediatrics remain members of Do No Harm, and I understand my practice remains subject to Colorado's laws governing places of public accommodation.

9.      I continue to believe that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity, and I want to exercise my fundamental constitutional right to speak in a manner that reflects those views to best serve the medical needs of all my patients. But, because Colorado law as amended by H.B. 25-1312 threatens to punish so-called deadnaming and misgendering, I remain unable to address or refer to individuals in my medical practice using biologically accurate terms inconsistent with an individual's supposed gender identity or otherwise speak consistently with my belief that sex is determined at birth and immutable. I continue to fear that I will be targeted, harassed, reported, and/or investigated based on my speech.

10.     I also still want to publish materials expressing my belief that sex is fixed at birth and immutable and that it is wrong and medically harmful to address or refer to someone using non-biological pronouns, chosen names, or other terms. For example, I still want to post a statement on Mountain Pediatrics' Facebook page explaining to

3

**3-App-081**

<span style="font-size:2em">**78**</span>

79

potential patients that, because I have an obligation as a physician not to harm my patients, I will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names. I would also like to publish on the Facebook page a review of relevant medical literature discussing the harms of so-called gender-affirming care and the importance of affirming children's biological sex. But I must refrain from publishing such materials because of Colorado law.

79

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge.

Executed on February 9th, 2026.

_____
Valeri Leswing, D.O.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-----------------------------------------------------

ZOOM DEPOSITION OF LORI GIMELSHTEYN
August 22, 2025

-----------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

-----------------------------------------------------

APPEARANCES:

     CONSOVOY MCCARTHY, PLLC
          By J. Michael Connolly, Esq.
             Paul Draper, Esq.
             1600 Wilson Boulevard, Suite 700
             Arlington, Virginia 22209
                Appearing via Zoom on behalf of
                Plaintiffs

     COLORADO ATTORNEY GENERAL'S OFFICE
          By Nora Q.E. Passamaneck
             Senior Assistant Attorney General
             Janna K. Fischer
             Senior Assistant Attorney General
             Dominick D. Schumacher
            Assistant Attorney General
             1300 Broadway, 10th Floor
             Denver, Colorado 80203
                Appearing via Zoom on behalf of
                Defendants CCRD, Sergio Cordova,
                Geta Asfaw, Mayuko Fieweger,
                Daniel S. Ward, Jade R. Kelly,
                and Eric Artis

AB Litigation Services

APPEARANCES (continued):

    COLORADO ATTORNEY GENERAL'S OFFICE
      By Lane Towery
       Assistant Attorney General
       1300 Broadway, 10th Floor
       Denver, Colorado 80203
         Appearing via Zoom on behalf of
         Colorado Attorney General

Also present:  Sarah Bomgardner

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of LORI GIMELSHTEYN, called by Defendants, was taken on Friday, August 22, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                          I N D E X

DEPOSITION OF LORI GIMELSHTEYN

EXAMINATION BY:                                    PAGE

     Ms. Passamaneck                                 5

     Mr. Connolly                                  138

|          |                                         | INITIAL REFERENCE |
| -------- | --------------------------------------- | ----------------- |
| EXHIBITS |                                         |                   |
| Exhibit 1 | Declaration of Lori Gimelshteyn        | 24                |
| Exhibit 2 | Plaintiffs Objections and Responses to Defendants First Set of Interrogatories | 26 |
| Exhibit 3 | Photograph at Prairie Middle School parking lot at CPAN rally, DE_000192 | 57 |
| Exhibit 4 | A Guilded Tribute Benefit Gala advertisement, DE_000166 | 64 |
| Exhibit 5 | Educate and Inform PowerPoint presentation, DE_000180 | 71 |

```
                                                     INITIAL
EXHIBITS (continued)                                REFERENCE

Exhibit 6      Educate and Inform PowerPoint           78
               presentation, DE_000180,
               native version

Exhibit 7      Press Release, Colorado Parent         117
               Advocacy Network Official
               Launch Event, DE_000007

Exhibit 8      Power to the Parents Event             117
               advertisement, DE_000025
```

*AB Litigation Services*

Educate and Inform program that CPAN offers?

A.    Yes.

Q.    And what is that?

A.    It is a series of -- it's a PowerPoint presentation.

Q.    And do they get a certificate for participating in a presentation on this?

A.    No.

Q.    Does CPAN have any physical location that is open to the public?

A.    No.

Q.    I'd like to turn your attention to paragraph 10 of your declaration, and you state, "CPAN hosts meetings, summits, and other events in places of public accommodation."  Do you see that?

A.    I do.

Q.    What did you mean in using the term "places of public accommodation"?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A.    So I'm not an attorney, but places of public accommodation include churches, bars, restaurants, hotels.  Sometimes we rent rooms.  We have contracts with a variety of organizations that

*AB Litigation Services*

are public in order to host our events.

Q.   (BY MS. PASSAMANECK)  You agree that CPAN itself is not a place to eat, drink, sleep, or rest, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  And you agree that CPAN itself is not a sporting or recreational area or facility, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  CPAN is not a public transportation facility, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  CPAN is not a barbershop or bathhouse, correct?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  CPAN is not a campsite or trailer camp?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  CPAN is not a mortuary, undertaking parlor, or cemetery?

86

*AB Litigation Services*

you also held a rally at the Prairie Middle School parking lot for the Cherry Creek School Board Meeting, correct?

A.   Yes.

Q.   And that is on pages 10 to 11 of Exhibit 2 in case you want to refresh your recollection regarding that event.

A.   Thank you.  Yes.

Q.   Now, it lists that no contracts were obtained for this event.  Do you see that?

A.   Yes.

Q.   You had no permit to hold a rally at the Prairie Middle School parking lot, correct?

A.   Yes.

Q.   It's fair to say that you kind of organized, everyone showed up, but it wasn't a -- actually, strike that.

Anyone passing the parking lot could listen to your event, correct?

A.   Yes.

Q.   You couldn't control who could listen and attend your event, correct?

A.   Yes.

Q.   And, in fact, there were a number of protesters at this event, correct?

**87**

*AB Litigation Services*

A.    Yes.

Q.    What is the Parasol Patrol?

A.    From my understanding, the Parasol Patrol is an organization of individuals that claim to defend individuals who identify as transgender.

Q.    I'm going to see if sharing my screen is easier for you as opposed to putting something in the chat, but let me know; and if not, I can put it in the chat.  I just want to make sure that we don't lose you.

So I'd like to mark as Exhibit 3 an image bearing the numbers DE_000192.

(Exhibit 3 was marked.)

Q.    (BY MS. PASSAMANECK)  Are you familiar with this image?

A.    Yes.

Q.    What does this image depict?

A.    This is an image of the parasols, the rainbow umbrellas that the organization members carry, and from my understanding, they use the parasols as a shield.

Q.    Was this image taken at the Prairie Middle School parking lot rally that CPAN held?

A.    Yes.

Q.    I will stop sharing my screen in case it

*AB Litigation Services*

on this, but if you'd like you may download what I've marked as Exhibit 4 and put in the chat, which is DE_000166.

A.   Thank you.  I'll download it and open it.

Yes, that is an advertisement.

Q.   This event you are planning is not open to the public, correct?

A.   Yes, it is open to the public if they purchase tickets.

Q.   How much is a ticket to the Guilded Tribute Benefit Gala?

A.   We have different levels, but a general admission ticket is $125.

Q.   Okay.  And you are also planning the Rocky Mountain Summit Part III, correct?

A.   Yes.

Q.   Do you have a general time frame for when you are planning to hold this event?

A.   Our goal would be to host it in 2026, in April of 2026, but right now we are concerned that we could be unable to host this event because of current law.

Q.   Okay.  You don't have the same concerns about the Guilded Tribute Benefit Gala, correct?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

A.   Yes.

Q.   (BY MS. PASSAMANECK)  And why is that?

MR. CONNOLLY:  Objection; form.

A.   The Rocky Mountain Summit on Safeguarding Children From Gender-Affirming Treatment Part III, which we have titled "Confronting Institutional Failure to Protect Children from the Harms of Gender-Affirming Treatments," will require people to reference individuals' birth names and biological pronouns, and it would greatly hinder our panel discussion to not be able to do that.

Q.   (BY MS. PASSAMANECK)  You are not planning -- actually, strike that.

So for the gala, you do not foresee having to use pronouns consistent with gender identity and/or chosen names; is that fair?

A.   We have --

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A.   Can you repeat the question or restate the question?

Q.   (BY MS. PASSAMANECK)  Sure.  You stated that you were concerned about the Summit Part III, but not the gala; is that fair?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A.   Correct.

Q.   (BY MS. PASSAMANECK)  Do you use this Educate and Inform presentation at any CPAN events?

A.   Yes.

Q.   Okay.  Feel free to take your time and go through the document, but I also know that you said you're very familiar with it.  When I went through this, I didn't see any slide that misgendered an individual; is that fair?

MR. CONNOLLY:  Objection; form.

Lori, if you need to take your time to look through the document to confirm this, please do.

A.   There is not a slide that specifically addresses that.

Q.   (BY MS. PASSAMANECK)  And is there a slide that specifically addresses pronoun usage?

MR. CONNOLLY:  Objection; form.

A.   There are -- there are slides that reference pronouns, and then my oral presentation does address that.

Q.   (BY MS. PASSAMANECK)  Which slides are you referring to?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

A.   So it would be Slide Number 3.

Q.   (BY MS. PASSAMANECK)   And that is --

A.   Slide Number 3, beginning with "Plummeting Academics" and ending with, "Hidden Use of Gender Transition Plans."

And I'm going to go through each slide.

Q.   Sure.

A.   Just a moment.

I believe Slide 2 is a video.  That is our main video for our organization that also addresses it.  Let's see here.

I would have to reference Slide 13.  I'm not sure which video this is.  Sometimes it changes, but we do have videos that do -- I would say that Slide 13 is going to be related to DEI, just because Slides 12 and 14 are related to DEI.

Slide 16, which is the Gender Unicorn poster that is posted in schools across the state from elementary to high school, does absolutely lead into oral discussion and questions and answers on biological pronouns, private spaces, males and female athletics.

Also, on Slide 17, when we talk about social emotional learning, this is also an opportunity during our oral presentation to talk

*AB Litigation Services*

specifically about gender ideology.

Slide 18, which is a sampling of the first five questions on the Healthy Kids Colorado Survey that is administered to middle-schoolers, this particular form is for middle-schoolers, it's also administered in high school, where right away after the first two questions, the questions talk about gender identity, transgender, and sexuality for children between the ages of 10 to 13, and this does have an oral component of the presentation that does dive into gender identity.

I would have to look to see what the video is in my PowerPoint for Slide 20.  I'm not sure what that video is off the top of my head, but it could relate.

And then Slide 21, which is a QR code for our most recent Rocky Mountain Summit, that also has an oral component where we talk about gender identity pronouns, birth names, private spaces, male and female athletics, et cetera.

Q.   Because you've referenced a number of videos in this, I'm going to drop into the chat and I'll just mark as Exhibit 6 the native PowerPoint that we received.  It is, for the record, 215 -- over 215 megabytes, so I don't know whether or not

*AB Litigation Services*

A.    Yes.

Q.    That video did not misgender any individual, correct?

MR. CONNOLLY:  Objection.

A.    Not to my knowledge.

Sorry.

MR. CONNOLLY:  Objection; form.

Q.    (BY MS. PASSAMANECK)  That video did not discuss the use of pronouns to match gender identity, correct?

MR. CONNOLLY:  Objection; form.

A.    Not in the video.

Q.    (BY MS. PASSAMANECK)  Okay.  Are there any other videos or audio we should -- you would like to listen to in this presentation?

A.    Yes.  I believe I've gone through all the audio and video and will clarify that these videos do oftentimes lead into conversation on pronouns -- biological pronouns and birth names and gender identity.

Q.    Okay.  I'd like to explore that a little more.

You can bring down your screen if you'd like.  It may help the audio.

During this presentation, do you deadname

*AB Litigation Services*

any particular individuals?

A.   I will call people by their birth name.

Q.   Okay.  Are those people that are in the audience, or are these individuals that are known in the public?

MR. CONNOLLY:  Objection; form.

A.   These are individuals known in the public.

Q.   (BY MS. PASSAMANECK)  Can you provide an example?

MR. CONNOLLY:  Objection; form.

A.   Yes.  For example, I would say Representative Brian Titone, who self identifies as a transgender woman and goes by the name Brianna Titone.

Q.   (BY MS. PASSAMANECK)  Okay.  Anyone else?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  Who?

A.   Kevin Smotherman, who identifies as a transgender woman and goes by the name of Vivian Smotherman.

Q.   Any other examples?

A.   Yes.  I will reference children by their biological birth names and pronouns.

*AB Litigation Services*

Q.   And those are children that are known in the public?

A.   Yes and no. -- well, yes.  Every reference that I make in an event is something that is known to the public that was released either through court records or media, and the families have given permission for me to discuss.

Q.   Okay.  Have you ever deadnamed somebody who was in the audience, to your knowledge?

MR. CONNOLLY:  Objection; form.

A.   Not to my knowledge.

Q.   (BY MS. PASSAMANECK)  Okay.  Have you ever -- so we talked about deadnaming.

Let's talk about misgendering.  What, if anything, do you discuss about use of pronouns to match gender identity in providing this presentation?

MR. CONNOLLY:  Objection; form.

A.   I apologize.  Can we go back to my answer on the last question?

Q.   (BY MS. PASSAMANECK)  Sure.

A.   I do believe -- I didn't necessarily know that there was this particular person who identifies as transgender was in the audience, but this particular person is a journalist that writes

for the Colorado Times Recorder, and I may have referenced him in my remarks by his birth name instead of as the name that he goes by now, which is Heidi Beedle.

Q.   Okay.  And so just to make sure I understand, at a CPAN event, this reporter either was or may have been in the audience?

A.   Yes.

MR. CONNOLLY:  Objection; form.

A.   Sorry.  Yes.

Q.   (BY MS. PASSAMANECK)  And did that reporter correct you in your reference to them by their birth name?

A.   No.

Q.   Did the reporter leave after you had used their birth name?

A.   Not to my knowledge.

Q.   Okay.  So we've talked about deadnaming.

I'd like to talk about use of pronouns to match gender identity.  In providing -- in giving this presentation, do you discuss use of pronouns?

A.   Yes.

Q.   And what do you say?

A.   That it is our organization's knowledge that sex is determined at birth and is immutable,

*AB Litigation Services*

and so we talk about people being compelled --

especially students in a classroom being compelled

to lie if there is someone who identifies as

transgender, and how that is a violation of their

constitutional right of free speech.

Q.    Do you encourage individuals to use

birth -- strike that.

Do you encourage the audience members to

use pronouns matching sex at birth?

A.    Yes.  We do tell people that it is cruel

to tell a child that they were born in the wrong

body, and that they should use their biological

pronouns.

Q.    Your example was specific to an

individual.  My question is a little more broader.

Do you encourage audience members to misgender

transgender individuals?

A.    We encourage our audience members to use

the birth names and biological pronouns of

children.

Q.    How about adults?

MR. CONNOLLY:  Objection; form.

A.    I don't have any recollection of telling

or informing people that they should use birth

names or biological pronouns for adults.  Our work

in any way?

MR. CONNOLLY:  Objection; form.

A.    Not to my knowledge.

Q.    (BY MS. PASSAMANECK)  Okay.  Did you insult Representative Titone for being transgender?

MR. CONNOLLY:  Objection; form.

A.    I did not, not to my knowledge.

Q.    (BY MS. PASSAMANECK)  Okay.  Did anyone tell you they were offended by your reference to Representative Titone using their birth name?

A.    Sometimes we receive comments on our social media accounts, and many of our venues where we host events receive emails indicating that our speech is unacceptable and that they should cancel our events because we will use birth names and biological pronouns.

Q.    Okay.  Those complaints are prior to an event --

MR. CONNOLLY:  Objection; form.

Q.    (BY MS. PASSAMANECK)  -- or about what occurred at an event?

A.    Those --

MR. CONNOLLY:  Sorry.  Lori, just a reminder to pause a little to give me time to say my objection, please.

*AB Litigation Services*

Q.   (BY MS. PASSAMANECK)  The next bullet, the last one on page 33, describes protests in relation to CPAN's Rocky Mountain Summit Part II, correct?

A.   Yes.

Q.   And they were carrying signs like "Trans Rights Are Human Rights" and "Eliminate the TERFs," correct?

A.   Yes, according to people that took images and observed the protesters as they were driving into the venue.

Q.   I apologize.  I'm not trying to be offensive.  I don't know what the term "TERFs" means.  Do you know what that means?

A.   I do.

Q.   And what is that a reference to?

A.   Trans-exclusionary radical feminists.

Q.   You agree that the term TERFs is derogatory?

MR. CONNOLLY:  Objection; form.

A.   Yes.

Q.   (BY MS. PASSAMANECK)  Okay.  It's fair to say that these signs are broader than protesting simply CPAN's use of pronouns to match sex at birth and deadnaming, correct?

MR. CONNOLLY:  Objection; form.

A.   I believe that it is inclusive of using people's birth names and biological pronouns.

Q.   (BY MS. PASSAMANECK)  It states that you spoke to the protesters for approximately 15 minutes.  Is that true?

A.   I -- two protesters entered the venue, and I was alerted by security because they were acting suspiciously, trying to record the event. They were sweating.  They were looking around.

And so I took the opportunity to sit -- well, to meet with them, and they shared their disagreement with the summit being hosted, and they ended up staying.  They both paid for a ticket, and they stayed for the event for approximately 20 minutes, and then left.

Q.   Their complaints about the summit were regarding the content of gender-affirming care and the discussion of trans issues generally, not just misgendering and deadnaming, correct?

MR. CONNOLLY:  Objection.

A.   It was -- sorry, I keep doing that.

MR. CONNOLLY:  Objection; form.

A.   It was inclusive of misgendering and -- as they stated in the conversation.  We actually

had a conversation where they accused me of misgendering, and I indicated that we use biological birth names and -- we use birth names and biological pronouns when discussing children with rapid onset gender dysphoria.

Q.   (BY MS. PASSAMANECK)  Were their complaints inclusive of but broader than simply misgendering and deadnaming?

MR. CONNOLLY:  Objection; form. Objection; vague.

A.   Can you restate that?

Q.   (BY MS. PASSAMANECK)  Sure.  You had a discussion with these individuals for 15 minutes, and at least in the interrogatory response, you state that -- the interrogatory response states that they complained that CPAN promoted voices that do not support gender-affirming care.

And so my question is do you agree that their complaints were not limited to misgendering and deadnaming, but were broader, to include at least CPAN's position on gender-affirming care?

MR. CONNOLLY:  Objection; form.

A.   Yes.  It was inclusive of using people's birth names and biological pronouns, and more broad to include our stance that gender-affirming

A.   I have been notified that venues have received complaints.  I have received comments on social media in reference to using individuals' birth names and biological pronouns, as well as for my views opposing gender-affirming practices on minor children.

Q.   (BY MS. PASSAMANECK)  In your answer you added not just simply misgendering or deadnaming, but the issue of gender-affirming care.

My question is limited to whether you have received a complaint from an individual at an event that you deadnamed or misgendered someone?

MR. CONNOLLY:  Objection.

A.   So you're saying at an event?

Q.   (BY MS. PASSAMANECK)  Correct.

MR. CONNOLLY:  Objection; form. Objection; asked and answered.

A.   So if you are saying at an event have I received a complaint, the answer is yes.  When those two protesters at the Rocky Mountain Summit Part II came and spoke to me, they specifically addressed with me my choice to use speech to use biological pronouns and to address people by their birth name, and they termed it as misgendering and deadnaming.

103

*AB Litigation Services*

Q.   (BY MS. PASSAMANECK)  And we discussed that event in the interrogatory response, correct?

A.   Correct.

Q.   Okay.  And you described those individuals as protesters, correct?

A.   Yes.

Q.   You also mentioned that you've received many complaints, but they are so voluminous you were not able to collect all of them; is that fair?

MR. CONNOLLY:  Objection; form.

A.   Yes.  Sorry.  Yes, and many are oral as well.

Q.   (BY MS. PASSAMANECK)  Okay.  Other than those two individuals who were protesting at one of your events, are there any other instances in which someone complained to you solely about you deadnaming or misgendering an individual?

MR. CONNOLLY:  Objection; form.
Objection; asked and answered.

A.   Are you asking at an event or before an event or after an event?

Q.   (BY MS. PASSAMANECK)  Let's start with at an event.

MR. CONNOLLY:  Objection; form.

A.   At the event, the one instance that I

*AB Litigation Services*

disclosed to you in a prior question.

Q.   (BY MS. PASSAMANECK)   No other examples though, correct?

A.   I have no other examples at an event where an individual complained to me directly that I was using biological pronouns or birth names.

Q.   Have you received any complaints after an event about your misgendering and deadnaming of individuals at the event?

A.   Yes.

MR. CONNOLLY:   Objection; form.

A.   Sorry.   Yes.

Q.   (BY MS. PASSAMANECK)   Thank you.

Were any of those complaints limited to your misgendering and deadnaming, or were they broader and inclusive of the speech generally?

MR. CONNOLLY:   Objection; form.

A.   Yes.   In articles that are written, and also in online comments.

Q.   (BY MS. PASSAMANECK)   What articles are you referring to?   Are they the ones that we discussed in looking at CPAN's response to Interrogatory Number 2?

A.   Yes.

Q.   Online comments.   Sitting here today, can

*AB Litigation Services*

you identify any online comment that complained about CPAN's misgendering and deadnaming at an event?

MR. CONNOLLY:  Objection; form.

A.   I have read through thousands and thousands of comments.  I can't state verbatim what those comments were, but alluding to the use of biological pronouns and birth names as bigotry and discrimination.

Q.   (BY MS. PASSAMANECK)  Okay.  I only have what you produced to me, so that's -- that is the problem.

When you refer to transgender individuals using their birth names and pronouns matching their sex at birth, are you intending to put them down?

MR. CONNOLLY:  Objection; form.

A.   No.  I'm attempting to speak the truth.

Q.   (BY MS. PASSAMANECK)  You're not intending to insult them, correct?

A.   No.

MR. CONNOLLY:  Objection; form.

Q.   (BY MS. PASSAMANECK)  You're not intending to harass them by using their birth names and sex at birth, correct?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

the future."  Do you see that?

A.   I do.

Q.   Okay.  You state, For example, at our last event, a transgender-identifying individual showed up at our event and told me he had come because he was concerned about -- concerned that we were not going to represent the perspective of the transgender community at our event.  Do you see that?

A.   Yes.

Q.   What event are you referring to?

A.   The Rocky Mountain Summit Part II this year.

Q.   And so he was -- strike that.

His complaint was not that CPAN was misgendering and deadnaming individuals, correct?

MR. CONNOLLY:  Objection; form.  Objection; misstates testimony.

A.   His complaint was inclusive of that.  This was one of the two individual protesters that I have discussed in prior answers.

Q.   (BY MS. PASSAMANECK)  Okay.  And then you state a little further down, "At the same event, two different parents each brought one of their children.  One child identifies as transgender and

*AB Litigation Services*

the other identifies as nonbinary."

Did you interact with either of these parents or their children?

A.   Yes.

Q.   With both of them or just one?

MR. CONNOLLY:  Objection; form.

A.   I interacted with both parents and both children.

Q.   (BY MS. PASSAMANECK)  Okay.  Let's start with parent one, let's say.  Tell me what your interaction was.

A.   I greeted them.  I knew that they were in attendance.  I welcomed them.  And I spoke to the parents' child using the child's birth name and that it was nice to formally meet this child and that I hoped that the child would gain some perspective from the panel discussions.

Q.   And what did the child say in response?

A.   The child just responded with gratitude, just, Thanks.  There wasn't much conversation from the child.

Q.   Okay.  Did the parent correct you for using the child's birth name?

A.   No.

Q.   Is it fair to say that the parent uses --

strike that.

Do you know whether that parent uses the birth name of that child in referring to that child?

MR. CONNOLLY: Objection; form.

A. The parent used the birth name of that child when talking with me. I am not aware of how that parent addresses that child at home.

