No. 26-1101

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## APPELLANTS' APPENDIX VOLUME IV

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026

*Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

| Document | ECF No. | App. Page |
|---|---|---|
| District Court Docket | N/A | 1-App-1 |
| First Amended Complaint | 25 | 1-App-15 |
| Plaintiffs' Amended Motion for Preliminary Injunction | 27 | 1-App-81 |
| Exhibit to Amended Preliminary Injunction Motion: Sarah Perry Declaration | 27-1 | 1-App-114 |
| Exhibit to Amended Preliminary Injunction Motion: Lori Gimelshteyn Declaration | 27-2 | 1-App-118 |
| Exhibit to Amended Preliminary Injunction Motion: Erin Lee Declaration | 27-3 | 1-App-140 |
| Exhibit to Amended Preliminary Injunction Motion: Kristina Rasmussen Declaration | 27-4 | 1-App-161 |
| Exhibit to Amended Preliminary Injunction Motion: Travis Morrell Declaration | 27-5 | 1-App-165 |
| Exhibit to Amended Preliminary Injunction Motion: Valeri Leswing Declaration | 27-6 | 1-App-182 |
| Defendants' Motion for Discovery | 31 | 1-App-193 |
| Exhibit A to Defendants' Motion for Discovery: Defendants' Discovery Requests | 31-1 | 1-App-209 |
| Exhibit B to Defendants' Motion for Discovery: Defendants' Proposed Deposition Topics | 31-2 | 1-App-218 |
| Plaintiff's Opposition to Defendant's Motion for an Extension of Time | 32 | 1-App-220 |
| Joint Motion to Adopt a Scheduling Order | 43 | 1-App-230 |
| Defendants' Consolidated Opposition to Motions for Preliminary Injunction | 85 | 1-App-236 |

## VOLUME II

Excerpts of Appendix to Defendants'
Consolidated Opposition to Motions
for Preliminary Injunction ................................................. 85-1    2-App-1

Plaintiffs' Brief in Support of Motion for Preliminary
Injunction and in Opposition to Defendants' Motions
to Dismiss ........................................................................ 98    2-App-226

## VOLUME III

Excerpts of Appendix to Plaintiffs' Brief in Support
of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................ 98-1    3-App-1

## VOLUME IV

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................ 98-1    4-App-1

## VOLUME V

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................ 98-1    5-App-1

Courtroom Minutes for Preliminary Injunction
Motion Hearing Held on Feb. 19, 2026 and
Recommendation of United States Magistrate Judge ........................ 101    5-App-21

Plaintiffs' Objections to Recommendation of United
States Magistrate Judge ........................................................ 110    5-App-24

Exhibit A: Preliminary Injunction Hearing Transcript .................. 110-1    5-App-39

Defendants' Response to Objections to Recommendation
of United States Magistrate Judge ........................................... 112    5-App-136

Order Adopting Recommendation of United
States Magistrate Judge and Denying Motion
for Preliminary Injunction .................................................... 115    5-App-149

Notice of Appeal ................................................................ 118    5-App-173

Recommendation of United States Magistrate Judge
on Defendants' Motions to Dismiss ........................................... 125    5-App-175

## VOLUME VI (SEALED)

Sealed Appendix to Plaintiffs' Replies in Support
of their Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss...................................99    6-App-1

## VOLUME VII (SEALED)

Second Restricted Appendix to Plaintiffs' Motion
for Preliminary Injunction and in Opposition
to Defendants' Motion to Dismiss........................................................ 100    7-App-1

Appellate Case: 26-1101   Document: 19-4   Date Filed: 06/08/2026   Page: 5



4-App-001

293

# DEI

## is NOT

# Diversity, Equity & Inclusion

4-App-002

294

# Beyond Diversity/Courageous Conversations

**WHAT IS IT:**  Beyond Diversity/Courageous Conversations is the professional development curriculum used in CCSD under the guise of Culturally Responsive Education.

**White Culture + White Privilege + White Oppression+ White Racism  = WHITENESS**

4-App-003

**COLOR**
Primary, Presence, Positioning
"White Privilege"
Stages of Avoidance: Ignorance to Competing Victimization

**CULTURE**
Being, Feeling and Acting White
"White Racial Bonding"
Avoidance | Individualism | Universality | De-Contextualization

**CONSCIOUSNESS**
Thinking and Reasoning White
"White Racial Identity Development"
Color-Blindness | Guilt/Shame | Anger | Helplessness | Anti-Racist

295

# SOME ASPECTS AND ASSUMPTIONS OF WHITE CULTURE IN THE UNITED STATES

While different individuals might not practice or accept all of these traits, they are common characteristics of most U.S. White people most of the time.

## RUGGED INDIVIDUALISM
- Self-reliance
- Individual is primary unit
- Independence and autonomy highly valued and rewarded
- Individuals assumed to be in control of their environment—"You get what you deserve"

## COMPETITION
- Be #1
- Win at all costs
- Winner-loser dichotomy
- Action oriented
- Master and control nature
- Must always "do something" about a situation
- Aggressiveness and extroversion
- Decision-Making
- Majority rules (when whites have power)
- Hierarchical

## JUSTICE
- Based on English common law
- Protect property and entitlements
- Intent counts

## COMMUNICATION
- *The King's English* rules
- Written tradition
- Avoid conflict, intimacy
- Don't show emotion
- Don't discuss personal life
- Be polite

## HOLIDAYS
- Based on Christian religions
- Based on white history and male leaders

## HISTORY
- Based on northern European immigrants' experiences in the United States
- Heavy focus on the British Empire
- Primacy of Western (Greek, Roman) and Judeo-Christian tradition

## PROTESTANT WORK ETHIC
- Hard work is the key to success
- Work before play
- "If you didn't meet your goals, you didn't work hard enough."

## EMPHASIS ON SCIENTIFIC METHOD
- Objective, rational, linear thinking
- Cause-and-effect relationships
- Quantitative emphasis

## STATUS, POWER AND AUTHORITY
- Wealth = worth
- Heavy value on ownership of goods, space, property
- Your job is how you are
- Respect authority

## TIME
- Adherence to rigid time schedules
- Time viewed as a commodity

## FUTURE ORIENTATION
- Plan for future
- Delayed gratification
- Progress is always best
- "Tomorrow will be better."

## FAMILY STRUCTURE
- Nuclear family (father, mother, 2.3 children) is the ideal social unit
- Husband is breadwinner and head of household
- Wife is homemaker and subordinate to husband
- Children should have own rooms, be independent

## AESTHETICS
- Based on European culture
- Woman's beauty based on blonde, thin—Barbie doll
- Man's attractiveness based on economic status, power, intellect
- Steak and potatoes; "bland is best"

## RELIGION
- Christianity is the norm
- Anything other than Judeo–Christian tradition is foreign
- No tolerance for deviation from single God concept

4-App-004

JUDITH H. KATZ ©1990. THE KALEEL JAMISON CONSULTING GROUP, INC. ALL RIGHTS RESERVED

W 61

# Middle School Principal's Commitment

## Middle School Commitment

Our collective commitment, as Middle School leaders, is to examine and deepen our understanding of race and the impact that it has on our students and within our school communities.

We commit to interrupt the role and presence of whiteness as we identify and disrupt biases and the marginalization of students. We will foster and engage in authentic relationships that ensure high-level learning for every student, especially the success of our Black, Brown, and Indigenous students.

4-App-005

SOURCE: Board of Ed Study Session on 9/13/19

file:///C:/Users/color/Desktop/BLMS/Beyond%20Diversity/MS%20Discipline%20Data%20Sept
%2013%202019.pdf

297

In my sophomore

4-App-006

**298**

# Curriculum-Why is your favorite hobby racist?



**What would be the purpose/vision of the organization (in other words, what problem is this organization trying to solve)?**

Segregation and racism in skiing. WE would make a less segregated and more anti racist skiing experience.

*"Mom, you don't understand.*

4-App-007

299

# Overland High School 9th Grade English Teacher



4-App-008

The same Overland High School English teacher shared his POLITICAL opinion with 9th graders about President Donald Trump.
*"Donald Trump was polarizing. Racists loved him.  The rest of us decent people found him horrific."*



300

# LGBTQIA+ AFFIRMATION
# Gender Support & Transition Plans



4-App-009

301

# SEL...do you know?

**WHAT IS IT:**  Social Emotional Learning (SEL) is a system used by schools to transform the educational system by placing focus on YOUR child's attitudes, morals, values and beliefs instead of spending valuable time focused on academic excellence in math, language arts, science and social studies.  **We believe that this is the parents right and role and that schools need to remain focused on core education and addressing the academic gap for ALL students.**

**HOW IS IT DELIVERED**: Schools are utilizing a series of materials to accomplish this including but not limited to:  Second Step Curriculum, FastBridge and the use of various surveys, questionnaires and "specials" classes disguised as a means to create "resilient, caring, empathetic and confident" children.  In actuality, SEL is emotionally manipulating YOUR child using benign language as a cover for delivering the CRT ideology, social justice, gender ideology, and sexual orientation into **YOUR** child's education.



4-App-010

302

# Say what?



**SAMPLE QUESTIONS ON THE HEALTHY KIDS SURVEY FOR MIDDLE SCHOOLERS:**

**HEALTHY KIDS COLORADO SURVEY**

**https://bit.ly/3tvmJbX**

**1. How old are you?**
A. 10 years old or younger
B. 11 years old
C. 12 years old
D. 13 years old
E. 14 years old
F. 15 years old
G. 16 years old or older

**2. In what grade are you?**
A. 6th grade
B. 7th grade
C. 8th grade
D. Ungraded or other grade

**3. What is your gender identity?**
A. Female
B. Male
C. Genderqueer/Nonbinary
D. I do not know my gender identity (questioning)
E. I have a different identity

**4. Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?**
A. No, I am not transgender
B. Yes, I am transgender
C. I am not sure if I am transgender
D. I do not know what this question is asking

**5. Which of the following best describes you?**
A. Heterosexual (straight)
B. Gay or lesbian
C. Bisexual
D. Asexual
E. I describe my sexual identity some other way
F. I am not sure about my sexual identity (questioning)
G. I do not know what this question is asking

4-App-011

**303**

# Say what?

**SAMPLE QUESTIONS ON THE HEALTHY KIDS SURVEY FOR MIDDLE SCHOOLERS:**



**71. How old were you when you had sexual intercourse for the first time?**
A. I have never had sexual intercourse
B. 8 years old or younger
C. 9 years old
D. 10 years old
E. 11 years old
F. 12 years old
G. 13 years old or older

**72. Did you drink alcohol or use drugs before you had sexual intercourse the last time?**
A. I have never had sexual intercourse
B. Yes
C. No

**73. The last time you had sexual intercourse, did you or your partner use a condom?**
A. I have never had sexual intercourse
B. Yes
C. No

4-App-012

## Remember these questions are for middle schoolers.

304





**4-App-014**

**306**





4-App-016

308
















**#atCPANwecan**

309

4-App-017



ART CLUB: WHAT IS HAPPENING IN OUR STATE???

Presented by: Erin Lee

4-App-018

310

# OUR STORY…



4-App-019

**311**

# OUR STORY...



4-App-020

# ...WHAT I'VE FOUND IN MY OWN SCHOOL DISTRICT







313

# SCHOOL BASED HEALTH CENTERS



4-App-022

314

# THE GROOMERS IN MY CHILD'S CLASSROOM



# (GROOMERS CONT'D)



316

# "NEARLY HALF OF KIDS IN LARIMER COUNTY ARE LGBTQ"



4-App-025

317

# THIS IS A SPIRITUAL BATTLE FOR OUR CHILDREN



4-App-026

**318**

# HOW DID WE GET HERE?

- Public Schools

- Higher Ed

- The Teachers Union

- Outside Influences ($$$, Mental Health Systems, NGO's, Universities, Social Services)

- Laws

4-App-027

**319**

# EXISTING CO LAWS TO KNOW & UNDERSTAND

- **HB 19-1120**: 12-year-olds control mental healthcare (NO parent knowledge/consent)

- **HB 19-1129**: Ban on "conversion therapy" – Must affirm gender confused kids

- **HB 19-1032:** Comprehensive Sexuality Education

- **HB 23-1003**: Mandates mental health screening for all 6th – 12TH Graders & iMatter

- **HB 24-1039**: "Non Legal Name Change" – Forces *all* teachers to socially transition children

- **HB 24-1170**: Foster bill of rights (forces transitioning of children)

- **HB 24-1071**: Allows transgender felons to legally change name ("Tiara's Law")

- **Senate Bills 188, 189 and 190**: Made CO a trans & abortion sanctuary, forced us to pay for it, and attacked Crisis Pregnancy Centers

- **HB 19-1192:** Mandated teaching "minorities" (must include LGBTQ) starting in 1st grade

4-App-028

**320**

# NEW COLORADO SOCIAL STUDIES STANDARDS





4-App-029

**321**

# LESSONS FROM THE CO DEPT OF ED FOR <u>FIRST GRADE</u>



322

# 2025 LEG UPDATE:

- **HB 25-1312**: Stripping parental rights, forcing gender transition, compelling speech, and attacking churches, schools & businesses

- **HB 25-1309**: forces us all of us to pay for transgender-affirming procedures. Makes Testosterone Rx's secret

- **SB 25-129**: Trans Sanctuary state law

- **SB 25-183**: Tax-payer funded abortions

- **HB 25-1239**: Changed CADA – added penalties for "misgendering"

4-App-031

**323**

# WHAT CAN WE DO ABOUT IT?

**#1: Educate yourself and TALK ABOUT IT!**

**#2: Get the kids out of government schools – Homeschool, Private, Classical/Core Knowledge Charter**

**#3: Research (CORA), Ask Questions, Expose, Lawfare**

**#4: Show Up! – School Boards, Statehouse, Protests, Volunteer In the Schools**

**#5: Get Involved – Mom 4 Liberty, Protect Kids Colorado, Grandparents4Kids, Moms4Liberty, … start programs through your church!**

**\*\*\*Grandparents: You have an equally important role to play!\*\*\***

4-App-032

**324**

# HOW TO PROTECT & INOCULATE THE CHILDREN IN YOUR LIFE!

**4 Things to tell your children *early* and *often***

**#1 – Safe adults do NOT ask you to keep secrets**

**#2 – No one should ask you to label yourself**

**#3 – Trust your gut! (& YOU have the authority to remove yourself)**

**#4 – God doesn't make mistakes**

4-App-033

**325**

# YOU CAN FOLLOW ME @


For Parental Rights (Erin4Parents on X)

Watch & Share the film! ArtClubMovie.com

Get Involved >> Sign up at ProtectKidsColorado.org

Follow #DontMessWithOurKids and #AMillionWomen

4-App-034

**326**

# PROTECT KIDS COLORADO



4-App-035

327







4-App-036

**328**



4-App-037

329

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 42

# QUESTIONS/DISCUSSION

4-App-038

**330**

| Bates | Description | Link |
|---|---|---|
| DE_000275 | Erin Lee being escorted out of the venue under the protection of police after protesters prevented a PKC event from proceeding at Denver University. | https://archive.org/details/a-13978-0001-001013 |
| DE_000269 | Speech by Colorado State Representative targeting Erin Lee and encouraging people to confront PKC volunteers. | https://archive.org/details/a-13978-0001-001033 |
| DE_000303 | TikTok video by mother of transgender child threatening legal action against Erin Lee for misgendering and deadnaming the child. | https://archive.org/details/a-13978-0001-001034 |
| DE_000440 | Floor speech by a Colorado State Representative who sponsored H.B. 25-1312, calling groups that opposed the bill's passage "hate groups." | https://archive.org/details/a-13978-0001-001209 |

4-App-039

**331**

550

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| DEFENDING EDUCATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-01572-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| COMMITTEE OF FIVE, INC., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-01668-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |
| DOXA ENTERPRISE, LTD., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-02177-RMR-MDB |
| AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, *et al.*, | |
| *Defendants*. | |

1

**4-App-040**

551

## SUPPLEMENTAL DECLARATION OF AUBREY SULLIVAN

I, Aubrey Sullivan, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1.  On November 20, 2025, I submitted a declaration in the three above-captioned cases. ("November Declaration"). I submit this Supplemental Declaration to clarify and/or correct certain statements made in the November Declaration.

### Statements Regarding Public Accommodations Cases

2.  In my November Declaration, I stated at paragraph 13 that "To the best of my knowledge during my tenure at the Division, the Division has found probable cause in only two public accommodations cases wherein the complainant alleged discrimination based upon gender identity or gender expression. The charges did not involve allegations of any failure to use an individual's chosen name and/or how the individual chooses to be addressed. I further stated at paragraph 15 that "To the best of my knowledge during my tenure at the Division, the Division has received two complaints of discrimination in public accommodations on the basis of gender identity, gender expression, or sexual orientation in which misgendering was part of the alleged discrimination. Neither resulted in a finding of probable cause. In both instances, the alleged misgendering was secondary to additional conduct, including the use of anti-LGBTQ slurs. Both complaints pre-date the passage of H.B. 25-1312."

3.  I made these statements based on my own recollection and internal searches conducted by the Division for such cases. Since my November Declaration, and based on additional searches conducted in response to document requests by Plaintiffs, I attach,

2

**4-App-041**

552

as Exhibit A, a chart summarizing cases with letters of determination involving allegations of misgendering and/or deadnaming against places of public accommodations. In total, there are 17 cases, and one in which a finding a probable cause of discrimination was made.

4.  To the best of my knowledge during my tenure at the Division, the Division has received no complaints of discrimination under the unwelcome clause or Part 7 of CADA based on a failure to use an individual's chosen name and/or how the individual chooses to be addressed.

5.  None of the information uncovered in these additional searches changes my earlier statements regarding whether the plaintiffs in any of these three actions have violated CADA.

**Analysis of XX-XY and Born Again Books**

6.  My understanding is that Plaintiffs XX-XY and Born Again Books challenge CADA based on potential interactions with members of the public and on actual or proposed publications stating that they will not knowingly use pronouns inconsistent with sex at birth (both Plaintiffs) and/or chosen names (XX-XY).  In my November Declaration, I stated that "because the analysis is fact-specific and contains both subjective and objective elements, and because there is no complainant, there is insufficient information to determine whether [XX-XY's/Born Again Books'] conduct violates CADA."  November Declaration ¶¶ 24, 27.  I understand that XX-XY and Born Again Books have served interrogatories asking Division and Commission Defendants to analyze their publications separately from their interactions with individuals.

3

4-App-042

553

7.  By themselves, neither the Pronoun Statement posted by XX-XY on its X social media account nor the proposed Pronoun Policy Blog Post by Born Again Books violate CADA's provisions governing publications of a place of public accommodation because they do not establish that their application will create  an environment that is subjectively and objectively hostile to individuals based on their gender identity. As a result, they do not, standing alone, violate the various CADA provisions directed to written communications. Whether and how the policies would be applied to any individuals and whether such interactions violate the Accommodation Clause of C.R.S. § 24-34-601 would depend on the specific facts of the interaction.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on this 23rd day December, 2025.


_s/ Aubrey Sullivan_
Aubrey Sullivan
Director
Colorado Civil Rights Division

4

**553**



# COLORADO

## Department of Regulatory Agencies

### Colorado Civil Rights Division

# Public Accommodation Discrimination

# 101

4-App-044

CCRD002191
**554**

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 49

# DISCLAIMERS

This presentation is intended to provide the attendees with a **broad overview** of anti-discrimination laws in Colorado.

This webinar is not intended to be used as legal advice or directives.

The Division cannot and will not offer any official opinion on actual or hypothetical scenarios.

Determinations on allegations are issued only after a full investigation of a submitted charge.



# Legislative

Senate
House of Representatives
State Auditor
Joint Budget Committee

# Judicial

Supreme Court
Court Administrator
Court of Appeals
District/County Trial Courts
Probation Services



# Executive

## Governor

Lt. Governor - Attorney General - Treasurer - Secretary of State



### Department of Regulatory Agencies



4-App-046

 

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

## C.R.S. 24-34-301 et seq.

The Colorado Civil Rights Division ("CCRD") enforces the Colorado Anti-Discrimination Act ("CADA"), which prohibits discrimination in the areas of:

- Employment

- Housing

- **Places of Public Accommodation**



4-App-047

CCRD002194
557

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 52

  

**COLORADO**
**Department of Regulatory Agencies**
Colorado Civil Rights Division

**Colorado Civil Rights Division**

Charged with enforcing the Colorado Anti-Discrimination Act  (CADA)

Intake and Investigation
Alternative Dispute Resolution
Community Outreach and Education

The manner in which cases are processed is dictated by statute and/or administrative rules:

**ccrd.colorado.gov/regulatory-information**

Staff of 39

For fiscal year 2024, the Division received over **1,700 complaints of discrimination.**

4-App-048





**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Colorado Civil Rights Commission

The CCRC is a seven-member bipartisan panel appointed by the Governor and confirmed by the state Senate.

- Selected from various regions across state
- Represent both political parties
- Four Year Terms
- Hears appeals of cases dismissed by the CCRD for lack of probable cause.
- Has the authority to set cases for hearing
- Can pursue probable cause cases through litigation if they do not settle through conciliation.

Monthly public meetings are being held the **fourth Friday of every month (Meeting links on https://ccrd.colorado.gov/)**

4-App-049

CCRD002196

559

  

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Key Definitions

## Place of Public Accommodation:

Any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public.

**C.R.S. § 24-34-601**

## Americans with Disabilities Act of 1990:

**C.R.S. 24-34-301 (5.3):** "Place of public accommodation" or "public accommodation" has the same meaning as set forth in **Title III of the federal "Americans with Disabilities Act of 1990",** 42 U.S.C. sec. 12181(7), and its related amendments and implementing regulations.

4-App-050

Creator attribution: Nick Youngson - link to - http://nyphotographic.com/





## Department of Regulatory Agencies

Colorado Civil Rights Division

# Public Accommodation Examples



**PUBLIC ACCOMMODATIONS**

ARE ANY PLACE WE ARE WHEN NOT AT HOME, WORK OR SCHOOL.

This includes, but is not limited to:

Medical Offices | Hotels | Theaters | Public Parks | Restaurants | Retail Stores & Malls | Public Transit

Also includes hospitals, public schools, libraries, museums, etc.

4-App-051

CCRD002198

561





**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation Exemptions

- Church

- Synagogue

- Mosque

- Any other place that is "principally used for religious purposes."





- Private Clubs

4-App-052






**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Key Definitions

## CCRD Exemptions:

- Federal employees filing against a federal employer
- Police and sheriff and other law enforcement officer misconduct
- Judicial determinations or court matters
- Prisoners' rights
- Discrimination based characteristics such as personal appearance, political affiliation, lack of education and training, short-term disabilities, and personality conflicts
- Labor relations issues, including wage and hour matters not based on a protected class, and workers' compensation
- Voting access

C.R.S. § 24-34-601

4-App-053

Creator attribution: Nick Youngson - link to -
http://nyphotographic.com/



CCRD002200

563





**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation Discrimination

## C.R.S. § 24-34-601

A place of public accommodation cannot "refuse, withhold from, or deny to an individual.. the **full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations**," based on protected class.

Discrimination occurs when individual from a protected class is subject to to **disparate, unfavorable treatment** because of that individual's "protected class."

4-App-054



## COLORADO
### Department of
### Regulatory Agencies
Colorado Civil Rights Division

## Protected Classes
### Public Accommodation
### Discrimination

It shall be unlawful in places of public accommodation, and hereby prohibited [to discriminate **_because_** of:

- **Sex**

- *Sexual Orientation*

- *Gender Identity*

- *Gender Expression*

- National Origin/Ancestry

- Race/Color

- Creed

- **Disability (mental/physical)**

- Marital Status

- Retaliation *(engaging in protected activity, such as filing a complaint of discrimination, complaining of harassment based on membership in a protected class)*



4-App-055



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Disparate Impact

Involves an adverse action that is:

- **Facially neutral** (intentional motivation not required)
- **Disadvantages** members in a protected class more than those from another class
- Is **not** consistent with a business **necessity**
- **Adverse impact** can often be supported by statistical evidence. Need not be intentional or motivated by animus/bias.

4-App-056



**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Disparate Treatment

- Involves **intentional** discrimination
- Proven through direct, circumstantial, or statistical **evidence**

## Prima Facie Case

- Individual is member of a **protected** class
- Individual suffered a **negative** action
- Individual was treated **differently** than similarly situated patrons not in the same protected group

4-App-057

  

**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

## Jurisdiction

# Nexus:

a connection or series of connections linking two or more
things.: "the nexus between industry and political power".

**Discriminatory
Action**



**Protected
Class**

4-App-058

  

**Department of Regulatory Agencies**

Colorado Civil Rights Division

## Discriminatory or Unfair Practices in Public Accomodation

- Refusal of Service
- Refusal to Sell Goods
- Unequal Terms and Conditions
- Disparate Impact
- Disparate Treatment
- Segregating/Isolating
- Printing or circulating any statement, advertisement, or publication ... that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].



