No. 26-1101

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

DEFENDING EDUCATION, *et al.*,

*Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, in her official capacity as the
Director of the Colorado Civil Rights Division, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Colorado, No. 1:25-cv-01572 (Rodriguez, J.)

## APPELLANTS' APPENDIX VOLUME V

J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

June 8, 2026                    *Counsel for Appellants*

# TABLE OF CONTENTS

## VOLUME I

| Document | ECF No. | App. Page |
|---|---|---|
| District Court Docket | N/A | 1-App-1 |
| First Amended Complaint | 25 | 1-App-15 |
| Plaintiffs' Amended Motion for Preliminary Injunction | 27 | 1-App-81 |
| Exhibit to Amended Preliminary Injunction Motion: Sarah Perry Declaration | 27-1 | 1-App-114 |
| Exhibit to Amended Preliminary Injunction Motion: Lori Gimelshteyn Declaration | 27-2 | 1-App-118 |
| Exhibit to Amended Preliminary Injunction Motion: Erin Lee Declaration | 27-3 | 1-App-140 |
| Exhibit to Amended Preliminary Injunction Motion: Kristina Rasmussen Declaration | 27-4 | 1-App-161 |
| Exhibit to Amended Preliminary Injunction Motion: Travis Morrell Declaration | 27-5 | 1-App-165 |
| Exhibit to Amended Preliminary Injunction Motion: Valeri Leswing Declaration | 27-6 | 1-App-182 |
| Defendants' Motion for Discovery | 31 | 1-App-193 |
| Exhibit A to Defendants' Motion for Discovery: Defendants' Discovery Requests | 31-1 | 1-App-209 |
| Exhibit B to Defendants' Motion for Discovery: Defendants' Proposed Deposition Topics | 31-2 | 1-App-218 |
| Plaintiff's Opposition to Defendant's Motion for an Extension of Time | 32 | 1-App-220 |
| Joint Motion to Adopt a Scheduling Order | 43 | 1-App-230 |
| Defendants' Consolidated Opposition to Motions for Preliminary Injunction | 85 | 1-App-236 |

## VOLUME II

Excerpts of Appendix to Defendants'
Consolidated Opposition to Motions
for Preliminary Injunction ..................................................... 85-1    2-App-1

Plaintiffs' Brief in Support of Motion for Preliminary
Injunction and in Opposition to Defendants' Motions
to Dismiss ................................................................................... 98    2-App-226

## VOLUME III

Excerpts of Appendix to Plaintiffs' Brief in Support
of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................. 98-1    3-App-1

## VOLUME IV

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................. 98-1    4-App-1

## VOLUME V

(continued) Excerpts of Appendix to Plaintiffs' Brief in
Support of Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss ............................. 98-1    5-App-1

Courtroom Minutes for Preliminary Injunction
Motion Hearing Held on Feb. 19, 2026 and
Recommendation of United States Magistrate Judge ......................... 101    5-App-21

Plaintiffs' Objections to Recommendation of United
States Magistrate Judge ............................................................... 110    5-App-24

Exhibit A: Preliminary Injunction Hearing Transcript .................. 110-1    5-App-39

Defendants' Response to Objections to Recommendation
of United States Magistrate Judge ................................................ 112    5-App-136

Order Adopting Recommendation of United
States Magistrate Judge and Denying Motion
for Preliminary Injunction ........................................................... 115    5-App-149

Notice of Appeal ........................................................................ 118    5-App-173

Recommendation of United States Magistrate Judge
on Defendants' Motions to Dismiss .............................................. 125    5-App-175

## **VOLUME VI (SEALED)**

Sealed Appendix to Plaintiffs' Replies in Support
of their Motion for Preliminary Injunction and in
Opposition to Defendants' Motions to Dismiss....................................99     6-App-1

## **VOLUME VII (SEALED)**

Second Restricted Appendix to Plaintiffs' Motion
for Preliminary Injunction and in Opposition
to Defendants' Motion to Dismiss........................................................ 100     7-App-1

AB Litigation Services

restaurant offers, but for in the next hour the bartender repeatedly calls the person Tom and repeatedly refers to the person by he/him pronouns. The transgender person finally gets sick of it and leaves.

In this factual situation, could the division find probable cause that the restaurant violated CADA?

MS. PASSAMANECK:  Objection; form.

A     So, again, same analysis here.  This is based on an interaction where deadnaming and misgendering occurred, and the deadnaming and misgendering would have to rise to the level of harassment.

So the place of public accommodation, if it's deemed to be a place of public accommodation, would have to intentionally deadname or misgender the individual based on that individual's protected class, and then the individual must subjectively experience that conduct as being a denial of the goods, services, facilities, privileges, advantages, or accommodations at the place of public accommodation based on gender identity.

And lastly, the division would have to determine that a reasonable person in the same

AB Litigation Services

circumstances as the complainant would also experience that conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodation of the place of public accommodation based on protected class.  And that analysis would be context and fact specific.

Q    (By Mr. Connolly)  So it is possible that the restaurant in this situation could be -- it is possible -- strike that.

So it is possible that in this situation the division could find probable cause that the restaurant violated CADA, correct?

A    If the misgendering and deadnaming rose to the level of harassment, it is possible.

Q    Another one.  Now we have a restaurant that has a Twitter page.  Every day the restaurant is issuing tweets, and in the tweets it is specifically misgendering and deadnaming specific people.  A transgender person reads these tweets and feels that the person wouldn't be welcome at that restaurant based on all of the tweets that this restaurant is making.

Is it possible that the restaurant, because of these tweets, would be in violation of CADA?

*AB Litigation Services*

was adopted in 2023, correct?

A    Correct.

Q    And when were the regulations last amended?

A    I can't speak to the date that the regulations were last amended.  The division and commission engage in updating rules with the assistance of counsel.  But if you are referring to -- are you referring to Rule 81.6 or just the rules in general?

Q    The rules in general.

A    The rules in general are updated with the guidance of counsel at statutorily required time frames.

Q    They haven't been updated since May of 2025, correct?

A    Correct.

Q    The division is charged with enforcing CADA, correct?

A    Correct.

Q    So if actions or speech violate CADA as written, the division will enforce that statute, correct?

MS. PASSAMANECK:  Objection; form.

A    The division would first have to

violate CADA.

Q    (By Mr. Connolly)  I'm trying to ask a more basic question, and it was probably poorly worded.  Let me try again.

H.B. 25-1312 amended CADA, correct?

A    Yes.

Q    The division intends to enforce CADA when the statute is violated, correct?

A    If the division has jurisdiction to take a complaint and a complaint is actually made with a complainant and a case and the division has jurisdiction, it will investigate the case.

Q    And take -- and not only investigate, but take whatever other steps are authorized by CADA with regard to that case, correct?

A    Yes, and to -- to further that statement, however, though, when the division has jurisdiction to investigate a case, it doesn't necessarily mean that a cause finding will be issued.  So jurisdiction in itself doesn't mean that there is a violation of CADA.  Whether there is probable cause to believe that discrimination occurred is only established throughout the investigative process by collection of evidence, et cetera.

Q    But if someone is violating CADA, the

*AB Litigation Services*

division will enforce the statute, correct?

A     Yes.

MR. CONNOLLY:   Thank you.   I don't have any further questions.

MS. PASSAMANECK:   I've got no redirect. I'm going to put this computer just over here, and we'll turn it over to counsel.

MR. MARTIN:   We're going to move on to Exhibit 13.

(Exhibit 13 was marked.)

MS. PASSAMANECK:   This is 2 of 3 and 3 of 3.   Is there a 1 of 3?   It doesn't appear to be a full document.

MR. MARTIN:   1 of 3 was just stated Exhibit A.   This was taken from our brief.

MS. PASSAMANECK:   Okay.   Very good.

EXAMINATION

BY MR. MARTIN:

Q     Have you seen this document before?

A     Yes.

Q     And you're aware that this is a post that XX-XY Athletics made on its official X account; is that right?

A     Yes.

Q     All right.   If an individual were to file

810

*AB Litigation Services*

a charge of discrimination alleging that while

perusing Twitter they saw this post and believed

that it was a discriminatory publication, would the

division investigate that charge?

A    So this is -- if I understand your

question, you're asking about the statement that is

on -- the statement alone?

Q    Correct, yes.  All that they allege in

the charge was that they were on Twitter and/or X,

and they saw this string of posts, it's seven

together, would the division investigate that

charge?

A    So the statement on its own is not a

violation of CADA, because it doesn't say that an

individual will be denied goods, services,

facilities, privileges, advantages, or

accommodations or that their patronage or presence

is unwelcome at a place of public accommodation

based on their protected class.

And without a complaint or a complainant,

the division would not have reason to investigate a

charge of discrimination.

Q    So I understand your position on whether

this violates CADA or doesn't.  I'm just asking --

let's change the hypothetical.

*AB Litigation Services*

Let's say that an individual does file a charge, and they say, while perusing Twitter, I saw this post and it made me feel unwelcome at XX-XY Athletics.  Would that be enough for the division to just start an investigation?  So I'm not asking whether or not it violates CADA, just is it enough to start an investigation.

A   The post in itself does not describe an interaction where a person would have been subjected to an adverse action based on their protected class.  The post is just a statement itself, and it doesn't tell what an interaction would look like.

So if a -- let's say an individual -- if an individual contacted the division with this, because the division has never received a charge based on a written communication, the division would likely consult with counsel before deciding how to handle a case like this.

Q   So it is possible that -- given the hypothetical, it is possible that the division would proceed to the investigation stage?

MS. PASSAMANECK:  Objection.

A   In order to proceed to the investigation stage, the division would have to conduct an

812

*AB Litigation Services*

analysis to determine whether the entity was a place of public accommodation and whether the individual was alleging that they were treated differently based on a protected class.

But when the division does establish jurisdiction based on those allegations, it investigates charges of discrimination.

Q    (By Mr. Martin)  And so it's possible that the division would conclude that there was, in fact, jurisdiction, at least, over such a charge?

A    In this instance, this is just a policy or a statement that is being made by XX–XY Athletics, and unless the policy or statement states that an individual will be denied goods, services, privileges, advantages, or accommodations based on a protected class or that their presence is unwelcome based on a protected class, there is not a violation of CADA.

And because there is not a violation of CADA, it is not something -- this doesn't look like there is an allegation of differential treatment being made.

Q    All right.  But you use the investigation process to determine whether or not there's been a violation of CADA, correct?

**813**

*AB Litigation Services*

A    We do.  But prior to the investigative process, the division had to determine whether there is jurisdiction or not to take the case and investigate the case.  And if there is not jurisdiction, because the entity is not a place of public accommodation or someone is not alleging that they were treated differently based on a protected class, then we would not take the case.

Q    All right.  I'm going to go back to Exhibit 9.  So this is your first supplemental response to plaintiffs first set of interrogatories, and I'd like to go to page 5.

And this is what you've said already in your testimony today, but just to clarify it, in the first paragraph on page 5, you say that, "The Policy does not state that XX–XY intends to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of XX–XY based on a protected trait."

Why did you conclude that this statement does not state that?

A    Because the statement doesn't say that an individual -- an individual will be denied goods, services, facilities, privileges, advantages, or

814

*AB Litigation Services*

meaning that it is both subjectively -- it is creating an environment that is both subjectively and objectively hostile based on the individual protected class, their gender identity.

Q    (By Mr. Martin)  Is it possible for a single instance of deadnaming or misgendering to amount to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    In order for deadnaming or misgendering to be a violation of CADA, the place of public accommodation would have to intentionally treat, deadname or misgender, an individual based on their gender identity; and then the individual would have to subjectively experience that conduct to be a denial of the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation based on the individual's gender identity.

And then the division would have to objectively determine that a reasonable person in the same circumstances as the complainant would experience the conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations based on their gender identity.

MS. PASSAMANECK:  Counsel, I don't mean

*AB Litigation Services*

Q    (By Mr. Martin)  Yes.

A    To be in violation of CADA, it would have to state that an individual would be denied goods, services, facilities, privileges, advantages, or accommodations based on a protected class or that their presence or patronage is objectionable or unwelcome based on a protected class.

Q    And is it possible for that communication to state that an individual's presence is unwelcome or objectionable based on a protected class without stating that it is going to engage in harassment or stating that it is going to create an objectively -- an objectively hostile environment?

MS. PASSAMANECK:  Objection; form.

A    I think that is very fact and context specific, but I think it's possible.

Q    (By Mr. Martin)  Okay.  So then it's possible that publishing -- that XX-XY's publishing of this post in Exhibit 13, it's possible that that could create -- that could make someone feel unwelcome or objectionable, but not necessarily that -- strike that.

MR. MARTIN:  I think we may stop there. Let's take a break.

(Break taken from 3:05 p.m. to 3:16 p.m.)

MS. PASSAMANECK:  Objection; form.

A    Every case is different, and it depends on context and the specifics of the case, and the division looks to its intake and investigations manual and the regulations that govern CADA and CADA itself to process the case.

Q    (By Mr. Martin)  So let's say that -- going back to the original hypothetical.  Let's say that the complainant alleged that XX-XY Athletics misgendered them five different times, and that the complainant stated that XX-XY Athletics was using incorrect pronouns, and XX-XY Athletics continued to misgender the complainant.

Would those facts be enough for you to determine that that misgendering by XX-XY Athletics had risen to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    Again, all cases are different, and we would look to see if the three prongs that we've discussed are met if we are analyzing whether deadnaming or misgendering rises to the level of harassment.

Q    (By Mr. Martin)  And are those facts that I gave you sufficient for you to make the harassment determination?

817

*AB Litigation Services*

A     Please restate the facts.

Q     A person visited the XX-XY pop-up shop in the Pilates studio that was open to the public. They were selling goods and services to the public. They misgendered an individual five times.  The individual is a customer.  And the individual told the employee that the employee was using incorrect pronouns, and the employee continued to misgender the complainant.

If you received that charge, would those be enough facts for you to determine that that encounter had arisen to the level of harassment?

MS. PASSAMANECK:   Objection; form.

A     The division would need to determine whether the place of public accommodation, provided that it is actually a place of public accommodation, intentionally deadnamed or misgendered the individual based on that individual's gender identity, and that the individual subjectively experienced the conduct as a denial of goods, services, facilities, privileges, advantages, or accommodations based on their gender identity.

And then the division would have to objectively determine that a reasonable person in

*AB Litigation Services*

the same set of circumstances as the complainant would have experienced the conduct as a denial of goods, services, facilities, privileges, advantages, accommodations based on a protected class, based on gender identity.

Q    And I understand that's how the division would analyze that.  What I'm asking is are those facts sufficient for you to make a determination, yes or no?

A    I think that I can't speak to what an individual would feel subjectively without an actual case.  And I think that there are a lot of facts and circumstances that go into developing a case, and without a collection of evidence and facts and doing a full investigation, I can't answer that.

Q    Okay.  And are there any additional facts that, if proven, would show that, yes, that encounter did rise to the level of harassment?

A    It's possible.  But again, it would depend on the specific facts of the interaction and the circumstances of what occurred.

Q    In the hypothetical I gave you, it is possible that that encounter could rise to the level of harassment, correct?

*AB Litigation Services*

MS. PASSAMANECK:  Objection; form.

A    Again, it would be fact and context dependent, but it's possible.

Q    (By Mr. Martin)  Okay.  And could it be possible that -- let's change the hypothetical a bit to say that there was only one instance -- let's change the hypothetical to be that the XX-XY employee knew that a transgender person, a transgender customer identified as a man, but the employee referred to that customer as her or she or ma'am.

Is it possible that that deliberate misgendering could rise to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    So intentional deadnaming and misgendering by themselves are not per se violations of CADA.  The intentional deadnaming or misgendering would have to rise to the level of harassment and would have to create an environment that is both subjectively and objectively hostile based on the individual's protected class, and those analyses are very fact and context specific.

Q    (By Mr. Martin)  I'm asking, though, if just the harassment analysis, whether it's

**820**

*AB Litigation Services*

possible, just possible that the division could find that there was harassment based on one instance of deliberate misgendering to a customer?

MS. PASSAMANECK:  Objection; form; asked and answered.

A    The division would need to look at the full circumstances of the interaction.

Q    (By Mr. Martin)  Okay.  If the complainant alleged that she thought the employee who misgendered her used a rude or mocking tone, could that affect the analysis of whether the encounter rose to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A    Again, every case is different, fact specific, and the analysis would be the came.  It would depend on whether the place of public accommodations intentionally treated the individual differently, in this case, deadnamed or misgendered the individual based on the individual's gender identity, and whether the conduct created an environment that was both subjectively and objectively hostile based on the individual's protected class.

Q    (By Mr. Martin)  So just to be clear, though, it is not your position that a single use,

*AB Litigation Services*

a single instance of misgendering or deadnaming could never rise to the level of harassment?

MS. PASSAMANECK:  Objection; form.

A      Again, it would be fact specific and depend on the specific interactions -- specific facts of an interaction, excuse me.

Q      (By Mr. Martin)  All right.  I'm going to move on to Born Again Used Books.  What do you know about Born Again Used Books?

A      The information that I know is from reviewing the documents in this case.

Q      What are the basic facts about the business that you're aware of?

MS. PASSAMANECK:  Objection; form.

A      They are a bookstore.

Q      (By Mr. Martin)  And you understand they sell books to the public?

A      Yes.

Q      And you understand they're a storefront that's open to the public?

A      Yes.

Q      Okay.  And in the division's view, is Born Again Used Books a place of public accommodation?

A      If Born Again Used Books is providing

*AB Litigation Services*

A    I think that we had discussed this before, but using pronouns I do not believe would be a service.

Q    (By Mr. Martin)  All right.  But stepping back a bit, it is possible that intentional deadnaming or misgendering of a patron at a place of public accommodation could rise to the level of harassment such that it violates CADA; is that right?

A    Intentional deadnaming or misgendering, in order to be -- to rise to the level of discrimination must rise to the level of harassment and create an environment that is both subjectively and objectively hostile based on an individual's protected class.

Q    Is it possible for intentional deadnaming or misgendering of a patron by a place of public accommodation to create a subjectively and objectively hostile environment and rise to the level of harassment?  I'm simply asking if that is a possibility that could happen.

MS. PASSAMANECK:  Objection; form.

A    It depends on the facts and circumstances of an actual interaction; it is possible.

Q    (By Mr. Martin)  Okay.  Could there be a

AB Litigation Services

situation or can you -- strike that.

Can you think of a scenario where the division would find that there was not an objectively hostile denial of service when a public accommodation intentionally deadnamed or misgendered a customer and the customer objectively experienced that experience as discrimination?

MS. PASSAMANECK:  Objection; form.

A    Because the division has never received a case based on a communication like this --

Q    (By Mr. Martin)  I'll just stop you for a moment.  At this point, I apologize, I'm not referring to the publication in specific.

A    Okay.

Q    I'm just asking in general.  Can you think of a scenario where the division would find that intentional misgendering or deadnaming did not rise to the level of harassment or an objective -- objectively hostile environment where there was intentional deadnaming and misgendering and the customer subjectively experienced the deadnaming or misgendering as discrimination?

MS. PASSAMANECK:  Objection; form.

A    I kind of got lost in your question.

Q    (By Mr. Martin)  The scenario is a

*AB Litigation Services*

complainant alleges they were intentionally

deadnamed or misgendered at a place of public

accommodation, and the division finds that the

customer subjectively experienced that encounter as

discrimination.

Can you imagine a scenario where the

division would not also find that that was an

objectively hostile environment that was created by

the misgendering or deadnaming?

MS. PASSAMANECK:  Objection; form.

A    The division would need to determine

objectively whether a reasonable person in similar

circumstances to the complainant would experience

alleged conduct as a denial of goods, services,

facilities, privileges, advantages, or

accommodations based on their protected class.

Sitting here, I can't think of specific examples.

Q    (By Mr. Martin)  Okay.  Going back

generally to the charges -- potential charges

against XX-XY Athletics.  If the division were to

receive a complaint alleging that XX-XY Athletics

misgendered or deadnamed the complainant at a

pop-up shop in Colorado, can you say definitively

that the division would not investigate that

charge?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No:    25-cv-01572-RMR-MDB           Date:    February 19, 2026
Courtroom Deputy:    E. Lopez Vaughan           FTR:    Courtroom 101

_Parties:_                                                  _Counsel:_

Defending Education et al                          Paul Draper

    Plaintiffs,

v.

Aubrey Sullivan et al                              Janna Fischer

    Defendants.

Truth and Liberty Coalition, Inc. et al

    Amicus                                         Andrew Nussbaum

---

Civil Action No:    25-cv-01668-RMR-MDB

Committee of Five, Inc.                            Mercer Martin

    Plaintiff
v.

Aubrey Sullivan, et al                             Janna Fischer

    Defendants

Truth and Liberty Coalition, Inc. et al

    Amicus                                         Andrew Nussbaum

---

Civil Action No:    25-cv-02177-RMR-MDB

Doxa Enterprise                                    Mercer Martin

    Plaintiffs,

**5-App-021**

v.

Aubrey Sullivan et al                                    Janna Fischer

  Defendants.

---

## COURTROOM MINUTES

---

**MOTION HEARING**

**1:02 p.m.         Court in session.**

Court calls case.  Appearances of counsel.

These matters are being heard contemporaneously on Plaintiffs'*Motions for Preliminary Injunctions:*
ECF No. 27 in 25-cv-01572
ECF No. 15 in 25-cv-01668
ECF No. 4 in 25-cv-02177

**2:22 p.m.         Court in recess.**
**2:29 p.m.         Court back in session.**

For reasons put forth on the record, the Court issues its findings in the form of
**RECOMMENDATION(S)** that the Motions for Preliminary Injunctions in each case be
**DENIED**.[1]

---

[1]**ADVISEMENT TO THE PARTIES**
Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the
Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of
Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that
does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A]
party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for
de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th
Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the
district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal
from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v.
Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de
novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d
at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to
preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref.
Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-
claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992)
(by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-
Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require
review).

**5-App-022**

Additionally, the Court considers the *Motions to Restrict* at ECF No.'s 72 and 88 in Case 25-cv-01572 and for reasons put forth on the record, it is

**ORDERED**:   The *Motions to Restrict* are both **GRANTED**.

**2:52 p.m.        Court in recess.**

Hearing concluded.
Total in-court time    01:45

\*To order transcripts of hearings, please contact Patterson Transcription Company at (303) 755-4536 or AB Litigation Services at (303) 629-8534.

**5-App-023**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

DEFENDING EDUCATION, *et al.*,

    *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official ca-
pacity as the Director of the Colorado Civil
Rights Division, *et al.*,

    *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

## PLAINTIFFS' OBJECTIONS TO THE REPORT & RECOMMENDATION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... ii

INTRODUCTION.................................................................................................... 1

ARGUMENT........................................................................................................... 2

    I.   The R&R misapplies the law of standing for pre-enforcement challenges............ 2

        A.  Courts presume enforcement for new laws. ............................................... 2

        B.  Defendants have not disavowed enforcement. ......................................... 3

        C.  Plaintiffs credibly fear that they will be accused of discrimination. ............. 5

        D.  The requested injunction would redress Plaintiffs' injury. ........................... 6

   II.  The R&R fails to properly weigh the equities. ........................................................ 7

  III. The R&R misunderstands the scope and nature of the requested injunction. ...... 8

CONCLUSION ...................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021) ....................................................................................6

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024) .....................................................................................3

*Aviel v. Gor*,
  780 F. Supp. 3d 1 (D.D.C. 2025)............................................................................. 10

*Babbitt v. Utd. Farm Workers Nat. Union*,
  442 U.S. 289 (1979)...................................................................................................6

*Bella Health & Wellness v. Weiser*,
  699 F. Supp. 3d 1189 (D. Colo. 2023) ......................................................................4

*Brown v. Herbert*,
  850 F. Supp. 2d 1240 (D. Utah 2012) .......................................................................3

*Bryant v. Woodall*,
  1 F.4th 280 (4th Cir. 2021) ........................................................................................2

*CDIA v. King*,
  678 F.3d 898 (10th Cir. 2012) ...................................................................................7

*CDIA v. Texas*,
  2023 WL 4744918 (5th Cir. July 25).........................................................................7

*Chiles v. Salazar*,
  116 F.4th 1178 (10th Cir. 2024) ................................................................................3

*Citizens for Responsible Gov't v. Davidson*,
  236 F.3d 1174 (10th Cir. 2000) .................................................................................4

*Colo. Motor Carriers Ass'n v. Vail*,
  153 F.4th 1052 (10th Cir. 2025) .............................................................................. 10

*Darren Patterson Christian Academy v. Roy*,
  699 F. Supp. 3d 1163 (D. Colo. 2023) ...................................................................2-4

*Free Speech Coal. v. Skrmetti*,
  761 F. Supp. 3d 1132 (W.D. Tenn. 2024) .................................................................7

*Free the Nipple v. Fort Collins*,
  916 F.3d 792 (10th Cir. 2019) ............................................................................7, 9-10

*Inst. for Free Speech v. Johnson*,
  148 F.4th 318 (5th Cir. 2025) ....................................................................................4

*ISKC v. Eaves*,
  601 F.2d 809 (5th Cir. 1979) .....................................................................................2

*Latta v. Otter*,
   2014 WL 12597162 (D. Idaho May 14) ........................................................ 10

*Masterpiece Cakeshop Inc. v. Elenis*,
   445 F. Supp. 3d 1226 (D. Colo. 2019) ........................................................ 7

*Masterpiece Cakeshop v. CCRC*,
   584 U.S. 617 (2018) ........................................................ 6

*Md. Shall Issue v. Montgomery County*,
   680 F. Supp. 3d 567 (D. Md. 2023) .............................................................. 2

*Mink v. Suthers*,
   482 F.3d 1244 (10th Cir. 2007) ........................................................ 4

*Mobil Oil Corp. v. Virginia*,
   940 F.2d 73 (4th Cir. 1991) ........................................................ 2, 7

*Prairie Band of Potawatomi Indians v. Pierce*,
   253 F.3d 1234 (10th Cir. 2001) ........................................................ 9-10

*S. Utah Drag Stars v. St. George*,
   677 F. Supp. 3d 1252 (D. Utah 2023) ........................................................ 9

*Scott v. Allen*,
   153 F.4th 1088 (10th Cir. 2025) ........................................................ 2

*Scott v. Hiller*,
   2022 WL 4726038 (D. Colo. Oct. 3) ........................................................ 3

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ........................................................ 3

*Unitednet v. Tata Commc'ns Am.*,
   2023 WL 2665578 (D.N.M. March 28) ........................................................ 6

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ........................................................ 6

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ........................................................ 2

*W. Watersheds Project v. Michael*,
   353 F. Supp. 3d 1176 (D. Wyo. 2018) ........................................................ 3

*Winsness v. Yocom*,
   433 F.3d 727 (10th Cir. 2006) ........................................................ 5

**Statutes**

Colo. Rev. Stat. §24-34-306 ........................................................ 7

Colo. Rev. Stat. §24-34-602 ........................................................ 7

## INTRODUCTION

This Court should not follow the Report and Recommendation, which advises the Court to deny a preliminary injunction even though Plaintiffs' speech is *currently* being chilled by Colorado's novel ban on so-called misgendering and deadnaming.

To start, the R&R accepts Defendants' erroneous standing arguments, finding that there is no credible threat that Defendants will enforce H.B. 25-1312 against Plaintiffs. But all the factors that bear on the likelihood of enforcement favor Plaintiffs here. *See* PI.Reply (Dkt.98) 7-12. Courts consistently apply a presumption of enforcement for new laws like H.B. 25-1312, Defendants refuse to disavow enforcement, and Plaintiffs credibly fear they will be punished because they have been targeted for their views before and Defendants have punished so-called non-gender-affirming speech in the past.

The R&R errs on the remaining preliminary-injunction factors as well. It finds no irreparable harm because it finds no credible threat of enforcement, but there *is* a credible threat of enforcement and First Amendment injuries are per se irreparable harm. Plaintiffs promptly sought a preliminary injunction against Colorado's new speech codes, and there is *no* state interest that can justify enforcing an unconstitutional law.

Finally, the R&R declares the requested injunction disfavored because, in its view, the injunction is broad, would give Plaintiffs all the relief they could secure after a final judgment, and would upset the status quo. But none of those rationales is correct. The Court can craft an appropriately tailored injunction; temporary relief is not the same as a permanent injunction; and the injunction would preserve, not upset, the status quo. The Court should reject the R&R and grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

**I.      The R&R misapplies the law of standing for pre-enforcement challenges.**

Standing in the First Amendment context is a "'lenien[t]'" test, "'facilitating pre-enforcement suits.'" *Scott v. Allen*, 153 F.4th 1088, 1095 (10th Cir. 2025). Plaintiffs satisfy that test. *See* Pl.Reply 5-28. The R&R reaches the opposite conclusion only because it misapplies the law of standing for pre-enforcement challenges. Though it assumes that Plaintiffs' speech is "pr[o]scribed" and "chilled" by Colorado law, it finds no "credible threat of enforcement." Tr. (Ex.A) 84:13-18. But all the relevant factors show otherwise.

**A.      Courts presume enforcement for new laws.**

Courts are "entitled to assume that [state] agencies will not disregard" a "recent expression of the legislature's will." *ISKC v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979). As such, courts evaluating the likelihood of enforcement presume that new laws, like H.B. 25-1312, will be enforced. *See* Pl.Reply 7-8. The R&R errs by rejecting this presumption.

The R&R criticizes some of the cases Plaintiffs cite to demonstrate the presumption. The R&R tries, for example, to minimize the Supreme Court's observation in *Virginia v. American Booksellers Association* that there is "no reason to assume" a "newly enacted law will not be enforced." 484 U.S. 383, 393 (1988); *see* Tr. 86:17-87:1. But federal courts have consistently read *American Booksellers* to support a presumption of enforcement for new or recently amended laws. *E.g.*, *Bryant v. Woodall*, 1 F.4th 280, 286-87 & n.1 (4th Cir. 2021); *Mobil Oil Corp. v. Virginia*, 940 F.2d 73, 76 (4th Cir. 1991); *Md. Shall Issue v. Montgomery County*, 680 F. Supp. 3d 567, 578 (D. Md. 2023).

The R&R likewise tries to downplay *Darren Patterson Christian Academy v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023). *See* Tr. 86:7-16. But *Darren Patterson* agreed that

"courts have held there is a 'presumption of enforcement'" for new laws. 699 F. Supp. 3d at 1176. In line with that presumption, *Darren Patterson* concluded that, when a challenged law is new, the "relevance" of prior enforcement is "diminish[ed]." *Id.*

Regardless, the R&R ignores the many other cases, both in the Tenth Circuit and elsewhere, recognizing a presumption of enforcement for new laws. *E.g.*, *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012); *W. Watersheds Project v. Michael*, 353 F. Supp. 3d 1176, 1183 (D. Wyo. 2018); *Antonyuk v. James*, 120 F.4th 941, 1016 (2d Cir. 2024); *Speech First v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (collecting cases). The R&R, on the other hand, musters not even a single case rejecting the presumption.