Q. (BY MS. PASSAMANECK) Okay. Tell me about the second -- the interaction with the other parent and child.

A. It was very similar. I addressed the parent, hugged the parent. I acknowledged the child and welcomed the child to the event.

Q. And what did the -- what, if anything, did the child say in response?

A. The child just nodded.

Q. Did you use particular pronouns with the child?

A. I cannot recall. I don't believe so, but I can't say for sure.

Q. You agree that when two people are talking to each other, the use of pronouns kind of falls to the wayside?

MR. CONNOLLY: Objection; form.

We just talked about instances in which transgender individuals have attended CPAN events as described in paragraph 13 of your declaration, correct?

A.   Yes.

Q.   Setting aside protesters, are there any other instances that you recall sitting here today of transgender individuals attending CPAN events?

MR. CONNOLLY:  Objection; form.

A.   Yes.  I have observed individuals that identify as transgender at our events.

Q.   (BY MS. PASSAMANECK)  And have you interacted with any of those individuals?

A.   Can you clarify?

Q.   Did you speak with any of them?

A.   I know that at the Senate Judiciary Committee on 1312, that hearing, I was kind of forced into interacting with several people who do identify as transgender, as they were kind of physically blocking access to the restroom.  So I had to politely request, you know, Excuse me, may I please get by, so it was more just general conversation.

Q.   Okay.  That senate hearing was not a CPAN event, correct?

*AB Litigation Services*

A.   We did host a press conference on the west steps of the Capitol that day, and there were these individuals.  Several individuals were present at the press conference, and later, from my perspective, were using intimidation tactics to make me feel uncomfortable.

Q.   So these protesters that were at this event, correct?

A.   I would say that they disagree with our organization's views.  They were not actively protesting at the event.  They were present at the event.

Q.   And how did you know those individuals were transgender?

A.   Just from observation.

Q.   Do you ever -- strike that.

You state that you knew these individuals were transgender from observation.  When you were interacting with someone -- actually, strike that.

Have you ever interacted with someone that you believe is transgender but don't have confirmation?

MR. CONNOLLY:  Objection; form.

A.   Can you explain what you mean by "confirmation"?

it impossible for CPAN and our leadership to effectively exercise our constitutionally protected right to speak in a manner that reflects our sincere belief that sex is immutable and fixed at birth."

Is that a true statement?

A.   Yes.

Q.   Prior to House Bill 25-1312, did you believe you were violating any Colorado law in your speech?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A.   I am not an attorney, nor am I -- have I gone through all of the state statutes, but prior to this bill becoming law, I did not believe we were violating any state statute.

Q.   (BY MS. PASSAMANECK)  The last sentence of paragraph 20 of your declaration, you state, "I understand the Colorado Civil Rights Division has also adopted regulations that prohibit, quote, unlawful harassment, unquote, which is -- it defines to include, quote, deliberately misusing an individual's preferred name, form of address, or gender-related pronoun."  Do you see that?

*AB Litigation Services*

A.   I never read the statute prior to lobbying against 1312, and I cannot remember the bill number for the changes to CADA that created this circumstance for individuals that identify as transgender being discriminated against if people call them by their birth names or biological pronouns, but when I became aware that this was in place, I immediately silenced myself.

Q.   (BY MS. PASSAMANECK)  What is the "it" that you're referring to?  Are you referring to the regulation or House Bill 25-1312?

A.   The --

MR. CONNOLLY:  Objection.

THE DEPONENT:  I'm getting tired.  Sorry, guys.  Go ahead.  What was the objection?

MR. CONNOLLY:  Objection; form.

A.   Can you repeat the question again?

Q.   (BY MS. PASSAMANECK)  In your answer you said, Once I became aware of it, I immediately silenced myself, and my question is what is the "it"?  Is it the House Bill 25-1312 or the regulation that you're referring to in that answer?

A.   I'm --

MR. CONNOLLY:  Objection; form.

THE DEPONENT:  Sorry.  I might need to

*Lori Gimelshteyn  - 08/22/2025*            *128*
**3-App-116**

**113**

*AB Litigation Services*

take a break here.

A.   I am referencing -- it was 1312 that really grabbed my attention.  And, you know, I'm not an attorney.  I'm not a legislator.  And reading through all of these regulations and these bills is an overwhelming task for an attorney, never mind someone who is not an attorney.

But I became quite alarmed when 1312 was on the floor, and then this other bill, I cannot remember the number of it, that added discrimination protections for individuals who identify as transgender.  And I realized that I really needed to prohibit my speech and really make sure that I was in alignment, especially when Governor Polis signed these bills into law.

MR. CONNOLLY:  We have been going for about an hour now.  Can we take a break?

MS. PASSAMANECK:  I would love just a few more questions to finish up this line, and then we'll be very close to being done.

But it's up to you, Ms. Gimelshteyn. Would you like a break now?

MR. CONNOLLY:  She did ask for a break, and she's having trouble with the objections. We've been going an hour, so I would prefer it.  I

*AB Litigation Services*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

---------------------------------------------------

ZOOM DEPOSITION OF ERIN LEE          August 21, 2025

---------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

---------------------------------------------------

APPEARANCES:

        CONSOVOY MCCARTHY, PLLC
            By J. Michael Connolly, Esq.
               Paul Draper, Esq.
               1600 Wilson Boulevard, Suite 700
               Arlington, Virginia 22209
                  Appearing via Zoom on behalf of
                  Plaintiffs

        COLORADO ATTORNEY GENERAL'S OFFICE
            By Nora Q.E. Passamaneck
               Senior Assistant Attorney General
               Janna K. Fischer
               Senior Assistant Attorney General
               Dominick D. Schumacher
               Assistant Attorney General
               1300 Broadway, 10th Floor
               Denver, Colorado 80203
                  Appearing via Zoom on behalf of
                  Defendants CCRD, Sergio Cordova,
                  Geta Asfaw, Mayuko Fieweger,
                  Daniel S. Ward, Jade R. Kelly,
                  and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

      COLORADO ATTORNEY GENERAL'S OFFICE
          By Talia Kraemer
            Assistant Attorney General
            1300 Broadway, 10th Floor
            Denver, Colorado 80203
              Appearing via Zoom on behalf of
              Colorado Attorney General

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of ERIN LEE, called by Defendants, was taken on Thursday, August 21, 2025, commencing at 9:05 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                    I N D E X

DEPOSITION OF ERIN LEE

EXAMINATION BY:                                    PAGE

    Ms. Passamaneck                                  5

EXHIBITS                                          INITIAL REFERENCE

Exhibit 1    Declaration of Erin Lee                19

Exhibit 2    Plaintiffs' Objections and             37
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 3    Movie Screening: Art Club              44
             with Erin Lee flyer

Exhibit 4    Protect Girls Sports in                56
             Colorado flyer

Exhibit 5    Text messages between Erin             57
             Lee and Jennifer Sey re:
             Andres Bissonette Gutierrez

Exhibit 6    Giving Parents a Voice Town            60
             Hall flyer

**117**

*AB Litigation Services*

```
                                                    INITIAL
    EXHIBITS (continued)                            REFERENCE

    Exhibit 7    (Not used.)

    Exhibit 8    Colorado Federation of              63
                 Republican Women District 8
                 Meeting, August 12, 2023, flyer

    Exhibit 9    Art Club PowerPoint presentation    67

    Exhibit 10   Notice of Parker Conservatives      65
                 Meeting, September 4, 2024

    Exhibit 11   TikTok video, Bee Gonzalez          95
```

*AB Litigation Services*

A   I'm not sure I understand that question either.  We have this lawsuit, but I don't believe outside of this we've utilized the court system, no.

Q   (BY MS. PASSAMANECK)  Did you bring this action to help promote PKC's mission of protecting kids and strengthening families in Colorado?

MR. CONNOLLY:  Objection; form.

THE DEPONENT:  Am I allowed to answer?

Q   (BY MS. PASSAMANECK)  Yes.

A   We brought this lawsuit to protect our ability to speak the truth in order to protect kids and strengthen families in Colorado.

Q   What do you mean by "speak the truth"?

A   Biological truth, male and female.

Q   And, in particular, PKC wishes to refer to individuals according to their sex at birth and names given at birth; is that a fair statement?

A   That's correct.

Q   At paragraph 4 of your declaration, Exhibit 1, the second sentence, you state the mission of PKC is to restore the principle that parents have a fundamental right to make decisions about their children's well-being and education. Is that a correct statement?

to give a yes or no answer.  I do not believe it's kind or loving to tell a child that they were born in the wrong body or that something is fundamentally wrong with them and needs to be changed.

Q   If a child tells their parent, Listen, I want my name now to be River instead of Joe, is it okay for the parent to call that child River?

MR. CONNOLLY:  Objection; form.

A   I'll say, again, that's not an easy yes or no answer.  There's too much nuance.  I do not believe it's kind or loving or right to tell a child that they are not their biological sex.

Q   (BY MS. PASSAMANECK)  So the difference is about it being tied to biological sex as opposed to categories of names that might be nicknames or other names that aren't tied to a name that does not reflect biological sex; is that fair?

MR. CONNOLLY:  Objection; form.

A   That's correct.  Children go by nicknames.  But, again, I don't believe it's kind or right to push a child into believing they are the opposite sex or rejecting their biological sex.

Q   (BY MS. PASSAMANECK)  In paragraph 4 of your declaration, in particular, the last sentence,

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A    Correct.  Although we are present all over the state all the time.  So no set physical location, but we frequent lots of public spaces all over the state through my advocacy and the volunteers of PKC.

Q    (BY MS. PASSAMANECK)  Understood.  We'll get to the actual events.  But there's no single location, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.

Q    (BY MS. PASSAMANECK)  Okay.  Let's look at paragraph 10 of your declaration.  Let me know when you're there.

A    Okay.

Q    It says, "PKC hosts meetings and other events in places of public accommodation."  Do you see that?

A    Yep.  Yes.

Q    When you included this sentence, what did you mean by a place of public accommodation?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney nor did I define

*AB Litigation Services*

public accommodation in statute.  But we host meetings in public spaces where anyone is welcome to attend.

Q    (BY MS. PASSAMANECK)  So that's what you meant when you wrote the words, "PKC hosts meetings and other events in places of public accommodation"?

MR. CONNOLLY:  Objection; form.

A    Correct, yes.  We only host meetings in places -- public places where anyone is welcome to attend.

Q    (BY MS. PASSAMANECK)  Okay.  The last sentence you state -- of paragraph 10, you state, "For example, in July and August of 2024, PKC leased space in Denver-area restaurants to host signature-gathering events in support of its ballot initiatives.  PKC publicized these events on social media."  Do you see that?

A    Yeah.  Yes.

Q    Why did you choose these two events to highlight in this paragraph?

MR. CONNOLLY:  Objection; attorney-client privilege.  I instruct the witness not to answer.

Q    (BY MS. PASSAMANECK)  I assume you're taking your attorney's counsel not to answer my

*AB Litigation Services*

educational institution, correct?

MR. CONNOLLY:  Objection; form.

A    We are not a physical educational institution, but we are an institution that promotes education.

Q    (BY MS. PASSAMANECK)  And as an institution that provides education, you have no physical location, correct?

MR. CONNOLLY:  Objection; form.

A    We do have a physical address, but not out of which we are educating people, correct.

Q    (BY MS. PASSAMANECK)  Thank you.  And PKC is not a public building, park, arena, theater, hall, auditorium, museum, library, exhibit, or public facility of any kind, whether indoor or outdoor?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked a legal conclusion.

A    That is correct, but we do operate in all of these places.

Q    (BY MS. PASSAMANECK)  Understood.  But you're not any of those facilities, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked

you have it.  I would just like you to identify whether this is the flyer for that event.

A    Yes, that's the flyer.

Q    Okay.  And so this was an event cosponsored by the Denver University Chapter of Turning Point?

A    That's correct.

Q    As a cosponsor, what was PKC's role as opposed to Turning Point's role?

MR. CONNOLLY:  Objection; form.

A    We shared equal responsibility of publicizing the event to garner attendance, but Protect Kids Colorado was the sole speaker at the event showing the film, and then myself and our chairman, Kevin Lundberg, speaking.

Q    Turning Point reserved the venue at the University of Denver, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.  A University of Denver student reserved that space, and then we were actually moved to a different room because of threats made against the event.

Q    (BY MS. PASSAMANECK)  Because a Denver University student reserved the room, you can't speak to the terms and conditions placed on the

reservation, correct?

MR. CONNOLLY:  Objection; form.

A    Correct, although I did communicate with the -- I believe he was the head of the College of Business prior to the event about expectations.

Q    (BY MS. PASSAMANECK)  Do you know whether Turning Point was able to reserve the space only because it was a Denver University organization?

A    I am not sure.

Q    And we've already discussed this, but the documentary Art Club is about you and your family, correct?

A    For the most part, yes, that's the main theme of the film.

Q    Does PKC own the rights to the movie?

A    No.  I guess I own the rights to the movie, although our chairman, Kevin Lundberg, is the filmmaker.  And so it was a project that he and I did together, again, as a means to educate the public on the issues that PKC represents.

Q    And was this event open to the public or only students?

MR. CONNOLLY:  Objection; form.

A    This event was open to the entire public, and we did have lots of people come who were not

*AB Litigation Services*

Denver University students.

Q    (BY MS. PASSAMANECK)  And it was a free event, correct?

A    Correct.

Q    Did people need to RSVP for the event?

A    People did RSVP for the event; there was a link for them to do so.  But it was not a requirement.  That was just for us to gauge potential attendance.  And as it turned out, there were way more people than who RSVPed.

Q    And, in fact, there were a number of protesters that came to this event, correct?

A    Correct.  There were hundreds of protesters.

Q    Focusing on the event itself, you weren't engaged in any commercial activity in showing this movie, correct?

MR. CONNOLLY:  Objection to the extent the witness is being asked for a legal conclusion.

A    I don't believe so.  We just showed the film and gave speeches.

Q    (BY MS. PASSAMANECK)  The protesters that were at this event, it's fair to say they weren't there to have an open discussion about PKC's mission; is that fair?

*AB Litigation Services*

MR. CONNOLLY:  Objection.  Objection; form.

A    That is correct.  There was a petition that was circulated that was actually signed by Colorado legislators and others to prevent my ability to speak at that event, and hundreds showed up.  They were outside the window, outside the door, outside the building yelling at me.

Q    (BY MS. PASSAMANECK)  They weren't there to receive any goods or information from PKC by attending this event, correct?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked for a legal conclusion.

A    I would say not commercial goods, but the people who were in the room did watch the film and engage in my conversation.

Q    (BY MS. PASSAMANECK)  I'm talking about the protesters, the hundreds of folks that were demonstrating outside and, I saw the video, I think also inside the room at certain points.  The protesters weren't there to obtain information from PKC, right?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.  Objection to the

*AB Litigation Services*

extent the witness is being asked for a legal conclusion.

A   I don't know that I can really speak to their intent in being there.  But I can say the people who were in the room did, again, watch the film and engage with our information-sharing.

Q   (BY MS. PASSAMANECK)  Okay.  You also held -- we talked briefly about the two events that you held at restaurants, correct?

A   Yes.

Q   And those are included on pages 20 to 21. Do you see that?

A   Yes.

Q   That's the Save Girls Sports Rally and the PKC Signing and Notary Event, right?

A   Yes.

MR. CONNOLLY:  I'm sorry, did you mean pages 21 and 22?

MS. PASSAMANECK:  Are you looking at the PDF pages or -- I'm looking at the number on the printed copy.

MR. CONNOLLY:  Yeah, and the one I have starts with In The Zone Sports Bar on page 21 and then Wide Open Saloon on page 22.

MS. PASSAMANECK:  Oh, you are absolutely

128

*AB Litigation Services*

goes on, but, yes, they do provide that.

Q    Okay.  Thank you.  We're going to flip around a little bit.  I'll get the pages correct.  Going to the interrogatory responses, Exhibit 2, I just want to direct your attention to paragraph -- page 25.

A    Okay.

Q    The last paragraph on page 25 references your speaking engagements, and the last sentence, which starts on page 25 with, "When speaking," and it goes on to 26, states that you often rely on a PowerPoint presentation that explores the harms caused by transgender ideology, and then, "Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation."  Do you see that?

A    Yes.

MS. PASSAMANECK:  I am going to drop into the chat -- I'm pausing just because I've taken my exhibits out of order.  So I'll ask Lisa to mark the exhibit I just dropped into the chat as the next exhibit in line.  I believe we are at --

Oh, Ms. Lee, were you holding up a number of fingers?

*AB Litigation Services*

This should be Exhibit 9 to Ms. Lee's deposition.

(Exhibit 9 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know when you've had a chance to open up Exhibit 9.  It's a larger exhibit.

A    Okay.  I have it open.

MR. CONNOLLY:  Just for the record, so the file name of this is Exhibit 7, but you are -- you want the court reporter to mark this as Exhibit 9?

MS. PASSAMANECK:  Correct.  I should have listed these all as tabs so we wouldn't have this issue.  This is what happens when you take things out of order in your outline.  So ignore my PDF names if that's okay.  We'll call this Exhibit 9.

Q    (BY MS. PASSAMANECK)  My question for you, Ms. Lee, is whether this is the presentation that you were referring to in this interrogatory response?

A    Yes.

Q    Do you also use this presentation for PKC events?

A    I have used portions of these slides for PKC-sponsored events, yes.

AB Litigation Services

Q   Now, I understand in the interrogatory response it states that, "Ms. Lee frequently refers to transgender-identifying individuals using their birth names and/or biological pronouns when delivering the presentation."  My question for you is I didn't see any slides that themselves refer to transgender-identifying individuals by birth names or pronouns; is that correct?

A   Correct.  That's correct.

Q   Is there a particular slide or slides in which you refer to transgender-identifying individuals using their birth names and their biological pronouns?

A   Yes.

MR. CONNOLLY:  Ms. Lee, if you need to take your time to review the PDF, please feel free to do so.

A   Yes.  Slide 7, there's an individual who goes by the name of Simon Wellington who was involved in the grooming and harming of my child in her public classroom.  This person, at the time they were in my daughter's classroom, went by the name Charlie, and Charlie is a female, and I only refer to Charlie as Charlie when describing what happened to my daughter using Slide 7.

*AB Litigation Services*

Q     (BY MS. PASSAMANECK)  And just to make sure we're on the same page, is Slide 7 the one with the title "(GROOMERS CONT'D)"?

A     Correct, yes.  The first three images are Simon, whom I call Charlie.

Q     Okay.  Has this individual ever attended one of your talks?

A     Yes.

Q     And have you called them out during this slide?

A     I don't believe Charlie was present when I used slides, so this would not have been applicable to them.  But I do believe I referred to them as Charlie openly in my talk.

Q     Other than referring to this individual, are there any other times you refer to transgender-identifying individuals using their birth names and/or their biological pronouns in this presentation?

A     Yes.  Slide 8 is a video that includes our school board president in the background, and I do reference that she has a trans-identified son. I do not -- I'm sorry, a trans-identified daughter. I do not refer to her daughter as her son.

Q     And you provide that qualifier as

*AB Litigation Services*

trans-identifying son to identify that, although the sex at birth is -- I'm going to get this mixed up, I apologize -- is female and they present as male?

A   Correct.

Q   Any other slides?

A   I'm sorry.  It's very confusing.  She's a trans-identified daughter who now identifies as a son, and I refer to that person as her daughter.

Q   Okay.  Just to make sure the record is clear then, I just want to make sure, in that Slide 8 you were referring to a child who identifies as male, but was born female?

A   Correct, and I believe adult child.

Q   And you were only referring to them by gender, not name or anything else?

A   Correct.

Q   Okay.  In what context are you bringing that up, beyond saying this individual has a child that is transgender?

MR. CONNOLLY:  Objection; form.

A   On that particular slide, that's the extent, just, You'll see in the background our school board president, who has a daughter who now identifies as a male or has a trans-identified

*AB Litigation Services*

daughter.

Q    To your knowledge, has that individual, either the mother or the trans child of that mother, attended your events?

A    Not to my knowledge, but could be.

Q    And how did you become aware of this individual?

A    I became aware upon a conversation with the school board president.

Q    Okay.  Any other slides in which you refer to transgender-identifying individuals?

A    Yes.  So Slide 11, when I -- sorry.

Q    If you don't mind, tell me the slide and the title, just so we're on the same page.

A    Slide 11, Existing Colorado Laws to Know & Understand.

Q    Thank you.  And tell me the context in which you refer to transgender-identifying individuals in this slide.

A    Sure.  Several things.  When discussing House Bill 24-1039, "Non-Legal Name Change," I always reference a conversation I had with the bill sponsor, Senator Janice Marchman, where I pressed her, What if five-year-old Billy wants to be Sally, and the parents say, Don't transition my child?

*AB Litigation Services*

And her response was, Then we will respect Sally's wishes.  So it's a hypothetical situation, but I refer to this child as Billy, not Sally.

The other is House Bill 24-1071, Tiara's Law.  Tiara is a man named Duane, and I would prefer when describing this law to say that Tiara is a man named Duane, and I specifically say, This man runs a child drag ring in Colorado Springs where he pimps out children to dance sexually for adults for tips.

And the reason that's so important is that Duane is a convicted felon.  His record is under the name Duane Kelley.  His record includes lewd behavior with children and assault.  And I feel it's very important to inform my community that this man with a criminal record under the name Duane has been put on a pedestal to pass this law to enable him to erase his criminal history.  So that's one where it's really imperative that I can inform my community of Duane Kelley's criminal history.

Q    And is Duane Kelley still in prison?

A    No.

Q    Has this individual attended your talks before?

*AB Litigation Services*

A     Yes.  Duane has been present at a rally at the capitol.

Q     And did you interact with this individual?

A     I did not, no, but members of PKC did.

Q     And what was that interaction, if you were told or saw?

A     Not positive.

Q     Could you describe what occurred?

A     Yes.  For example, when this law was being heard in the legislature, there was an altercation between one of our proponents on our Girls Sports initiative, Rich Guggenheim, who referred to Duane as Duane in the Colorado, I believe it was a house committee hearing, it could have been a senate committee hearing, I don't recall, where Rich was then silenced and kicked out of the committee for refusing to call Duane Tiara. I believe this was at the time that Rich was a named proponent on our ballot initiative.

Q     That was at the capitol that that occurred?

A     Correct.

Q     So both individuals had the right to be there and voice their opinions, correct?

*AB Litigation Services*

A    In my opinion, yes.

Q    Any other instances that you can recall sitting here in which you would use this presentation and refer to transgender-identifying individuals?

A    Yes, two things.  So Slide 13, Lessons from the Colorado Department of Ed for First Grade, when I describe Sylvia and Marsha start a revolution, I refer to them as transvestite men -- and I honestly don't know if they're living or not anymore, but I refer to them as transvestite men who run a prostitution operation for children.

Q    Okay.  And what else?

A    And then Slide 14, 2025 Leg Update, when I reference House Bill 25-1309, and I go through who sponsored that bill, I refer to Representative Brian Titone, who goes by Brianna.

Q    And has Representative Titone attended any of your events?

A    Not to my knowledge.

Q    Marching on.  Any others?

A    I don't believe so in these slides.  I will say one other person that I often refer to that's not referenced in the slides is a reporter by the name of Sean Beedle, who goes by Heidi, who

*AB Litigation Services*

has been present at my events, and I do refer to him as Sean.

Q   Okay.  Other than the fact of misgendering, is there any other content or -- actually, strike that.

Beyond the fact of referring to an individual by their biological sex, are you providing any commentary about that decision?

MR. CONNOLLY:  Objection; form.

A   I mean, when I talk about Tiara's Law and Duane Kelley, I'm pretty explicit that it's imperative that people understand his name that is attached to his criminal history.

Q   (BY MS. PASSAMANECK)  You are not commenting that all transgender individuals, for example, are sexual predators, though?

MR. CONNOLLY:  Objection; form.

A   No.

Q   (BY MS. PASSAMANECK)  And you're not making any references to transgender individuals, generally, and their characteristics?

MR. CONNOLLY:  Objection; form.
Objection; misstates the testimony.

A   No.  But if you look at slide -- let me pull it up here -- Slide 16, How to Protect &

*AB Litigation Services*

Inoculate the Children in your Life, when I go over bullet point Number 4, I will always say that there are only two sexes, male and female; that you cannot change your sex; and that it's imperative that you teach your children that they could not have been born in the wrong body; they cannot change their sex.