C.R.S. § 24-34-601

4-App-059

CCRD002206

Appellate Case: 25-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 64



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Federal Law Considerations

**Title II of the Civil Rights Act (1964):** All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin.

**Title III of the ADA:** prohibits discrimination on the basis of disability in the activities of places of public accommodations and requires newly constructed or altered places of public accommodation—as well as commercial facilities (privately owned), to comply with the ADA Standards.

**Accessible Design & ADA**

4-App-060

   

**Department of Regulatory Agencies**

Colorado Civil Rights Division



# Anti-Discrimination Notices

## 3 CCR 708-1

*(ccrd.colorado.gov/regulatory-information)*

**ANY PLACE OF BUSINESS engaged in any SALES to the PUBLIC and ANY PLACE OFFERING SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS to the PUBLIC** are **required** to post a notice that summarizes prohibited discriminatory or unfair practices.

All notices available in English and Spanish *(website or hard copy)*

---

COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

### Colorado Law Prohibits
### Discrimination in places of:
# PUBLIC ACCOMMODATION
#### C.R.S. § 24-34-601 *et seq.*

**PLACE OF PUBLIC ACCOMMODATION MEANS:**
ANY PLACE OF BUSINESS engaged in any SALES to the PUBLIC and ANY PLACE OFFERING SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS to the PUBLIC.

**IT IS A DISCRIMINATORY PRACTICE AND UNLAWFUL FOR A PERSON DIRECTLY OR INDIRECTLY TO:**
REFUSE, WITHHOLD FROM, or DENY to an individual or a group FULL and EQUAL ENJOYMENT of the GOODS, SERVICES, FACILITIES, PRIVILEGES, ADVANTAGES, or ACCOMMODATIONS of a place of public accommodation

**BECAUSE OF:** DISABILITY, RACE, CREED, COLOR, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER EXPRESSION, MARITAL STATUS, NATIONAL ORIGIN or ANCESTRY.

---

**SERVICE ANIMALS C.R.S. § 24-34-803:**
SERVICE ANIMAL DESIGNATION IS LIMITED TO A DOG OR MINIATURE HORSE — EMOTIONAL SUPPORT ANIMALS ARE NOT SERVICE ANIMALS
THE DOG MUST BE INDIVIDUALLY TRAINED TO PERFORM TASK(S) OR WORK RELATED TO A DISABILITY.
THE MERE PRESENCE OF THE DOG MEANT TO PROVIDE EMOTIONAL SUPPORT/THERAPY/ AND/OR COMPANIONSHIP IS NOT SUFFICIENT TO MEET THE DEFINITION OF A SERVICE ANIMAL.
AN ENTITY MAY NOT REQUIRE OR REQUEST A LICENSE, REGISTRATION, OR OTHER DESIGNATION CONFIRMING STATUS AS A SERVICE ANIMAL. AN ENTITY MAY MAKE THE FOLLOWING INQUIRIES:
1.) IS THIS DOG A SERVICE ANIMAL TRAINED TO PERFORM A TASK(S) OR WORK RELATED TO A DISABILITY?
2.) WHAT IS THE TASK OR WORK THE DOG IS TRAINED TO PERFORM?
A SERVICE ANIMAL MUST BE UNDER THE CONTROL OF ITS HANDLER AT ALL TIMES. THE HANDLER IS RESPONSIBLE FOR THE CARE OF THE SERVICE ANIMAL, INCLUDING TOILETING, FEEDING, AND OTHERWISE CARING FOR THE DOG.
A SERVICE ANIMAL MAY BE DENIED ENTRY IF ITS PRESENCE WOULD RESULT IN A FUNDAMENTAL ALTERATION OF THE NATURE OF THE ENTITIES' OPERATIONS AND/OR MAINTENANCE OF A STERILE ENVIRONMENT. THE MERE PRESENCE OF A SERVICE ANIMAL IS NOT GROUNDS FOR A VIOLATION OF THE HEALTH CODE. SERVICE ANIMALS MUST BE ALLOWED IN DINING AREAS AND IN SELF SERVICE FOOD LINES. AN ENTITY MAY NOT CHARGE FEES FOR ALLOWING A SERVICE ANIMAL TO BE PRESENT.

4-App-061

CCRD002298
571



**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Complaint Process

**Appeal**

**Intake** **Investigation** **Determination**

**Mediation**

**Conciliation**

**Settlement/Closure**

CCRD002299
572

**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

**Complaint Process**

Intake → Investigation → Determination

Appeal

Mediation

Conciliation

Settlement/Closure

## Intake

- Jurisdiction subject to CADA?

- Harm based on or because of protected class(es)?

- Timely? – **60 days** from alleged act of discrimination.

# Three Ways to Begin Process:

1- Online (preferred):

**CaseConnect Civil Rights**

Start a New Intake Inquiry

2- Telephone: **303-894-2997**

3- In-Person Kiosk:
   1560 Broadway, Suite 100
   Denver, CO 80202

4-App-063

CCRD002240
573



COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Complaint Process

Intake → Investigation → Determination

Appeal

Conciliation

Mediation

Settlement/Closure

4-App-064

## Mediation

- Voluntary
- Typically four hours
- Goal to resolve the case w/o investigation and subsequent determination
- Results in No Fault Settlement Agreement (NFSA) if successful

CCRD002241

**574**



## Investigation

- Investigative Specialist gathers initial complaint statement, submits an **RFI** from the responding party (Position Statement), other key documents.

- Rebuttal statement from Complainant (optional)

- *In public accommodations cases Position Statement and Rebuttal is requested within thirty (30) days from request date.*

CCRD002242

575

4-App-065



4-App-066

## Determination

- Finding of facts.
- Goal is to issue w/in 270 days from filing.
- PC = probable cause to believe a violation of CADA has occurred.
- NPC = no probable cause to believe a violation of CADA has occurred.
- Mixed Finding= PC/NPC possible if complaint alleges more than one violation of CADA

CCRD002243.



4-App-067

## Probable Cause

- Compulsory conciliation.

- Goal of conciliation is to resolve matter. Similar to mediation with the *caveat that there is a PC determination*.

- If unable to reach resolution, CCRC will set matter for hearing (i.e., file an administrative lawsuit with OAC).



4-App-068

## No Probable Cause

- Complainant may appeal to CCRC. CCRC may then:
  - Uphold determination
  - Request additional investigation
  - Reverse determination

- If no appeal and/or appeal unsuccessful, determination acts as a dismissal.





**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Protected Class: Disability

- **A physical or mental impairment that substantially limits a major life activity**

- A record of such an impairment; or; Being regarded as having such an impairment.

- Definition of "disability" and "substantially limited" is <u>**construed broadly;**</u>

- Impairment can be a disability even if episodic or in remission;

- Mitigating measures should not be considered in determination if an impairment is substantially limiting.



4-App-069

CCRD002246

579



**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Protected Class:
# Disability
## (Mental/Physical)

Diagnoses *generally* considered

**to be substantially limiting major life activities**

- Deafness, blindness, mobility impairments requiring use of a wheelchair, partially or completely missing limbs;

- Autism, intellectual disability, cancer, cerebral palsy, diabetes, epilepsy, HIV infection, lupus, multiple sclerosis, muscular dystrophy;

- Mental impairments such as major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive-compulsive disorder, schizophrenia.

4-App-070

CCRD002217



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Protected Class: Disability (PA Accessibility)

## Questions to Ask:

1. Are the entrance and approach to the entrance accessible?
2. Can visitors get to the goods or products in an accessible manner?
3. Are the restrooms accessible?

## The basic areas where places places of public accommodations must make changes to accommodate people with disabilities are:

1. Store signs and directions
2. Parking lots
3. Curbs for store entrances and sidewalks
4. Ramps and stairways
5. Doors and building entrances
6. Shelves, aisles, and maneuvering space
7. Checkout and service counters
8. Dressing rooms
9. Restrooms

4-App-071

CCRD002218

581

  

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Reasonable Accommodation

Definition: An addendum to rules, policies, practices or services that is **_necessary_** to allow the person with a disability equal access to public service or location.

_A business owner need not provide such accommodation if doing so would create an **undue hardship** - e.g. significant difficulty or expense._

- Only **actual disabilities** can be accommodated - i.e. not regarded as or perceived as disabled.

- Patron must initiate request ((no formal verbiage required); can be a verbal request)

- Accommodation request can be made on behalf of patron by third party.

4-App-072

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 77





**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Reasonable Accommodation and the Interactive Process

- Good Faith Participation

- Working Together: A business owner need not necessarily provide the specific accommodation requested by the patron, <u>**if another equally effective accommodation is available.**</u>

- Accommodations are seldom a single-step process. A business owner may be required to make **multiple efforts** to identify and implement a reasonable accommodation or reevaluate the effectiveness of a current accommodation.

4-App-073





**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## and PA Discrimination

## C.R.S. 24-34-803

A qualified individual with a disability has the right to be accompanied by a service animal individually trained  for that individual **without being required to pay an extra charge for the service animal** in or on the  following places or during the following activities and subject to the conditions and limitations  established by law and applicable alike to all individuals:

**(a) Any place of employment, housing, or public accommodation;**
**(b) Any programs, services, or activities conducted by a public entity;**
**(c) Any public transportation service; or**
**(d) Any other place open to the public.**

4-App-074

CCRD002231




**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Assistance Animals

An "Assistance Animal" is an animal that works, **provides assistance**, or **performs tasks** for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability.

An assistance animal is **NOT a pet.** Assistance animals include both Service Animals and Emotional Support Animals ("ESA").

**Service Animals:** Dog or Miniature Horse that is individually trained to do work or perform tasks for a person with a disability- e.g. guide dog.

**ESA:** any type animal, need not be individually trained to perform tasks - mere presence may provide therapeutic effect.



They told me to "Try someplace else." So I did. I called HUD.

SCAN HERE FOR MORE INFO

4-App-075

CCRD002232
585






**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Certifications?

Private company "Assistance Animal" certifications are **not recognized** under CADA



Screenshot of the $50 package from the US Service Dog Registry



## DO NOT:

-Ask for a license/certification

-Ask for animal to "demonstrate" task

This "deluxe package" from an official-looking site called US Service Animals sells for nearly $200. Service dogs need to be trained for specific disabilities, and faking one is a criminal offense in many states.

4-App-076



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## *and PA Discrimination*

(1)    It is unlawful for any person, firm, corporation, or agent of any person, firm, or corporation to:

(a) **Withhold, deny, deprive, or attempt to withhold, deny, or deprive** a qualified individual with a disability who is accompanied by a service animal or a trainer of a service animal of any of the  rights or privileges secured in section 24-34-803;

(b) **Threaten to interfere** with any of the rights of a qualified individual with a disability who is  accompanied by a service animal or a trainer of a service animal secured in section 24-34-803;

(c) **Punish or attempt to punish** a qualified individual with a disability who is accompanied by a  service animal or a trainer of a service animal for exercising or attempting to exercise any right  or privilege secured by section 24-34-803; or

(d) **Interfere with, injure, or harm, or cause another dog to interfere with, injure, or harm, a  service   animal.**

(2) **Any person who violates any provision of subsection (1) of this section commits a class 3 misdemeanor and shall be punished as provided in section 18-1.3-501, C.R.S.**

CCRD002224
587



**COLORADO**
**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Service Animals
## Examples

Guide Dog – assists an individual that has vision impairment.

**Mobility Dog** – may **retrieve items, open doors** or even push buttons for its handler.  Also, this service animal may assist people with disabilities with walking, balance and transferring from place to place.

**Hearing Dog** – alert its handler with a hearing loss to sounds.  This can be telephone, doorbell, smoke alarm, crying baby, traffic and more.

**Medical Alert Dog** – trained to alert to some types of oncoming medical conditions or attend its handler in the event of heart attack, stroke, diabetes, epilepsy, seizure, etc.

**Autism Service Dog** –  trained to interrupt certain negative behaviors of its handler so that the handler may keep these behaviors to a minimum.

**Psychiatric Service Dog** – works with a handler that has a mental disability.  Some types of tasks could be to attend a handler who may need a dog to be able to go out in public (agoraphobic), or a handler who suffers from  panic attacks, anxiety attack, PTSD (post-traumatic stress disorder) or other mental disorders.  These dogs are trained NEVER to leave their handler's side.

4-App-078

CCRD002225

588




COLORADO
Department of
Regulatory Agencies

Colorado Civil Rights Division

# Service Animals



CCRD00236

  

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Service vs Emotional Support

## Emotional support animals, comfort animals, and therapy dogs are <u>not</u> service animals.

### COMPARISON

| | Service | Emotional Support |
|---|---|---|
| ADA covered: Rights to bring animal into public establishments | ✔ | ✘ |
| May fly inside the airplane with their disabled owner | ✔ | ✘ |
| May live with their disabled owners, even if "No Pets" policy in place | ✔ | ✔ |

4-App-080

**COLORADO**
Department of
Regulatory Agencies

Colorado Civil Rights Division

# Service Animals
## Exemptions

# • Not allowed in:
- ○ **Certain areas of Zoos**
- ○ **Surgical or burn units**
- ○ **Public swimming pools**



4-App-081

CCRD002228

591

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 86



**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Sexual Orientation and Gender Identity

- *Sexual Orientation* - A person's identity in relation to the gender or genders to which they are sexually attracted; the fact of being heterosexual, homosexual, etc

- *Gender Identity-* innate sense of one's own gender

- *Gender Expression-* external appearance, characteristics or behaviors typically associated with a specific gender.

   *Places of public accommodation must allow individuals the use of gender-segregated restroom facilities that are consistent with the individual's gender identity.*

4-App-082

CCRD002239

592

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 87





**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Gender Identity and Gender Expression

## Equal Restroom Access

- All covered entities shall allow individuals the use of <u>gender-segregated facilities</u> that are <u>consistent with their gender identity</u>. Gender-segregated facilities include, but are not limited to, ***restrooms, locker rooms, dressing rooms, and dormitories.***

- <u>Not all facilities are gender segregated, there are often "unisex," "family restrooms" and "gender neutral" restrooms that are available for use by any sex; often these sorts of restrooms are restricted to the use of one person and/or one family at a time.</u>



WHATEVER
JUST WASH YOUR HANDS

4-App-083



STUDENT GENDER
NEUTRAL BATHROOM
ANYONE CAN USE THIS
RESTROOM, REGARDLESS
OF GENDER IDENTITY
OR EXPRESSION

CCRD002233

593




**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodation

# Case Examples

4-App-084





**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# July 5th, 1978

- On this day, a group of disability rights protesters shut down the Colfax bus line at the Broadway/Lincoln stop for 24 hours.
- They became known as The Gang of 19. They laid their bodies in front and behind the buses.
- They chanted "We will ride! We will ride".
- This is a key moment in public transportation access in Denver.




4-App-085




**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Gavin G v Gloucester County School Board

**Charge in 2015-**
- Gavin Grimm began transitioning to his male gender identity.
- He was located in a mostly rural area east of Richmond, VA
- He had chest reconstruction surgery and hormone therapy
- Gavin initially was allowed to use to the boys' restroom and locker room
- Then, the school board banned Gavin from the boy's facilities and forced him to use a private restroom for the remainder of his education
  - This led to health complications, both mental and physical
- His old high school refused to issue a transcript with the correct name and gender

**Result in 2021-**

- 1.3 Million dollars in legal fees paid
- Issued a transcript with the correct gender identity

4-App-086




**Department of
Regulatory Agencies**

Colorado Civil Rights Division



# Dignity Health v. Minton

## Charge in 2016-

- Evan Minton is a man from California.
- He was scheduled to receive routine surgery from his local hospital
- However, two days before his scheduled surgery, he disclosed the fact that his gender identity to the surgical team.
- His surgery was cancelled as a result of his gender identity
- This resulted in him having to go to another hospital to get his surgery

## Result in 2017-

- California Supreme Court affirms under their version of CADA that public establishments cannot discriminate on the basis of Gender Identity

4-App-087

https://www.aclu.org/cases/dignity-health-v-minton

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 92




**Department of**
**Regulatory Agencies**

Colorado Civil Rights Division



# Fry v. Napoleon Community Schools

**Charge in 2009-**
- Ehlena Fry has cerebral palsy which led her pediatrician to recommend her a service dog.
- The dog, named Wonder, assisted her with various tasks such as: opening doors, picking up items, helping her balance while going from her walker to the toilet and turning on lights
- The local school board refused to let her on school property
- They claimed that by assigning her an aide, this made Wonder the service dog unnecessary.
- The school mocked the claims that having a service dog was a reasonable accommodation.
- She had to switch schools as a result.

**Result in 2017-** After a lower court dismissed the claim, stating that they had no exhausted all possibilities necessary for the process, SCOTUS ruled in favor of her rights to her dog

4-App-088

Source:https://www.aclu.org/news/disability-rights/ehlena-and-wonder-service-dogs-incredible

CCRD002235

598

**COLORADO**

**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Anderson v. Pass Christian Isles Golf Club

**Charge in 1972-**

- Four Black men from Jackson, MS purchased a Golfers Holiday tour including rounds of golf at Pass Christian Isles GC.
- They were denied access due to them being Black, since according the the Golf Club's policy that Blacks were not allowed.
- They sought relief from the courts in response to this treatment.

**Result in 1974-**

- Overturning of lower court's decision
- Compensatory Damages
- Specific Declaratory Relief
- A court order was issued preventing this from happening again
- Awarding of attorneys' fees

4-App-089

Source:https://casetext.com/case/anderson-v-pass-christian-isles-golf-club

CCRD002236

599



**COLORADO**

**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Remedies Available
## *(Settlement)*

- Cease and Desist from discriminatory practices
- Compensatory Damages
- Monetary and/or Non-Monetary - "pain and suffering"
- Punitive Damages
- Attorney Fees
- Affirmative requirements to overcome a discriminatory practice
  - Policy and procedure modifications
  - Education and training of management and staff

4-App-090

CCRD002237
600



**Department of
Regulatory Agencies**

Colorado Civil Rights Division

# Thank you!

# Questions?

1560 Broadway, Suite 825
Denver, CO  80202
Phone: 303-894-2997
Website:  ccrd.colorado.gov
E-mail: richard.forney@state.co.us

4-App-091

Was this training part of a settlement agreement?
Trainee must email certificate: DORA_CCRDcompliance@state.co.us and reference case number.

CCRD002238

601

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 96




**COLORADO**
**Department of**
**Regulatory Agencies**

Colorado Civil Rights Division



# Sexual Orientation, Gender Identity and Gender Expression Discrimination

4-App-092

CCRD002689
602

Appellate Case: 26-1101     Document: 19-4     Date Filed: 06/08/2026     Page: 97



# DISCLAIMERS

This presentation is intended to provide the attendees with a **broad overview** of anti-discrimination laws in Colorado.

This webinar is not intended to be used as legal advice or directives.

The Division cannot and will not offer any official opinion on actual or hypothetical scenarios.

Determinations on allegations are issued only after a full investigation of a duly filed charge.





# What is Sexual Orientation?

- ○ A person's identity in relation to the gender or genders to which they are sexually attracted such as: heterosexual, homosexual, bisexual, etc.

4-App-094



**Gender Identity**

# What is Gender Identity?

○ An individual's personal sense of having a particular gender such as: cis/trans man, cis/trans woman, non-binary, and two spirit.

4-App-095

CCRD002692

605





# What is Gender Expression?

- The way in which a person expresses their gender identity, typically through their appearance, dress, and behavior such as wearing traditionally masculine or feminine clothes

4-App-096

CCRD002693

606



4-App-097

CCRD002694
607



**COLORADO**

Department of
Regulatory Agencies

Colorado Civil Rights Division

# Sexual Orientation, Gender Identity and Gender Expression Discrimination in Employment

4-App-098

CCRD002695





# Employment Discrimination

Employment discrimination occurs when an employer subjects an employee or a job applicant to **disparate, unfavorable treatment** because of that individual's "protected class."

An employer may not base decisions on an employee or applicant's protected class(es).

4-App-099

CCRD002696

609



**CADA**

**Employer Obligations**

It is a discriminatory practice for any person, whether or not an employer, an employment agency or a labor organization, to:

- aid, abet, incite, compel or coerce a discriminatory employment act;
- obstruct or prevent any person from complying with the provisions of the Act;
- or attempt, either directly or indirectly, to commit an act defined as discriminatory.

**Employers are obligated to:**

- Maintain a workplace that free from unlawful discrimination, harassment and/or retaliation;
- ***Engage in an interactive process*** when a request for a religious, pregnancy or disability accommodation is made by a qualified employee/applicant;
- **Promptly investigate complaints of discrimination, harassment and retaliation**;
- Where discrimination, harassment and/or retaliation may have occurred, **take prompt and appropriate remedial action** (i.e., discipline commensurate with the offense).

4-App-100

CCRD002697

610



**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Discriminatory or Unfair Employment Practices

- Failure/Refusal to Accommodate an individual the right of using gender segregated facilities according to their gender identity/expression
- Failure/Refusal to accommodate an individual during their transition
- Refuse to Hire
- **Discharge**
- Failure to Promote
- Demote
- Harass
- Unequally apply terms and conditions of employment - schedule, working conditions, etc.
- Unequally compensate - employees are permitted to inquire about, disclose, compare, or otherwise discuss employee wages.
- **Retaliation**
- Printing or circulating any statement, advertisement, or publication … that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].

C.R.S. § 24-34-402

4-App-101



CCRD002698

611





4-App-102

CCRD002699





## Housing Discrimination

*CADA; Title VIII, ADA, Section 504-RA*

Fair housing laws apply to **housing providers** (landlords), but also real estate brokers, mortgage lenders, homeowner associations, and others.

Housing discrimination occurs when a provider subjects a member of a protected class to **disparate, unfavorable treatment** because of that individual's "protected class."

4-App-103

CCRD002700
613





## Exemptions to CADA

### Excluded from FHA "Housing" Definition

**Familial Status:** Single Family homes exempt if private individual owns no more than 3 single family homes.

**Housing for Older Persons:** Exempts housing only from Familial Status provision

4-App-104

CCRD002701

614




**COLORADO**
**Department of**
**Regulatory Agencies**
Colorado Civil Rights Division

# Discriminatory or Unfair Housing Practices

- Refusal to rent/sell (make housing "unavailable")
- Misrepresent availability
- Apply unequal terms or conditions of sale or rental
- **<u>Refusal to accommodate an individual's transition or gender identity/expression</u>**
- **<u>Not allowing an individual use of gender segregated facilities according to their gender identity/expression</u>**
- Redlining
- Steering
- Intimidation, Threaten/Coerce (Harassment)
- Advertise with a discriminatory preference or limitation
- Retaliation

4-App-105



CCRD002702

4.15



# Discriminatory Advertising

"No same sex couples"

"Straight people only"

"No queers"

"Trans individuals not allowed"



**<u>Rule of Thumb: Describe the property, not who you want to live there.</u>**

4-App-106

CCRD002703



**Department of Regulatory Agencies**

Colorado Civil Rights Division

# Sexual Orientation, Gender Identity and Gender Expression Discrimination in Places of Public Accommodation

4-App-107

CCRD002704
617



# Public Accommodations Discrimination

## C.R.S. § 24-34-601

A place of public accommodation cannot "refuse, withhold from, or deny to an individual.. the **full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations**," based on protected class.

Discrimination occurs when individual from a protected class is subject to to **disparate, unfavorable treatment** because of that individual's "protected class."

4-App-108

CCRD002705



618



**Department of**
**Regulatory Agencies**

Colorado Civil Rights Division

## Discriminatory or Unfair Practices in Public Accomodations



- Refusal of Service
- Refusal to Sell Goods
- Unequal Terms and Conditions
- Disparate Impact
- Disparate Treatment
- Segregating/Isolating
- **<u>Refusal to accommodate an individual's transition or gender identity/expression</u>**
- **<u>Not allowing an individual use of gender segregated facilities according to their gender identity/expression</u>**
- Printing or circulating any statement, advertisement, or publication … that expresses, either directly or indirectly, any limitation, specification, or discrimination as to [protected classes].

4-App-109

CCRD002706
619

 

COLORADO
**Department of**
**Regulatory Agencies**

Colorado Civil Rights Division

# Public Accommodations Examples



Also includes hospitals, schools, libraries, museums, etc.

4-App-110

CCRD002797
620

COLORADO
**Department of Regulatory Agencies**
Colorado Civil Rights Division

## Public Accommodations Exemptions

- Church

- Synagogue

- Mosque

- Any other place that is "principally used for religious purposes."