## B.   Defendants have not disavowed enforcement.

Presumptions aside, when a defendant refuses to disavow enforcement of a challenged law, that suffices to find a credible threat of enforcement. *See* Pl.Reply 8-9. Indeed, the Tenth Circuit has found a credible threat based solely on a refusal to disavow enforcement. *E.g.*, *Chiles v. Salazar*, 116 F.4th 1178, 1198-99 (10th Cir. 2024); *see also Scott v. Hiller*, 2022 WL 4726038, at *6 (D. Colo. Oct. 3). And Defendants have never promised that they will not enforce the challenged CADA provisions against Plaintiffs, so this factor favors a preliminary injunction here. *See* Pl.Reply 8-9, 27.

The R&R reaches the opposite conclusion only because it treats Defendants' *statutory construction* argument that misgendering and deadnaming are not "per se unlawful" under CADA as equivalent to a full disavowal. *See* Tr. 87:15-88:23 (describing Defendants' "interpretation of the subject CADA provisions" as, "[i]n essence, … a disavowal."). That was error, for two reasons. First, Defendants' contention that enforcement of CADA

against misgendering and deadnaming depends on the "'facts and context of the usage and the circumstances,'" Tr. 88:3-5, is the *opposite* of a disavowal. *See Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (argument that "enforcement would depend on the facts of the case" constitutes "refusal to disavow prosecution" (cleaned up)). It is an assertion that Defendants will enforce the statute when they see fit.

Second, as a matter of law, a defendant's mid-litigation statutory construction argument is not the kind of categorical disavowal required to dispel a credible threat of enforcement. *See* PI.Reply 16, 19-20. In *Citizens for Responsible Gov't. v. Davidson*, for example, the Tenth Circuit found a credible threat of enforcement—even though Colorado "insisted that" the plaintiffs would "not be prosecuted" "under the State's construction" of the law—because courts do not "defer" to the government's statutory "construction." 236 F.3d 1174, 1192-93 (10th Cir. 2000). Likewise, in *Bella Health & Wellness v. Weiser*, the court explained that "limited disavowals" provided by "*counsel*" at a "preliminary-injunction hearing" "do not have the same sort of force as the [enforcing authority] forswearing enforcement under penalty of perjury." 699 F. Supp. 3d 1189, 1208 (D. Colo. 2023). And arguments "that it is *possible* [Defendant] won't discipline Plaintiffs" are "a far cry from the showing needed to defeat pre-enforcement standing." *Id.* at 1209; *see also Darren Patterson*, 699 F. Supp. 3d at 1180 (a "disavowal" that "is a product of litigation" "fall[s] flat").

Defendants' efforts to muddy the statutory waters, in other words, fall far short of the formal and unequivocal disavowals that the Tenth Circuit has found sufficient in other cases. *E.g.*, *Mink v. Suthers*, 482 F.3d 1244, 1255-57 (10th Cir. 2007) (defendant issued a public decision, outside the context of litigation, "in writing," taking the "unequivocal

4
**5-App-031**

position" that the plaintiff "would not be prosecuted under the statute now or in the future");

*Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (defendant "filed an affidavit" promising that he would not prosecute the plaintiff "or anyone else under the statute" "'unless and until the constitutional doubts about the … statute are eliminated through a constitutional amendment or a new decision of the United States Supreme Court'").

Proving the point, even Defendants don't describe their arguments as a disavowal. *See* Pl.Reply 8, 29; Plaintiffs' App'x (Dkt.98-1) 2-8 ("there is insufficient information" to say "whether Plaintiffs' desired speech" violates CADA), 809:25-810:2 (agreeing that, "if someone is violating CADA, the division will enforce the statute"). And the R&R itself acknowledges that Defendants' interpretive arguments "are not law and ultimately" may not be "relevant … at all … to the question of constitutionality." Tr. 88:9-11.

### C.    Plaintiffs credibly fear that they will be accused of discrimination.

Plaintiffs' speech is chilled because they fear that someone will file charges of discrimination against them if they misgender or deadname. *See* Pl.Reply 9-12, 23-24. The R&R diminishes Plaintiffs' fears, noting that no one has yet filed a formal discrimination charge against them. *See* Tr. 88:24-89:11. But the R&R gets at least three things wrong.

First, H.B. 25-1312 is a new law. Before it was enacted, CADA did not ban Plaintiffs' speech. And since it was enacted, Plaintiffs have remained silent because they fear punishment. *See* Pl.Reply 23-24. So it is "not surprising" that no one has complained about their speech yet. *Id.* Second, although no one has *formally* complained about Plaintiffs to the Division, Plaintiffs are frequently harassed, accused of transphobia, and threatened with legal action for their speech. *Id.* at 12, 14, 17, 23. The possibility that one of

those disgruntled individuals files a formal complaint is far from "imaginary." *Babbitt v. Utd. Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979). Especially because, as the R&R acknowledges, "any person can file a charge" against Plaintiffs "alleging discrimination." Tr. 90:9-10. Third, the Division has received discrimination charges based on misgendering or deadnaming in the past, and it has found probable cause in some of those cases. *See* PI.Reply 9-12; *contra* Tr. 89:12-25.

In essence, the R&R would force Plaintiffs to wait until someone has formally accused them of discrimination before allowing them to challenge Colorado's speech bans. *See* PI.Reply 24-25. But "a plaintiff need not first expose himself to actual … prosecution to be entitled to challenge the statute." *Babbitt*, 442 U.S. at 302 (cleaned up).

### D.     The requested injunction would redress Plaintiffs' injury.

Finally, the R&R suggests that a preliminary injunction would "be of limited practical value" because, while it would prohibit enforcement by Defendants, it may not stop private individuals from filing lawsuits against Plaintiffs. Tr. 81:18-83:5. Notably, this argument was not raised by Defendants. *See Unitednet v. Tata Commc'ns Am.*, 2023 WL 2665578, at *4 (D.N.M. March 28) ("The Court generally does not address issues which have not been briefed by the parties."). Nor was it raised in *303 Creative* or *Masterpiece Cakeshop*, which both granted similar injunctions against the same Defendants and the same law (CADA) at issue here. *See* 6 F.4th 1160 (10th Cir. 2021); 584 U.S. 617 (2018).

An injunction does not have to fix *all* of a plaintiff's injuries. Even without "full redress," the ability "'to effectuate a partial remedy'" warrants injunctive relief. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021). The Tenth Circuit, applying this principle, has

held that injunctions against state officials are appropriate even "in cases where the state defendant shares enforcement power with private litigants." *CDIA v. King*, 678 F.3d 898, 904-05 (10th Cir. 2012). Other courts apply the same rule, *e.g.*, *CDIA v. Texas*, 2023 WL 4744918, at *6 (5th Cir. July 25) (such injunctions still "reduce the total amount of risk and liability" that plaintiffs face); *Mobil Oil Corp*, 940 F.2d at 76 (similar), including in First Amendment cases alleging chilled speech, *e.g.*, *Free Speech Coal. v. Skrmetti*, 761 F. Supp. 3d 1132, 1143, 1147-48 (W.D. Tenn. 2024).

Of course, there are many practical reasons to fear Defendants more than private lawsuits: As government officials, Defendants have more resources; unlike individuals, they can file charges of discrimination without an "aggrieved" party, *compare* Colo. Rev. Stat. §24-34-306(1)(b) *with* §24-34-602(1)(a); and, though individuals can file their own lawsuits, they are more likely to seek redress *through* the Division's complaint process. And, as Plaintiffs have explained, they fear Defendants in particular because Defendants have targeted similar entities for their views on gender identity before. *See* Pl.Reply 9-10; *e.g.*, *Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226 (D. Colo. 2019).

## II. The R&R fails to properly weigh the equities.

Because Plaintiffs likely have standing and likely prevail on the merits of their constitutional claims, they prevail on the equities as well. *See* Pl.Reply 30-36. It is "well-settled" that constitutional violations are an irreparable injury, "'even a temporary loss'" of constitutional rights trumps any harm that a preliminary injunction might cause to a defendant, and it is "'always in the public interest to prevent the violation of a party's constitutional rights.'" *Free the Nipple v. Fort Collins*, 916 F.3d 792, 806-07 (10th Cir. 2019).

The R&R gets the equities wrong largely because it gets the standing question wrong. *See* Tr. 90:23-91:3 (finding no credible threat and no irreparable injury "[f]or similar reasons"). Specifically, the R&R's equities analysis repeats two errors from its standing analysis. First, it finds that the "absence of pending complaints or a history of enforcement" against Plaintiffs' conduct "undermines any claim of imminent or non-speculative harm." *Id.* at 91:3-6. But, as explained above, H.B. 25-1312 is a new law that dramatically expanded CADA to prohibit all misgendering and deadnaming in public accommodations, and Plaintiffs credibly fear that one of the many transgender individuals who have protested their speech in the past may take advantage of the law's new provisions. *See supra* 5-6; Pl.Reply 31-32. Second, the R&R accuses Plaintiffs of delay, claiming that the challenged CADA provisions "have been in place for decades." Tr. 91:7-9. But again, CADA in its current form was in place for only *one* business day before Plaintiffs sued. Even if Plaintiffs could have sought relief sooner, "'tardiness is not particularly probative in the context of ongoing'" constitutional injuries like chilled speech, which is why "'courts are loath to withhold relief solely on th[e] ground'" of "'delay.'" Pl.Reply 32-33.

On the balance of harms and the public interest, the R&R credits Defendants' assertion that they have a "significant interest in administering and enforcing [their] anti-discrimination regime" to punish speech that offends transgender individuals. Tr. 91:12-13; *see also* Pl.Opp. (Dkt.85) 43-44. But *no* state interest justifies applying an unconstitutional law in a manner that violates Coloradans' speech rights. *See* Pl.Reply 34-36.

III.    **The R&R misunderstands the scope and nature of the requested injunction.**
The R&R also raises a series of "threshold" objections to Plaintiffs' requested

preliminary injunction. Tr. 79:19-81:17. But these objections mischaracterize the requested relief and misconstrue applicable caselaw.

To start, the R&R says the requested injunction is too "broad" because it seeks to enjoin the unconstitutional CADA provisions in full as well as any "'materially similar statutory or regulatory provisions.'" Tr. 80:3-11; *see also id.* at 91:10-12. As Plaintiffs' briefs explain, they are entitled to that relief. *See* PI.Mot. (Dkt.27) 11-26; PI.Reply 37. But even if the Court disagrees, that does not justify denying injunctive relief altogether. Injunctions are not "binary." Tr. 40:4-17. They are flexible remedies, and the Court "'has considerable discretion'" when "'defining the terms of an injunction.'" *S. Utah Drag Stars v. St. George*, 677 F. Supp. 3d 1252, 1275 (D. Utah 2023). The Court can exercise that discretion to craft a tailored injunction "that bars Defendants from enforcing CADA in a manner that violates Plaintiffs' First and Fourteenth Amendment rights while allowing them to enforce the law to prohibit *actual* denials of service." PI.Reply 34-35. But the R&R declines to exercise that discretion and instead rejects an injunction wholesale.

Next, the R&R says the injunction is "disfavored" because it "seek[s] the same injunctive relief requested in the complain[t]." Tr. 80:12-16. Not so. A preliminary injunction "falls into the all-the-relief category only if its effect, once complied with, cannot be undone." PI.Reply 39 (quoting *Free the Nipple*, 916 F.3d at 798 n.3). It would be impossible, for example, to unwind a preliminary injunction that covers a one-time event or requires "'the disclosure of confidential information.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-48 (10th Cir. 2001). Here, by contrast, the preliminary injunction would provide "only *temporary*" protection for Plaintiffs' speech. *Id.* at 1248. If

9
5-App-036

Defendants ultimately prevail, the preliminary injunction will be lifted. If Plaintiffs prevail, they will be entitled to a separate permanent injunction that prohibits enforcement indefinitely. Either way, "the preliminary injunction" does not afford "all the relief [Plaintiffs] might recover" after a full victory. *Id.* "[I]nterim relief" is not "'complete'" relief. *Id.*

Finally, the R&R concludes that "a preliminary injunction would disturb … the status quo" because CADA is a "longstanding statute." Tr. 81:5-17; *see also id.* at 91:14-15. But the R&R "ha[s] it backward." *Aviel v. Gor*, 780 F. Supp. 3d 1, 16 n.6 (D.D.C. 2025). It is *Plaintiffs* who want to preserve the "longstanding" status quo in which misgendering and deadnaming were *not* punished by CADA. *See* PI.Reply 38-39; *Free the Nipple*, 916 F.3d at 798 n.3 (the "status quo" is the "'last peaceable uncontested status existing between the parties'"). Colorado disrupted that status quo when it amended CADA "to punish *all* refusals to use someone's 'chosen name' or other forms of 'addres[s].'" PI.Reply 38-39; *see* Tr. 81:8 (R&R acknowledging that H.B. 25-1312 "amend[ed]" CADA). The only case the R&R cites to support its contrary conclusion involved a law that had existed in its challenged form, *without* amendment, for "more than a year" before the plaintiffs sued. *Colo. Motor Carriers Ass'n v. Vail*, 153 F.4th 1052, 1057, 1065-66 (10th Cir. 2025).

Besides, the "status quo" is of little importance compared to the paramount goal of preventing irreparable harm. PI.Reply 38. "[T]he public interest" does not "favor preserving a status quo that deprives individuals of their constitutional rights." *Latta v. Otter*, 2014 WL 12597162, at *1 (D. Idaho May 14).

### CONCLUSION

The Court should reject the R&R and grant the preliminary injunction.

Dated: March 5, 2026

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Cameron T. Norris
Paul R. Draper
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
cam@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 5, 2026, I e-filed the foregoing brief with the Clerk of the

Court using the Court's ECF system, which will email everyone requiring notice.

*/s/ J. Michael Connolly*
Counsel for Plaintiffs

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 1 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 43

1

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

DEFENDING EDUCATION, et al.,   . Case No. 25-cv-01572-RMR-MDB
                               .
          Plaintiffs,          .
                               .
vs.                            . Colorado Springs Courthouse
                               . 212 North Wahsatch Avenue
AUBREY C. SULLIVAN, et al.,    . Suite 100
                               . Colorado Springs, CO  80903
          Defendants.          .
                               .
TRUTH AND LIBERTY COALITION,   .
INC., et al.,                  .
                               .
          Amicus               .
                               . February 19, 2026
. . . . . . . . . . . . . . . . 1:01 p.m.
                               .
COMMITTEE OF FIVE, INC.,       . Case No. 25-cv-01668-RMR-MDB
                               .
          Plaintiff,           .
                               .
vs.                            .
                               .
AUBREY C. SULLIVAN, et al.,    .
                               .
          Defendants.          .
                               .
TRUTH AND LIBERTY COALITION,   .
INC., et al.,                  .
                               .
          Amicus               .
. . . . . . . . . . . . . . . .
                               .
DOXA ENTERPRISE,               . Case No. 25-cv-02177-RMR-MDB
                               .
          Plaintiffs,          .
                               .
vs.                            .
                               .
AUBREY C. SULLIVAN, et al.,    .
                               .
          Defendants.          .
. . . . . . . . . . . . . . . .

**5-App-039**

2

**TRANSCRIPT OF PROCEEDINGS HELD BEFORE**
**THE HONORABLE MARITZA DOMINGUEZ BRASWELL,**
**UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs Defending Education, et al.: | Consovoy McCarthy PLLC<br>By:  Paul R. Draper<br>By:  J. Michael Connolly<br>1600 Wilson Boulevard<br>Suite 700<br>Arlington, VA  22209<br>(703) 243-9423 |
| For the Plaintiffs Committee of Five and Doxa Enterprises, Ltd.: | Alliance Defending Freedom<br>By:  Mercer Martin<br>By:  Henry Framptom<br>15100 North 90th Street<br>Scottsdale, AZ  85260<br>(480) 444-0020 |
| For the Defendants: | Colorado Department of Law<br>By:  Janna K. Fischer<br>By:  Nora Quinto Passamaneck<br>By:  Dominick D. Schumacher<br>1300 Broadway<br>Denver, CO  80203<br>(720) 508-6374 |
| For Colorado Attorney Philip Jacob Weiser: | Colorado Attorney General's Office<br>By:  Talia Kraemer<br>By:  Lane Towery<br>1300 Broadway<br>Denver, CO  80203<br>(720) 508-6000 |
| For Amicus: | First & Fourteenth PLLC<br>By:  Andrew M. Nussbaum<br>2 North Cascade Avenue<br>Suite 1430<br>Colorado Springs, CO  80903<br>(719) 428-4937 |

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 3 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 45

3

APPEARANCES, Continued:

Court Recorder:                     Clerk's Office
                                    U.S. District Court
                                    212 N. Wahsatch Ave., Ste. 100
                                    Colorado Springs, CO  80903

Transcription Service:              AB Litigation Services
                                    216 16th Street, Suite 600
                                    Denver, CO  80202
                                    (303) 296-0017

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**5-App-041**

4

(Time Noted:  1:01 p.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Okay.  Take a seat.  Thank you.  All right.  All right.  Good morning -- no, good afternoon.  Good afternoon.  Thank you all for being here.

My courtroom deputy is very ill, and so she is basically running everything from chambers remotely.  So just bear with us if we have any tech glitches that may require a quick pause, but hopefully, everything goes smoothly today.

We are here in connection with three different cases -- 25-cv-1572, 25-cv-1668, 25-cv-2177.  And I'll start by having counsel enter their appearance and tell me who you're here on behalf of, and then we'll get started.

MR. DRAPER:  Your Honor, Paul Draper from Consovoy McCarthy.  I'm here on behalf of all the Plaintiffs in the Defending Education matter.

THE COURT:  Okay.

MR. CONNOLLY:  Michael Connolly with the Defending Education Plaintiffs.

THE COURT:  Okay.

MR. MARTIN:  Mercer Martin on behalf of XX-XY Athletics and Born Again Used Books.

THE COURT:  Okay.

MR. FRAMPTON:  And Hal Frampton on behalf of XX-XY Athletics and Born Again Used Books.

**5-App-042**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 5 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 47

5

THE COURT:  Okay.

MS. FISCHER:  Good morning.  Janna Fischer on behalf of the Colorado Civil Rights Division and the Colorado Civil Rights Commission.

MS. PASSAMANECK:  Nora Passamaneck on behalf of the Division and Commission Defendants in all cases.

MS. KRAEMER:  Talia Kraemer on behalf of Attorney General Weiser in all three of the cases.

MR. TOWERY:  Lane Towery on behalf of the Attorney General also on all three of the cases.

MR. SCHUMACHER:  Dominick Schumacher on behalf of the Division and Commission Defendants in all cases.

THE COURT:  Okay.  All right.  Now going forward, when you speak, don't stand up anymore.  It's very difficult for the microphones to catch your voice when you're far away from them, so you need to pull them close to you if you want to seat while you speak, which is fine by me.

Or you can come up to the podium if you want to stand while you're making an argument.  But it has to be into the microphone or the recording won't capture your voice.

Okay.  So we are here in connection with the preliminary injunction motions that were filed by the Plaintiffs.  I have reviewed everything, so I don't need folks to walk through each of the arguments.

I've read everything.  I've looked at the record

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 6 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 48

6

that you've submitted.  I have some specific questions.  So hopefully you'll be prepared to answer some targeted questions today.

But before we start with that and I start to fire off some questions, I think it would be really helpful for you to table set a little bit, in part because I have some student observers here today, and I think it would be helpful just to help them understand the context that we're in.

Obviously, you're here to argue your preliminary injunction motions, but a little bit of table setting around your claims can be really helpful.  Keep it short.  Just 5 minutes, 5 to 10 minutes, somewhere in there.

And then I'll give the Defendants an opportunity to respond and also frame.  And then I will probably move right into questions, if that's okay with you.  I will, after I ask you some questions, give you an opportunity to tell me anything else you think I need to take into consideration.

But that's about how today's going to go.  Hopefully we can be done in about an hour or so.  Okay?  That sound good?  Any questions?

All right.  And I'm going to start with Plaintiffs, and again, you can do it from your seat or you can come up to the podium.

MR. DRAPER:  Okay.  I'll come up to the podium.

THE COURT:  Okay.

MR. DRAPER:  Good afternoon, Your Honor.  Again, my name is Paul Draper.  I'm here on behalf of all the Plaintiffs in the Defending Education matter.

The Plaintiffs in our matter are Defending Education and Do No Harm, which are associations, and then Colorado Parent Advocacy Network and Protect Kids Colorado, which are parent advocacy groups based here in Colorado, as well as Drs. Morrell and Leswing, who are both physicians who work in medical practices here in Colorado, and finally, Dr. Leswing's medical practice, Mountain Pediatrics.

So all of our Plaintiffs have deeply-held beliefs that sex is fixed at birth and is immutable.  Accordingly, before Colorado adopted House Bill 25-1312, all of our Plaintiffs frequently misgendered and deadnamed in places of public accommodation, which is to say that they use biologically accurate pronouns and birth names to refer to self-identified transgender individuals who prefer different terms.

But now, following HB25-1312, they feel that they cannot use that speech or publish statements consistent with that speech, else they risk financial and equitable penalties.

We think that's an unconstitutional regulation of speech under both the First and Fourteenth Amendments, and it is currently chilling our Plaintiffs' speech.  That's why we

**5-App-045**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 8 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 50

8

need a preliminary injunction.

So, as Your Honor probably knows, most of the action in this case in the briefing so far has been on standing, and we certainly do have standing as the Plaintiffs.

But I'd like to start by touching on the merits briefly.  And I think that's important because throughout all of this briefing, the Defendants have not made any arguments on the merits.  I think it's understandable, though, because the merits are so clearly in the Plaintiffs' favor here for a number of reasons.

So Colorado law currently requires post-HB25-1312, anyone operating in a place of public accommodation to refer to somebody using their preferred pronouns and chosen name as it reflects their gender expression.

That is a content-based regulation, a viewpoint-based regulation, compelled speech, and arguably over broad. It regulates based on content because it requires people to use certain language in connection with gender expression and gender identity.

It regulates based on viewpoint because, again, our Plaintiffs believe that sex is fixed at birth and not changeable, and they want to express that belief through their use of biologically-accurate pronouns and birth names that correspond to an individual's sex at birth.

9

THE COURT:  Counsel --

MR. DRAPER:  Yes.

THE COURT:  -- will you do me a favor and just slow down a little tiny bit?

MR. DRAPER:  Yeah, sure.

THE COURT:  I know I'm the one --

MR. DRAPER:  No problem.

THE COURT:  -- that said, hey, we've got to get through this quick --

MR. DRAPER:  No problem.

THE COURT:  -- but just slow down a little bit.

MR. DRAPER:  Yeah.  So they want to express that viewpoint through the use of biologically-accurate pronouns and through the use of birth names.  But the law, as it currently stands now, requires them to use chosen names and preferred pronouns, which endorse the state's view that sex is mutable and people can change their gender identity.

Obviously, it's compelled speech because it requires people to use certain language, not the language of their choosing.  Or alternatively, it requires them to stay silent and avoid using preferred pronouns or biologically-accurate pronouns at all.  But again, our Plaintiffs want to be using biologically-accurate pronouns.

The law also prohibits what we call unwelcome statements or unwelcome advertisements.  These are any

**5-App-047**

statements that somebody operating a place of public accommodation puts out that make someone directly or indirectly feel unwelcome in the place of public accommodation.

Our Plaintiffs' speech could violate that law in one of two ways. One, when they misgender or deadname somebody, or indicate that they're going to do so, a person who identifies as transgender and prefers preferred pronouns or a chosen name, would feel that if they go into that place of public accommodation, they're not going to be referred to with their preferred terms, and so they're going to feel unwelcome.

Or if our Plaintiffs make statements generally expressing their beliefs about issues of gender identity, refusing to endorse the idea that a person can change their gender, somebody might feel unwelcome being in their place of business or being at their events.

So that's how the law affects our Plaintiffs. Again, we think these are clear violations of the First Amendment because it regulates their speech, and the Fourteenth Amendment, because these laws are unconstitutionally vague. It's very unclear what it means for a person to feel unwelcome.

And as Judge Tymkovich said in the *303 Creative* opinion, that seems to be a very subjective term. It's also

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 11 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 53

11

unclear what it means to directly or indirectly make somebody feel unwelcome.  So the law violates the First and Fourteenth Amendments.

On the other PI factors, the Defendants devote most of their energy to disputing our standing.  But standing in the First Amendment context is a very low threshold, and we clearly satisfy it for a number of reasons.

Number one, our Plaintiffs' speech is chilled by a credible threat of enforcement.  And two things in particular make this very clear.  First, this is a new law.  HB25-1312 was passed just this most recent May, and we filed this lawsuit the very next business day.  So it's a new law.

And second, the Defendants have never disavowed the authority to enforce it against Plaintiffs or against anybody else.  In fact, they've pointedly refused to even say whether they think our conduct, our speech, violates the law.  So our Plaintiffs are kind of operating under this vague worry that, you know, they don't know whether what they're going to say is going to violate the law.

So it's a new law, and Defendants have refused to disavow enforcement.  And in recent decisions, most notably the *Chiles* decision, the Tenth Circuit has made clear that these are probably the most important factors in the preliminary injunction analysis when it comes to evaluating a credible threat of enforcement.

**5-App-049**

In *Chiles*, for example, which was another case addressing questions of gender identity and gender affirmation -- in that context, it was a conversion therapy law -- the court found the likelihood of enforcement without any past enforcement and placed great emphasis on the fact that the state had refused to disavow enforcement.

*303 Creative*, which was a challenge to CADA, again, the same law we're challenging here, also noted and placed, you know, a decent amount of emphasis on the fact that the state refused to disavow enforcement.  So those are the most important factors, and we think are more than enough to find a credible threat of enforcement here.

But the other credible threat of enforcement factors also cut in favor of the Plaintiffs.  So when it comes to past enforcement, the Defendants in this case, they have found probable cause in plenty of past discrimination cases alleging discrimination based on transgender status. And in at least two cases, they have found probable cause based solely on misgendering or deadnaming.

And finally, the last factor is a question of who can file a complaint under CADA.  Anybody who feels aggrieved by a case of discrimination can go to the Division and file a complaint.  And then on top of that, the Defendants here also have the authority to file complaints on their own initiative.

So all of the credible threat factors cut in favor of the Plaintiffs here.  That brings me to what I think is a second important point, which is that our Plaintiffs in particular are likely to be targets of complaints of discrimination.

That's because they're all very public about their views.  So two of our Plaintiffs, Colorado Parent Advocacy Network and Protect Kids Colorado, a very core part of their mission is opposing the spread of what they describe as gender ideology and the whole idea that people can change their genders.

They oppose that.  They oppose it in particular spreading that idea amongst their youth.  So obviously, this is kind of their reason for being.  They're very public about their views.  They host many events on it.  They've gotten a lot of aggression from members of the public in the past for their views.

So it's very reasonable to believe that they're going to be targeted by people who want to file complaints about that in the future.

And then again, Drs. Morrell and Leswing are also very public about their views.  Dr. Morrell speaks widely about this and writes very widely about issues of gender identity.  Dr. Leswing has also been very clear about her views.

**5-App-051**

She said in her deposition testimony, members of her community are very familiar with her.  She's very clear with her patients.  So people know who they are.  They're very likely to be targeted.  That's what happened, for example, to Jack Phillips in the *Masterpiece Cakeshop* cases.

After his first round of litigation involving CADA, he was the target of a discrimination complaint because he refused to bake a cake celebrating a gender transition ceremony.  Sorry.

So I think in addition to generally -- in addition to the PI factors for credible enforcement generally cutting in favor of the Plaintiffs here, our Plaintiffs in particular face a high likelihood of having the law enforced against them or at least having complaints filed against them.

I think the Defendants' contrary arguments don't necessarily prevail, and I imagine Your Honor will have a number of more specific questions about this.  So I'll try to keep my initial statements brief.

First, they say that CADA does not apply at all to some of our Plaintiffs, in particular CPAN and PKC when they're operating in places of public accommodation.  The Defendants want to argue that CADA only applies to a place or an entity that is itself a place of public accommodation.

But two reasons why that doesn't work.  One is if you look at the text itself, the text very clearly indicates

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 15 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 57

15

that what is unlawful is for a person in a place of public accommodation to do something that denies somebody equal access to or enjoyment of the place of public accommodation.

So the law operates against the person operating the place of public accommodation, not against the physical place of public accommodation itself.

The second point is case law pretty consistently reaches that same conclusion. We cite a number of cases in our brief. In our initial motion, we cite the *Creek Red Nation* case. In our reply brief, we cite the *PGA Tour* case.

Both of those cases make the point that when a private entity that is not otherwise a place of public accommodation operates in a place of public accommodation, they're subject to exactly the same laws.

Second, the Defendants try to rewrite CADA and conjure extra elements to avoid opposing -- applying the law to Plaintiffs' conduct here. For example, they say that misgendering and deadnaming would only be violations of CADA if the law is -- or if the misgendering and deadnaming creates a hostile environment, is severe or pervasive, is intentional or repeated, all of these extra terms, none of which are found in the CADA statute itself.

All CADA says is that if you deny somebody equal enjoyment of a place of public accommodation because you refuse to use their preferred pronouns or their preferred

**5-App-053**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 16 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 58

16

name, you've committed a violation of the law.  It's straightforward.  It doesn't require the misgendering or deadnaming to be intentional, severe, pervasive, hostile, any of that.

And even if it did, our Plaintiffs' speech would arguably fall -- meet the -- meet even that higher standard for liability because they do misgender or deadname people intentionally, repeatedly, because they're trying to express their sincere beliefs about sex and gender.

And in the case of Dr. Leswing and Dr. Morrell, they're trying to treat their patients holistically and they feel that part of that is affirming the person's actual biological sex.

And then finally, Defendants seem to acknowledge that the law does apply to Dr. Morrell and Dr. Leswing, but they think it's just unlikely that they're going to have a complaint filed against them because nobody's filed a formal complaint before.

But I think the record clearly belies that because, one, HB25-1312 is a new law.  Previously, their speech was not unlawful, or at least not as clearly unlawful as it is now.  So it makes sense that they wouldn't have complaints filed against them before.

But they have been the target of very aggressive, I guess I would call them informal complaints from members of

the public and from their own patients.  Dr. Morrell, for example, he's given speeches where he wants to talk about this topic, and people have contacted the accrediting agency for continuing medical education credits and had those credits revoked.

He's had people file Google reviews against his medical practice saying that he's not a safe doctor for LGBT patients.  A number of people, he's been threatened with litigation before because he refused to support the idea of a ban on gender conversion therapy.  So he's faced a number of complaints.

Dr. Leswing in particular has had a number of patients leave her medical practice specifically because she refused to use so-called gender-affirming pronouns and names with her patients.

It's very likely now that HB25-1312 is in place and CADA does squarely ban misgendering and deadnaming that a number of those people, it's possible they may choose to file complaints against them now.