Q    (BY MS. PASSAMANECK)  And that's your opinion about biological sex, generally.  It's not a judgment on transgender individuals; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's a hard question to answer.  It's my opinion, but it's a biological fact.

Q    (BY MS. PASSAMANECK)  Okay.  If you haven't gotten confused with all the exhibits, let's turn back to Exhibit 2, which is the interrogatory responses.

A    I've got it.

Q    Okay.  And on page 25 -- Michael will hold this to me, so I want to make sure that I get the page correct.  Yes, on page 5, the first sentence after the chart states, "PKC plans to organize and/or (co-)sponsor additional public events in the future and is actively seeking to

with your child, not the mere fact they are transgender, correct?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  In paragraph 3 (sic) of your declaration, Exhibit 1, you state that an individual who you know to identify as transgender came to your event at a recreation center.

A    I'm sorry, I'm not following.  On the declaration, which page was that or which paragraph?

Q    Paragraph 13.  And I did paraphrase, but I'll read it.  The last sentence states, "For example, a few weeks ago we sponsored an event at a recreation center that was open to the public.  An individual who I know to identify as transgender came to the event."  Do you see that?

A    Yes.

Q    Was this the Give Parents a Voice Town Hall that you're referring to?

A    Yes.

Q    And how did you know the individual was transgender?

A    I am familiar with Sean Beedle.  He is a

*AB Litigation Services*

reporter from the Colorado Times Recorder who has

frequently attended our events and frequently

posted about me and written articles about Protect

Kids Colorado.

Q    Okay.  So the individual was there in a

reporting context?

MR. CONNOLLY:  Objection; form.

A    I can't say for certain what -- what his

intent was being there.  I don't believe an article

came out as a result of his attendance.

Q    (BY MS. PASSAMANECK)  Did you interact

with the reporter?

A    I did.

Q    Tell me what occurred.

A    It was a very friendly interaction.  I

believe, and I'm not certain if I did it when I was

onstage with the microphone or after I had finished

speaking, but I did reference that Sean Beedle was

in the room for others to hear.  And it just so

happened my husband was sitting next to him in the

crowd, unknowingly.  And so we had a very cordial,

brief interaction saying hello.

Q    Just so I understand the sequence of

events, you saw the reporter in the audience.  You

referred to him and said, Hey, this reporter, you

*AB Litigation Services*

referred to him by his birth name, is present.  And
then subsequently he had a friendly interaction
with your husband; is that a fair summary?

MR. CONNOLLY:  Objection; form.

THE COURT REPORTER:  I didn't hear the
answer.  I'm sorry.  Did you answer that question?

THE DEPONENT:  I didn't.

A    Correct.  Brief, a very, very brief
interaction with my husband.

Q    (BY MS. PASSAMANECK)  Did this individual
leave after you had used their birth name?

A    I want to say he stayed for a few minutes
after that occurred.

Q    Did he correct you in using his birth
name?

A    Did not.

Q    So other than this instance with this
reporter and outside of protesters, can you
identify any other instances in which a transgender
individual attended one of your events?

MR. CONNOLLY:  Objection; form.
Objection; misstates testimony.

A    That's a really hard question to answer
because I don't assume anyone's sex.  So is it
possible transgender individuals have been in the

*AB Litigation Services*

crowd?  Very possible.  That's just a tough one to answer.  Yes, I assume there have been transgender individuals at nearly every event that we've had, but I have not called them out by name from the stage.

Q    (BY MS. PASSAMANECK)  So I understand that you want to use birth names and pronouns consistent with an individual's birth sex.  How does that work when you don't assume the sex of an individual?

MR. CONNOLLY:  Objection; form.

A    Good question.  If I know the individual is transgender, again, I -- it is against my firmly held beliefs to further that belief that they were born in the wrong body and can change their sex.

Q    (BY MS. PASSAMANECK)  In interacting with someone, are you planning to ask about their birth names and sex at birth?

MR. CONNOLLY:  Objection; form.

A    I mean, not typically a question I lead with, no.  But, for example, our legislator, reporters, people who I'm directly involved with in my children's school, especially people who I know as their birth sex who then change their name and pronouns, I do not wish to have to adhere to that

*AB Litigation Services*

change.

Q    (BY MS. PASSAMANECK)    Have you ever interacted with someone you believed was transgender but did not have verification of that fact?

A    Yes.

Q    And in that context, have you explained your belief that you should be using birth names and sex at birth such that could they verify what you should be using with them?

MR. CONNOLLY:    Objection; form.

A    I have not asked them to verify, but, yes.  I mean, for example I gave a speech at a school board meeting in my neighboring school district, and there was another person who was in the same lineup as me who was proudly proclaiming that they were transgender, and I did not feel comfortable using that female name.

Q    (BY MS. PASSAMANECK)    And what did you say to that individual or about that individual?

MR. CONNOLLY:    Objection.

A    To them directly, I believe I said something to the effect of, Respectfully, I'm not going to use that name.  I don't think it's kind or loving to further that mentality.

144

*AB Litigation Services*

Q    (BY MS. PASSAMANECK)  Did you ask for a name to refer to them as?

A    No, because I already had their name in the lineup of speeches, so that had already been called.

Q    Did you ask for a name you could refer to them as?

A    No.

Q    Turning back to interrogatory number -- the interrogatory responses.  There's a second interrogatory that has some PKC information.  Let me go to the page so I can direct you, but if you would pull up Exhibit 2.

A    Okay.

Q    And on page 31, there's an interrogatory, it's labeled Number 2, and it says, "As to all Plaintiffs, identify all instances in which any person has complained about Plaintiffs' use of incorrect pronouns and deadnames of transgender individuals."  Do you see that?

A    Yes.

Q    Okay.  And starting on page 34, there's Protect Kids Colorado that states, "To the best of its recollection, PKC is aware of the following instances in which someone has complained about the

*AB Litigation Services*

use of pronouns and/or names of transgender individuals," and there's a bulleted list.  Are you familiar -- have you seen this list before?

A    Yes.

Q    I'm not asking for any attorney interactions in making this list, but I assume these events involved you?

A    Correct.

Q    In reading these events -- and we can go line by line, but I'm going to see if I can ask some summary questions.  In my review of these, none of these complaints are about PKC's misgendering or deadnaming an individual on its own, that there were other things involved in these complaints; is that fair?

MR. CONNOLLY:  Objection; form.

Ms. Lee, if you need to -- since she's summarizing, if you need to review the bullets, feel free to do so.

A    So I can -- there are several points where people are upset by me in my PKC capacity misgendering and deadnaming.  For example, Bee Gonzalez.

Q    (BY MS. PASSAMANECK)  Now, in particular, that's a bullet at the bottom of page 35 where Bee

*AB Litigation Services*

Gonzalez posted a video on TikTok.  And my understanding is that there is a custody issue between Ms. Gonzalez and her husband, and the child is kind of stuck in the middle; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  This TikTok wasn't stemming from any event that you had held; is that fair?

MR. CONNOLLY:  Objection; form.

A    Well, this -- not necessarily.  This stemmed from Ms. Gonzalez's child's attendance at a CPAN event where PKC was present and my daughter and I spoke, and also my Twitter account, and my public testimony for 1312.

Q    (BY MS. PASSAMANECK)  And so it's fair to say Ms. Gonzalez -- let me back up.

The interaction -- strike that.

Ms. Gonzalez isn't upset simply that you referred to her child using birth name, but also the transition of that child, correct?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    I'm not sure I understand the question, but my understanding as I watched the video is it

*AB Litigation Services*

was entirely related to me using -- referring to her child as a girl, as her daughter, and not using the correct names and pronouns.

Q   (BY MS. PASSAMANECK)  So CPAN had an event in which Bee and her child were present -- and I see you shaking your head, so I'll stop.

A   CPAN had an event in which Bee's child and her father were present.

Q   Okay.  And the child's father wants the child to go by birth name and sex, correct?

MR. CONNOLLY:  Objection; form.

A   Correct.

Q   (BY MS. PASSAMANECK)  And Bee's mother -- sorry, the mother disagrees and wants the child to be referred to by their new name, correct?

A   That's my understanding.

Q   And so it's your testimony that Ms. Gonzalez's TikTok was only about the fact that you had misgendered her child?

MR. CONNOLLY:  Objection; form.

A   That's how I interpreted it, yes.

Q   (BY MS. PASSAMANECK)  She had also appeared in the video, and you can tell me if you disagree -- I don't want us to have to watch the whole video together -- seems upset about you

*AB Litigation Services*

referring to her child at all; is that fair?

MR. CONNOLLY:  Objection; form.

Ms. Lee, if you cannot remember, we can watch the video as well and -- or, sorry.  I guess I won't -- if the video -- if you need the video to refresh your recollection, you may ask Ms. Passamaneck for it.

A    I think that would be most appropriate. Again, I only recollect her referring to me misgendering and deadnaming.  That's where the threat of lawsuit came from.

Q    (BY MS. PASSAMANECK)  Didn't she also refer to the fact that -- let me strike that.

Didn't she also intimate that your story with your oldest child and the ex-husband's story with their child was very similar?

MR. CONNOLLY:  Same objection.  In addition, objection; form.

A    I do recall her saying something to the effect of how convenient that he met you and now his story is your story.  But it might be beneficial to watch the clip.

Q    (BY MS. PASSAMANECK)  Okay.  You agree that people are very passionate and emotional about their children?

*AB Litigation Services*

A    Yes.

MS. PASSAMANECK:  Why don't we take a break and go off the record.

MR. CONNOLLY:  Sounds good.

(Break taken.)

Q    (BY MS. PASSAMANECK)  Ms. Lee, I want to get the order of operations.  We were talking about a woman, Bee Gonzalez, who has a transgender child.  Do you recall that, our discussion previously?

A    Yes.

Q    Okay.  And I understand that Ms. Lee (sic) made a TikTok complaining about your reference to her child using birth name and sex, correct?

A    Ms. Gonzalez did, yes.

Q    Thank you.  Ms. Gonzalez did.  Did that TikTok occur before or after her child attended a CPAN event which PKC was also at?

MR. CONNOLLY:  Objection; form.

A    After.

Q    (BY MS. PASSAMANECK)  Okay.  So the order of operations is the child's father took her to this event, Ms. Gonzalez was upset about hearing of the event and made this TikTok; is that fair?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

A    I actually have no idea how she felt about her child attending the event.  But in my understanding, the video was just referencing me referring to her child incorrectly.

MS. PASSAMANECK:  Okay.  Let's mark as Exhibit 11 a video that was produced to us labeled DE_000303.

(Exhibit 11 was marked.)

Q    (BY MS. PASSAMANECK)  Let me know if you're able to open it, Ms. Lee.  If not, I can play it on my computer.  It's a rather large document -- or, rather, video.

A    It opened, yes.

Q    Okay.  Before playing it, is this the TikTok video that you are referring to?

A    Yes.

Q    Okay.  I am going to see if I can't share my screen and play it through my computer for us all to be able to see it and be on the same page, sound good?

A    Yes.

Q    Okay.  Just so you're aware, the reason we put things into the chat as well is I want to make sure the court reporter has it for the record.

Okay.  I'm going to play this, and then

Q    Ms. Gonzalez referenced a number of social media posts you had made either referencing or discussing her child.  What were those social media posts?

A    To my recollection, I only ever made the one post that she shared in that video referencing a family -- is it Family Institute of Illinois article that the ex-husband, Dustin Gonzalez, was quoted and I was quoted in as well.  I don't believe I've ever made any post before or after that particular one on X.

Q    It's fair to say she does not want you discussing her child in the public?

MR. CONNOLLY:  Objection; form.

A    I would say that's fair to say.

Q    (BY MS. PASSAMANECK)  And she was upset that you had mentioned her child at all?

MR. CONNOLLY:  Objection; form.

A    I perceive that as she was upset I referenced her child as a girl, as a daughter, as I do my child and my daughter.  That's why she made that reference.

Q    (BY MS. PASSAMANECK)  But she told you not to speak about her child, right?

MR. CONNOLLY:  Objection.

*AB Litigation Services*

A    Correct.

Q    (BY MS. PASSAMANECK)  So while she mentioned the pronouns and name, she's telling you not to mention her child whatsoever?

MR. CONNOLLY:  Objection; form.

A    I believe she said if you continue to refer to my child or do what you do to your daughter to my daughter, then she'll see me in court, and what I do to my daughter is accurately sex her.

Q    (BY MS. PASSAMANECK)  Beyond accurately sexing your child, you have provided some services to help your child.  I don't want to get into details of your child, but I just want to make sure we're not just misgendering here.  There was a transition issue here; is that fair?

MR. CONNOLLY:  Objection; form.

A    My child was secretly transitioned, and I did not go along with her new name and pronouns. So I didn't actually -- I didn't provide any services to my daughter outside of counseling, which the counselors are legally required to affirm my child's gender confusion, and I objected to that.  I'm not sure what she means by doing to her daughter what I do to mine other than accurately

referring to her by her biological sex.

Q   (BY MS. PASSAMANECK)  Does misgendering, in your use of the word, simply involve using different pronouns and names as opposed to a larger set of interactions, especially in the child context?

MR. CONNOLLY:  Objection; form.

A   I'm not sure I understand the question. But I think it's important for me to note that I don't believe in gendering.  There are two biological sexes, male and female.  There are now seemingly infinite genders, but I don't acknowledge that.  I just believe that there are two sexes.

Q   (BY MS. PASSAMANECK)  But with Ms. Gonzalez's child, when she says, "Don't speak about my child," that's also a reference to the transition of that child, not just the decision to use different pronouns and names, correct?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A   I'm not sure how to answer that.  I really perceive this situation as she does not want me to call her daughter her daughter or to reference Dustin's child as a daughter.  All I've really done in reference to talking about them is

talk about this transition in that one post.

Q (BY MS. PASSAMANECK) Based on that video, do you think she's fine with you discussing her child at all?

MR. CONNOLLY: Objection; form. Objection; calls for speculation.

A Based on that video, no. But, again, the only time I've ever referenced her child is referring to that child's transition to the opposite sex -- or non-binary, it seems. She said they -- they/them.

Q (BY MS. PASSAMANECK) So it's the transition, not just the fact of what name and pronouns to use?

MR. CONNOLLY: Objection; form. Objection; vague. Objection; misstates testimony.

A Transition in this case is just the use of name and pronoun. This child has been socially transitioned, which is just referring to them as the opposite sex and a different name and pronoun. So in my opinion, that's -- transition is synonymous with just names and pronouns in this case.

Q Transitioning can involve more than just use of pronouns, though, correct, and name?

*AB Litigation Services*

Q    (BY MS. PASSAMANECK)  So other than children that are in the public, you would not reference or discuss specific children as a matter of privacy; is that fair?

MR. CONNOLLY:  Objection; form.

A    Correct.  I've only ever referenced children of the parents that have come to Protect Kids Colorado for support.

Q    (BY MS. PASSAMANECK)  We were discussing complaints about misgendering that were listed in Exhibit 2, Interrogatory Number 2, on pages 34 through 36, and you had identified the interaction with Ms. Gonzalez as an event where there was a complaint about misgendering.

Since I don't want to summarize, I just want to walk through these.  Do you have the document open?

A    I do.

Q    The first one is an incident with an individual named Ms. Chambers, correct?

A    Correct.

Q    Okay.  That incident was not about misgendering alone, correct?

MR. CONNOLLY:  Objection; form.

A    I cannot interpret what drove them to

involve Child Protective Services on my family, but it's my understanding it's entirely related to my unwillingness to call my daughter my son.

Q    (BY MS. PASSAMANECK)  Okay.  And this incident did not stem from any misgendering at any PKC event, correct?

A    That's correct.

MR. CONNOLLY:  Objection; form.

Q    (BY MS. PASSAMANECK)  The second bullet about February 22nd, 2024, is also regarding Ms. Chambers, correct?

A    Correct.

Q    And that complaint was not about any misgendering that occurred at a specific PKC event, correct?

MR. CONNOLLY:  Objection; form.

A    Correct.  I believe it was in reference to -- it was more general, I think, our unwillingness to acknowledge transgender children.

Q    (BY MS. PASSAMANECK)  Okay.  The fourth bullet, which is from the fall of 2023 to spring of 2024, again, it's regarding Ms. Chambers.  That series of events and posts was not specific to any misgendering by PKC at any specific event, correct?

MR. CONNOLLY:  Objection; form.

*AB Litigation Services*

A    Correct.  That was in reference to me not gendering my child the way this woman wanted me to.

Q    (BY MS. PASSAMANECK)  The March 2024 incident in which you reported death threats, those death threats were not specific to any misgendering at a specific PKC event?

MR. CONNOLLY:  Objection; form.

A    They were in reference to my presence and speech and showing the Art Club film, which in their perception could be misgendering my child and others.  So I can't say for certain, but I do believe that my unwillingness to transition my own child and call my daughter Chloe by the name Toby, as we describe in that film, led to those death threats.

(Ms. Passamaneck disconnected from Zoom.)

THE COURT REPORTER:  Should we go off the record for a minute?

MR. CONNOLLY:  Yes.

(Break taken.)

(Ms. Passamaneck reconnected to Zoom.)

MS. PASSAMANECK:  Just to get us back aligned, would the court reporter please read back the last question?

(The last question was read.)

*AB Litigation Services*

Q    (BY MS. PASSAMANECK)  Would you answer that question, Ms. Lee?

A    Yes.  It was April 2024, for the record, that event.  I do believe that the death threats were tied to my unwillingness to call my daughter my son, to refer to my child as a boy.  There were protesters in the room who made horrific comments to my husband and myself, that we were bad parents, that we deserve to die.  So I can say with -- actually with certainty that at least some of the death threats were tied to my unwillingness to call my daughter my son.

Q    Those death threats were not only because of your refusal to call your daughter your son, but rather your advocacy on gender ideology issues, correct?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    I can't say for certain but that's possible.

Q    (BY MS. PASSAMANECK)  Well, this bullet states, "In March 2024, PKC Executive Director Erin Lee filed a report with the Federal Bureau of Investigation regarding the death threats she had received because of her advocacy on gender ideology

*Erin Lee  - 08/21/2025*                    *107*

*AB Litigation Services*

issues."  Is that a correct statement?

A    That's correct.

Q    So it's not just a matter of misgendering, but it is gender ideology; is that fair?

MR. CONNOLLY:  Objection; form.

A    That's fair to say, yes.  The April 2024 threats, as I said, I can confirm that some of them were directly related to misgendering my own child.

Q    (BY MS. PASSAMANECK)  Your misgendering of your child was not at a specific PKC event, though.  That was a reference to how you were raising your child; is that fair?

MR. CONNOLLY:  Objection; form.

A    In April 2024, as we were showing the Art Club film and I gave a speech afterwards at Denver University, yes.  That was explicitly -- at least one of the death threats I received that day were in relation to me not transitioning my child, not calling her my son.

Q    (BY MS. PASSAMANECK)  Okay.  I'm looking at the bullet that says, "In March 2024."  You keep mentioning April 2024.  I'm guessing you may have gotten death threats in both March and April; is that fair?

*AB Litigation Services*

A   Correct.

Q   Okay.  I just want to make sure we're talking about the same series of events, because the next bullet talks about the screening where you were told that you were transphobic and also accused of misgendering transgender-identifying people.  Again, these objections and protests were about your gender ideology, not limited to the fact of misgendering an individual; is that fair?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A   Not limited to that, but definitely included my unwillingness to transition my daughter and call her my son.

Q   (BY MS. PASSAMANECK)  Okay.  Is it fair to say that -- other than the Bee Gonzalez event, which we discussed and looked at the video, are there any complaints you received that are specific to only misgendering or deadnaming at a PKC event?

MR. CONNOLLY:  Objection; form.

A   I guess I wonder your interpretation of complaints.  I have certainly gotten social media messages in response to me using inaccurate names and pronouns at PKC events, but I'm not sure what constitutes a complaint.

*AB Litigation Services*

Q   (BY MS. PASSAMANECK)  What social media post -- what complaint have you received on social media about misgendering at an event?  Let's start with that.

A   Good question.  I received a slew after that April 10th, 2024, event, and I know in person at the event people did raise the complaint that I was misgendering and deadnaming.

Q   Those individuals that were protesting were there to protest, though, correct?

MR. CONNOLLY:  Objection; form.

A   I can't assume their intent in being there.  There were people who sat in the room quietly and watched the film who still raised a complaint afterwards.

Q   (BY MS. PASSAMANECK)  Other than Ms. Gonzalez, have you received any complaint specific to an interaction you had with an individual at a PKC event?

MR. CONNOLLY:  Objection; form.

A   I don't recall at the moment.  I have to say that I've been just barraged with hatred and death threats, so I don't remember them all.  I couldn't screenshot them all.

Q   (BY MS. PASSAMANECK)  It is difficult --

*AB Litigation Services*

what I'm trying to do is focus in on complaints due
to your speech at a PKC event, and I understand
that there were protesters.

My question is whether your -- in a PKC
event, someone stood up and said, Hey, listening to
this, I'm offended; I'm leaving?

MR. CONNOLLY:  Objection; form.

A     No, I don't believe so, not -- not off
the top of my mind.

Q     (BY MS. PASSAMANECK)  You agree that
you're free to share your opinions on gender
identity with anyone who will listen, right?

MR. CONNOLLY:  Objection; form.
Objection to the extent you are asking the witness
for a legal conclusion.

A     I'm not an attorney, but I can say that
prior to 1312, I felt pretty confident that I had
the right to speak my opinions on gender ideology.
Since the bill, my speech has been chilled.  I do
mental gymnastics to try to avoid saying the wrong
thing and getting myself in trouble.  So, no, since
the passing of 1312, I do not feel like I'm free to
speak my full opinions on gender ideology.

Q     We've walked through a fair amount of
speech in which you have either -- you talked about

*AB Litigation Services*

gender at events or individuals at events.  What speech are you afraid you can no longer do at events in light of HB 25-1312?

MR. CONNOLLY:  Objection; form.

A    For example, I help many parents who are -- like Dustin Gonzalez who are in the shoes that I've been in where their child has been transitioned to the opposite sex, and that's not their wish for their child, and I often speak about those parents.  But it has become really difficult.

In Dustin's case, for example, I believe his child is his daughter, and it's very hard when speaking publicly about the parents that I help just trying to say "child" instead of "daughter," or trying to avoid using those names, when I feel like it's really important for people to understand all the elements of what's happening with that family, that that is, in fact, his daughter that has been turned into his son.

So that's an example, the families that I help that I do publicly speak about with their permission; that, and the presentation that we went through, my slides.  There are times where it's imperative that I inform the public about transgender-identified individuals and their birth

*AB Litigation Services*

names.  Duane Kelley, for example, where I think it's imperative for people to understand his criminal history, where I don't feel like I can properly inform the public of that biological legal name, which they have a right to know.

Q    (BY MS. PASSAMANECK)  You're aware that prior to HB 25-1312, Colorado law recognized gender expression as a protected status, right?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney and I'm not intimately familiar with every facet of existing Colorado statute, no.  I'm keenly aware, now that 1312 has been passed, what the parameters around speech are in Colorado.

Q    (BY MS. PASSAMANECK)  Would you turn to paragraph 20 of your declaration, Exhibit 1.  The very last sentence that runs from pages 6 to 7 states, "I understand the Colorado Civil Rights Division has also adopted regulations that prohibit unlawful harassment, which is defined to include deliberately misusing an individual's preferred name, form of address, or gender-related pronoun." Do you see that?

A     That's fair to say.

Q     (BY MS. PASSAMANECK)  Would you have changed any of your prior speeches if you had been aware of this regulation?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.  Objection to the extent the witness is asked to state a legal conclusion.

A     And I'm not an attorney, but I am, again, very keenly aware of the implications of 1312, especially as they've been expressed to me by people like Bee Gonzalez.  So 1312 is the point at which I really felt as though like my speech has been chilled.

Q     (BY MS. PASSAMANECK)  So is it fair to say that prior to HB 25-1312, you felt comfortable in saying all the things that we have been discussing today?

MR. CONNOLLY:  Objection; form.

A     That's correct.