- Private Clubs





**CLUB MEMBERS ONLY**
No Trespassing
Violators Will Be Prosecuted

4-App-111

CCRD002798
**621**



**COLORADO**
**Department of**
**Regulatory Agencies**
Colorado Civil Rights Division

# Gender Identity and Gender Expression

## Equal Restroom Access

- All covered entities shall allow individuals the use of <u>gender-segregated facilities</u> that are <u>consistent with their gender identity</u>. Gender-segregated facilities include, but are not limited to, ***restrooms, locker rooms, dressing rooms, and dormitories.***

- <u>Not all facilities are gender segregated, there are often "unisex," "family restrooms" and "gender neutral" restrooms that are available for use by any sex; often these sorts of restrooms are restricted to the use of one person and/or one family at a time.</u>



STUDENT GENDER NEUTRAL BATHROOM
ANYONE CAN USE THIS RESTROOM, REGARDLESS OF GENDER IDENTITY OR EXPRESSION

4-App-112

CCRD002799

622

Case No. 1:25-cv-01572-RMR-MDB   Document 98-1   filed 02/11/26   USDC Colorado   pg 626 of 828

Appellate Case: 26-1101   Document: 19-4   Date Filed: 06/08/2026   Page: 117




COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

# Recent Cases

CCRD002710
623

**COLORADO**
Department of
Regulatory Agencies

Colorado Civil Rights Division

## Recent Cases

## EEOC v. APPLEBEE'S

**Charge (2021)** According to the EEOC's lawsuit, two members of the restaurant's staff verbally abused a black employee by the use of anti-gay and racist slurs on a consistent basis. One of the harassers wore confederate flag apparel on days that the employee worked. The employee's hours were cut and then the employee quit in response.

### Result (2022)

$100,000 Dollars in monetary relief

Specialized training for HR and Management around Sexual Orientation discrimination

Appointment of an internal consent decree monitor

4-App-114

CCRD002711
**624**

Source: https://www.eeoc.gov/newsroom/applebees-pay-100000-settle-eeoc-lawsuit-over-sexual-orientation-and-race-discrimination

COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

## Recent Cases

## Lusardi v Department of the Army

**Charge (2013)** The soldier requested to use a bathroom according to her gender identity and have people use she/her pronouns with her. The higher ranking officers refused to let her use the women's facilities, and one team leader used male pronouns repeatedly to the soldier directly.

### Result (2015)

Immediate access to the common women's areas

Immediate cessation of using male pronouns and titles

Mandatory training on gender identity

Source: https://www.eeoc.gov/sites/default/files/migrated_files/decisions/0120133395.txt

4-App-115

CCRD002712
625

**COLORADO**
**Department of Regulatory Agencies**
Colorado Civil Rights Division

# Recent Cases

## Felix R. v NASA

**Charge (2019)** Employee was subjected to repeated slurs regarding his sexual orientation. The employee was mocked repeatedly by his supervisor to the point that a hostile work environment was created. Comments were leveled against employee and the larger gay community altogether.

### Result (2021)

Employee will no longer work in a chain with former supervisor

Mandatory training on sexual orientation issues

4-App-116

Source: https://www.eeoc.gov/sites/default/files/decisions/2021_11_30/2019002240%20DEC.pdf

CCRD002713
626

**COLORADO**
**Department of Regulatory Agencies**
Colorado Civil Rights Division

## Recent Cases

## Lynne E. v Department of Veterans Affairs

**Charge (2015)** Employee was subjected to a hostile work environment. Multiple co-workers and supervisors made statements like the community was not ready for someone with her sexual orientation. Her supervisor's reaction to hearing the news that they hired a gay employee was to say, "Oh my gosh, I hired a gay employee"

### Result (2016)

Employee will be restored leave lost due to issues or be allowed to transfer to another location

Mandatory training on sexual orientation issues

4-App-117

Source: https://www.eeoc.gov/sites/default/files/decisions/2021_08_31/0120170202.pdf

CCRD002714

627

COLORADO
**Department of Regulatory Agencies**
Colorado Civil Rights Division

# Recent Cases

## Sis-Bro, Inc. v EEOC

**Charge (2024)** In 2018 a high performing employee began transitioning to her female gender identity while working at Sis-Bro, Inc. One of the co-owners of the company immediately began engaging in constant harassment of the employee based on her gender identity. She also was not accommodated for her transition, and harassed for using company health insurance and leave for this process. In 2020, a new male employee was hired. This new employee engaged in constant sexual harassment of the trans employee. This was often in view of other employees. At least one other employee reported the harassment. Both of the above behaviors continued until the employee in question was forced to quit her job.

4-App-118

Source: https://www.eeoc.gov/newsroom/eeoc-sues-sis-bro-inc-gender-identity-discrimination-and-harassment

CCRD002715

628

**COLORADO**
**Department of**
**Regulatory Agencies**

Colorado Civil Rights Division

# Recent Cases

## Gavin G v Gloucester County School Board

**Charge (2015)** Gavin Grimm began transitioning to his male gender identity. He lived in a mostly rural area east of Richmond, VA. He had chest reconstruction surgery and hormone therapy. At first, Gavin was allowed to use to the boys' restroom and locker room. Then, the school board banned Gavin from the boy's facilities and forced him to use a private restroom for the remainder of his education. This led to health complications, both mental and physical. His old high school refused to issue a transcript with the correct name and gender.

### Result (2021)

1.3 Million dollars in legal fees

Issued a correct transcript

4-App-119

CCRD002716

629

Source: https://apnews.com/article/education-lawsuits-us-supreme-court-school-boards-d4bcef5873b85e020ecc1de39884e448



**Ways to File**

## 1. Online(Preferred)



## 2. Telephone
## 303-894-2997

## 3. In Person

## 1560 Broadway, Suite 100 Denver, CO 80202



4-App-120

30




**COLORADO**
**Department of Regulatory Agencies**
Colorado Civil Rights Division

# Time to File

| **Fair Housing** | **Employment** | **Public Accommodations** |
|---|---|---|
| CCRD Filing: **1 year** Determination Goal: **100 days** | CCRD Filing: **300 days** Determination Goal: **1 year** | CCRD Filing: **60 days** Determination Goal: **270 days** |
| HUD Filing: **1 year** Determination Goal: **100 days** | EEOC Filing: **300 days** Determination Goal: **N/A** | |

4-App-121

CCRD002718

631

Appellate Case: 26-1101    Document: 19-4    Date Filed: 06/08/2026    Page: 126

COLORADO
Department of
Regulatory Agencies
Colorado Civil Rights Division

# Remedies Available
## (Settlement)

- Cease and Desist from discriminatory practices
- Compensatory Damages
- "Pain and suffering"
- Punitive Damages
- Attorney Fees
- Affirmative requirements to overcome a discriminatory practice
  - Policy and procedure modifications
  - Education and training of management and staff

4-App-122

CCRD002719

632




**Department of
Regulatory Agencies**

Colorado Civil Rights Division



# Thank you!

# Questions?

1560 Broadway, Suite 825
Denver, CO  80202
Phone: 303-894-2997
Website:  ccrd.colorado.gov
E-mail: richard.forney@state.co.us

4-App-123

CCRD002720
633

*AB Litigation Services*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

---

**REMOTE DEPOSITION OF ILAN MEYER, Ph.D.**

**January 30, 2026**

---

| | |
|---|---|
| **Plaintiffs:** | |
| **DEFENDING EDUCATION, et al.,** | **Case No. 1-25-cv-01572-RMR-MDB** |
| v. | |
| **Defendants:** | |
| **AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, et al.,** | |
| **Plaintiff:** | |
| **COMMITTEE OF FIVE, INC., d/b/a XX-XY ATHLETICS,** | |
| v. | **Case No. 1:25-cv-01668-RMR-MDB** |
| **Defendants:** | |
| **AUBREY C. SULLIVAN, in her official capacity as the Director of the Colorado Civil Rights Division, et al.,** | |

---

*AB Litigation Services*

letters "Methodology."  Let me know when you're there.

A.    Yes.

Q.    Okay.  So in paragraph 9 you state, "In this report, I rely on my reading and interpretation of current scientific peer-reviewed literature in different disciplines."

Did I read that correctly?

A.    Yes.

Q.    Is that an accurate statement of how you prepared this report?

A.    Yes.

Q.    Okay.  So outside of existing -- reviewing existing literature, you didn't do any independent research to prepare this report; is that right?

A.    That's correct.

Q.    You didn't conduct any new studies, correct?

A.    Correct, although I should say -- I'm sorry -- some of the research that I relied on is research I had conducted, but I didn't conduct any new research for this purpose.

Q.    You didn't conduct any new interviews with anyone, correct?

A.    No.

*AB Litigation Services*

Q.    You didn't otherwise independently gather other data to prepare this report aside from what you prepared in the articles you cite here?

A.    Right.

Q.    Your conclusions in this report do not rely on any clinical experience, correct?

A.    Correct.

Q.    Do you know how many pieces of literature you consulted to prepare this report?

A.    Yeah.  Can I add something on the clinical side?

Q.    Sure.

A.    I'm not a clinician, but my training, as I mentioned before, I should have said, was in psychiatric epidemiology, which is the epidemiology of mental disorders.  So I do have familiarity from a research perspective on psychiatric disorders and was trained in that field, just to be clear on that.

I think there are something like 30 maybe sources.  There are 36 citations, but some of them repeat.  So honestly, I didn't count them, but there's 36 footnotes, but there might be around the same number of sources.

Q.    Is all of the literature that you reviewed cited in the footnotes in the article in your report?

*AB Litigation Services*

are kind of leading journals.  Like in my field of public health, the American Journal of Public Health is a prestigious journal to publishing, so -- but again, that doesn't mean that other journals that are not in the regular public health are not good or not citable.  It's very rare that I would say a journal is something I would not rely on.  So that comment was -- really would apply to rare cases where I would feel what I would make this assessment.

Q.    Can you give me an example of a journal that you would consider insufficiently prestigious to finding that, as you would, insufficiently prestigious to include in the literature you reviewed?

A.    Yeah.  Everything here is debatable and controversial.  There's a group of journalists on the Frontier, such as Frontier in Psychology, that -- and even within that some of them might be better than others, but some of them are very easy publications, let's put it this way.  You send the article.  You barely get any comments.

A normal article, when you submit an article, it takes months to review.  You get extensive reviews from reviewers and the editor, and then you revise and send it back, so this process is

*AB Litigation Services*

often averted in some Frontier publication, just as an example.

And I would be a little hesitant, but it doesn't mean that I would wholesale ban looking at the Frontier's article either.

Q.   Right.

A.   Authors may have done a good job and sent it there, and I would definitely look at it.  So there's no fast rule in that.  I was just mentioning that as one aspect.

Q.   Were there any articles or other pieces of literature that you considered including in the report but did not include because they were in a journal that you didn't consider prestigious enough?

A.   No.

Q.   Okay.  When you prepared this report, did you consult any pieces of literature that found no association between microaggressions and negative health outcomes for transgender people?

MS. FISCHER:  Objection; form.

A.   Some of the articles I cited found relationships that were not -- some of the relationships were not confirmed by the articles I cited, whereas some others were.

So I did not have -- I did not see an

article that concluded there is no relationship and I would therefore exclude it, if that's what you're asking.  But some of the articles that I did cite have some aspects of what they looked at that was not confirmed, that was negative, as you say.

Q.   (BY MR. DRAPER)  Can you tell us which articles those were?

A.   I would have to look at them again, but --

Q.   If you need to take a minute to look at the report again, that's perfectly fine.

A.   I mean, I wouldn't be surprised if every article had some elements that are not confirmed because that's very typical in research, so when they conclude something is based on the kind of overarching finding, so specific aspects of what they looked at, for example, in -- I want to say maybe if we look at page -- if I use my page numbers, I don't have the page numbers.

Q.   That's fine.  If you want to refer to the paragraph --

A.   Paragraph 33 reports on review of other articles.  Some of them did and some of them didn't find the specific relationships, so -- but I would say that is very typical in every research.  You don't find every single association to be

*AB Litigation Services*

significant.  You look at the tendency -- overall tendency of the results.

Q.    Are you referring to the Kimber review?

A.    Yes.

Q.    Okay.  But did any of the articles that you cite in the footnotes in your report -- did any of them reach the overall conclusion that there's no association between microaggressions --

A.    No.

Q.    -- and negative health outcomes?  Okay. Okay.  If you could turn to page -- the bolded numbers, page 222 of your report.  It is --

A.    Do you have the paragraph number?

Q.    Paragraph 12.

A.    Okay.  Yeah, I'm here.

Q.    Okay.  So on that page in bolded font it reads -- and I'll read it -- "Transgender people are a stigmatized group subject to discrimination and violence."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then a few pages later just above paragraph 14, there's bolded wording reading, "Stigma against transgender people leads to excess stress and related adverse health outcomes."

*AB Litigation Services*

Did I read that correctly?

A.    Yes.

Q.    And those are your conclusions when you prepared this report?

A.    Yes.

Q.    And you believe those conclusions are accurate still today?

A.    I do.

Q.    Okay.  What you call "stigma" here, does that include misgendering and deadnaming?

A.    That -- well, stigma is a broader concept, but deadnaming and misgendering can lead to -- some of the articles -- one of the articles showed it leads to the person feeling stigmatized.  But in terms of what stigma is, it is an overall devaluation of a category of people.

So deadnaming and misgendering would be an outcome of that, I would say.  It's a social attitude that may lead some people to that expression of stigma.

Q.    To make sure I understand you, misgendering and deadnaming can lead to stigma, correct?

A.    No.  Let me say it again.  So stigma is the overall social phenomenon, and certain

interpersonal behaviors that we're talking here now can stem from that.

So people learn about stigma or socialized, stigmatized attitudes, and that could be expressed as deadnaming and misgendering.

Q.   Understood.  And just to make sure we're on the same page, you're familiar, presumably, with the term "misgendering"?

A.   Yes.

Q.   How would you define that term?

A.   Referring to the person's gender that is different from their gender identity and preferred way of being addressed.

Q.   So if someone identified as a male, but I refer to them using female pronouns, that would be an act of misgendering, correct?

A.   Correct.

Q.   And I assume you're familiar with the term "deadnaming," correct?

A.   Yes.

Q.   How would you define that term?

A.   Similarly, somebody uses a name that is not the preferred name that the person uses in their interactions with people.  That would be using a name typically that was assigned to the person before

their transition.

Q.   Okay.  So if an individual used to identify as male and go by the name "John," now identifies as female and goes by the name "Jane," but if I were to refer to them as "John," that would be an act of deadnaming, correct?

A.   Yes.  Let me just add to this that we're assuming they're intentional rather than mistaken or accidental use of those, both the misgendering and the deadnaming.

So, for example, I can imagine a situation where this Jane had a document and not mentioned her name, and somebody reading the document would use that name and then maybe correct it.  So it's really an intentional act usually that we think of.

Q.   Okay.  But when people use the term "misgendering" or "deadnaming," that can include accidental misgendering or deadnaming, correct?

MS. FISCHER:  Objection; form.

A.   It could, yes.

Q.   (BY MR. DRAPER)  Okay.  Based on your research, how do transgender people typically react when they are misgendered or deadnamed?

A.   Misgendering or deadnaming is really a message, as we established earlier, that is

*AB Litigation Services*

associated with stigma towards people.  And as I
said, stigma is a devaluation of the person's worth.

So it is an insult to their sense of
identity, and they will typically react with feeling
hurt, feeling stigmatized, feeling upset, I would
imagine, as well as several consequences that are
laid out in the report.

Q.    I want to make sure I'm not talking -- are
you finished with that answer?

A.    Yes.

Q.    Okay.  In your view, is that reaction
reasonable?

A.    Yes.

Q.    When transgender people are misgendered or
deadnamed, can that lead them to experience stress?

A.    Yes.

Q.    Can you explain why they experience that?

A.    Yes.  So our definition of stress is the
experience of social stress.  There are many
different kinds of stress.  Some of them are large
events like losing a job.  Some of them are more what
we used to call "minor" or people call
"microaggressions," which is kind of what we're
talking about today.

And the experience of stress has to do

*AB Litigation Services*

with the context of the comment, and that's why I said that it has to do with the devaluation of the person and the devaluation of their identity.

We sometimes call it an "identity threat" where your sense of yourself is not being respected and accepted to some extent by others, whether it's family, strangers, or even institutions in the case of, for example, travel documents or driver's licenses, things like that.  They are also part of the same experience of not having your sense of yourself validated and respected by society, I would say.

Q.   Okay.  Would you say that transgender people are likely to feel offended if they are intentionally misgendered or deadnamed?

A.   I would think so.  Of course, I can't predict any particular individual's response.  It would be varied, but I would think it would be offensive, yeah.

Q.   In the research that you reviewed either to prepare this report or in your career otherwise, would you say that research indicates that people -- transgender people feel offense when they are misgendered or deadnamed?

A.   I don't know the measured offense

specifically, but the answer is, yes, in that what I read from that in particular when they describe the feeling of being stigmatized and, of course, some of the impact of those experiences, those microaggressions, like it's called.

Q.    So when transgender people are misgendered or deadnamed, do they interpret that as the person doing the misgendering or deadnaming denying their identity?

MS. FISCHER:  Objection; form.

A.    I think -- again, I don't know if they go through this specific type of analysis.  What I'm saying is that its meaning -- the meaning of this behavior, of this interpersonal behavior is off -- treating with disrespect, lack of dignity.

So I think offended -- I don't know how they -- you know, that's a very specific thing.  I mean, in general, they do feel, as I said, mistreated, disrespected.  In some ways it's an assault on their sense of self -- self-identity.  So I think offended might be one of the reactions they experience.

Q.    (BY MR. DRAPER)  Based on the research that you've seen, when transgender people are misgendered or deadnamed, do they tend to perceive

that as harmful?

A.    They -- research shows that it is harmful. Whether they perceive it as harmful, I would -- I don't know specifically, like, whether it was perceived as harmful or perceived, as we said, as disrespectful, I would say.  And the research has shown the harmful impact of that by looking at associations.

So I don't think I can answer specifically whether they perceived it as harmful, but it was harmful by the research results.

Q.    Looking at some of the research that you're referring to, do they -- how do they measure -- how do they measure the fact that the act of misgendering or deadnaming is harmful?

A.    Well, these are all correlational studies, I believe, without exception.  Some studies were qualitative.  So they did ask people's sense of experience, but in most quantitative studies, you ask a series of questions.  And some of them assess things -- in this example that you ask some of them would assess misgendering, and have you ever experienced this, or have you experienced this in the past day or the past week?  There are a variety of ways of doing this.  And the same thing for

deadnaming.

And they also ask separately a number of questions that assess, let's say, mental health outcomes like suicidality, depression, anxiety symptoms, things like that, and the research correlates between the two.

So it's not the person said, Because I was deadnamed, I feel depressed; but the research finds that the relationship between people who have experienced, let's say deadnaming, are more likely to also report depressive symptoms, for example.  So that's the kind of association that the research describe.

Q.    Understood. Okay.  Let's move to paragraph 13 of the report, so in this paragraph -- and I'll read it -- you state, "Transgender people have historically experienced -- and continue to experience -- both de facto and de jure discrimination across several aspects of public and private life."

Did I read that correctly?

A.    Yes.

Q.    How do you define "de facto discrimination"?

A.    Well, that's the experiences that people

*AB Litigation Services*

have in their day-to-day lives, whether it's from interpersonal relationships, from family, at school, at work.  It could take different forms.

When I say "discrimination," I should note in this report entirely and in my deposition today, I'm referring to discrimination the way social scientists refer to it rather than any legal definition of discrimination.

And the way we define discrimination and measure it is basically about discriminatory not in the legal sense -- differential, I would say, the way you are treated differentially, different from other people.

So we ask questions like -- one of the very often used measures that's called "everyday discrimination" ask, for example, Were you treated with less respect than other people?  And if you said yes, that's considered discriminatory.  But again, that's not obviously a legal definition of "discrimination," but a social, scientific one.

Q.    Okay.  Well, so I'll ask a similar question.  Can you define how you're using the term "de jure discrimination" here?

A.    So these are discrimination that is written into law and has been practiced through laws

*AB Litigation Services*

and maybe policies.  For example, there's a long history of -- there was a history of criminalizing cross-dressing in the United States where people were arrested for wearing clothes that were not fitting their sex assignment at birth, as we call it.  So a transgender woman who wears a dress would be arrested for cross-dressing.

Other laws barred people who are transgender from service, for example, in the military; and even now there's laws that bar them from obtaining a passport that matches their gender presentation, which is contested in several lawsuits.

So those are the kind of things that are -- we assess discriminatory that are written in the law or were in the past written into laws.

Q.   Okay.  Moving back to paragraph 14, here you state that, "LGBT people are" -- and I quote -- "at risk for excess exposure to stress and related adverse outcomes."

Did I read that correctly?  That was the very last sentence.

A.   Oh, the last sentence.

Q.   Sorry, apologies.

A.   The last sentence of paragraph 14?

Q.   The last sentence states that, "LGBT

mentioned, between a major life event, such as losing a job or losing a loved one, and other types of stresses. Just a range of stressors that I can explain more about, but deadnaming and misgendering would be among those sometimes referred to as microaggressions or, you know, smaller events; the daily events, sometimes they're called.

Q. Okay. Did any of the sources that you cite in the footnotes for this paragraph specifically evaluate the negative effect, if any, that misgendering and deadnaming have on transgender people?

A. No.

MS. FISCHER: Objection; form.

A. Sorry. No, not this -- well, are you talking about paragraph 14?

Q. (BY MR. DRAPER) Yes, correct.

A. So it doesn't specifically address deadnaming, although citation 10 does talk about workplace discrimination and harassment, and I have to be honest, I don't remember if they included it or not, but this paragraph was meant to provide an overall, somewhat introductory paragraph that I used that later explained.

Q. So this paragraph is discussing the effect

*AB Litigation Services*

of all forms of anti-LGBT stigma and prejudice?

A.   Yes.  Again, it's talking about LGBT, not specifically even transgender, so it includes more broader processes.

Q.   Understood.  Okay.  So I'd also like to understand -- and we discussed it a little bit, but I want to focus in on it -- what we mean by "excess stress."

A.   Yes.

Q.   So can you -- and apologies if you've already discussed this a little bit, but could you please explain to us what "excess stress" refers to?

A.   Yes.  I don't want to go into a lecture, but I will try to be brief.  First of all, the reason why it's important, excess stress, is because when we measure in epidemiology a risk factor for a disorder or a disease, it has to be in excess of other people for it to be a risk.

So an example for that is smoking. Smoking is a risk factor for cancer.  It's an excess risk to many other risks that people have, so the smokers compared to nonsmokers, we would look at the impact of that specific risk.

In a similar way here, we look at risk that is specific or unique to LGBT population or to

MS. FISCHER:  Yeah, that's fine.

MR. DRAPER:  Okay.  Great.

Q.   (BY MR. DRAPER)  So let's move down to paragraph 16.

A.   Yes.

Q.   One second.  So in this paragraph you're discussing the concept of societal and familial rejection, correct?

A.   Correct.

Q.   And you say that this societal and familial rejection can lead to adverse outcomes for transgender people, correct?

A.   Right.

Q.   Okay.  So another definition question: Could you tell us what you mean by "societal and familial rejection"?

A.   Yes.  Again, those are broad terms that can be expressed in different ways.  Societal -- well, I guess the difference is if it happens within the family or outside of the family in general in society.

So under societal, I would include any kind of interpersonal interactions in society, including public accommodations, school, work environment.

*AB Litigation Services*

And obviously familial would be within the family. Usually we look at relationships with parents or siblings and their regard to an LGBT person. So that would be examples of familiar -- or not example, but this would be societal versus familial.

Q. Okay. So again, this could include -- societal and familial rejection could include a range of behaviors, correct?

A. Yes.

MS. FISCHER: Objection; form.

Q. (BY MR. DRAPER) Could it include, for example, a parent telling their child that they have to leave the household because they're transgender?

A. Yes.

Q. Okay. The sources that you cite in this paragraph in the footnotes, did any of them evaluate the adverse outcomes that result from deadnaming and misgendering in particular?

A. So the purpose of the citations are not specifically to explore this. As I said before, those are general kind of introductory statements explaining and addressed more directly than they mean and misgendering later.

But I can tell you that for sure a copy of

*AB Litigation Services*

this article may mention it, but I can't remember right now, but they're not here for that purpose. They're making a broader point about family rejection.  And some of those articles may include reference to misgendering, but that's not what I was citing them for in this particular paragraph.

Q.    Okay.  So your conclusions in this paragraph are discussing the impact of societal and familial rejection generally, not just misgendering and deadnaming in particular?

A.    Yes.

Q.    In preparing this report and reaching the conclusions in this paragraph, did you investigate the difference between misgendering and deadnaming as opposed to other kinds of familial and societal rejection in terms of their impact on transgender people?

MS. FISCHER:  Objection; form.

A.    Not here, but as I said, towards the end of the report it focuses on those two aspects of rejection, but here I did not make those distinctions.