And of course, in a pre-enforcement challenge, Plaintiffs don't need to have already faced a complaint or an act of enforcement against them.  If they did, that would defeat the idea of a pre-enforcement challenge altogether. And of course, that's not what the law requires.

I think at the end of the day, the Defendants'

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 18 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 60

18

arguments essentially boil down to saying, look, you can't bring this challenge until somebody has actually enforced the law against you.

But the First Amendment context in particular does not require that because we're particularly concerned about chilled speech, and we don't want to put any Plaintiff in a situation where they face a choice of either exercising their First Amendment rights and facing liability when somebody does file a complaint against them and having to contest the law there.

We don't want to force them to choose between that or silencing themselves to avoid liability altogether and any kind of challenge.  So I think that's just a good general sketch of our points and our claims.  I'm happy to take more questions now or let maybe some of the other --

THE COURT:  I think I'm going to pivot and just ask you --

MR. DRAPER:  Yeah, sure.

THE COURT:  -- the questions now.  I was anticipating a little bit of table setting from the Plaintiffs and then a little from the Defendants, but you sort of went into the argument, so I'm just going to --

MR. DRAPER:  Sorry, yeah.  Go --

THE COURT:  It's okay.

MR. DRAPER:  -- go ahead.

**5-App-056**

19

THE COURT:  I'm going to pivot --

MR. DRAPER:  Happy to take any questions.

THE COURT:  -- and just ask you some questions.  So I want to start first with the actual acts and actions of your clients and whether those are indeed prescribed by statute.

Because all the evidence I saw here, and I think even as you're arguing it, concerns misgendering and deadnaming.  I mean, that's it.  That's what they're saying they want to do.  They want to misgender, they want to deadname.  And to your point, they're doing it intentionally.  They have a reason for it, and they plan to do it repeatedly.

MR. DRAPER:  Uh-huh.

THE COURT:  But I need you to walk me through exactly how the act of misgendering on its own is prescribed by statute.  Because you say in your brief, you know, it's in the plain text, it's straightforward, and you multiple times say, just the very act of misgendering and deadnaming is in and of itself exposing my clients -- our clients.

MR. DRAPER:  Uh-huh.

THE COURT:  In fact, I think in part of your brief, I think the last -- the response or the reply, you call it a ban.  You said that the statute has a misgendering and deadnaming, quote, "ban."  I don't see that in the statute.

And so I need you to walk me through how you get to

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 20 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 62

20

the conclusion that the statute expressly bans misgendering and deadnaming, and that that act, on its own, without anything else, is what exposes your clients to enforcement.

MR. DRAPER:  Yeah.  So section 601 of the law of CADA prohibits a person in the place of public accommodations from doing anything that denies, you know -- and this is a bit of short in here -- but denies somebody equal enjoyment of the place of public accommodation.

Before HB25-1312, gender expression and gender identity were already protected categories in the law.  And so, for example, it would have been unlawful if a restaurant owner denied somebody food service because they, you know, they identified as transgender.

The use of a chosen name and other terms by which they choose to be addressed is the language that the law uses.  I think everybody agrees that includes preferred pronouns here.

Those terms weren't in the law, weren't expressly protected.  Now with HB25-1312, it is included under the definition of gender expression the use of a chosen name and other terms of address, like preferred pronouns.

So now, whereas before, it was only unlawful to deny service based on actual gender identity, here it's unlawful to deny somebody enjoyment of a place of public accommodation based on the fact that the person uses --

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 21 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 63

21

THE COURT:  But that's it.  You just said it, right?  That's what's unlawful.  It's the denial of services --

MR. DRAPER:  Uh-huh.

THE COURT:  -- or the creating of an unwelcome environment.  That's what is the actual unlawful act, and that's what would expose your client or someone else to enforcement.  It's not the speaking of it; it's the consequence around that, which means what I think Defendant Sullivan has said in her declaration or affidavit, her sworn statement, that it's a very fact-specific inquiry, that it's not the mere act --

MR. DRAPER:  Right.

THE COURT:  -- of misgendering or deadnaming.  So that's why I'm having a hard time, because your brief really double and triples down on this notion that the very act, again, you call it even a ban, the plain text has a ban.  And I just, I don't see that.

And so that obviously goes to the question of whether the acts that your clients want to engage in are actually prescribed.

MR. DRAPER:  Right.  Yeah, I guess, maybe two or three points, Your Honor.  So I think everyone agrees that all that is required from our Plaintiffs to violate the law in terms of the speech they actually have to engage in is an

**5-App-059**

Case No. 1:25-cv-01572-RMR-MDB     Document 110-1     filed 03/05/26     USDC Colorado
pg 22 of 97
Appellate Case: 26-1101     Document: 19-5     Date Filed: 06/08/2026     Page: 64

22

act of misgendering and deadnaming.  Defendants say this requires two things After that.  they require that the person feel subjectively offended or excluded by the misgendering or deadnaming, and that it be objectively unreasonable that an objective person would have felt the same way if they were subjected to the misgendering and deadnaming.

There's nothing more required from our Plaintiffs, though, in terms of what they have to say to violate the law. At that point, it just flips over to the subjective experience of the person who hears the misgendering and deadnaming.

And the Defendants have agreed -- and I'll even quote from some earlier probable cause determinations they've issued -- And these are on pages 85 and 96 of the restricted appendix.  I'm quoting probable cause determinations where they say, "being misgendered would generally be considered objectively unreasonable treatment."  And also their own expert --

THE COURT:  But that doesn't give any -- I mean, I --

MR. DRAPER:  Yeah.

THE COURT:  -- saw those probable cause determinations, and I actually thought they sort of cut against you because they reflect that the inquiry truly is very fact specific.  And so while something might be

**5-App-060**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 23 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 65

23

misgendering and deadnaming might be considered in and of itself hostile, or in and of itself unreasonable, or in and of itself maltreatment, it doesn't do what you say in your brief over and over again, which is automatically trigger enforcement essentially.

It's automatically the thing that causes the exposure. I mean, again, you call it an actual ban, as if the plain text of the statute expressly banned that behavior, those statements.

MR. DRAPER: Right. Well, of course, you know, somebody who hears the misgendering and deadnaming, whether they're offended or not, may choose to not go and file a complaint against them. But I think the crucial point is that somebody who hears our Plaintiffs, you know, imagine somebody comes to one of CPAN's events, you know.

They want to engage in the discussion. They go up to the microphone and they say, I identify as a woman and I have she/her pronouns. And Lori Gimelshteyn, who's the CPAN director, says, I'm not going to call you that. I'm going to call you he/him, and I'm going to use your old name.

That person might feel subjectively offended by that. Obviously, right from their own probable cause determinations, Defendants think that that can be an objectively unreasonable way to treat somebody. That person could go and file a complaint.

**5-App-061**

I think the point, the idea that some people may choose to not file complaints of discrimination against them doesn't defeat the fact that our Plaintiffs have to constantly be worried that when they are engaging in conversation with transgender-identifying people, they have to constantly worry that if they do misgender and deadname this person, that person could go and file a complaint.

And because the Commission has said that that kind of misgendering or deadnaming can be objectively unreasonable, it could lead to liability.  That's why our Plaintiffs have to censor their speech.

THE COURT:  But you're taking a lot of leaps there.  There's a lot of leaps there, and I'm having a hard time finding the support for it.  Let's very relatedly going to the point that you've made, which is they haven't disavowed --

MR. DRAPER:  Right.

THE COURT:  -- you know, enforcement.  I read Defendant Sullivan's statement as a disavowal.  I mean, she's saying, we're not interested in enforcing against the mere act of misgendering, right.  So it's not, obviously not some broad disavowal.  We're never going to prosecute, we're never going to --

MR. DRAPER:  Uh-huh.

THE COURT:  -- take action against these clients

**5-App-062**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 25 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 67

25

ever under CADA.  But it is a disavowal to some extent because they're saying the mere act of misgendering is not going to trigger enforcement.  And so I hear you --

MR. DRAPER:  Uh-huh.

THE COURT:  -- that maybe your clients are sort of self-regulating, thinking that there may be some exposure, but I don't see the basis for that if the Division has said this is not something we're interested in enforcing when it's just the misgendering and just the deadnaming.

MR. DRAPER:  Yeah, I wouldn't call it a disavowal, Your Honor.  I think a disavowal, especially as earlier cases have treated it before, is something more akin to outside the context of litigation, the enforcing authority saying, we agree that it would be unlawful to impose this law against you, so we're not going to enforce it against you.

That's very different from, in the course of litigation, promising to only enforce the law when certain extra statutory conditions are met.  I think the courts have been very clear that the defendant cannot -- the defendant enforcing authority cannot escape liability in a pre-enforcement challenge by promising to enforce the statute responsibly.

We cite a number of cases in our brief to that effect.  The *Stevens* case out of the Supreme Court is a very good example.  And that's especially true in the First

**5-App-063**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 26 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 68

26

Amendment context again where when the Defendants are saying,
we're not sure if what you're doing is going to violate the
law, even if you credit that statement, that doesn't --
that's cold comfort to the Plaintiffs here, who have to hope
that what they say is not going to meet the Defendants'
threshold for what's an enforceable violation of the law.

THE COURT:  But they've unequivocally said that
based mainly on a, quote, "failure or refusal to use an
individual's chosen name and/or how the individual chooses to
be addressed, there's no interest in enforcing that."

MR. DRAPER:  Right.  But I think the important
thing, Your Honor, is they haven't pointed to anything else
that the Plaintiffs would have to say or do to create a
violation of the law.

What they're saying is that misgendering and
deadnaming can be a violation of the law if the person who
hears it feel subjectively offended, and it's something that
is objectively offensive.  And they've already said
elsewhere, you know, in their own probable cause
determinations and their own expert, that misgendering and
deadnaming are intrinsically the kind of thing that somebody
would reasonably feel is offensive.

So there's nothing more that our Plaintiffs have to
do that the Defendants are pointing to, to violate this law.
They're just saying we need to leave it up to the chance or

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 27 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 69

27

the hope that the person who hears the misgendering or deadnaming doesn't personally feel offended enough to go and file a complaint.

But of course, our Defendants, our Plaintiffs, aren't going to know in advance who those people are. They're going to have to hold their tongue no matter who they're speaking to.

THE COURT: No, I don't think that's what they're saying. I don't read it that way. They're not saying that there's necessarily other -- I understand that they've said, you know, there's a subjective component and an objective component.

But I read their statements as pretty unequivocally saying that what you're saying, right, that there's this ban, that the misgendering and deadnaming on its own is going to trigger enforcement, that's not the case. That that on its own, that if your Plaintiffs do nothing more than that, that they're going to be subjected to enforcement. I'm hearing them say, no, that's not the case.

MR. DRAPER: I don't think that's true, Your Honor.

THE COURT: Okay.

MR. DRAPER: And of course, maybe they can speak to that better.

THE COURT: Yeah, we'll test that when they come up here. Okay. Let me ask you another question. You're asking

**5-App-065**

for very broad relief.  You're asking for an injunction that enjoins the Defendants from enforcing multiple provisions of CADA, some of which have been in place for a very long time.

And I think your conclusion is it goes even further.  It says that you're wanting to enjoin them from enforcing any other materially similar statutory or regulatory provisions.

I mean, that's just incredibly broad.  How does that -- how is that different from basically just giving, like, your clients full opportunity to just discriminate without consequence, right?

Because now, like, all of these provisions of CADA, the state can't enforce them.  They've been around for a long time.  So it's not just based on the new amendment that came in, in May.  It seems like a carte blanche to just discriminate without consequence.

MR. DRAPER:  I would respectfully disagree, Your Honor.

THE COURT:  Okay.

MR. DRAPER:  I think -- so I don't think we're asking for an injunction that would prohibit -- the injunction we're asking for would not prohibit the Defendants from enforcing their anti-discrimination laws as they would have enforced it before HB25-1312 to the extent they want to enforce those laws to prohibit actual denials of service.

**5-App-066**

29

So, for example, you know, if Dr. Morrell or Dr. Leswing -- and they don't want to do this -- but if they refuse to offer medical treatment to somebody who identified as transgender, the Defendants can continue to enforce CADA against them to prohibit that kind of discrimination.

What we're asking for is an injunction that stops them from going that extra further step to say, in addition to providing services to them, you have to also use your speech to affirm their gender identity in a way that violates your sincerely-held medical, scientific, religious, political, personal beliefs.

THE COURT:  Are you changing what you're asking for in your conclusion, in your motion?  Because I'll just read it to you.  "For these reasons the Court should grant Plaintiffs' motion and enjoin Defendants from enforcing the gender expression and chosen-name definitions as amended by HB25-1312, comma."  So I think that's what you're describing there.

MR. DRAPER:  Uh-huh.

THE COURT:  But you go on.  You say, comma, "the unwelcome provision, comma, the unwelcome statements provision, comma, and any materially similar statutory or regulatory provision in full and as applied to Plaintiffs and their members."

MR. DRAPER:  So --

**5-App-067**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 30 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 72

30

THE COURT:  Are you changing that?

MR. DRAPER:  No, I don't think so, Your Honor.  So the unwelcome and unwelcome statements provision, in addition to the denial clauses also being vague, the unwelcome and unwelcome statements provision have the problem that even before HB25-1312, they were unconstitutionally vague for all the reasons I pointed out at the beginning -- unclear what it means to directly or indirectly make somebody feel unwelcome, unclear what it means to make somebody feel unwelcome in the first place.

So there's a huge swath of conduct there, huge swaths of speech that's being made unlawful, and Plaintiffs don't really know how to navigate that existing description. So it does make sense to enjoin those in full, whether just against Plaintiffs or on their face, and enjoin the application against anyone.

So I think there is a difference there between the denial clauses, as you said, as amended by HB25-1312.  There, we're particularly concerned about the new definition of gender expression.  And the unwelcome clauses are, you know, sort of irretrievably vague, even aside from applying them to the gender expression context.

And of course, it's Defendants who have thrown into the mix this idea that they have these regulations that operate separately from the statute itself, if they interpret

**5-App-068**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 31 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 73

31

those to prohibit exactly the same thing that CADA itself

prohibits.  And of course, we have arguments about why the

regulation is a little different.

But if the Court ultimately decides that there are

existing regulations, wherever they're deriving the authority

to implement those is, if the Court thinks those existing

regulations cover the same conduct and therefore have the

same violations -- constitutional problems as the statute

itself, those should be enjoined too.

THE COURT:  So, yes.  Your request is really broad.
You're asking me -- you're asking the Court to enjoin the
enforcement of even those provisions that have been in place
long before the amendments that are at issue in your -- in
this litigation.

MR. DRAPER:  I wouldn't use the word broad.  I
would say we're asking for all the relief we need to actually
remedy the Plaintiffs' injuries here.  One of those injuries
is that even aside from HB25-1312's new definition of gender
expression, where it involves chosen name and pronouns,
somebody could have come in and said, I'm a transgender
person and I feel unwelcome at PKC and CPAN's events because
they just generally put out advertisements that are hostile
to people in my identity.  Or I feel unwelcome, as that one
Google review on --

THE COURT:  I mean, I get it.

32

MR. DRAPER:  Yeah.

THE COURT:  I understand your reasoning for it, and that's what you're giving me now.  But I'm trying to understand just the what, right?  What are you asking me to do?  And I'm not hearing anything different.  You're not backing away from this conclusion paragraph, which is very, very broad.

It also goes into another issue, which is, you know, you're asking to enjoin, and again, I just said this, a provision that's been in place long before these amendments came into place.

And so in that sense, you are asking to disrupt the status quo.  I understand your argument that the status quo is the place that we were immediately before these amendments went into place.  But when you're asking for an injunction against the enforcement of provisions that were in place -- have been in place for decades, that's -- you are asking to disrupt the status quo.

MR. DRAPER:  Yeah.  Of course, as Your Honor pointed out, I think the status quo changed significantly post-HB25-1312, at least as regards to the pronoun and deadnaming issue.  And that obviously is --

THE COURT:  I didn't point that out.  I think you pointed that out.  But -- okay.

MR. DRAPER:  Sorry.

**5-App-070**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 33 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 75

33

THE COURT:  I understand your point.

MR. DRAPER:  And that's obviously intertwined with the unwelcome provisions in the sense that now the kind of speech that can make somebody feel unwelcome under CADA has expanded.

THE COURT:  Okay.

MR. DRAPER:  And so I think the status quo as regards most of the challenge provisions, at the very least, is what was -- is the state of the law before HB25-1312. Because before that, our Plaintiffs -- and this is well-documented in the record -- felt free to use whatever pronouns and names best aligned with their beliefs.

Now they don't.  The last peaceable state was pre-25-1312.  As regards the unwelcome statements that existed in their current form even before HB25-1312, I think our Plaintiffs became most keenly aware of the threat of them after they saw the changes in the law with HB25-1312.

But I do think it makes sense, just on the vagueness grounds, to enjoin the laws even as they existed before.  You know, the Supreme Court has said a number of times that the idea of a status quo is a tricky metric and hard to apply.

But even if you wanted to apply it here, it's just one amongst many factors.  And in the First Amendment context especially where we're worried about chilled speech,

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 34 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 76

34

remedying the Plaintiffs' injury, at least for the duration of the litigation, is the most important factor in the preliminary injunction analysis, over and above the status quo question.

THE COURT:  Let's talk about the First Amendment context, because I agree with you.

MR. DRAPER:  Uh-huh.

THE COURT:  It's a more relaxed standard when you're thinking about standing in the First Amendment context.  That said, this is a preliminary injunction --

MR. DRAPER:  Uh-huh.

THE COURT:  -- and a preliminary injunction has a different standard than would be applied, for example, on the motion to dismiss and in thinking about the standing issues in that context and your burden in that context.

Here you have to make a clear showing.  So, yes, there's this relaxed standard sort of underlying the issues.  But what's in front of me right now is the preliminary injunction motion and the standard there is a heightened standard.

And I think actually here an even more heightened standard due to the status quo issue.  So help me understand that.  Help me square that.  Because you keep referring to this relaxed standard.  I agree.  If we were doing a typical ordinary standing analysis, the analysis I'll have to do on

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 35 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 77

35

their motion to dismiss.

MR. DRAPER:  Uh-huh.

THE COURT:  But this isn't that analysis.  This is a preliminary injunction analysis with a heightened standard.

MR. DRAPER:  Well, it's higher than the motion to dismiss standard, Your Honor.  That's correct.  Which is why I think, if you agree with us that there should be a preliminary injunction, necessarily we have to deny the motion to dismiss.

I don't think I would describe it as a high standard, though, and that's not the way the Tenth Circuit has described it.  So I'll just, you know, I'll quote from *Scott v. Allen*, which is a 2025 Tenth Circuit case.  It says, "We apply the standing requirement somewhat more leniently."

THE COURT:  Can you --

MR. DRAPER:  Sorry.

THE COURT:  -- in the microphone so I can hear you?

MR. DRAPER:  Yeah.  "We apply the standing requirement somewhat more leniently facilitating pre-enforcement suits."  And I think that's pretty representative of the way both the Supreme Court and the Tenth Circuit have treated this issue, that in the pre-enforcement context, the standing threshold is not very high, especially when it comes to the credible threat of enforcement issue.

I think it was Babbitt, but I don't have the quote

**5-App-073**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 36 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 78

36

in front of me, but the Supreme Court has said, for example, that as long as it's not merely speculative or merely hypothetical, as long as there's some genuine possibility of enforcement, the Plaintiffs have met their standard to show a credible threat of enforcement.

THE COURT:  But the Supreme Court has also said that the standing analysis and really every element of the merits, which includes the threshold jurisdictional issues, have to be tested against the appropriate standard at each stage in the litigation.

And the appropriate standard here is a clear showing standard plus, right, because it's a heightened standard.  So it's clear showing plus.  And so I hear you again on the underlying standard associated with the standing analysis ordinarily.

MR. DRAPER:  Uh-huh.

THE COURT:  But in the preliminary injunction context, it's a heightened standard.

MR. DRAPER:  I guess I'm not familiar with this clear standard plus articulation.

THE COURT:  Well, I'm just saying that courts have said over and over again that if you're disturbing the status quo, there's an even greater -- it's even more heightened than the ordinary heightened standard of a preliminary injunction motion.

**5-App-074**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 37 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 79

37

MR. DRAPER: Oh, okay. Yeah. Well, and again, I, you know, I don't think the injunction we're requesting here, at least regards most of the challenge provisions, would severely upset the status quo.

In fact, I think for all but the unwelcome provisions, it would be a return to the status quo. And then I think the clear vagueness of the unwelcome provisions is itself reason to issue a preliminary injunction here.

But at the very least, as regards the denial clauses as amended by HB25-1312, the status quo is the pre-25-1312 context. So I don't think there's any interruption to the status quo there.

And then as going back to just, I guess, the standing threshold in general in the pre-enforcement context, it's fairly low. It's certainly far less than we would have to show, you know, to get a final decision on the merits.

The Supreme Court, for example, has said, as long as your conduct is arguably prescribed by the law. And I think, you know, even Defendants would agree that there are some acts of misgendering indemnity that our Plaintiffs want to engage in that could violate the law.

So arguably our Plaintiffs' conduct is covered by the law. As long as you meet that standard and have shown that the credible threat of enforcement is not merely conjectural and hypothetical, you satisfied the standing

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 38 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 80

38

threshold generally to get a preliminary injunction.

And then I just don't think that this injunction would be upsetting the status quo.  I think especially as regards to the denial clauses, the status quo is pre-HB25-1312.  And I think 25-1312 so much changed the game for even the unwelcome clauses that injunction against the unwelcome clauses is also appropriate to return to a status quo where the Plaintiffs feel comfortable speaking in line with their beliefs.

THE COURT:  Okay.  Well, and even if I agreed with you on the status quo piece, which I don't think I do, I mean, the relief that you're seeking is so broad that I do think an injunction would disrupt the status quo.

But even if I didn't agree with you on it, you're also asking for basically a full win.  And that's another basis for heightening the standard in the preliminary injunction phase.  Because, I mean -- and I saw your argument about --

MR. DRAPER:  Uh-huh.

THE COURT:  -- well, as long as you can sort of -- what's the analogy, like, put the toothpaste back in the tube?

MR. DRAPER:  I thought it was cute -- put the toothpaste back in the bottle, yeah.

THE COURT:  Then it's okay and you don't get that

heightened standard.

MR. DRAPER:  I can't take credit for that analogy. That was a, I think, a Tenth Circuit opinion.

THE COURT:  I think it was a Tenth Circuit footnote.

MR. DRAPER:  Yeah.

THE COURT:  And I don't think it was actually -- I don't think the statement was as persuasive as you made it sound or as significant as you made it sound.  So I do think that in this case, you're basically asking for a win at the very beginning, and the courts apply a heightened standard when plaintiffs are asking for that.

So even if I didn't agree with you or if I agreed with you on status quo, I think the heightened standard still applies.

MR. DRAPER:  Can I --

THE COURT:  I had one other question.  Oh, sure. You can respond.

MR. DRAPER:  Yeah, I was going to say, you know -- and maybe I should have made this point earlier, Your Honor -- but I do think, you know, the question -- the Court has discretion, obviously, to fashion an injunction that it feels is most appropriate to give the relief the Plaintiffs need.

So certainly, if you think that the requested injunction, as requested in our initial motion, which was

**5-App-077**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 40 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 82

40

obviously before the Supreme Court's *Trump against CASA* decision, you know, you could certainly tailor the injunction to the scope that you think is appropriate.

You know, for example, you know, we think we're entitled to the relief we asked for in the injunction motion, but if the Court felt that we wanted to issue something narrow, it could issue an injunction that simply prohibits the Defendants from enforcing CADA or its implementing regulations against Plaintiffs in a way that would prohibit them from speaking, using pronouns and names in a common, you know, in a commonplace way, in aligned with their -- in, you know, aligned with their beliefs.

You know, it's not binary to the sense where you either have to enjoin all the laws altogether or let them go into a effect altogether.  The Court, you know, we'd welcome you to use your discretion to fashion a more appropriate relief.  And then I, you know --

THE COURT:  Okay.

MR. DRAPER:  -- I think the -- to the question of whether this is giving all the relief that the Plaintiffs would get at the end of the day, you know, I think the prototypical, the stereotypical case of a preliminary injunction that gives all the relief the Plaintiffs are requesting would be, one, if we said, hey, all we're concerned about here is one event that's happening next month

**5-App-078**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 41 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 83

41

that we want to speak the way we want to speak, and we need a preliminary injunction to make sure that happens.

Obviously, if the Court granted that and the preliminary injunction covered that event, there'd be nothing left in the case after that. Here, by contrast, we're just asking for an injunction to let us speak the way we want to speak during the pendency of the litigation.

And then at the end of the day, if the Court disagrees with us ultimately on the merits, it can lift the injunction and the Defendants can go straight back to enforcing it as they would before.

THE COURT: Okay. I have one other question for you --

MR. DRAPER: Uh-huh.

THE COURT: -- and then I'm going to turn to Defendants. Isn't it true that even if there's an injunction here, an aggrieved individual could still go and file a case, right, and proceed under the or provision. I mean, the individuals have sort of two paths under CADA, right?

They can either go file a complaint and the Division can take this on, or they can try to pursue a claim on their own. And in fact, I think I saw your clients stating that they're concerned about that. They're concerned about --

MR. DRAPER: Uh-huh.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 42 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 84

42

THE COURT:  -- the liability of an aggrieved individual.  And frankly, all of the evidence I saw seems to be concerns around individuals lashing out, more so than any sort of threat by the Division or any possible complaint. It's really about individuals.

The practical effect of an injunction in a context like this seems pretty minimal when individuals can still expose your clients, and your clients are still going to be made to, as you suggested earlier, be forced, right, to choose between speaking how they want to speak or exposing themselves.  Can you address that?

MR. DRAPER:  Yeah, I think there are sort of two related questions there.  I'll answer the second one first. The statute does also allow aggrieved individuals to pursue litigation on their own.

Obviously, you know, an injunction against the Defendants, we couldn't ask for an injunction that would solve that problem, since that's out of their hands.  But an injunction or the remedy does not have to afford all of the relief that the Plaintiff -- to the entire injury that the Plaintiff is suffering, even if it affords partial relief.

And then here, it's very significant partial relief, enjoining the Defendants from taking action against Plaintiffs.  That would be significant and would really free up Plaintiffs to feel that they're at least more free to

**5-App-080**

speak than they were before.

THE COURT:  That seems contrary to what your clients seem to be concerned about.  All of the evidence I saw, the statements that your clients were making -- when I say "you," I mean the collective you.

But the statements that they were making seem to be mostly concerned with how the public has been lashing out, right?  I post this and people say this.  Got negative Google reviews.  People are angry.  Patients who --

MR. DRAPER:  Uh-huh.

THE COURT:  -- you know, are, for lack of a better phrase, lashing out about the deadnaming or misgendering.  I mean, that seems to be where the concern is.  And your clients seem to be, as you say, chilling their speech as a result in large part of that.

An injunction against the state isn't going to fix any of that.  So it just seems to me that in this context and based on this evidence, the impact of an injunction, sorry, the impact of an injunction seems relatively minimal.

MR. DRAPER:  Well, I do think -- again, a number of responses -- I do think it would afford at least partial redress.  And I think that's all we need to merit the injunction.

But this sort of leads me to my second point, which is in the main, the main way that even private individuals

**5-App-081**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 44 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 86

44

enforce Colorado's Anti-Discrimination Act is by filing charges of discrimination with the Division.

And that is what chiefly our Plaintiffs are worried about, is that somebody, especially now that HB25-1312 was very publicly passed and drew a lot of public interest, people will be now looking to file charges of discrimination against people based on misgendering and deadnaming.

So I think it will be very substantial, very significant. And you know, I don't have the data in front of me. I would venture to guess that the number of charges of discrimination filed are much more, are much greater than the number of private lawsuits instituted under the statute by individual litigants.

The other thing I also think that you asked, you know, obviously it wouldn't stop somebody from filing a charge of discrimination. But what the injunction would do when they do get a charge of discrimination against one of our Plaintiffs, this injunction would stop the Division from moving forward with that claim.

It would stop the Attorney General and the commissioners from filing charges of discrimination themselves against Plaintiffs. So Plaintiffs could rest assured in the knowledge that even if a private individual files a charge of discrimination against them, because of this injunction, they would know that the Defendants can't

**5-App-082**

take any action on that, won't be able to impose any penalties.

So I think it would give them a lot of security knowing that that's how the injunction would operate.  It would stop any kind of enforcement from the Defendants, even if it doesn't stop the initial charge.

THE COURT:  Okay.  But nevertheless, an individual can pursue a claim on their own.

MR. DRAPER:  They could.  But again, we don't need the preliminary injunction in order to be entitled to some relief --

THE COURT:  I understand that part.

MR. DRAPER:  -- we don't need to show that it solves all of the problems.

THE COURT:  I understand that part.  I'm just talking about the practical consequences --

MR. DRAPER:  And of course, the --

THE COURT:  -- and sort of what can or can't happen.

MR. DRAPER:  -- problem there would be, I guess the systemic problem there would be that the state government could always avoid any kind of injunction against them on this just by setting up their own enforcement regime and then also allowing private individuals to file a lawsuit.

If it were the case, that that would always make it

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 46 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 88

46

impossible to get redressed through an injunction and therefore defeat any kind of possible injunction, that just doesn't seem to be --

THE COURT:  Well, I'm certainly not suggesting that that --

MR. DRAPER:  Yeah.

THE COURT:  -- fact on its own, it defeats --

MR. DRAPER:  No.

THE COURT:  -- the ability to get a preliminary injunction.  But I do think it's an important part of the context here.  Okay.  Thank you.

MR. DRAPER:  Thank you.

THE COURT:  Appreciate your time.

I'm going to hear from Defendants.

MR. MARTIN:  Your Honor, I apologize for interrupting.

THE COURT:  It's okay.

MR. MARTIN:  Just I'm fine with going in whatever order Your Honor would like.  I just want to point out that we have some separate arguments on behalf of --

THE COURT:  I didn't realize that.  I thought you all were sort of putting all your eggs in one basket.

MR. MARTIN:  No.

THE COURT:  Okay.

MR. MARTIN:  My apologies.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 47 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 89

47

THE COURT:  I appreciate that.

MR. MARTIN:  Yeah.  So, but we can go in whatever --

THE COURT:  Well, tell me does it make sense for you to tack on your arguments here at this juncture or do you want to wait to hear from Defendants first?

MR. MARTIN:  I think it makes most sense to just go ahead and follow up.

THE COURT:  Okay.

MS. FISCHER:  Yeah.

THE COURT:  Great.

MS. FISCHER:  And we're prepared to address all the Plaintiffs at once.  So if that's everyone's preference, that's fine with us.

THE COURT:  Okay.  Great, great.  And I'm sorry.  If I had realized that you guys had -- do you also have comments to make today or are you --

MR. CONNOLLY:  No, Your Honor.