Q     (BY MS. PASSAMANECK)  Okay.  And it was only after HB 25-1312 defined "gender expression" to include chosen name and other terms by which an individual chooses to be addressed that you became concerned about your language?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A    That's correct.  Now, I have received criticism and threats prior to 1312, but that was definitely the point at which I didn't feel like I could speak openly anymore.

Q    (BY MS. PASSAMANECK)  Is it your belief that failure to use an individual's chosen name or other terms by which an individual chooses to be addressed is now a violation of Colorado law?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney, but as I interpret 1312, yes, I am forbade from using accurate biological sex and pronouns.

Q    (BY MS. PASSAMANECK)  If the CCRD, the Colorado -- you're familiar with the CCRD, correct?

A    Yes.

Q    It's easier than saying it all out loud. Let me start again.  If the CCRD stated that the failure to use an individual's chosen name or other terms by which an individual chooses to be addressed is not a per se violation of Colorado law, would you still be concerned about your language?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.
Objection; calls for speculation.  Objection to the
extent the witness is being asked to state a legal
conclusion.

A    I don't know if I fully understand the
question.  Would you mind --

Q    (BY MS. PASSAMANECK)   Sure.  If the CCRD
stated that the failure to use an individual's
chosen name or use terms by which an individual
chooses to be addressed is not a per se violation,
so the CCRD says it's got to be something more, any
use of this is not a per se violation, would you
still be concerned about suit?

MR. CONNOLLY:  Objection; form.
Objection; calls for speculation.  Objection to the
extent the witness is being asked to state a legal
conclusion.

A    I don't know what per se violation means,
but I certainly do feel as though I am not able to
say those things and that I am at risk of a
lawsuit.  And as someone who has watched the Jack
Phillips case, the Lorie Smith case here in
Colorado, I know that these laws and regulations
are applied towards law-abiding citizens like
myself, so I probably would feel as though I'm not

able to speak the truth.

Q    (BY MS. PASSAMANECK)  You're aware that people sue each other for all sorts of reasons, right?

MR. CONNOLLY:  Objection; form.

A    Sure.

Q    (BY MS. PASSAMANECK)  Sometimes people bring lawsuits without a basis; is that fair?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    I honestly don't know.  I am not an attorney.  I have brought a lawsuit, and it certainly was justified and had a basis for bringing that suit, but I -- it's possible.

Q    (BY MS. PASSAMANECK)  Well, looking at paragraph 22 of your declaration, you state, "HB 25-1312 punishes those who deadname or misgender with investigations, lawsuits, and fines."  Do you see that?

A    Yes.

Q    Are you aware of anyone who has been investigated for deadnaming or misgendering?

MR. CONNOLLY:  Objection; form.

A    No, I'm not aware.  Again, referencing Jack Phillips, I know he has been pursued by a

transgender individual, and refused to bake the cake, and was challenged on that issue. So as not a lawyer, I don't know exactly what all that entails, but I know that there have been Coloradans pursued for not being willing to call someone by their chosen.

Q    You're talking about the Masterpiece case, correct?

A    Correct.

Q    And that was a baker who refused to make a wedding cake for a gay couple, correct?

MR. CONNOLLY: Objection; form.

A    I'm referencing his unwillingness to bake a cake for a transgender individual's new name and pronouns.

Q    (BY MS. PASSAMANECK) The lawsuit and the investigation was about the refusal to offer the service of baking a cake, though, correct?

MR. CONNOLLY: Objection; form. Objection; vague. Objection; asked and answered.

A    I have not read the ins and outs of the pursuit. I've only seen it from Jack Phillips's standpoint that he has struggled tremendously because people have pursued him with these violations.

Q    (BY MS. PASSAMANECK)  PKC is not refusing to offer services to anyone, right?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion.

A    Correct.  But PKC would refuse to call someone by their chosen name and pronouns if that does not align with their biological sex, much like Jack Phillips refused to call them that on the cake.

Q    (BY MS. PASSAMANECK)  You're not refusing to give a pamphlet to a transgender individual, correct?

MR. CONNOLLY:  Objection; form.

A    That's correct.

Q    (BY MS. PASSAMANECK)  You wouldn't refuse entry of a transgender individual to one of your events, correct?

MR. CONNOLLY:  Objection; form.

A    Correct, unless it was closed to press and that individual was a member of the press.

Q    (BY MS. PASSAMANECK)  But all individuals are welcome at PKC events except for press?

A    Or disrupters, that's correct.

Q    Protesters, in general, are excluded,

171

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

-------------------------------------------------

ZOOM DEPOSITION OF TRAVIS MORRELL, M.D., MPH
August 25, 2025

-------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

-------------------------------------------------

APPEARANCES:

        CONSOVOY MCCARTHY, PLLC
            By J. Michael Connolly, Esq.
                Paul Draper, Esq.
                1600 Wilson Boulevard, Suite 700
                Arlington, Virginia 22209
                  Appearing via Zoom on behalf of
                  Plaintiffs

        COLORADO ATTORNEY GENERAL'S OFFICE
            By Janna K. Fischer
                Senior Assistant Attorney General
                Nora Q.E. Passamaneck
                Senior Assistant Attorney General
                Dominick D. Schumacher
                Assistant Attorney General
                1300 Broadway, 10th Floor
                Denver, Colorado 80203
                  Appearing via Zoom on behalf of
                  Defendants CCRD, Sergio Cordova,
                  Geta Asfaw, Mayuko Fieweger,
                  Daniel S. Ward, Jade R. Kelly,
                  and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

      COLORADO ATTORNEY GENERAL'S OFFICE
         By Talia Kraemer
           Assistant Attorney General
           1300 Broadway, 10th Floor
           Denver, Colorado 80203
             Appearing via Zoom on behalf of
             Colorado Attorney General

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of TRAVIS MORRELL, M.D., MPH, called by Defendants, was taken on Monday, August 25, 2025, commencing at 9:03 a.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

I N D E X

DEPOSITION OF TRAVIS MORRELL, M.D., MPH

EXAMINATION BY:                                          PAGE

   Ms. Fischer                                              5


                                                        INITIAL
EXHIBITS                                               REFERENCE

Exhibit 1    Declaration of Dr. Travis                    20
             Morrell

Exhibit 2    Plaintiffs' Objections and                   32
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 3    Article in Restoring America:                73
             Medical schools have
             embraced radicalism, by Travis
             Morrell, September 26, 2024

Exhibit 4    Article in The Publica:                      87
             Exclusive: Trans Activist
             Medical Students Override
             Colorado Medical Society Vote
             Against "Gender Affirming"
             Surgery for Minors, June 14, 2024

|  |  |  | INITIAL |
| --- | --- | --- | --- |
| EXHIBITS (continued) |  |  | REFERENCE |
| Exhibit 5 | Social media exchange |  | 91 |
| Exhibit 6 | Dr. Morrell's website |  | 116 |
| Exhibit 7 | Amended Employment and Compensation Agreement (2022) |  | 119 |

*AB Litigation Services*

Q    (BY MS. FISCHER)  Looking back at paragraph 14, you state that you regularly speak and write on the issues of sex and gender as they relate to the medical profession; is that accurate?

A    Yes.

Q    How many total publications do you have on the issues of sex and gender as they relate to the medical profession?

A    I'm not sure.

Q    Can you give a ballpark estimate?

A    Yeah, let's see.  As far as publications, I mean, do you include social media?  Do you include academic publications?  Do you include popular publications?  Maybe you can clarify the question.

Q    Okay.  Let's break it down.  Ballpark, how many academic publications on the issues of sex and gender as they relate to the medical profession?

A    So I have presented a few oral presentations -- or poster presentations, I should say, at conference.  I have published probably one on sex with the -- publication --

THE COURT REPORTER:  I'm sorry, which publication?

*AB Litigation Services*

A   I've published a -- I have published at least one article on sex or genitals, I guess, or the reproductive system in the Green Journal, which is the top journal of both obstetrics and gynecology.  I have published on sex and gender in the medical profession in The Wall Street Journal. I have published on equity and inclusion in the DC Examiner.

I have published -- or I have written letters to the editor to, like, Colorado -- at least one Colorado paper.  I have attempted other times in Colorado, in addition to podcasts, social media, and public speaking.

Q   (BY MS. FISCHER)  Did you get paid for any of these publications?

A   The Wall Street Journal pays everyone who -- I think they pay everyone as a routine practice.  It wasn't negotiated or anything.  They just -- they send you a check.  I don't think I got paid -- no, I didn't.  I don't remember getting paid for any of the others.  I don't think I did.

Q   And have you published these articles in your own name?

A   I think everything that I talked to you about was in my own name.  I've additionally

**177**

*AB Litigation Services*

contributed either anonymously or edited or as a

group or, you know, reviewed, or whatever,

probably, I'm sure, countless articles on this

topic and other topics.  I can't imagine.

Q    And did you write any of these articles

at the request of someone else?

MR. CONNOLLY:  Objection; form.

A    I mean, I wanted to write all of the

articles that I've written.

Q    (BY MS. FISCHER)  But has anybody ever

asked you specifically to write one?

A    I mean, every -- I mean, lots of articles

come up with -- people have an idea.  Your

professor has an idea.  It's -- I don't know

that -- I don't know that I've ever been approached

like, Hey, will you write this article, and then

write the article.

Lots of articles, academically or

popularly, come up in discussions.  I don't -- I've

never been -- I've never been asked to write an

article -- I've never been directly asked to write

an article.

Q    And have you written any articles on

behalf of Mountain West?

A    No.

*AB Litigation Services*

Q    Have you written any articles on behalf of CPP?

A    I have written articles -- like, I have written at least I can think of one letter to the editor for a Colorado newspaper that I wrote, and I recognized my association with them, but I don't know -- I don't know -- nobody asked me to write it for them.  I don't know what that means.

Q    And which Colorado newspaper did you write that letter to the editor to?

A    The one I'm thinking of is the Grand Junction Sentinel.

Q    How many speaking engagements have you had on the issues of sex and gender as they relate to the medical profession?

A    Well, you earlier asked me about testimony, which has been on this topic.  And then in my declaration, I believe -- is it okay if I review the declaration as I answer this question, or would you rather I not?

Q    You can review the declaration.

A    Well, I don't know.  But I just -- I have spoken -- the main ones I think of are last April, this April, and we intend to next April, speak on this topic, this topic being pediatric

gender-affirming care.  I've spoken on kind of associated topics, like equity and inclusion, at other times, such as at the Denver Tech Center last September.

Q   Okay.  And we'll get to the ones you've listed in your declaration.  Did you get paid for your time at these speaking engagements?

A   No.  I --

Q   Did you take --

A   Go ahead.  Sorry.

Q   No.  Go ahead and finish.

A   I -- I may have gotten some, like, transportation reimbursement to maybe the FAIR one in September last year, maybe, like, reimbursement, but no payment or honorarium.

Q   And did you pay money to participate at these speaking engagements?

A   No.

Q   And did you speak in your personal capacity?

A   Yes.

Q   So not on behalf of Mountain West?

A   So you've asked -- I feel like you've asked that question in different angles, different times.  I've never spoken publicly about Mountain

*AB Litigation Services*

Q    And then if you go up one to page 53, to clarify, you did not sign on behalf of Do No Harm, correct?

A    That is correct.

Q    It's signed by Kristina Rasmussen?

A    Yes.

Q    And who is that?

A    Kristina Rasmussen is, I believe, the executive director of Do No Harm.

Q    Have you met her?

A    Yes.

MS. FISCHER:  And, Lisa, I'm going to mark this as Exhibit 2.

(Exhibit 2 was marked.)

Q    (BY MS. FISCHER)  I'm going to ask you to go all the way up to page 4 of Exhibit 2, Dr. Morrell.  Just let me know when you're there.

A    I'm on page 4 of Exhibit 2.

Q    Okay.  Interrogatory Number 1 here asks about all the events at which you spoke; is that accurate?

A    I mean, it says, Dr. Morrell and his speaking engagements, all events they operated or plan to operate and/or which they have spoken or plan to speak in a place of public accommodation

*AB Litigation Services*

located in Colorado.

Q    Okay.  And I'm going to take you down to page 27 where the document includes information on events at which you have spoken, as opposed to other plaintiffs in this case.  Just let me know when you're there.

A    I'm on page 27.

Q    Okay.  And if you scroll down a bit, it lists three events at which you've already spoken; is that correct?

A    Let's see.  It lists April 2024, September 2024, and April 2025.

Q    And there's an additional planned for April 2026; is that accurate?

A    That is correct.

Q    And is it your belief that all three of these past events were held at places of public accommodation?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    I'm not an attorney, but I believe these are places of public accommodation.

Q    (BY MS. FISCHER)  I'm going to ask about the first event listed, the Rocky Mountain Summit

**182**

*AB Litigation Services*

Q    You write there that it's your belief that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual because it encourages them to believe a falsehood about themselves and discourages them from seeking proper care to address their gender dysphoria; is that accurate?

A    To clarify, on my page 3, paragraph 9, that's not what it says.

Q    Okay.

A    Mine says, "Plaintiffs' object to each interrogatory to the extent it calls for a legal conclusion."

Q    Wrong document.  I'm looking at Exhibit 1, not Exhibit 2.

A    Do you think I can close -- okay.  I'm going to --

Q    You can either close it or minimize it. I may ask you to open it again.

A    Paragraph -- sorry, page 3, paragraph 9?

Q    Yes, of Exhibit 1.

A    Yes, that is correct.  And I do believe that affirming someone's nonbiological gender identity is harmful to them.

Q    So what is the falsehood that a person

*AB Litigation Services*

believes in using nonbiological gender identity or gender expression?

MR. CONNOLLY:  Objection; form.

A    The falsehood that a person believes -- there's actually quite a few, and one is that the -- that someone can -- can change sex or gender, and many -- or that they can have a disembodied gender identity in the wrong body.

It affirms the idea that they could change their secondary sexual traits or other physical things about them and that it will, number one, make them feel better.  Number two, be safe. Number three, that there's a low risk of regret. Number four, again, especially for kids, that it will decrease risk of suicide.  Number five, that they are at a high risk of suicide and they must do that, that there's urgency to it.  Number six, that they will have a healthy working body after this.

Patients I have -- as you know if you've read my declaration, I've taken care of, at the time, patients self-identified as transsexual patients, and I prescribed them hormones.  I've helped assist in making a new vagina in a man surgically and published or presented on this at a conference.  I've been very much trying to kind of

*AB Litigation Services*

support them in this.

And I was surprised that every single patient had serious side effects.  And these are commonly not disclosed, and patients are sold a very falsely cheery -- very falsely cheery picture of what will happen when they go down, first, a social transition or social confirmation, and then medical and surgical confirmation.

It's very harmful to them, and medicine has done an extreme disservice.  In fact, I have in the past have done an extreme disservice to patients for treating this metaphysical belief as something that medicine can address with these treatments.

Q    (BY MS. FISCHER)  And what do you consider proper care to address their gender dysphoria?

A    I think proper care would be to reach out to properly qualified therapists and physicians who will not go against all medical -- all medical wisdom, that we don't affirm -- we don't try to damage healthy bodies to align with a false belief about oneself.

We don't do that for -- I would be doing malpractice if I affirmed an anorexic's identity as

overweight or needing to lose weight.  I would be doing malpractice for body dysmorphic patients if their appearance was normal and they wanted a medical or surgical change.  I would be doing malpractice to -- that's very much -- I would be doing malpractice to false pregnancy patients who I have treated in the past who were sure they had a pregnancy if I performed a C-section on them.

And this is the only area of medicine where doctors align with a false belief, and then use medicine and surgery in risky and harmful ways, and those are some of the harms.

Q    So is it malpractice to use someone's chosen name?

MR. CONNOLLY:  Objection to form. Objection to the extent the witness is being asked to state a legal conclusion.

A    I think it is harmful to the individual to encourage a false belief about themselves, just as it would be harmful to tell an anorexic that they need to lose weight.

Q    (BY MS. FISCHER)  Is it malpractice to use someone's pronouns matching their gender identity?

MR. CONNOLLY:  Objection; form.

Objection to the extent the witness is being asked to state a legal conclusion.

A    I don't feel comfortable defining malpractice, as I'm not an attorney.  But I do think it is harmful to affirm a patient's false -- their gender expression if it differs from their actual sex, including with pronouns, false -- incorrect pronouns or a name.

Q    (BY MS. FISCHER)  Dr. Morrell, are you qualified as a psychiatrist?

A    No.

Q    As a psychologist?

MR. CONNOLLY:  Objection; form.

A    I said -- I'll repeat.  I'm sorry.  No.

Q    (BY MS. FISCHER)  Any of the other five mental health certifications that Colorado offers?

MR. CONNOLLY:  Objection; form.

A    No.

Q    (BY MS. FISCHER)  Now, getting back to your speaking engagement at the Rocky Mountain Summit Part I, did you share your beliefs with the audience?

A    Well --

MR. CONNOLLY:  Objection.  Objection; form.

*AB Litigation Services*

A    So, yeah.  As a doctor, I believe that real empathy follows evidence.  And so if I'm encouraging someone down a road that's going to hurt them, then, yes, I would be harming them.

I think the reason -- the first reason that I began speaking up on this was I was aware of the sexual and pelvic dysfunction that follows from gender-affirming treatments in adults; but I rationalized it because these were adults, they were choosing it, and that was okay.

But when I realized this was being done to kids, and I realized that many kids would grow up.  We know that from the Diagnostic and Statistical Manual Five, Text Revision, published in 2022, we know that most kids with gender dysphoria self-resolve, meaning their gender discomfort goes away, by the time they reach adulthood, and that's without medicine and surgery.  And we've known that for decades.  So we know that the alternative of doing no medicine and surgery and not affirming their pronouns and name actually works great for helping them get rid of their gender dysphoria.

However, we also know that the treatments that are done do cause high rates of published

188

pelvic and sexual dysfunction.  WPATH president, now former president, I believe, Dr. Bowers, stated that Dr. Bowers is not aware of any boy treated with puberty blockers and cross-sex hormones, according to the way that Colorado Medicaid pays for it, which is at Tanner Stage 2, which is the beginning of puberty -- Dr. Bowers, the WPATH president, that's the World Professional Association of Transgender Health, who's written the so-called medical guidelines for this that other organizations imitate -- Dr. Bowers says Dr. Bowers is not aware of any boy that has gone through what Colorado Medicaid gives for gender dysphoria having a sexual ability as an adult.

So I'm thinking many of these boys who get the full treatment will have a micropenis, will have the inability to orgasm or enjoy their relationships, and will not be able to reproduce if they so choose.  And I personally am troubled by this.

Again, I very much love and care for my patients who consider themselves transgender, who have gender dysphoria, and I want them to be able to, like some of these adult transgender patients, doctors -- Dr. Bowers, Dr. Levine -- who were able

*AB Litigation Services*

to have kids as an adult before they made that

decision.  And the kids that Colorado is doing this

to, many of them may not have that option.

And I feel very horrible that my

profession is doing that to those kids who have

gender dysphoria.  And I also feel horrible for

most of these kids who would have self-resolved

without our intervention.  I feel horrible that

many of these kids, most of whom we know grow up

and are gay or lesbian, many of these gay guys who

will not be able to have sex with their partner,

not be able to emotionally bond with their

partners.  I think that's a tragedy.

And so, yeah, because of this great

concern and compassion for my patients and other

patients with gender dysphoria or consider

themselves transgender, because I want them to have

the most options for a healthy life, I can't

encourage them or support them in something that

has these known harms.

Q    So is it your belief that transgender

people are dysfunctional?

MR. CONNOLLY:  Objection; form.

Objection; misstates testimony.

A    That is -- I don't believe that's what

specifically at that event?

A    I don't know.  It's the type of thing I would do.

Q    To the best of your recollection, did you knowingly use a transgender person's birth name?

MR. CONNOLLY:  Objection; form.  Objection; asked and answered.

A    I don't remember all the things I said in that meeting, but it's the kind of thing that I do and would do.

Q    (BY MS. FISCHER)  And would you also use pronouns to refer to a transgender person that the person doesn't use?

MR. CONNOLLY:  Objection; form.

A    So prior to the signing of 1312, it was typical for me in my practice to speak more naturally and use correct pronouns, meaning their biological pronouns, when needed.

Q    (BY MS. FISCHER)  Were any transgender people at the Rocky Mountain Summit Part I that you were aware of?

MR. CONNOLLY:  Objection; form.

A    I don't know.  I know that they were at -- I know that there were people who considered themselves transgender at Part II.  It's very

*AB Litigation Services*

matching gender identity?

A    Prior to HB 25-1312, it wouldn't be appropriate to say I had a desire to do that.  I simply did that.

Q    Did you share your belief at Diversity Without Division that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual?

A    I don't recall what was said during that event in detail, but that is the type of thing that I would say is integrally tied into the harms of gender-affirming treatment.

Q    Did you discuss any transgender people specifically at Diversity Without Division?

A    I don't recall.  If it came up in the context like it did in our conversation earlier, I would have spoken naturally about their actual birth names and accurate biological pronouns.

Q    When you spoke at Diversity Without Division, did you knowingly use a transgender person's birth name or pronouns the person doesn't use?

A    It's certainly the type of thing I would have done.

Q    What would have been your intent in doing

*AB Litigation Services*

that?

A    Well, as you earlier questioned me and I spoke about the harms of gender-affirming treatment, it's often very -- I think it's enlightening to people whose mind is open to hear how the biggest, most aggressive activists for pediatric gender-affirming treatment are -- have openly or -- have openly talked about the harms, or it has come out in other ways, such as the Alabama court case with the WPATH files.

Some of the leading activists in gender-affirming treatment are well aware that kids' identity is not stable.  And so, obviously, treatments that they receive when they are younger, they'll have those harms when they are older, but they won't have the matching gender identity, because everyone's gender -- everyone's identity is somewhat fluid.  And so they spoke openly about that.  Dr. Bowers has spoken on video about the lifelong risk of inability to have sex, orgasm, reproduce for young boys and men that get on some of these treatments.

So it's very -- I think it can be helpful to listen to what the other side is saying.  And so when you quote someone or refer to someone's

*AB Litigation Services*

statement, it's natural, and if not required --

it's definitely natural to refer to them by name,

and it would be unnatural to use their false

pronouns, especially if there is anyone in the

audience -- which they're at all of these events;

there's always someone in the audience who has at

least a child who has been affected by this.  And

it would be wrong to not -- to damage those

parents' understanding and to not -- and to use the

fake pronouns for a belief that neither I have nor

those parents; or if there are transgender people

in the audience, it would be wrong to signal that

their false belief can be accurately addressed by

medical or surgical transition when it can't.  That

would be directly harmful to my listeners who

identify as transgender.

So that is why it would be very natural

and common for me to reference two doctors, as

already came in our conversations, why I would use

their biological pronouns in that conversation.

Q    So can you give an example of somebody

that you would refer to by a deadname in these

conversations?

MR. CONNOLLY:  Objection; form.

Objection; vague.

Q    So moving on to the next event listed,
Rocky Mountain Summit Part II.

A    Yes.

Q    And this event was held on April 6, 2025?

A    Yes.

Q    And this event was cosponsored by Do No
Harm; is that correct?

A    Yeah.  Do No Harm was a -- yeah.  I don't
know what class of sponsor they were, but they did
help sponsor the event.

Q    Were you involved in organizing this
event?

A    I was involved in planning the first
expert panel.

Q    Were you involved in arranging for event
space to hold this event?

A    No.

Q    Were tickets sold to this event?

A    Yes.

Q    Could anyone buy a ticket?

A    Yes.

Q    Are you aware of anyone being turned
away?

A    I'm not aware of anyone being turned
away.

why they left?

A    Well, in my understanding, it was related to the discussion that we were having, not related to them being late for someplace or something.  My understanding was that it was related to the discussion, the speech.

Q    And how did you come by that understanding?

A    By speaking -- by people that had spoken with them talking to me.

Q    And who were those people?

A    As I recall, it was Lori Gimelshteyn, who was the organizer of the event.

Q    Do you believe that your speech that you give is appropriate for children?

MR. CONNOLLY:  Objection; form. Objection to the extent -- no.  Objection; form.

A    I use professional language, and I think that I don't -- I don't seek out children.  I wouldn't -- if I'm at an event and a parent brings their adult or minor child, I would not stop them from that if I was --

Q    (BY MS. FISCHER)  Did you promote or advertise Rocky Mountain Summit Part II?