Q.    (BY MR. DRAPER)  Okay.  Let's move down to paragraph 19.  The second sentence in that paragraph reads, "Thus, research has shown that LGBT youth and

adults, when compared to their non-LGBT peers, are more susceptible to depression, anxiety, self-harm, substance use, and suicide attempts because of the minority stressors they face."

Did I read that correctly?

A.    Yes.

Q.    Can you tell me how you reached that conclusion?

A.    Well, this article -- this relies on comparison of transgender and non-transgender youth in people or looking at findings from transgender status and comparing them to standards established by large studies of the U.S. populations.

So we can see the group of -- it's a group.  LGBT people are, as I said here, more susceptible, meaning they have more -- higher prevalence of depression, anxiety, self-harm, substance use, and suicide attempts.  And the association with minority stressors -- again, there's a variety of them -- is true correlational data.

Q.    In reaching this conclusion, did you evaluate the effect that misgendering in particular as opposed to other stressors has a likelihood that an LGBT person will suffer one of these negative outcomes?

MS. FISCHER:  Objection; form.

A.    No, that is not specific to this -- to stressors.

Q.    (BY MR. DRAPER)  Okay.  So again, this paragraph is talking about stress generally, not stress particularly from misgendering or deadnaming?

A.    It is not specifically, but inclusive.  So it is -- there are different ways of measuring stress, as I said, so this is more of an overarching study, although misgendering is an important stressor especially with studies with transgender populations, but this paragraph and these citations are more general.

Definitely they mention misgendering, but that's not what is specifically referred to here in this paragraph.

Q.    So this paragraph is not claiming that misgendering or deadnaming in particular leads to a higher likelihood of self-harm among transgender people; do I have that right?

A.    Not per se in this particular paragraph, but it is later provided in -- I think we're probably going to get to the rest of it, but in this particular paragraph this is not specifically assessing the -- sorry.  It is not assessing the

specific role of misgendering and deadnaming.

Q.   Okay.  All right.  Now let's move down to paragraph 20.  In this paragraph you're discussing gender affirmation, and you say that gender affirmation -- I'm looking at the second sentence -- I'm sorry; I apologize.

Third sentence you say gender affirmation, "is an interpersonal, interactive process whereby a person receives social recognition and support for gender identity and expression."

Did I read that correctly?

A.   Right.

Q.   Can you give me an example of something that you would consider gender-affirming?

A.   Yeah.  So not misgendering, not deadnaming, but also, as I think I talk about in this paragraph or the next paragraph also, as I mentioned, documents are a very important way of affirming or not affirming gender.

So a transgender woman who has a driver's license or passport that shows her male name to indicate that she's male is a way of non-affirming, whereas a passport that shows the gender identity and name that the person uses is affirming.

Q.   Okay.  Let's move down to paragraph 22.

There in the first sentence you state that, "compared with people with lower gender-affirming experiences, transgender people with greater gender-affirming experiences fare better in terms of their mental health."

Did I read that correctly?

A.    Yes.

Q.    So kind of reflecting what we just discussed, when you say "gender-affirming experiences" here, this is referring to all kinds of gender-affirming experiences, not a particular kind of experience?

MS. FISCHER:  Objection; form.

A.    That's correct, but it's -- it includes gender-affirming in the form of deadnaming and pronouns used.

Q.    (BY MR. DRAPER)  So did any of the sources that you cite in this paragraph specifically evaluate the effect that the use of gender-affirming pronouns in everyday speech has on a person's mental health?

MS. FISCHER:  Objection; form.

A.    Yes.

Q.    (BY MR. DRAPER)  Which one?

A.    All of them.  They didn't necessarily isolate it separately, but -- and I have to refer to

*AB Litigation Services*

the original here, but they all measure it.  So, for example, reference 28 is specifically looking at identity documents.  27 talks about experiences in different social and medical, like, interactions.

And the measure could be a little broader, but it basically refers to gender affirmation in general.  Gender deadnaming and pronouns are the two most significant types of affirmation within interpersonal interactions other than, as I said, documents and things like that.  So they're often tested and measured, but the articles measure them in different ways.

Q.    Did any of these sources cited in these footnotes for this paragraph look at the use of gender-affirming pronouns in everyday speech?

MS. FISCHER:  Objection; form.

A.    Yeah, I'm not sure what "everyday speech" means.

Q.    (BY MR. DRAPER)  So, for example, you know, in a conversation in a business that you happen to be in that day as opposed to, you know, on a person's ID or in a medical context, which might be more formal settings.

MS. FISCHER:  Objection; form.

A.    Can you repeat the question?  I'm sorry.

*AB Litigation Services*

Q.    (BY MR. DRAPER)  Yeah.  I guess I'm just asking if any of the studies cited here evaluated the effect on transgender people's mental health of being misgendered or deadnamed in everyday conversation, so a conversation with a friend or a family member or a coworker as opposed to, you know, the one study here looks at identity documents.  Another one looks specifically in the medical context.

A.    Yes.  Well, the one that looks at the medical context, looks at other social contexts is, I would say, everyday experiences.  So I believe I referred to that in the other paragraph.

These are all -- the reason that I'm trying to be careful is that the way the studies measure gender affirmation is with a list of questions, maybe sometimes being one or two questions, sometimes more; and those would always include deadnaming or pronouns because those are the most pronounced ways of gender affirmation in interpersonal relationships.

So the answer is, yes, they do measure it, but they might measure it in different ways.  You know, each time he uses a somewhat different way to measure it.

Q.    Okay.  So we've already touched on it, but

*AB Litigation Services*

paragraph 22 here refers to the study of personal

identification documents matching someone's gender.

This is in footnote 28, correct?

A.    Correct.

Q.    Okay.  I am going to place another

document into the Zoom chat.  Okay.  It should be

there.  Do you see it?

A.    Yeah.

Q.    Could you please open that and let me know

when you have it open?

A.    Yes.

Q.    Okay.  Is this the study about

gender-affirming ID's that we've been referring to?

You can take a minute to look at it if you'd like.

A.    It's opening.  Sorry.

MS. FISCHER:  Take your time, Dr. Meyer,

if you need a minute to look at the whole thing.

A.    Yes, that's the study.

MR. DRAPER:  Okay.  I'm going to enter

this as Exhibit B, I believe we're on.

(Deposition Exhibit B was marked for

identification.)

Q.    (BY MR. DRAPER)  Okay.  So looking back at

paragraph 22 of your declaration, you say that this

study found that transgender people who had an ID --

and I'm paraphrasing here -- who had an ID that
matched their gender identity had a lower prevalence
of psychological distress and suicidal ideation
compared to transgender people whose ID did not match
their gender identity.

Did I accurately summarize your
description there?

A.    Yes.

Q.    And when we say, "the ID matches their
gender identity," I'm assuming that means that the ID
listed the individual's chosen name, even if it was
different from their name assigned at birth, and
listed their gender identity as opposed to their sex
assigned at birth, correct?

A.    Yes.  To be more precise, we look at the
measure, but that's what it refers to.

Q.    Okay.  So this study in particular only
focused on the role of gender-affirming
identification documents, correct?

A.    Correct.

Q.    It did not evaluate the effect that any
other kind of gender-affirming or
non-gender-affirming behavior has on transgender
people, correct?

A.    Right.

*AB Litigation Services*

Q.    So it did not evaluate the effect of being verbally misgendered or deadnamed, correct?

A.    Correct.

Q.    And it did not evaluate the effect of being misgendered or deadnamed in written form other than on a personal ID, correct?

A.    Correct.

Q.    And this study did not study the effect of a single instance of misgendering or deadnaming as opposed to persistent misgendering or deadnaming, correct?

A.    Correct.  I mean, it doesn't differentiate.  It just asked whether the document is concordant.  It doesn't specifically talk about the exposure of anybody to those documents.

Q.    So again, in paragraph 22 you state that having -- of your declaration, you state that having an ID that matched their gender identity was associated with, quote, less suicidal ideation.  Do I have that right?

A.    Yes.

Q.    Okay.  So let's turn back to the study, the Scheim study, and turn to page e199.  The page number should be in the bottom corners.

A.    I need to fix my view here.

Q.    Oh, take your time.  I believe it's the fourth page of the --

A.    Yeah, it kept skipping.  Page 199, yes.

Q.    Yep.  So I'm looking at the paragraph right under the bolded words "Statistical analysis."

A.    Uh-huh.

Q.    And I'm going to read that first sentence. "We examined associations between respondents' IDs reflecting their preferred name and gender, and psychological distress and past-year suicide ideation, planning, and attempts."

Did I read that correctly?

A.    I'm sorry.  Is it the paragraph above "Statistical analysis"?

Q.    The paragraph right under "Statistical analysis."  It starts, "We examined."

A.    Oh, sorry.  We examined, yes.

Q.    So I'll read that again.  It says, "We examined associations between respondents' IDs reflecting their preferred name and gender and psychological distress and past-year suicide ideation, planning, and attempts."

Did I read that correctly?

A.    Yes.

Q.    So this study looked not just at suicidal

*AB Litigation Services*

ideation and planning, but actual suicidal attempts,
correct?

    A.    Yes.

    Q.    And then please turn to page 202.

    A.    Yes.

    Q.    So about halfway down the first paragraph
there, there's a sentence that reads,
"Gender-concordant ID status was not associated with
suicide attempts."

          Do you see that?

    A.    Yes.

    Q.    Did I read that correctly?

    A.    Yes.

    Q.    Okay.  So just to make sure I understand
the study correctly, in this study's findings, having
a gender-affirming ID correlated to the likelihood of
suicide ideation but not to the likelihood of actual
suicide attempts.

          Do I understand that correctly?

    A.    I need to refer to it again.  Sorry.

    Q.    Take your time.

    A.    Okay.  So if you look at page e201 in the
middle column -- in the left column in the middle
paragraph, if I may read it to you:  "Respondents
with all or some concordant IDs were significantly

*AB Litigation Services*

Q.    (BY MR. DRAPER)  Okay.  Looking back at your declaration, we're going to go back to paragraph 22 there.  At the very end of that paragraph, you say that this study indicates, quote, a protective health effect of gender affirmation.

Did I read that correctly?

A.    Correct.

Q.    Okay.  Can you explain what you mean by that?

A.    Well, it's kind of the opposite of what we just said, so we call it a "protective health effect" if what they found was having those documents did not lead to those outcomes like depression, anxiety symptoms, and the suicidality items.  So that's why we call it a "protective effect."

Q.    Okay.  So is a -- let's go back to the study, back to page 202 of the study, and this time I'm going to look in the right column in the second to last paragraph that starts with, "Our findings." You can let me know when you're there.

A.    Yes.

Q.    Okay.  So that sentence there -- that first sentence of that paragraph reads, "Our findings have various limitations, particularly the cross-sectional study design, which precludes causal

interpretations."

Did I read that correctly?

A.    Yes.

Q.    So is this study making any conclusions about the causal effect of having a gender-affirming ID?

A.    Can you ask the question again?

Q.    Yeah.  This study did not conclude that having a gender-affirming ID causes somebody to have better mental health outcomes, correct?

A.    That is correct in part.  When we discuss causality, we infer it from causal association. That's not ever a perfect assessment of causality, but it is often the only way that we can assess it.

So in that sense, I agree with their pointing out this limitation because it didn't test causal relationship as you would.  We would need a clinical trial for that.  That cannot happen.

So we use associations to infer about causal relationships based on a variety of other elements in the study, and in this case, I believe that it does indicate a protective health effect because of the associations they found.  But it is also true to say they did not prove causal associations.

Q.    Okay.  I'm going to read the very next sentence in that paragraph.  It says, "It is possible that psychological distress and suicidality preceded the exposure; in particular, psychological distress could make it more difficult to obtain gender-concordant IDs."

Did I read that correctly?

A.    Yes.

Q.    Okay.  Let's turn back to your declaration, paragraph 25 this time.

A.    I'm sorry.  Can you repeat this?

Q.    If you can turn back to your declaration, back to your report --

A.    Yes.

Q.    -- back to paragraph 25 this time.

A.    Yes.

Q.    This paragraph is discussing a study about the prevalence of gender identity discrimination in Massachusetts, correct?

A.    Correct.

Q.    And this is referring to the 2015 Reisner study in footnote 29, correct?

A.    Yes.

Q.    Okay.  I'm going to place that document into the Zoom chat.  All right.  It should be there.

Open it if you can.

A.    I'm downloading it.  Yes, I got it.

Q.    Okay.  You can take as long as you need to look at it, but is this the study that you're referring to in that footnote?

A.    Yes.

MR. DRAPER:  I'm going to mark this as Exhibit C, I believe we're on.

(Deposition Exhibit C was marked for identification.)

Q.    (BY MR. DRAPER)  This study was a survey of transgender individuals in Massachusetts, correct?

A.    Yes.

Q.    And what year was the survey administered?

A.    2013.

Q.    Okay.  And this survey asks respondents if they had experienced discrimination in a place of public accommodation in Massachusetts within the past year.  Do I have that correct?

A.    Yes.

Q.    Could you please turn to page 490 of the article?

A.    Yes.

Q.    And then I want to look at the second paragraph.  The second sentence of that paragraph

reads, "Respondents were asked:  Based on your transgender or gender-nonconforming status, please --

A.    Wait.  I'm sorry.  Are we looking at page 489?

Q.    I have it on page 490, I'm looking at.

A.    Oh, sorry, sorry.

Q.    Sorry if I misspoke.  I meant page 490.

A.    Okay.  And which paragraph?

Q.    And then we're in the second paragraph under "Measures."

A.    Yes.

Q.    Okay.  So this paragraph is describing how they conducted the evaluation, and the second sentence of the paragraph, starting there, it reads, "Respondents were asked:  Based on your transgender" status -- or "based on your transgender or nonconforming status, please check whether you have experienced any of the following by a staff member or stranger in at least one of these public spaces in the past 12 months.  Respondents were considered to have experienced discrimination when they marked 'yes' to one or both of the following questions on specific types of public places.  I did not receive fair treatment or service, or I was verbally harassed or disrespected?"

I know that was a lot, but did I read that correctly?

A.    Yes, that's correct.

Q.    So when the article states that 65 percent of transgender adults experienced public accommodation discrimination in the previous year, that includes both those who were denied fair treatment or service and those who were verbally harassed or disrespected; do I have that right?  You can take the time to look at it.

A.    Yeah.  I'm sorry.  I just wanted to verify.

Q.    Go ahead.

A.    I believe you're right, but I'm just trying to -- yes, one or both, yeah.

Q.    Okay.  Does this article tell us what portion of that 65 percent falls into each of those categories:  Those who were denied fair treatment versus those who were verbally harassed or discriminated?

A.    I have to look for that in the results section.

Q.    Take your time.

A.    I don't see that they separated it.

Q.    Does the article define the term "fair

treatment or service"?

A.    They were -- that's the way the people were asked to answer that, what they felt was fair treatment.

Q.    Okay.  So the term was open to the respondents' interpretation?

A.    Yes.

MS. FISCHER:  Objection; form.

Q.    (BY MR. DRAPER)  And same for the term "verbal harassment and disrespect," was that left to the respondents' interpretation?

MS. FISCHER:  Objection; form.

A.    Yes.

Q.    (BY MR. DRAPER)  Okay.  Does this article specify how many, if any, of the survey respondents reported experiencing discrimination because they were referred to with terms other than their chosen name or preferred pronouns?

A.    They don't specifically ask it that way, but they -- as you already indicated, they asked specifically related to transgender and gender-nonconforming status whether they were disrespected or did not receive fair treatment. Misgendering is the most common way that that would happen, so -- but they didn't specify -- they didn't

isolate that.

Q.    Okay.  So verbal harassment or discrimination -- I'm sorry.  Verbal harassment or disrespect, that could include things other than misgendering or deadnaming, correct?

A.    Yes.

Q.    Okay.  Looking back at your declaration back on paragraph 25, in the last two sentences of that paragraph you state, "That discrimination" -- referring to the discrimination in this article -- "was associated with a greater risk of adverse emotional and physical symptoms, including emotional symptoms for the past 30 days, a positive screen for clinical depression in the past 7 days, negative physical symptoms in the past 30 days, and a gastrointestinal diagnosis.  Significantly, each additional site of public accommodation discrimination experienced by the person was associated" -- I'm assuming there's supposed to be a "with" there -- "was associated with an increase of risk for adverse outcomes."

Did I read all that correctly?

A.    Yes.

Q.    So in evaluating this effect, in evaluating the association between experiencing

discrimination and having adverse health outcomes, did this study distinguish between those who indicated that they were denied fair treatment or service and those who indicated that they were verbally harassed or disrespected?

A.    No.

MR. DRAPER:  If it works for you, Dr. Meyer and Janna, now might be a good time -- I'm maybe going to move on to another set of questions. Now might be a good time to take a five- or ten-minute break if it works.  Would that be all right?

THE DEPONENT:  Okay.

MS. FISCHER:  That's fine with me if it's fine with Dr. Meyer.

THE DEPONENT:  Yeah, I'm okay with that.

MR. DRAPER:  You want to take maybe ten minutes?  Come back at 12:40?  I'm sorry, 12:40 Eastern time.

THE DEPONENT:  Yeah, yeah.

(Break was taken from 10:32 a.m. to 10:42 a.m.)

MS. KRAEMER:  Paul, I'm sorry.  This is Talia.  Can I just cut in real fast?

MR. DRAPER:  Sure.

*AB Litigation Services*

cite in your report?

A.    Yes.

Q.    Okay.  Are you aware of any other scoping reviews focusing on this topic?

A.    I'm not.

Q.    Okay.  Let's look at page 128 of the study.  You'll see it's a table of the different studies that were included in the review.

A.    Yes.

Q.    Okay.  Can you tell us how many studies were included in the review?

A.    Then?  They had 12 studies.

Q.    Okay.  And are you familiar with all the different studies listed here?

A.    Well, I wasn't familiar with them before I looked at it.  I'm not familiar with them independently.

Q.    Okay.  So you did not separately review the studies listed here when you were conducting -- when you were drafting your report?

A.    No, I didn't.

Q.    Okay.  So if you look in the far-right column, it's labeled "Key outcomes."  Do you see where I'm looking on page 128 of the table?

A.    Is that on Figure 1 still?

*AB Litigation Services*

Q.   Table 1, still on page 128.

A.   Oh, okay, yeah.

Q.   So this column describes the main findings of each of the studies, correct?

A.   Yes.

Q.   Okay.  So I'm just looking down this column here.  Looking at this, it appears that some of these studies found no association between microaggressions and negative health outcomes.  Do I have that correct?

A.   Yes.  I referred to that earlier when you asked me about that too.

Q.   Okay.  So I'm looking, for example -- and I apologize if I get any of these names wrong -- the Cascalheira study in 2023.  It's the fourth study down.  Do you see which one I'm referring to?

A.   One, two, three, four, yeah.

Q.   Okay.  And if you look at the key outcomes for that in the right column, it says, "Microaggressions were not associated with mental health."

Did I read that correctly?

A.   Yes.

Q.   And then two studies down, the Velez 2024 study, do you see which one I'm referring to?

*AB Litigation Services*

A.    Yes.

Q.    And then if you look at the key findings for that, it states, "General anti-trans and nonbinary microaggressions were not associated with psychological distress."

Did I read that correctly?

A.    Yes.

Q.    And then all the way at the bottom, the Woodford 2017 study, do you see which one I'm referring to?

A.    Yes.

Q.    And then if you look at the key outcomes for that, it states, "Microaggressions were not associated with depression and suicide attempts."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then some of the other studies listed in here found mixed or limited association between microaggressions and negative health outcomes; is that correct?

A.    Yes.

Q.    So for example, if you look at the Austin 2022 study, so it's the second one down.  Do you see which one I'm referring to?

A.    Yes.

Q.    And then the key outcomes for that, it states, "Interpersonal microaggressions were associated with suicide attempts.  Microaggressions were not associated with six-month suicidality."

Did I read that correctly?

A.    Yes.

Q.    The Truszczynski study, so that's three further down, the Truszczynski 2022 study.  Do you see which one I'm referring to?

A.    Yes.

Q.    And then if you look at the key outcomes for that, it states, "Participants were more likely to use marijuana following multiple discriminatory events than when experiencing microaggressions alone."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then, finally, the Woodford 2018b study, it's two more down.  Do you see which one I'm referring to?

A.    Yes.

Q.    Okay.  And then the key outcomes for that, it states, "Microaggressions were associated with depression but not suicide."

Did I read that correctly?

*AB Litigation Services*

A.    Yes.

Q.    Okay.  If we can turn back to the very first page of the article, so I think it's the second page of the PDF where we've got the abstract.

Do you see what I'm looking at?

A.    Yes.

Q.    Okay.  The results section of the abstract, the second sentence there, I'll read it.  It states, "While findings were mixed, most included studies that found microaggressions towards trans- and gender-diverse people were associated with adverse mental health outcomes."

Did I read that correctly?

A.    Correct.

Q.    So is it fair to say that the studies included in this report found -- some of them found -- scratch that.

Is it fair to say that the results of the studies included in this report were mixed in terms of their findings regarding the association between microaggressions and negative health outcomes?

A.    Yes.

Q.    Okay.  The 12 studies that were included in this review, do you know if all of them used the same definition of "microaggression"?

*AB Litigation Services*

A.    They did not.

Q.    Okay.  Do you know if they all evaluated the same microaggressions when they were evaluating their effect on health outcomes?

A.    No, they did not.

Q.    Do you know if they all used the same methodology to measure the outcomes?

A.    They did not.

Q.    Okay.  Let's turn to page 135 of the study.  Let me know when you're there.

A.    I'm here.

Q.    Okay.  So I'm looking at the third paragraph in the left column.  It starts with, "There was limited discussion. . ."

A.    Yes.

Q.    Do you see where I'm looking?  Okay.  The second sentence of that paragraph states that, "Only two studies reported on income."

Did I read that correctly?

A.    Yes.

Q.    Does this mean that the other ten studies did not include information about the respondents' income?

A.    That's how I read it.

Q.    Okay.  So in the next sentence it states,

"As socioeconomic status consistently predicts psychological well-being, it is an important variable to consider in mental health research."

Did I read that correctly?

A.    Yes.

Q.    Do you agree that it's important to control for socioeconomic status in mental health research?

A.    I don't agree it's important to control, but it's important to consider.  That's what you just read.

Q.    So the very next sentence in that paragraph states, "Additionally, ability status was not assessed with any of the included studies."  And the next sentence states, "This is despite people with disabilities experiencing unique microaggressions and poorer mental health outcomes."

Did I read that correctly?

A.    Yes.

Q.    Do you think it's important for studies of this nature to include information about ability status?

MS. FISCHER:  Objection; form.

A.    Well, to include information is kind of a vague question because I'm always going to like more

information.  That's what we do.  But I think maybe if I'm reading into what you asked about controlling for something, that's a different question, so -- because you referred to controlling.

I think the authors in this particular review, those two statements are correct.  Both SES income, ability, and many other variables are important to consider.  I don't think they are needed in the control if we're looking at the model that's statistically controlled for them.

Q.    (BY MR. DRAPER)  So if -- if the studies do not include data about the respondents' ability status, is it possible that mental health outcomes could be driven by ability status rather than the presence of microaggressions?

MS. FISCHER:  Objection; form.

A.    What the studies show -- I mean, we actually talked about the same thing in an earlier study, whether the control model is looked at or not. What the studies show is this population that was exposed to this microaggression as measured by the different studies, a majority of them was associated with some outcome or at least one of the outcomes.

The need to control is necessary when you have two groups that you're comparing when one group

is different in one of those variables.  So if I concurred transgender and nontransgender people and one group was disabled and one was not, then you can say that the disability in one group could lead to the differences we are observing.

In this one group analysis that they're doing here, it is -- would be informative, but I don't think it's important, necessary even, to control because what you find is what you got, which is that transgender people who experienced these microaggressions were more likely to also experience some of the outcomes.

They were not chosen in particular to be disabled versus the group that didn't experience them, but I will always say with more data, it would be nice to look at, but I don't think it's necessary as far as drawing a conclusion in this case.

Q.   (BY MR. DRAPER)  Is it possible that transgender and nonbinary people experience disabilities at a higher rate than the general population?

MS. FISCHER:  Objection; form.

A.   It is possible, but in this example, everybody was transgender.  So as I said, I didn't feel that it was necessary to control for that,

although you can, of course, pose all kinds of hypotheticals where it would matter.

Q.    (BY MR. DRAPER)  Okay.  Let's turn back to your declaration, and I want to look at paragraph 27 of the declaration now.

A.    Yes.

Q.    So in the first sentence here, you refer to a study that indicates that for young people, the ability to use a chosen name at home, school, and work was associated with improved mental health.  Do I have that right?  I'm paraphrasing, not quoting exactly.