THE COURT:  -- together?  Okay.  So it's just you, the additional comments.  I would have left a little more time, but I am going to have to hurry you a little bit now for sure.

MR. MARTIN:  For sure, for sure.

THE COURT:  Okay.  Thank you.

MR. MARTIN:  Your Honor, I'll -- as you mentioned,

Case No. 1:25-cv-01572-RMR-MDB     Document 110-1     filed 03/05/26     USDC Colorado
pg 48 of 97
Appellate Case: 26-1101     Document: 19-5     Date Filed: 06/08/2026     Page: 90

48

so my name is Mercer Martin.  I represent Born Again Used Books and XX-XY Athletics.  I'll begin with just some table setting on our Plaintiffs for the Court and the audience. And then I'll cue the Court when I'm ready to go into arguments and --

THE COURT:  Okay.

MR. MARTIN:  -- answer any questions.  So just to begin, I represent XX-XY Athletics, which is a clothing apparel company, and Born Again Used Books.  Both of these organizations in some senses are traditional public accommodations.

XX-XY Athletics operates primarily online, but it also has pop-up shops all throughout Colorado.  And Born Again Used Books has a physical storefront here in Colorado Springs.

What makes them unique is that they both are very mission-focused companies.  So XX-XY Athletics is a very prominent force in the women's sports space.  So this athletic apparel company exists to advocate for women's sports and to protect women's sports from inclusion by biological males.  So that's the mission for XX-XY Athletics.

For Born Again Used Books, it's a Christian bookstore, so it's trying to create a Christian atmosphere, a Christian ministry where they can pray and talk to customers and not just sell books.

**5-App-086**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 49 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 91

49

Now because of each of these missions, our clients will only use biologically-accurate language.  So that means even if an individual identifies as transgender and enters the stores, because of the religious beliefs of Born Again Used Books and the deeply-held beliefs of XX-XY Athletics, they're only going to use biologically-accurate language.

And that's core to their missions.  Also, because of the unique aspect of the stores, they engage with customer interactions quite frequently.  As Eric Smith testified in his deposition, they go into deeper conversations.  They'll pray.

XX-XY Athletics, their CEO, Jennifer Sey, is very outspoken about women's sports.  So on their X account, for example, they are constantly using chosen or given names and biologically-accurate pronouns when referring to athletes.

And so we believe that the Act, the Colorado Anti-Discrimination Act, as amended, violates the First Amendment as applied to our clients because it forces them to use preferred pronouns or to use chosen names when they desire not to.  So that's the basis for the First Amendment arguments.  That's the table setting, Your Honor.

I can now move into arguments and answer any questions you have.

THE COURT:  Okay.  Why don't you highlight for me -- I don't want you to walk through every argument that we've

50

already been through just so we don't retread old ground.
But if there's something different, new, or specific that you
want to emphasize, you can do that now.  And then I'll see if
I have questions.

MR. MARTIN:  Okay, Your Honor.  So first, I would
like to address your questions about how the statute is
interpreted and how it should be interpreted here.  I agree
with everything that my colleague said on behalf of Defending
Education.

A couple of things I would just add is the standard
here when we're talking about whether the intended conduct
is, you know, if we have standing based on that intended
speech, is whether that speech is arguably prescribed by the
statute.

So I'll point out the *Scott v. Allen* case.  In that
case, the plaintiff wanted to challenge a law that was
prohibited disclosing private information.  And critically,
the -- in order to violate the law, you had to have knowledge
that disclosure would cause injury to the individual that
you're talking about.

The plaintiff in that case -- it was a First
Amendment pre-enforcement case -- he didn't have that
element.  He did not have any evidence that disclosing that
information would cause injury.  The Tenth Circuit said
that's okay.  There's still pre-enforcement standing because

**5-App-088**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 51 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 93

51

you don't have to actually violate the law; you just need to arguably violate the law.  He didn't have an essential element to the claim.  And the court said there was still pre-enforcement standing.

So here, we -- both of the parties agree that, you know, using biologically-accurate language or given names can violate the statute.  And so that's enough to say that, you know, the intended speech is at least arguably prescribed.

I'd also like to just point out *303 Creative*.  In that case, the court said that, you know, as long as some of the intended conduct violates, you know, arguably violates the statute, that's enough.

So I think it's -- that there are, you know, I think it is an arguable interpretation of the statute that merely the act of refusing someone's preferred pronouns, you are refusing their accommodation.

THE COURT:  So even if I agreed with you on that, even if I agreed, look, maybe the language is arguably prescribed, right, so the standard arguably prescribed, let's say I give you that, credible threat of enforcement is still a necessary showing for standing.

And your colleague, you know, says that the statement from Defendant Sullivan isn't a disavowal.  But even if it doesn't rise to the level of a disavowal, it is still very clearly stating that merely speaking in that way

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 52 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 94

52

isn't going to trigger enforcement.

So is it arguably prescribed by the statute? Maybe.  Maybe I give you that.  But credible threat of enforcement, I don't see it when you have the Division head saying this is not something we're going to enforce when that's all we have.

MR. MARTIN:  Yeah, a couple of responses to that answer.  I mean, first I would just like to say that what they have done is not a disavowal because the Division director was asked repeatedly in her deposition, you know -- well, first off, just in her interrogatory responses.

She has said, you know, whether or not an interaction would violate CADA or not depends on the circumstances.  That's not a disavowal.  That could happen. Same was asked, you know, let's say that there was, you received a complaint, you know, alleging in the store there was a comment, or let's say there was, you know, someone complained about a publication.  Would you disavow investigating that, and she said no every time.

And so there is no disavowal.  But critically, Your Honor, another important fact is that even under their standard, right, so they say it needs to rise to the level of harassment or create a hostile environment, I would just point the Court to page 365 of the appendix.

And this is where the XX-XY Athletic puts in its

**5-App-090**

Case No. 1:25-cv-01572-RMR-MDB     Document 110-1     filed 03/05/26     USDC Colorado
pg 53 of 97
Appellate Case: 26-1101     Document: 19-5     Date Filed: 06/08/2026     Page: 95

53

document production.  And I would just say to scroll through that and you will see that under no circumstances will XX-XY Athletics -- and it's the same for Born Again Used Books -- use biologically-inaccurate language.

So if they're pressed on it, they're going to keep doing it.  If they're told that's wrong, they're still going to use that language.  That could easily rise to the level of harassment, even in the Defendants' view.

You can look at some of the publications that XX-XY Athletics has posted.  They poke fun sometimes at statements by transgender-identifying individuals.  They're not trying to harass.  It's easy to see how the Defendants can interpret it that way.

And so in that sense, you know, even under their own standard, there is a credible risk of enforcement.  And again, there has been no disavowal.  They have not said they're not going to prosecute.  They do believe that deadnaming and misgendering, in their words, violate this act.  And so there is a credible threat of enforcement there.

I'd also like to point out that, you know, Your Honor asked about a number of things that might need to happen in order for a complaint, you know, for there to actually be an enforcement action.

I would just like to note that Born Again Used Books and XX-XY Athletics, they've both already had in-person

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 54 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 96

54

interactions with transgender-identifying individuals where their pronouns or names came up.  That's already happened.

Jennifer Sey, the CEO of XX-XY Athletics, she told the transgender-identifying individual at a pop-up shop, I am not going to use biologically-inaccurate language.  So the violations have already happened.  All that needs to happen is for someone to file a complaint with the Division.

THE COURT:  Actually, I think that kind of cuts against you because it's true.  I've also seen in the record that some of the doctors are very active.  So other clients are very active on social media, you know, so much so that they're getting bad Google reviews.

I mean, they're active, they're out there.  And yet no complaint has been filed.  There's no indication that someone's going to file a complaint, right.  So the fact that your clients are out there saying this and being very open about it and doing it over and over again, and yet there hasn't been anything seems to support this idea that the mere misgendering and deadnaming isn't going to trigger enforcement action which cuts against your standing argument.

MR. MARTIN:  Two responses to that, Your Honor.  First, the law is brand new, so it was just enacted in May of 2025.  That is when things changed.  A lot of these complaints come before then.

But secondarily, *303 Creative* already addressed

**5-App-092**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 55 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 97

55

that.  So in that case, it was a similar pre-enforcement standing case.  And the plaintiff in that case had not had any complaints in the past.  In that case, she didn't want to create a wedding website for a same-sex couple.  And there had never been a same-sex couple that had come to her.

THE COURT:  I know the case.  Yeah, you don't have to go through it but yeah.

MR. MARTIN:  Yeah.

THE COURT:  Okay.

MR. MARTIN:  So the only reason I raised that though is to just make the point that those arguments have already been raised by Colorado and rejected by the Tenth Circuit --

THE COURT:  Okay.

MR. MARTIN:  -- which is that there doesn't need to be past examples of that happening.

THE COURT:  Okay.  Unless you have something else really, really important, I'd like to move on so that we can get Defendants to have a little bit of time and then any closing.

MR. MARTIN:  The last thing I'd like to say, Your Honor, is just we haven't discussed the publication provisions.  Born Again Used Books has chilled its speech. It's not posting publications.  The Defendants do not address Born Again Used Books publications at all, that they violate

**5-App-093**

the unwelcome clauses, that they violate the denial clause.

It's easy to see how that would make someone feel unwelcome.  Same with XX-XY Athletics.  Every day they are posting publications that could easily make someone feel unwelcome in violation of the welcome clauses.  So at the very least they have standing based on their publications and to challenge those publication provisions.

THE COURT:  Okay.  All right.  Thank you.

MR. MARTIN:  All right.  Thank you, Your Honor.

THE COURT:  Thanks.  And thanks for bearing with me as I rush you.  I should have asked earlier who was talking.

MR. MARTIN:  Understood.

THE COURT:  Go ahead.

MS. FISCHER:  Your Honor, I'm Janna Fischer.  I represent the Division and the Commission Defendants.  My colleague Talia Kraemer represents the Attorney General.  So if you have any specific questions about the Attorney General, they're best directed to Ms. Kraemer.

THE COURT:  I have to say my biggest focus is on standing, on Article III standing.  And so I don't think I necessarily need to --

MS. FISCHER:  Okay.

THE COURT:  -- hear separately from the Attorney General.

MS. FISCHER:  Okay.

**5-App-094**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 57 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 99

57

THE COURT: Yeah.

MS. FISCHER: So just to set the table here, I'm going to talk about what CADA does and it does not do. This is not a new law. The Anti-Discrimination Act itself has been in effect for decades, and it does not ban per se misgendering and deadnaming, which is something Director Sullivan has said on the record in her declaration and in her deposition.

The law does not require the use of any particular speech, and all the passage of HB25-1312 did was add the definition of chosen name to gender identity, which was already in the law as a protected category.

If the Plaintiffs in each of these three cases don't have standing, then this case -- then they're at an end. And standing is the threshold inquiry that must be answered before addressing the merits, which is why the Defendants are concentrating on standing at this juncture.

No Defendant in this case has conceded the merits, and Defendants will vigorously contest the merits should these cases move forward. None of the Plaintiffs has demonstrated that they intend to engage in conduct that arguably violates CADA.

And in the nine months since this first lawsuit was filed, none of these Plaintiffs have been the subject of any complaints of discrimination to the Division. The written

**5-App-095**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 58 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 100

58

policies in this case on their face do not violate CADA.

Director Sullivan did review and address XX-XY's advertisements in the appendix and Born Again Bookstore's proposed written policy and, as stated in the record, these policies don't on their face state that a patron will be denied service or denied the full and equal enjoyment of service.

All of these Plaintiffs say we will serve transgender individuals. XX-XY will sell them clothes, Born Again Bookstore will sell them books, and the two doctors will treat them as patients.

Further, the Division has never received a complaint at all based on a written publication under Part 7. And if the Division were to receive such a complaint based only on a written publication, they would consult with counsel before enforcing against a complaint.

The Plaintiffs' conduct in this case also or stated wished-for conduct also doesn't arguably violate CADA because no Plaintiff has indicated a desire to treat a patron in a way that would rise to the level of harassment or to create a hostile environment.

And misgendering in and of itself is not a per se violation of CADA. The use of pronouns is not by itself a good or a service. And I would call your attention to Plaintiffs' appendix at pages 5, 11, and 12, which are the

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 59 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 101

59

interrogatory responses from the Division.

And the chain of events that Plaintiffs speculate could happen are speculative Sunday events that require a chain of -- that require nothing more than an abstract injury.

And even in the First Amendment context, to state an injury in fact sufficient for standing, there needs to be a real and immediate and not conjectural or hypothetical injury.

This case is different from *303 Creative* and *Masterpiece Cakeshop*.  Because in those cases, in the case of *Masterpiece*, there was an actual denial of service.  And in *303 Creative*, the website designer wished to publish a statement that said on its face, I will deny you service if you are a homosexual couple.

And here we have Plaintiffs who say, we will serve you.  We will gladly and happily serve you.  We have the CEO of XX-XY stating that she wanted everybody to buy her clothes and she wanted everybody to buy all of her clothes, that there's no requirement that an online purchaser state their gender before buying a sports bra.

Under the D.E. Plaintiffs' reading of CADA, anyone anywhere would have standing.  If any statement of a person that happens to be in a public accommodation is actionable, then a patron's conversation at the next table could be

**5-App-097**

enough to trigger a CADA violation.  And that's not how the Division has ever interpreted or enforced the law.

And while the harassment standard is not in the statute, it is in rule.  And that's not a new regulation. The regulation stating that sexual orientation harassment is unlawful and can include deliberately misusing an individual's preferred name, form of address, or gender-neutral pronoun has been in rule since 2009, all of which goes to the credible fear of enforcement.

Now as to the two advocacy organizations, CPAN and PKC, they are not places of public accommodation.  And the Division, when it receives a charge, the first thing it looks at is, does it have jurisdiction to pursue the charge?  Is this a place of public accommodation?

And if there is no jurisdiction, then the Division stops.  And now to be a place of public accommodation, a place must offer goods, services, facilities, privileges, the advantages, or accommodations of a place of public accommodation.

And these two advocacy organizations speak and they disseminate their point of view.  They don't sell anything, they don't provide a service, and they don't act as a place of public accommodation when they merely rent space at a hotel.

And for the reasons that there's no standing, this

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 61 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 103

61

case also is not ripe.  These issues are not yet fit for judicial review because there is no danger of imminent prosecution of any of these Plaintiffs.  And the requested injunction is extraordinarily broad and would disrupt the status quo.

For the first time today, the D.E. Plaintiff says -- say that they're challenging the entire unwelcome clause, which has been part of CADA since 1979, and gender identity has been protected in CADA since 2008.  So the status quo is that the Division implements the rule as enacted in 2009, and the statute and does not consider per se misgendering by itself to be a violation of CADA.

So the Plaintiffs do have a heavier burden to pursue this injunction.  It's a disfavored injunction that would change the status quo, and the Plaintiffs have not met that burden.

So the Plaintiffs' policies on their face do not violate CADA.  The Division director testified that a complaint made only on the policies would not violate CADA. And Plaintiffs' conduct does not arguably violate CADA because CADA on its face does not prescribe misgendering and deadnaming, and because the Plaintiffs have offered no details that would establish an injury in fact.  And for the same reasons this matter is not ripe, and a preliminary injunction should not issue.

**5-App-099**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 62 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 104

62

THE COURT:  Okay.

MS. FISCHER:  And I welcome questions.

THE COURT:  I just want to go back to something you said earlier.  You said the Division has reviewed or maybe it was Ms. Sullivan that reviewed the publications and this goes to something counsel just said.  He said they haven't taken a position on the publications.

Am I hearing the opposite from you, that there is a position taken on it, and it is that the publications on their face do not violate CADA?

MS. FISCHER:  Yes, you're correct, Your Honor.  That is our position.  I can direct you to the record, the docket 98, the Plaintiffs' non-restricted appendix at pages 10 and 11 addressing the Defending Education Plaintiffs at 336 and then at -- actually, my apologies.  Those are the policies themselves -- 336.  And then pages 507 to 510 are Doxa's policies.

And I may not have written down what pages the response is on, but I can direct you to Director Sullivan's supplemental declaration, which I know is also in the Plaintiffs' appendix.  And she did address all the publications that she had reviewed.

THE COURT:  And her position is they do not violate on their face, they don't violate CADA.

MS. FISCHER:  Correct.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 63 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 105

63

THE COURT:  Okay.

MS. FISCHER:  That just the policies themselves, the written policies, don't violate CADA on their face.

THE COURT:  Okay.

MS. FISCHER:  And the Division, in fact, has never received a complaint based on a written publication by itself on part 7 of CADA.

THE COURT:  Okay.  I also don't see that the Division has received any complaints generally about any of Plaintiffs' conduct that would potentially lead to enforcement by the Division.  Is that still true --

MS. FISCHER:  Yes, that's --

THE COURT:  -- today?

MS. FISCHER:  -- still true.

THE COURT:  Okay.  Can you answer the question I asked earlier, which is, can an individual, let's say I issue an injunction --

MS. FISCHER:  Okay.

THE COURT:  -- can an individual still, an aggrieved individual still move through the process and file their own complaint?

MS. FISCHER:  An aggrieved individual can, as long as the Division's issued what's called a right to sue letter.

THE COURT:  Right.

MS. FISCHER:  Which if the Division determines we

**5-App-101**

64

don't have jurisdiction, there's no probable cause, they issue --

THE COURT:  Or you're enjoined.

MS. FISCHER:  Yeah, or you're enjoined, the Division issues that letter, and then the individual can go to district court --

THE COURT:  Right.

MS. FISCHER:  -- state district court.

THE COURT:  Right.  Okay.  Okay.  I don't think I have other questions for you.

MS. FISCHER:  Okay.  Thank you.

THE COURT:  All right.

Is there anything else you wanted to close on for Plaintiffs?

MR. DRAPER:  I think -- sorry, was somebody going to speak for the Attorney General?

MS. KRAEMER:  Only if Your Honor has questions for me.

THE COURT:  I don't think so.  I'm, like I said, I'm focused on the standing piece.

MR. DRAPER:  Well, I have maybe --

THE COURT:  Sure, yeah.

MR. DRAPER:  -- just two or three more points.

THE COURT:  Yeah.

MR. DRAPER:  And apologies.  I moved these --

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 65 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 107

65

through these in somewhat haphazard fashion.

THE COURT:  That's okay.

MR. DRAPER:  First, there was a comparison made to *303 Creative*.  And I think the Defendants wanted to suggest that somehow that the distinction between *303 Creative* and these cases actually cuts in the Defendants' favor here.  I think, if anything, the distinction cuts in the opposite direction.

Because *303 Creative*, as far as I'm aware, the plaintiff in that case had not received any sort of -- when I say complaints, I mean informal complaints from potential customers for being denied, being denied service, for anything *303 Creative* said.

Nothing like that.  It was all just pure statements about I desire to engage in this kind of speech.  I expect that if I engage in that kind of speech, I'll receive formal complaints, and I don't want to suffer that injury.

The difference here is, in addition to that, in addition to our Plaintiffs making that same exact point, the Plaintiffs in all these cases -- but I'll speak to the Defending Education matter, and we talk about this in our brief -- have been the target of pretty vitriolic criticism, threats, threats of litigation, and physical threats from members of the public.

So if anything, I think the case we're standing

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 66 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 108

66

here is even greater than it is in *303 Creative*.  Again, here, the Defendants --

THE COURT:  But again --

MR. DRAPER:  Sorry.

THE COURT:  -- you're focused on -- I sort of see two paths here, right?  One is enforcement --

MR. DRAPER:  Uh-huh.

THE COURT:  -- the Division, the state.  And the other is aggrieved individuals.  And you're focused on this one, on the aggrieved individuals.  I agree with you.  I think there's evidence that there are individuals who are unhappy.  There's evidence that your clients are adjusting their behavior and their speech based on what individuals have said to them.

MR. DRAPER:  Uh-huh.

THE COURT:  But I don't see the threat of enforcement, right, which is the really critical piece when it comes to the standing analysis.

MR. DRAPER:  Well, because the fear is that those individuals who are angry will now use HB25-1312 to file charges of discrimination against them with the Defendants.  And the Defendants will then enforce CADA against the Plaintiffs.

So the thing that kicks off the enforcement process is an individual.  In the main, it's the individual filing a

**5-App-104**

complaint of discrimination.  Obviously, the Defendants have the authority to institute charges of discrimination on their own under the statute, which is an entirely separate threat of enforcement right there.

But I think the reality is that most of the cases are going to be filed by individuals who are aggrieved by, you know, so-called discriminatory language from the Plaintiffs.

And the fear is that because -- and Plaintiffs know that there are individuals out there who are aggrieved by their language and who are interested in taking advantage of legal recourse against them.  Now post-HB25-1312, their very real fear is that those individuals are going to use charges filed with the Division --

THE COURT:  Sure.

MR. DRAPER:  -- as the method for doing that.

THE COURT:  But if the Division has said that they are not going to prosecute based just on misgendering and deadnaming, then that cuts off that piece right there, right?

So you've got these two paths, and the individuals can do what they want to do or they can try to go the Division path.  But the Division path has said we're not going to prosecute for misgendering and deadnaming on its own.  There has to be more than that.

And so there's a safeguard there, right?  And

**5-App-105**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 68 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 110

68

there's -- that threat of enforcement is diminished as a result of very clear statements that say, no, we're not going to enforce on the basis of just misgendering and deadnaming.

MR. DRAPER:  Right.  This actually brings me to two other points I was going to make.

THE COURT:  Okay.

MR. DRAPER:  Both geared towards, you know, making the point that I don't think that that statement that they are going to look at other circumstances gets them what they need to get, you know, for two reasons.  In addition to the fact that Plaintiffs can't avoid enforcement here just by kind of waving their hands and saying we're not sure about exactly what's going to violate the statute.

One is I didn't hear anything in my friend's discussion about what more would be required for the Plaintiffs to violate the statute.  Of course, in their briefing, they suggest a number of things, all geared towards basically, you know, most of it geared towards whether the person who is misgendered and deadnamed subjectively feels that they've been offended enough to warrant a charge of discrimination.

But I haven't heard them explain anything that our Plaintiffs aren't doing that more, in their speech that would be required to constitute a violation.

THE COURT:  But I can understand how that argument

**5-App-106**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 69 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 111

69

goes and potentially is helpful to you on the merits of this around vagueness --

MR. DRAPER:  Uh-huh.

THE COURT:  -- around over breadth.  I understand that.  But in terms of a credible threat of enforcement, here's the description.  I'm just using my hands here to describe this.  But, you know, here's the bucket of behavior and speech that your clients say they engage in.  And then here's the state saying, we're not going to enforce based on just this behavior in this speech, right?

And so, yes, maybe they haven't explained to you precisely what would violate.  And that goes to your argument on the merits.  But in terms of a credible threat of enforcement, and again, on the heavy burden associated with a preliminary injunction, it seems difficult to me to say that you've made a clear showing of a threat of enforcement when you've described the specific conduct that the Division says they will not enforce against.

MR. DRAPER:  So I want to be clear.  I do not think, and I'm welcome -- happy to have the other side correct me on this -- I don't think they're saying that they will not punish our Plaintiffs for the speech that they -- our Plaintiffs say they want to engage in.

What they're saying is that our Plaintiffs want to engage in certain speech.  And they are saying it would

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 70 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 112

70

depend on the facts whether or not that particular speech gets CADA enforced against it.

That is not a disavowal. If anything, it is the opposite. They are refusing to say that they won't enforce it against us. They are saying, we'll see when we get there. And there's nothing more chilling to a Plaintiffs' speech than hearing that, you know, we'll see what happens when we get there, whether we punish you underneath the law.

You know, I do want to -- I want to point to two particular things in the record. One, in the deposition of Aubrey Sullivan, one very specific example that was given was a question of whether it would violate CADA if a bartender in a restaurant saw somebody come in that they previously knew as Sam, but the person now goes by Sally. You know, I'm paraphrasing the names here.

THE COURT: Uh-huh.

MR. DRAPER: And they said hi, but they knew the person goes by Sally. And they said hi, Sam, and referred to them using masculine pronouns instead of their now-preferred feminine pronouns. Director Sullivan agreed it's possible that could violate the statute. And that's on page 805 to 807 of the Plaintiffs' appendix.

THE COURT: Sure. Because there could be other facts and circumstances. But that's kind of the point, right? I mean, you're phrasing this as an outright ban on

speech, as a no exceptions, once you've said it, you're now liable, but that's not what it is.  It's a highly specific fact inquiry.  And I think that's the point, right --

MR. DRAPER:  It's a --

THE COURT:  -- in saying there isn't some credible threat --

MR. DRAPER:  Yeah.

THE COURT:  -- of enforcement based just on the conduct that you're describing and that conduct alone, that speech alone --

MR. DRAPER:  It's a -- sorry.

THE COURT:  -- doesn't automatically trigger it.

MR. DRAPER:  It's a prohibition on that kind of speech in the sense that the kind of speech Plaintiffs want to engage in are being told that that can give rise to liability under CADA.

It's very difficult, if not impossible, for Plaintiffs to be able to discern in advance what situations are going to have those extra circumstances, which we do not concede that those extra circumstances are required under CADA.

But even if they were required, it's impossible for our Plaintiffs to know in advance precisely which situations are going to have those circumstances and get them liability under CADA.  And that's precisely why they're afraid to speak

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 72 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 114

72

here.

But the other thing I wanted to point to in the Plaintiffs' appendix was pages 821 to 822, when Director Sullivan was asked whether a single instance of misgendering or deadnaming can rise to the level of harassment, which they think, they agree even that on their stricter reading of CADA and their regulations, that would give rise to liability. And she just said, again, it would depend on the circumstances, which goes back to the point they're --

THE COURT:  Well, sure.  I mean, if somebody is misgendering while holding a bat over someone's head, that could certainly give rise, right --

MR. DRAPER:  Right.

THE COURT:  -- to a sense of unwelcome and potential discrimination and saying, we're denying your services.  But that's --

MR. DRAPER:  Right.  But when the -- sorry.

THE COURT:  -- those aren't the descriptions that you've -- your clients have given when they're describing the kind of acts they want to engage in or the -- in fact, they're saying the opposite.

They're saying, yeah, we want to misgender and we want to deadname, but we also want to really welcome people, and we want to see serve people, and we're not going to exclude anyone.

**5-App-110**

MR. DRAPER: Right. And I think, you know, the -- and that draws me to another point the Defendants raised here about what exactly is being denied in terms of a public accommodation when somebody is misgendered or deadnamed.

In order to violate the public accommodation statute, you know, post-25-1312, you don't have to, you know, totally deny somebody the opportunity to purchase a product from you.

You don't even have to be engaged in sales of a product at all. Take, for example, you know, a business owner who had an African American customer come in and said, look, I'll sell you anything you want to buy. But while you're here, I'm going to throw, you know, a number of racial invectives and slurs at you.

I think we would all agree that that denies somebody equal access to and enjoyment to that place of business; and therefore, they're at least functionally, constructively being denied equal enjoyment of the facility and of access to the person's goods.

Take CPAN and PKC, for example. When they reserve space and operate space in a hotel, which they do frequently, and those are places of public accommodation, they're very happy to have somebody who's transgender and have had people who are transgender come to their events and speak up.

But if that person then says, I feel that I can't

**5-App-111**

74

be here and that I'm not welcome because you're refusing to address me using my preferred pronouns, that person would at least have a claim that they'd been denied equal access to that facility and that space, which is a kind of denial under the public accommodation statute, based on their preferred pronouns and their language.

You know, the bat example is maybe a useful one. And I think if Defendants genuinely thought that that was the kind of thing that was required to violate the statute, they could have said that by now.  They have not said that. They've kind of thrown around a number of vague, you know, it's subjective.  Is it hostile, is it offensive, is it intentional?

But they've never pointed to specific, concrete extra speech or extra conduct that the Plaintiffs would have to engage in before they cross that threshold into at least possibly incurring liability under CADA.

They've agreed essentially that it could be a single instance of misgendering, which, depending on the circumstances, maybe it's a single instance of misgendering where the speaker knew the person identified as transgender and was saying it intentionally to poke fun at them and upset them.

That's the kind of thing our Plaintiffs do.  In our declarations, the exhibits to our declarations, we have a

**5-App-112**

number of Tweets, for example, where, you know, they're poking fun at Dylan Mulvaney and a number of other high-profile transgender people.

So I think our Plaintiffs' speech reaches even that level of conduct. But the point is, I think the Defendants, they can't just say, we think there are other circumstances, it's not just the speech, and then be very coy about what those additional circumstances are.

If they want to come forward and say exactly what extra speech is required, they can do that. But I don't really think they've done that yet.

THE COURT: Okay.

MR. DRAPER: And the final thing -- and this is just a, you know, sending-off point -- again, I think if the Court wants to issue a more tailored injunction, that's fully within the Court's discretion to do that. We think at the very least, our Plaintiffs are entitled to an injunction that protects their ability to speak using pronouns and names that align with their very sincerely-held beliefs about sex and gender.

Whatever authority the Defendants are using under CADA to prohibit them from doing that, they should be enjoined from using that. Certainly the Court doesn't have to issue an injunction that stops them from enforcing CADA altogether. And I don't think we're asking for that.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 76 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 118

76

THE COURT:  Okay.

MR. DRAPER:  Thank you.

THE COURT:  Thank you.

Was there something else you wanted to say?  Can you do it in, like, two minutes?  Because I got to take a break and I'm going to come back.

MR. MARTIN:  I'll keep it under two minutes.

THE COURT:  Okay.

MR. MARTIN:  Yeah.  May it please the Court.  Just a couple of things.  First, as to the Defendants' claim that this is a highly fact-intensive inquiry, you know, maybe it's not just one instance of deadnaming or misgendering.

Even under that objective standard, under that harassment standard, hostile environment standard, our Plaintiffs are willing to go that far.  So that is still likely.  There is still a credible threat of enforcement.

Because under any standard, our Plaintiffs are going to continue to refuse requests and are going to continue to use biologically-accurate language.

As to the publications, I certainly did not mean to mislead the Court.  The Defendants have made a position on whether or not on their face, a couple of the publications violated the clause.  I would simply point out that they made no arguments as to whether or not these are arguably prescribed by the statute.

**5-App-114**

77

And also, critically, they did not disavow enforcement if there is a complaint filed based on those publications.  So Born Again Used Books wants to hand out its blog post.  That could change the subjective analysis.  So the publication clauses, there is still a credible threat of enforcement.

And lastly, as to whether something more has to happen in order for there to be a credible threat of enforcement besides just the language, I would just point the Court to the Sixth Circuit's *Christian Healthcare Center's* decision.

It explains, and many jurisdictions, Your Honor, read the statute this way, that refusing the accommodation that is at question here is the speech.  The accommodation is the preferred pronouns.  Our Plaintiffs provide that accommodation to individuals who don't identify as transgender, but they do not provide that to individuals that do identify as transgender.

So there's no other -- you know, it doesn't matter that they're not -- that they're still willing to sell their goods because that singular accommodation is being denied.