A    I shared -- I shared posts on X regarding

it.  I probably -- I mean, I probably, almost

certainly, spoke on the radio on related topics

and, if given the chance, would have, you know,

mentioned it on the website or something like that.

Q    (BY MS. FISCHER)  What radio stations?

A    In Denver, maybe -- I don't remember the

names of radio stations.  I could -- I think KOZ is

one.  I've spoken on KOA once, and a couple other

radio stations.  Maybe KHOW.  I don't remember

which ones were before this event or after this

event.

Q    What age would you say is appropriate for

the speech you gave at Rocky Mountain Summit Part

II?

MR. CONNOLLY:  Objection; form.

Objection; vague.

A    Well, if it's -- you know, one of our --

I mean, right now, I think people are telling their

kids at any age that they are born in the wrong

body.  So I think by telling kids that they are

healthy and normal and that things will get better,

it's appropriate for any age child to hear.  Of

course, I think -- so I think that's appropriate.

I would have to go -- I would have to

know everything that was said in the program to say

*AB Litigation Services*

therapists and doctors and parents.

That was -- that was definitely a key part of the event -- or let's say a part.  It was a long event.  In fact, we specifically invited an attorney to come and at least speak to this a little bit.

So, yes, we definitely spoke about 1312 and its intent to restrict speech.

Q    (BY MS. FISCHER)  Did you speak about your belief that affirming an individual's nonbiological gender identity or gender expression is harmful to the individual?

MR. CONNOLLY:  Objection; form.

A    Yeah.  So the purpose of the event and the prior event was to speak about the harms of gender-affirming treatment, and gender identity is intrinsically tied into that as a false justification and as a way to promote social transition, which leads down this harmful road.

So, yes, these are the kinds of things that I would have talked about, and we -- yes, these are the kinds of things we talked about and, in the context of 1312, its restriction on speech.

Q    (BY MS. FISCHER)  Did you discuss any

transgender people specifically at Rocky Mountain Summit Part II?

A   I don't recall.  It seems -- it's definitely the type of thing I would have done. Dr. -- the news about Dr. Levine taking away kind of the safety mechanism of age limits for medicines and procedures was sort of fresh; it seems likely that would have come up.  I can't say specifically.

Q   Were there any transgender people at this event of which you were aware?

A   Okay.  So we're still talking about April 6, 2025, Rocky Mountain Summit Part II?

Q   Yes.  I'm sorry.

A   Okay.  So there was at least -- at least one kid who desisted, at least one Colorado adult who considered herself transgender until, I believe, a few weeks or so before that.  There was -- like I said, there was the parent and youth, who I believe the family considered that youth to be transgender.  And then there was, I think, 40 or 60 protesters out front that had been organized online against it that I'm assuming that some portion of them were identified as transgender.

Q   Did you speak to any of these protesters?

A   I did not speak -- so I didn't speak to

*AB Litigation Services*

any of those protesters.  I did have at least -- I mean, there were things online about the event, including I was emailed by an organized protest -- protester/activist in the days leading to the event, and the -- these protesters organized online and were able to get a national accrediting body to remove our previously duly-granted continuing medical education.  So there was some interaction, but I didn't go out directly and speak personally to them that day, no.

Q    So you had no face-to-face interaction with the protesters?

MR. CONNOLLY:  Objection; form.

A    With the protesters, yeah, we had -- we actually had to pay for police officers to -- in our venue.  So I don't think we had protesters, like, actively protesting face-to-face unless I were to walk or drive out to the front.

Q    (BY MS. FISCHER)  And did you walk or drive out to the front?

A    Not during the time that the protesters were there.

Q    Going back to Exhibit 2, there's one additional event listed on page 29, the Rocky Mountain Summit Part III, and it says that's

*AB Litigation Services*

scheduled for April 2026?

A    Yes.

Q    So it has not happened yet?

A    That is in the future, yes.

Q    And as far as you're aware, is this event planned to be similar to Rocky Mountain Summit Parts I and II?

A    I think it will be similar.

Q    And are you involved in planning this event?

A    Yes.

Q    Are you involved in reserving space for the event?

A    I anticipate that I will help, yes.

Q    Are you planning to sell tickets to this event?

A    Yes.

Q    Are you planning to open -- are you planning -- scratch that.

Will tickets be sold to anyone who wants one?

A    Yes.  And could we take a break for, like, ten minutes or so?

Q    Yeah.  Let me just wrap up asking about this event, and then we can take a break.  It

*AB Litigation Services*

shouldn't be much longer.

Do you plan to advertise the Rocky Mountain Summit Part III?

A   I anticipate that CPAN will take the lead.  I anticipate that I will, you know, speak on radio or on social media about the event.  Every year it gets bigger, so it's possible that I will take a larger role in advertising it, but probably -- but I anticipate it will be a lot similar to previous events.

Q   Is the level of your participation in planning Rocky Mountain Summit Part III more than Parts I and II?

MR. CONNOLLY:  Objection; form.

A   I anticipate that it will grow, yes.

Q   (BY MS. FISCHER)  What's the planned content of your speaking engagements?

A   Well, we will have experts from different fields speak about the harms of gender-affirming treatment.  It will probably focus even more on the ideas behind it, such as we're talking about now. Pronouns and names will probably be more of a focus, and kind of the social and other pressures, legal pressures surrounding it.

But it will be talking about the harms of

2024"?

Q    Correct.  So what is the Colorado Medical Society?

A    The Colorado Medical Society is a great organization.  It's a nonprofit professional society or professional organization in Colorado and it represents Colorado physicians.

Q    And this paragraph refers to a vote on a proposal that you put forward?

A    Yes.

Q    That the medical society voted against; is that right?

MR. CONNOLLY:  Objection; form.

A    The medical -- the paid physician members voted for it.  The unpaid medical students voted against it, and the board of trustees voted against it.

Q    (BY MS. FISCHER)  And I'm dropping Exhibit 4 into the chat.  It will probably take a minute for it to load, and you can go ahead and open that up, please.

A    Yes, I have that open.

Q    Okay.  Exhibit 4 appears to be a newspaper article from something called The Publica.  Do you recognize that?

A     Yes.

Q     And this was produced by your attorneys in this litigation?

MR. CONNOLLY:  Objection; form.

Q     (BY MS. FISCHER)  Is that accurate?  I'm sorry.  Did you give this to your attorneys to produce?

A     I certainly would have.  It looks like a file from me.

MS. FISCHER:  Ms. Dague, I'm going to mark this as Exhibit 4.

(Exhibit 4 was marked.)

Q     (BY MS. FISCHER)  And, Dr. Morrell, does this article reference the vote that you referred to in the interrogatory response?

A     Yes.  Well, I'd have to go back to -- yes.  Yes, we just read that.  This is the one, yes.

Q     Okay.  Do you need a minute to review it?

A     If you ask me a question about it, I would probably need to review it.

Q     What is The Publica?

A     It is an online news site.

Q     And I'll give you a minute to look through this.  There's a reference to an internal

*AB Litigation Services*

source on page 2 of the document.  So that's the page -- there's a number in the bottom right corner called a Bates number.  It ends in 236.

A    I see it.

Q    There's a reference to, "According to an internal source," on the last full paragraph on that page.

A    Yes.

Q    Are you that internal source?

MR. CONNOLLY:  Hang on.  Sorry.  There may be issues of journalism and reporting confidentiality and that sort of thing.  I think if you're going to -- if you're going to persist in this question, I might need to have a conversation with Dr. Morrell on this.

MS. FISCHER:  All right.  I'll withdraw that question.

Q    (BY MS. FISCHER)  Dr. Morrell, did you talk to a reporter for this article?

A    I believe I was -- let's see.  I was quoted in the article.

Q    And this article, does it mention using someone's birth name rather than their chosen name?

A    Well, I would have to read the article. Again, this is prior to 1312 when that was not an

*AB Litigation Services*

issue.  However -- an issue legally.  However, I am being attacked as discriminatory and unconscionable for -- for the policy, which did talk about social transitioning, which is one way we refer to using the pronouns of -- the false pronouns and name.  So it's related.

I'd have to read the whole article.  I don't see any at this moment.

Q    I'm going to ask you to look at the page ending in Bates 238.  It's page 4 of the PDF.

A    Yes, I'm at page 238.

Q    And do you see the kind of black box in the middle?

A    Yes.

Q    And that box, if you look at kind of the left-hand column, the last paragraph in the left-hand column, this email states, "I was recently made aware that CMS is currently voting on a proposal to characterize gender-affirming care in minors as female genital mutilation."  Do you see that?

A    I do.

Q    And also this email isn't referencing names or pronouns, correct?

MR. CONNOLLY:  Sorry.  Did you say is not

referencing?

MS. FISCHER:  Is not referencing.

A    The author is referencing a large document that addresses social and medical transition for minors.

Q    (BY MS. FISCHER)  So the sentence here doesn't refer to names or pronouns, correct?

MR. CONNOLLY:  Objection; form.

A    This sentence is referring to a proposal, and his concise summary of it does not reference pronouns.

Q    (BY MS. FISCHER)  Turning back to Exhibit 2.

A    Yes.

Q    The paragraph starting, "Also in June 2024," does that refer to this same proposal you put forth to the Colorado Medical --

A    Yes.

Q    Let me finish -- to the Colorado Medical Society?

A    Yes.

Q    And now, the next bullet down, beginning, "On June 20, 2024," referring to a comment exchange on X --

A    Yes.

*AB Litigation Services*

Q    -- to your recollection, was this complaint about chosen names or pronouns?

MR. CONNOLLY:  Objection; form.

A    So -- so that's interesting that you point this one out.  So, yes, this person, a Colorado-based activist, is specifically implying to threaten me with Colorado laws regarding speech about gender identity.  So it's the same subject to me, although pronouns were not named in this tweet.

Q    (BY MS. FISCHER)  I'm going to ask you to open up Exhibit 5 which is in the chat.

A    Yes, I have it.

(Exhibit 5 was marked.)

Q    (BY MS. FISCHER)  So is this the social media exchange you referenced on June 20th, 2024?

A    This is, yes.

Q    I'll give you a minute to look at it. Let me know when you've reviewed it.

A    Yeah.  Is there something specific you want me to look for?

Q    Not yet.

A    Okay.  Yes.  Thank you.  I've reviewed it.

Q    Okay.  And so this exchange doesn't talk specifically about names and pronouns, correct?

*AB Litigation Services*

MR. CONNOLLY:  Objection; form.

A    I don't think that's accurate.  The --
the reference to conversion therapy and wanting an
investigation is a reference to Colorado bill HB
19-1129, which, as I understand it, and I'm not an
attorney -- which, as I understand it, says that
licensed clinicians in Colorado are not allowed to
affirm a patient's actual birth sex and actual
biological sex, which is done with someone's name
and pronouns.

And that's what the person is threatening
me about and threatening to either start an
investigation with -- that bill, I believe, as I
understand it, references the Colorado Civil Rights
Commission, which is my current fear and concern,
or -- that's what I believe they meant, because
they are referencing conversion therapy in context.
They also might be referencing the Medical Board,
or DORA, which, as you may know, investigates all
complaints.

So I don't know which they are
threatening me with.  I think it's the Civil Rights
Commission.  And it's about conversion therapy, so
they're speaking about social transition, which is
pronouns and names.

*AB Litigation Services*

Q    It states that on March 15th, 2025, you were interrupted with cries of "Nazi" when you testified in front of the Wisconsin state legislature, correct?

A    Yes.

Q    So this person was also attending -- sorry.  This person that you reference in the bullet was also attending the hearing?

A    Yes.

MR. CONNOLLY:  Objection; form.

Q    (BY MS. FISCHER)  And did you interact directly with this protester?

A    No, except for them yelling during my speech.

Q    Did you speak to them face-to-face?

A    I spoke to some protesters face-to-face. I did not speak to that protester face-to-face.

Q    And was your testimony to the Wisconsin state legislature specific to use of names or pronouns?

MR. CONNOLLY:  Objection; form.

A    Any speaking about gender-affirming treatment includes addressing social transition; social transition includes names and pronouns.  So that would have been the subject at hand.  I don't

**210**

Appellate Case: 26-1101   Document: 19-3   Date Filed: 06/08/2026   Page: 218

know if the word "pronoun" was specifically used.

Q    (BY MS. FISCHER)  Now, you say in this paragraph that you were interrupted with cries by an individual that you believe was a transgender-identifying biological male, correct?

A    Yes.

Q    What did you base that belief on?

A    Well, afterwards, there were -- I was sitting next to a very friendly protester, and I was sitting next to other people that were testifying in agreement with me and disagreement. And so that was what I gathered from reports after the -- after the fact, later that day.  And I heard a masculine voice saying something very loudly while I was presenting.

Q    So what made you say the voice was masculine?

A    I think that's general knowledge, a general experience in humans.

Q    So moving on to the next bullet beginning, "Dr. Morrell spoke at Colorado Parent Advocacy Network's Rocky Mountain Summit Part II." This references the fact that your panel did not receive continuing medical education credits, correct?

A    Yeah.  We actually did get it formally approved with -- we actually went through the standard process and got it formally approved.  But after organized online activism, in a very unusual move, it was revoked ahead of the meeting.

Q    Was the revocation about the use of names and pronouns?

A    It was about -- I mean, you could look on Reddit or whatever and see what they were talking about, but yeah, it was about my views on gender identity.

Q    But it was broader than just names and pronouns?

MR. CONNOLLY:  Objection; form.

A    As -- am I a witness or testifying?  I don't know the language.  As I've testified or as I've stated, the gender-affirming -- no one does gender-affirming treatment to somebody that's not using -- who doesn't also have different beliefs about gender identity and often different pronouns and names.  So this is an integral topic.

Q    (BY MS. FISCHER)  So moving on to the next bullet, which begins, "Also leading up to the Rocky Mountain Summit Part II," that refers to complaints that the venue received that the beliefs

*AB Litigation Services*

of your panelists were not acceptable in Denver?

A    Yes.

Q    And was that complaint specifically about the use of names and pronouns?

MR. CONNOLLY:  Objection; form.

A    Again, these complaints are that we are not respecting their identity and then encouraging gender-affirming treatment.  So, yes, it's concerning names and pronouns.

Q    (BY MS. FISCHER)  And the next bullet, I think we've maybe talked about this already, refers to two individuals at the Rocky Mountain Summit Part II.  And that was the parent and child that left during or after your talk?

A    Yes.

Q    And then the second to last bullet refers to an article a Colorado newspaper published on August 7, 2025, and that was about the filing of this lawsuit, correct?

A    Yes.

Q    And then the final bullet refers to negative Google reviews left for your practice?

A    Yes.

Q    Now, are any of these reviews specific to your treatment of a particular patient?

**213**

A   So, no.  To my knowledge, I've never received negative reviews from my treatment of a specific patient.  These reviews have been in response to my public actions on this topic.

Q   Have you ever seen a patient's name you recognize on a Google review that refers to your -- let me strike that.

Have you ever seen a patient's name on a negative Google review of your practice that you recognized?

A   Again, I don't know if just standard practice and professional rules and standards of confidentiality allow me to answer that, I'm told.

But that being said, I can tell you that, to my knowledge, all of the negative reviews -- none of the negative reviews on mine are my patients, and some of the negative reviews, I not only know they are not my patients; I can tie them to a specific event by their name related to my public actions.

Q   Okay.  So going back to Exhibit 1, your declaration.  I'm going to call your attention to Exhibit C, which is on the very last page of the declaration.  It's numbered 16.

A   Exhibit C.  Got it.

*AB Litigation Services*

encouraged to prescribe these medicines even for kids.  And I was very early on that, I would say, prescribing it for adults.  So I did that.

And then more recently, I have been the dermatologist for such patients, and I very much care for these patients.  I have good rapport and take care of their dermatologic health needs.

Q    You used the past tense in paragraph 6. Do you have a preference not to treat transgender patients going forward?

A    Absolutely not.  I am merely assenting to the fact that in the past, present, and future, I did have and expect to care for, with expertise and compassion and a positive rapport, my patients who identify as transgender.

Q    Do you believe you can treat a transgender patient without sharing your beliefs as to why you will not use chosen names and pronouns matching gender identity?

MR. CONNOLLY:  Objection; form.

A    Well, as you may know, doctors of any specialty are expected, or sometimes required, sometimes encouraged by Medicare and the government, to address patients' general health. So we've been at times required or expected or

*AB Litigation Services*

encouraged to check on patients' flu vaccine status or their smoking status and see where they are at on stopping smoking for that information, whether or not that's in our personal -- our emphasis or practice.  So, yeah.

And then for the patient individually, if I as a doctor am affirming a false belief, whether it's false pregnancy, false ability to transition, false body image or body dysmorphia problems, those are all things that, as a physician, I ethically can't affirm for a patient.

Q    (BY MS. FISCHER)  Do you understand that a transgender patient may not want to see you given your belief that they're delusional for believing that he or she can change or have changed his or her gender?

MR. CONNOLLY:  Objection; form.  Objection; misstates testimony.

A    Yeah, it's quite a -- quite a way to phrase it.  I think if you have experience clinically, you see that you build quite strong bonds with patients, sometimes in just seconds upon meeting them, sometimes over time.

And patients -- we understand that patients are big and physicians are big and there's

*AB Litigation Services*

more to life than just someone's gender identity as is stated.  And so I don't boil anyone down to simply their gender identity, and I think -- so patients so far, we have mutual respect and I have compassion for them.

Q   (BY MS. FISCHER)  Do you make your policy of using chosen name -- or, sorry -- your policy of not using chosen names and pronouns known to your patients?

MR. CONNOLLY:  Objection; form.

A   I don't -- well, I mean, I think anyone who googles me could find out my personal beliefs on this subject, if that's helpful.

Q   (BY MS. FISCHER)  But do you make your policy known to your patients?

MR. CONNOLLY:  Objection; form. Objection; asked and answered.

A   I -- I don't know.  Do you want to specify, or do you want me just to ramble?

Q   (BY MS. FISCHER)  Let me ask you this. Do you tell your transgender patients that you will only use their birth names?

A   So in human conversation, it doesn't proceed like legal -- legal consent.  So ideas and relationships build over time.  And so, you know --

*AB Litigation Services*

A    I don't know if -- I don't think I always do anything.  But as far as a patient -- you see people multiple times, and so it would depend on the setting.

Q    (BY MS. FISCHER)  Would you agree that you don't want to be confrontational with your patients?

MR. CONNOLLY:  Objection; form.

A    I don't seek out confrontation for confrontation's sake.  Unfortunately, as a doctor, sometimes I have to have difficult conversations with people.  I have patients or -- and sometimes it's a brief statement or sometimes I'll have a conversation.  But some very personal issues that -- alcohol use has come up recently.  Smoking, whatever, that's health-related.

I unfortunately sometimes have to have these conversations, or at least I can't enable or -- at the very least, I can't enable or encourage poor health decisions when somebody is seeing me as a physician.

Q    (BY MS. FISCHER)  Is it possible to interact with a patient without using any pronouns?

A    It depends on the duration of the visit and what's going on.  If I'm taking care of -- as

*Travis Morrell  - 08/25/2025*                    *114*

**3-App-221**

**218**

*AB Litigation Services*

you know, transgender identity is heavily

culturally influenced and is much more heavily

skewed in young people.

And so my young patients on -- for

example, if somebody is on an acne treatment, and

we have to do a pregnancy test or something like

that, and we're doing more, we're talking with a

medical assistant and maybe talking with a parent

or a friend or something like that, it becomes

increasingly difficult to not -- you would use --

at a certain point you're going to use pronouns and

people's name in a visit.

Q   (BY MS. FISCHER)  I'm going to ask you to

open Exhibit 6, which is in the chat.  Just let me

know when you've had a chance to scroll through and

look at it.

A   Yeah.  Exhibit 6, yes.

Q   Is this a website advertising your

practice?

A   No.  This is a website advertising the

fact that I offer consultancy.

Q   Did you create this website?

A   Yes.

MS. FISCHER:  Ms. Dague, we're going to

mark this one as Exhibit 6.

were on Sunday.  I don't practice on Sunday.  I did -- yeah.  I've taken off the Monday after, at least the Monday morning, if not all day.  And then for the other one, it was during the week, so I would have had to take time off.  So, yes, I would have to.

Q   So you've done it a couple times.  Any more than that?

A   Well, I would have to say, I mean, those are the speaking engagements that I recall, and so when I -- so, yeah.  If they are outside of this area, I would have to.  I don't -- I don't -- I don't remember other times.

Q   Has anybody at Mountain West ever said you were taking too much time off?

A   No.

Q   I'm going to ask you to scroll to Section 9.1, which is on the page ending in Bates 221.

A   Got it.

Q   And it continues onto the next page.  So this contract states events that would terminate your employment; is that accurate?

A   Termination events, yes.

Q   And in Section 9.1.5, it discusses involuntary termination, when your employer might

decide you needed to part ways?

A    That's correct.

Q    And just looking at these causes, none of them include just the receipt of a discrimination complaint, correct?

MR. CONNOLLY:  Objection; form.

Dr. Morrell, if you need to take the time to review, please do so.

A    So my understanding is that if I was found to be discriminating against someone or to receive censure from a governing board, like the Colorado Civil Rights Commission, my impression is that could, directly for some of these or indirectly for others, lead to involuntary termination.

Q    (BY MS. FISCHER)  But does it state anywhere that just the receipt of a complaint is cause?

MR. CONNOLLY:  Objection; form. Objection to the extent the witness is being asked to state a legal conclusion about the nature of this contract.

A    Yeah.  Again, I would ask you or Mike to explain it to me, I guess.

But my fear when I look at this is there

**221**

*AB Litigation Services*

are several areas here that seem like it could include complaints.  (i), unsatisfactory quality of medical practice as determined.  (g) engaging in unethical conduct.  The idea of discrimination could be considered, I'm assuming, unethical.  It seems like -- not to mention the restriction of medical license in the State of Colorado in (a).

So I'd say I have fears regarding 1312 on several of those points that you're pointing out.

Q    (BY MS. FISCHER)  Would you agree that not every complaint brought to the Colorado Medical Board is founded?

MR. CONNOLLY:  Objection; form. Objection; calls for speculation.

A    Yeah.  I would have to speculate and also go off of hearsay, so -- but my personal understanding is that Colorado has the -- whereas some states, like California, kind of filter out complaints, Colorado's DORA does not filter out complaints and investigates them.

And I am aware of physicians that I know that actively practice in Colorado who have had unfounded complaints, and it cost them several thousand dollars, and they were, you know -- and they were -- they reported to me that they were put

A    I mean, again, there are articles I've written on websites and social media posts that technically you can access through the web.  So I don't want to -- you're aware -- I think you're aware of all of it.

You're asking me if I've, first of all -- I don't remember the question.  Was the question as a physician or was the question I don't want to see patients?  What was your question?  Sorry.

Q    (BY MS. FISCHER)  The question is whether -- the original question was whether your bio or any of your online materials say you won't treat a transgender patient.

A    There's no material that says that anywhere, because that's not the case.  I care about any patient.

Q    We've talked about your social media posts and your publications today.  Would it be fair to say that your views on sex and gender are publicly known?

A    I think so.

Q    So a prospective patient would be able to find them through a Google search?

A    If they're -- yeah, I think that they could, uh-huh, yeah.

*AB Litigation Services*

Q   And is it correct that you have treated transgender patients in dermatology within the last year?

A   Yes.

Q   And at all times have you used their birth names and the pronouns that match their sex at birth?

A   Yes.

Q   And without providing any identifying details, have you discussed your policy to use birth names and sex at birth with any of your current transgender patients?

MR. CONNOLLY:  Objection; form.

A   So, I'm sorry, you used this word "policy" before, and I'm not familiar with the technical meaning of it.  But if you mean my personal practice or my personal -- professional beliefs regarding it, my personal ethic regarding it, I believe it's self-evident, just as you noticed earlier when I referenced two doctors without using their so-called preferred chosen name or pronouns.  You picked up on it, and I think other people, I'm assuming, do as well.

But I don't consider it -- but I don't have, like, a written -- I don't have a written

**224**

*AB Litigation Services*

policy at work, if that helps answer your question.