A.    Can you repeat it?  I think you said --

Q.    Sure.  I'll just read -- I'll read the sentence to you.  "Among youth and young adults, the ability to use a chosen name at home, school, and work was significantly associated with lower levels of depression and suicidality and with higher self-esteem."

Did I read that correctly?

A.    Yes, that's correct.

Q.    And the study this is citing is the 2019 Pollitt study in footnote 34, correct?

A.    Yes.

Q.    Okay.  I am going to place that in the

*AB Litigation Services*

chat. Okay. You can open it up and let me know when you have it.

A. Yes, I got it.

Q. Okay. You can take as long as you need to to look at it. Is this the Pollitt study that you referred to in your report?

A. Yes, it is.

MR. DRAPER: Okay. I'd like to enter this as Exhibit E, I think we're on.

(Deposition Exhibit E was marked for identification.)

Q. (BY MR. DRAPER) Okay. So just looking at your declaration, you say, "This report refers to youth and young adults." This study only looked at young people, then?

A. I believe that's correct.

Q. Okay. So as far as you're aware, it did not evaluate the effect of using a chosen name for adults, correct?

A. I'm sorry. I need to look at the --

Q. Take your time.

A. Sometimes we consider the different definitions of youth and adults, so I want to make sure. So their age group was 15 to 21, so depending on your definitions, some of them were adults.

Q.   Okay.  But it did not evaluate anyone over 21, correct?

A.   Correct.

Q.   Gotcha.  This study evaluated the use of a chosen name at home, school, and work, correct?

A.   Yes.

Q.   So it did not evaluate the effect of using a chosen name in other contexts; do I have that right?

A.   I believe in my declaration it says, "with friends" as well.  I guess that's part of "at school and work," yeah.

Q.   So it didn't evaluate the use of a chosen name in the public accommodations context --

A.   No.

Q.   -- except where those overlap with school and work, right?

A.   Correct.

Q.   This study, did it evaluate the use of preferred pronouns?

A.   I think so, but -- yeah, it's just asking about chosen name.

Q.   So -- sorry.  Just to make sure I've got that, so it does not evaluate the use of preferred pronouns, correct?

A.   Correct.  I should say, "not directly."
It just asks the question about chosen name.  It
didn't ask directly about pronouns, so they're a
little bit overlapping.  If your name is Jane, it has
a gender in it.

Q.   How did this study measure a person's
ability to use a chosen name in these contexts?

A.   How did they -- well, I'm sorry.  Can you
ask me this again?  How did they measure the chosen
name?

Q.   Yeah.  How did it evaluate a person's
ability -- how did it measure an individual's ability
to use a chosen name in these contexts?

MS. FISCHER:  Objection; form.

A.   Well, they asked, first of all, whether
people have a different chosen name, and then if they
were able to use that in the different settings,
specifically home, school, work, and with friends.

Q.   (BY MR. DRAPER)  So it asks participants
if they could generally use a chosen name in a given
context, correct?

A.   Yes.

Q.   Did the study ask participants if or how
frequently they -- did the -- sorry.  Did the study
ask participants how frequently they have been

*AB Litigation Services*

deadnamed in any of these settings?

MS. FISCHER:  Objection; form.

A.   I believe they only asked if they could use their name, not how frequently they looked at the different outlet -- different contexts, as we said, but not how many times it happened in any particular place.

Q.   (BY MR. DRAPER)  Does the study measure the psychological impact of a discrete instance of being deadnamed in one of these settings?

A.   Can you ask that again?

Q.   Yeah, sure.  I guess what I'm trying to get at is the difference between the ability to generally use a chosen name in a setting versus, you know, a single instance of being referred to with the incorrect name.

A.   I see.

Q.   So I'll represent to you that at school, a student who identifies as transgender might generally be allowed to use a chosen name, but in passing, one of their classmates might refer to them using their dead name.

This study did not evaluate the psychological impact of that latter example of a passing instance of somebody referring to you using a

*AB Litigation Services*

dead name, correct?

A.    That's correct.

MS. FISCHER:  Objection, form.

A.    Sorry.  That's correct.

Q.    (BY MR. DRAPER)  Did this study conclude -- reach any conclusions about causation?

A.    It's the same answer that I explained before.  A perfect study of causation is not available at all.  But when we assess in epidemiology, causes, we start by the way the studies are done and infer about whether there's a consistent -- whether the explanation is consistent with causation, but it does not prove causation.

Q.    Gotcha.  So did the study rule out the possibility that transgender youth are more likely to use a chosen name in these contexts because they have better health mental status?

A.    No, they could not rule that out.

Q.    Okay.  Moving back to your declaration, back to paragraph 27, in the -- I'm looking at the second sentence there, the next two sentences.  They read, "And using a chosen name in more of these contexts (home, school, work, and with friends) was associated with lower depression, suicidal ideation, and suicidal behavior.  That is, depression, suicidal

*AB Litigation Services*

ideation, and suicidal behavior were lowest when chosen names could be used in all four contexts."

Did I read that correctly?

A.   Yes.

Q.   And in the footnote you're citing to another study here, the Russell study from 2018; is that correct?

A.   Right, which is -- it's the same study but a different paper referring to the same study.

Q.   Okay.  Well, I will -- I will place that document into the chat as well.  You can let me know when you have it open.

A.   Okay.

Q.   And you can take a minute to look at it if you'd like, but is this the document that you're referring to in your report?

A.   Yes.

MR. DRAPER:  Okay.  I'll offer this as Exhibit F.

(Deposition Exhibit F was marked for identification.)

Q.   (BY MR. DRAPER)  So you stated this is looking at the same set of data as the previous report?

A.   I believe so, yes.

*AB Litigation Services*

Q.    Okay.  Well, I'll ask just a few questions about this one, then.  So this -- again, this report is only looking at the use of chosen names in the home, school, work, and with friends context, correct?

A.    Yes.

Q.    So it's not looking at the use of chosen names in public accommodations outside of those contexts?

A.    Correct.

Q.    Okay.  And again, this study just looked at the use of chosen names, correct?

A.    Whether they could use a chosen name, yes.

Q.    This report, like the last one, I understand, you know, there's -- there's about exactly what causation might mean, but it did not reach any conclusions about causation, correct?

A.    Yes.

MS. FISCHER:  Objection; form.

A.    With the same caveat that I mentioned earlier as far as inferring.

Q.    (BY MR. DRAPER)  All right.  Then looking back at your declaration, in the last few sentences of that paragraph, paragraph 27, you state, "Another study among youth found that regardless of frequency,

*AB Litigation Services*

being misgendered was significantly associated with

feeling stigmatized.  In turn, feeling stigmatized

was associated with negative emotions, such as anger

and shame, lowered self-esteem related to others'

perception of their appearance, and feelings of

inauthenticity."

Did I read that correctly?

A.    Yes.

Q.    And this is referring to the McLemore, or

Macelmore maybe, 2018 study in footnote 36?

A.    Yes.

Q.    Okay.  I will go ahead and place that into

the chat as well, and you can let me know when you

have it open.

A.    I got it.

Q.    Okay.  Again, you can take a minute to

look at it, but is this the document you're referring

to in your report?

A.    Yes.

MR. DRAPER:  Okay.  Then I will offer this

as Exhibit G, I believe we're on.

(Deposition Exhibit G was marked for

identification.)

Q.    (BY MR. DRAPER)  This study, like the

other two, only evaluated young people, correct, not

*AB Litigation Services*

adults?

A.   Yes, but in this case it's a little older than the other one, so the average age here was, I believe, 26.

Q.   Okay.

A.   Yeah.  We have a varying definition of what we consider youth.  Usually 18 to 29 is considered youth.

Q.   Okay.  This study, did it focus on a particular context for misgendering, like the home or the workplace?

A.   I have -- I'm sorry.  Let me take a look. No, it just asked, How often do people misgender you?

Q.   Okay.  So it didn't ask questions about misgendering in public accommodations specifically, correct?

A.   It didn't ask specifically any -- where that happened.

Q.   Okay.  How did this study measure the frequency of misgendering?

A.   It asked them to indicate on a scale of "never to always."

Q.   Okay.  Now, you say in your report that this study found an association between feeling stigmatized by misgendering and negative emotions

*AB Litigation Services*

like anger, shame, and low self-esteem.  Do I have that correct?

A.    Yes.

Q.    I understand the caveats we've been using, but this study, did it reach any conclusions about causation?

A.    No.

Q.    So does this study preclude the possibility that an individual with poor mental health is more likely to feel stigmatized by misgendering?

MS. FISCHER:  Objection; form.

A.    No.

Q.    (BY MR. DRAPER)  Okay. Okay.  We discussed this briefly towards the beginning of the deposition, but there are studies out there on the relationship between microaggressions and mental health that you did not include in your report, correct?

A.    Yes, presumably.

Q.    Okay.

A.    Sorry.  Let me just clear this up.

Q.    Go ahead.

A.    I did not exclude any studies, but I used the ones that I found that I had -- that I felt were

sufficient.

Q.    Okay.  Yeah, I just want to establish there are studies out there that you didn't cite in your report, correct?

A.    Presumably.  I didn't see them and exclude them, but I'm sure there are studies that I might have overlooked or not considered.

Q.    I want to look at two of those studies, so I'm going to drop another document into the chat, and you can open it and tell me when you've got it.

A.    Yes, I've got it.

MR. DRAPER:  Okay.  I'll mark this as Exhibit H.

(Deposition Exhibit H was marked for identification.)

Q.    (BY MR. DRAPER)  So I'll represent to you that this is a study published in 2024 that examined the association between misgendering and the well-being of nonbinary people in Canada.  You can take a minute to look at it now, or as I'm asking questions, take as much time as you'd like to look at it before answering.

A.    I'm going to need to look at the abstract.

Q.    Perfect.  Go ahead.

A.    Okay.

Q. Okay. Are you familiar with this study?

A. I don't remember it offhand. I'm familiar with some of the authors of this study.

Q. Okay. If you look at the top of the very first page, you can see where this study was published. It says it was published in the International Journal of Transgender Health. Do I have that correct?

A. Yes.

Q. Are you familiar with that journal?

A. Somewhat, yes.

Q. To your knowledge, is that a peer-reviewed journal?

A. Yes, I believe it is.

Q. Okay. So still on the first page, if you look in the abstract, it describes the study's Aims. You can see where it has the bolded word "Aims." I'll read that. It says, "Our research asked: Among nonbinary people, what factors are associated with frequency of misgendering? And do nonbinary people who experience misgendering less often have better health outcomes?"

Did I read that correctly?

A. Yes.

Q. Okay. Now I want to turn to page 824 of

the study.

A.   Got it.

Q.   So I'm looking in the "Discussion" section in the first full paragraph on the right column, so it starts with, "While misgendering. . ."  Do you see where I'm looking?

A.   Hold on.  I'm sorry.  I need to --

Q.   Take your time.

A.   Okay.  824?  I'm sorry.  Go ahead.

Q.   Page 824, I'm looking on the right column in the first full paragraph that starts with, "While misgendering. . ."

A.   Yes.

Q.   Okay.  I'll read the first sentence there. "While misgendering frequency was associated with measures of anxiety, depression, and psychological well-being in unadjusted regression models, after adjusting for confounders, we observed a small but statistically significant effect on anxiety, and no significant effect on depression or psychological well-being."

Did I read that correctly?

A.   You did.

Q.   Okay.  And then I'll continue reading the next two sentences.  "Given our sample's general

perception of misgendering as a highly distressing experience, this finding is surprising.  Potentially, individuals may experience intense distress immediately after being misgendered, but this impact dissipates over time."

Did I read that correctly?

A.    Yes.

Q.    So based on that, is it fair to say that this study found no significant relationship between misgendering and psychological well-being for nonbinary people?

MS. FISCHER:  Objection; form.

A.    Well, they did report in the adjusted model a small but statistically significant effect on anxiety, and the unadjusted models reported effect -- according to this paragraph again on anxiety, depression, and psychological well-being.  So there was an effect on one of those in the adjusted model and the effect on the three outcomes in the unadjusted model.

Q.    (BY MR. DRAPER)  But am I correct in reading this, that after adjusting for confounders, they found, quote, no significant effect on depression or psychological well-being?

A.    Yes.

it is limited to nonbinary people, and I tried to use more general articles that look at the entire population.

Nonbinary people are people who don't -- so it's a little different, in my mind, in terms of the question we're asking here. Some articles include nonbinary and transgender. This article specifically looked only at nonbinary people, so I wouldn't necessarily -- it just complicates the picture. So I didn't include it.

But I don't recall, honestly, the thinking process, but that would be a reason why I wouldn't include it.

Q. Okay. I'm going to place one more document into the chat. There we go. It should be there. You can let me know when you have it open.

A. Okay. I have it. Let me just take a look. Okay.

MR. DRAPER: Okay. I would like to -- if I haven't already, I'd like to enter this as Exhibit I, I believe.

(Deposition Exhibit I was marked for identification.)

Q. (BY MR. DRAPER) Are you familiar with this study, Dr. Meyer?

*AB Litigation Services*

Q.    Gotcha.  So it's similar to a scoping review?

A.    It's similar only in the sense that it's a review of existing literature, but it uses different standards for the analysis --

Q.    Okay.

A.    -- the difference being that you actually create a data set from those other studies that you can then analyze separately from their findings.

Q.    Understood.  Okay.  I'd like to turn to page 31 of the study.

A.    Yes.

Q.    Okay.  And then on the right column there, there's a paragraph labeled "Grade of the evidence."

Do you see what I'm looking at?

A.    Yes.

Q.    Okay.  So this paragraph indicates that the studies in this report were evaluated using this grade system.  Are you familiar with that system?

A.    Not specifically, but there is a system for grading articles; and, yeah, I have no problem with that.

Q.    Okay.  So the last sentence of the paragraph indicates -- it states, "The quality of the evidence was rated very low for all the estimates

*AB Litigation Services*

mainly due to the small number of studies included
and the risk of bias linked to the sample selection."

Did I read that correctly?

A.    Yes.

Q.    To your knowledge, is "very low" the
lowest possible grade in the grade system?

A.    I am not sure, but "very low" sounds
pretty low.

Q.    Okay.  All right.  You can set that to the
side.  So we've spent a while going through your
declaration and looking at the different studies.

A.    Can you give me one second?  I'm sorry.

Q.    Yep, yep, take your time.

A.    So this statement is talking about --

Q.    Yep.

A.    -- very low for the inclusion in a
systematic review.  The benefit of the systematic
review is that you rely on existing studies.

Q.    Uh-huh.

A.    A small number of them is a disadvantage
because you're -- in some ways, you're not moving the
literature far enough from the individual studies.
So that's what they're referring to here, I believe.

Q.    Okay.  You can set that to the side.

A.    Okay.

Q.    So we're not looking at any particular document right now.  I just want to ask you a few more questions.  We've looked through your declaration, looked at the different studies you cite.

Thinking about the studies that you've cited in your report, would you agree that none of the studies you cite in your declaration specifically evaluated the effect that misgendering and deadnaming in places of public accommodation has on transgender people's health outcomes?

MS. FISCHER:  Objection; form.

A.    When -- I mean, I don't know if you -- what you said was too general, but they didn't specifically assess those two things, although they included, you know -- especially I'll presumably one day be asked about some of the harassment or disrespect.  Those would include that, but they didn't isolate specifically the deadnaming and misgendering in that particular context.  They each have different ways of addressing this question.

Q.    (BY MR. DRAPER)  Okay.  So there were studies that looked at misgendering and deadnaming in other contexts, but not in public accommodations, correct?

A.    Well, as we said before, public accommodation, if you mean a business or -- I mean, they did look at different places that could be considered public accommodation, so I don't know how we would define "public accommodation" for that purpose.  Um --

Q.    Sorry.  I didn't want to cut you off. Were you finished?

A.    Yeah, that's my point.  I'm not sure how you define "public accommodations" in this example, in this question, but some of the studies looked at things that are public accommodations as well.

Q.    Okay.  And I know you -- we had a study looking, for example, at misgendering or the use of a chosen name in school, which might be considered public accommodations.  But none of the studies evaluated the effect of misgendering and deadnaming in public accommodations as a category, correct?

MS. FISCHER:  Objection; form.

A.    I'm not sure this question is precise enough for me to address.  None of them identified public accommodation as a term perhaps.

Q.    (BY MR. DRAPER)  So, for example, in the Massachusetts survey study that asked respondents if they had suffered -- if they had been the victim of

*AB Litigation Services*

discrimination in public accommodations --

A.    Right.

Q.    -- that study, for example, did not ask specifically, Have you been a victim of misgendering or deadnaming in public accommodations?

A.    Right, right.

Q.    And -- sorry.  Go ahead.

A.    I think in the most specific way, if I understand this question, I would agree.  But as I said, there are different ways that the studies highlight these issues, but they didn't specifically isolate those issues that you are addressing -- that you're describing.

Q.    Okay.  So just to make sure I understand that, none of the studies asked respondents if they had been misgendered or deadnamed in public accommodations as opposed to asking them about a specific context like a school or a workplace?

A.    We just said that the school is public accommodation, so. . .

Q.    I understand, but none of the studies asked about public accommodations broadly in the way that the Massachusetts survey did, for example?

A.    It's very hard for me to answer it, honestly.  Broadly, meaning -- it's a little unclear,

*AB Litigation Services*

but --

Q.    I guess I'll -- sorry.  Go ahead.

A.    I will try to help you.  I think they don't specifically do this deadnaming and pronouns in a specific public accommodation that they identified, but as you mentioned, the Massachusetts study did ask about restaurants, retail but, again, did not specifically mention deadnaming.

So I think it's that the specificity is not there, but the overarching findings, as I said, illuminate this question, in my mind.

Q.    Okay.  Did any of the studies that you cite in your declaration find that transgender individuals are more likely to attempt suicide based only on misgendering and deadnaming?

A.    Meaning that that is the only cause of them attempting suicide?  Is that what you're asking?

Q.    I'm asking if any of the studies you cited in your report found a relationship specifically between misgendering and deadnaming and the higher likelihood of attempting suicide as opposed to microaggressions generally?

A.    I see.  I think there is only a couple of studies that specifically look at deadnaming and pronouns.  I really can't remember specifically that

*AB Litigation Services*

they didn't -- that the studies didn't look at suicide.  I have to find the studies.  I'm sorry.

Q.    Take your time.

A.    So I think the review, as we said, had a variety of ways of measuring the microaggression they defined.  And they did find a relationship with some of the studies, but I can't right now tell you whether any of the nine or so articles in there measured specifically gender, deadnaming, or gender pronouns.

I don't know if they were isolated separately.  I know some of them measured it, but I don't know if they isolated the effect for that, and the review was not addressing the isolated item.

Q.    Okay.  So just sitting here right now, to the best of your recollection, you can't recall that any of the articles you cited in your study found a relationship specifically between misgendering and deadnaming and the higher likelihood of suicide attempts?

A.    Right.  They isolate those two aspects of the -- yes.

Q.    Okay.  Okay.  And finally, you would -- you would agree that there are peer-reviewed studies that have found no association between

**707**

AB Litigation Services

microaggressions and negative health outcomes for
transgender people, correct?

A.    Yes.

Q.    Okay.  And I don't believe -- you do not
cite any of those in your report, correct?

A.    Well, I mean those are the ones that I
include in the review by Kimber.

Q.    In the Kimber scoping review?

A.    Yeah.

Q.    Okay.  But you didn't separately cite any
of those --

A.    No.

Q.    -- listed here, correct?

MR. DRAPER:  Okay.  Why don't we take a
five-minute break, and then I'll come back and
potentially have no more questions, but we basically
reached the end of my questioning.  So if we could
just take a five-minute break, I'll come back and we
can see if there's anything more.

Does that sound good, Janna?

MS. FISCHER:  Yeah, that's fine.

(Break was taken from 11:47 a.m. to
11:54 a.m.)

MR. DRAPER:  We have no further questions.

MR. FRAMPTON:  All right.  I think that's

*AB Litigation Services*

They do separate interpersonal, and in that case, the media.  So I think everybody recognizes the interpersonal sphere, as I would say it's more primary maybe.

Q.    Okay.  Let me ask you this:  Within that interpersonal sphere, if a -- if a transgender person is interacting and the person they're interacting with deadnames the other person that they're with, would that still, in your mind, be a sort of interpersonal interaction, an interpersonal microaggression?

MS. FISCHER:  Objection; form.

A.    I think if I tried to imagine that hypothetical that you're giving, so there's two people who might be transgender, and one of them observed the other one being misgendered, I would think it would be a microaggression in the sense of what I described it for; that the deadnaming or using the wrong pronouns is really a message that has social context.

And in that sense, the two people experiencing it, even though it's directed at one, I would think they both see it as a disrespectful statement that applies to both of them.

Q.    (BY MR. FRAMPTON)  Okay.  And they --

based on your understanding in the literature, that interpersonal microaggression, they could perceive that as hostile, correct?

MS. FISCHER:  Objection; form.

A.    Yeah.  Again, I think most of the literature, I -- they ask about your personal experience.  I can't recall right now a measure that asked, you know, when it happened to somebody you were with, like in your hypothetical.

But I'm assuming that it will have a similar effect if it happened to you.  If we're talking about a public accommodation, you would have a sense that this person who is treating your person you're with with disrespect as far as their pronoun or name has negative feelings about transgender people in general, presumably.

Q.    (BY MR. FRAMPTON)  Okay.  And I guess, similarly, within the rubric of an interpersonal microaggression specifically in the public accommodation context, the misgendering could be like two employees of the store talking to each other about the person, correct, that they can hear?

MS. FISCHER:  Objection; form.

A.    I can see that.

Q.    (BY MR. FRAMPTON)  Okay.  And it would be

*AB Litigation Services*

reasonable for a transgender person, based on the

literature, to perceive that as objectively hostile,

correct?

                    MS. FISCHER:  Objection; form.

        A.    I can't say based on the literature

because as I said, I am not -- I can't recall right

now the studies that looked at it specifically, but

by extension, I would agree that that would send a

message of derision in that particular context.

                    So if the person observed it or if it was

addressed to them, I would think their understanding

of the establishment that they were at or the person

they were interacting with would be pretty similar if

they're both similarly situated.

        Q.    (BY MR. FRAMPTON)  Got it.  Do you have

any familiarity with a brand known as XX-XY

Athletics?

        A.    I am familiar with just -- I believe the

Complaint mentioned it.  I read it a long time ago.

I believe -- so my familiarity is very shallow, but I

believe that's one of the people -- one of the

establishments mentioned in the Complaint and that --

or one of the plaintiffs here.

        Q.    Okay.  Do you -- do you agree that a

transgender person viewing advertising material that

deadnames and misgenders people could cause them psychological distress?

MS. FISCHER:  Objection; form.

A.   Again, I don't have evidence for that.  So I really can't answer whether it would have that impact.  It definitely would be something that offends them maybe, but I don't know what impact it will have specifically on health and mental health.

Q.   (BY MR. FRAMPTON)  Okay.  Do you agree that a business's refusal to refer to a transgender person with that person's preferred name or pronouns can cause psychological distress?

MS. FISCHER:  Objection; form.

A.   I agree that a person experiencing that, the research shows, could lead to psychological effects again because of the message of derision, disrespect, or rejection.

Q.   (BY MR. FRAMPTON)  Do you agree that could cause the person to feel unwelcome or objectionable in that particular business?

MS. FISCHER:  Objection; form.

A.   I can only guess that probably, but it's again not something that I -- it seems by extension, that if they experience it, they would feel unwelcome.  But it's a little bit of speculating on

*AB Litigation Services*

how they would feel, and of course, people have
different feelings.

Q.    (BY MR. FRAMPTON)  Would it be reasonable
for the person to feel unwelcome or objectionable
based on being deadnamed or misgendered
intentionally?

MS. FISCHER:  Objection; form.

A.    Again, I feel -- I feel a bit out of the
scope because you're asking, in my personal opinion,
would it be reasonable?  I don't mind answering.  I
think it is reasonable for them because there's
clearly a message that this person or establishment
is not respecting them.

So anybody would want to feel respected in
their interaction with a business, so -- but again,
this is just based on my speculating here on what a
person might feel if they had confronted that.  It
makes sense that -- again, within the context of
rejection in general society, the stigma and
prejudice that I described earlier, the stereotypes
about transgender people, that they would take that
message to mean that.

Q.    (BY MR. FRAMPTON)  Okay.  And I think what
you've said that, in your mind -- in your
understanding, the literature would show that there

*AB Litigation Services*

Exhibit K.  It should be there.

(Deposition Exhibit K was marked for identification.)