THE COURT:  And you're talking about in terms of whether they're a place that provides public accommodation.  Got it.  Is that what you're pointing at, you're referring to is whether or not they even fall under the purview of the

**5-App-115**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 78 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 120

78

statute?

MR. MARTIN:  Not exactly, Your Honor.  What I'm pointing to is the question of whether additional, you know, whether it's relevant that they are also selling goods and whether -- how that plays into the analysis of whether misgendering or deadnaming would violate CADA.

THE COURT:  Okay.

MR. MARTIN:  My point is that because using preferred pronouns --

THE COURT:  Oh, I see what you're saying.

MR. MARTIN:  -- is an accommodation --

THE COURT:  Got you.  Okay.

MR. MARTIN:  -- it doesn't matter if they're also willing to sell goods.

THE COURT:  Okay.

MR. MARTIN:  And that's what the Sixth held in *CHC*.

THE COURT:  Okay.  Okay.  All right.  Thank you.

MR. MARTIN:  Thank you, Your Honor.

THE COURT:  I'm going to take a quick break.  I'd like you all to just hang tight for a little bit, and I'll be back.  Okay?

THE COURTROOM DEPUTY:  All rise.

(Recess from 2:22 p.m. to 2:29 p.m.)

THE COURT:  Okay.  All right.  I'm prepared to issue a decision on the record.  This will come in the form

**5-App-116**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 79 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 121

79

of a recommendation which the parties can object to in the appropriate timeframe.

The record is obviously audio, but the parties can order a transcript, and you can order that transcript on an expedited basis if you'd like, so it doesn't cut into your objection period for too long.

A preliminary injunction is an extraordinary remedy, the exception rather than the rule. *Gunnison County Stockgrowers' Association, Inc. v. U.S. Fish and Wildlife*, 707 F.Supp. 3d 1056, 1062 (D. Colo. 2023). "To obtain a preliminary injunction, the movant must show a substantial likelihood of success on the merits; irreparable harm to the movant if the injunction is denied; three, that the threatened injury outweighs the harm the preliminary injunction may cause the opposing party; and four, that the injunction, if issued, will not adversely affect the public interest. It is the movant's burden to establish that each of these four factors tips in their favor."

Before considering each of the preliminary injunction factors, I want to highlight several threshold considerations.

First, this is a pre-enforcement action. Preliminary injunctions in pre-enforcement actions are, quote, "particularly fraught," unquote, because there is no, quote, "freestanding constitutional right to pre-enforcement

**5-App-117**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 80 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 122

80

review in federal court," end quote, *Uber Technologies, Inc. v. Moss*, 2025 WL 1420940, at 3 (D. Colo. January 31, 2025).

Second, Plaintiffs' injunctive relief request is exceptionally broad.  They seek to enjoin Defendants from enforcing the entire unwelcome and unwelcome statements provisions, as well as other provisions that impact multiple aspects of CADA and any other, quote, "materially similar statutory or regulatory provisions."

That's from the Plaintiffs' brief.  And for simplicity, I'll cite to document number 27, at 32.  That's in their conclusion.

Third, Plaintiffs' preliminary injunction motions seek the same injunctive relief requested in the complaints, which is disfavored.  The case cite for that is *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

Plaintiffs disagree with this, saying that a preliminary injunction falls into the all-relief category only if its effect, once complied with, cannot be undone.  But this is an overstatement.

Plaintiffs quote from a footnote in which the Tenth Circuit said the district court likely erred in applying the heightened standard, but the Tenth Circuit expressly declined to resolve the issue because Plaintiffs could satisfy the heightened standard anyway.

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 81 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 123

81

The Court therefore rejects that argument and finds that a heightened standard is appropriate here where relief on these preliminary injunction motions is essentially a win on the claims.

Fourth, granting a preliminary injunction would disturb rather than preserve the status quo.  Plaintiffs argue the status quo is the state of the law prior to the recent CADA amendments, but that framing ignores that the amendments were made to a longstanding statute, and that the existing enforcement regime under that statute is itself the status quo.

Because Plaintiffs seek to broadly enjoin enforcement under a statutory scheme that has been operative for years, their requested relief would upset the status quo, and that too requires a heightened showing.  See *Colorado Motor Carriers Association v. Town of Vail*, 153 F.4th 1052 at 1065-66 (10th Cir. 2025).

Fifth and finally, even if the Court were to enjoin Defendants from enforcing the challenge provisions, to some extent, Plaintiffs would still be required to comply with CADA or risk suit by an aggrieved individual.  This is because an aggrieved individual alleging public accommodation discrimination may either file a charge with the Civil Rights Commission or proceed directly to court under C.R.S. § 24-34-602.

**5-App-119**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 82 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 124

82

And while the Court may have the ability to enjoin these Defendants, it cannot enjoin prospective aggrieved individuals from filing suit, nor can it strike the challenged statutory language from CADA.  See *Uber Technologies, Inc.*, 2025 WL 1420940.

Stated differently, with or without a preliminary injunction, Plaintiffs still have to choose between giving up what they contend are their First Amendment rights or complying with CADA to avoid exposure.

Indeed, citing to the statute, Plaintiffs admit that, quote, "Violators can also be sued by aggrieved individuals and upon a finding of liability, be forced to pay hefty fines," at doc number 27 at 12.  And today in court, obviously, we also discussed that this is a separate path that prospective aggrieved individual could take regardless of the Division or the state being enforced or enjoined from enforcing the statute.

Additionally, as I noted earlier, the evidence suggests that the Plaintiffs feel the pressure more significantly from the public at large than anything else. Most of the evidence refers to public comments being made, public reviews being given, feeling forced to refer to patients in a particular way so that the family doesn't have the ability to seek punitive legal action.

That is the type of evidence the Plaintiffs have

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 83 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 125

83

submitted in support of their injunction motion.  Thus, from the Court's perspective, Plaintiffs' own statements demonstrate that a preliminary injunction would be of limited practical value and would not cure the dilemma that they describe.

With these threshold considerations in mind, the Court moves on to consider each of the preliminary injunction factors.

First, the substantial likelihood of success on the merits.  Here Plaintiffs are correct that this is the most significant factor, but the likelihood of success on the merits depends in part on the resolution of certain threshold jurisdiction arguments.  See *Murthy v. Missouri*, 603 U.S. 43 at 58 (2024).  See also *Oklahoma v. Biden*, 577 F.Supp. 3d 1245, at 1251 (W.D. Okla. 2021), and *Fisher v. Lynch*, 2007 WL 2225943, at 5 (D. Kan. July 31, 2007).

In this case, Defendants challenge standing.  To establish Article III standing, a Plaintiff must show an injury in fact, a sufficient causal connection between the injury and the conduct, and the likelihood that the injury will be redressed by a favorable decision, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, at 157 to 58 (2014).

In the pre-enforcement context, a Plaintiff satisfies the injury in fact requirement where they allege an intention to engage in a course of conduct arguably affected

with a constitutional interest but prescribed by a statute, and there exists a credible threat of prosecution thereunder.

In the First Amendment context, the Plaintiff can also show a credible threat of future prosecution plus an ongoing chilling effect on their desire to exercise their First Amendment rights. But either way, the mere presence on the statute books of an unconstitutional statute in the absence of enforcement or credible threat of enforcement does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally-protected conduct prohibited by the statute. And that's from *Winsness v. Yocom*, 433 F.3d 727 at 732 (10th Cir. 2006).

Thus, even assuming that Plaintiffs have made a clear showing that their speech is actually prescribed or arguably prescribed, as the Plaintiffs have noted today, by the amendments, and assuming that their speech is indeed chilled, the absence of a credible threat of enforcement can't be dispositive in a pre-enforcement standing analysis. See *Moms for Liberty - Wilson County, TN v. Wilson County Board of Education*, 155 F.4th 499 at 512 (6th Cir. 2025).

Courts consider at least three factors when analyzing whether there is a credible threat of enforcement:

One, whether the Plaintiff showed past enforcement against the same conduct; two, whether authority to initiate the charges was not limited to a prosecutor or an agency and

**5-App-122**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 85 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 127

85

instead any person can file a complaint; and three, whether the state disavowed future enforcement.

And while it is true that this is not supposed to be a difficult bar for Plaintiffs to clear in the First Amendment pre-enforcement context, there is an important nuance here.

The standing analysis must be conducted under the correct standard.  Indeed, the United States Supreme Court has specifically said this of the Article III standing analysis.  Quote, "Each element must be supported in the same way as any other matter on which the Plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Susan B. Anthony*, 573 U.S. at 158.

More importantly -- I'm sorry, more recently, the Supreme Court has also expressly stated that at, quote, "the preliminary injunction stage, the plaintiff must make a, quote, clear showing that she is likely to establish each element of standing."  And that's *Murthy*, 603 U.S. at 58. See also *Winter v. Natural Resources Defense Council*, 555 U.S. 7, at 22 (2008) and also *Am. Encore v. Fontes*, 152 F.4th 1097, at 1106 (9th Cir. 2025).

Thus, the Court applies a clear showing standard. That is, have the Plaintiffs made a clear showing that there is a credible threat of enforcement?  Plaintiffs argue that

**5-App-123**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 86 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 128

86

there is a presumption of enforcement when it comes to new laws.  Saying that courts assume a likelihood of enforcement for new laws, they rely on *Darren Patterson Christian Academy v. Roy*, 699 F.Supp. 3d 1163 (D. Colo. 2023) where, according to Plaintiffs in their brief, the Court noted a strong presumption of enforcement for, quote, "new laws."

Not exactly.  In that case, the United States District Court Judge Dan Domenico recognized that some courts have adopted such a presumption and he cited Fifth Circuit authority, but he did not adopt the presumption himself.

Instead, Judge Domenico found that the newness of the law, quote, "seems to diminish the relevance of the lack of enforcement history factor, making it, quote, neutral rather than weighing against standing."  In short, his statements on the matter were just a little more nuanced than Plaintiffs suggest.

Similarly, Plaintiffs overstated *Virginia v. Amer. Booksellers Association*, 484 U.S. 383.  There the Court said it saw, quote, "no reason to assume non-enforcement, but the statement came after the court had already determined that plaintiffs had standing based on concrete facts."  The statute was aimed directly at plaintiffs, imposed criminal prosecution as a penalty, required significant and costly compliance measures, and caused well-founded fears of enforcement.  Thus, the statement was not, as Plaintiffs

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 87 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 129

87

suggest, some presumption of enforcement.

Plaintiffs also place great weight on the automatic operation of CADA provisions. And they certainly don't describe it this way, but as the Court reads their briefs, that is how the Court is interpreting their arguments.

Plaintiffs argue that, quote, "Those who operate in a place of public accommodation are now liable if they refuse to address or refer to someone using their chosen name, preferred pronouns, or other gender-affirming terms and that by doing so they have denied the individual in full and equal enjoyment of a public accommodation." This is from Plaintiffs' brief document number 27, at 10.

Under Plaintiffs' theory, the mere act of speaking in the manner they wish to speak would inevitably trigger enforcement and liability. But Defendant Sullivan, Director of the Colorado Civil Rights Division, has offered the following interpretation of the subject CADA provisions.

Quote, "Whether a place of public accommodation would violate CADA by failing and/or refusing to use an individual's chosen name based on gender identity and/or how the individual chooses to be addressed based on gender identity would be a highly fact-specific inquiry and contains both subjective and objective elements. As a result, a place of public accommodation's announcement of a desire to use and/or ultimate failure or refusal to use an individual's

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 88 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 130

88

chosen name and/or how the individual chooses to be addressed by itself is not per se unlawful discrimination under CADA."

"Rather, it requires a close analysis of all facts and context of the usage and the circumstances related to the usage, including how such usage relates to providing any goods, service, facility, privilege, advantage, or accommodation to the general public."  That's from document number 85-1 at 211 to 12.

These statements, of course, are not law and ultimately, they may be nothing more than tangentially relevant, if at all, to the question of constitutionality. However, as it concerns a credible threat of enforcement, Defendant Sullivan's statements demonstrate that the mere act of speaking would not automatically trigger enforcement.

They also demonstrate that Defendants do not intend to enforce CADA against Plaintiffs at this juncture based merely on a, quote, "failure or refusal to use an individual's chosen name and/or how the individual chooses to be addressed," end quote from the same statement.

In essence, although the Plaintiffs disagree, this operates like a disavowal.  Defendants do not intend to prosecute, as Plaintiffs say, the mere act of misgendering and deadnaming.

Moreover, there's no evidence that the Division has received complaints about Plaintiffs misgendering or that the

**5-App-126**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 89 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 131

89

Division has warned Plaintiffs that their desired approach is unlawful. And while the record shows some evidence that members of the public have lashed out against certain Plaintiffs, there does not appear to be any evidence that members of the public have complained to a state official in a manner that might lead to enforcement.

Thus, while Plaintiffs offer evidence that the Division believes intentional misgendering and deadnaming can be considered hostile, this evidence speaks to the Division's general views on hostility, but not necessarily to a specific threat of enforcement.

Plaintiffs also argue that Defendants have used CADA in the past to punish alleged discrimination determination based on gender identity and gender expression. They offer some evidence of probable cause determinations and suggest that the basis for those determinations is misgendering and deadnaming on its own.

But the evidence tends to support what Defendant Sullivan says about the process of determining whether a CADA violation has occurred, that it is highly fact specific. Indeed, in responses to interrogatories, the Division said it has, quote, "not found probable cause in any public accommodations case solely based upon a respondent's place of public accommodations, failure to use an individual's chosen name, and/or how the individual chooses to be addressed."

**5-App-127**

90

And that's from document number 98-1 at 6.

Accordingly, two of the three factors weigh against finding a credible threat of enforcement, and as to the third, which is whether authority to initiate charges is limited to a prosecutor or agency or whether any person can file a complaint, Plaintiffs argue that the authority to file a complaint is not limited to the Division, the Commission, or the Attorney General.

Instead, any person can file a charge alleging discrimination, and anyone who wishes to make use of Plaintiffs' services or attend one of their events but feels unwelcome due to Plaintiffs' use of biologically-accurate language may file a complaint and initiate a potentially burdened administrative hearing against Plaintiffs.

To the extent Plaintiffs are referring to complaints the Division can choose to take action on, the authority appears to remain with Defendants.  To the extent Defendants are referring to a private right of action that would, as already stated, counsel against a preliminary injunction in this case.

In any event, even assuming that the Court weighs this factor in Plaintiffs' favor, the other two factors weigh against Plaintiffs.  Thus, Plaintiffs have not demonstrated a credible threat of enforcement under the heavy burden that applies to these preliminary injunction motions.

**5-App-128**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 91 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 133

91

For similar reasons, Plaintiffs have not made a clear showing that irreparable injury is likely in the absence of an injunction.  The absence of pending complaints or a history of enforcement tied to the specific conduct Plaintiffs describe undermines any claim of imminent or non-speculative harm.

Moreover, the fact that CADA and specifically the provisions Plaintiffs seek to nullify have been in place for decades also undercuts the claim of irreparable harm.

Additionally, the balance of harms and public interest do not favor the sweeping injunctions Plaintiffs seek.  The state articulates significant interest in administering and enforcing its anti-discrimination regime and case law in this district counsels restraint where the requested relief would alter the status quo and be of limited practical value in light of a private right of action.  See *Uber Technologies* 2025 WL 1420940, at 3.

For these reasons, the Court recommends that the Plaintiffs' request for a preliminary injunction be denied. However, before closing, the Court pauses to emphasize two points.

First, as noted already, a preliminary injunction is an extraordinary remedy, one that is particularly disfavored, whereas here it would alter the status quo or afford Plaintiffs the full relief they might obtain at trial.

**5-App-129**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 92 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 134

92

Second, the record is voluminous and the Court reviewed it on a somewhat expedited basis, though still thoroughly, but in order to give Plaintiffs a prompt hearing without disrupting the Court's docket.  Accordingly, this ruling should not be read as a decision on the pending motions to dismiss, which are governed by a different legal standard and are not yet fully briefed.

A finding that Plaintiffs have not made a clear showing that is required to carry their burden on the preliminary injunction motions is not a prediction of the outcome under that different standard and with the benefit of full briefing on those different motions.

Additionally, the Court expresses no view on the ultimate question of whether the statute, as amended, does or does not violate the First and Fourteenth Amendments.

And unless the parties want me to address anything else, administrative or otherwise, we can adjourn.  Oh, the motion's to restrict.  I do want to address that.  Yeah.

MS. FISCHER:  And just one question, Your Honor. We will be filing a motion, our motion to dismiss reply.  I assume, per our prior status conference, having a consolidated reply is your preference.

THE COURT:  I thought that's what you all had requested and maybe I'm misremembering the email to my chambers when you were coordinating, I think, the

**5-App-130**

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 93 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 135

93

consolidated response and reply, and you all --

MS. FISCHER:  We filed a single --

THE COURT:  I would prefer consolidated.

MS. FISCHER:  -- a single brief --

THE COURT:  Okay.

MS. FISCHER:  -- that addressed all three cases.

THE COURT:  Right.

MS. FISCHER:  They in turn filed, each individual, oppositions to our motions to dismiss.

THE COURT:  I would prefer consolidated --

MS. FISCHER:  Okay.  Very good.

THE COURT:  -- if you can do that.  Is there any reason why you can't?

MS. FISCHER:  We will have to do some string citing to different briefs, but we will make it work for Your Honor.

THE COURT:  Okay.  That would be better.

MR. DRAPER:  I apologize if Your Honor said this and I didn't hear.  Are you -- will you also be issuing a written decision on the recommendation?

THE COURT:  No, this is it.  That's why I was suggesting to you that you might want to order --

MR. DRAPER:  Expedited, yeah.

THE COURT:  -- the transcript.

MR. DRAPER:  Understood.

THE COURT:  Right.  You have 14 days to object to

Case No. 1:25-cv-01572-RMR-MDB    Document 110-1    filed 03/05/26    USDC Colorado
pg 94 of 97
Appellate Case: 26-1101    Document: 19-5    Date Filed: 06/08/2026    Page: 136

94

my decision, starting from today, since I've issued the decision today.  So you may want to request the transcript on an expedited basis, which I think they can usually get it to you pretty quickly.

I would like to address the motion to restrict that was filed, I think, by your clients.  Is that right?  Is it Defending Education?

MR. DRAPER:  Yeah.  There was -- when the Defendants filed theirs, they had some documents filed under a sealed appendix that we asked to be restricted.

THE COURT:  Uh-huh.

MR. DRAPER:  So the only pending motion to restrict, I believe, is ours.  There's some additional sealed appendices that were filed with our briefs that I think will have forthcoming motions to restrict.  But the only pending one is --

THE COURT:  Okay.

MR. DRAPER:  -- is the Defending Education Plaintiffs.

THE COURT:  I believe that motion is unopposed.  Is that right?

MS. FISCHER:  That is correct.

THE COURT:  Okay.

MS. FISCHER:  And we will be filing a motion to restrict as to the material they filed, which we believe

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 95 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 137

95

contains confidential information.  In particular, it is the specific statements identifying the, you know, charges and names, et cetera, of individuals that have filed actions with the CCRB.

THE COURT:  I'm a little bit confused now.

MS. FISCHER:  Sure.

THE COURT:  Because I think there is a pending motion right now, correct?

MS. FISCHER:  Correct.

THE COURT:  Two?

MS. FISCHER:  And we will be filing imminently in the next week --

THE COURT:  Okay.

MS. FISCHER:  I think we've got two weeks, per the local rule, to file a motion to restrict as to what they have filed restricted on our --

THE COURT:  Let's set that aside.

MS. FISCHER:  Okay.

THE COURT:  I don't want to deal with motions --

MS. FISCHER:  Perfect.

THE COURT:  -- that haven't been filed yet.

MS. FISCHER:  Perfect.

THE COURT:  But I know that there are motions on the docket --

MS. FISCHER:  Yeah.

**5-App-133**

Case No. 1:25-cv-01572-RMR-MDB   Document 110-1   filed 03/05/26   USDC Colorado
pg 96 of 97
Appellate Case: 26-1101   Document: 19-5   Date Filed: 06/08/2026   Page: 138

96

THE COURT:  -- that are pending that I'd like to address today.  And -- no, I think we could just do it now.  Yeah.  So they're unopposed.  And they were motions related, I think, to the doctors in the case, right --

MR. DRAPER:  Yeah, so --

THE COURT:  -- and potentially patient information?

MR. DRAPER:  -- they were -- yeah.

THE COURT:  Okay.

MR. DRAPER:  They were some interrogatory responses and deposition transcripts.

THE COURT:  You don't need to say the substance.  We're on the record, so this is public.

MR. DRAPER:  They were just --

THE COURT:  Yeah.

MR. DRAPER:  That's correct.

THE COURT:  Okay.

MR. DRAPER:  They were discussing specific patient interactions.

THE COURT:  And they are unopposed, correct?

MS. FISCHER:  Correct.  Yes.

THE COURT:  All right.  So I'm going to grant them.  I do see a basis for it, although I don't see any real identifying information in them.  I suspect that if there is other discovery that comes about that has to be filed and it could potentially be paired with this information, it could

become identifying.  So I think it's prudent to grant the restriction.  So I will grant those.

And then I'll deal with those other motions that you referred to when they come in.

MS. FISCHER:  Okay.  I apologize for the multiple papers that were coming your way.

THE COURT:  Okay.  It's okay.  That's all right.  I just wanted to make sure I was clear on what we were doing.

MS. FISCHER:  Yeah.

THE COURT:  Is there anything else that the parties need me to address today?

MS. FISCHER:  No.

THE COURT:  Okay.  All right.  Thank you all. Court is adjourned.

(Time noted:  2:52 p.m.)

* * * * *

CERTIFICATE

I, MAUREEN STEPHENS, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.

/s/Maureen Stephens                          March 2, 2026

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

DEFENDING EDUCATION, *et al.*,

       *Plaintiffs*,

v.

AUBREY C. SULLIVAN, in her official
capacity as the Director of the Colorado
Civil Rights Division, *et al.*,

       *Defendants*.

Case No. 1:25-cv-01572-RMR-MDB

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO THE REPORT &
RECOMMENDATION**

---

## TABLE OF CONTENTS

PAGE

INTRODUCTION ....................................................................................................... 1

1. The R&R properly acknowledged and weighed that CADA has protected transgender individuals for years. ............................................................. 1

2. On likelihood of success, the R&R properly determined that Plaintiffs failed to make a clear showing of credible threat of enforcement. ..................................... 3

3. The R&R properly considered the scope of Plaintiffs' requested relief ............. 7

4. The R&R properly weighed the equities ........................................................... 10

CONCLUSION ......................................................................................................... 10

i

## INTRODUCTION

Plaintiffs, an assortment of advocacy organizations, medical doctors, and associations to which they belong, assert that CADA's public accommodation laws violate their First Amendment right to misgender and deadname individuals, and seek a broad preliminary injunction precluding Defendants from enforcing certain CADA provisions not only against them, but against anyone. The R&R properly determined that Plaintiffs have not carried their burden—Plaintiffs are seeking a disfavored injunction that would alter the status quo, and they failed to make a clear showing that they have a credible threat of enforcement. CADA and its protections for transgender individuals—including its antiharassment protections for verbal statements that rise to the level of denying transgender persons full and equal enjoyment of a public accommodation's goods and services—have long been on the books. Those antiharassment protections remain unchanged by H.B. 25-1312 defining "gender expression" to include how an individual chooses to be addressed. Moreover, Plaintiffs have never been the subject of any CADA complaint, and the Division has never found probable cause of discrimination based on misgendering and deadnaming alone. Finally, misgendering and deadnaming are not *per se* violations of CADA, and thus whether any interactions in the future might result in a CADA violation is a highly fact-intensive analysis. Plaintiffs' objections to the contrary lack merit.

### 1.  The R&R properly acknowledged and weighed that CADA has protected transgender individuals for years.

Plaintiffs argue that the R&R did not properly take into account the recent enactment of H.B. 25-1312, including by (1) allegedly failing to recognize the

presumption that new laws should be enforced, Obj. 2-3; (2) failing to give credence to Plaintiffs' new-found fears of CADA enforcement against them, *id.* 5-6; and (3) in finding Plaintiffs' injunction is disfavored by disrupting the status quo, *id.* 9-10. The Court should reject these objections because the R&R properly found that the recent enactment of H.B. 25-1312 does not change CADA's longstanding antiharassment protections for transgender individuals.

Plaintiffs ignore that CADA has prohibited discrimination based on a person's transgender status since at least 2008, and the Commission Rules have specifically outlined when misgendering and deadnaming rise to a CADA violation since 2009. Specifically, CADA's 2008 definition of "sexual orientation" includes "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200). And Commission Rule 81.6(A)(4), promulgated in 2009, provides that "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" can amount to a CADA violation in the form of "unlawful harassment" when it "creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation." 3 CCR 708-1, Rule 81.6(A)(4); *see also* Dkt. 98-1, PA pp. 2-6, ROG Responses (outlining framework). This Rule has long provided for CADA enforcement in certain circumstances involving misgendering and deadnaming, so Plaintiffs are simply wrong that CADA did not address misgendering or deadnaming prior to H.B. 25-1312. *See* Obj. 5, 10. Indeed, all that law did was to codify what was already long reflected in this rule by clarifying that the existing protected characteristic of

"gender expression" includes an individual's "chosen name" and "how the individual chooses to be addressed." C.R.S. § 24-34-301(3.5), (9).

Because protections against discrimination based on transgender status, including harassment involving misgendering or deadnaming, have been on the books for years, there is no reason to apply a presumption that CADA will be newly enforced against Plaintiffs, whatever validity such a presumption may have in contexts that, unlike the case at hand, actually involve the creation of new legal rights and responsibilities. And for the same reason, the R&R properly determined that a heightened standard for injunctive relief applies.

## 2. On likelihood of success, the R&R properly determined that Plaintiffs failed to make a clear showing of credible threat of enforcement.

The R&R properly determined that Plaintiffs did not make a clear showing of "an objectively justified fear of real consequences." *Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022); *see also Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (for preliminary injunctive relief on First Amendment claims, plaintiff "must make a clear showing that she is likely to establish each element of standing"). Plaintiffs' arguments to the contrary are not supported.

**Disavowal**: Plaintiffs argue that a failure to disavow enforcement "suffices to find a credible threat," and that a disavowal counts only if "formal and unequivocal." Obj. 3-4. Plaintiffs misstate how courts view this factor.

Disavowal is only one of three non-exclusive factors courts have identified, and "an assurance of non-enforcement is not necessary to defeat standing." *Peck*, 43 F.4th at 1133. However, a refusal to disavow is given "heavy weight" towards a finding of credible threat where "there is nothing, not even their word,

to prevent prosecutors from bringing criminal charges against someone who violates" the challenged statute. *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024), *cert. granted*, 145 S. Ct. 1328 (2025).

Disavowal is applicable where the conduct at issue is specific and arguably violates the challenged statute. *See, e.g.*, *Peck*, 43 F.4th at 1132-33 (lack of disavowal relevant where plaintiff challenged law providing for confidentiality of child abuse records and judge had warned plaintiff against violating statute); *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 329 (5th Cir. 2025) (the failure to disavow contributed to credible threat when all parties agreed plaintiff's proposed conduct would violate the statute at issue). *Christian Healthcare Centers, Inc. v. Nessel* ("*CHC*"), provides an apt example, explaining that "[w]here a defendant refuses to disavow enforcement 'against a particular plaintiff' *with respect to the plaintiff's specific conduct*, our precedent treats enforcement as more credible." 117 F.4th 826, 850 (6th Cir. 2024) (emphasis added)). As *CHC* made clear, it is "unrealistic to expect a defendant to disavow a law's enforcement as applied to 'fluid and future facts' that are unclear at this time. By contrast, refusing to disavow is less understandable—and enforcement more credible—where there is not 'a single additional fact that would be required to adjudicate the present action.'" *Id.* at 850-51 (citations omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (injury in fact requires plaintiff to be "immediately in danger of sustaining some direct injury'" and the "threat of injury [is] both 'real and immediate,' not 'conjectural' or 'hypothetical.'"). If disavowal is applicable, an official's sworn statement that it will not enforce a

4

5-App-141

challenged statute, even if made after the start of litigation, amounts to a disavowal. *See St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956, 985–86 (D. Colo. 2024), *aff'd*, 154 F.4th 752 (10th Cir. 2025) (finding disavowal of enforcement of contract provision by agency official's sworn affidavit and testimony during litigation was effective disavowal); *Darren Patterson Christian Acad. v. Roy*, 765 F. Supp. 3d 1194, 1201 (D. Colo. 2025) (same); *contra Bella Health*, 699 F. Supp. at 1208 (counsel's statements at hearing lacked the force of a disavowal).

Applying this framework, the R&R properly determined that this consideration did not weigh in Plaintiffs' favor. The Division and Commission have stated unequivocally in discovery responses that Plaintiffs' proposed written policies on misgendering and deadnaming do not violate CADA, PA pp. 8-12, and no additional facts are necessary to determine whether a violation may occur. Further, the verified Division and Commission discovery responses are no less effective for having been made in litigation. *See St. Mary*, 736 F. Supp. 3d at 985–86; *Darren Patterson Christian Acad.*, 765 F. Supp. 3d at 1201.

As to Plaintiffs' interactions with the public that involve misgendering and deadnaming, the Division and Commission have explained that such conduct is not a *per se* violation of CADA but rather must rise to the level of harassment. *See* PA pp. 3-12.[1] The R&R correctly rejected Plaintiffs' reading of CADA—

---

[1] Stringing together cherry-picked phrases, Plaintiffs argue that the Tenth Circuit found a credible threat of enforcement in *Citizens for Responsible Gov't. v. Davidson* despite the state's narrow reading of the challenged statute because "courts do not 'defer' to the government's statutory 'construction.'" Obj. 4 (citing

revived here—as "prohibit[ing] *all* misgendering and deadnaming in public

accommodations." Obj. 8 (emphasis added). Because not all misgendering or

deadnaming violates CADA, this conduct is not the proper subject of a

disavowal—it remains unclear whether Plaintiffs may violate CADA in the future,

and any violation depends on "fluid and future facts" unclear and hypothetical at

this time. *See CHC*, 117 F.4th at 850. Plaintiffs can hardly expect carte blanche

for all interactions they ultimately may have.

**Plaintiffs' fear of prosecution**: Plaintiffs argue that the R&R improperly

diminished their fears of prosecution where H.B. 25-1312 is a new law, Plaintiffs

are harassed for their beliefs, and the Division has found probable cause in at

least some cases involving misgendering/deadnaming.

First, as explained above, H.B. 25-1312 does not create any new

protections for transgender individuals.