Q   (BY MS. FISCHER)  Sitting here, can you recall any discussion you had with a transgender patient regarding your use of pronouns and birth names?

MR. CONNOLLY:  Objection; form.

A   So far to this point, we've focused on their main concerns or whatever is going on in their life or their general -- their general whole self and well-being or their dermatologic problem, and so we haven't had any, to this point, kind of confrontation.

Q   (BY MS. FISCHER)  Do you avoid using pronouns directly with your patient?

A   Well --

MR. CONNOLLY:  Objection.  Objection; form.  Objection to the extent the witness is being asked a legal conclusion.

A   Could you repeat the question, please?

Q   (BY MS. FISCHER)  Do you avoid using pronouns directly with your patients?

MR. CONNOLLY:  Same objection.

A   Well, I do use biologically appropriate pronouns and birth names with my patients.

Following 1312, I am definitely going to avoid this for fear of the Civil Rights Commission or other lawsuits.

Q    (BY MS. FISCHER)  So what -- speaking about past conversations, what is the context in which you would use a patient's pronouns matching their sex at birth as opposed to pronouns that they've introduced themselves with?

MR. CONNOLLY:  Objection; form.

A    So if I were to order a pregnancy test for a patient and perform it in my office, I might say to the patient's parent or friend or to the medical assistant, which I always have a medical assistant in the room, I would say, Could you please run her pregnancy test; and it would not only be potentially a harmful lie, but also nonsensical for me to say it any other way.

If I were to perform a biopsy on the genitals, for example, of a male's penis, I am going to say, Be careful to get his specimen to the lab or refer to it, again, with appropriate biological pronouns.  It would be quite nonsensical to refer to a penis as belonging to some other sex.

Q    (BY MS. FISCHER)  Have you ever had a

with a dozen -- I don't know, five, six, multiple others at different times, even during just this past year, not to mention over a longer period of time.  So there's some coworkership.

Q    (BY MS. FISCHER)  Do you agree that your views on sex and gender do not affect your treatment of transgender patients?

MR. CONNOLLY:  Objection; form.

A    Well, I think, as I've indicated, if someone were to come to me and say, Hey, this weekend, I, you know, had 42 beers and, you know, I'm on this medicine, or whatever, or not, or if I were to have a patient say, you know -- and I do have patients with basically body dysmorphia, have some kind of concern about something about their face that's normal, or if they were anorexic or something and they thought they had to lose more weight, it would be wrong for me to be, like, Yeah, that's cool that you had 48 beers, or, Yeah, your nose really is too big and crooked, or, Yeah, you really do need to lose a few pounds, or, I hope you do well on your weight loss goals.

That's not innocuous to go along with false beliefs in medicine, especially if I'm wearing scrubs and a white coat and introduce

myself as a doctor in a clinic.  I can't do that.

So the same goes to gender identity.  So, yeah, my beliefs on gender identity definitely affect my treatment.  In fact, I think it's better treatment for patients with gender dysphoria to not affirm false beliefs.  So it definitely does affect my care, but in my belief, it makes it better.

Q    (BY MS. FISCHER)  Do you agree that your views of sex and gender do not impact whether patients feel welcome at Mountain West?

MR. CONNOLLY:  Objection; form. Objection; vague.

A    Yeah.  I'm fortunate that, overall, patients still have remained with me or to my knowledge remained with me, and I hope that continues to be the case.  I would like that to be the case.  I like taking care of them.  Whether this is -- they see this as a quirk or a minus point, but overall I'm still worth it or what, I don't know.  I haven't interrogated them, and I can't speculate completely to their beliefs.

Q    (BY MS. FISCHER)  I'm going to switch gears and ask you about House Bill 25-1312, which is the subject of this lawsuit.  I'm going to ask you to go back to Exhibit 1, which is your

declaration, and go to paragraph 18, which is on page 6 of the document.

A     Yeah, I see that.

Q     In that paragraph you state, "Colorado's public accommodation laws as amended by House Bill 25-1312 makes it impossible for me to effectively exercise my constitutionally protected right to speak in a manner that reflects my beliefs"; is that accurate?

A     Yes.

Q     Is it fair to say that prior to the passage of 1312, you did not believe that you were violating Colorado's law?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A     To my knowledge, before 1312, this law, 1312, did not exist.  So, to my knowledge, the way that I practiced was okay in Colorado prior to 1312, and my understanding is that going forward, it's not.

Q     (BY MS. FISCHER)  So it's your belief, looking at the next paragraph, that it was only after 1312 redefined gender expression to include the use of a chosen name or other terms by which an

*AB Litigation Services*

individual chooses to be addressed that you're now

concerned about your speech?

MR. CONNOLLY:  Objection; form.

Objection to the extent the witness is being asked

to state a legal conclusion.

A    I think how it reads reflects my views

that 1312 redefines gender expression in connection

with someone's gender identity, and that I am

afraid to be considered discriminatory or unlawful

for speaking my beliefs about reality and good

medical practice with patients.

Q    (BY MS. FISCHER)  So your concern about

Colorado's law is specifically 1312's definition of

gender expression to include the use of a chosen

name or other terms by which an individual chooses

to be addressed?

MR. CONNOLLY:  Objection; form.

A    Well, again, I am not an attorney, so I

can't probably accurately interpret 1312.  But to

my understanding, 1312 redefines gender expression,

includes chosen name, forms of address, pronouns

related to gender expressing, and, therefore, I'm

afraid that I'm going to be considered

discriminatory and unlawful and receive harm --

financial harm, reputational harm, monetary damage,

potentially lose my -- lose patients or lose my job.

So, yes, I'm afraid of all those things from 1312, specifically.

Q    (BY MS. FISCHER)  Can you give an example of a discussion you had with a patient before the passage of House Bill 25-1312 that you would not now have?

A    Yeah.

MR. CONNOLLY:  Objection; form.

A    I mean, I gave examples which are from -- they are from the practice and the type of patient and the things that -- the conversations that we've had.  So I wouldn't want to say, you know -- I would like to be able to -- I don't want to say names, but I want to say, Janna, we're going to run your pregnancy test now, or to my assistant, Lisa -- I just don't want to use the patient name -- but, Lisa, please take the pregnancy test to the lab for her, or something like that.

Those are examples that I understand would be just a few examples of the way that 1312 would restrict my speech and put me at risk of basically legal or financial harm.

Q    (BY MS. FISCHER)  Can you give an example

of something that you have said at a speaking engagement that you would not now say since the passage of House Bill 25-1312?

A    Yeah.  I think, again, if I were to say -- I guess I'm going to break 1312.  Do I get the sensation to break it while I'm here?  This isn't a public accommodation, I guess?  I don't know, but I guess.

Yeah.  If I were to say, Dr. Bowers was able to have children.  Dr. Levine was able to have children, but he had children, and now he's taken that ability away from kids by removing age limits that are there for safety for pediatric gender-affirming care.  That would be one example.  Or Representative Brian Titone says that men can breastfeed; but that's not safe for your baby and it's not something that a boy or male should expect to be able to do after receiving medicines.

That's -- so those are two examples of names and pronouns that I would say that I'm afraid that I can't say anymore.

Q    Are you aware that prior to the passage of House Bill 25-1312, Colorado law recognized gender expression as a protected status?

MR. CONNOLLY:  Objection; form.

Objection to the extent the witness is being asked to state a legal conclusion.

A    My knowledge of Colorado Antidiscrimination Act and the Colorado Civil Rights Commission prior to 1312 was limited probably to basically it being used as a way to pick on people with alternate beliefs, like Jack Phillips at the Masterpiece Cakeshop, who I understand has multiple times had customers approach him and go through hundreds of thousands of dollars in legal fees or whatever just because he has different beliefs.

My fear is that with 1312, I'll be used in the same way.  As we've said, I'm publicly known, and I've been picked on on the internet as far as groups of organized activism against me successfully.  Groups have organized Google-bombing my reviews successfully.  So I'm concerned that I'll have a patient probably, whether legitimately in their view or purposefully just to injure me, make such a complaint about me in reference to 1312.

Before 1312, I, again, was not -- I had general knowledge that CODA and CCRC was used against people with biological beliefs, but I

*AB Litigation Services*

A    Jack Phillips, Master Shop Cake --
Masterpiece Cakeshop.  It's been to the Supreme
Court, and the courts have said use him for
reeducation.

Q    And was that case about deadnaming and
misgendering?

A    I believe it was not.  But I believe that
there is a second case where it was about his
desire not to make a cake for a person who
identified as transgender for a gender reveal, so,
I mean, a very similar issue.

Q    But that person was being denied service,
right?  You said he refused to make a cake?

MR. CONNOLLY:  Objection; form.
Objection to the extent the witness is being asked
to state a legal conclusion.

A    In my understanding, it was for his
deeply held belief, just as I also have a deeply
held belief, that's directly attacked by 1312.

Q    (BY MS. FISCHER)  Are you aware of anyone
other than Jack Phillips who has been sued under
1312?

A    I am not.

Q    Anybody who has been fined?

MR. CONNOLLY:  Objection; form.

A    I mean, this is a new -- a new law, and I am not aware of it.

Q    (BY MS. FISCHER)  As paragraph 25 of your declaration, and paragraph 25 is on the top of page 9, you state, "HB 25-1312's punishments for disfavored speech also mean that I must refrain from publishing materials that refer to individuals by using biologically accurate pronouns and birth names inconsistent with their purported gender identity or gender expression"; is that accurate?

A    Yes.

Q    Tell me what you would like to publish that you believe House Bill 25-1312 prevents you from publishing?  Can you give me an example?

MR. CONNOLLY:  Objection; form.

A    Yeah.  I think it's the same forms of speech that we've previously addressed, biologically accurate pronouns and birth names. That would be my concern.

Q    (BY MS. FISCHER)  Is the speech you are worried about broader than pronouns and birth names?

MR. CONNOLLY:  Objection; form.

A    I mean, I speak frequently on gender identity expression and affirming treatments, and

*AB Litigation Services*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-01572-RMR-KAS

------------------------------------------------------

ZOOM DEPOSITION OF VALERI LESWING, D.O.
August 27, 2025

------------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.

Defendants:

AUBREY C. SULLIVAN, et al.

------------------------------------------------------

APPEARANCES:

    CONSOVOY MCCARTHY, PLLC
        By J. Michael Connolly, Esq.
           Paul Draper, Esq.
           1600 Wilson Boulevard, Suite 700
           Arlington, Virginia 22209
             Appearing via Zoom on behalf of
             Plaintiffs

    COLORADO ATTORNEY GENERAL'S OFFICE
        By Dominick D. Schumacher
           Assistant Attorney General
           Janna K. Fischer
           Senior Assistant Attorney General
           Nora Q.E. Passamaneck
           Senior Assistant Attorney General
           1300 Broadway, 10th Floor
           Denver, Colorado 80203
             Appearing via Zoom on behalf of
             Defendants CCRD, Sergio Cordova,
             Geta Asfaw, Mayuko Fieweger,
             Daniel S. Ward, Jade R. Kelly,
             and Eric Artis

*AB Litigation Services*

APPEARANCES (continued):

    COLORADO ATTORNEY GENERAL'S OFFICE
       By Lane Towery
         Assistant Attorney General
         1300 Broadway, 10th Floor
         Denver, Colorado 80203
           Appearing via Zoom on behalf of
           Colorado Attorney General

Also present:  Sarah Bomgardner

*AB Litigation Services*

Pursuant to Notice and the Federal Rules of Civil Procedure, the Zoom deposition of VALERI LESWING, D.O., called by Defendants, was taken on Wednesday, August 27, 2025, commencing at 1:02 p.m., via remote videoconference, before Lisa A. Dague, Certified Shorthand Reporter and Notary Public within and for the State of Colorado.

                         I N D E X

DEPOSITION OF VALERI LESWING, D.O.

EXAMINATION BY:                                        PAGE

     Mr. Schumacher                                      4


                                                    INITIAL
EXHIBITS                                           REFERENCE

Exhibit 1    Plaintiffs' Objections and                29
             Responses to Defendants'
             First Set of Interrogatories

Exhibit 2    Declaration of Dr. Valeri                 85
             Leswing

them.

Q    Do you still treat any elderly patients?

A    I routinely give families flu vaccines, so we do routinely do that, but it is not my standard to treat adults.

Q    Do you ever provide any kind of care where a patient would stay overnight?

A    No.

Q    I wanted to ask some questions about your patient population and folks that you've treated in the past, and I'll just start by saying I don't want to get any protected patient information.  I don't want to put you in -- I'm not trying to put you in any kind of ethical bind.  So all my questions, I'm looking for answers without any identifying information.

My first one is, generally, have you ever treated a patient who identifies as transgender?

A    Yes.

Q    And have you ever treated patients who, in your professional opinion, have gender dysphoria?

A    Yes.

Q    Could you describe in your own words what gender dysphoria is?

wouldn't need treatment because you would be

perfectly happy with how you were.

Q    If a person identified as trans had
gender dysphoria and did not grow out of the
self-identification of being transgender by
adulthood, so let's say by 25 or 30, would
gender-affirming care possibly be appropriate at
that juncture?

MR. CONNOLLY:  Objection; form.

A    I don't treat adults, so it's hard to say
what would be the best treatment for an adult in
that situation.  Yeah, I'm not -- I don't know the
adult literature.  It's very different than
pediatrics.

Q    (BY MR. SCHUMACHER)  We've talked a
little bit about your declining to use preferred
names or pronouns connected with a gender identity
or gender expression that does not match a person's
sex at birth.  Do you do the same in your personal
life, so outside of the clinical context?

MR. CONNOLLY:  Objection; form.

A    Yes.

Q    (BY MR. SCHUMACHER)  So if you knew
somebody socially that wanted to transition or had
transitioned to a new gender and adopted a new name

to reflect their new gender identity, you would continue to refer to them using their old name?

MR. CONNOLLY:  Objection; form.

A    I would probably try to not refer to them, but if I needed to, I would use their old name.

Q    (BY MR. SCHUMACHER)  Why would you try to avoid referring to them using a name?

MR. CONNOLLY:  Objection; form.

A    In my social life, I'm not trying to treat people.  They are not asking me for a medical opinion on their personal state, and, in general, I'm not going around trying to cause unnecessary offense.

Q    (BY MR. SCHUMACHER)  Would it be fair to say, then, that, when you choose not to use a pronoun associated with a new gender identity or choose not to use a name associated with a new gender identity, that it is not your intent to denigrate anybody?

MR. CONNOLLY:  Objection; form.

A    There are a lot of like negatives in there.  I'm not quite sure where you went with that.

Q    (BY MR. SCHUMACHER)  Sure.  I can restate

Q    Do you have a preference not to treat
patients because they are transgender or nonbinary?

A    No.

Q    Have you ever treated patients without
using their pronouns or names at all regardless of
what those pronouns or names are?

MR. CONNOLLY:  Objection; form.

A    What do you mean?

Q    (BY MR. SCHUMACHER)  Sure.  I'll just
represent that I have interactions with folks all
the time where I don't use their name, maybe I
don't know their name, or I don't use a pronoun to
describe them.  Does that ever happen in the
context of your medical practice?

MR. CONNOLLY:  Objection; form.

A    It does.  It's not common, though.

Q    (BY MR. SCHUMACHER)  Let's say that you
have a patient who is transgender or nonbinary, but
comes into your practice for some other reason
having nothing to do with their gender identity or
gender expression.  Do you feel like you can treat
their medical issue without any discussion of
gender?

MR. CONNOLLY:  Objection; form.

A    It's very hard to treat someone's

biological health without recognizing their

biological health.  Your UTI may have nothing to do

with your identity, but the fact that you're female

makes your UTI a very significant different risk

than if you were male.

And so while it's not relevant for

treating a UTI whether you are trans or not, your

biological identity is very significant, and the

vast majority of medicine is that way.

Q    (BY MR. SCHUMACHER)  And so let's say I

came in with a, we'll call it garden-variety

injury, maybe a sprained ankle.  Would it be

possible to treat that without any discussion of

gender?

MR. CONNOLLY:  Objection; form.

Objection; asked and answered.

A    So you, being an adult, that may be the

case.  But, universally, when I'm treating young

men for injuries, the risk of reinjury is

significantly higher than when I'm treating young

women.  They are just more aggressive, and they are

much less likely to sit still and hang out.

And so the biological gender is always

relevant, although it's not relevant whether they

are trans or not.

*AB Litigation Services*

A    No, not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with the Colorado Civil Rights Division, or CCRD?

A    Not to my knowledge.

Q    To your knowledge, have any of the patients we've discussed today filed complaints with any other organization?

A    Not to my knowledge.

Q    Your practice of only using pronouns and names associated with one's sex at birth, is that -- strike that.

Your practice of only using names and pronouns associated with sex at birth, has that always been how you operate?

A    Yes.

Q    And do you still only use names and pronouns associated with somebody's sex at birth?

A    Since the recent law, I've felt compelled to not use either.

Q    And when you use the term "since the recent law," are you talking about House Bill 25-1312, which was passed in approximately May of 2025?

A    Yes.

244

Q    So since May of 2025, you have felt compelled to not use names or pronouns?

MR. CONNOLLY:  Objection; form. Objection; misstates testimony.

A    When I'm dealing with patients who I'm unsure of, I just have to refer to them generically as "the patient" instead of being able to talk to them like you would in polite conversation with their name, how are you doing.  It has to be something more generic.

Q    (BY MR. SCHUMACHER)  Are you afraid to use a legal name on someone's medical records?

MR. CONNOLLY:  Objection; form.

A    I'm concerned that the State will come after me if I refer appropriately to the patient in a chart by their biological sex or naturally by their biological pronouns, including using their given birth name.

MR. CONNOLLY:  Dr. Leswing, are you okay? Do you need to take a break?

THE DEPONENT:  (Shook head.)

MR. CONNOLLY:  Okay.

Q    (BY MR. SCHUMACHER)  Can you explain a little bit more about your concern that the State will come after you?

*AB Litigation Services*

A    It's unquestionable that in the State of Colorado, people have been targeted for their views on trans issues.  And knowing that I've been in this community for a long time and knowing that the community knows how strongly I feel about not harming children, it's not at all inconceivable that I would be directly and actively targeted by somebody who didn't come in to actually seek care, but by somebody who came in to make a point of backing me into a position where I have to choose between doing what I think is deeply harmful for their child or following some bizarre speech code that the State has decided is critical.

Q    Who are you concerned specifically would target you?

A    Any family or parent who wanted to be the person that made themself famous by making a stand for what they consider are trans rights.

Q    What about HB 25-1312 makes you believe that you're now likely to be targeted?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A    Even if I wasn't directly targeted, if a family came in and they want me to call their

ten-year-old boy a girl, they want me to refer to them as a girl, and I find that to be harmful directly to them, I feel now forced to refer to them androgynously as "the patient" so that the family doesn't have the ability to seek punitive legal action in the civil rights department in the State of Colorado because I spoke honestly with them about what I thought was right for their child.

Q   (BY MR. SCHUMACHER)  And it's your belief that HB 25-1312 puts you at that risk?

MR. CONNOLLY:  Objection to the extent the witness is being asked to state a legal conclusion.

A   Yes.

Q   (BY MR. SCHUMACHER)  Is it fair to say that you did not feel at risk before HB 25-1312 was passed?

A   Yes.

Q   Have you seen any transgender patients since May of 2025?

A   Not that I know of.

Q   And you say that you feel like you might be targeted by somebody who knows your views on the topic of gender.  How would somebody know what your

materials?

A    I've considered doing a formal review on Facebook under my Mountain Pediatrics page, reviewing the literature for people so they can see it, and openly having a discussion there.

Q    How long have you been planning to or considering publishing those materials?

A    Probably two or three years.

Q    Have you made any progress on writing these materials?

A    I stopped considering that as much after the law was passed, because I think it will lead to further anger in people who disagree with me.

Q    Did you start writing those materials?

A    Generally when I write, I kind of spend a lot of time thinking about it in my head, and then I kind of write it all in one big spree.  And so I haven't actually written anything.  I've just contemplated how I would do it.

Q    And it's your belief that in the current climate, it would be controversial, and folks might be upset with you about publishing it?

A    Correct.

Q    And for that reason, you have decided not to go forward and publish it?

*AB Litigation Services*

A    Correct.

Q    And the Facebook page you want to publish
it on, that's Mountain Pediatrics' Facebook page?

A    Correct.

Q    That's not your personal page.  That's
completely controlled by Mountain Pediatrics,
right?

A    I don't have a personal page, so, yes.

Q    Looking at paragraph 15, which references
an internal Exhibit A that can be found on page 11
of this PDF, you discuss wanting to publish a
statement on Mountain Pediatrics' page regarding
gender ideology, preferred pronouns, and chosen
names; is that right?

A    Correct.

Q    How long have you wanted to publish this
statement?

A    Probably six, nine, ten months, something
like that.

Q    And why have you not done so?

A    I don't want to generate further angst
and anger in my community.

Q    And your goal with the statement that you
want to publish is to inform potential patients
that you're not going to use preferred pronouns or

*AB Litigation Services*

chosen names that don't match a patient's biological sex, correct?

A    Correct.

Q    Do you have any other similar policies or disclaimers on Mountain Pediatrics' Facebook page?

A    I don't know what you mean by "similar."

Q    Sure.  Do you announce any other of Mountain Pediatrics' policies on the Facebook page?

A    I review my thoughts on current medical concerns, such that, like, the last page I think you see there, I'm talking about the concern of measles in the community.  And so I give people my thoughts on, you know, You don't need to worry about getting measles in the community if you're vaccinated, et cetera.  I don't think your infant needs an early vaccine at this time.  We're watching the measles epidemic in Colorado closely.

So I do use the Facebook page to inform the community of what my thoughts are on different medical concerns.

Q    So thinking about the materials that you said you wanted to publish in paragraph 14 and this potential Facebook statement in paragraph 15, are these meant to be advertisements for your practice?

A    I don't -- I don't see them as

associated with sex at birth?

A    Yes.

Q    Is there anything more than that?

MR. CONNOLLY:  Objection; form.

A    I think speaking forthrightly means always being honest in your communication.

Q    (BY MR. SCHUMACHER)  Is it your concern that this law will force you to be dishonest in your communication?

A    100 percent.

Q    How so?

A    The law is an attempt to compel me to use somebody's chosen pronouns, which is dishonest in the face of their biology, and it harms them.

Q    You can go ahead and close this exhibit, which I'll mark as Exhibit 2.

(Exhibit 2 was marked.)

Q    (BY MR. SCHUMACHER)  Are you familiar with the organization Do No Harm?

A    Yes.

Q    And is it okay if I refer to that organization as DNH?

A    Sure.

Q    If you don't mind, could you go back to Exhibit 1, page 37?



**Parasol Patrol**

Posts    About    Videos    More ▾

**Parasol Patrol**
5h · 🌐

***CALL TO ACTION***
MONDAY OCTOBER 9TH
AURORA COLORADO
6:30PM

From a parent, "Queer advocacy opportunity
<TONIGHT> (Monday, 10/9/23):

A far-right, conservative, anti-queer group is
planning to attend our Cherry Creek School
board meeting Monday at 7pm at Overland
High School (Aurora, CO). They are
specifically targeting LGBTQ-inclusive school
policies and are anticipating national coverage
to hype their agenda. If you live in Colorado,
we would greatly appreciate you showing up
to our school board meeting to support our
queer kids and families...

...Please share and attend if you can."

3-App-255

DE_000189

 **SPLASH Staff** @splashnoco · 15m                    · · ·

@MorrellMDmph did you have additional questions?

A tad bit of advice…. Be careful preaching in Colorado, we have an active ban on conversion therapy because it's harmful to young people and your beliefs tap that line. Wouldn't want an investigation…

💬 1          ↻          ♡          ili 7          🔖  ⬆

**Travis Morrell, MD MPH**                     · · ·
@MorrellMDmph

Do you have a name, or do you only threaten people anonymously?

Medicine/surgery harming the reproductive abilities of future gay, lesbian, or straight adults is a real crime.

As a physician, I have an oath to do no harm. The oath doesn't go away because you threaten.