A.   Yes, I got it.

Q.   (BY MR. FRAMPTON)  All right.  And that is a study that you cited in paragraph 22 of your report; is that right?

A.   Yes.  I haven't verified it was 22, but it is -- I believe I referred to it twice, actually, so in paragraph 19 -- no, sorry, paragraph 22.  Yeah, paragraph --

Q.   Okay.  So you're generally familiar with this study?

A.   Yes.

Q.   All right.  Go to page 6, if you would.

A.   Okay.

Q.   All right.  Do you see the sort of subheading, "Gender Affirmation"?

A.   Yes.

Q.   It says, "Social gender affirmation was assessed by asking participants whether they had disclosed their gender identity to one or more family members or coworkers," correct?

A.   Yes.

Q.   And in this section, that appears to be

*AB Litigation Services*

the only measure of social gender affirmation in the study, correct?

A.    Yes.

Q.    Okay.  And so that is not asking about deadnaming or misgendering, correct?

A.    Right.

Q.    And it's not even asking if people are going by their chosen names or pronouns, correct?

A.    Right.

Q.    And then if you go right above that on "Transgender-Related Discrimination," it says -- describes the measure that they used for assessing transgender-related discrimination, correct?

A.    Yes.

Q.    And that also did not ask specifically about deadnaming or misgendering, correct?

A.    Correct.

Q.    So someone could answer those questions, yes, and be talking about some other type of discriminatory event, right?

A.    Yes.

Q.    And then if we flip to page 13.

A.    Yes.

Q.    Go to the first full paragraph, second sentence, "Given our study's cross-sectional design,

it is not possible to make causal inferences."

Did I read that correctly?

A.    Yes.

Q.    And then the next sentence says, "Given that our measures were self-reported, it is possible that biases in recollection or reporting influenced the results."

Did I read that correctly?

A.    Yes.

Q.    And that's a general -- that's a general concern anytime that you've got self-reported metrics, correct?

A.    Which is almost any study, yes.

Q.    One way you can try to mitigate that is through a structured interview rather than just a survey; is that right?

A.    No, because a structured interview will also be self-report.  The only way to overcome self-report is by using other sources of data.  Some use -- I mean, I can explain more, but there's other ways to get data, but most studies use self-report because you have to rely on the participants to tell you what happened to them or how they feel, et cetera.

Q.    Right.  And that can be influenced by a

*AB Litigation Services*

variety of things, correct, their ability to recall?

A.    Yes, absolutely.  It's not perfect.

Q.    All right.  Go back to the McLemore study, which was Exhibit G.

A.    I got it.

Q.    And go to page 56.

A.    Yes.

Q.    First column, halfway down the page, it's got the subheading, "Misgendering frequency and felt stigma."

A.    Yes.

Q.    And in this study they did not distinguish among who was doing the misgendering, correct, whether it was a family member versus a stranger, correct?

A.    Correct.

Q.    So they were lumping together experiences with very close relations and experiences with people you may not know at all, right?

A.    Presumably.  They just asked, yeah, How often do people misgender you?  So anybody.

Q.    Okay.  If we go to page 58.

A.    Yes.

Q.    Bottom of the second column, couple of sentences after it reads, "One avenue for future

*AB Litigation Services*

research would be to examine how different situational and relational characteristics affect" --

A.    Excuse me.  Can you direct me again?

Q.    Oh, yeah, I'm so sorry.  Page 58.

A.    Yes.

Q.    Second column.

A.    Yeah.

Q.    Bottom of the page right above Table 4.

A.    Oh, okay.  Okay.  Go ahead.

Q.    Yeah.  So a couple of sentences up, do you see where it starts, "One avenue. . ."?

A.    Yes, thank you.

Q.    "One avenue for future research would be to examine how different situational and relational characteristics affect the subjective evaluation of misgendering as a stigmatizing experience.  For example, it would be useful to identify if the intimacy associated with the source of the misgendering leads to different appraisals of the experience.  In other words, being misgendered may be less psychologically impactful if the source is a stranger rather than a family member or friend.  Furthermore, it may be important to examine if the location or context in which an individual is misgendered affects how the experience is appraised."

*AB Litigation Services*

Did I read all of that correctly?

A.    Yes.

Q.    And so they're pointing out that those are things that might affect somebody's experience, but that they were not measuring in this particular study, correct?

A.    Correct.

Q.    And if we go to page 60.

A.    Yes.

Q.    Second paragraph under "Limitations," you see where I am?

A.    Yes.

Q.    They say, "Moreover, this study was cross-sectional and involved only self-report data. As a result, it is not possible to determine the causal direction of the variables examined in this study.  For example, it is entirely plausible that an individual who perceives transgender and gender-nonconforming individuals to be stigmatized in society more generally to also perceive themselves as misgendered more frequently.  Similarly, poor mental health may bias the reporting of experiences with misgendering, which could in part explain the observed relationships in this study."

Did I read that correctly?

*AB Litigation Services*

A.    Yes.

Q.    And they're just pointing out that there are -- that the causal arrow could go one way or the other based on this data, correct?

A.    Say it again.

Q.    Right.  They're saying that the --

A.    I just didn't hear your last sentence.

Q.    Yeah.  They're saying the causal arrow could go one way or the other based on this data?

A.    Yes, it could go in the reverse order, yes.

Q.    Go back to the Pullitt study or Pollitt. I apologize.  I don't know how to pronounce that person's name.

A.    Yeah, Pollitt, I think, is right.

Q.    Pollitt.  It's Exhibit E.

A.    Yes.

Q.    And go to page -- go to page 8, if you would.

A.    Okay.

Q.    The last sentence before "Discussion" -- before the "Discussion" section, it says, "Chosen name use at home and at school did not predict any negative health outcomes in this model."

Did I read that correctly?

A.   Yes.

Q.   So they're saying that whether a person was allowed to use their chosen name at home or at school was not a predictor of negative health outcomes; is that right?

A.   Yes.

Q.   Let me see.

A.   I just hesitate because I think they asked if they had it rather than if they were allowed to use it, and you said "allowed" to use it.

Q.   Okay.  Chosen name -- well, let's look at it.   Flip back to page 6.

A.   Yeah, it says, "Chosen name used."

Q.   Yes.  So it says -- well, first they ask, Do you have one, right?  But then if yes, they asked if you could go by it at home or at school, at work, or with friends, right?

A.   Right.

Q.   So when they're saying that it's not -- that chosen name use didn't predict negative health outcomes, they're talking about whether you're able to use it at home or at school, correct?

A.   Well, and I think I can just tell you what they say, which is, yeah, you could go by their name. You said "allowed."  I don't know if that was

*AB Litigation Services*

scale.  I will drop into the chat as Exhibit M a new one.

(Deposition Exhibit M was marked for identification.)

Q.    (BY MR. FRAMPTON)  If you would, please, take a look at that, and I'm simply -- question one, so you're loaded for it, is simply, does this appear to be the study that provided the microaggression scale for the Austin study?

A.    Okay.  Let me just look -- read this here.

Q.    Take your time, sir, please.

A.    Yeah, that's the study they're referring to.

Q.    Okay.  So if we look at Woodford, go to Appendix A and tell me if that appears to be the microaggression scale that was used.

A.    I'm just making sure that they use all those items.  Those are definitely the items.

Q.    Okay.

A.    So I think this is a shortened version, it looks like, but it is using the items.  It seems that they used 5 items and 4 items and so 20 items.  The Woodford lists 20 items.  I believe, from what I'm reading in the paragraph you pointed to, that they used 9 items.

*Ilan Meyer  - 01/30/2026*                    *153*
**4-App-212**

**722**

*AB Litigation Services*

Q. Okay. And they -- the Woodford scale is specific to LGBQ issues and not LGBTQ issues, correct, and they had to adapt it?

A. Yes.

Q. Okay. In the original version of the Woodford scale, it doesn't have any items that deal with deadnaming or misgendering, correct?

A. I think it -- that it would be the case. I didn't read all the items, but being that it's not directed at transgender people, yes.

Q. Okay. And from the Austin article, from their description, we don't know whether the adapted version asked about deadnaming or misgendering, correct?

A. Correct.

Q. So as we sit here today, this Austin study, we don't know if it even asked people about a deadnaming or misgendering microaggression, correct?

A. Correct.

Q. Look back at Woodford -- if we -- the original Woodford version included five items that it called "environmental microaggressions," correct?

A. Correct.

Q. And that included, like, seeing something on -- negative messages on social media, correct?

*AB Litigation Services*

A.    Yes.

Q.    Hearing people make jokes in their school or workplace, correct?

A.    Yes.

Q.    And although we don't know exactly how they did it, in the Austin study, they adapted that and asked about some kind of environmental microaggression as applied to transgender people, correct?

A.    They gave you some sample items, so -- or maybe one sample item.

Q.    One sample item?

A.    Yeah.

Q.    But we know that they did incorporate the concept of an environmental microaggression into that study, correct?

A.    Oh, yes.

Q.    All right.  Let me show you another Woodford study.  All right.  I'll show you what I'm going to mark as Exhibit -- I'm sorry.  My Zoom window went away when I tried to share it with you. I'm going to try again.  Showing you what I am marking as Exhibit --

MR. FRAMPTON:  Are we on N, Madam Court Reporter?

THE COURT REPORTER:  Yes.

(Deposition Exhibit N was marked for identification.)

Q.    (BY MR. FRAMPTON)  All right.  Let me know when you've got it open.  You got it?

A.    I got it.  Yeah, sorry.

Q.    Okay.  And is this also one of these studies identified in the Kimber scoping review?

A.    Yes.

Q.    Okay.  All right.  Scoot to page 427, please.

A.    I'm here.

Q.    Okay.  First column, last paragraph, do you see where it says, "For trans students, we used seven items to assess environmental microaggressions" -- I'll skip the parenthetical -- "and 18 items for interpersonal microaggressions"?

Do you see that?

A.    Yes.

Q.    Did I read that correctly?

A.    Yes.

Q.    Okay.  And it looks like they are -- they obtain the items from a different Woodford 2018 study; is that how it looks to you?

A.    I mean, the 2018 study assessed the

*AB Litigation Services*

psychometric properties.  It might be where they introduced the scale, but I'm not sure.

Q.   And if you flip to the -- to the references at the back, does it look like -- that Woodford 2018, does it look like they're citing to a conference presentation?

A.   Yes.

Q.   Okay.  And so that would not be available in the peer-reviewed literature, correct?

A.   Some conferences would publish abstracts. I am not familiar with this conference, and I don't know if they would, but not -- the entire paper typically would not be available like that.

Q.   Okay.  So as we sit here just looking at this study, we don't know if they asked about deadnaming or misgendering as part of their microaggression scale, correct?

A.   I have to look at how they describe the measure.  Sorry.

Q.   Sure.  Page 427, go ahead and review that.

A.   Yes, I believe that's true.

Q.   Okay.  And this study also included the concept of an environmental microaggression, correct?

A.   Yes.

Q.   The idea being there's something

disrespectful in the person's environment, but not necessarily happening in an interpersonal interaction, right?

A.    Yes.  I mean, when you say "environment," it's not as vague, but access to bathrooms and things like that that affect a person, but they're not happening in an interpersonal way.  So it seems like they measured the environment and presumably how it affects the person in question, but it is not an interpersonal interaction.

Q.    Right.  And that might include, per that last study we looked at, something like what they see on social media?

A.    I think here they asked about things like -- they had in the LGBT scale, which we looked at just now, which were more like -- it did include one question about social media, but some of it was, you know, about the school environment.  I mean, four of the five that were listed in the other Woodford article were asking about the school environment.

Q.    Right.  Things like what people are saying around them, correct?

A.    And I think what the school environment is more generally.  So I think when they say -- I hear someone say, That's so gay, they're referring to kind

of the school policies about things like that.  So if you hear it, it means that, presumably, the school doesn't monitor or ban that kind of language, things like that.

Q.    Go in Woodford to -- I'm sorry, Woodford (2018), go to Table 3, which is on page 431.

A.    Okay.

Q.    And if you look at the bottom half where they're looking at trans students, do you read this table to say that there was no statistically significant association between either environmental or interpersonal microaggressions and suicide attempts?

A.    So it looks like there's a definition of "victimization."  You were asking about the microaggressions?

Q.    Yeah.  We can look back at the definition of "victimization," but I was asking about microaggressions.

A.    I'm sorry.  The two microaggression items were not associated with increased risk in a significant level.

Q.    All right.

A.    Although significance level is not the only thing I would look at, but the significance

*AB Litigation Services*

him, that would be microaggression, yes.

But I can see other examples where maybe -- and as I said, the term "microaggression" is being used in many ways, and I don't typically use it so much myself.  I like to be more specific and precise, but as an umbrella term, it refers to a lot of incidents like that that a person might take offense to.

Q.   Sure.  Let me ask you it this way, then: You've said that -- you know, if you and I are talking, and you say, My pronouns are he/him, and I say, Well, I don't use those.  I'm calling you she/her, that would be an interpersonal microaggression, correct?

A.   I think so.  I think I would experience it like that.

Q.   Right.  So then let me -- let me change the scenario a little bit and try to understand where it would fit.  If a transgender person walks into a store, and the store has a big sign that says, We will only use biologically based pronouns in language.  If you were born male, we'll refer to you as "Mr." and "he."  Don't bother asking for other pronouns.  We won't use them.

MS. FISCHER:  Objection; form.

*AB Litigation Services*

Q.   (BY MR. FRAMPTON)  As you understand it, would seeing that sign count as an -- either an interpersonal or an environmental microaggression?

MS. FISCHER:  Objection; form.

A.   I think so, because, again, the main characteristic there is I'm going to -- you're not going to be respected as a transgender person in this environment; and moreover, you won't be even served maybe.  I don't know what the example was.  So, yeah, I would say yes.

Q.   (BY MR. FRAMPTON)  Okay.  Do you know who Dylan Mulvaney is?

A.   I'm sorry?

Q.   Do you know who Dylan Mulvaney is?

A.   Can you remind me?

Q.   Identifies as a transgender female, social media presence, got into a controversy over -- with Bud Light a few years ago.

A.   The Coors person?

Q.   I think it was Bud -- Bud Light, but yeah.

A.   Oh, Bud, yeah, yeah.  I remember.  I mean, I obviously don't know her, but yes.

Q.   Okay.  Then I'm going to show -- let's look at what I am going to mark as Exhibit O.  It's a video, so I'm going to ask you to play it.

*AB Litigation Services*

A.   Are you sending it on the chat?

Q.   I am putting it in the chat.  It looks like it just went through.

A.   Okay.  Hold on.

Q.   Just let me know if you're able to play it.

(Deposition Exhibit O was marked for identification.)

Q.   (BY MR. FRAMPTON)  Sorry.  It got loud on mine.

A.   Yeah, I think I can play it.

Q.   Go ahead and play it and look at it, and then I'll ask you a couple of questions.  Just let me know when you're done.

(Deposition Exhibit O was played.)

A.   Okay.  I've viewed it.

Q.   (BY MR. FRAMPTON)  All right.  And my question is, could a transgender person seeing that video on social media experience that as an environmental microaggression?

A.   Again, we're asking for a lot of generalizations here, but again, they could, of course.

Q.   Well, would that fit within, like, an adapted version of Woodford's scale where you see

*AB Litigation Services*

something on social media that disrespects transgender people?

A.    Yes.

Q.    Okay.  So it would fit as something someone could sort of check the box, I experienced that as a microaggression?

MS. FISCHER:  Objection; form.

A.    I think so, yes.

Q.    (BY MR. FRAMPTON)  Okay.  We've been talking a lot -- we talked about misgendering generally, and I guess just let me make sure as I break down that word.  In your understanding, what are we referring to when we refer to "gender"?

A.    Well, gender is the expressed and experienced gender, whether the person experiences themselves as male, female, transgender, nonbinary, which could be -- although most often it's not different than their, what we call, sex assigned at birth.  Some people call it "biological sex."

Biological is a bit of a misnomer even in that ad because biology is a lot more complicated than XX-XY, but I understand their point of the ad, of course.  It's not a biology lesson.

Q.    Got it.  And so misgendering is simply, in some form or fashion, treating someone out of

CONFIDENTIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

------------------------------------------------

30(b)(6) DEPOSITION OF COLORADO CIVIL RIGHTS
DIVISION as given by AUBREY C. SULLIVAN
January 19, 2026

------------------------------------------------

Plaintiffs:

DEFENDING EDUCATION, et al.,

v.                                    Civil Action No.
                                      1:25-cv-01572-RMR-MDB
Defendants:

AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.

Plaintiff:

COMMITTEE OF FIVE, INC.,
d/b/a XX-XY ATHLETICS,

v.                                    Civil Action No.
                                      1:25-cv-01668-RMR-MDB
Defendants:

AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.

Plaintiff:

DOXA ENTERPRISE, LTD., d/b/a
BORN AGAIN USED BOOKS,

v.                                    Civil Action No.
                                      1:25-cv-02177-RMR-MDB
Defendants:
AUBREY C. SULLIVAN, Director
of the Colorado Civil Rights
Division, in her official
capacity, et al.
------------------------------------------------

complainant provides the facts of what happened, so why they believe they were discriminated against or experienced an adverse action based on a protected class.

Q    And why does the division make online charges available?

MS. PASSAMANECK:  Objection; form.

A    So the division is not making online charges available.  They are making the online filing process to file a charge available.  And one of the reasons that they do this is for ease of use for the parties on both sides and accessibility as well.

Q    (By Mr. Martin)  So you would say it's important to the department to make it easy to file a charge?

MS. PASSAMANECK:  Objection; form.

A    I think that the division looks to be efficient.

Q    (By Mr. Martin)  Okay.  Do you know approximately how many charges against places of public accommodation the division receives through intake each year?

A    I'm not sure of exact numbers.  And to clarify, we're talking about just cases of public

or the attorney general?

MS. PASSAMANECK: Objection; form.

A   I think that if the situation arose, that the division and the commissioner would work with our respective counsel to determine what that process would look like.

Q   (By Mr. Martin)  Does the division have a position on whether deadnaming and misgendering impose a significant societal or community impact?

A   No.

Q   And could the commission, a commissioner, or the attorney general file a charge without identifying an aggrieved person?

A   No.

Q   So if you were to receive a charge from the commission or commissioner or the attorney general that identified a discriminatory practice that they discovered that a place of public accommodation was engaged in, but they did not identify an individual who had been discriminated against by that practice, how would the division analyze that charge?

MS. PASSAMANECK: Objection; form.

A   Without a complainant or a charge of discrimination, the division wouldn't have

AB Litigation Services

jurisdiction to investigate.

Q   (By Mr. Martin)  Well, let's say that you did receive a charge from the attorney general, but -- but the charge just did not identify a person that experienced discrimination under the practice.  You are saying that the division would not have jurisdiction to analyze that charge?

MS. PASSAMANECK:  Objection; form.

A   If we received a charge, we would consult with counsel to determine whether we had jurisdiction and whether the charge in itself satisfied jurisdictional requirements for filing.

Q   (By Mr. Martin)  Okay.  So if the attorney general were to see a publication that he believed violated CADA and imposed a significant societal or community impact and filed a charge with the division stating that the publication was discriminatory under CADA, could the division proceed with such a charge?

MS. PASSAMANECK:  Objection; form.

A   Again, it would depend on facts and context, and because we've never seen such a case before, we would consult with counsel before continuing or moving the case further.

Q   (By Mr. Martin)  Generally speaking,

*AB Litigation Services*

witnessing the publication be an adverse action

that provides the division with jurisdiction to

investigate that charge?

MS. PASSAMANECK:  Objection; form.

A     So the division has never received a

charge based on written communications.  And so to

that end, because we haven't seen one before, we

would look at all of the facts and circumstances

and we would likely consult with counsel.

Q    (By Mr. Martin)  Could the division move

forward with an investigation on a charge that was

based solely on a publication?

MS. PASSAMANECK:  Objection; form.

A     The division would look to its intake and

investigations manual and the regulations that

govern CADA to determine whether they have

jurisdiction over the charge.  And every case is

different, so it would depend on the facts and

circumstances.

Q    (By Mr. Martin)  Okay.  Would you

describe the process of transferring a submission

through intake into a perfected complaint?

A     Sure.  So a potential charging party

files either online using the online filing system

or using a paper intake packet, and they submit

that information to the division.

The division's intake team then reaches out to the prospective complainant and facilitates an interview to collect information regarding what happened, what they experienced, why they believe that they were discriminated against based on a protected class.

If there is information that shows that we have jurisdiction in looking at the intake and investigations manual and applicable regulations, then the division will process the charge, and the charge will be sent to the complaining party for signature, and then it is deemed as filed.

Q    All right.  And how does the division confirm a jurisdiction when it receives a charge?

A    The division is guided by its intake and investigations manual as well as the regulations that govern CADA.

Q    Are there any specific elements that the division employs when assessing jurisdiction?

A    The division looks to the intake and investigations manual and regulations that govern CADA to help determine jurisdiction.

Q    And what are the different bases that the division looks for to determine that it has

*AB Litigation Services*

the claim prior to an investigative finding.

If they don't participate in mediation, then the case goes to investigation.  During the investigative process, evidence is collected, witness statements are taken, looking at statements from other people; for example, employees.  The division may collect affidavits.  The division may collect comparative data.

All of the evidence is analyzed, and then a recommendation is made as to whether there is cause for discrimination or not.

Q    Okay.  Does the division investigate every perfected complaint that it receives?

A    So as I said before, if the division has jurisdiction over a case, it typically conducts an investigation.  However, there is also an opportunity for mediation, and there are a fair number of cases that go to mediation and do not result in a finding.

There are also other circumstances where the division will dismiss a case, such as if the parties withdraw a case and decide that they don't want to continue the process.  Sometimes that happens pursuant to settlement when they've reached an outside settlement.

The parties can also request a right to sue.  So perhaps if they want to take the case -- if they have other claims that they wish to consolidate and they want to take the case to court, they can request a right to sue, and the division would not be looking at that.

Q    Okay.  You mentioned that the division may request documentation from respondents or complainants.  What kind of documentation is normally requested from a respondent during the investigation phase?

A    Every case is different, so it depends on the facts of a specific case.  We collect evidence that is relevant to whether -- to the analysis of whether discrimination occurred.

Q    So that could include financial information about a business, a respondent?

A    Possibly.

Q    Could it possibly include personnel files?

A    Yes.

Q    Could it possibly include emails or text messages?

A    Yes.

Q    And does the division also compound

AB Litigation Services

written questions for respondents and complainants during the investigation process?

A    Yes.

Q    Do those take the form of an interrogatory or some other form?  Can you describe how you would have written questions sent?

A    So that would be called a request for information, and it's a process -- it's a standard process for all kinds of cases, that is sent to the respondent or complainant during the investigative process in writing.  And the parties have an opportunity to provide a response to that request for information.

Q    Okay.  If the respondent does not respond to a request for information, how would the division respond?

A    The division typically reaches out when a respondent doesn't respond or isn't responsive and sends a demand letter.

Q    And if the respondent still did not provide the information requested after the demand letter, what would the division next do?

A    The division may possibly subpoena, send a subpoena to the respondent in an attempt to get the information.

AB Litigation Services

Q    Okay.  And how would that subpoena be enforced?

A    The subpoena would be -- if necessary, which we do not typically see during our process -- we would work with counsel on that process.

Q    And if the subpoena would go to the enforcement stage with the court, would the attorney general's office prosecute that subpoena?

A    I cannot speak to what the attorney general's office would do.  That is outside of my process.

Q    But it would be that office that would have the responsibility of enforcing that subpoena in court; is that correct?

A    I believe so.

Q    Who makes the decision on whether to proceed with enforcing a subpoena if a respondent does not comply with a request?

A    That has so rarely, if ever, happened that we would typically consult with counsel prior to making a decision on whether to pursue enforcement.

Q    Do you have any written policies on determining whether to proceed with enforcing a subpoena or not?

whether or not to recommend a complaint to the commission?

A   The division uses its intake and investigations manual, the regulations that govern CADA, and consults with counsel.

Q   Do you have an estimate on approximately what percentage of complaints that -- where probable cause was found, what percentage of those are recommended to the commission?

A   I can't speculate.  Sitting here, I can't think of an exact number.

Q   Would you say that most of the time -- if the division finds probable cause in a complaint and the parties don't settle, most of the time the division would recommend that a hearing will be set with the commission?

A   No, I would not say that.

Q   So less than half?

A   Yes.

Q   And can you describe the hearing process for the commission, generally?

A   I can't speak to the hearing process because that's outside of the division's process.

Q   Who represents the interests of the complainant during the hearing process before the

*AB Litigation Services*

they wouldn't necessarily have experienced unequal treatment; is that right?

MS. PASSAMANECK:  Objection; form.

A    I think there's two parts to the question that you're asking.  We would need to know if the statement in itself was actually discriminatory.  We would have to analyze that.  The division has never looked at any cases based on written communications, so we would consult with counsel.

Q    (By Mr. Martin)  But there's nothing prohibiting you from proceeding if the complainant merely witnessed the publication; you could possibly proceed with investigating that charge?