Second, it appears that Plaintiffs are largely afraid that individuals will file

CADA complaints against them in retaliation for their viewpoints on transgender

individuals, not that individuals will file charges alleging harassment by Plaintiffs

through misgendering and deadnaming. *See* Obj. 5. This is a meaningful

difference for standing purposes: Plaintiffs report that individuals voice their

disagreement with Plaintiffs' viewpoints about transgender people, yet no CADA

complaints have been filed against them. *See* PA pp. 31-39 (complaints and

---

236 F.3d 1174, 1192-93 (10th Cir. 2000). But in that case, the Court held that the state's proffered construction was contrary to the statute's plain language and would violate standard rules of statutory construction. *See id.* at 1189-93. Here, by contrast, it is Plaintiffs' reading that ignores CADA's plain language.

threats received by PKC's and CPAN's leaders and negative Google reviews of Dr. Morrell's practice); Restricted PA pp. 39-41 (patient complaints received by Dr. Leswing). Despite people disagreeing with Plaintiffs' views, the Division has received no complaint regarding any Plaintiff, thus undermining Plaintiffs' claim of a credible fear of enforcement. *See* DA pp. 212, ¶ 20.

Third, "[p]ast enforcement" is relevant where it is "against the same conduct." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). The prior CADA enforcement actions cited by Plaintiffs establish that the Division has never found probable cause for a charge alleging deadnaming and misgendering alone, and has received no complaints against a place of public accommodation's policy or publication regarding misgendering or deadnaming. *See* PA pp. 552 (Sullivan Decl.), 737 (Sullivan Dep., same). Rather, Plaintiffs cite Division investigations that show enforcement where there is a denial of full and equal enjoyment of goods and services, which is not present here. Restricted PA pp. 5-18, 20-23, 139-42, 161-166, 167-72, 177-181.

### 3.  The R&R properly considered the scope of Plaintiffs' requested relief.

Contrary to Plaintiffs' objections, the R&R properly considered that injunctive relief would not preclude actions by private individuals, *see* Obj. 6-7, and that Plaintiffs were requesting extraordinarily broad relief, *id.* 9.

As an initial matter, Plaintiffs seek extraordinarily broad injunctive relief, including to enjoin, both facially and as applied to Plaintiffs, enforcement of the "gender expression" and "chosen name" definitions in H.B. 25-1312, "the Unwelcome Provision, *see* [C.R.S.] § 24-34-601(2)(a), the Unwelcome Statements Provision, *see id.* § 24-34-701(1)(c), and any materially similar

statutory or regulatory provisions." Dkt. 27, at 27. That is, Plaintiffs seek facially to enjoin CADA's provisions making it a discriminatory unlawful practice to "indicate[] . . . that an individual's patronage or presence at a place of public accommodation is unwelcome" based on *any* protected characteristic, or to issue a communication or advertisement stating as much. *See* C.R.S. §§ 24-34-601(2)(a); 24-34-701(1)(c). Plaintiffs also seek to facially enjoin "any materially similar statutory or regulatory provisions," yet never offer any explanation as to what those provisions are.

Although Plaintiffs attempt to blame the R&R for failing to craft more tailored relief, Defendants' briefing put Plaintiffs' requested relief squarely at issue, arguing that federal courts are not authorized to enter "universal injunctions" that "prohibit[] the Government from enforcing the law against *anyone*, anywhere." *See* Dkt. 71 at 48 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 837 n.1 (2025)). Further, even though "[i]t is well settled [that] an injunction must be narrowly tailored to remedy the harm shown," *Garrison v. Baker Hughes Oilfield Operations,* 287 F.3d 955, 962 (10th Cir. 2002) (citations omitted), Plaintiffs continued to seek an injunction of CADA provisions that have existed for decades when confronted with the breadth of their requested relief at the hearing. *See* Tr. 33:14-20. Only when pressed did they become willing to accept some undefined, alternative relief. Tr. 40:4-12. The R&R should not be faulted for Plaintiffs' failure to request lesser relief. And in any event, the R&R did not deny relief because Plaintiffs' requested relief was too broad, but instead because Plaintiffs failed to make a clear showing of standing and failed their burden on the

preliminary injunction factors.

The R&R also correctly noted that preliminary relief would be "of limited practical value in light of a private right of action" provided by CADA's enforcement scheme. Tr. 91:12-17 (citing *Uber Techs., Inc. v. Moss*, No. 1:25-CV-00096-DDD-KAS, 2025 WL 1420940, at *3 (D. Colo. Jan. 31, 2025). Private enforcement is not insignificant, and is permitted once the Division's and Commission's jurisdiction expires— i.e., because the Division does not find probable cause, the Commission does not timely initiate enforcement proceedings; or the Complainant requests a notice of right to sue. C.R.S. §§ 24-34-306(2)(b)(I)(B), (11); *see also* C.R.S. § 24-34-306(15) (outlining complainant's ability to request notice of right to sue). These facts are properly considered as an equitable consideration weighing against preliminary relief. *See Uber*, 2025 WL 1420940, at *2-3.

In arguing otherwise, Plaintiffs mistakenly rely on caselaw regarding when an injury is redressable for purposes of showing Article III standing. *See, e.g.*, *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902-03 (10th Cir. 2012). But the R&R did not address redressability. Rather, it concluded that the availability of a private right of action counseled against the extraordinary remedy of preliminary relief because of its limited practical effect. Tr. 83:1-5. Indeed, *Uber* itself recognized this distinction. *See Uber*, 2025 WL 1420940, at *3 (rejecting idea that "possibility of private enforcement . . . deprives this court of jurisdiction," but concluding that its effect would render "any injunction here . . . closer to an advisory opinion than to actual preservation of the status quo").

**4. The R&R properly weighed the equities.**

Plaintiffs acknowledge that likelihood of success is often determinative, Obj. 7, and as explained above, Plaintiffs have not made a clear showing of standing. Nor have Plaintiffs shown irreparable harm—as outlined above and as found by the R&R, the "absence of pending complaints or a history of enforcement tied to the specific conduct Plaintiffs describe undermines any claim of imminent or non-speculative harm," and CADA's anti-discrimination provisions have been on the books for decades. Tr. 91:3-9. Plaintiffs disagree with this finding by pointing to H.B. 25-1312's recent enactment, but as explained above, CADA's anti-discrimination provisions have been on the books for years. Finally, the State of Colorado "ha[s] a 'compelling interest' in eliminating discrimination in places of public accommodation," *303 Creative v. Elenis*, 600 U.S. 570, 590 (2023), meaning that the overbroad injunction Plaintiffs seek against CADA as a whole would undermine the public interest in preventing discrimination.[2]

### CONCLUSION

Defendants respectfully request that the Court adopt the R&R.

---

[2] Though not addressed by the R&R, as argued in Defendants' opposition to Plaintiffs' preliminary injunction motion, there are additional, independently sufficient grounds to deny the motion. Not all Plaintiffs even qualify as places of public accommodation to which CADA would apply, Plaintiffs have not shown an intent to engage in conduct that arguably violates CADA as required to establish an injury in fact, and their claims are not ripe. And as to the Attorney General, he is protected by sovereign immunity and there is no credible threat that he would enforce Parts 6 or 7 of CADA against Plaintiffs.

Dated this 19th day of March, 2026.

PHILIP J. WEISER
Attorney General

For Defendants Aubrey C. Sullivan, Sergio
Cordova, Geta Asfaw, Mayuko Fieweger,
Daniel S. Ward, Jade R. Kelly and Eric
Artis:


*s/ Nora Q.E. Passamaneck*
Nora Q.E. Passamaneck
Senior Assistant Attorney General
Helen Norton
Deputy Solicitor General
Janna K. Fischer
Senior Assistant Attorney General
Dominick D. Schumacher
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
FAX: (720) 508-6032
nora.passamaneck@coag.gov
helen.norton@coag.gov
janna.fischer@coag.gov
dominick.schumacher@coag.gov


For Defendant the Attorney General in his
official capacity:

s/ *Talia Kraemer*
Talia Kraemer
Senior Assistant Attorney General
Lane Towery
Assistant Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, Colorado  80203
Telephone:  (720) 508-6000
talia.kraemer@coag.gov
lane.towery@coag.gov


11
**5-App-148**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

**Civil Action No. 25-cv-01572-RMR-MDB**

DEFENDING EDUCATION, *et al.*,

      Plaintiffs,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division (the "Division"), in her official capacity;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, and ERIC ARTIS, as members of the Colorado Civil Rights Commission, in their official capacities; and
PHIL WEISER, Colorado Attorney General, in his official capacity,

      Defendants.

**Civil Action No. 25-cv-01668-RMR-MDB**

COMMITTEE OF FIVE, INC. d/b/a XX-XY ATHLETICS,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

**Civil Action No. 25-cv-02177-RMR-MDB**

DOXA ENTERPRISES, LTD d/b/a Born Again Used Books,

      Plaintiff,

v.

AUBREY C. SULLIVAN, Director of the Division, in her official capacity, *et al.*,

      Defendants.

**5-App-149**

5-App-150

## ORDER ADOPTING MAGISTRATE JUDGE RECOMMENDATION

This matter is before the Court on the Recommendation of United States Magistrate Judge Maritza Dominguez Braswell. On February 19, 2026, Magistrate Judge Braswell held a hearing addressing three motions for preliminary injunction in three related cases: *Defending Education, et al, v. Sullivan, et al.*, No. 25-cv-01572-RMR-MDB ("Defending Education"); *Committee of Five, Inc. v. Sullivan, et al.*, No. 25-cv-01668-RMR-MDB ("Committee of Five"); and *Doxa Enterprises, Ltd., v. Sullivan, et al.*, No. 25-cv-02177-RMR-MDB ("Doxa"). At the end of the hearing, Magistrate Judge Braswell pronounced the Recommendation: *Defending Education*, ECF No. 102; *Committee of Five*, ECF No. 87; and *Doxa*, ECF No. 49.

The motions addressed in the Recommendation are motions for preliminary injunction filed by Plaintiff(s) in each case: *Defending Education*, ECF No. 27; *Committee of Five*, ECF No. 15; and *Doxa*, ECF No. 4. Magistrate Judge Braswell recommends denying each motion for preliminary injunction. Plaintiff(s) timely filed an objection to the Recommendation in each case: *Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; and *Doxa*, ECF No. 57. Defendants filed a response in each case: *Defending Education*, ECF No. 112; *Committee of Five*, ECF No. 97; and *Doxa*, ECF No. 59.

The Court has reviewed the Recommendation, as well as the objections, the responses, the record, and the pleadings in each case. For the reasons stated below, the Court overrules the objections and adopts the Recommendation.

2
5-App-150

# I.   BACKGROUND

The central issue in this case is whether the Court should enjoin enforcement of Colorado's amended anti-discrimination law. All Plaintiffs allege the amended statute unconstitutionally regulates their speech, violating the First and Fourteenth Amendment.[1] The Colorado Anti-Discrimination Act ("CADA") prohibits discrimination in places of public accommodation. *See* Colo. Rev. Stat. § 24-34-601. In May 2025, Colorado passed HB25-1312 (the "Act"), which amends portions of the CADA. Plaintiffs challenges the constitutionality of CADA's discrimination in places of public accommodation statute with the Act's amended definitions.

## A.  Colorado Statutes at Issue

The "Discrimination in places of public accommodation" statute under CADA as amended states:

> It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, **gender identity**, **gender expression**, marital status, national origin, or ancestry the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation **or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is**

---

[1] Because these cases involve "a common question of law or fact," the Court addresses the *Defending Education*, *Committee of Five*, and *Doxa* preliminary injunction motions in this consolidated Order "to avoid unnecessary cost or delay" under Fed. R. Civ. P. 42(a).

> **unwelcome, objectionable, unacceptable, or undesirable**
> because of disability, race, creed, color, sex, sexual
> orientation, **gender identity**, **gender expression**, marital
> status, national origin, or ancestry.

Colo. Rev. Stat. § 24-34-601(a)(2) (emphases added). The Act amends CADA's definition

of "gender expression" to:

> an individual's way of reflecting and expressing the
> individual's gender to the outside world, typically
> demonstrated through appearance, dress, behavior, **chosen**
> **name**, and how the individual chooses to be addressed.

*Id.* § 24-34-301(9) (emphasis added). It also amends "chosen name" to mean:

> a name that an individual requests to be known as in
> connection to the individual's disability, race, creed, color,
> religion, sex, sexual orientation, gender identity, gender
> expression, marital status, familial status, national origin, or
> ancestry, so long as the name does not contain offensive
> language and the individual is not requesting the name for
> frivolous purposes.

*Id.* § 24-34-301(3.5). And finally, "gender identity" is defined under CADA as:

> an individual's innate sense of the individual's own gender,
> which may or may not correspond with the individual's sex
> assigned at birth.

*Id.* § 24-34-301(10).

## B. Background on *Defending Education*, *Committee of Five*, and *Doxa* Plaintiffs

*Defending Education* plaintiffs are various non-profit organizations (Defending

Education, Colorado Parent Advocacy Network, Protect Kids Colorado, and Do No

Harm), two individuals (Dr. Travis Morrell and Dr. Valeri Leswing), and Dr. Leswing's

medical practice, Mountain Pediatrics. *Defending Education*, ECF No. 27 at 12-13. The

organizations "hold traditional views on matters of sex and gender identity" and "believe

4
5-App-152

that sex is determined at birth and immutable." *Id.* at 13. They host events in places of public accommodation and want "to refer to individuals at these events using biological pronouns, birth names, and other biologically accurate terms, even if those pronouns, names, or terms conflict with an individual's self-professed gender identity or expression." *Id.* at 13. Dr. Morrell and Dr. Leswing possess "scientific, objective, and reproducible views on matters of sex and gender identity." *Id.* at 14. Dr. Morrell also "wants to refer to individuals using birth names and biologically accurate pronouns and other terms" when writing or speaking publicly about issues of sex and gender. *Id.* Dr. Leswing "wishes to issue a public statement notifying potential patients that she will not refer to them using chosen names, preferred pronouns, or other non-biological terms." *Id.* at 15.

The *Defending Education* organizations allege the Act forces them to stop addressing individuals by their biological pronouns in places of public accommodation and prohibits them from publishing materials that refer to individuals using biologically accurate pronouns, birth names, and other terms inconsistent with their purported gender identity or gender expression. *Id.* Dr. Morrell and Dr. Leswing "fear that their medical practices will be investigated and punished for their speech," and Dr. Morrell fears termination of his ownership interest or other disassociation from his medical practice if he is investigated. *Id.*

*Committee of Five* plaintiff is an athletic-apparel retailer called XX-XY Athletics ("XX-XY") with a distinct message and mission: "to empower women and protect women's sports and women's spaces." *Committee of Five*, ECF No. 1 ¶ 1. XX-XY's message and mission are "grounded in the belief that men and women are physiologically different; sex

is binary, biological, and immutable; women deserve the chance to be champions in their own sports." *Id.* XX-XY uses its platform to draw attention to "men and boys who compete in women's sports" and "refers to them with masculine pronouns and terms, often using their given name, rather than their chosen names." *Id.* ¶ 2. In one instance, XX-XY published a video on X "protesting a male athlete competing in girls' high-school track in Pennsylvania." *Id.* ¶ 3. The post included the text: "Sean 'Luce' Allen is having a track season to remember. Meanwhile girls are receiving a message they'll never forget. When boys run girls' track, they win. *And girls lose*." *Id.* The post refers to the athlete as a "boy" and uses the athlete's given name. *Id.* XX-XY alleges that if it could not refer to male athletes as "male," "men," or "boys," its advertisements would not make sense. *Id.* ¶ 4. It asserts that "the Act coerces the company to speak against its principles and alter the meaning of its core message." *Id.* ¶

Finally, *Doxa* plaintiff is a Christian bookstore, Born Again Used Books, in Colorado Springs with the "mission [] to provide literature that supports customers in their relationship with God and others." *Doxa*, ECF No. 4-1 at 10. To achieve this, Born Again Used Books "curates its selection according to its Christian faith, refusing to sell books with a message contradicting the store's mission of providing uplifting Christian support." *Id.* "To stay faithful to these beliefs," Born Again Used Books "will not use pronouns, honorifics, or other language inconsistent with a person's sex." *Id.* at 9. Additionally, it would like to "formalize this policy, publish it to its employees and customers, and publicly explain the religious basis for the policy, including by writing about it on the Bookstore's blog." *Id.* However, Born Again Used Books "happily sells books to everyone." *Id.* It "fears

that if it formalized its policy on gender identity and pronouns and spoke about that policy on its blog, Colorado would swoop in to punish it under CADA." *Id.* at 12.

*Defending Education* plaintiffs, XX-XY, and Born Again Used Books (collectively, "Collective Plaintiffs") seek as-applied pre-enforcement preliminary injunctions under the First and Fourteenth Amendment enjoining Defendants from enforcing CADA on them. *Defending Education*, ECF No. 25; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4.

### C. First Amendment Pre-Enforcement Claims

To establish standing for its First Amendment pre-enforcement claim, Collective Plaintiffs must demonstrate they "intend[] to engage in arguably protected conduct that is covered by the challenged governmental action" and "face[] a credible threat of enforcement." *Gays Against Groomers v. Garcia*, No. 24-1473, 2026 WL 668378, at *5 (10th Cir. Mar. 10, 2026). The plain language of CADA's public accommodation statute describes prohibited "discriminatory conduct" as "to refuse, withhold from, or deny to an individual or a group, because of . . . gender identity, gender expression . . . the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a public place of accommodation." Colo. Rev. Stat. § 24-34-601. Therefore, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex without denying goods or services—does not appear on its face to violate CADA or present a credible threat of enforcement. For these reasons, and those stated below, the Court accepts the Recommendation and denies each Collective Plaintiffs' Motion for Preliminary Injunction.

## II.   LEGAL STANDARD

The Court is required to make a de novo determination of those portions of a magistrate judge's recommendation to which a specific, timely objection has been made, and it may accept, reject, or modify any or all of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").

"[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1060 (10th Cir. 1996).

## III.   THE RECOMMENDATION

Magistrate Judge Braswell opens and closes her Recommendation emphasizing that "[a] preliminary injunction is an extraordinary remedy, the exception rather the rule." *Doxa*, ECF No. 54 at 79:7-10 (quoting *Gunnison Cnty. Stockgrowers' Ass'n, Inc. v. U.S. Fish & Wildlife Serv.*, 707 F. Supp. 3d 1056, 1062 (D. Colo. 2023)); *id.* at 91:22-25. She also highlights several threshold considerations. First, there is no "freestanding constitutional right to pre-enforcement review in federal court." *Id.* at 79:22-80:2 (quoting *Uber Techs., Inc. v. Moss*, No. 1:25-CV-00096-DDD-KAS, 2025 WL 1420940, at *3 (D. Colo. Jan. 31, 2025)). Second, the injunctive relief requested is exceptionally broad. *Id.*

80:3-8. Third, the motions for preliminary injunction seek the same relief as its complaint, which is disfavored. *Id.* at 80:12-16 (citing *Free the Nipple v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019)). Fourth, granting a preliminary injunction would disturb rather than preserve the status quo. *Id.* at 81:5-11. And fifth, even if the Court were to enjoin Defendants from enforcing the challenged provisions, Collective Plaintiffs would still be required to comply with CADA or risk suit by an aggrieved individual. *Id.* at 81:18-25. Magistrate Judge Braswell explains the evidence "suggests that [Collective] Plaintiffs feel the pressure more significantly from the public at large than anything else. . . . Thus, from the Court's perspective, [Collective] Plaintiffs' own statements demonstrate that a preliminary injunction would be of limited practical value and would not cure the dilemma that they describe." *Id.* at 82:18-83:5.

Next, Magistrate Judge Braswell turns to the factors Collective Plaintiffs must prove to succeed on a request for pre-enforcement preliminary injunction. She first considers the likelihood of success on the merits and the fundamental question of standing. *Id.* at 83:9-22. Magistrate Judge Braswell explains that even if Collective Plaintiffs made a clear showing that their speech is actually prescribed and chilled, "the absence of a credible threat of enforcement can be dispositive in a pre-enforcement standing analysis." *Id.* at 84:13-20 (citing *Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 512 (6th Cir. 2025)). When analyzing credible threat of enforcement, Magistrate Judge Braswell evaluates three factors: (1) whether the Collective Plaintiffs showed past enforcement against the same conduct; (2) whether authority to initiate the charges was not limited to a prosecutor or an agency and instead

any person can file a complaint; and (3) whether the state disavowed future enforcement. *Id.* at 84:21-85:2. She also highlights that "[e]ach element must be supported in the same way as any other matter on which the [Collective] Plaintiff bears the burden of proof, *i.e.*, with the same manner and degree of evidence required at the successive stages of the litigation." *Id.* at 85:7-14 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). At the preliminary injunction stage, the plaintiff must make a "clear showing that she is likely to establish each element of standing." *Id.* at 85:15-22 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). Therefore, Magistrate Judge Braswell applies the clear showing standard. *Id.* at 85:23-86:6.

Magistrate Judge Braswell distinguishes *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1169 (D. Colo. 2023) and highlights that, in that case, Judge Domenico recognized the presumption of enforcement for new laws but did not adopt the presumption himself. *Id.* at 85:2-10. She also explains that Collective Plaintiffs overstates *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 387 (1988), because the statute in that case was directed at plaintiffs and imposed criminal prosecution as a penalty. *Id.* at 86:17-87:1. Then, she clarifies that Defendant Sullivan's interpretation of the subject CADA provisions, while not law, helps demonstrate that the mere act of speaking would not automatically trigger enforcement and that this operates like a disavowal under factor three (whether the state disavowed future enforcement). *Id.* at 87:15-88:23. Regarding factor one (whether the Collective Plaintiffs showed past enforcement against the same conduct), Magistrate Judge Braswell calls attention to the fact that the Colorado Civil Rights Division (the "Division") has not received any complaints about Collective Plaintiffs'

misgendering and that the Division has not warned them that their desired approach is unlawful. *Id.* at 88:24-89:6. She ultimately determines that these two of the three factors are enough to weigh against a finding of credible threat of enforcement and that Collective Plaintiffs have "not demonstrated a credible threat under the heavy burden that applies to these preliminary injunction motions." *Id.* at 90:2-25. With respect to factor two (whether authority to initiate the charges is limited to a prosecutor or an agency), Magistrate Judge Braswell states that any person can file a charge alleging discrimination under CADA. *Id.* at 90:9-14. Collective Plaintiffs contend that the authority to initiate charges remains with the Division, because it can choose which complaints to take action on. *Id.* at 90:15-20. Even if this factor weighed in favor of Collective Plaintiffs, Magistrate Judge Braswell finds the balance of the three factors weigh against them. *Id.* at 90:21-25. Thus, she determines that Collective Plaintiffs have not established a credible threat of enforcement to have standing.

Finally, Magistrate Judge Braswell notes that "the balance of harms and public interest do not favor the sweeping injunctions [Collective] Plaintiffs seek." *Id.* at 91:7-17. Thus, she recommends the preliminary injunction requests be denied.

## IV.    ANALYSIS

### A.  Threshold Considerations

Collective Plaintiffs object to the Recommendation's threshold considerations, arguing that "none has merit." ECF No. 57 at 1. Plaintiff makes six arguments: (1) a preliminary injunction could be undone after trial; (2) a preliminary injunction would not disrupt the status quo; (3) preliminary injunctions are proper in pre-enforcement litigation;

(4) Collective Plaintiffs seek an appropriate scope of relief; (5) CADA's enforcement scheme counsels for preliminary relief, not against it; and (6) standing requirements are applied leniently in First Amendment cases. The Court addresses each argument below.

First, Collective Plaintiffs object to the Recommendation's fourth threshold consideration that they seek a disfavored injunction. Disfavored injunctions prompt "a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-the-harms factors." *Free the Nipple*, 916F.3d at 797. Collective Plaintiffs argue that they are not seeking a disfavored injunction because, although their complaints and motions for preliminary injunction seek the same relief, the preliminary injunction can be undone. *Committee of Five*, ECF No. 95 at 7-8; *Doxa*, ECF No. 57 at 7-8 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001)). Collective Plaintiffs contend the instant case is similar to *Pierce*, where the Tenth Circuit determined "the preliminary injunction granted by the district court did not, as the defendants contend, afford the tribe substantially all the relief it might recover." 253 F.3d at 1278. The Court agrees. In *Pierce*, the plaintiff's complaint alleged that "the state was compelled to grant recognition to tribal motor vehicle registrations and titles pursuant to the Indian Commerce Clause, the Kansas Act for Admission, and other federal law." *Id.* at 1239. The preliminary injunction motion sought to "enjoin the Defendants from enforcing the Kansas motor vehicle registration and titling laws against the Plaintiff and any persons who operate or own a vehicle registered and titled the Tribal Code § 17-10-1 *et seq*." *Id.* Here, Collective Plaintiffs' complaint seeks a "preliminary and permanent injunction" to enjoin Defendants and those acting in concert with them from enforcing CADA as applied to Collective

Plaintiffs and "third-party speakers similarly situated to" them. *Committee of Five*, ECF No. 1 at 50; *Doxa*, ECF No. 1 at 40. Collective Plaintiffs' preliminary injunction requests only seek to enjoin Defendants from enforcing CADA as applied to Collective Plaintiffs. *Committee of Five*, ECF No. 15 at 1-2; *Doxa*, ECF No. 4 at 1-2. Thus, the Court is persuaded by Collective Plaintiffs' argument that granting their preliminary injunction requests would not afford them all the relief they might recover.

However, another type of disfavored injunction is one that would alter the status quo. *Free the Nipple*, 916 F.3d at 797. Collective Plaintiffs argue a preliminary injunction would not disrupt status quo. The Court disagrees. As Defendants note, the CADA provisions at issue were in place decades before the passage of the Act and, the "Commission Rules have explicitly outlined when misgendering and deadnaming rise to a CADA violation since 2009." *Committee of Five*, ECF No. 97 at 4; *Doxa*, ECF No. 59 at 4. Commission Rule 81.6(A)(4), which went into effect November 30, 2009, prohibits "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" as unlawful harassment. 3 CCR 708-1-81.6(4). Thus, Collective Plaintiffs' argument that CADA as applied prior to the Act only prevented discrimination in furnishing tangible goods does not hold weight. Their requested injunctions would disrupt CADA's decades-long history. Accordingly, the Court agrees with the Recommendation's finding that Collective Plaintiffs seek a disfavored injunction.

Next, Collective Plaintiffs object to Magistrate Judge Braswell's determination that pre-enforcement actions are "particularly fraught" because there is no "freestanding constitutional right to pre-enforcement review in federal court." *Committee of Five*, ECF

5-App-162

No. 95 at 9; *Doxa*, ECF No. 57 at 9. They argue that the Tenth Circuit regularly grants pre-enforcement preliminary injunctions and that "*Uber Technologies* merely stands for the proposition that a pre-enforcement plaintiff seeking a preliminary injunction must show a credible threat to avoid an 'advisory ruling.'" *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9 (citing *Uber Technologies*, 2025 WL 1420940, at *3). The Court finds Collective Plaintiffs' reasoning coincides with the Recommendation. The Court interprets Magistrate Judge Braswell's statement that there is no "freestanding constitutional right to pre-enforcement review in federal court" to mean that a preliminary injunction is an extraordinary remedy and that Collective Plaintiffs must meet their burden in demonstrating the right to a pre-enforcement preliminary injunction. Collective Plaintiffs do not (and cannot) dispute this.

Fourth, Collective Plaintiffs contend the relief they seek is appropriate in scope and not "exceptionally broad" as stated in the Recommendation. *Committee of Five*, ECF No. 95 at 9; *Doxa*, ECF No. 57 at 9. The Court acknowledges that the Recommendation addresses all three preliminary injunction motions filed by different groups of plaintiffs. Thus, certain statements made in the Recommendation may apply more directly to some plaintiff's motions and not others. The Court agrees that injunctive relief must be "narrowly tailored to remedy the harm shown." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002). However, the scope of each Collective Plaintiffs' relief requested was not the basis for the recommended denial of injunctive relief, and the Court will not give this consideration extra weight.

Fifth, Collective Plaintiffs object to the Recommendation's interpretation of CADA's enforcement scheme as it relates to their motions for preliminary injunction. Collective Plaintiffs argue "an injunction need not relieve every conceivable injury to provide an appropriate remedy." *Committee of Five*, ECF No. 95 at 10; *Doxa*, ECF No. 57 at 10 (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021)). The Recommendation does not bring up CADA's private right of action to indicate that an injunction needs to relieve "every conceivable injury." Instead, CADA's private right of action allows individuals to file the type of complaints Collective Plaintiffs seek to enjoin Defendants from pursuing. This part of CADA's enforcement scheme highlights the fact that the grant of Collective Plaintiffs' preliminary injunction motions against Defendants "would not cure the dilemma that [Collective Plaintiffs] describe." ECF No. 54 at 82:18-83:5. Thus, the Recommendation appropriately considers this threshold issue before reaching the merits of the case.

Finally, Collective Plaintiffs contend the Recommendation incorrectly applied the heightened "clear showing" standard in its analysis. *Committee of Five*, ECF No. 95 at 11; *Doxa,* ECF No. 57 at 11. Relying on *Peck*, Collective Plaintiffs argue that standing requirements should be applied "leniently" in First Amendment cases.  (citing *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022)). Collective Plaintiffs fail to address the rest of the Tenth Circuit's statement—"the First Amendment context creates unique interests that lead us to apply the standing requirements *somewhat more leniently*, facilitating pre-enforcement suits." *Peck*, 43 F. 4th at 1129 (emphasis added). The Tenth Circuit goes on to explain that a plaintiff bringing a First Amendment claim can prove

standing by: (1) "alleging an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a *credible threat of prosecution* thereunder" or (2) "alleging a *credible threat of future prosecution* plus an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights." *Id.* (emphases added). This does not contradict the Recommendation's application of the "clear showing" standard. *See Murthy*, 603 U.S. at 58 ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."). Further, Collective Plaintiffs concede in their objections that "[p]recedent requires only a *clear showing* that the Bookstore is *likely* to establish a credible threat of enforcement." *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (first emphasis added). Thus, Collective Plaintiffs admit the Recommendation was correct in applying the "clear showing" standard. However, Collective Plaintiffs insinuate that, because this "is not supposed to be a difficult bar for plaintiffs to clear," they must have surpassed it. *Committee of Five*, ECF. No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024)). The dispute lies in the result of the analysis, which the Court turns to next.

### B.  Credible Threat of Enforcement

Collective Plaintiffs assert they have standing, because they each face a credible threat of enforcement. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11. Preliminarily, Plaintiff alleges the Recommendation disregards Tenth Circuit precedent where plaintiffs were found to have standing even with past enforcement of a statute. *Committee of Five*, ECF No. 95 at 11; *Doxa*, ECF No. 57 at 11 (citing *303 Creative LLC*

*v. Elenis*, 6 F.4th 1160, 1173 (10th Cir. 2021), *rev'd*, 600 U.S. 570 (2023); *Chiles*, 116 F.4th at 1198). Although Plaintiff does not discuss how this precedent applies to the instant case, the Court finds them distinguishable.