**253**
DE_000259

## Re: Feedback from Dr. Drew Updike

From    Kate <kate_alfano@cms.org>

To    LYNN PARRY<nurvdr@mac.com>

CC    Diversity, Equity and Inclusion Committee<dei_committee@cms.org>

Date    Monday, June 10th, 2024 at 2:58 PM

---

You're right, Dr. Parry. Voting is open until June 13 (the day before the Board meeting), per the Central Line process.

> On Jun 10, 2024, at 2:36 PM, LYNN PARRY <nurvdr@mac.com> wrote:
>
> I have just posted this for the Board. The response to Central Line has been slow. I absolutely think the opportunity to vote needs to be reopened until the day before the Board meets.
>
> Lp
>
>> On Jun 10, 2024, at 8:46 AM, Kate Alfano <kate_alfano@cms.org> wrote:
>>
>> Dear Doctors:
>> I am forwarding the email thread below at Dr. Quarles's request.
>>
>> Kate
>>
>>> Begin forwarded message:
>>>
>>> **From:** Leto Quarles <letoquarlesmd@gmail.com>
>>> **Subject: Fwd: Your vote needed on policy proposals**
>>> **Date:** June 9, 2024 at 4:07:19 PM MDT
>>> **To:** Kate Alfano <kate_alfano@cms.org>
>>>
>>> Kate, the email settings don't seem to let me forward this whole email thread (included below) directly to our DEI committee email group – would you mind sharing with the DEI committee crew as an affirming reminder that we're not alone in the fight and there are some awesome docs across CMS membership ready to step up as allies, too?
>>> Thanks!
>>>
>>>
>>> ---------- Forwarded message ----------

**254**
DE_000231

From: **Drew Updike** <drew.updike@gmail.com>
Date: Sun, Jun 9, 2024, 3:50 PM
Subject: Your vote needed on policy proposals
To: Leto Quarles <letoquarlesmd@gmail.com>
Cc: Kate Alfano <kate_alfano@cms.org>, <chet_seward@cms.org>


Hi Leto,

Thank you for quick response, and considerate words!

Yes, please feel free to share my feedback with the CMS BOD, staff, author of this proposal, and any interested parties.

I may also share my sentiments with the Denver Post in the interim, regarding Dr. Morrell's weaponization of medicine, intentionally during Pride Month. It's deceptive by the author, and it is disappointing that it comes from a physician who is in a privileged place of power.

I know that its appearance in CL is c/w the current, well intentioned process in place to solicit member input; and it is at no fault of CMS, the staff, or the BOD.

But it is a shameful and overt use of our members' communication tool, and it should be taken down.

Thank you!

Drew


On Sunday, June 9, 2024, Leto Quarles <letoquarlesmd@gmail.com> wrote:
> Hi Drew,
> Thank you.
> Totally agree with your sentiments.
> Also, to fill you in on the process, Central Line proposals come directly (unedited by CMS staff) from the CMS Member(s) who are proposing them. So that's why the language reads the way it is. May I have your permission to read your comment verbatim at the CMS BOD meeting this coming week when we discuss the Central Line proposals and membership feedback?
> Thanks!
> Leto
> --
> "I have loved the stars too fondly to be fearful of the night."  ~ Galileo Galilei

On Sun, Jun 9, 2024 at 12:34 PM Drew Updike <drew.Edike@gmail.com> wrote:

Hi Kate,

I felt like reaching out to you & Dr. Quarle directly would be best way to address this.

The central line proposal attached is clinically offensive and misleading - its title conflates two medically unrelated topics.

Gender affirmative therapy & genital mutilation are medical separate entities. The author of this CL proposal is intentionally conflating them for political reasons.

I believe the results of the "survey" are a result of people's reflexive, negative-association with the intentionally-framed subject line.

I strong urge CMS to remove and reassign a subject more honest with the content of the proposal.

Thank you,

Drew Updike MD, MPH, FACP

On Saturday, June 8, 2024, Colorado Medical Society <membership@cms.org> wrote:

Some members using Google Chrome are experiencing issues viewing links on CMS.org. We recommend using a different
Internet browser such as Safari if you receive an error message, or refreshing your browser. Thank you for your patience.



**Central Line proposal**

Dear Dr. Updike:

Three policy proposals will be considered by the Colorado Medical Society Board of Directors on June 14, 2024, and your input is needed.

The following personalized link will log you into Central Line to vote and comment on the proposals: [personalized link removed to prevent unauthorized use]

Please be sure to vote by June 13, 2024, and do not share your link as it is associated

Thank you for using CMS Central Line.

**COLORADO**
**MEDICAL SOCIETY**

<Message to my fellow Board Members for 6-14-2024.docx>

257
DE_000234



258
DE_000278

11:05

docs.google.com

← Transgender Support Sign-...

Jeremy Haefner, Chancellor, University of Denver
Mary Clark, Provost & Executive Vice Chancellor, University of Denver
Marti McCaleb, Associate Vice Chancellor of Equal Opportunity and Title IX and Title IX Coordinator at DU, University of Denver

We, the undersigned members of the University of Denver staff, students, campus workers, faculty, and alumni, are writing to express our deep concern regarding the upcoming event hosted by Turning Point USA on April 10th, featuring Erin Lee from Protect Kids Colorado. While we recognize the importance of fostering diverse perspectives and encouraging robust dialogue on our campus, we cannot condone the dissemination of harmful rhetoric that perpetuates discrimination and undermines the well-being of marginalized communities.

As an institution committed to inclusivity and diversity, it is imperative that we denounce any efforts to promote hateful stereotypes or propagate misinformation, especially when it comes to issues affecting transgender individuals. The recent surge in anti-LGBTQ legislation across the country, with a staggering 484 anti-LGBTQ bills in state legislatures in 2024 alone so far being tracked by the ACLU, underscores the urgency of our responsibility to stand in solidarity with our transgender peers and allies.

According to the US Trans Survey of 2015, transgender students face pervasive harassment in various forms, both in person and online. Shockingly, 1 in 20 individuals surveyed reported being physically assaulted as a result of their gender identity. These alarming statistics paint a grim picture of the daily struggles and threats faced by transgender individuals, particularly in educational settings.

Furthermore, it is crucial to acknowledge the barriers

3-App-262

**259**
DE_000281

11:05

docs.google.com

← Transgender Support Sign-...

Furthermore, it is crucial to acknowledge the barriers that transgender individuals encounter in pursuing higher education. Due to rampant harassment and discrimination, very few transgender individuals make it to college, depriving them of the opportunity to access vital resources and opportunities for personal and professional growth.

Turning Point USA's promotion of harmful rhetoric and association with Protect Kids Colorado, an organization known for its anti-transgender and anti-science stances, is deeply troubling. By perpetuating harmful stereotypes and fostering an environment of fear and discrimination, Turning Point USA is complicit in perpetuating systemic barriers that restrict access to life-saving gender-affirming healthcare, restroom accommodations, and parental rights for transgender individuals and their families.

As members of the University of Denver community, we call on Turning Point USA to reconsider their decision to host this event and to prioritize the well-being and safety of all students. We call on the larger University of Denver campus to protest this event and the University of Denver to not allow this event or future events which violate the DU Honor Code to go forward. We urge our fellow community members to join us in condemning hate speech and standing in solidarity with transgender individuals in our pursuit of a more equitable and inclusive campus environment.

**Signatories:**

1. Shoshana McClarence, PhD candidate in the Joint Doctoral Program in Religious Studies, and Staff in Anderson Academic Commons
2. David C. Kemp, PhD student in the Joint Doctoral Program in Religious Studies, and student staff in the Anderson Academic Commons and JDP
3. Nicole Cortez-Nevarez, staff at the Anderson

**260**
DE_000282

duclarion.com



**261**
DE_000349



< **Gwen** >
geistwen_



# Gwen

geistwen_

65 followers · 194 posts

You don't follow each other on Instagram

[ **View profile** ]

YESTERDAY 9:37 PM

 Antifa agent here. Stop posting sensitive information immediately or you will be silenced.

**262**
DE_000433

2:14

< Gwen >
Active 16m ago

geistwen_
65 followers · 194 posts
You don't follow each other on Instagram

View profile

YESTERDAY 9:37 PM

Antifa agent here. Stop posting sensitive information immediately or you will be silenced.

12:00 PM

lol

This isn't a joke. I was told to warn you.

2:11 PM

I will never stop exposing the harms of gender ideology and those who harm children in my community with it. 😊

——————— New Messages ———————

Then you will soon die

Message...

**3-App-266**

**263**
DE_000429



**Gnowknayme** @Gnowknayme · 7h

Replying to @Erin4Parents @COBeeMama and @KyleClark

Hey Erin!

[Image: A VOX amplifier on a stage with a sign reading "TRANSPHOBES EAT SHIT AND DIE ALONE"]

💬 1     🔁     ♡ 1     📊 74     ⬆️

**264**
DE_000430

10:46

**elliebc**
Restricted Account

**elliebc**

Instagram

1.5K followers · 145 posts

You don't follow each other on Instagram

**View profile**

You started a chat with elliebc. We use information from this chat to improve your experience. Learn about business chats and your privacy.

7:17 PM

your transphobia is not welcome on our campus

▶ Sent a photo
Allow messages to view this pho

we're outside and we're not afraid of you

**You have restricted elliebc**
They can't see when you're online or when you've read their messages.

**Block**        **Delete**        **Unrestrict**

**3-App-268**

**265**
DE_000434

 **Nicole Solas Domestic Terrorist!** ✔    • • •
@Nicoletta0602

This is a public school employee publicly threatening legal action because @Erin4Parents and I exposed her emails keeping secrets from parents.

Please sue lol

twitter.com/mgrosstaylor/s...

 **Marlena Gross-Taylor** ✔    ⋮
@mgrosstaylor

🛑 It's hard enough navigating racism, etc. at work as the only #blackwoman in leadership there, but having to also deal with racist, discriminatory news media & the bots/sick people it empowers is crazy. ✅ My personal legal team is involved. No one deserves this treatment.

> 🟥 **Fox News** ✔ @FoxNews · 05 Mar
>
> Elementary school's private emails show secret plans to defy parents' wishes on transitioning their child fxn.ws/3YpOOzH



Hey Kimberly,

Sorry I am just responding, this has been a lot to process. The family has reached out the school a couple times this week, we are trying to get to a good place with them.

I really appreciate you taking the time to write thoughtful response. Thank you so much for your support and time, I'd love to get some advice sometime this summer on how I can best support students if something like this happens again.

Thanks again,

Jenna Riep
Art Teacher
she/her/hers
Wellington Middle School
jriep@psdschools.org

From: Kimberly Chambers <kimberly@splashnoco.org>
Sent: Friday, May 7, 2021 9:19 AM
To: Riep, Jenna - WEL <jriep@psdschools.org>
Subject: Re: Requesting content for Wellington Middle program

Absolutely!
As needed, you have a strong ally in our Board of Education, who can help your admin with responses and base them on the Equal Access Act where parents don't have to approve which clubs and activities their children participate in (which will probably be the next attempt by this parent). Kristen Draper has been briefed on this parents' outreach and she is ready to respond if anyone needs it. She is very available to you via email, even if you/Admin just want advice, and has fielded all of the other middle schools as they began GSA's and pushed through these barriers.
If there is additional work that I can do on my side, please let me know, how this is handled will set a precedence for other parents as they hear about it, so a strong first allyship is key.

Have you been able to check in with ▮▮▮▮ to make sure she is okay?

On Fri, May 7, 2021 at 9:45 AM Riep, Jenna - WEL <jriep@psdschools.org> wrote:
Thanks so much, I will keep her Kristen's in mind if anything else arises. Unfortunately, ▮▮▮▮ hasn't been in school since all this started, so I am not sure how they are doing.

I will reach out if anything else comes up, again, thank you so much for your support!

Jenna Riep
Art Teacher
she/her/hers
Wellington Middle School
jriep@psdschools.org

From:       Kimberly Chambers <kimberly@splashnoco.org>
Subject:    Re: Requesting content for Wellington Middle program
To:         Riep, Jenna - WEL <jriep@psdschools.org>
Sent:       May 7, 2021 4:00 PM (UTC+00:00)

If that persists, you'll want to talk to admin about doing a well-child check or whatever is within the policies of the school. In one former extreme case, a parent had been so concerned that their child wasn't allowed to leave home without family until they [reportedly] decided this "gender identity" was "nonsense". That parent was an attorney, so that was an overreach, and the parent was very focused on how it would affect their career if they had a trans child. That 13-year old was moved from Liberty Commons to a private boarding school out of state (where they ended up staying until they turned 18 last year and moved back to NoCo fully out of the closet much to their dad's dismay). It was learned after a school presentation and then subsequent back-to-back suicide attempts that I was alerted to by their friends and called in to have checks made at home. We never got this parent communication, so it is likely different this time, but keeping whatever type of communication that is within school policies open is a good idea.

It's a lot of work being an ally in these situations, but it's rewarding in the end. I have requested to join the Wellington community group right after our session but haven't been admitted as of yet.
Thanks again.

**Kimberly Chambers**
**(she/her/hers) what's this?**
**Director, SPLASH Youth of Northern Colorado**
**SplashNoCo.org/support**
**Find us anywhere online with #splashnoco**

**3-App-270**

**267**
DE_000301



# RESUME

**March 25, 2024**

Group Code: CPAN
Sales Mgr: Christy Scrivner
Service Mgr: Jessica Gregory

Group Name:    Colorado Parent Advocacy Network
Post As:    Colorado Parent Advocacy Network
Address:    ███████████████

Contact:    Ms. Lori Gimelshteyn
Telephone:    ███████████

---

**Arrival:** Sunday, April 7, 2024
**Departure:** Sunday, April 7, 2024

**Check-in Time:**    4:00 p.m.
**Check-out Time:**    11:00 a.m.

| GUESTROOMS | | | | | | | | | # of Rooms | Rate per Room |
|---|---|---|---|---|---|---|---|---|---|---|
| DATES → | | 4/6 | 4/7 | | | | | | | |
| Individual Guest – Single | Contracted | 0 | 0 | | | | | | | |
| | Pick Up | S | S | | | | | | S | $150 |

*All rates are per person per day.* Please contact your Conference Services Manager **72 Working Hours** prior to your function with your expected attendance. Set or attendance may be reduced; however, billing will reflect original contracted number.

**3-App-271**

**268**
DE_000081

# PROGRAM

**Group Name:** Colorado Parent Advocacy Network
**Group Code:** CPAN
**Post As:** Colorado Parent Advocacy Network
**Contact:** Ms. Lori Gimelshteyn

| Date | Time | Function | Room | Setup | AGR | Rental | BEO # |
|------|------|----------|------|-------|-----|--------|-------|
| Sun, 04/07/24 | 2:00 PM - 5:00 PM | Setup | Pikes Peak | Theater | | | 166639 |
| Sun, 04/07/24 | 2:30 PM - 5:00 PM | Meeting | Pikes Peak | Theater | 250 | $2,000.00 | 166639 |
| Sun, 04/07/24 | 2:30 PM - 5:00 PM | Registration | Peak Foyer | Registration | | $.00 | 166639 |

| | |
|---|---|
| Front Office: | Reservations made by individual call in.  All charges individual pay.<br><br>The following reservations are room and tax to master incidentals individual pay.   Each guest has their own own room but all rooms have the same confirmation #.<br><br>Confirmation # is 3488433218<br>Mitchell Cole 4/6-4/8  (Q2)<br>Erin Lee 4/6-4/8 (Q2)<br>Dr. Travis Morrell 4/6-4/8 (Q2)<br>Mary Margaret Oloham 4/6-4/8  (K1)<br>Eddie Waldrep 4/6-4/8 (Q2)<br><br>Should guests decide to valet there is a $12 per day fee. |
| Client Areas of Importance | |
| Guest Services: | No requests at this time |
| Bell Desk/Valet/Parking: | No requests at this time |
| Food & Beverage Outlets: | |
| Housekeeping: | No requests at this time |
| Property Operations: | No requests at this time |
| Security: | No requests at this time |
| Accounting: | |
| Concessions: | |

Other Notes:

## BILLING INFORMATION

Please forward invoice to:
Colorado Parent Advocacy Network
Ms. Lori Gimelshteyn

<span style="background:black">        </span>

## SHIPPING/RECEIVING

Please address all packages to:
Colorado Parent Advocacy Network
ATTN: Jessica Gregory
The Inverness Denver, a Hilton Golf & Spa Resort
200 Inverness Drive West
Englewood, CO  80112

**3-App-272**

Acceptance of Conference Details

_____
Authorized Signature                Date

**270**
DE_000083

The Inverness Denver, a Hilton Golf & Spa Resort
200 Inverness Drive West, Englewood, CO 80112
Phone: 303-799-5800

**Banquet Event Order**

BEO #: 166639
Page 1 of 1
Date Printed: 3/25/2024

Local Catering

| Post As: | Colorado Parent Advocacy Network | Event Date: | Sunday, April 07, 2024 |
|---|---|---|---|
| Account: | Colorado Parent Advocacy Network | Contact: | Lori Gimelshteyn |
| Address: | ⬛ | Phone: | ⬛ |
| | | Email: | |
| | | Onsite Contact: | |
| | | Onsite Phone: | |
| Master Account #: | CPAN | Catering Manager: | Jessica Gregory |
| | | Phone: | 303.397.7029 |
| | | Email: | jgregory@invernessdenver.com |

| Event Time | Event Name | Room | Setup | Agr | Gtd | Set | Rental |
|---|---|---|---|---|---|---|---|
| 2:00 PM - 5:00 PM | Setup | Pikes Peak | Theater | | | | |
| 2:30 PM - 5:00 PM | Meeting | Pikes Peak | Theater | 250 | 250 | | $ 2,000.00 |
| 2:30 PM - 5:00 PM | Registration | Peak Foyer | Registration | | | | $ .00 |

## Menu

### Beverage

## Room Setup

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

Directional Sign
PEAK FOYER
( 2 ) 6ft Tables with ( 4 ) Chairs at the bottom of the stairs for Registration

PIKES PEAK
Theater set up for ( 250 )

8 x 18 stage at the front of the room
Podium
( 2 ) 6ft Tables with ( 3 ) chairs each on the stage

( 5 ) 6ft Tables with ( 2 ) chairs in the back of the room for sponsors

Water Station in the Room

## Multimedia

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

AV Arranged through Encore Global, Tony Nolan
Quote # 4018-
Set to include

## Special Instructions

## Billing Instructions

**Meeting | Pikes Peak | 2:30 PM - 5:00 PM**

Final guarantee and estimated charges due 4/1
All charges to master
Payment by credit card

All meeting room, food and beverage, audio-visual and related services are subject to applicable taxes (currently 4.25%) in effect on the date(s) of the event and subject to change without notice. Prior to the application of any taxes, all meeting room, food and beverage, audio-visual and related services will be subject to a 25% administrative charge. Please note that the administrative charge is not a gratuity or tip and, accordingly, is subject to all applicable taxes. A portion of this charge (currently 12.00% of food & beverage sales) will be distributed directly to food & beverage staff as additional compensation for their services, while the remainder will be applied to costs and/or expenses other than employee wages.

Organization Authorized Signature _____ Date _____

The Inverness, a Hilton Golf & Spa Resort _____ Date _____
Approval

BEO #: 166639
Page 1 of 1
Date Printed: 3/25/2024

**3-App-274**

**271**
DE_000084

# INVERNESS
### DENVER
##### A HILTON GOLF & SPA RESORT

The Inverness Denver, a Hilton Golf & Spa Resort
200 Inverness Drive West, Englewood, CO 80112
Phone: 303-799-5800

## Booking Check

Page 1 of 1
Date Printed: 3/25/2024

| Post As: | Colorado Parent Advocacy Network | | Event Dates: | April 7, 2024  - April 7, 2024 |
|---|---|---|---|---|
| Account: | Colorado Parent Advocacy Network | | Contact: | Lori Gimelshteyn |
| Address: | ███████████████ | | Phone: | ██████████████ |
| | | | Email: | |
| | | | Onsite Contact: | |
| | | | Onsite Phone: | |
| Master Account #: | CPAN | | Sales Manager: | Christy Scrivner |

| Event Date | Event Time | Room | Event Name | Setup | Agr | Gtd | BEO # |
|---|---|---|---|---|---|---|---|
| Sun, 04/07/2024 | 2:00 PM - 5:00 PM | Pikes Peak | Setup | Theater | | | 166639 |
| Sun, 04/07/2024 | 2:30 PM - 5:00 PM | Pikes Peak | Meeting | Theater | 250 | 250 | 166639 |
| Sun, 04/07/2024 | 2:30 PM - 5:00 PM | Peak Foyer | Registration | Registration | | | 166639 |

### Sunday, April 07, 2024

#### Events

| Qty | Name | Value | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|---|---|
| 1 | Pikes Peak | $ 2,000.00 | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |

#### Daily Total

| | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|
| Events | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |

### Deposit Summary

| Payment, USD 500.00 | ($ 500.00) |
|---|---|
| Subtotal | $ 500.00 |

### Summary All Charges

| | Subtotal | Combined Tax | Service Charge | Total |
|---|---|---|---|---|
| Guestrooms | $ .00 | $ .00 | $ .00 | $ .00 |
| Events | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |
| Subtotal | $ 2,000.00 | $ 106.25 | $ 500.00 | $ 2,606.25 |
| Less Deposit | | | | ($ 500.00) |
| Grand Total | | | | $ 2,106.25 |

Organization Authorized Signature _____     Date _____

Page 1 of 1
Date Printed: 3/25/2024

**From:**

**Rachel Willis**

Vehicle Vault

Venue

(303) 626-8920

[email protected] (/cdn-cgi/l/email-protection)



**VEHICLE VAULT**

| Bill To: | Kimberly W |
|---|---|
| | [email protected] (/cdn-cgi/l/email-protection) |
| **Project:** | **CPAN Benefit Gala** |
| Type | Non-Profit |
| Date | Sep 19, 2025 |
| Time | 3:00 pm - 11:00 pm |
| Location | Vehicle Vault, 18301 Lincoln Meadows Pkwy, Parker, CO 80134, USA |

# CPAN BENEFIT GALA PROPOSAL

## Version 4

**PROPOSAL**

| | QTY | UNIT | PRICE | SVC | TAX | TOTAL |
|---|---|---|---|---|---|---|
| **Gallery Floor Package** | | | | | | $0 |
| Pre Event Set Up Time: 3:00 P.M - 6:00 P.M.<br>Event Time: 6:00 P.M. - 10:00 P.M.<br>Post Event Tear Down Time: 10:00 P.M. - 11:00 P.M.<br>Capacity: Gallery Floor - 500 seated (700 standing)<br>Size: 6,000 sq ft<br>**Includes Wi-Fi, multiple power sources. | | | | | | |
| ♣ **Hourly Rental** | 8.0 | hour | $640.00 | | | $5,120.00 |
| Per hour space rental (5 hour minimum).<br>Total hours to represent set-up, event and tear down hours needed.<br>20% nonprofit discount reflected from the original rate of $800 per hour | | | | | | |

| | | QTY | UNIT | PRICE | SVC | TAX | TOTAL |
|---|---|---|---|---|---|---|---|
| ♣ | **Janitorial Fee** | **0.0** | **item** | **$500.00** | | | |
| | Applied to event that does not contract with a Vehicle Vault approved food and beverage vendor | | | | | | |
| ♣ | **Event Security** | **5.0** | **item** | **$150.00** | | | **$750.00** |
| | Required for all Gallery Floor Events | | | | | | |
| | Two Total Officers | | | | | | |
| | One officer per 150 guests at a rate of $75 per hour per officer for the duration of the event plus half an hour before the event and half an hour after | | | | | | |
| ♣ | **5' Round Tables** | | | | | | |
| | Included in your rental - 35 Available | | | | | | |
| ♣ | **8' Banquet Tables** | | | | | | |
| | Included in your rental - 7 Available | | | | | | |
| ♣ | **6' Banquet Tables** | | | | | | |
| | Included in your rental - 6 Available | | | | | | |
| ♣ | **2.5' Cabaret Tables (Tall/Short Stems)** | | | | | | |
| | Included in your rental - 20 Available | | | | | | |
| ♣ | **Crystal Chiavari Chairs with Black Pads** | | | | | | |
| | Included in your rental - 300 Available | | | | | | |
| ♣ | **Tire Tables** | | | | | | |
| | Included in your rental - 4 Available | | | | | | |
| **Rescheduling Fee** | | **1.0** | | **$1,024.00** | | | **$1,024.00** |
| Rescheduling event date within 90 days of 5/9/25 | | | | | | | |
| | | | Subtotal: | | | | **$6,894.00** |
| | | | **Total Amount:** | | | | **$6,894.00** |

PAYMENT PLAN

1.  $2,935.00          Oct 21, 2024          #389233-000102          PAID # 389233-000102

2.  $3,959.00          Aug 19, 2025          #389233-000103          UNPAID

**274**

DE_000501

Total Amount:    **$6,894.00**

**275**

CONTRACT

# Event Addendum

## I. EVENT INFORMATION

Event Name: <u>CPAN Benefit Gala</u>

Event Date:<u>September 19, 2025</u>

Space(s) Rented:<u>Gallery Floor</u>

Number of Attendees not to exceed:  <u>300</u>

Client Name:<u>Lori Gimelshteyn</u>

Client Company (If applicable): <u>Colorado Parent Advocacy Network</u>

Client Phone Number█████████

Client Email Address<u>[email protected] (/cdn-cgi/l/email-protection)</u>

Designated Contract Signee (if different than Client Name): <u>Lori Gimelshteyn</u>

Designated Contract Signee Email Address (if different than Client Email Address): <u>[email protected] (/cdn-cgi/l/email-protection)</u>

## II. Details of Facility Rental

Total Rental Hours: <u>Eight</u>

Pre-Event Set Up Time: <u>3:00 P.M. - 6:00 P.M.</u>

Event Time <u>6:00 P.M. - 10:00 P.M.</u>

Post Event Tear Down Time:<u>10:00 P.M. - 11:00 P.M.</u>

Rented Space(s) Cost: <u>$6144</u>

## III. *Security* Required for all Gallery Floor Events

Total Security Fee:<u>$750</u>

## IV. Total Charges

Total Cost:<u>6,894.00</u>

*Includes Facility Rental, any additional items from the proposal and security.