A    If the division has a complainant and establishes jurisdiction, then we can proceed with investigation.

Q    So if, let's say, an African American individual were to witness a publication posted by a place of public accommodation that said, "Whites Only," and that person filed a charge with the division, would the division consider that complainant to be an aggrieved person?

A    Yes.

Q    Okay.  So on what basis would you conclude that person was an aggrieved person under

the regulations?

A    You're talking about signage in this specific example, correct?

Q    Yes, a sign.

A    So the signage in the example that you provided is indicating that an individual will be denied goods, services, privileges, facilities, advantages, accommodations, et cetera, based on a protected class, or that the individual would be -- their presence or patronage would be unwelcome at a place of public accommodation based on a protected class, and because of that, that would meet jurisdictional requirements for taking the charge.

Q    Okay.  So then it is enough for jurisdiction that the individual merely read the sign, even if no one actually interacted with that person from the place of public accommodation?

A    I wouldn't say it like that.  The preliminary issue before determining whether there is jurisdiction is the division would also have to know if the place is actually a place of public accommodation.

Q    Assuming that it is a place of public accommodation in the scenario I presented, for the individual to be aggrieved, he would not have had

to actually speak with someone from the place of public accommodation?

A    If an individual is alleging differential treatment based on a protected class, and the division, in using its intake and investigations manual and applicable regulations, determined that there is jurisdiction, it will take the case.

Q    Okay.

MS. PASSAMANECK:  We've been going almost an hour, do you want to take a break?

MR. MARTIN:  This is a good point.

(Break taken from 9:07 a.m. to 9:18 a.m.)

Q    (By Mr. Martin)  Earlier you had mentioned that, to your knowledge, the division has not received a charge from the attorney general. What basis do you have to make that determination? Why do you believe that the division has never received such a charge?

A    It's based on the time that I have worked at the division, I have never seen that happen.

Q    Okay.  And I'd like to go back to the CCRD rules and regulations, specifically 10.12(C)(1), and this is the rule concerning charges initiated by the commission, a commissioner, or the attorney general.  The last

division would investigate?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Martin)  Okay.

(Exhibit 4 was marked.)

MS. PASSAMANECK:  Counsel, this appears cut off.  You're missing Number 10 in the list of definitions.  You may not be going there, but the record should reflect that this is not a complete copy of C.R.S. 24-34-301.

MR. MARTIN:  Okay.  We'll have it on the record, but I won't be asking about that specific definition.

MS. PASSAMANECK:  Okay.  And if for some reason, Ms. Sullivan, you know what 10 is or 24 is and need them for any answers, let me know and we'll figure out what to do at that point.

Q    (By Mr. Martin)  All right.  So this is Section 24-34-301 of the Colorado Anti-Discrimination Act, and we're going to go to Section 15(a), which states, "Person means one or more individuals, limited liability companies, partnerships, associations, corporations, legal representatives, trustees, receivers, or the state of Colorado and all of its political subdivisions

and agencies."

Is this the definition that the division uses to define a person under the Colorado Anti-Discrimination Act?

A    Yes.

Q    Based on this definition, could a civil rights advocacy group file a complaint of discrimination?

MS. PASSAMANECK:  Objection; form.

A    The division has never seen a case like that before, and so it would likely consult with counsel.  But this says one or more individuals, limited liabilities companies, partnerships, associations, corporations, legal representatives, trustees, receivers, et cetera.  So we would likely use the definition in determining whether we have jurisdiction to take a charge.

Q    (By Mr. Martin)  And if that civil rights advocacy group was a limited liability company or a partnership or a corporation, then it would be a person who could have experienced discrimination under CADA and file a complaint, correct?

MS. PASSAMANECK:  Objection; form.

A    A person here, person, has to allege discrimination based on a protected class.  It

would depend on the facts and circumstances of that specific case. And again, because we've never had that happen, we would likely consult with counsel before moving forward, if at all.

Q  (By Mr. Martin)  Assuming they do allege discrimination, would the division at least conclude that that limited liability company or partnership, that's also a civil rights group, could at least be a person and that has jurisdiction to file a complaint?

MS. PASSAMANECK:  Objection; form.

A  Again, because it's a context and facts that I've never seen before, I would consult with counsel prior to making any conclusion.

Q  (By Mr. Martin)  And after consulting with counsel, the division would make the final determination on whether or not that organization is a person, correct?

MS. PASSAMANECK:  Objection; form.

A  The division would make the determination, but they take advice from counsel.

Q  (By Mr. Martin)  All right.  And do you have any policies that would prohibit the division from investigating a charge brought by a civil rights group?

MS. PASSAMANECK:  Objection; form.

A    Not to my knowledge.

Q    (By Mr. Martin)  Okay.  So you would -- you could not say that the division would not investigate a charge alleging discrimination brought by a civil rights group that was, say, a corporation?

MS. PASSAMANECK:  Objection; form.

A    Again, the division has never received such a charge and has never seen that situation. It would be fact and context dependent, and we would consult with counsel prior to making a decision, and I can't say how we would handle it definitively.

Q    (By Mr. Martin)  But it is possible that the division could move forward with a complaint brought by such a group?

MS. PASSAMANECK:  Objection; form.

A    It's possible, but again, that has never occurred.

Q    (By Mr. Martin)  All right.  Let's go to the next exhibit.

(Exhibit 5 was marked.)

Q    (By Mr. Martin)  All right.  This is Exhibit Number 5, Section 24-34-600.3 of CADA, and

a wide array of businesses to be a place of public

accommodation in order to prevent discrimination?

MS. PASSAMANECK:  Objection; form.

A    The division processes charges of

discrimination in a consistent and standard manner

using the intake and investigations manual and

statute and regulations.

MR. MARTIN:  All right.

(Exhibit 6 was marked.)

Q    (By Mr. Martin)  I'll give you a moment

to review it if you need it, but do you recognize

this document?

A    This looks like it is some sort of

training document that maybe came from outreach at

CCRD.  I don't know the date of the document or

whether this is updated or when it was created.

Q    Okay.  This is a document that we

received in discovery and the PDF said it was --

the title said it was from October of 2025.  Does

that sound like the time that this could have been

produced?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Martin)  Okay.  And who developed

the content in this document?

*AB Litigation Services*

A    The content would have been developed by a CCRD's outreach staff.

Q    Okay.  And how would that have used it?

A    So this typically would have been provided during an online training on public accommodations.

Q    Okay.  And who would be the recipients of that training?

A    The trainings are open to the public.

Q    And how is the public made aware of these trainings?

A    The trainings and dates thereof are posted on the division and commission's website online.

Q    And to your knowledge, does the division still employ this particular PowerPoint in its trainings?

A    I cannot say without checking with my outreach manager whether this specific training is being used right now.

Q    Would you say that the training PowerPoint here accurately describes the division's policies and practices?

MS. PASSAMANECK:  Objection; form.

A    Without taking the time to review the

entire document, I cannot say with certainty, but from my limited review of it sitting in front of me, it does look like at least some of it is applicable.

Q    (By Mr. Martin)  We're just going to look at one slide in it in particular.  If you need to reference something, you can.  But let's go to CCRD002198.

MS. PASSAMANECK:  Ms. Sullivan, just so you're aware, what he's referring to are the Bates numbers at the bottom right-hand, and those are put on in producing documents to opposing counsel.

THE DEPONENT:  Thank you.

Q    (By Mr. Martin)  His slide says, "Public Accommodation Examples," and it says, "Public accommodations are any place we are when not at home, work or school," and then it lists a few examples as well.

Would you say this accurately describes how the division defines a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    To me it looks like this PowerPoint presentation was created to give a training to the general public.  So I think that the verbiage used

AB Litigation Services

in here is meant to make it easier and more

digestible for the public versus the division in

processing charges of discrimination.

The division uses the intake and

investigations manual, regulations governing CADA,

and statute.

Q    (By Mr. Martin)  So the division would

not use this definition to determine what a place

of public accommodation is?

A    No.

Q    Why, then, did it feel comfortable

sharing this to the public if it's not what it

itself uses to define a place of public

accommodation?

A    I can't speak to the person's intent who

created this document, because I did not create it,

but as I stated, perhaps they were trying to make

this more digestible for the general public, rather

than someone who works for division staff and is

using the intake and investigations manual,

regulations, and statute.

Q    And so what would you say is different --

I'll start over.

What is different about the division

staff definition of a public accommodation from

*AB Litigation Services*

this definition provided from the training?

MS. PASSAMANECK:  Objection; form.

A   The division is following its intake and investigations manual, the regulations that govern CADA, and statute to define a place of public accommodation.

Q   (By Mr. Martin)  And in reviewing those resources, is it reasonable to say the division would conclude that this definition is, in fact, what a place of public accommodation means?

MS. PASSAMANECK:  Objection; form.

A   To clarify, are you asking if the division is looking at regulation, statute, and its intake and investigations manual if it's going to determine that this, on this page, 2198, meets the definition?

Q   (By Mr. Martin)  Correct.

MS. PASSAMANECK:  Same objection.

A   I think that this training document is extremely broad and, as stated before, is directed at a different audience.  Whereas, division staff would not necessarily say that this, the items on this -- these are pictures in this.  And the division staff is going to use the intake and investigations manual and regulations and statute

to determine what a place of public accommodation

is.

Q   (By Mr. Martin)  Aside from the intake

and investigations manual, regulations, and

statute, are there any other documents or policies

or guidelines that the division uses to define a

place of public accommodation?

A   The intake team would also have the

opportunity to work with division management.  And,

again, if we have facts or context that we have not

seen before, we consult with counsel in the

attorney general's office.

Q   Okay.  Would you say that an online

business without a physical storefront could

qualify as a place of public accommodation under

CADA?

MS. PASSAMANECK:  Objection; form.

A   It depends on the facts and circumstances

regarding that online business.  The online

business would have to engage in sales to the

public and offer services, facilities, privileges,

advantages, or accommodations to the public.

Q   (By Mr. Martin)  If the online business

were to do those things, offer sales and goods to

the public, it could qualify as a place of public

context of that place.  I can't say definitively without more information.

Q    (By Mr. Martin)  Does the fact that a business engages in issue advocacy have any impact on how the division analyzes whether or not it's a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    The division would use this definition and applicable regulations to determine whether the entity is a place of public accommodation in any case that is filed consistently.

Q    (By Mr. Martin)  And so if a business that did sell goods to the public was also engaged in issue advocacy, it is then possible that it is also a place of public accommodation; is that correct?

MS. PASSAMANECK:  Objection; form.

A    If the business is engaged in any sales to the public and offering services, facilities, privileges, advantages, or accommodations to the public, it is possible.

Q    (By Mr. Martin)  All right.  Let's go to Exhibit 7.

(Exhibit 7 was marked.)

Q    (By Mr. Martin)  And this is Section

A    Without information, facts, and context developed during a case, the division would not make a determination that disparate impact occurred, et cetera.

Q    (By Mr. Martin)  What additional facts would be needed in that scenario to determine that discrimination had occurred?

A    Well, first, the division would need to determine whether the entity that was being visited was actually a place of public accommodation and whether the prospective complainant was filing a case alleging differential treatment based on a protected class to establish jurisdiction to even take the case for investigation.

And then during the investigation, the full facts and circumstances would be collected; and without more information on specific facts and circumstances, I wouldn't want to speculate.

Q    (By Mr. Martin)  So let's say that in this scenario, an African American man requested to sit on the patio, and the restaurant owner came and said, I'm sorry, the patio is only available for white customers, so I'm not going to seat you out there.  And then the individual left the restaurant, was not served, and filed a charge of

*AB Litigation Services*

discrimination.  In that scenario, would you say that the complainant received disparate, unfavorable treatment by the restaurant owner?

MS. PASSAMANECK:  Objection; form.

A    So to clarify, you're asking about an actual interaction?

Q    (By Mr. Martin)  Correct.

A    So the division, before making a determination, would look to see whether or not the place of public accommodation was denying this individual goods, services, facilities, privileges, advantages, or accommodations based on the individual's protected class or that the individual's presence or patronage was unwelcome or objectionable based on a protected class prior to making any sort of determination; and that determination would be fact and context specific.

Q    In that scenario, would the division consider access to the patio to be a service, facility, privilege, advantage, or accommodation under CADA?

A    Under the limited facts that you provided, yes, it's possible.

Q    And if the restaurant owner explicitly said to the complainant patron, We will not allow

A    I think that, according to CADA, that -- sorry, I got kind of lost in there.  Can you please restate your question?

Q    (By Mr. Martin)  Would you agree that, along with the regulations, CADA also requires that businesses make available restrooms to individuals based on their gender expression?

MS. PASSAMANECK:  Objection; form.

A    I believe that CADA and the regulations are two separate guiding principles that are used to determine whether an individual has been denied goods, services, facilities, privileges, advantages, or accommodations.

Q    (By Mr. Martin)  So restrooms could be one of those facilities regulated under CADA, correct?

A    I believe so.

Q    And if a business were to deny a transgender man access to a men's restroom, would that be providing, that facility, unequal terms based on that individual's protected status?

MS. PASSAMANECK:  Objection; form.

A    That would depend on the specific facts of the interaction, and analysis would need to be done to determine, first, whether the entity was a

and the division didn't believe that that interaction rose to the level of harassment, you're saying the division would not conclude that the restaurant violated CADA?

MS. PASSAMANECK:  Objection; form; misstates testimony.

A     For an interaction to be found to violate CADA, the interaction has to show that the place of public accommodation treated the complainant differently intentionally, intentionally treated the complainant differently based on the complainant's protected class, and then the complainant has to subjectively experience that treatment to be the denial of goods, services, facilities, privileges, advantages, or accommodations because of their protected class.

And then, lastly, the division has to objectively determine that a reasonable person under the same circumstances as the complainant would have experienced that interaction to be a denial of the goods, services, facilities, privileges, advantages, or accommodations based on their protected class.

So all of those are taken into account and are very fact and context specific.

*AB Litigation Services*

Q    (By Mr. Martin)  In that description, you didn't mention harassment.  So when does the division determine whether or not a denial needs to rise to the level of harassment to violate CADA?

A    The analysis that I just stated in terms of the intentional, that is the analysis that is used for harassment.  It is when an individual is intentionally treated differently based on protected class and the place of public accommodation creates an environment that is both subjectively and objectively hostile based on that person's protected class.

MS. PASSAMANECK:  Counsel, we've been going over an hour.  Should we take a break?

MR. MARTIN:  I have a few more questions on this, and then we can take a break.

MS. PASSAMANECK:  I want to take a break now.

MR. MARTIN:  Can I just ask a few more, and then --

MS. PASSAMANECK:  I will give you three more, but I don't want the situation where we go on for another 20 minutes.  So three more questions.

MR. MARTIN:  Okay.  I will not go on for another 20 minutes, for sure.

*AB Litigation Services*

goods, services, facilities, et cetera, based on protected class.

MR. MARTIN:  Okay.  We'll take a break there.

(Break from 10:25 a.m. to 10:36 a.m.)

Q   (By Mr. Martin)  All right.  Going back to the PowerPoint here.  This also states, lists, "Refusal to accommodate an individual's transition or gender identity expression."

Can you describe what it means for a place of public accommodation to refuse to accommodate an individual's transition or gender identity expression?

A   I think it would be fact specific.  It depends on the context of the case.  But I think an example might be the restroom example you just gave.

Q   Is using an individual's chosen name a part of accommodating an individual's transition or their gender identity expression?

A   I think it could be a part of the analysis.

Q   And using a person's preferred pronouns, would that also be a part of accommodating an individual's transition or gender identity

expression?

A    Again, I think it's fact specific and context specific, but I think it could be part of the analysis.

Q    And when you say it would be part of the analysis, can you describe what you mean by that? What part of the analysis would that play?

A    I think that we are looking at the sum of all of the circumstances to determine whether the individual was denied goods, services, facilities, privileges, advantages, or accommodations based on their protected class.

Q    Do you believe that accommodating an individual's transition or gender expression is an accommodation as that term is used in CADA in the denial clause?

MS. PASSAMANECK:  Objection; form.

A    Can you give me a second to look at the definition in CADA?

Q    (By Mr. Martin)  Yes, sure.

MS. PASSAMANECK:  I think that's Exhibit 7.

A    So to be clear, you are asking me if refusal to accommodate an individual's transition or gender identity expression would be a denial of

an accommodation?

Q    (By Mr. Martin)  Correct.

MS. PASSAMANECK:  Objection; form.

A    I think it's possible.  I think it would depend on the specific facts of what happens and the circumstances.

Q    (By Mr. Martin)  What kind of facts would be needed for the division to determine that, in such a circumstance, there was a denial of an accommodation under CADA?

A    We're looking for facts that would show that the individual was denied goods, services, privileges, facilities, advantages, or accommodations because of their protected class. So facts would have to support that.

Q    And in the instance of someone misgendering or deadnaming, let's say a public accommodation misgendered or deadnamed an individual, a patron at their place of public accommodation, what facts would the division look to to determine whether or not that amounted to a denial of a facility, good, service, accommodation under CADA?

A    So just to clarify, now we're only talking about -- we're talking about just

misgendering and deadnaming?

Q    That's right.

A    Okay.  So that would go to what I was discussing before the break where the place of public accommodation has to -- we have to show that the place of public accommodation intentionally deadnamed or misgendered the individual based on that person's protected class, here gender identity, and that that deadnaming or misgendering rises to the level of harassment.

Q    Okay.

A    And so that harassment means that the individual subjectively experienced the conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations at a place of public accommodation because of their gender identity, and the division would have to objectively determine that an individual under the same circumstances as the complainant would experience that deadnaming or misgendering, the conduct, to be a denial of goods, services, privileges, facilities, advantages, accommodations at the place of public accommodation based on the individual's protected class.

Q    And let's just back up one moment.  Would

*AB Litigation Services*

you define how the -- or how does the division define misgendering?

A    So misgendering is referring to an individual by a gender other than their preferred gender or how they identify.

Q    And how does the division define deadnaming?

A    Deadnaming is the use of an individual's birth name -- an individual that is transgender or nonbinary, the use of their birth name after they have changed their name following a gender transition.

Q    Okay.  So let's say that the division received a complaint by a patron at a place of public accommodation and the division concludes this is a place of public accommodation, it has jurisdiction.  The individual was deadnamed or misgendered, and they asserted in their charge that they felt that that was discriminatory.  Would that be enough for the division to conclude that the complainant had met that subjective prong of the analysis that you mentioned?

MS. PASSAMANECK:  Objection; form.

A    So to be clear, you're just asking if the complainant saying that they experienced the

conduct as a denial of goods, services, et cetera, is enough to make meet the subjective part of that?

Q    (By Mr. Martin)  Right, they said they felt discriminated against.

A    Yes.

Q    I'd like to go back to this Appendix D, Exhibit 3.  When the division analyzes claims that someone was misgendered or deadnamed at a place of public accommodation, would it employ these elements under Enjoyment of PA Provision here under Appendix D?

A    This would be part of the analysis, yes.

Q    What else would be part of the analysis?

A    The division would also look to the regulations governing CADA, such as Rule 81.6.

Q    Okay.  And is it possible that an investigator could rely solely on these elements without going to Rule 81.6 to analyze a claim alleging deadnaming or misgendering in a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    The language contained in 81.6 isn't part of this, but it is implicit in the analysis of whether harassment occurred during allegations involving deadnaming or misgendering.

Q    (By Mr. Martin)  Okay.  So it's possible that division staff could find probable cause on a claim of misgendering or deadnaming in a place of public accommodation by just referencing these elements without going to Rule 81.6 to make that determination?

MS. PASSAMANECK:  Objection; form.

A    So, no, I would not say that.

Q    (By Mr. Martin)  Okay.

A    So for deadnaming or misgendering to be considered discrimination, they would have to rise to the level of harassment, and that analysis would require the analysis that's discussed in 81.6 as I discussed prior.

Q    Do you have any -- I'll strike that.

Have you instructed division staff that when they are reviewing claims of misgendering or deadnaming by a place of public accommodation, that they need to employ Rule 81.6 in that analysis?

A    I wouldn't say that, but I think that it is understood at the division that 81.6 is implicit in the analysis of those types of claims.

Q    Okay.  All right.  Let's go to the next exhibit here.

(Exhibit 9 was marked.)

determination.  Would you like me to speak to the first or the --

Q    (By Mr. Martin)  I'm asking about the objective.

A    Okay.  So to be clear, are we -- to give this some context, because everything depends on facts and context, are you asking about a misgendering or deadnaming interaction?

Q    That's correct, yes.

A    Okay.  So for the objective part of the analysis, the division would have to determine that a reasonable person under the same circumstances as the complainant would experience the conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation based on that individual's protected class, here, gender identity, because it's involving deadnaming or misgendering.

Q    Could there ever be an instance where a place of public accommodation intentionally misgendered or deadnamed a patron in an interaction in a way that wasn't objectively discriminatory?

MS. PASSAMANECK:  Objection; form.

A    So intentional deadnaming and

misgendering are not per se CADA violations.  A situation such as that would be fact and context specific, and it would have to rise to the level of harassment.

So the complainant -- we would have to determine that the place of public accommodation intentionally deadnamed or misgendered the complainant based on the protected class.  And then the complainant would have to subjectively experience that conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations at the place of public accommodation based on their gender identity, their protected class.

And then, lastly the division would have to objectively determine that a reasonable person under the same circumstances as the complainant would have experienced the conduct as the denial of full and enjoyment -- or the goods -- excuse me, as a denial of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on protected class, here, gender identity.

Q    (By Mr. Martin)  And on page 11 of this document, you list a number of factors that the

*AB Litigation Services*

regulations.  That was our very first exhibit.

MS. PASSAMANECK:  Actually, it was not, Counselor.  That was the second.

MR. MARTIN:  Oh, right.  My bad.

Q    (By Mr. Martin)  And we're going to go to Rule 81.6.

MS. PASSAMANECK:  It's page 1651 at the bottom.

Q    (By Mr. Martin)  Okay.  And are division staff instructed on how to use these regulations in conducting probable cause analyses?

A    The division staff are guided by the intake and investigations manual and the regulations that govern CADA.

Q    And let's specifically talk about Rule 81.6.  So we've discussed Rule 81.6, and specifically 81.6(A)(4) mentions that unlawful harassment could include deliberately misusing an individual's preferred name, form of address, or gender-related pronoun.

In your review, how does the regulation relate to the Colorado Anti-Discrimination Act? Does it implement it or is it doing something different?

MS. PASSAMANECK:  Objection; form.

A    So these words are not in the Colorado Anti-Discrimination Act, but this analysis is implicit in determining whether an individual has been denied goods, services, facilities, privileges, advantages, or accommodations based on a protected class.

Q    (By Mr. Martin)  So you're saying that this essentially implements CADA?

MS. PASSAMANECK:  Objection; form.

A    I wouldn't use those exact words.  I would say that this is implicit in the analysis of cases.

Q    (By Mr. Martin)  And when analyzing -- and you would say that when dealing with claims of misgendering or deadnaming at a place of public accommodation in an interaction, Rule 81.6 is part of the CADA analysis; is that right?

MS. PASSAMANECK:  Objection; form.

A    It is part of the analysis of whether an individual has been denied goods, services, et cetera.

Q    (By Mr. Martin)  And when analyzing claims under this specific regulation, am I correct that when you're analyzing whether deliberately misusing an individual's preferred name, form of

*AB Litigation Services*

address, or gender-related pronoun, whether it violates this rule, it needs to be subjectively or objectively experienced as discriminatory; is that correct?

MS. PASSAMANECK:  Objection; form.

A    You said subjectively or objectively.  So to be considered discriminatory, the deadnaming or misgendering would have to rise to the level of harassment, meaning that the place of public accommodation intentionally deadnamed or misgendered the complainant based on their protected class.

And then the complainant would have to show that they subjectively experienced that deadnaming or misgendering conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation based on their gender identify, and the division would have to determine objectively that a reasonable person under the same circumstances as the complainant would have experienced that conduct to be the denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class.  And all three of those factors have to be met.

Q    (By Mr. Martin)  All right.  And specifically, what would the division look to to determine whether a place of public accommodation's deadnaming or misgendering was objectively hostile, intimidating, or offensive such that it would rise to the level of harassment and violate this rule?

A    The division would look to whether a reasonable person under the same circumstances as the complainant would have experienced the conduct to be a denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class; in this case, gender identity.

Q    And would a reasonable person conclude that the intentional deadnaming of a transgender-identifying person would be objectively hostile, intimidating, or offensive?

MS. PASSAMANECK:  Objection; form.

A    I think that would depend on the specific facts of the interaction.  That would be highly context dependent.

Q    (By Mr. Martin)  But it is possible that the division would conclude so?

MS. PASSAMANECK:  Objection; form; asked and answered.

A    It's possible.

Q    (By Mr. Martin)  And would a reasonable person conclude that intentional misgendering would be objectively hostile, intimidating, or offensive?