Shortly before entering this Order on March 31, 2026, the Supreme Court issued its opinion on *Chiles*, reversing the Tenth Circuit's judgment. *Chiles v. Salazar*, No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026). The Supreme Court agreed with both the district court and the Tenth Circuit determination that "Ms. Chiles had Article III standing to pursue her as-applied pre-enforcement challenge." *Id.* at *5. "Ms. Chiles had alleged a 'credible threat' that the State would enforce its law against her if she continued speaking as she had in the past and wished to do in the future." *Id.* Additionally, "both courts observed, Colorado authorities had refused to disavow bringing enforcement actions against her." *Id.* The circumstances in this case are different.[2] As described above, Collective Plaintiffs' intended conduct—to refer to individuals using pronouns, honorifics, or titles that are consistent with that person's biological sex—in and of itself does not violate CADA's public accommodations statute. The plain language of the statute requires denial of "the full and equal enjoyment of the goods [or] services" of each public accommodation. Colo. Rev. Stat. § 24-34-601. Collective Plaintiffs have not alleged such denial of goods or services. In fact, Born Again Used Book states it will "happily sell its products to anyone." Therefore, Collective Plaintiffs' intended conduct does not appear on its face to violate CADA or present a credible threat of enforcement. And, for the

---

[2] The Court also notes that the *303 Creative* is distinguishable, because it was decided at the summary judgment stage on the merits. *303 Creative LLC*, 6 F.4th at 1190, The instant case has not yet reached the merits.

reasons stated below, Collective Plaintiffs have failed to demonstrate the elements of credible threat of enforcement to justify pre-enforcement injunctive relief.

### 1. Disavowal of Future Enforcement

Collective Plaintiffs reject the Recommendation's finding that Director Sullivan's testimony "operates like a disavowal." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12. Collective Plaintiffs suggest that, because it declines to use pronouns in *every* situation, it "risks violating Colorado's supposedly fact-intensive and obscure inquiry." *Committee of Five*, ECF No. 95 at 12; *Doxa*, ECF No. 57 at 12. Relying on *Scott v. Allen*, they contend that "Colorado's claim that enforcement under CADA depends on the facts just confirms the enforcement threat." *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. But in *Scott v. Allen*, "at least one professional association believe[d] that Scott violated the statute, and the District Attorney himself refuse[d] to disavow that Scott's intended actions do not fall under the statute." 153 F.4th 1088, 1097 (10th Cir. 2025). Additionally, the District Attorney did not disavow the possibility of a future prosecution. *Id.*

Here, the specific facts at issue are important. Again, Collective Plaintiffs have represented they will not deny their goods or services to anyone. Therefore, there is no violation of the statute on its face. Further, while Collective Plaintiffs eschew the Division's explanation of the process it uses to determine whether a prosecution under this statute would be pursued, such explanation sheds light on the likelihood of prosecution and the credible threat of prosecution—an issue on which Collective Plaintiffs bear the burden. According to the Director, a CADA violation would have to satisfy three steps: (1) "the

public accommodation must intentionally treat a customer or prospective customer differently based on their protected class status"; (2) "the customer must, as a subjective matter, experience the conduct at issue to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity;" and (3) "the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity." *Committee of Five*, ECF No. 84-1 at 7; *Doxa*, ECF No. 46-1 at 7. Defendants have provided sworn declarations, deposition testimony, and discovery responses explaining that Collective Plaintiffs' intended misgendering and deadnaming alone is not conduct that violates CADA *per se*—the conduct must rise to the level of harassment to be a violation. *Doxa*, ECF No. 59 at 7-8; *see Doxa*, ECF No. 46-1 at 8 (Defendants' interrogatory response describing conduct that would violate CADA: "Without any facts regarding the circumstances surrounding the hypothetical complained conduct, the most comparative conduct described by the interrogatory would be harassment."). The Division has not received any complaints against a place of public accommodation regarding its policy or publication on misgendering or deadnaming. *Committee of Five*, ECF No. 84-1 at 555; *Doxa*, ECF No. 46-1 at 555. Even if a member of the public were to file a complaint, it would ultimately be up to the Division to determine whether an enforcement action would proceed. Again, the Director has provided evidence that such an action would not be taken under the

circumstances presented by Collective Plaintiffs. While it is true the Defendants have not completely disavowed any possible prosecution of Collective Plaintiffs under any circumstances, this is not required. Rather Collective Plaintiffs must demonstrate a credible threat of prosecution. has At this stage, they have not offered a reasonable basis to infer they face a credible threat of prosecution—which, again, is their burden. Thus, the Court agrees with the Recommendation on this factor.

## 2.  Past Enforcement Against the Same Conduct

Plaintiff contends that "[e]nforcing CADA against similar speech is enough" to satisfy the second credible threat of enforcement. *Committee of Five*, ECF No. 95 at 13; *Doxa*, ECF No. 57 at 13. Collective Plaintiffs offer two examples where the Division found probable cause "based solely on misgendering." *Committee of Five*, ECF No. 95 at 13-14; *Doxa*, ECF No. 57 at 13-14. According to Collective Plaintiffs, these examples and the fact that they challenge "a newly enacted law" is enough to prove this factor.

Defendants clarify that the examples introduced by Collective Plaintiffs were circumstances in which there was "a denial of full and equal enjoyment of goods and services." *Committee of Five*, ECF No. 97 at 10; *Doxa*, ECF No. 59 at 10. The first example involved a complainant utilizing the respondent's services to donate blood. *Doxa*, ECF No. 47 at 142. The complainant identified as "male" when creating a donor profile but completed her transition from male to female over a decade later. *Id.* After her transition, the complainant sought the respondent's blood donation services and filled out a new profile, self identifying as "female." *Id.* at 143. The respondent merged the accounts but "refused to change the [c]omplainant's gender to female in the system." *Id.* In the

20
5-App-168

second example, the charging party and her friend were patrons of the respondent, a cocktail lounge. *Id.* at 23. The charging party, who identifies as female/transgender, and her friend went to the women's bathroom. *Id.* at 22-23. When they exited the bathroom, an off-duty police officer employed by the respondent was waiting to speak with them. *Id.* at 23-24. The officer "told her if they were going to use the women's bathroom again then they were not permitted to re-enter the establishment. *Id.* at 24.

As described above, a violation of CADA requires a denial of the full and equal enjoyment of the goods or services offered by the public accommodation because of the individual's gender identity. In the blood bank case, the complainant "was not provided equal treatment to donors outside her protected class, because she was not allowed to self-identify her gender in her donor profile." *Id.* at 143. In the other example, the complainant was told if she and her friend were "going to use the women's bathroom again then they were not permitted to re-enter the establishment." *Id.* at 24. In both cases, the complainants were denied the services of the public accommodations because of their gender identity.

Collective Plaintiffs have expressed that they intend to offer their goods or services to everyone. Additionally, *Darren Patterson Christian Academy* and *St. Mary* do not involve the conduct of misnaming and deadnaming. *Darren Patterson Christian Academy*, 699 F.Supp.3d at 1173 (addressing the non-discrimination rules of the "Universal Preschool Program" as applied to hiring ministers); *see also St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956 (D. Colo. 2024) (also addressing the "Universal

Preschool Program). Thus, Collective Plaintiffs have not satisfied their burden of demonstrating past enforcement against the same conduct.

### 3. Authority to Initiate Charges

Collective Plaintiffs also object to the Recommendation's conclusion that an individual's ability to file a charge against them weighs against a clear threat of enforcement. *Committee of Five*, ECF No. 95 at 15; *Doxa*, ECF No. 57 at 15. Collective Plaintiffs rely on *303 Creative*, arguing that CADA's complaint process itself creates a credible threat of enforcement. *Id.* Indeed, the Supreme Court stated that "anyone in the State may file a complaint . . . and initiate a potentially burdensome administrative hearing process." *303 Creative*, 600 U.S. at 583. However, *303 Creative* did not describe the weight of each factor in the clear threat of enforcement analysis. In this case, Magistrate Judge Braswell clearly explained that the weight of the other two factors are sufficient to find that Collective Plaintiffs have not demonstrated they face a credible threat of enforcement. *Doxa*, ECF No. 54 at 90:21-25. Collective Plaintiffs do not dispute this.

Thus, the Court finds that Collective Plaintiffs have not met their burden in proving clear threat of enforcement to establish standing.

### C. Remaining Preliminary Injunction Factors

Finally, Collective Plaintiffs object to the Recommendation's finding that the remaining preliminary injunction factors weigh against preliminary relief. *Committee of Five*, ECF No. 95 at 15-16; *Doxa*, ECF No. 57 at 15-16. Collective Plaintiffs asserts that (1) their injuries are irreparable because they face a credible threat of enforcement by Colorado and (2) "it is always in the public interest to prevent the violation of a party's

constitutional rights." *Committee of Five*, ECF No. 95 at 16; *Doxa*, ECF No. 57 at 16. (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)). As described above, Collective Plaintiffs have not demonstrated a credible threat of enforcement. They also fail to provide evidence of a single complaint or history of enforcement tied to the conduct at issue. Therefore, Collective Plaintiffs have not demonstrated irreparable harm. And, while the Court agrees the public has an interest in protecting an individual's constitutional rights, this alone cannot overcome Collective Plaintiffs' failure to satisfy their burden of demonstrating that the extraordinary relief of pre-enforcement injunction is appropriate.

Accordingly, the Court agrees with the Recommendation and finds that Collective Plaintiffs have not carried their burden to demonstrate pre-enforcement injunctive relief is appropriate. Therefore, their requests for preliminary injunction are denied. The Court notes that, at this stage, it has not reached the merits of these cases. The motions to dismiss (*Committee of Five*, ECF Nos. 69, 70; *Defending Education*, ECF Nos. 81, 82; *Doxa*, ECF Nos. 33, 34) are fully briefed and the Court orders the parties to set a status conference with Magistrate Judge Braswell as soon as possible to address the motions to dismiss and the relief requested thereunder.

### V.   CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Collective Plaintiffs' Objections to the Recommendation (*Defending Education*, ECF No. 110; *Committee of Five*, ECF No. 95; *Doxa*, ECF No. 57) are OVERRULED;

2. The Recommendation (*Defending Education*, ECF No. 102; *Committee of Five*, ECF No. 87; *Doxa*, ECF No. 49) is ACCEPTED AND ADOPTED;

3. Collective Plaintiffs' Motions for Preliminary Injunction (*Defending Education*, ECF No. 27; *Committee of Five*, ECF No. 15; *Doxa*, ECF No. 4) are DENIED; and

4. The parties are ORDERED to set a status conference with Magistrate Judge Braswell to address the pending motions to dismiss (*Defending Education*, ECF Nos. 81, 82; *Committee of Five*, ECF Nos. 69, 70; *Doxa*, ECF Nos. 33, 34) and the relief requested thereunder.

DATED:  March 31, 2026

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge

24
**5-App-172**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-01572

DEFENDING EDUCATION; COLORADO PARENT ADVOCACY NETWORK; PROTECT KIDS COLORADO;
DO NO HARM; DR. TRAVIS MORRELL; DR. VALERI LESWING; and MOUNTAIN PEDIATRICS,

       Plaintiffs,

 v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division;
SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE
KELLY, and ERIC ARTIS, in their official capacities as members of the Colorado Civil Rights
Commission; and PHILIP JACOB WEISER, in his official capacity as the Attorney General of
Colorado,

       Defendants.

---

**NOTICE OF APPEAL**

---

Pursuant to 28 U.S.C. §1292(a)(1), all Plaintiffs appeal to the United States Court of Appeals for

the Tenth Circuit from the Order Adopting Magistrate Judge Recommendation entered on March

31, 2026. *See* Dkt. 115 (Order); Dkt.102 (Magistrate Judge Recommendation).

 Dated: April 1, 2026

                        Respectfully submitted,

                        */s/ J. Michael Connolly*
                        J. Michael Connolly
                        Cameron T. Norris
                        Paul R. Draper
                        CONSOVOY MCCARTHY PLLC
                        1600 Wilson Boulevard, Suite 700
                        Arlington, VA 22209
                        (703) 243-9423
                        mike@consovoymccarthy.com
                        cam@consovoymccarthy.com
                        paul@consovoymccarthy.com

                        *Counsel for Plaintiffs*

**5-App-173**

**CERTIFICATE OF SERVICE**

I certify that on April 1, 2026, I e-filed the foregoing notice using the Court's ECF system,

which will email everyone requiring notice.

*/s/ J. Michael Connolly*
Counsel for Plaintiffs

**5-App-174**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25–cv–01572–RMR–MDB
Civil Action No. 25–cv–01668–RMR–MDB
Civil Action No. 25–cv–02177–RMR–MDB


DEFENDING EDUCATION;
COLORADO PARENT ADVOCACY NETWORK;
PROTECT KIDS COLORADO;
DO NO HARM;
TRAVIS MORRELL;
VALERI LESWING;
MOUNTAIN PEDIATRICS,
COMMITTEE OF FIVE, INC., and
DOXA ENTERPRISES, LTD,

      Plaintiffs,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official
capacity,
SERGIO RAUDEL CORDOVA,
GETA ASFAW,
MAYUKO FIEWEGER,
DANIEL S. WARD,
JADE ROSE KELLY,
ERIC ARTIS, as members of the Colorado Civil Rights Commission, in their official capacities,
and
PHIL WEISER, Colorado Attorney General, in his official capacity,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Maritza Dominguez Braswell**

      This matter is before the Court on The Attorney General's Consolidated Motion to

Dismiss ("AG Motion") and the Division and Commission Defendants' Consolidated Motion to

Dismiss ("Division Motion"), filed in three related cases (collectively, the "Motions"). (Case No.

**5-App-175**

1:25–cv–01572–RMR–MDB (Doc. Nos. 81; 82); Case No. 1:25–cv–01668–RMR–MDB (Doc. Nos. 69; 70); Case No. 1: 25–cv–02177–RMR–MDB (Doc. Nos. 33; 34).) Plaintiffs have responded in opposition. (Case No. 1:25–cv–01572–RMR–MDB (Doc. No. 98); Case No. 1:25–cv–01668–RMR–MDB (Doc. No. 84); Case No. 1: 25–cv–02177–RMR–MDB (Doc. No. 46).) Defendants have replied in support (Case No. 1:25–cv–01572–RMR–MDB (Doc. Nos.108; 109); Case No. 1:25–cv–01668–RMR–MDB (Doc. Nos. 93; 94); Case No. 1: 25–cv–02177–RMR–MDB (Doc. Nos. 55; 56)). After reviewing the Motions, briefing, and applicable law, the Court respectfully **RECOMMENDS** that the AG Motion be **GRANTED in part and DENIED in part** and that the Division Motion be **GRANTED in part and DENIED in part**.

## BACKGROUND

### I.    The Colorado Anti-Discrimination Act and H.B. 25-1312

The Colorado Anti-Discrimination Act ("CADA") "restricts a public accommodation's ability to refuse to provide services based on a customer's identity." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1168 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023). CADA defines a public accommodation as "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public." Colo. Rev. Stat. § 24-34-601(1).

Under CADA's "Accommodation Clause," a public accommodation may not "directly or indirectly ... refuse, withhold from, or deny to an individual or a group, because of ... sex, sexual orientation, gender identity, [or] gender expression ... the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. § 24-34-601(2)(a). In other words, a public accommodation

2

**5-App-176**

may not deny the "full and equal enjoyment" of the accommodation based on one's protected status.

> Further, under CADA's "Communication Clause," a public accommodation may not

> directly or indirectly ... publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of … sex, sexual orientation, gender identity, [or] gender expression[.]

*Id.*; *see also* Colo. Rev. Stat. § 24-34-701 (prohibiting the publication of discriminatory advertisements by persons who own or operate places of public accommodation). Sexual orientation was added as a protected class in 2008 and was defined to include "transgender status." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200). Gender identity and gender expression were added as protected classes in 2021. *See* 2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108).

In May 2025, H.B. 25-1312 amended the definition of "gender expression" to include an individual's "chosen name, and how the individual chooses to be addressed." *See* Colo. Rev. Stat. § 24-34-301(9). The bill further defined "chosen name" as "a name that an individual requests to be known as in connection to the individual's ... sexual orientation, gender identity, [or] gender expression, ... so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes." Colo. Rev. Stat. § 24-34-301(3.5).

## II.    Enforcement Under CADA

"CADA provides several different means of enforcement." *303 Creative LLC*, 6 F.4th at 1169. A person alleging a violation of CADA can bring a civil action in state court. *See* Colo. Rev. Stat. § 24-34-602(1)(a). An individual can also file charges alleging discrimination with the

Colorado Civil Rights Division (the "Division"), as can the Attorney General (the "AG"), the

Colorado Civil Rights Commission (the "Commission"), or individual commissioners. *See* Colo.

Rev. Stat. § 24-34-306(1); *see* § 24-34-306(1)(b) (stating that the AG, the Commission, or a

commissioner can bring a complaint when the alleged discriminatory practice "imposes a

significant societal or community impact"). Following the filing of a complaint,

> [t]he Director of the Civil Rights Division ... investigates the allegations and
> determines whether the charge is supported by probable cause. If probable cause
> is found, the Director provides the parties with written notice and commences a
> compulsory mediation. If mediation fails, a hearing may be held before the
> Colorado Civil Rights Commission, a single Commissioner, or an administrative
> law judge. If a violation is found after a hearing, the Commission may issue a
> cease and desist order against the offending public accommodation.

*303 Creative LLC*, 6 F.4th at 1169. At a hearing, the Commission is represented by counsel from

the AG's office. *See* Colo. Rev. Stat. §24-34-306(8); 3 Colo. Code Regs. § 708-1:10.7(B) ("The

case in support of the complaint shall be presented at the hearing by the attorney general's office

as counsel in support of the complaint.").

## III.     Plaintiffs

Plaintiffs "believe that sex is immutable and fixed at birth" and that H.B. 25-1312

violates their First Amendment Right to "speak consistently with that view" because, according

to Plaintiffs, the amendment makes it a "'discriminatory practice' ... to refer to transgender-

identifying individuals by their birth name (i.e., not their 'chosen name') or to use biological

pronouns (i.e., not their preferred pronouns) in a place of public accommodation." (1:25–cv–

01572–RMR–MDB (Doc. No. 25 at ¶¶ 6-9).) Plaintiffs further contend that H.B. 25-1312

"means that Coloradans who operate in a place of public accommodation are prohibited from

publishing or sending materials that refer to a transgender-identifying individual by their birth

name ... or use their biological pronouns[.]" (*Id.* at ¶ 7.)

4

**5-App-178**

No Plaintiff alleges that H.B. 25-1312 has been enforced against them. They bring these cases as "pre-enforcement" challenges.

### Defending Education and Do No Harm

Defending Education ("DE") and Do No Harm ("DNH") are "nationwide, grassroots" 501(c)(3) non-profit membership organizations. (*Id.* at ¶¶ 12, 15.) "DE's mission is to prevent ... the politicization of education and the spread of harmful gender ideology." (*Id.* at ¶ 12.) "DNH's mission is to ensure that medicine is driven by scientific evidence rather than ideology," and it "opposes the spread of gender ideology and the use of so-called gender-affirming medical treatments." (*Id.* at ¶ 15.) DE and DNH claim standing through their members, and do not assert organizational injury. (*Id.* at ¶¶ 49, 99.)

### Colorado Parent Advocacy Network and Protect Kids Colorado

Colorado Parent Advocacy Network ("CPAN") is a Colorado 501(c)(4) non-profit organization with a "mission ... to defend the fundamental right of parents to direct the upbringing, care, and education of their children." (*Id.* at ¶ 51.) "In furtherance of this mission, CPAN ... opposes policies and practices, particularly those concerning gender ideology, that undermine truth, biological reality, and the role of parents in their children's lives." (*Id.* at ¶ 52.) CPAN is an advocacy organization. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 82-1[1] at 62 (29:17–20) (deposition of CPAN executive director Lori Gimelshteyn) (saying that CPAN "exists to support advocacy for Coloradans ... around issues that our organization is centered on").) In furtherance of its mission, CPAN has hosted events and gatherings at different public and private locations in Colorado. (*See id.* at 68–79 (noting, for example, a press conference in

---

[1] This document is a set of exhibits. The set is identical across all three cases and hereafter the Court will refer to it as the "Division Exhibits." Defendants included page numbers the bottom right hand corner of the document, which the Court will refer to when citing the document.

5

**5-App-179**

front of the Colorado Supreme Court, rallies and roundtables on the Capitol's steps, a press conference at the Arapahoe County Judicial Center, a summit at The Inverness Denver, and multiple events at different churches).)

Protect Kids Colorado ("PKC") is also a 501(c)(4) non-profit organization. It "aims to restore the principle that parents have a fundamental right to make decisions about their children's wellbeing and education," and "hopes to raise awareness about the prevalence of false gender ideologies and the dangers of so-called gender-affirming treatments." (1:25–cv–01572– RMR–MDB (Doc. No. 25 at ¶ 75).) Like CPAN, PKC is an advocacy organization and has hosted events and gatherings at different public and private locations in Colorado. (Division Exhibits at 93–102) (deposition of PKC executive director Erin Lee) (noting, for example, rallies on the Capitol's steps, the screening of a documentary at Denver University's Daniels College of Business, a ballot petition signing event at a sports bar, a press conference at the Byron White Federal Courthouse, and a town hall at a recreation center).)

CPAN and PKC do not claim standing through their members. They claim standing on their own behalf, asserting organizational injury. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 13–17).)

### Dr. Travis Morrell

Dr. Morrell is a dermatologist practicing out of Mountain West Dermatology in Grand Junction. (1:25–cv–01572–RMR–MDB (Doc. No. 27-5 at ¶¶ 3–4).) Dr. Morrell "believe[s] that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity." (*Id.* at ¶ 5.) Dr. Morrell has "treated transgender-identifying, gender-dysphoric, and gender-questioning patients in [his] medical practice in the past .... [and] addressed these patients ... us[ing] biologically accurate pronouns and birth names." (*Id.* at ¶ 6.)

**5-App-180**

He does not "address or refer to patients using 'chosen names' connected to their 'gender expression' or preferred pronouns that conflict with the patient's biological sex." (*Id.*) Dr. Morrell "anticipate[s] treating transgender-identifying, gender-dysphoric, and gender-questioning patients in the future." (*Id.*) He believes H.B. 25-1312 "renders [him] unable to speak candidly about biological sex in [his] practice" and that he is "no longer allowed to use [his] preferred language in [his] practice." (*Id.* at ¶ 27.) Dr. Morrell is a member of DNH. (*Id.* at ¶ 2.)

Outside of his practice, and in his personal capacity, Dr. Morrell, "regularly speak[s] and write[s] on the issues of sex and gender as they relate to the medical profession." (*Id.* at ¶ 14.) In those speaking engagements and publications, he "opposes gender ideology... and raise[s] awareness about the dangers of gender-affirming care." (*Id.*) Dr. Morrell is "active on social media" and he "regularly publish[es] content that opposes gender ideology and refers to transgender-identifying individuals using biological pronouns and birth names rather than preferred pronouns or chosen names." (*Id.* at ¶ 16.)

### *Dr. Valeri Leswing and Mountain Pediatrics*

Dr. Leswing is a pediatrician who owns and operates Mountain Pediatrics in Evergreen. (1:25–cv–01572–RMR–MDB (Doc. No. 27-6 at ¶¶ 3–4).) Dr. Leswing "believe[s] that sex is determined at birth and is immutable, regardless of an individual's internal perceptions about their identity." (*Id.* at ¶ 6.) Dr. Leswing has "treated transgender-identifying, gender-dysphoric, and gender-questioning patients in [her] medical practice in the past .... [and] addressed these patients ... us[ing] biologically accurate pronouns and birth names." (*Id.* at ¶ 7.) She declines to use "'chosen names' connected to [a patient's] 'gender expression' or preferred pronouns that conflict with the patient's biological sex." (*Id.*) Dr. Leswing "anticipate[s] treating transgender-

7

**5-App-181**

identifying, gender-dysphoric, and gender-questioning patients in the future." (*Id.*) Dr. Leswing says that "H.B. 25-1312 threatens to punish deadnaming and misgendering," and as a result, she "must stop addressing or referring to individuals in [her] medical practice using biologically accurate pronouns, birth names, or other terms that are inconsistent with an individual's purported 'gender identity' or 'gender expression.'" (*Id.* at ¶ 23.) She says she fears "that, if [she] continue[s] to engage in [such] speech…[she] will be investigated by the Colorado Civil Rights Commission, sued by individuals, and face financial or equitable penalties." (*Id.*) Dr. Leswing is a member of DNH. (*Id.* at ¶ 2.)

Dr. Leswing's practice, Mountain Pediatrics, "maintains a Facebook page to advertise ... and communicate with the public." (*Id.* at ¶ 15.) Dr. Leswing "want[s] to post a statement on [the] Facebook page explaining to potential patients that ... [she] will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names." (*Id.*) She has also "considered doing a formal review" of the "literature" regarding gender identity and expression on Mountain Pediatrics Facebook page. However, Dr. Leswing has not made either post. (Division Exhibits at 138–39 (80:21–81:19) (Dr. Leswing's deposition).) In her deposition, Dr. Leswing cited H.B. 25-1312 and "not wanting to generate further angst and anger in [her] community" as reasons she has not made the posts in question. (*Id.* at 139–40 (81:11–13, 82:21–22); *see id.* at 139 (81:11–13) (saying "I stopped considering [posting the literature review] as much after the law was passed, because I think it will lead to further anger in people who disagree with me" and "I'm concerned that the State will come after me if I refer ... to the patient ... by their biological sex or ... their biological pronouns, including using their given birth name").)

***Committee of Five d/b/a XX-XY Athletics***

8

**5-App-182**

XX-XY Athletics ("XX-XY") is an "athletic-apparel retailer ... grounded in the belief that men and women are physiologically different; sex is binary, biological, and immutable." (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶ 1).) XX-XY generally sells its clothing online but it also "regularly" hosts "pop-up shops"—"physical, short-term retail locations"—at events in Colorado. (*Id.* at ¶¶ 32, 36–42; *see* 1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 347–352).) XX-XY makes apparel for men and women (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶ 33)), and has sold apparel to at least two transgender individuals. (Division Exhibits at 172–73).)

XX-XY's "brand messaging" "focuses almost exclusively on protecting women's sports from the unfair inclusion of biologically male athletes," and "regularly" deadnames and misgenders transgender athletes in its online communications. (1:25–cv–01668–RMR–MDB (Doc. No. 1 at ¶¶ 48, 67–90).) It is also XX-XY's policy to deadname and misgender customers and members of the public. (*Id.* at ¶¶ 93–96.) XX-XY communicates with the public at its pop-up shops, at speaking events and public engagements, and through online advertising, email, posts on social media, and online review boards. (*Id.* at ¶¶ 42–45.) Asserting organizational injury, XX-XY claims standing as a corporation. (*Id.* at ¶ 12.)

### *Doxa Enterprises d/b/a Born Again Used Books*

Born Again Used Books ("Born Again") is a store in Colorado Springs that sells books and provides "Christian literature and homeschool curricula." (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 23, 25).) Born Again "curates its selection in accordance with its Christian faith.... the store will not sell books with a message that it believes contradicts its mission of providing uplifting Christian support[,] [a]nd it seeks out books for sale that advance this mission." (*Id.* at ¶ 41.) However, Born Again, "serves everyone regardless of gender identity. That includes customers who present as transgender." (*Id.* at ¶ 4.) Born Again has had

**5-App-183**

transgender individuals patronize the store on at least three occasions. (Division Exhibits at 186–94).)

Born Again maintains that the "use [of] pronouns, titles, or other language that does not align with an individual's biological sex" is inconsistent with its values. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 63–78).) As such, "[w]hen asked to use pronouns, titles, or language that does not align with a customer's biological sex," Born Again employees "respectfully decline and instead intentionally, respectfully, and consistently use a form of address that does not contradict the customer's sex, such as the customer's first or last name." (*Id.* at ¶ 77.) Born Again says it seeks to "formalize" and publish its pronoun policy, and a blog post on the subject, in writing. (*Id.* at ¶¶ 79–88; *see* 1:25–cv–02177–RMR–MDB (Doc. Nos. 4-2; 4-3).) However, Born Again contends that H.B. 25-1312 prevents it from publishing its pronoun policy or blog post without fear of sanction. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶¶ 111–17).) It further contends H.B. 25-1312 has caused "anxiety" in its employees about informally maintaining the pronoun policy, but it nevertheless "intends" to continue using biological pronouns. (1:25–cv–02177–RMR–MDB (Doc. No. 56-1 at 520–21).) Asserting organizational injury, Born Again claims standing as an LLC. (1:25–cv–02177–RMR–MDB (Doc. No. 1 at ¶ 12).)

## IV.   The Motions to Dismiss

Defendants challenge Plaintiffs' standing to bring this pre-enforcement challenge.[2]

(Division Motion at 16–28; AG Motion (stating that the AG joins the Division Motion's standing

---

[2] Defendants also argue Plaintiffs' claims are not ripe, either under Article III or a prudential ripeness framework. (Division Motion at 29–30.)

The Article III ripeness argument overlaps with Defendants' pre-enforcement standing argument. (*See id.* at 30 ("For the same reasons outlined above that Plaintiffs lack standing, Plaintiffs have not shown any threatened injury that is sufficiently imminent to establish Article III ripeness."));

10

**5-App-184**

arguments), *id.* at 12–14.) The AG also argues he has Eleventh Amendment immunity. (AG

Motion at 6–12.)

## PROCEDURAL HISTORY

Plaintiffs initiated these actions during the spring and summer of 2025, following the

passage of H.B. 25-1312. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 1); 1:25–cv–01668–

RMR–MDB (Doc. No. 1); 1: 25–cv–02177–RMR–MDB (Doc. No. 1).) In light of the significant

factual and legal overlap across each suit, the cases were assigned to a single presiding and

magistrate judge. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 58); 1:25–cv–01668–RMR–MDB

(Doc. No. 59); 1: 25–cv–02177–RMR–MDB (Doc. No. 6).) The parties resisted consolidation,

(*see, e.g.*, 1:25–cv–01572–RMR–MDB (Doc. No. 74)), but agreed to a joint schedule for

jurisdictional discovery, the preliminary injunction motions ("PI Motions"), and the instant

Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 75); 1:25–cv–01668–RMR–MDB (Doc.

No. 64); 1: 25–cv–02177–RMR–MDB (Doc. No. 24).)

---

*Teva Pharms., USA, Inc. v. Weiser*, 709 F. Supp. 3d 1366, 1375 (D. Colo. 2023) ("Standing and
ripeness are closely related in that each focuses on whether the harm asserted has matured
sufficiently to warrant judicial intervention. In pre-enforcement challenges, moreover, standing
and ripeness often boil down to the same question." (internal citation and quotations omitted)
(quoting *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022), *Susan B. Anthony List v.
Driehaus*, 573 U.S. 149, 158 n.5 (2014))), *aff'd*, 2025 WL 2555552 (10th Cir. Sept. 5, 2025).