## V. Payment Schedule

**3-App-279**

**276**
DE_000503

First Payment Total Cost 2,935.00

Due: Oct 15, 2024

Remaining  Balance:3,959.00

Due:Aug 19, 2025

# Vehicle Vault Event Contract

Upon execution of this Event  Contract (the  "Contract"), Vehicle Vault agrees to provide Client (as named in Event Addendum) use of the Vehicle Vault facility for the purpose of Client hosting an event (the "Event") as described in the Addendum and under the terms and conditions set forth herein. The Contract's effective date is the date when both parties have executed it.

**Event Addendum:** Vehicle Vault and Client have completed the Vehicle Vault Event Addendum, which sets forth the times, location, anticipated items, event details, and cost of and services to be provided by Vehicle Vault.

**Payment:** Client shall pay Vehicle Vault for all amounts due and owing as listed under the Total Charges and according to the Payment Schedule as defined in the Addendum. Other payment terms are included as follows:

1.

    In the event of any additional charges due to damages, hours, and/or services exceeding total charges, Vehicle Vault will send Client an invoice within 7 days which Client agrees to pay such additional charges within 30 days after the date of such invoice.

2.

    Vehicle Vault accepts checks, and all major credit cards. Checks are to be made out to Vehicle Vault.

3.

    Any unpaid balance within 30 days of the event may be subject to late fees in the amount of 18% per annum, accrued monthly, or event being canceled.

**Rescheduling:** All Event reschedule requests shall be submitted to Vehicle Vault in writing and Client shall be responsible for a Rescheduling Fee as defined herein. Rescheduling this Event requires Client acceptance and execution of a revised Event Contract containing the Reschedule Date and other terms contained therein. Acceptance of the Reschedule Date by Vehicle Vault shall be subject to facility availability and shall not be greater than 18 months from the date of written request by Client to reschedule, unless agreed to in writing by Vehicle Vault at its sole discretion. If the Client is unable to request a specific Reschedule Date, then the parties will execute a Rescheduling Memorandum of Agreement until the Reschedule Date may be determined and agreed upon. Client is responsible for accepting and executing any Rescheduling Memorandum of Agreement or revised Event Contract and remitting any applicable

reschedule fee payment within seven (7) days of receipt. Failure of Client to accept and execute the Rescheduling Memorandum of Agreement or revised Event Contract within the seven (7) day period may result in cancellation of the event and a Cancellation Fee will be applied as defined in the Cancellation section below.

*Rescheduling Fees:*

- If Client reschedules the Event more than one year prior to the current Event Date, Client will be responsible for a 5% fee of the Total Charges as set forth in the Event Addendum.

- If Client reschedules the Event between more than six months and one year prior to the current Event Date, Client will be responsible for a 10% fee of the Total Charges as set forth in the Event Addendum.

- If Client reschedules the Event between more than 90 days and six months prior to the current Event Date, Client will be responsible for a 15% fee of the Total Charges as set forth in the Event Addendum..

- If Client reschedules the Event within 90 days of the current Event Date, Client will be responsible for a 20% fee of the Total Charges as set forth in the Event Addendum.

**Cancellation:** All Event cancellations shall be submitted to Vehicle Vault in writing and Client shall be responsible for a Cancellation Fee as defined herein.

- If Client cancels the Event more than 90 days prior to the Event Date, Client will be responsible for 25% of the Total Charges as set forth in the Event Addendum.

- If Client cancels the Event between 31 and 90 days prior to the Event Date, Client will be responsible for 50% of the Total Charges as set forth in the Event Addendum.

DE_000505

- 

  If Client cancels the Event less than 31 days prior to the Event Date, Client will be responsible for 100% of the Total Charges as set forth in the Event Addendum.

- 

  If Client is due a refund for any balance remaining from monies paid less the Cancellation Fee, Vehicle Vault will reimburse Client no later than 30 days after the date of Cancellation.

**Performance:** The performance of the Contract by either party is excused for acts of God, war, government regulations, disasters, strikes, civil disorder, or any other emergency making it illegal or impossible to provide the facilities or to hold the Event. Performance is not excused in advance due to anticipation of the possibility of one or more of these conditions potentially occurring. Neither is performance excused due to lack of attendance at Event. In the event Vehicle Vault is unable to perform under the Contract for any reason other than the excused reasons listed above, then Client's only recourse shall be the option to either (a) receive a refund of all monies paid to date, less any costs of performance incurred by Vehicle Vault, or (b) reschedule the same event for a future available date, at no additional cost to the Client. In any event, Client shall not be entitled to any other damages, whether direct or indirect, incidental or consequential, which include, but are not limited to, costs of advertising, invitations, entertainment, catering or travel expenses. In the event Client is unable to perform under the Contract for any reason other than the excused reasons listed above, then Client shall be responsible for immediate payment of all monies due under the Contract unless Client requests to reschedule the Event according to the terms outlined under the Rescheduling section above.

Notwithstanding the foregoing, the Parties acknowledge that at the time of execution of the Contract, due to the potential public health threat of the COVID-19 pandemic, COVID-19 related guidance and directives from Federal, state and local government agencies (the "Directives") have been issued and are periodically being updated. The Parties further acknowledge that as of the time of execution of the Contract, the actual impact of the Directives upon the Event is unknown.

Client hereby agrees that if the Event, as defined in the Contract, is unable to be executed as planned due to the Directives, Client shall:

a.

  waive any claim force majeure under the Performance section herein;

b.

  work diligently and in good faith with Vehicle Vault to reschedule the event as per the Rescheduling section herein; and,

c.

If unable to reschedule the event and a cancellation is requested by Client, that the provisions of the Cancellation section of the Contract shall apply without exception.

**Damage to Venue: Client is responsible for all damages, expenses, and losses including theft and property loss to the Vehicle Vault facility related to the Event, whether such damage is caused by Client, Client's guests, invitees, representatives or vendors. If such damage occurs, Client shall pay Vehicle Vault the actual cost to repair or replace the damage, plus a twenty percent (20%) administrative fee.**

**Third Party Or Authorized Agent**: If this Contract, Addendum or any other legally binding agreement, including agreement to pay, is to be executed for the Client by another party, including a third party agent or planner, Client shall provide Vehicle Vault, at the time of execution of the agreement being signed, with a letter identifying the third party and authorizing him/her to act on Client's behalf. Failure to provide such authorization shall render any such agreement as null and void until such authorization is provided by Client and accepted by Vehicle Vault. Additionally, written authorization must be provided for any person(s) other than the signer of this agreement who may be authorized to give direction or make decisions on behalf of Client in regard to the planning and details of the Event.

**Event Occupancy:** Preceding Event, Client must contact Vehicle Vault immediately for approval of changes in the Number of Attendees defined in the Event Addendum. Final attendee count is due to Vehicle Vault no later than seven (7) days prior to Event Date.

The safety of our clients, guests, vendors and staff is our primary concern. Due to strict regulations issued by the appropriate authorities, Vehicle Vault requires that Clients adhere to all such regulations as well as agree to limit the Event's total attendees to comply with all occupancy and attendee limits.

If the actual number of guest attendees exceeds the Number of Attendees set forth on the Event Addendum, Client assumes all responsibility and liability for any violation of such regulations, including exceeding occupancy and attendee limits. In addition, if actual attendee count exceeds capacities of spaces rented in the Event Addendum, Client agrees to be responsible for resolving any such regulatory violation to comply with occupancy limits.

**Food and Beverage:** All food and beverages that are brought into Vehicle Vault must be prepared by a licensed establishment, restaurant, or vendor in accordance with the Colorado Department of Public Health and Environment. Vehicle Vault has the right to refuse any food or beverage items that will be served at your event.

**Vendors:** All vendors must be from Vehicle Vault's list of Approved Vendors unless Vehicle Vault, at its sole discretion, provides prior written consent. Any non-approved under consideration shall be required to execute a One Day Vendor Contract with Vehicle Vault prior to receiving consent.

In addition, full-service staffing is required for all Gallery Floor events. If such full-service staffing is not included by vendors contracted for the Event, then Client shall contract from Vehicle Vault's Approved Vendor list to meet this requirement.

At any time, Vehicle Vault may require a copy of the Vendor's business license, most recent health inspection and contracts between Client and Vendor. Client agrees to assist to ensure that Vehicle Vault receives such documentation in a timely fashion.

Additionally, all vendors or other suppliers of services ("Vendor(s)") which have contracted with Client for the Event must meet with Vehicle Vault no later than 30 days prior to the Event Date to coordinate delivery times, loading areas, set-up locations, and pick-up schedule. Vehicle Vault does NOT and will NOT provide staff, carts, hand trucks, ladders or other items to move or set supplies or equipment. Entry into the Vehicle Vault facility for Pre-Event Set Up Time may begin in

**280**

DE_000507

accordance with the Event Addendum. Long-term parking for Vendor staff is not allowed in loading area but is available in designated areas of the Vehicle Vault parking lot. All vendors and their items must be cleared from Vehicle Vault in accordance with the Post Event Tear Down Time in the Event Addendum. Client may be responsible for additional charges if vendors are on premises outside of the Event Addendum times.

**Alcoholic Beverage Services: Alcohol may not be served on premises by any other vendor or persons than the approved Vendor for Alcohol Services as designated on the Vendor Detail Worksheet for the Event. An approved Vendor for Alcohol Services shall only use staff who are TIPS trained and certified. All alcohol service shall end 30 minutes prior to event end time. Where required by local ordinance, Client is solely responsible for applying and obtaining a special event permit through the Town of Parker and no vendor shall provide or serve liquor if such required permit has not been obtained by Client. Vendor agrees to adhere to all local and state statutes and regulations in regard to Alcoholic Beverage Services and further agrees that Vehicle Vault is not responsible for providing such services, nor does Vehicle Vault guarantee that Client will be able to receive any permits or approvals as may be required by law.**

**Rental Services**: Vehicle Vault has rental inventory for use during the event as listed within the Event Proposal. Should the event require additional quantities or items not in Vehicle Vault's inventory it will be at the client's expense to secure such items through a rental partner who shall be required to execute a One Day Vendor Contract with Vehicle Vault prior to receiving consent to work on premise.

**Parking**: Vehicle Vault offers complimentary on-site, self-parking on the property. Please note cars may not be parked in non-paved areas or Outdoor Plaza without written approval.

**Animals**: Live animals are not allowed on the Vehicle Vault property except for legally recognized service animals.

**Safety & Security**: Client, attendees and Vendors, all are permitted access only to the contracted spaces unless otherwise agreed upon by Vehicle Vault. If the event takes place on the Gallery floor, a flat rate for security will be charged, based on size and time of the event. Vehicle Vault is not responsible for any lost or stolen items.

**General Guidelines: Amplified music and sound volume levels must be kept at a level agreed to by Vehicle Vault at its sole discretion. Client agrees that the cars and sets at Vehicle Vault are for display purposes only. Client, Vendors and attendees are not permitted to touch, climb in/on, or in any way compromise the vehicles. Cars on display at time of Event are at the sole discretion of Vehicle Vault unless otherwise documented and approved in advance by Vehicle Vault.**

**Insurance Requirements**: Any registered entity (Client and all Vendors) associated with an event must provide Vehicle Vault with a Certificate of Insurance. The following information MUST BE INCLUDED ON THE CLIENT'S AND VENDOR'S certificate of general liability

1.

   Vehicle Vault shall be named as an additional insured.

2.

   The policy must be primary and Non-Contributory.

3.

DE_000508

The policy must be insured at a minimum of $1 million for each occurrence.

**Decorations:** No decorations or other items shall be posted, nailed, screwed, glued or otherwise attached to the walls, floors or other parts of the Vehicle Vault facility, building, furniture or surrounding areas without Vehicle Vault's permission. The use of the following items is prohibited inside the building and restricted outside:

· Pyrotechnics

· Combustible materials

· Fog/Steam Machines

· Glitter

· Confetti

· Bubbles

· Rice

· Birdseed

· Other items that Vehicle Vault may determine to be unacceptable at its sole discretion.

Additionally, all open flames must be securely contained completely in a glass container.

Please contact a Vehicle Vault representative for authorization for outdoor use. All decorations, supplies, promotional items, rental equipment, and other items must be removed immediately following the Event. Vehicle Vault is not responsible for any materials or equipment left at the Vehicle Vault facility. In the event the Vehicle Vault facility requires to be cleaned due to an Event, beyond normal clean up requirements, Vehicle Vault may charge the Client an additional cleaning fee.

**Smoking:** Smoking in any form, including but not limited to electronic, vapor, cigarettes, cigars or pipes, regardless of the material being used, is prohibited inside any of the Vehicle Vault buildings. Smoking is allowed in outside areas where designated receptacles are provided.

**Compliance with Laws**: Client shall comply with, and hereby accepts full and complete responsibility for ensuring compliance by its representatives, agents, Vendors, invitees, and guests with, all federal, state and local laws, regulations, health and executive orders in connection with the Event. Vehicle Vault shall comply with all federal, state and local laws, regulations, health and executive orders in connection with the Event.

**Enforcement**: In the event of any breach of the Addendum by Client, Client shall be liable for all costs of collection, including attorney fees incurred by Vehicle Vault. In the event, any party brings a lawsuit seeking enforcement of the Addendum, exclusive jurisdiction and venue shall be in the District or County Court for the County of Douglas, State of Colorado.

**Indemnification:** Client shall indemnify, hold harmless and defend Vehicle Vault from any liability, costs and all expenses incurred, including attorney fees, relating to any claims asserted against Vehicle Vault in connection with the Event. Vehicle Vault shall indemnify, hold harmless and defend Client from any liability, costs and all expenses incurred, including attorney fees, relating to any claims asserted against Client in connection with the Event which arises from Vehicle Vault's gross negligence or willful misconduct.

**Advertising:** Vehicle Vault exclusively maintains all rights to the use of its logo, name, and address in relation to all Marketing and Printed Materials. Any and all such Materials must be approved in advance by Vehicle Vault, and if not approved may be subject to legal action. Vehicle Vault maintains the right to document all events for use in Marketing materials and promotional items.

**Changes, Additions, Modifications**: This is the entire agreement between the parties and any prior agreements either oral or written are deemed void, and the Addendum cannot be changed or amended except by written amendment notification acknowledged and agreed upon signed by both parties.

**Acceptance:** Upon execution by both parties, this Addendum constitutes a binding contract between Vehicle Vault and Client. The individuals signing below represent that each is authorized to bind his or her party to the Addendum.

*Rachel Willis*

Rachel Willis                                   Oct 22, 2024

*Lori A. Gimelshteyn*

Lori Gimelshteyn                              Oct 21, 2024

[email protected] (/cdn-cgi/l/email-protection) | www.vehiclevaultco.com | 3036268920 | 18301 Lincoln Meadows Parkway, Parker, CO 80134

## APPLICATION/PERMIT FOR USE OF SPACE IN PUBLIC BUILDINGS AND GROUNDS

OMB Control Number: 3090-0044
Expiration Date: 5/31/2025

Public reporting burden of this collection of information is estimated to average 20 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Facilities Management and Services Programs (PM), GSA Public Buildings Service, Washington, DC 20405.

**INSTRUCTIONS:** This form allows the Applicant to request the use of federally owned property in accordance with 40 U.S.C. § 581(h) and Federal Management Regulation 41 C.F.R. part 102-74, subpart D. The Applicant must accurately describe the proposed use and, if approved, the form will serve as the permit for that use. Please submit the form to the federal property manager responsible for the property.

**Note:** If the proposed use is a farmers market, the Applicant must confer with the Federal property manager and regional counsel to determine whether a permit (GSA 3453); a license (GSA 1582); or an outlease is the appropriate vehicle for the specific circumstances of each market.

### PART I - APPLICATION

#### APPLICANT

| FIRST NAME | MIDDLE | LAST NAME | MAILING ADDRESS |
|---|---|---|---|
| Erin | | Lee | STREET |

| TELEPHONE NUMBER | EXTENSION | E-MAIL ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| | | | | CO | |

#### SPONSOR, PROMOTER OR CONDUCTOR OF PROPOSED ACTIVITY

| NAME OF PERSON OR ORGANIZATION | MAILING ADDRESS |
|---|---|
| Erin Lee | STREET |

| AREA CODE | PHONE | EXTENSION | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| | | | | CO | |

#### SUPERVISION OF/AND RESPONSIBILITY FOR THE PROPOSED ACTIVITY

| NAME OF PERSON | MAILING ADDRESS |
|---|---|
| Erin Lee | STREET |

| AREA CODE | PHONE | EXTENSION | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| | | | | CO | |

**DESCRIPTION OF PROPOSED ACTIVITY**

Brief press conference with America First Policy Institute and Illumine Law counsel, representing plaintiffs Lee and Jurich families in Case 24-1254. Case oral argument is at 9AM in Courtroom IV. Counsel and plaintiffs would like to hold a presser on the courthouse main (southeast) steps immediately following oral argument. Some press and cameras may be present.

| PROPOSED BUILDING | PROPOSED AREA |
|---|---|
| Byron White Courhouse | Main entrance (southeast side, Stout Street) |

**PROPOSED DATES AND HOURS DURING WHICH THE ACTIVITY IS TO BE CARRIED OUT**

| FROM | TO | HOURS | APPROXIMATE NUMBER OF PERSONS TO BE ENGAGED IN THIS ACTIVITY (If known) |
|---|---|---|---|
| 1/21/25 | 1/21/25 | 8AM-10:30AM | 20-30 |

**IMPORTANT:** If applicant purports to represent an organization, a letter or other documentation that the applicant has authority to represent that organization is required to be submitted with this form.

APPLICANTS PROPOSING TO ENGAGE IN THE SOLICITATION OF FUNDS MUST CHECK ONE OF THE FOLLOWING STATEMENTS:

I HEREBY CERTIFY THAT:

☐ I represent and will be soliciting funds for the sole benefit of a religion or religious group;

☐ My organization has received an official Internal Revenue Service (IRS) ruling or letter of determination stating that the organization or its parent organization qualifies for tax-exempt status under 26 U.S.C. 501(c)(3), (c)(4), or (c)(5); or

☐ My organization has applied to the IRS for a determination of tax-exempt status under 26 U.S.C. 501(c)(3), (c)(4), or (c)(5), and that the IRS has not yet issued a final administrative ruling or determination of such status.

**CERTIFICATION:** I CERTIFY that the above information is true and correct.

| SIGNATURE OF APPLICANT | DATE SIGNED |
|---|---|
| *E L* | 01/12/2025 |

### PART II - PERMIT (TO BE COMPLETED BY GSA ONLY)

**DESIGNATED BUILDING AND AREA, ACTUAL DATES AND HOURS, FOR WHICH ACTIVITY APPROVED**

| BUILDING | AREA | FROM | TO | HOURS |
|---|---|---|---|---|
| Byron White US Courthouse | Main Plaza and front steps | 1/21/2025 | 1/21/2025 | 8:30 am - 1:30 pm |

**GSA APPROVING OFFICIAL**

| SIGNATURE | NAME OF OFFICIAL | DATE SIGNED |
|---|---|---|
| Shelly Baxter (Digitally signed by Shelly Baxter, DN: C=US, E=shelly.baxter@gsa.gov, CN=Shelly Baxter, Reason: I am approving this document, Date: 2025.01.13 14:16:04-07'00') | Shelly Baxter, GSA Bldg Manager | |

**GENERAL SERVICES ADMINISTRATION**

GSA 3453 (REV. 1/2016)

284

DE_000461

## PART III - CONDITIONS

By submitting this form, Applicant agrees to the following terms and conditions:

Applicant will conduct the proposed activity strictly in accordance with the description of the activity in this permit.

Applicant must submit, as part of this permit, a copy, sample or accurate description of any materials proposed for distribution at the event.

Unless otherwise agreed to, in writing, by GSA and incorporated into this permit, the Applicant assumes all responsibility for, and costs and expenses associated with, clean-up of the grounds, providing trash containers and disposal of trash, as well as any additional security, electrical and water or related services needed to support the activity.  Portable restroom facilities may be authorized, at Applicant's sole cost and expense, if Applicant arranges for the removal before the beginning of the next business day.

GSA will neither store nor assume any responsibility for any materials that are used for an event.

By signing the permit application and without the need for further documentation, Applicant hereby indemnifies and saves harmless the United States, its agents and employees, in both their personal and official capacities, against any and all loss, damage, claim, or liability whatsoever, due to personal injury or death, or damage to property of the Federal Government or others, directly or indirectly, due to the exercise by Applicant of the privilege granted by this permit, or any act or omission of Applicant, including failure to comply with the obligations of this permit.

In keeping with federal policy regarding retention of records associated with federal contracts and the like, GSA will retain a copy of the permit for three (3) years from the date of issuance.

Special terms and conditions related to this permit are listed below (and continued on the following page(s), if necessary):

| SIGNATURE OF APPLICANT | DATE SIGNED |
|---|---|
|  | 01/12/2025 |

If the request to use federal space is denied or an issued permit is cancelled, the Applicant may appeal within 5 calendar days of the notification of disapproval or cancellation to the GSA Regional Administrator or his/her designee.  For more information about how to request the use of Federal property under 40 U.S.C. § 581(h) and Federal Management Regulation 41 C.F.R. part 102-74, subpart D, please contact GSA's Office of Facilities Management and Services Programs (PM), 1800 F Street, NW, Washington, DC 20405 or visit www.gsa.gov

GSA 3453 (REV. 1/2016) **BACK**

**285**
DE_000462

**The Colorado Parent Advocacy Network**

#ATCPANWECAN

**OUR VISION:**

CPAN is a collaborative statewide network in which parents, educators, and concerned citizens are purposefully working together to secure parental rights & restore a rigorous, non-political, safe and fulfilling educational experience for all students. This is achieved through a culture of accountability for academic excellence, accessibility to school choice, school lesson transparency, and partnerships with families.

Learn more at **WWW.COLORADOPARENTS.ORG**

3-App-289

286

3-App-290

- **Plummeting Academics**

- **Alarming Safety Issues**

- **Controversial Curricula**

- **HIDDEN Use of Gender Transition Plans**

3-App-291

288



**Valedictorian**



**3-App-293**

**290**

# Alarming Safety Issues

Appellate Case: 26-1101    Document: 19-3    Date Filed: 06/08/2026    Page: 299

3-App-295

**292**