A    Can you please restate the question?

Q    Would a reasonable person conclude that intentional misgendering is objectively hostile, intimidating, or offensive?

MS. PASSAMANECK:  Objection; form.

A    That is highly fact specific and would depend on whether that person -- or whether a reasonable person under the same circumstances as the complainant felt would experience that conduct to be a denial of goods, services, facilities, privileges, advantage, or accommodations based on a protected class.

Q    (By Mr. Martin)  Okay.  And to clarify, when conducting an analysis under the objective prong, the division would use these factors that you've outlined on page 11 and 12 of your interrogatory response to XX-XY; is that right?

MS. PASSAMANECK:  Objection; form.

A    I think those factors are some factors that could be considered, but not necessarily all factors that might be considered.  The division would look at the totality of the circumstances.

Q   (By Mr. Martin)  So it's really -- are these factors published anywhere for division staff to use or look at?

A   To be clear, are you referring to the ten -- the factors in the --

Q   (Nodded head.)

A   No, they aren't.

Q   Is there a specific number of these factors that need to be found for the case to rise to the level of harassment in violation of CADA?

A   No.  There are -- those are factors that could be considered, and there's -- not all of them might be considered.  There are other factors that could be considered.  Again, it would be highly dependent on the specific facts of an actual case.

Q   Okay.  Does the division believe that deadnaming and misgendering are equally as harmful as using racial slurs?

MS. PASSAMANECK:  Objection; form.

A   The division doesn't have a belief on that.

Q   (By Mr. Martin)  Okay.  Does -- would the division say that similar harms emanate from racial slurs as the harms that emanate from deadnaming and misgendering?

*AB Litigation Services*

conducted in response to document requests by

Plaintiffs, I attach as Exhibit A a chart

summarizing cases with letters of determination

involving allegations of misgendering and/or

deadnaming against places of public accommodations.

In total, there are 17 cases, and one in which a

finding a probable cause of discrimination was

made."  I believe there was a slight typo in that

last sentence, but did I read that correct?

A    Yes.

Q    Are you familiar with the cases that are

identified in Exhibit A?

A    Yes.

Q    What is the general time period that the

complaints in these cases were made?

A    I believe that the time period was from

2016 to present.

Q    Okay.  Were any of these complaints made

after May 16th, 2025?

A    Not that I'm aware.

Q    So all of these complaints would have

been made before the passage of H.B. 25-1312; is

that correct?

A    To my knowledge, yes.

Q    And when I refer to H.B. 25-1312, you're

aware of the piece of legislation that I'm referring to?

A    Yes.

Q    When the division makes a probable cause determination, does it try to be thorough with its reasoning in its written opinion?

MS. PASSAMANECK:  Objection; form.

A    Yes.  The division uses the available evidence and the facts and context that we have collected during the investigative process and issues a letter of determination that is as thorough as possible.

Q    (By Mr. Connolly)  Okay.  Does the division explain its reasoning?

A    Yes.

Q    Does the division list out all of the facts that led to a finding of probable cause?

MS. PASSAMANECK:  Objection; form.

A    The division issues a letter of determination that provides reasoning as to why the determination was made.

Q    (By Mr. Connolly)  And in that determination, it would list the facts that led to its finding of a probable cause, correct?

A    Most cases have a long form letter of

promulgated 3 C.C.R. 708-1:81.6, covering sexual orientation harassment.  That regulation clarifies that, quote, deliberately misusing an individual's preferred name, form of address, or gender-related pronoun may create an environment that is subjectively and objectively hostile and therefore violate CADA.  This regulation is still in effect and applies to housing, employment, and public accommodations discrimination."

Did I read that correctly?

A    Yes.

Q    Now, we have been focusing on the part of Rule 81.6 earlier in this deposition that refers to deliberately misusing an individual's name or pronoun, but Rule 81.6 applies more broadly to other provisions or other actions as well, right?

MS. PASSAMANECK:  Objection; form.

A    Yes.

Q    (By Mr. Connolly)  Thinking about the regulation more broadly, so not just the deadnaming and misgendering provision, has the division ever found probable cause than an employer violated Rule 81.6 by engaging in unlawful harassment against an employee?

MS. PASSAMANECK:  Objection; form.

A     The division has found probable cause in employment cases that allege harassment of an employee, yes.

Q     (By Mr. Connolly)  Very roughly, ballpark, do you know how many times that has happened since you've been there --

MS. PASSAMANECK:  Objection; scope.

Q     (By Mr. Connolly)  -- in the employer-employee context?

A     Sitting here, I don't know the exact number of times.

Q     More than 50?

MS. PASSAMANECK:  Objection; scope.

A     I wouldn't want to speculate.  I don't want to guess.  I'm not sure of the exact number.

Q     (By Mr. Connolly)  Okay.  More than five?

A     I would say more than five, yes.

Q     Has the division ever found probable cause that a company engaged in unlawful harassment in housing under Rule 81.6?

A     By company, are you referring to a housing provider or an HOA or an entity that would be providing housing?

Q     Let me rephrase.  Has the division ever found probable cause that anyone engaged in

unlawful harassment in housing?

A    Yes.

Q    Can you give me an example of how that would occur?

A    So I can't think of exact specifics off the top of my head, but harassment might occur in the housing context where someone is treated differently based on a protected class, such as race, based on their activity -- I mean, based on their protected classes.  They are treated differently in a housing context based on their protected class.

Q    Can you give me an example of how someone could be harassed in the housing context?

A    An example might be if they were at an interaction where they were referred to as a racial slur.

Q    Okay.  So maybe a landlord is interacting with someone who rents there and uses a racial slur, that could be a form of harassment?

A    It could be, yes.

Q    Okay.  So, similarly, has the division ever found probable cause that anyone operating within a place of public accommodation engaged in unlawful harassment under Rule 81.6?

*AB Litigation Services*

MS. PASSAMANECK:  Objection.

A     I wouldn't say it like that.  We have had cause cases in the public accommodations context, but we wouldn't refer to them as probable cause under Rule 81.6.

81.6 is implicit in the analysis, and it is used as a tool for determining whether a complainant was subjected to the provisions of CADA or subjected to violations of the provisions of CADA.

Q     (By Mr. Connolly)  So sitting here today, you can't recall any example of the division ever specifically finding that Rule 81.6 was violated, that there was probable cause that Rule 81.6 was violated by somebody operating in a place of public accommodation; is that correct?

A     I wouldn't say it like that.  So the division has found probable cause in harassment cases where 81.6 would have been used as a tool for analysis to determine whether harassment occurred. But the division's finding may not denote that it was based on 81.6 or cite 81.6.

Q     Correct.  And you can't think of a specific example where the division said, We hereby conclude that Rule 81.6 was likely violated,

correct?

A    I've seen many cases, and I can't, sitting here, identify a specific case.

Q    Does the division have any internal guidance that says that Rule 81.6 is, quote, implicit in the analysis of how you figure out whether somebody who is operating in a place of public accommodation violates CADA?

MS. PASSAMANECK:  Objection; form.

A    The division looks to guidance in its intake and investigations manual and the regulations of CADA.

Q    (By Mr. Connolly)  Okay.  And are you aware, is that -- are those instructions in either your intake manual or the regulations?

A    To clarify, are you asking if there is specific guidance pertaining on the use of 81.6 and its application?

Q    Correct.

A    Not to my knowledge.

Q    When did the division reach the determination that Rule 81.6 is implicit in the analysis of when you determine whether someone is -- who is operating in a place of public accommodation is violating CADA?

784

AB Litigation Services

MS. PASSAMANECK:  Objection; form.

A    I can't speak to exact dates, as it might have been before I was an employee at the division as an investigator, but since I have been in my role, it has been understood that it is implicit and used as a tool in harassment analysis.

Q    (By Mr. Connolly)  How do you know that it's understood if it's not written down anywhere?

MS. PASSAMANECK:  Objection; form.

A    The division looks to its intake and investigations manual and also informs its practices based on previous cases that it has received and how those cases have been handled.

Q    (By Mr. Connolly)  Now, focusing on Rule 81.6(A)(4), which applies to deliberately misusing an individual's preferred name, form of address, or gender-related pronoun, has the division ever found probable cause that an employer engaged in unlawful harassment of an employee by misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form and scope.

Michael, just so she has it, I pulled up her exhibit of 81.6.

A    Sitting here, I can't think of any.

Q    (By Mr. Connolly)  Has the division ever found probable cause that a place of -- that an -- strike that.

Has the division ever found probable cause that someone operating in a public accommodation likely violated Rule 81.6(A)(4) by misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form.

A    Not to my knowledge, no.

Q    (By Mr. Connolly)  In paragraph 10 of your declaration, you state, "In May 2025, H.B. 25-1312 amended the definition of gender expression to expressly include an individual's chosen name and how the individual chooses to be addressed."

Did I read that right?

A    Yes.

Q    You're aware of the legislation H.B. 25-1312, correct?

A    Yes.

Q    When the legislature was considering H.B. 25-1312, were you having any discussions with the legislature about the legislation?

A    No.

Q    Do you know if anyone at the division was having any discussions with anyone at the

AB Litigation Services

legislature about H.B. 25-1312?

A    To my knowledge, no one at the division was engaged in any discussions regarding 1312 with the legislature.

Q    After H.B. 25-1312 was enacted, did the division issue any new internal guidance as to how to implement the new law?

A    No.

Q    Why not?

A    The division hadn't received any cases pertaining to the new legislation.

Q    Did the division ever make a determination as to how H.B. 25-1312 changed CADA?

A    The division did not, and the division continued to process charges of discrimination in a standard and consistent manner in accordance with statute.

Q    Let me ask you a different way then.  How does the division interpret H.B. 25-1312 to have changed CADA?

MS. PASSAMANECK:  Objection; form.

A    The division has interpreted 1312 to amend the definition of gender expression.

Q    (By Mr. Connolly)  And practically speaking, what does that mean?

*AB Litigation Services*

81.6 and that analysis is implicit in determining whether an individual has been denied the goods, services, facilities, privileges, advantages, accommodations of a place of public accommodation based on protected class.

Q    To your knowledge, does CADA prohibit harassment?

MS. PASSAMANECK:  Objection.

A    CADA prohibits discrimination, which harassment may be a type of discrimination that occurs based on a protected class.

Q    (By Mr. Connolly)  So harassment is a type of discrimination that can occur under CADA; is that correct?

A    Yes.

Q    So there may be other forms of discrimination that can occur under CADA that are not harassment; is that correct?

A    Yes.

MS. PASSAMANECK:  Michael, if we could just go off the record for one minute.

MR. CONNOLLY:  Sure.

(Discussion off the record.)

Q    (By Mr. Connolly)  Paragraph 12 of your declaration -- actually, strike that.

*AB Litigation Services*

Let's go to paragraph 17.  It says here, "I reviewed the Amended Complaint in the Defending Education action and the Amended Motion for Preliminary Injunction and Brief in Support, both filed June 13th, 2025."  Did I read that correct?

A    Yes.

Q    So you were generally aware of the type of speech that the plaintiffs in the Defending Education action want to make, correct?

A    Yes.

Q    You're aware of the Plaintiffs Colorado Parent Advocacy Network, also known as CPAN, and Protect Kids Colorado, also known as PKC?

A    Yes.

Q    You're aware that Lori Gimelshteyn is the head of CPAN and Erin Lee is the head of PKC, correct?

A    Yes.

Q    I will represent to you based on these filings that Lori and Erin want to go to places of public accommodation, like a hotel or a restaurant, and they want to misgender and deadname specific people while they are in a place of public accommodation.

Does that sound like an accurate

description of the speech they want to engage in

according to your review of the documents?

A    Yes.

Q    Now, let's say that instead of Lori and Erin doing this, it is employees of a hotel.  So we've got a hotel in Colorado that is holding an event, and the hotel's employees want to specifically misgender and deadname people who are in the audience.  Is it possible that the division could find probable cause against this hotel for violating CADA?

MS. PASSAMANECK:  Objection; form.

A    I would need more information and facts and context to answer that question.

Q    (By Mr. Connolly)  What additional information would you need?

A    I would need to know if the -- you're referencing a hotel, correct?

Q    Yes.

A    We would need to know if the hotel or those employees of the hotel were acting as a place of public accommodation.  We would need to know if they were providing goods, services, facilities, privileges, advantages, or accommodations to the general public.

Q    Okay.  So I will represent to you that in this situation, the hotel is holding an event. Everyone is allowed to attend.  And at the event there are speakers, and these speakers are hotel employees, and those hotel employees are misgendering and deadnaming individuals who are in the room.

A    So as --

MS. PASSAMANECK:  Objection; form. Sorry.  I wasn't sure if there was a question there.

Q    (By Mr. Connolly)  So once I give you those facts, now can you determine whether there is probable cause -- whether there might be probable cause that those hotel employees are violating CADA?

MS. PASSAMANECK:  Objection; form.

A    So based on the specific facts that you gave me, I would need to know whether these employees were providing goods, services, et cetera, to the general public.

In the example that you provided, where they are just engaged in speech or advocacy, they would not be a place of public accommodation because they would not likely be providing services

AB Litigation Services

that relate to their employment at the hotel.

Q    (By Mr. Connolly)  So in this situation, the hotel would not be a place of public accommodation?  A hotel that is welcoming individuals off the street to hear speakers, the division would not consider that hotel to be a place of public accommodation?

MS. PASSAMANECK:  Objection; form.

A    To clarify, was your question about the employees that were speaking or the hotel that was speaking?

Q    (By Mr. Connolly)  Let's use the hotel -- either.  Hotel or the employees, could either of them -- is it possible that the division could find probable cause that either the hotel or the employees violated CADA?

MS. PASSAMANECK:  Objection; form.

A    It depends on the specific facts and the context.  When an entity is engaging in advocacy alone, that would not be a violation of CADA.  It would not be a place of public accommodation based on just the speech, because the speech in itself does not show a denial of goods, services, facilities, privileges, advantages, or accommodations based on a protected class.

Q    (By Mr. Connolly)  Yes, but in this situation, I'm not talking about the plaintiff organizations in this case.  I'm talking about the hotel or the hotel employees.  So in my example, could the hotel or the hotel employees -- is it possible that the hotel or hotel employees might be violating CADA in the facts that I gave you?

MS. PASSAMANECK:  Objection; form.

A    To clarify, are we talking about speech itself or the provision of goods or services?  In your example, are you talking about an instance where they are at this supposed place of public accommodation, and they are providing goods and services, or are you just talking about they are engaged in speech or advocacy?

Q    (By Mr. Connolly)  Let me summarize the facts again and make sure we're on the same page.

Hotel, call it a Marriott.  Marriott in Denver says, We are going to have an event.  We're talking about -- we're talking about food all day, and everyone from the street is welcome to come in and listen to Marriott, and the Marriott employees are going to talk about anything and everything.

When people come in off the street, the hotel and the hotel employee -- the hotel employees

*AB Litigation Services*

are specifically misgendering and deadnaming individuals that come in off the street to listen to the hotel talk about -- talk during their event.

Is it possible that the division would find probable cause that this hotel has violated CADA because of its misgendering and deadnaming of specific individuals?

MS. PASSAMANECK:  Objection; form.

A    Okay.  So first we would look to determine that the hotel is actually a place of public accommodation.  And then I believe that the next part of your question involves an interaction where the employees of a place of public accommodation are intentionally deadnaming people at the place of public -- individuals at the place of public accommodation.

So that interaction would -- the intentional misgendering and deadnaming alone are not per se discrimination.  They must rise to the level of harassment.  And so you would need to show that the place of public accommodation intentionally deadnamed or misgendered those individuals based on their gender identity, and that the individual subjectively experienced that conduct to deny them the goods, services,

AB Litigation Services

facilities, privileges, advantages, or

accommodations of that place of public

accommodation based on their gender identity.

And then the division would need to

objectively determine that a reasonable person

under the same circumstances as the complainant

would have experienced the conduct to be a denial

of the goods, services, facilities, privileges,

accommodations, or advantages of the place of

public accommodation based on gender identity.

Q   (By Mr. Connolly)  So you cannot -- if

those three factors were met, then it is possible

that the division could find that the hotel, in my

example, violated CADA, correct?

A   It is possible.

Q   Paragraph 18, you state, "Based on my

review, it does not appear that Plaintiffs CPAN or

PKC offer any good, service, facility, privilege,

advantage, or accommodation to the general public

that would subject them to CADA's public

accommodation provisions."

Did I read that correctly?

A   Yes.

Q   Is it the division's position that an

organization cannot be liable under CADA unless

people.  Is it your position that the KKK would not be in violation of CADA?

MS. PASSAMANECK:  Objection; form.

A    I would need to determine if the KKK was a place of public accommodation and engaged in the goods -- in providing goods, services, facilities, privileges, advantages, or accommodations to the general public.  If the KKK was not deemed to be a place of public accommodation because the organization was not providing those services, the division would not have jurisdiction because they would not be a place of public accommodation.

Q    (By Mr. Connolly)  Do you have any internal guidance that would support this -- which I, frankly, find very astonishing -- conclusion?

A    The division looks --

MS. PASSAMANECK:  Objection; form and argumentative.

A    The division looks to its intake and investigations manual for guidance as well as the regulations that govern CADA.

Q    (By Mr. Connolly)  And sitting here today, are you aware of anything in your -- in those documents that supports your interpretation?

MS. PASSAMANECK:  Objection; form.

A    With regard to the terminology in those documents, are you asking what the documents specifically state?

Q    (By Mr. Connolly)  Yes.

A    I think that we would look at the intake and investigations manual and the regulations that govern CADA consistently, and it would depend on the facts and context of the case.

Q    Has the division ever found that an individual likely violated CADA?

MS. PASSAMANECK:  Objection; form.

A    To be clear, your question could include someone that is an employer or a housing provider or an individual that provides goods, services, facilities, privileges, advantages, or accommodations to the public.  If you're asking about that context, then the person might have -- we would have jurisdiction over the individual and could look at a case, and an individual could possibly violate CADA.

Q    (By Mr. Connolly)  You could have an individual working for a company and the company, and both might possibly be in violation of CADA, correct?

A    It's context specific.  It depends on

*AB Litigation Services*

what kind of case it is and the facts of the case.

Q    But it's possible, correct?

A    Possible.

MS. PASSAMANECK:  Do you want a break, Michael?

MR. CONNOLLY:  Sure, that's fine.

(Break from 1:08 p.m. to 1:18 p.m.)

Q    (By Mr. Connolly)  Going back to our KKK example that we were talking about.  So, again, to refresh, this is where the KKK is holding an event at a hotel and refusing to let Black people come into their events.  Is it possible that the commission could find probable cause that the hotel was violating CADA?

MS. PASSAMANECK:  Objection; form.

A    So we would need to look at whether the hotel was a place of public accommodation and whether the hotel was providing goods, services, facilities, privileges, advantages, or accommodations to the public.

Q    (By Mr. Connolly)  So let's assume that both of those are true.  Could the division find that a hotel -- that this hotel was likely violating CADA?

MS. PASSAMANECK:  Objection; form.

*AB Litigation Services*

advantages, or accommodations to the public.

Q    (By Mr. Connolly)  And where are you --
where are you getting that?  Do you have anything
in your internal documents or regulations or
anywhere that makes that interpretation of CADA?

A    The division looks to its investigations
and intake manual and the regulations governing
CADA, and its analysis is also informed by cases
that it has received in the past.

Q    Sitting here today, can you identify a
single place where you ever made that
interpretation?

A    In every public accommodations case, the
charges are processed and analyzed in a consistent
and standard manner regardless of protected class.

So in public accommodations cases, in
order for the division to have jurisdiction in a
public accommodation cases we have to first
determine whether the entity that a prospective
charge is filed against is actually a place of
public accommodation.  And if the entity is not a
place of public accommodation, the division does
not take the charge of discrimination.  They don't
have jurisdiction over the case.

Q    (By Mr. Connolly)  Respectfully, you

didn't answer my question.  Do you have any -- can you right now sitting here think of any place where you have ever made the interpretation that you just gave me?

MS. PASSAMANECK:  Objection; form; asked and answered.

A   The division, to my knowledge, has never received a case that involved advocacy.  So in light of that, if we did receive such a case and those facts and circumstances were there, we would likely confer -- we would talk to counsel and discuss before moving forward.  But again, we have never seen this before.

Q   (By Mr. Connolly)  I'd like to introduce another exhibit.  You should have these in front of you.  This is your response to our interrogatories.

(Exhibit 12 was marked.)

Q   (By Mr. Connolly)  Do you have the document in front of you?

A   Yes.

Q   Do you recognize this document?

A   Yes.

Q   It's titled "Division and Commission Defendants' Responses to Plaintiffs' First Set of Interrogatories," and at the last page there is a

privileges, advantages, or accommodations.

Q   On page 5, you reference the investigations and intake manual.  Can you tell me when that was last updated?

A   To my knowledge, it was 2023.

Q   And so during, this deposition when you're referring to the intake manual, you're referring to this version from 2023, correct?

A   Yes.

Q   At the bottom of page 6, do you see the ten factors -- or the ten relevant circumstances that you listed here?

A   Yes.

Q   Where did you get these circumstances?

MS. PASSAMANECK:  I believe she's already been asked this once by prior counsel.

If you can answer this question without revealing attorney-client privilege, you may.

A   We discussed with counsel.

Q   (By Mr. Connolly)  So these factors were provided to you by counsel?

MS. PASSAMANECK:  Answer that yes or no, that is it.

A   Yes.

Q   (By Mr. Connolly)  Are these factors

contained in your intake manual?

A No.

Q Page 8. Do you see in the middle where it says, "As to Drs. Morrell's and Leswing's interactions"?

A Yes.

Q You are generally familiar with the speech that Dr. Morrell and Dr. Leswing want to engage in, correct?

A Yes.

Q Let's assume that Dr. Morrell and Dr. Leswing are repeatedly misgendering and deadnaming one of their patients. Is it possible that the division would find probable cause that they were in violation of CADA?

MS. PASSAMANECK: Objection; form.

A So to be clear, we're talking about an interaction while they are treating a patient, correct?

Q (By Mr. Connolly) Correct.

A So intentional deadnaming and misgendering is not a per se CADA violation. It depends on context and the facts of the specific interaction and it has to rise to the level of harassment.

Q    So is it possible that their speech -- that the division would find that their speech violated CADA?

A    The division would first have to determine that they were acting as a place of public accommodation, and that they intentionally deadnamed or misgendered an individual based on that individual's gender identity, and that that deadnaming and misgendering created an environment that was both subjectively and objectively offensive based on an individual's protected class.

Q    So let's assume that this speech occurred at the doctor's office.  Let's say the patient found it insulting.  Let's say it happened multiple times.  Let's say the doctors purposefully did this.  It wasn't an accident.

Under those facts, is it possible that the division would find probable cause that Dr. Morrell and Dr. Leswing violated CADA?

MS. PASSAMANECK:  Objection; form.

A    If the doctors are engaged in an interaction that is related to their provision of services in their practice, and an individual was intentionally deadnamed or misgendered, and the deadnaming and misgendering rose to the level of

harassment, meaning that it created an environment

that was both subjectively and objectively hostile

based on that person's gender identity, then it is

possible that it would violate CADA.

Q    (By Mr. Connolly)   You've said a number

of times that misgendering and deadnaming are not

per se CADA violations; is that correct?

A    Yes.

Q    Would there be a situation where

misgendering and deadnaming alone by a person in a

place of public accommodation violated CADA?

A    Misgendering and deadnaming have to -- it

depends on the facts and context, and they have to

rise to the level of harassment.   Intent to

deadname and misgender alone is not a violation of

CADA.   It has to rise to the level of harassment.

Q    In your view, could intentionally

deadnaming and misgendering by an individual in a

place of public accommodation ever arise to the

level of harassment under 81.6?

A    So I will speak to the division's

practices rather than to my view, because I don't

have a view.   I'm speaking in my official capacity.

But in order for -- if the intentional deadnaming

and misgendering rose to the level of harassment

and created an environment that both subjectively and objectively created an environment that was hostile based on an individual's protected class, it would violate CADA.

Q    So you cannot say that the division won't find probable cause that someone violated CADA for misgendering and deadnaming alone in a place of public accommodation, correct?

MS. PASSAMANECK:  Objection; form.

A    I would say that differently.

Q    (By Mr. Connolly)  How would you say it?

A    Intentional deadnaming and misgendering alone are not a violation of CADA.  They have to rise to the level of harassment.  The conduct has to rise to the level of harassment to violate CADA.

Q    And that is the division's interpretation of CADA?

A    And applicable regulations that govern CADA, yes.

Q    Another hypothetical for you.  A transgender person walks into a restaurant.  This person was born a male, and his birth name is Tom, but the person now identifies as female and goes by Sarah.  The bartender knows this person's original name.  The customer gets all the services that the

**805**