The prudential ripeness inquiry is slightly different. *See United States v. Supreme Ct. of New
Mexico*, 839 F.3d 888, 903 (10th Cir. 2016) (noting prudential ripeness "turn[s] on both the
fitness of the issues for judicial decision and the hardship to the parties of withholding court
consideration."). But here, Defendants say the lack of prudential ripeness requires dismissal for
"all the same reasons ... as ... standing," and their paragraph addressing this issue is merely a
conclusory rehash of their standing arguments. (*See* Division Motion at 30 (saying Plaintiffs lack
prudential ripeness because "Plaintiffs have shown no hardship where" (1) CPAN and PKC are
not regulated by CADA, (2) XX-XY and Born Again have not establish their conduct is
proscribed by CADA or that there is a credible threat of enforcement, and (3) Drs. Leswing and
Morrell have not established a chilling effect).) Because Defendants treat the prudential ripeness
arguments as coterminous with their standing arguments, the Court will not analyze the
prudential ripeness arguments separately.

Jurisdictional discovery was complete in January 2026, and the PI Motions were fully briefed in February. The PI Motions sought to enjoin Defendants from enforcing the gender expression and chosen name definitions as amended by H.B. 25-1312, as well as certain long-standing provisions in CADA that bar public accommodations from engaging in unwelcoming actions and communications. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 27 at 27); 1:25–cv–01668–RMR–MDB (Doc. No. 15 at 1–2); 1:25–cv–02177– RMR–MDB (Doc. No. 4 at 1–2).) On February 19, 2026, the Court held a hearing on the PI Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 107); 1:25–cv–01668–RMR–MDB (Doc. No. 92); 1:25–cv–02177–RMR–MDB (Doc. No. 54).) [3]

Following the parties' arguments, the Court issued an oral recommendation that the PI Motions be denied. (PI Recommendation at 78:24–92:18.) The Court emphasized the "clear showing" standard applicable to preliminary injunction motions, (*see id.* at 85:15–22 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008); *Am. Encore v. Fontes*, 152 F.4th 1097, 1106 (9th Cir. 2025))), and determined Plaintiffs fell short. (*Id.* at 91:18–21; *see id.* at 90:2–3 (finding "two of the three factors weigh against finding a credible threat of enforcement").) The Court also reasoned that the requested injunction was "exceptionally broad," seeking to strike long-standing portions of CADA and requesting the same relief as the operative Complaint, which also counseled against a preliminary injunction. (*Id.* at 80:3–81:4.) The Court noted that it reviewed the "voluminous" record on an "expedited basis, ... in order to give Plaintiffs a prompt hearing without disrupting the Court's docket," and that the PI Recommendation "should not be read as a decision on the

---

[3] These documents are the transcript of the PI motion hearing filed in each of the cases. Because the transcript contains the Court's Recommendation, the Court will refer to the transcript as the "PI Recommendation."

**5-App-186**

pending motions to dismiss." (*Id.* at 92:1–7; *see id.* at 92:8–12 ("A finding that Plaintiffs have not made a clear showing that is required to carry their burden on the preliminary injunction motions is not a prediction of the outcome under [the motion to dismiss] standard and with the benefit of full briefing on those … motions.").)

On March 31, 2026, the presiding Judge adopted this Court's Recommendation and denied the PI Motions. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 115); 1:25–cv–01668–RMR–MDB (Doc. No. 98); 1:25–cv–02177–RMR–MDB (Doc. No. 60).)[4] The presiding Judge emphasized the threshold considerations discussed in the PI Recommendation, including the scope of the relief requested. (PI Order at 11–16.) She also concurred with the Court's determination that Plaintiffs fell short of making a "clear showing" of a credible threat of enforcement. (*Id.* at 15–16, 22.)

All Plaintiffs have appealed the PI Order to the Tenth Circuit. (*See* 1:25–cv–01572–RMR–MDB (Doc. No. 118); 1:25–cv–01668–RMR–MDB (Doc. No. 101); 1:25–cv–02177–RMR–MDB (Doc. No. 63).) The appeals remain pending at the time of this Recommendation.

## LEGAL STANDARD

Federal Rule of Civil Procedure Rule 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Such dismissal is not a judgment on the merits of a plaintiff's case; rather, it is a determination that a court lacks authority to adjudicate the matter. *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking[,]" C*aballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019)

---

[4] The Court will refer to this document as the "PI Order."

**5-App-187**

(quotation omitted), and the dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

Challenges to subject matter jurisdiction may take two forms—a facial attack or a factual attack—each with distinct analytical frameworks. *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A facial challenge focuses on the sufficiency of the allegations in the complaint. *Id*. In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id*. Conversely, a factual challenge—the type of challenge at issue here—allows a party to "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id*. (quotation omitted).

In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations, but has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id*. (citation and quotations omitted); *see also Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) ("[A] court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion"). The burden of establishing subject matter jurisdiction by a preponderance of the evidence lies with the party asserting it. *U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

**ANALYSIS**

I. **Article III Standing**

Article III standing is a prerequisite to suit requiring "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*

*v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Defendants argue that Plaintiffs have failed to establish an injury in fact. (Division Motion at 16.) An injury-in-fact need not amount to an "actual arrest, prosecution, or other enforcement action," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), and can be found "even if a plaintiff has 'never been prosecuted or actively threatened with prosecution.'" *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1203 (D. Colo. 2023) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). A plaintiff seeking prospective relief demonstrates an injury in fact if he "alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Ward*, 321 F.3d at 1267 (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir. 1997)). Moreover, in the First Amendment context, a plaintiff can also demonstrate injury in fact by establishing that he suffers from an "ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights." *Id.* at 1267 (quoting *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987)) (emphasis in original).

"Line-drawing in standing cases is rarely easy," but in the First Amendment context, "the standing inquiry is particularly delicate." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006). Because "the First Amendment context creates unique interests ... [courts] apply the standing requirements somewhat more leniently, facilitating pre-enforcement suits." *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (citing *Ward*, 321 F.3d at 1267); *see also Colorado Union of Taxpayers, Inc. v. Griswold*, 2023 WL 5426581, at *2 (10th Cir. Aug. 23, 2023) (unpublished) (noting the court "appl[ies] a low evidentiary bar for pre-enforcement

15

**5-App-189**

standing on First Amendment claims."); *see also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st

Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the

evidentiary bar that must be met is extremely low.").

Still, "[a] plaintiff bringing a facial challenge to a statute on First Amendment grounds ...

must nonetheless establish an injury-in-fact sufficient to satisfy Article III's case-or-controversy

requirement." *Ward*, 321 F.3d at 1267 (citing *Phelps v. Hamilton,* 122 F.3d 1309, 1326 (10th

Cir. 1997)). Here, Defendants argue the following:

- The "Commerce Plaintiffs"—XX-XY and Born Again—have not established that

  their conduct is proscribed by CADA. (Division Motion at 23–28.)

- The Commerce Plaintiffs and the "Medical Plaintiffs"—Dr. Morrell, Dr. Leswing,

  and Mountain Pediatrics—have failed to demonstrate a credible threat of

  enforcement or chilling effect on their activities. (Division Motion at 21–23.)

- The "Advocacy Plaintiffs"—CPAN, PKC, DNH, and DE—lack standing because

  CPAN and PKC do not fit the definition of public accommodations,[5] and DNH

  and DE cannot assert standing through their members.

The Court considers each argument in turn.

## A.  Commerce and Medical Plaintiffs

1. <u>Have the Commerce Plaintiffs established by a preponderance of the evidence
   that they are engaged in activities that are arguably proscribed by CADA?</u>

Defendants argue the Commerce Plaintiffs' claimed injuries are too speculative to

support a pre-enforcement suit because they have not established that their specific conduct

violates CADA. (Division Motion at 19–21, 23–28.) Defendants' arguments boil down to two

---

[5] Defendants also say this argument applies with equal force to Dr. Morrell's personal speaking
activities outside of his practice. (Division Motion at 19.)

primary contentions: (1) the Commerce Plaintiffs have not demonstrated that instances of deadnaming or misgendering are likely to occur, and (2) even if they did occur, deadnaming and misgendering are not *per se* violations of CADA; instead they are but one factor in a "highly fact-specific" inquiry into whether the individual has been denied the full enjoyment of an accommodation. (Division Motion at 5, 19–21, 23–28.)

The Court rejects the first argument. While it may be difficult to say when exactly the Commerce Plaintiffs will deadname or misgender customers or use deadnaming or misgendering in their brand's communications, it is almost certain to occur. Indeed, the owners of both Commerce Plaintiffs testified that such instances *have already occurred* and that they do not intend to make any changes to their practices. (*See* Division Exhibits at 180 (5:13), 182 (58:11–12) (Sey deposition); Division Exhibits at 186–87 (23:17–24:9), 195 (3:16–25) (Smith deposition).)

The second question presents a closer call. Determining whether a CADA violation has occurred requires, as Defendants say, a fact-intensive inquiry. (PI Recommendation at 87:18–88:2; *see also* Division Exhibits at 208 (Sullivan Declaration) ("Whether a place of public accommodation would violate CADA by failing and/or refusing to use an individual's chosen name ... and/or how the individual chooses to be addressed based on gender identity would be highly fact specific and contains both subjective and objective elements.... [I]t requires a close analysis of all facts and context of the usage and the circumstances related to the usage, including how such usage relates to providing any good, service, facility, privilege, advantage, or accommodation to the general public").) Under this fact-intensive inquiry, it is at least possible that Plaintiffs' conduct will *not* trigger enforcement. However, it is also possible that their conduct *will* trigger enforcement. Applying a preponderance of the evidence standard, the

17

**5-App-191**

question is whether the evidence tips one way or the other. *See Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006) ("The preponderance of the evidence standard requires the party with the burden of proof to support its position with the greater weight of the evidence." (footnote omitted)).

Here, the Commerce Plaintiffs have not suggested that they will deadname or misgender customers occasionally or accidentally; they intend to do so on an ongoing basis and as a matter of practice and strongly held beliefs. For example, Jennifer Sey, the owner of XX-XY testified that the "vast majority of the time" XX-XY employees use pronouns and honorifics in interactions with customers at its pop-up shops and that, because the company is "adamant in adhering to the truth about biological reality," it will always use "biologically [ ]correct pronouns." (1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 459:23–24, 460:2–3, 463:14).) Similarly, Eric Smith, the owner of Born Again, testified that "gendered language comes up a lot" in interactions with customers and if "we saw a biological reality of a man and he said, call me ma'am, we would say we are just not going to do that[.]" (*Id.* at 534:67:18, 534:68:10–13 (cleaned up).)

Thus, while it is true that context matters, and that one particular instance of deadnaming or misgendering may not, in and of itself, constitute a violation of CADA, the type of conduct described by the Commerce Plaintiffs is at least more likely than not to give rise to a denial—or perceived denial—of services at some point in the future. Accordingly, they have established by a preponderance of the evidence that their conduct is arguably proscribed by CADA. *Scott v. Allen*, 153 F.4th 1088, 1096 (10th Cir. 2025) (saying a pre-enforcement plaintiff "need not show that his intended conduct *actually* violates the law, just that it *arguably* does" (emphasis in original)).

18

**5-App-192**

2.  <u>Have the Commerce and Medical Plaintiffs established by a preponderance of the evidence that there is a credible threat of enforcement?</u>

The credible threat prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Chiles v. Salazar*, 116 F.4th 1178, 1198 (10th Cir. 2024) (quoting *Peck*, 43 F.4th at 1133), *rev'd and remanded on other grounds*, 2026 WL 872307 (U.S. Mar. 31, 2026); *see Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987) ("[T]he Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official who has made no attempt to prosecute the plaintiff under the law at issue."); *see also Mangual*, 317 F.3d at 57 ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low."); *Peck*, 43 F.4th at 1129 ("[T]he First Amendment context creates unique interests.").

There are "at least three factors to be used in determining a credible fear of prosecution: (1) whether the plaintiff showed 'past enforcement against the same conduct'; (2) whether authority to initiate charges was 'not limited to a prosecutor or an agency' and, instead, 'any person' could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *303 Creative LLC*, 6 F.4th at 1174 (quoting *SBA List*, 573 U.S. at 164–65). "No one 'credible threat' factor is dispositive." *Chiles v. Salazar*, 2022 WL 17770837, at *4 (D. Colo. Dec. 19, 2022), *aff'd*, 116 F.4th 1178 (10th Cir. 2024), *rev'd and remanded on other grounds*, 2026 WL 872307 (U.S. Mar. 31, 2026).

As to past enforcement, Plaintiffs have not presented evidence of any enforcement action predicated on deadnaming or misgendering. (*See* PI Order at 20–22.) Nevertheless, the Court recognizes that one year is still a relatively limited period. It also recognizes that these suits

**5-App-193**

parallel the law's inception[6] and may be playing some role in the lack of enforcement. Thus, the

Court finds the past enforcement factor to be neutral. *See Darren Patterson Christian Acad. v.*

*Roy*, 699 F. Supp. 3d 1163, 1176 (D. Colo. 2023) (finding the past enforcement prong

"appear[ed] to be neutral" when the law was "new" and "being implemented for the first time

this academic year"); *see also id.* ("Even if this factor weighed against a finding of standing, that

would not torpedo Plaintiff's claims.").

The second factor weighs in Plaintiffs' favor because under CADA, "any (would be)

customer ... may file a complaint and initiate [enforcement proceedings]." *303 Creative LLC*, 6

F.4th at 1174, Thus, Plaintiffs must fear complaints brought not only by the State, but by any

person patronizing their business. *See SBA List*, 573 U.S. at 164 ("The credibility of that threat is

bolstered by the fact that authority to file a complaint ... is not limited to a prosecutor or an

agency. Instead, the ... statute allows 'any person' with knowledge of the purported violation to

file a complaint.").

The third factor—and, ultimately, the dispositive one here—is whether the State has

disavowed enforcement. *See Rocky Mountain Gun Owners*, 121 F.4th 96, 110 (10th Cir. 2024)

("The threat of prosecution is generally credible where the defendant 'has not disavowed any

intention of invoking' the statute against the plaintiff." (quoting *Babbitt v. United Farm Workers*

*Nat'l Union*, 442 U.S. 289, 298 (1979))).

Here, Defendant Sullivan offers some assurances by stating that deadnaming and

misgendering are not *per se* denials of service:

> 1) the public accommodation must intentionally treat a customer or prospective
> customer differently based on their protected class status; (2) the customer must,
> as a subjective matter, experience the conduct at issue to be a denial of the full

---

[6] For example, 1:25–cv–01572–RMR–MDB was filed May 19, 2025, three days after Governor
Polis signed the amendment into law.

and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation because of the customer's gender identity; and (3) the Division would have to determine that a reasonable person, under the circumstances, would experience the conduct to be a denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation based on their gender identity.

(Division Exhibits at 208, ¶ 11; PI Order at 18–19 (citing 1:25–cv–01668–RMR–MDB (Doc. No. 84-1 at 4)) (internal quotation marks omitted).) At the preliminary injunction stage, these statements created a meaningful hurdle for Plaintiffs. CADA enforcement decisions are highly "fact-specific" and because Defendants' representations indicated that "the mere act of speaking would not automatically trigger enforcement," (PI Recommendation at 87:18–88:2 (quoting Defendant Sullivan's declaration), 88:13–14)), the extraordinary remedy of a preliminary injunction was not appropriate. *See Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024); *see also U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989) ("A preliminary injunction is an extraordinary remedy, the exception rather than the rule.").

However, at the motion to dismiss stage, Plaintiffs' burden is relatively lighter. *See Celli*, 40 F.3d at 327; *see also Rocky Mountain Gun Owners*, 121 F.4th at 108; *Lujan*, 504 U.S. at 561. Viewed through that lens, the calculus is different. The ultimate question before the Court is not whether the status quo should be disrupted, and Defendants broadly enjoined, but whether Plaintiffs should be permitted to move their claims forward at all. Put simply, do Plaintiffs have enough assurances from Defendants, such that adjudication of these issues is unnecessary? The answer is no.

Defendant Sullivan's assurances, are not the kind of clear and definitive commitments courts recognize as sufficient at the motion to dismiss stage. *See e.g., Ward*, 321 F.3d at 1268

(finding no disavowal where the plaintiff had been given "no assurances" he would not be charged under the law in question). *Cf. D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (finding disavowal "where the ... prosecutor ... stated in an affidavit that he will *not* bring charges against [the plaintiff] for the conduct as he has described it" (emphasis in original)). She does not promise that complaints based on deadnaming or misgendering will always go unprosecuted. She promises only that enforcement will follow "a close analysis of all facts and context." (Division Exhibits at 208, ¶ 11. *See generally* PI Recommendation at 24:21–22 (noting that Defendants had not committed themselves to a "broad disavowal"; PI Order at 19–20 (where the presiding judge noted that "Defendants have not completely disavowed any possible prosecution.").) Defendant Sullivan's statements leave intact the State's full enforcement authority, and where a declaration continues to reserve rather than relinquish enforcement discretion, the disavowal is insufficient to halt the prosecution of a pre-enforcement action. *See Scott*, 153 F.4th at 1097 (declining to find disavowal where a state trooper "reserved the right" to file a criminal complaint against the plaintiff and the district attorney "[did] not disavow the possibility of a future prosecution"). In short, Defendants' failure to commit to a broad disavowal weighs against them, and with the balance of factors tipping in favor of Plaintiffs, the Court finds the credible threat of enforcement element satisfied.

> 3. Have the Medical Plaintiffs established by a preponderance of the evidence that their speech has been chilled?

In the First Amendment context, a plaintiff can demonstrate injury-in-fact by showing "the statute's chilling effect on his desire to exercise his First Amendment rights." *Peck*, 43 F.4th at 1129 (quoting *Ward*, 321 F.3d at 1267). Under the chilling effect test, "the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or conduct affected by the challenged government action; (2) evidence that the plaintiff has a present desire, though no

specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced." *Bella Health*, 699 F. Supp. 3d at 1203 (citing *Peck*, 43 F.4th at 1129–31).

There are two sets of allegations that appear to leverage the chilling effect test. First, the Medical Plaintiffs state they "would deadname and misgender patients but for H.B. 25-1312." (1:25-cv-01572-RMR-MDB (Doc. No. 98 at 22).) Second, they say they would like to publish materials that arguably give rise to statutory violations now that H.B. 25-1312 has passed. (*See* Division Exhibits at 138–40 (80:21–82:22) (Dr. Leswing's deposition).)[7]

The Medical Plaintiffs satisfy the first prong of the chilling effect test because there is no dispute that each previously implemented a policy or practice of deadnaming and misgendering customers and patients. They also satisfy the second prong because they have demonstrated a present desire to engage in that speech, even if no specific plans to do so at this time. *See Peck*, 43 F.4th at 1130–32 (finding this prong met where the plaintiff submitted an affidavit "clarify[ing] the type of speech she wishes to engage in" and "indicated that she would likely be in a position to make such statements in the future"). The third prong is also met because each plausibly alleges that the reason for self-censorship is a credible threat of prosecution. As found already, Defendant Sullivan's declaration—which may have been sufficient to warrant preserving the status quo at the preliminary injunction stage, *see supra* at 21–22,—reserves enforcement authority and leaves open the possibility of prosecution. This is enough to demonstrate a credible threat of enforcement and, in turn, a chilling effect supporting standing.

---

[7] Similarly, Born Again would like to formalize and circulate its pronoun policy to current and future employees, and post a blog on the subject, but has not done so out of fear of sanction. (*See* 1:25–cv–02177–RMR–MDB (Doc. Nos. 1 at ¶¶ 79–88; 4-2; 4-3).) The Court declines to address this issue, because it has already found that Born Again intends to engage in a course of conduct arguably proscribed by CADA, and faces a credible threat of enforcement. Still, the Court notes that Born Again's allegations also appear to demonstrate a chilling effect.

**5-App-197**

**B. Advocacy Organization Plaintiffs**

      1.  <u>Do CPAN and PKC meet the definition of public accommodation?</u>

CADA defines a "place of public accommodation" to include "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public[.]" Colo. Rev. Stat. § 24-34-600.3(1)(a). Defendants argue that, on its face, the definition of public accommodation cannot apply to advocacy organizations like CPAN and PKC which merely "hold[ ] events for the purpose of expressing their views," and "do not offer goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, coalition-building' or the other advocacy efforts[.]" (Division Motion at 18 (internal quotation marks omitted).)

Plaintiffs respond that CPAN and PKC may not be "places of public accommodation," but they nevertheless host some of their events at such places, bringing them within CADA's scope. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 14–15 (noting that section 601's title is "[d]iscrimination *in* places of public accommodation" (emphasis in original)).) The Court disagrees. Plaintiffs do not offer case law to support their construction, and the plain language of CADA betrays their interpretation.

CADA applies in the context of "sales to the public" or "services, facilities, privileges, advantages, or accommodations to the public." Colo. Rev. Stat. §24-34-600.3(1)(a). Neither CPAN nor PKC are in the business of selling goods to the public nor do they offer services, facilities, privileges, advantages or accommodations. Moreover, the mere fact that these entities hold an event inside a facility that meets the definition of public accommodation, does not transform them into public accommodations themselves.[8] The relevant inquiry under CADA

---

[8] And indeed, Defendant Sullivan has disavowed such a construction of CADA. (*See* Division Exhibit at 211, ¶ 18 (saying "it does not appear that Plaintiffs CPAN or PKC offer any good,

**5-App-198**

concerns the nature of the organization itself, not its partners, venues, or hosts.[9] Accordingly, the Court finds CPAN and PKC lack standing and recommends that they be dismissed from this action.

2.  Do DNH and DE have standing through their members?

"An association has standing to sue even if it has not been injured itself, so long as the association's members satisfy the constitutional minimum of Article III." *Colorado by & Through Colorado Dep't of Nat. Res., v. United States Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 963 (D. Colo. 2018). The associational standing inquiry is satisfied when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

---

service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions").

[9] Perhaps anticipating this conclusion, the Advocacy Organization Plaintiffs offer an alternative argument in a single paragraph: even if CPAN and PKC are not in danger of themselves violating CADA, the public accommodations hosting them are, and accordingly, "are unlikely to lease space ... out of fear that [CPAN and PKC's] practice of deadnaming and misgendering will incur liability for the venue itself." (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 17).) Plaintiffs say this potential enforcement against a third party indirectly chills their own First Amendment rights. At a high level, Plaintiffs are correct that an unregulated party can establish injury in fact based on the indirect effects of regulation on a third party. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 384–85 (2024). But Plaintiffs' argument is too underdeveloped to demonstrate "a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. Plaintiffs do not offer evidence that any public accommodation has actually refused, or is likely to refuse, to host their events. In fact, the opposite appears to be true. *See supra* at 5–6 (noting CPAN and PKC have held multiple events at public accommodations including, hotels and restaurants) Essentially, Plaintiffs ask the Court to infer, based solely on the fact that venues have previously received complaints about CPAN and PKC, that third parties will begin denying them space. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at 17).) That is an unsupported leap that the Court will not make.

25

Here, Defendants argue DNH and DE lack standing because their members lack standing. (Division Motion at 23.) However, the Court has already found that at least two DNH members, Drs. Morrell and Leswing, have standing. *See supra* at 22–23. Moreover, Defendants do not argue, and the Court does not independently see, any basis for finding DNH's purpose is not germane to the issues in the case, nor that the claims or relief involved in this suit cannot be adequately litigated by DNH, in the place of remaining members.

The Court reaches a different conclusion with respect to DE. In its briefing, DE, merely states that it "easily satisfy[ies] the requirements for associational standing," before making conclusory statements that it meets each element of the associational standing test. (1:25–cv–01572–RMR–MDB (Doc. No. 98 at n.*).)[10] At best, DE offers the declarations of PKC's executive director, Erin Lee, and CPAN's executive director, Lori Gimelshteyn. (1:25–cv–01572–RMR–MDB (Doc. Nos. 27-1 at ¶ 6; 27-2 at ¶ 2; 27-3 at ¶ 2).) Both Ms. Lee and Ms. Gimelshteyn say they are DE members, and DE says those individuals "would otherwise have standing to sue in their own right," but that assertion is also conclusory and unsupported. *See Vianello v. City of Prairie Vill., Kansas*, 812 F. Supp. 3d 1207, 1210 (D. Kan. 2025) ("Mere conclusory allegations of jurisdiction are not enough." (citing *United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999))).[11] In short, DE has not carried its burden of establishing standing. *See Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 ("[T]he plaintiffs bear the burden of establishing standing.").

## II.    Defendant Weiser's Eleventh Amendment Immunity

---

[10] Plaintiffs' brief also states that "Defendants don't dispute that ... Defending Education and Do No Harm have associational standing through their members." But as noted, Defendants *do* dispute this. (Division Motion at 23.)

[11] Moreover, the Court has already found that neither PKC nor CPAN have standing in this matter. (*See supra* at 24–25.).

**5-App-200**

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). "It also extends to 'suit[s] against a state official in his or her official capacity' because such suits are 'no different from a suit against the State itself.'" *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

However, Eleventh Amendment immunity "is not absolute." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). Indeed, and as is relevant here, *Ex parte Young*, 209 U.S. 123 (1908) "created an exception under which individuals can sue state officers in their official capacities if the lawsuit seeks prospective relief for an ongoing violation of federal law." *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024) (citing 209 U.S. 123, 159–60 (1908)). To come within the *Ex parte Young* exception, the state official whom a plaintiff seeks to enjoin must have (1) "a particular duty to enforce" the challenged law and (2) "a demonstrated willingness to exercise that duty." *Free Speech Coal.*, 119 F.4th at 736 (citations and quotations omitted).

### A. Particular Duty to Enforce

"CADA establishes an administrative system for the resolution of discrimination claims." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 628 (2018). Claims may be brought by any aggrieved person, the Colorado Civil Rights Commission, or the AG. *See* Colo. Rev. Stat. § 24-34-306(1)(a)–(b). Complaints are reviewed by the Colorado Civil Rights Division. *Masterpiece Cakeshop, Inc. v. Scardina*, 556 P.3d 1238, 1246 (Colo. 2024) (citing Colo. Rev. Stat. 24-34-306(2)(a)). If the Division finds probable cause for a CADA violation, the matter can be referred to the Commission. *Id.* (citing Colo. Rev. Stat. § 24-34-306(4)). The

**5-App-201**

Commission, in turn, decides whether to initiate a formal hearing before a state administrative

law judge ("ALJ"), who hears evidence and argument before issuing a written decision. *Id.* at

1246–47 (citing Colo. Rev. Stat. § 24-34-306(4)). When the Commission decides to pursue a

case, the AG's office is tasked with prosecuting that case before an ALJ. Colo. Rev. Stat. § 24-

34-306(8); 3 Colo. Code Regs. § 708-1:10.7 ("The case in support of the complaint shall be

presented at the hearing by the attorney general's office as counsel in support of the

complaint."). In other words, the AG's role in CADA enforcement is two-fold: a discretionary

ability to bring complaints, and a mandate that he prosecute complaints on behalf of the

Commission.

One Court in this District has already concluded that the AG's connection to CADA

enforcement is sufficient to constitute a particular duty to enforce the law. *See Masterpiece

Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1253 (D. Colo. 2019). Though he does not point

to any conflicting decisions, the AG says the Court should decline to follow that decision. (AG

Motion at 9.) He argues his prosecution efforts before an ALJ are akin to ministerial work by an

agent tasked with advancing the Commission's goals and thus are not true independent or

discretionary enforcement decisions. (*Id.* at 9–11.) But the Tenth Circuit has explained that an

official need only have "some connection" to the enforcement of a law, not necessarily a "special

connection." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).

Accordingly, the Tenth Circuit has applied *Ex parte Young* in cases where, like here, the state

officer was "not specifically empowered to ensure compliance with the statute at issue," but

"clearly [has] assisted … in giving effect to the law." *Id.*

In *Bella Health*, the AG asserted Eleventh Amendment immunity from a suit involving

actions referred to him by the State Nursing Board. 699 F. Supp. 3d at 1210–11. As in this case,

28

**5-App-202**

the AG argued that his participation in enforcement proceedings was akin to "client-service duties," not independent enforcement. *Id.* at 1335. The Honorable Daniel D. Domenico rejected that argument. He concluded that the duty to prosecute charges referred by the Nursing Board "easily me[t] the requirements of *Ex Parte Young.*" *Id.* at 1335–36; *see Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253 ("Because the Attorney General must represent the Commission at a hearing in support of the complaint ... I conclude the Attorney General has a duty to enforce C.R.S. § 24-34-601(2)(a).").

So too here. The AG is not statutorily required to bring complaints, nor is he tasked with choosing the complaints to bring before an ALJ, but he has an important role to play when he's called upon to appear on the Commission's behalf. Under the applicable law, the AG's legal representation, and by extension, his actions in furtherance of enforcement, are not discretionary. He is required to assist the Commission in their enforcement efforts, and this connection to enforcement is sufficient to meet the requirements of *Ex Parte Young.*

### B. Demonstrated Willingness to Enforce

The *Ex parte Young* exception may be "narrow," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021), but it is hardly an insurmountable hurdle. Here, the Court's credible-threat finding, *see supra* at 19–22, leaves little room for doubt on the demonstrated-willingness prong. Indeed, the analysis overlaps significantly. Moreover, a "demonstrated willingness" can be attributed to the AG himself because, as noted in the preceding section, he has a meaningful role in enforcement. Additionally, the AG does not dispute that he regularly prosecutes discrimination charges at Commission hearings.

Finally, it is undisputed that the Commission's regulations identify the AG as its attorney for administrative enforcement actions. (AG Motion at 10, fn.3); *see Masterpiece Cakeshop*, 445

**5-App-203**

F.Supp.3d at 1253 ("At an administrative hearing on a charge of discrimination, '[t]he case in support of the complaint shall be presented at the hearing by one of the commission's attorneys or agents.' According to the Commission's Rules and Regulations, the Commission's 'attorney' is the Attorney General's office." (internal citations omitted) (citing and quoting Colo. Rev. Stat. 24-34-306(8); 3 C.C.R. 708-1:10.7(A)(3); 3 C.C.R. 708-1:10.7(B))). And because the AG has not disavowed this role in this context, it is reasonable to conclude that the AG would appear on the Commission's behalf if and when they choose to prosecute a denial of services predicated on deadnaming or misgendering.

The *Ex parte Young* exception is satisfied. *See Masterpiece Cakeshop*, 445 F. Supp. 3d at 1253 ("The Attorney General has also demonstrated a willingness to enforce [CADA].").

## CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that The Attorney General's Consolidated Motion to Dismiss and the Division and Commission Defendants' Consolidated Motion to Dismiss be **GRANTED in part and DENIED in part**. The Court further

**RECOMMENDS** that Defending Education, Colorado Parent Advocacy Network and Protect Kids Colorado's claims be dismissed without prejudice for lack of standing.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will

**5-App-204**

not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 1st day of May, 2026.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge

31

**5-App-205**